IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
(Jackson Division)

UNITED STATES OF AMERICA and,
the STATE OF MISSISSIPPI,                          )
                                                    )
                                                    )
                          Plaintiffs,               )        Case: No. 3:12-cv-790 TSL-MTP
                                                    )
            v.                                      )        <u>CONSENT DECREE</u>
                                                    )
                                                    )
THE CITY OF JACKSON, MISSISSIPPI,                   )
                                                    )
                          Defendant.                )
_____             )

# TABLE OF CONTENTS

I. JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

II. APPLICABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III. OBJECTIVES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV. DEFINITIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

V. REVIEW OF DELIVERABLES/CERTIFICATION OF DELIVERABALES . . . 16

VI. COMPLIANCE REQUIRMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

VII. CIVIL PENALTY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

VIII. SUPPLEMENTAL ENVIRONMENTAL PROJECT. . . . . . . . . . . . . . . . . . . 72

IX. REPORTING REQUIREMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .75

X. STIPULATED PENALTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

XI. FORCE MAJEURE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .84

XII. DISPUTE RESOLUTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

XIII. RIGHT OF ENTRY AND INFORMATION COLLECTION
        AND RETENTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

XIV. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS. . . . . . . . . . . . . 91

XV. COSTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

XVI. NOTICES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

XVII. EFFECTIVE DATE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

XVIII. RETENTION OF JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

XIX. MODIFICATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

XX. TERMINATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .96

XXI.  PUBLIC PARTICIPATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

XXII.  SIGNATORIES/SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

XXIII.  INTEGRATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

XXIV.  FINAL JUDGMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .98

XXV.  APPENDICES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .98

WHEREAS, Plaintiff, the United States of America ("United States"), by the authority of the Attorney General of the United States and through its undersigned counsel, acting at the request and on behalf of the United States Environmental Protection Agency ("EPA"), filed a Complaint ("Complaint") concurrently with the lodging of this Consent Decree alleging that Defendant, the City of Jackson, Mississippi (the "City"), has violated and continues to violate Sections 301 of the Clean Water Act, 33 U.S.C. § 1311 ("CWA"), and terms and conditions of its National Pollutant Discharge Elimination System ("NPDES") permits issued under Section 402 of the CWA, 33 U.S.C. § 1342;

WHEREAS, Plaintiff, the State of Mississippi (the "State"), acting through the Mississippi Commission on Environmental Quality and the Mississippi Department of Environmental Quality (collectively, "MDEQ"), joined in the Complaint and seeks injunctive relief and civil penalties for the City's alleged violations of the Mississippi Air and Water Pollution Control Law, Miss. Code Ann. § 49-17-1 *et seq.*;

WHEREAS, the State is also a Plaintiff in this action and is joined as a party under Section 309(e) of the CWA, 33 U.S.C. § 1319(e), which requires the state in which a municipality is located to be joined as a party whenever the municipality is a party to a civil action brought by the United States under Section 309 of the CWA;

WHEREAS, MDEQ has been authorized by EPA to administer the NPDES program pursuant to Section 402(b) of the CWA, 33 U.S.C. § 1342(b);

WHEREAS, the City is a "municipality" pursuant to Section 502 of the CWA, 33 U.S.C. § 1362;

-4-

WHEREAS, the City's Wastewater Collection and Transmission System ("WCTS") transports wastewater to three (3) publicly owned wastewater treatment plants ("WWTPs"): the Savanna Street Wastewater Treatment Plant ("Savanna Street WWTP"), the Trahon/Big Creek Wastewater Treatment Plant ("Trahon WWTP"), and the Presidential Hills Wastewater Treatment Plant ("Presidential Hills WWTP"), which are operated by the City pursuant to NPDES permit numbers MS0024295, MS0044059 and MS0030295, respectively ("NPDES Permits");

WHEREAS, EPA and MDEQ have determined, based upon information provided by the City, that the City has had at least 2,300 unauthorized Sanitary Sewer Overflows ("SSOs") in the past five (5) years;

WHEREAS, EPA and MDEQ have determined that the City has experienced a number of Prohibited Bypasses, in which the Savanna Street WWTP has discharged wastewater without required primary and/or Secondary Treatment into the Pearl River, a water of the United States;

WHEREAS, the City has reported to MDEQ a number of violations of the effluent limitations in the NPDES Permits;

WHEREAS, EPA and MDEQ have determined that the City had no effective system of SSO reporting or record-keeping, and has thus failed to comply with the reporting requirements of its NPDES Permits;

WHEREAS, the United States and the State contend that these SSOs, Prohibited Bypasses, effluent limit exceedances, and reporting failures are violations of the CWA, Miss. Code Ann. § 49-17-29, and the City's NPDES Permits;

WHEREAS, on September 10, 2010, MDEQ and the City entered into an Agreed Order, as amended on October 11, 2010 and again amended on September 29, 2011, a copy of which is attached hereto as Appendix A, that includes requirements for the City to address certain violations and other specific environmental issues at the Savanna WWTP and pay a civil penalty of $240,000 (the "MDEQ Agreed Order I");

WHEREAS, on August 23, 2011, MDEQ and the City entered into an Agreed Order, a copy of which is attached hereto as Appendix B, that requires the City to address certain violations and other specific environmental issues at the Presidential Hills WWTP and pay a civil penalty of $22,500 (the "MDEQ Agreed Order II");

WHEREAS, on May 4, 2012, MDEQ issued to the City a revised NPDES Permit for the Savanna Street WWTP that includes more stringent effluent limits for the nutrients Nitrogen (Total) and Phosphorous (Total), and more stringent effluent limits for parameters Ammonia Nitrogen (Nov-Oct); Flow (Nov-Apr); Oxygen Demand, Carbonaceous (Nov-Oct); Solids (Total Suspended) Effluent (Nov-Apr); % Effect Static Renewal 7-Day Chronic Ceriodaphnia, Effluent (Jan-Dec); and % Effect Static Renewal 7-Day Chronic Pimephales, Effluent (Jan-Dec);

WHEREAS, the City contends that it is not currently able to meet the new effluent limits for these nutrients;

WHEREAS, this Consent Decree requires the City to develop, submit, finalize, and implement plans for the continued improvement of its WCTS and WWTPs; to eliminate SSOs, effluent limit violations (including any violations of the new effluent limits for nutrients), and reporting violations; and to minimize Prohibited Bypasses;

WHEREAS, the Parties to this Consent Decree have negotiated in good faith and have reached a settlement of the issues raised in the Complaint;

WHEREAS, the City's agreement to this Consent Decree is not an admission of liability, except for the City's consent to jurisdiction and venue as provided in Section I of this Consent Decree, nor is it an adjudication or admission of any law or fact;

WHEREAS, the Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation between the Parties and that this Consent Decree is fair, reasonable, and in the public interest.

NOW THEREFORE, with the consent of the Parties, it is hereby ORDERED, ADJUDGED and DECREED as follows:

## I. **JURISDICTION AND VENUE**

1.      This Court has jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Section 309(b) of the CWA, 33 U.S.C. § 1319(b), and over the Parties.  This Court has supplemental jurisdiction over the state law claims asserted by the State pursuant to 28 U.S.C. § 1367.  Venue is proper in the Southern District of Mississippi pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b), and 28 U.S.C. §§ 1391(b) and 1395(a), because the violations alleged in the Complaint are alleged to have occurred in this judicial district.  For purposes of this Decree, or any action to enforce this Consent Decree, the City consents to the Court's jurisdiction over this Consent Decree and any such action and over the City and consents to venue in this judicial district.

2.     For purposes of this Consent Decree, the City agrees that the Complaint states claims upon which relief may be granted pursuant to Sections 309(b) of the CWA, 33 U.S.C. § 1319(b), and Miss. Code Ann. § 49-17-29 and § 49-17-43.

## II. APPLICABILITY

3.     The obligations of this Consent Decree apply to and are binding upon the United States, the State, and upon the City and any successors, assigns, or other entities or persons otherwise bound by law.

4.     No transfer of ownership or operation of the Sewer System, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve the City of its obligation to ensure that the terms of this Consent Decree are implemented.  At least thirty (30) Days prior to such transfer, the City shall provide a copy of this Consent Decree to the proposed transferee and shall simultaneously provide written notice of the prospective transfer, together with a copy of the proposed written agreement, to EPA Region IV, the United States Department of Justice and MDEQ, in accordance with Section XVI of this Consent Decree (Notices).  The City shall require, as a condition of any sale or transfer, that the purchaser or transferee agrees in writing to be bound by this Consent Decree and submit to the jurisdiction of the Court for its enforcement.  Any attempt to transfer ownership or operation of the Sewer System without complying with this Paragraph constitutes a violation of this Consent Decree.

5.     The City shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include compliance with any provision of this Consent Decree, as well as to any contractor retained to perform work required under this Consent

Decree.  The City shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree.

6.      In any action to enforce this Consent Decree, the City shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

### III. OBJECTIVES

7.      All plans, measures, reports, construction, maintenance, operational requirements, and other obligations in this Consent Decree or resulting from the activities required by this Consent Decree shall have the objective of causing the City to achieve and maintain full compliance with the CWA, the Mississippi Air and Water Pollution Control Law, and the NPDES Permits, including the elimination of all Sanitary Sewer Overflows.

### IV. DEFINITIONS

8.      Terms used in this Consent Decree that are defined in the CWA or in regulations promulgated pursuant to the CWA (including, without limitation, those terms defined in Section 502 of the CWA, 33 U.S.C § 1362, and at 40 C.F.R. § 122.2) shall have the meanings assigned to them in the CWA, 33 U.S.C. §§ 1251 *et seq.*, and regulations promulgated under the CWA, unless otherwise provided in this Consent Decree.  Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

(a)      "Building Backup" shall mean a wastewater release or backup into a building that is caused by blockages, flow conditions, or other malfunctions in the Wastewater Collection and Transmission System.  A wastewater backup or release that is caused by blockages, flow conditions, or other malfunctions of a Private Lateral is not a Building Backup.

(b)     "Calendar Quarter" shall mean the three (3)-month periods ending on March 31, June 30, September 30, and December 31.

(c)     "Calendar Year" shall mean the twelve (12)-month period starting on January 1 and ending on December 31.

(d)     "Certification" or "certify" when used in this Consent Decree shall require the City to comply with Paragraph 16 of this Consent Decree.

(e)     "The City" or "Defendant" shall mean the City of Jackson, Mississippi, a municipal corporation, including all of its departments, agencies, instrumentalities such as the Public Works Department, and any successor thereto.

(f)     "CMOM" or "Capacity, Management, Operations, and Maintenance" shall mean a program of accepted industry practices to properly manage, operate and maintain sanitary wastewater collection, transmission and treatment systems, investigate capacity-constrained areas of these systems, and respond to SSO events.

(g)     "Complaint" shall mean the complaint filed by the United States and the State in this action.

(h)     "Consent Decree" or "Decree" shall mean this Decree and all appendices attached hereto listed in Section XXV.  In the event of a conflict between this document and any appendix, this document shall control.

(i)     "CWA" shall mean the Clean Water Act, as amended, 33 U.S.C. §§ 1251, *et seq.*

(j)     "Date of Entry" shall mean the date on which this Consent Decree is entered by the United States District Court for the Southern District of Mississippi.

-10-

(k)     "Date of Lodging" shall mean the date this Consent Decree is filed for lodging with the Clerk of the Court for the United States District Court for the Southern District of Mississippi.

(l)     "Day" shall mean a calendar day unless expressly stated to be a business day.  In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next business day.

(m)     "Deliverable" shall mean any written document required to be prepared and/or submitted by or on behalf of the City pursuant to this Consent Decree.

(n)     "DOJ" shall mean the United States Department of Justice and any of its successor departments or agencies.

(o)     "EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies.

(p)     "Excessive Inflow/Infiltration" or "Excessive I/I" shall have the meaning provided in 40 C.F.R. § 35.2005(b)(16).

(q)     "Force Main" shall mean any pipe that receives and conveys, under pressure, wastewater from the discharge side of a pump.  A Force Main is intended to convey wastewater under pressure.

(r)     "Gravity Sewer Line" or "Gravity Sewer" shall mean a pipe that receives, contains and conveys wastewater not normally under pressure, but is intended to flow unassisted under the influence of gravity.

(s)     "Infiltration" as defined by 40 C.F.R. § 35.2005(b)(20) shall mean water other than wastewater that enters the WCTS (including sewer service connections and foundation drains) from the ground through such means as defective pipes, pipe joints, connections, or manholes.

(t)     "Inflow" as defined by 40 C.F.R. § 35.2005(b)(21) shall mean water other than wastewater that enters the WCTS (including sewer service connections) from sources such as, but not limited to, roof leaders, cellar drains, yard drains, area drains, drains from springs and swampy areas, manhole covers, cross connections between storm sewers and sanitary sewers, catch basins, cooling towers, storm water, surface runoff, street wash waters, or drainage.

(u)     "I/I" shall mean the total quantity of water from inflow, infiltration, and rainfall induced inflow and infiltration without distinguishing the source.

(v)     "Major Gravity Line" shall mean any of the following:

(i)     all Gravity Sewer Lines that are twelve (12) inches in diameter or larger;

(ii)     all Gravity Sewer Lines that convey wastewater from one pumping station service area to another pumping station service area; and

(iii)     all Gravity Sewer Lines that have caused or contributed, or that the City knows will likely cause or contribute to capacity-related SSOs.

(w)     "MDEQ" shall mean the Mississippi Department of Environmental Quality and any of its successor departments or agencies of the State.

(x)     "NPDES" shall mean the National Pollutant Discharge Elimination System authorized under Section 402 of the CWA, 33 U.S.C. § 1342.

(y)     "NPDES Permits" shall mean NPDES permit No. MS0024295 issued to the City  pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342, for the Savanna Street WWTP; NPDES permit No MS0044059 issued to the City pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342, for the Trahon/Big Creek WWTP;  NPDES permit No. MS0030295 issued to the City pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342, for the Presidential Hills WWTP; and any future extended, modified, or reissued permits.

(z)     "Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral.

(aa)    "Parties" shall mean the United States of America on behalf of EPA, the State on behalf of MDEQ, and the City.

(bb)    "Plaintiffs" shall mean the United States of America on behalf of EPA and the State of Mississippi on behalf of MDEQ.

(cc)    "Private Lateral" shall mean that portion of a sanitary sewer conveyance pipe that extends from the wastewater main to the single-family, multi-family, apartment, or other dwelling unit or commercial or industrial structure to which wastewater service is or has been provided.

(dd)    "Prohibited Bypass" shall mean the intentional diversion of waste streams from any portion of a treatment facility which is prohibited pursuant to the terms set forth at 40 C.F.R. § 122.41(m).

(ee)    "Public Document Repository" or "PDR" shall mean the City of Jackson's Eudora Welty Library, located at 300 N. State Street, Jackson, Mississippi  39201, and the City's website, http://www.jacksonms.gov/home/index.php.

-13-

(ff)     "Publicly Owned Treatment Works" or "POTW" shall mean a publicly owned treatment works or POTW as defined in 40 C.F.R. § 403.3(q), and includes the WCTS and the WWTPs as defined in this Consent Decree.

(gg)     "Pump Station" shall mean facilities comprised of pumps which lift wastewater to a higher hydraulic elevation, including all related electrical, mechanical, and structural systems necessary to the operation of that pump station.

(hh)     "Sanitary Sewer Overflow" or "SSO" shall mean any discharge of wastewater to waters of the United States or the State from the City's Sewer System through a point source not specified in any NPDES permit, as well as any overflow, spill, or release of wastewater to public or private property from the Sewer System that may not have reached waters of the United States or the State, including all Building Backups.

(ii)     "Secondary Treatment" is a biological wastewater treatment technology required by the Clean Water Act for discharges from Publicly Owned Treatment Works, as that term is defined at 40 C.F.R. § 403.3(q).  The minimum level of effluent quality attainable through the application of Secondary Treatment is established in 40 C.F.R. § 133.102 in terms of the parameters for 5-day biochemical oxygen demand ("$BOD_5$") concentration and percent removal, total suspended solids ("TSS") concentration and percent removal, and pH.

(jj)     "Section" shall mean a portion of this Consent Decree identified by a Roman numeral.

(kk)     "Sewershed" shall mean the subdivisions of the City's WCTS containing sewers that are primarily hydraulically linked as identified on Appendix C, attached hereto and incorporated herein.

(ll)    "Sewer System" shall mean the WCTS and the WWTPs.

(mm)    "State" shall mean the State of Mississippi including all of its departments, agencies, and instrumentalities.

(nn)    "Timely" when applied to the submittal of a Deliverable shall mean submitted no later than the deadline established in this Consent Decree (or in a document approved pursuant to this Consent Decree) and containing all of the elements pertaining to the submittal as set forth in this Consent Decree (or in a document approved pursuant to this Consent Decree). "Timely," when applied to the implementation of any Work shall mean implemented no later than the deadline established in this Consent Decree (or in a document approved pursuant to this Consent Decree) and in accordance with the elements pertaining to such Work as set forth in this Consent Decree (or in a document approved pursuant to this Consent Decree).

(oo)    "United States" shall mean the United States of America, acting on behalf of EPA, including its departments, agencies, and instrumentalities.

(pp)    "Wastewater Collection and Transmission System" or "WCTS" shall mean the municipal wastewater collection, retention and transmission system, including all pipes, Force Mains, Gravity Sewer Lines, Pump Stations, pumps, manholes, and appurtenances thereto, which are owned or operated by the City.

(qq)    "Wastewater Treatment Plant" or "WWTP" shall mean devices or systems used in the storage, treatment, recycling, and reclamation of municipal wastewater. For purposes of this Consent Decree, this definition shall include all facilities owned, managed, operated, and maintained by the City, including but not limited to the following treatment facilities: the Savanna Street WWTP located at 3810 I-55 South & Savanna Street, Jackson, MS 39121; the

-15-

Trahon/Big Creek WWTP located at One Apache Dr., Landfill Road, Byram, Mississippi; the Presidential Hills WWTP located at Franklin D. Roosevelt Dr. W, Jackson, Mississippi; and all components of such sewage treatment plants.

    (rr) "Work" shall mean all activities the City is required to perform under this Consent Decree.

## V. <u>REVIEW OF DELIVERABLES/CERTIFICATION OF DELIVERABLES</u>

   9. <u>Public Document Repository</u>.  Within seven (7) Days after a Deliverable is submitted to EPA, the City shall place a copy in the PDR along with a one (1)-page instruction flyer containing a brief synopsis of the Deliverable and instructions on how to navigate to the City's website.  Within seven (7) Days after EPA's approval, approval contingent upon conditions, or modification by EPA, the City shall place a copy of such version of the Deliverable in the PDR.  This copy shall replace all previous copies of that Deliverable in the PDR and shall remain in the PDR along with all comments until termination of this Consent Decree.  In addition, the City shall maintain in the PDR a listing of all Deliverables.

   10. <u>Copy to MDEQ</u>.  The City shall provide a copy of any Deliverable to MDEQ at the same time such Deliverable is due to EPA.

   11. <u>EPA Action on Deliverables</u>.  After review of any Deliverable that is required to be submitted pursuant to this Consent Decree, EPA, after consultation with MDEQ, shall in writing:

    (a) approve the submission;

    (b) approve the submission upon specified conditions;

    (c) approve part of the submission and disapprove the remainder; or

(d)     disapprove the submission.

12.     <u>Approved Deliverables</u>.  If a Deliverable is approved by EPA pursuant to Paragraph 11.(a), the City shall take all actions required by the Deliverable in accordance with the schedules and requirements of the Deliverable as approved.  If the Deliverable is conditionally approved or approved only in part, pursuant to Paragraph 11.(b) or (c), the City shall, upon written direction from EPA, after consultation with MDEQ, take all actions required by the approved plan, report, or other item that EPA, after consultation with MDEQ, determines are technically severable from any disapproved portions, subject to the City's right to dispute only the specified conditions or the disapproved portions, under Section XII of this Consent Decree (Dispute Resolution).  Following EPA approval of any Deliverable or portion thereof, such Deliverable or portion thereof so approved shall be incorporated into and become enforceable under this Consent Decree.

13.     <u>Disapproved Deliverables</u>.  If the Deliverable is disapproved in whole or in part pursuant to Paragraph 11.(c) or (d), the City shall, within thirty (30) Days or such other time as EPA and the City agree to in writing, correct all deficiencies and resubmit to EPA the Deliverable, or disapproved portion thereof, for approval, in accordance with Paragraphs 11 and 12.  If the resubmission is approved in whole or in part, the City shall proceed in accordance with Paragraph 12.

14.     <u>Stipulated Penalties Accruing</u>.  Any stipulated penalties applicable to the original Deliverable, as provided in Section X of this Decree, shall accrue during the thirty (30)-Day period or other specified period, but shall not be payable unless the resubmitted Deliverable is untimely or is disapproved in whole or in part; provided that, if the original submission was so

deficient as to constitute a material breach of the City's obligations under this Decree, the stipulated penalties applicable to the original submission may be due and payable notwithstanding any subsequent resubmission.

15.    Resubmitted Deliverable.  If a resubmitted Deliverable, or portion thereof, is disapproved in whole or in part, EPA, after consultation with MDEQ, may again require the City to correct any deficiencies, in accordance with preceding Paragraph 13, or may itself correct any deficiencies, subject to the City's right to invoke Dispute Resolution and the right of EPA to seek stipulated penalties as provided in preceding Paragraph 14.  Upon EPA's correction of any deficiencies, such resubmitted plan, report, or other item, or portion thereof will be incorporated into and become enforceable under this Consent Decree and shall be implemented by the City according to the approved schedule subject to the City's right to invoke Dispute Resolution.

16.    Certification.  In all Deliverables, notices, documents or reports submitted to the United States and State pursuant to this Consent Decree, the City shall, by a senior City management official, sign and certify such notices, documents and reports as follows:

> *I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering such information, the information submitted is, to the best of my knowledge and belief, true, accurate and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.*

## VI.  COMPLIANCE REQUIREMENTS

### A. Summary of the Sewer System Remedial Actions

17.    The remedial actions for the City's Sewer System consist of a phased approach for the evaluation and rehabilitation of the City's WCTS (Section VI.B); the development and

implementation of a Comprehensive Performance Evaluation ("CPE") and Composite Correction Program ("CCP") for the Savanna Street WWTP (Section VI.C); the development and implementation of programs to insure proper Capacity, Management, Operations and Maintenance of the Sewer System ("CMOM") (Section VI.D); and the implementation of certain work set forth in MDEQ Agreed Orders I and II (Section VI.E).

18.     The evaluation and rehabilitation of the WCTS consist of a multi-phased program which will result in a prioritized analysis and evaluation of the City's WCTS, the identification of deficiencies, and the correction of deficiencies.  The City shall first develop and implement a West Bank Interceptor Work Plan and a West Bank Interceptor Rehabilitation Plan pursuant to which the City will conduct sewage flow monitoring and inspection of the West Bank Interceptor to identify and remediate any structural deficiencies in the West Bank Interceptor.  The City shall also develop and implement a Prioritization Work Plan and a Prioritization Report pursuant to which the City will estimate the severity of I/I within each Sewershed comprising the WCTS; map the Sewer System; assess the capacity of the WCTS; and establish Sewershed priorities for further evaluation and rehabilitation.  The City shall also develop and implement a Sewershed Evaluation Plan that will outline how Sewersheds or groups of Sewersheds will be assessed in phases pursuant to the approved schedules set forth in the Prioritization Report.  These evaluations will determine the extent of rehabilitative needs and corrective actions the City shall perform in the WCTS pursuant to an Evaluation Report/Rehabilitation Plan to meet the objectives of this Consent Decree.  Such rehabilitative needs and corrective actions shall be completed for the Sewersheds or groups of Sewersheds in accordance with an approved schedule as set forth in the Evaluation Report/Rehabilitation Plan for that Sewershed or groups of

Sewersheds, provided, however, that all such rehabilitative needs and corrective actions shall be completed on or before two hundred seven (207) months after the Date of Entry of this Consent Decree.

19.     The CPE consists of an in-depth diagnostic evaluation of the capacity and operation of the Savanna Street WWTP and its ability to comply with the NPDES Permit including eliminating Prohibited Bypasses.  Based on this evaluation, the CCP shall identify rehabilitative needs and corrective actions to address problems identified in the CPE which shall be completed on or before sixty (60) months after EPA's approval of the CCP.

20.     The CMOM programs that the City will develop and implement include the following: Training Program; Capacity Assurance Program; Sewer Overflow Response Plan; Inter-Jurisdictional Agreement Program; Private Lateral Program; Water Quality Monitoring Program; Pump Station Operations Program; Fats, Oils and Grease Control Program; Pump Station Preventive Maintenance Program; Gravity Line Preventive Maintenance Program; WWTP Operations and Maintenance Program; and Financing and Cost Analysis Program.

21.     Specific references must be cited for proposed procedures, techniques, and design criteria to be used in evaluating the City's Sewer System.  The I/I evaluations and WCTS evaluations and rehabilitation shall be consistent with EPA's Handbook: *Sewer System Infrastructure Analysis and Rehabilitation*, EPA/625/6-91/030, October 1991; Water Environment Federation's *Manual of Practice FD-6, Existing Sewer Evaluation & Rehabilitation*, 1994; and the most current edition of MDEQ's *Guidance for the Design of Publicly Owned Wastewater Facilities*.  The CPE and CCP shall be consistent with the following publications: *Improving POTW Performance Using the Composite Correction Approach*, EPA

CERI, October 1984; *Retrofitting POTWs,* EPA CERI, July 1989; and the most current edition of MDEQ's *Guidance for the Design of Publicly Owned Wastewater Facilities*.  The Pump Stations evaluations shall be consistent with the "Pumping Systems" chapter of the most current version of Water Environment Federation's *Manual of Practice FD-4*, *Design of Wastewater and Stormwater Pumping Stations*.

**B.  Phased Approach for WCTS Evaluation and Rehabilitation**

22.     West Bank Interceptor Work Plan.  Within five (5) months after the Date of Entry of this Consent Decree, the City shall submit to EPA for review and approval a West Bank Interceptor Work Plan.  Upon approval by EPA, the City shall implement the West Bank Interceptor Work Plan.  The West Bank Interceptor Work Plan shall include, at a minimum, the following:

(a)     The proposed locations selected, and proposed methodologies and criteria that the City will implement and use, to conduct sewage flow monitoring and inspection of the West Bank Interceptor to identify and analyze structural deficiencies in the West Bank Interceptor.

(b)     The methodologies and procedures the City will implement for monitoring and determining the total dry weather and wet weather (peak) flow rate in the West Bank Interceptor in order to estimate the severity of I/I in the West Bank Interceptor.

(c)     The methodologies and procedures the City will implement for evaluating and assessing the West Bank Interceptor to enable the City, in the West Bank Interceptor Rehabilitation Plan set forth below, to identify any deficiencies therein and a specific list of proposed remedial measures to correct such deficiencies.  The proposed remedial measures shall

-21-

be performed in two (2) phases. The first phase of such remedial measures shall include cleaning of debris accumulated in the West Bank Interceptor and repairs throughout the length of the West Bank Interceptor that have been evaluated as being necessary to prevent imminent structural failure or have been evaluated as necessary to correct a major structural defect, including sources of Excessive I/I. The first phase shall also include total rehabilitation of at least 20% of the total length of the West Bank Interceptor, or a lesser amount as approved by EPA based upon justification by the City in the West Bank Interceptor Work Plan. Examples of these repairs include, but are not limited to, point repairs, manhole repairs, and replacement of sections of sewer pipe or pipe lining of critical segments. The second phase of such remedial measures shall include rehabilitation of those segments throughout the length of the West Bank Interceptor that include long-term repairs necessary for proper "Asset Management" and/or addressing sources of non-Excessive I/I. Examples of these repairs include, but are not limited to, manhole repairs, sewer pipe lining, and replacement or construction of new gravity sewer pipe segments. Asset Management is a continuous process that guides the acquisition, use, and disposal of infrastructure assets to optimize service delivery and minimize costs over the asset's entire life.

23.     West Bank Interceptor Rehabilitation Plan. Within twenty-two (22) months after EPA approval of the West Bank Interceptor Work Plan, the City shall submit to EPA for review and approval a West Bank Interceptor Rehabilitation Plan setting forth the results and conclusions from the implementation of the West Bank Interceptor Work Plan. Upon approval by EPA, the City shall implement the West Bank Interceptor Rehabilitation Plan. The West Bank Interceptor Rehabilitation Plan shall include, at a minimum, the following:

-22-

(a)     The results of flow monitoring conducted pursuant to the West Bank Interceptor Work Plan and estimates of the severity of I/I within the West Bank Interceptor.

(b)     Proposed remedial measures to be conducted in two (2) phases, as more particularly described in Paragraph 22.(c) above, to correct any identified deficiencies.  Any such proposal for remedial measures for the West Bank Interceptor shall include a detailed work plan for the implementation of such measures within each phase including beginning and completion dates and a date for the submittal to EPA of a West Bank Interceptor Final Report upon completion of the remedial measures in each phase detailing the activities taken; provided, however, that such remedial measures for phase I shall be completed within seventy-two (72) months after EPA approval of the West Bank Interceptor Rehabilitation Plan and that such remedial measures for phase II shall be completed within one hundred seventy-four (174) months after EPA approval of the West Bank Interceptor Rehabilitation Plan.

24.     <u>Prioritization Work Plan</u>.  Within seven (7) months after the Date of Entry of this Consent Decree, the City shall submit to EPA for review and approval a Prioritization Work Plan which shall set forth the proposed locations selected, and proposed methodologies and criteria that the City will implement and use, to identify the severity of I/I within the WCTS, to map the Sewer System, to assess the capacity of WCTS, and to establish Sewershed priorities for further evaluation and rehabilitation of the WCTS pursuant to the Sewershed Evaluation Plan and Evaluation Report/Rehabilitation Plan as set forth in Paragraphs 26 and 27 below.  Upon approval by EPA, the City shall implement the Prioritization Work Plan.  The Prioritization Work Plan shall include, at a minimum, the following:

(a)     The methodologies and procedures the City will implement to estimate the severity of I/I within each Sewershed.

(b)     The methodologies and procedures the City will implement for the development of a computerized digital mapping system for each Sewershed that shall include, and have the ability to display, the West Bank Interceptor, all Gravity Sewer Lines, Force Mains, Pump Stations, manholes, inverts, siphons, WWTP locations, diversion valves, outfall locations, and all other appurtenances relating to the City's Sewer System.  The mapping system does not need to include Private Laterals.  The mapping system shall have the capability to store, update, and display information in a manner that will aid City personnel in the development and implementation of a Hydraulic Model, the Sanitary Sewer Evaluation Survey and the proper operation and maintenance of the Sewer System.

(c)     The methodologies and procedures the City will implement for assessing the capacity of the WCTS including the West Bank Interceptor, all Pump Stations, all Major Sewer Gravity Lines, all Force Mains and siphons and their respective related appurtenances, all known SSO locations, and any other portions of each Sewershed.  The capacity assessment shall include the WCTS that must be assessed so as to allow a technically-sound evaluation of the causes of SSOs and Prohibited Bypasses at the WWTPs.  The capacity assessment shall specifically identify, at a minimum, the hydraulic capacities of the WCTS, and compare those capacities to existing and future projected average and peak flows in dry and wet weather.  This assessment shall identify those portions of the WCTS that are expected to cause or contribute to SSOs and/or Prohibited Bypasses at the WWTPs under existing and future projected average and peak flows in dry and wet weather, and the degree to which those portions experience or cause,

-24-

under current or projected future conditions, SSOs and/or Prohibited Bypasses at the WWTPs. As part of the capacity assessment, the City shall use the information it is required to develop pursuant to Section VI.B to assess existing and future projected capacity of the WCTS and the ability of the WCTS to transmit peak flows experienced by and predicted for the WCTS.

       (d)    The methodologies and procedures the City will implement to develop a computerized Hydraulic Model of the WCTS within each Sewershed using a hydraulic modeling software package. The City shall use the Hydraulic Model in the assessment of the hydraulic capacity of the WCTS in that Sewershed and in the identification of appropriate rehabilitative and corrective actions to address all capacity and condition limitations identified in that Sewershed's WCTS. The City shall develop the Hydraulic Model to provide a detailed understanding of the response of the WCTS to wet weather events and an evaluation of the impacts of proposed remedial measures and removal of I/I flow.

The City shall configure the Hydraulic Model to accurately represent the City's WCTS, in accordance with currently accepted engineering practice. The City may model its WCTS in different levels of detail, as necessary to identify the causes of all known SSOs and to assess proposed remedial measures with the goal of eliminating those SSOs. The City's Hydraulic Model shall include at a minimum the West Bank Interceptor, all Major Gravity Lines and associated manholes, and all Pump Stations and associated Force Mains.

The City shall configure the Hydraulic Model using adequate, accurate, and sufficiently current physical data (e.g., invert and ground elevations, pipe diameters, slopes, pipe run lengths, Manning roughness factors, manhole sizes and configurations, Pump Station performance

factors) for its WCTS.  In particular, the City shall field verify the physical data to allow calibration and verification of the model.

The City shall calibrate and verify the Hydraulic Model using appropriate rainfall data, actual hydrographs, and WCTS flow data. The City shall use at least three (3) separate data sets each for calibration and verification.  As part of the calibration process, the City shall either use existing sensitivity analyses for the selected model, or carry out its own sensitivity analyses, such that calibration effectiveness is maximized.

The Hydraulic Model shall, at a minimum, include:

(i)  a description of the Hydraulic Model that includes the criteria set forth above;

(ii)  specific attributes, characteristics, and limitations of the Hydraulic Model;

(iii)  identification of all input parameters, constants, assumed values, and expected outputs;

(iv) digitized map(s) and schematics that identify and characterize the portions (including the specific Gravity Sewer Lines) of the WCTS that shall be included in the Hydraulic Model;

(v)  identification of input data to be used;

(vi)  configuration of the Hydraulic Model;

(vii)  procedures and protocols for performance of sensitivity analyses (*i.e.*, how the Hydraulic Model responds to changes in input parameters and variables including the use of various design storms of varying durations and intensities);

(viii)  procedures for calibrating the Hydraulic Model to account for values representative of the WCTS and WWTPs using actual system and WWTP data (*e.g.*, flow data); and

(ix)  procedures to verify the Hydraulic Model's performance using additional, independent actual Sewer System data (*e.g.*, flow data).

(e)      The methodology and criteria for prioritizing Sewersheds or groups of Sewersheds in order to conduct the phased evaluation and rehabilitation of the WCTS in each Sewershed as required by this Consent Decree.  The criteria for prioritizing Sewersheds shall include, at a minimum, the following:

(i)  the severity of the estimated I/I in the Sewersheds;

(ii)  the frequency, volume and location of SSOs in the Sewersheds;

(iii)  the relative potential impact of SSOs in the Sewersheds to human health and the environment;

(iv)  the average age of Gravity Sewer Lines within each Sewershed;

(v)  the pipe material used within each Sewershed; and

(vi)  any ongoing rehabilitation or corrective action work in the Sewersheds including detailed information on the current status and completion dates for such work.

(f)      The methodologies, procedures and criteria for developing proposed schedules for implementing and completing the evaluation and rehabilitation of the WCTS in each Sewershed or groups of Sewersheds as required by this Consent Decree.

25.   Prioritization Report.   Within thirty-two (32) months after EPA approval of the Prioritization Work Plan, the City shall submit to EPA for review and approval a Prioritization Report setting forth the results and conclusions from the implementation of the Prioritization Work Plan.  The Prioritization Report shall include, at a minimum, the following:

(a)   The results of flow monitoring conducted pursuant to the Prioritization Work Plan and estimates of the severity of I/I within each Sewershed.

(b)   The computerized digital map of the Sewer System.

(c)   The results of the capacity assessment of the WCTS.

(d)   The results of the Hydraulic Model.

(e)   The results of applying to each Sewershed the prioritization criteria approved in the Prioritization Work Plan.

(f)   An organization of the Sewersheds into three (3) Sewer Groups, based upon the severity of I/I, and other criteria set forth in Paragraph 24(e), with the most severe being prioritized into Sewer Group 1.  In addition, the Sewersheds in Group 1 shall contain at a minimum at least 30% of the estimate of total I/I within all the Sewersheds, and the Sewersheds in Group 2 shall contain at a minimum at least 40% of the estimate of total I/I within all the Sewersheds.  The Prioritization Report shall also include a schedule for the Sewersheds in the Sewer Groups to be evaluated in accordance with the Sewershed Evaluation Plan as set forth in Paragraph 26 below, including beginning and completion dates; provided, however, that such schedule shall provide for all Sewersheds in Group 1 to be evaluated within sixty-three (63) months after the Date of Entry of this Consent Decree and all Sewersheds in Group 2 be

evaluated within one hundred forty-one (141) months after the Date of Entry of this Consent Decree.

Upon approval by EPA of the Prioritization Report, the City shall evaluate the Sewersheds in accordance with the Sewershed Evaluation Plan as approved by EPA in accordance with Paragraph 26 below and the prioritized schedule for the Sewersheds as set forth in the approved Prioritization Report.

26.     <u>Sewershed Evaluation Plan</u>.  Within twelve (12) months after the Date of Entry of this Consent Decree, the City shall submit to EPA for review and approval a Sewershed Evaluation Plan that the City will implement for the Sewersheds in Sewer Groups 1 and 2 pursuant to the schedule set forth in the approved Prioritization Report.  The Sewershed Evaluation Plan shall provide for the City to evaluate the WCTS within the Sewersheds in order to support the development of the Evaluation Report/Rehabilitation Plan for the Sewershed, as provided in Paragraph 27 below, and the identification of rehabilitative and corrective actions to meet the objectives of this Consent Decree.  The City's evaluation of the Sewersheds shall include (and the Sewershed Evaluation Plan shall describe) at minimum the following requirements:

(a)     <u>Sanitary Sewer Evaluation Survey</u>.  The Sewershed Evaluation Plan shall provide for the City to characterize and address the structural integrity of the WCTS and to identify means to improve WCTS capacity and eliminate SSOs and Prohibited Bypasses at the WWTPs, including the identification and reduction of I/I, by conducting a Sanitary Sewer Evaluation Survey for the Sewershed.  The Sanitary Sewer Evaluation Survey component of the Sewershed Evaluation Plan shall include, at a minimum, the following:

(i)  the criteria that the City will use for establishing the location of flow and rainfall monitoring equipment installation for the Sewershed evaluations, and for determining whether the City will install the flow and rainfall monitoring equipment either permanently or temporarily, in order to adequately characterize flow in the Sewershed;

(ii)  a map showing the location of each permanent and temporary flow and rainfall monitoring site established in the WCTS;

(iii)  a description of the data management system that will organize, analyze, and report flow and rainfall data collected from the WCTS;

(iv)  a description of the quality assurance and quality control program the City will follow to ensure the accuracy and reliability of flow and rainfall data collected from the WCTS;

(v)  procedures to identify and evaluate I/I in the Sewersheds (including, without limitation, Private Laterals);

(vi)  dry weather monitoring to characterize base flows and wet weather monitoring following events of sufficient duration and intensity to characterize peak flows;

(vii)  techniques for reducing Infiltration;

(viii)  a program to eliminate sources of Inflow (including legal mechanisms and enforcement programs);

(ix)  a program to identify and eliminate cross connections between the WCTS and the City's municipal separate storm sewer system;

(x)  methodologies to evaluate the success of items (v) through (ix) above;

-30-

(xi)  a review of the legal authority in the current sewer use ordinance to require that the owner of an illegal stormwater connection to the WCTS take all appropriate steps necessary to eliminate the connection;

(xii)  if the review of the legal authority indicates a need to amend the legal authority in order to assume better control over illegal stormwater connections to the WCTS, the Plan shall include the proposed revisions to the ordinance with a schedule for proposing the draft ordinance to the City Council for adoption;

(xiii)  decision-making criteria, procedures, and protocols for prioritization of the evaluation and rehabilitation of Gravity Sewer Lines and associated manholes;

(xiv)  decision-making criteria, procedures, and protocols to determine the need for, and the conduct of, internal condition inspection of Gravity Sewer Lines and associated manholes;

(xv)  decision-making criteria, procedures, and protocols to determine the need for, and the conduct of, grouting in Gravity Sewer Lines and associated manholes (e.g., leakage rate for application of grout);

(xvi)  decision-making criteria, procedures, and protocols used to determine the need for, and the conduct of, smoke testing;

(xvii)  decision-making criteria, procedures, and protocols used to determine the need for, and the conduct of, dye testing;

(xviii)  decision-making criteria, procedures, and protocols used to determine the need for, and the conduct of, point repair(s), slip lining or line replacement;

(xix)  decision-making criteria, procedures, and protocols to determine whether I/I from a Private Lateral is excessive and needs to be addressed;

(xx)  decision-making criteria, procedures, and protocols to determine the need for, and the conduct of, flow isolation of Gravity Sewer Lines and associated manholes;

(xxi)  guidelines for conducting a cost-effectiveness analysis to consider the rehabilitation costs for I/I sources and rainfall-induced I/I source eliminations versus the costs of transportation, storage, and treatment; and

(xxii)  documentation of the basis and criteria for rehabilitation, transportation, storage, and treatment costs.

(b)     Pump Station Evaluations.  The Sewershed Evaluation Plan shall provide for the City to evaluate the design capacity, current effective capacity, equipment condition, and operational redundancy in its Pump Stations in the Sewersheds.  This evaluation shall include, at a minimum, the following criteria:

(i)  adequacy of station capacity;

(ii)  critical response time, defined as the time interval between activation of the high wet well level alarm and the first SSO, under peak flow conditions;

(iii)  adequacy of station condition, based upon both physical inspection and any available operating and mechanical failure history during at least the past five (5) years preceding the lodging date of the Consent Decree;

(iv)  adequacy of station design and equipment, including redundancy of pumps and electrical power supply (including whether emergency or back-up power is available

on a portable or fixed basis), and other equipment installed, based upon the most current edition

of MDEQ's *Guidance for the Design of Publicly Owned Wastewater Facilities*; and

      (v)  the ability of maintenance personnel to take corrective action within

the critical response time calculated for each Pump Station.

    27.    Evaluation Report/Rehabilitation Plan.  Within three (3) months after completion

of the WCTS evaluation within a Sewershed pursuant to the Sewershed Evaluation Plan, the City

shall submit to EPA for review and approval an Evaluation Report/Rehabilitation Plan setting

forth the results of the Sewershed Evaluation Plan for that Sewershed, proposed rehabilitative

and corrective actions and schedules in order to meet objectives of this Consent Decree.  Upon

approval by EPA, the City shall implement the remedial measures in the approved Rehabilitation

Plan portion of this submittal in accordance with the schedule contained therein.

    (a)    The Evaluation Report portion of this submittal shall include, at a

minimum, the following:

      (i)  a thorough analysis of historical and current flow monitoring,

inspection, rainfall and other data, including data collected during the evaluation of the

Sewershed;

      (ii)  identification of areas with Excessive I/I, such that these conditions

are causing and/or contributing to SSOs and/or Prohibited Bypasses at the WWTPs;

      (iii)  identification of sources of I/I within the Sewershed , if identifiable,

by manhole/line segment, street address, type (Infiltration or Inflow), source (*e.g.*, "wall

leakage"), and estimated flow from the source;

(iv)  identification of cross-connections between the WCTS and the City's municipal separate storm sewer system;

(v)  identification and quantification of SSOs, including all potential SSOs identified pursuant to implementation of the Prioritization Work Plan and the Sewershed Evaluation Plan;

(vi)  a summary of activities undertaken to configure the Hydraulic Model for each Sewershed and certification that the Hydraulic Model is capable of performing those functions identified in Paragraph 24.(d);

(vii)  a summary of activities undertaken to calibrate the Hydraulic Model and certification that the Hydraulic Model has been calibrated (including the performance of sensitivity analyses) and verified in accordance with the Prioritization Work Plan using actual system data (e.g., flow data) from permanent and temporary sewage flow monitoring points in the WCTS (this certification shall include a description of the methodology, data collected, and results of the Hydraulic Model calibrations and verifications);

(viii)  identification of portions of the WCTS within the Sewershed in which physical degradation is causing or contributing to SSOs;

(ix)  results of average and peak daily dry and wet weather flow measurements;

(x)  a determination of maximum Infiltration rate during periods of high ground water (in gpd/inch diameter-mile);

(xi)  a determination of maximum hourly Inflow rate during wet weather for various storm durations and intensities (in gpd/inch diameter-mile);

-34-

(xii)  a determination of peaking factors for each Sewershed (the ratio of measured peak flow to average dry weather flow as measured through the duration of the evaluation);

(xiii)  a summary of flow monitoring activities, to include, at a minimum, a map showing the delineation of the Sewershed, location and type of each flow meter, problems encountered and deviations from the Prioritization Work Plan and Sewershed Evaluation Plan, and a description of flow monitor calibration activities, including any scatter graphs and calibration and verification graphs;

(xiv)  a summary of field investigative activities performed to include, at a minimum: type of activity; number of activities performed (*e.g.*, "100 out of 500 manholes inspected in Sewershed XX"), observations made under each activity (inspection procedure), and summaries of the results;

(xv)  a summary of the structural defects identified in the WCTS to include, at a minimum: number of each type of defect by line segment, manhole number or street address, and estimates of peak flow or impact on WCTS capacity (as appropriate) from defects in each line segment, based on a consistently applied set of stated criteria as set forth in the Sewershed Evaluation Plan;

(xvi)  a summary of the technical approach utilized in carrying out the capacity assessment analyses;

(xvii)  a detailed description of any deviations from the capacity assessment portion of the Prioritization Work Plan, including a discussion of the reasons for such deviation;

(xviii)  identification of all portions of the WCTS within the Sewershed with insufficient capacity as identified by the Hydraulic Model of a Major Gravity Line, Pump Station or other structure to convey peak flows without experiencing surcharge sufficient to cause an SSO under either predicted peak flows or predicted average conditions or both;

(xix)  a description of future projected flows;

(xx)  information on the predicted (e.g. Manning equation) and actual peak flow capacity of all Major Gravity Lines (by segment), all Force Mains, siphons, and Pump Stations;

(xxi)  summaries of the number and footage of sewer segments surcharged, and the number of structures at which an SSO might be expected to occur under each condition investigated;

(xxii)  mapping for each condition investigated, illustrating each pipe segment operating in surcharge, and each manhole or structure at which an SSO might be expected to occur;

(xxiii)  information regarding the Pump Station evaluation as required by Paragraph 26.(b) above;

(xxiv)  the results of the capacity assessment as required by the Prioritization Work Plan; and

(xxv)  a summary of any capital projects implemented since commencement of the Sewershed Evaluation Plan.

(b)  The Rehabilitation Plan portion of this submittal shall include, at a minimum, the following:

-36-

(i)  identification of specific measures and schedules that, when implemented, will result in adequate capacity in the WCTS within that Sewershed to collect, convey and treat anticipated peak flows, without SSOs or Prohibited Bypasses at the WWTPs;

(ii)  identification of the degree to which sources of Excessive I/I shall be removed, and the degree to which Excessive I/I removal is expected to alleviate capacity constraints, and propose specific remedial measures and schedules that will address those capacity limitations not expected to be addressed by Excessive I/I removal (anticipated I/I removal rates used in the development of the Rehabilitation Plan shall reflect current industry practice);

(iii)  identification of specific remedial measures and schedules to address capacity limitations that may also include increases in Pump Station and sewer line capacity, construction of storage or equalization basin facilities, or increases in WWTP capacity;

(iv)  identification of all measures and schedules necessary to eliminate all cross-connections between the WCTS and the City's municipal separate storm sewer system;

(v)  identification of all measures and schedules necessary to eliminate all SSOs caused by physical degradation of sewers, inadequate Pump Station capacities, or inadequate Pump Station reliability;

(vi)  prioritized schedules for remedial measures based upon relative likely human health and environmental impact risks, SSO frequencies, and SSO volumes;

(vii)  a description of the methodology used to apply the prioritization factors in Paragraph 27.(b)(vi) above;

(viii)  estimated capital, operations and maintenance, and present value costs for each identified remedial measure in consistent, year-specific dollars;

(ix)  an expeditious schedule such that design, construction, and placement in service of all proposed measures for Sewersheds in Group 1 shall be completed within one hundred twenty-nine (129) months after the Date of Entry of this Consent Decree and for Sewersheds in Group 2 completed within two hundred seven (207) months after the Date of Entry of this Consent Decree; and

(x)  identification of the dates for preliminary design, complete design, complete permitting, contract award, construction commencement, and construction completion dates for each measure proposed.

28.  Rehabilitation Report for each Sewershed.  Within three (3) months after completion of all remedial measures set forth in a Rehabilitation Plan for a Sewershed, the City shall submit to EPA for review and approval a Rehabilitation Report summarizing the implementation of the Rehabilitation Plan for that Sewershed.  Such summary shall include, at a minimum, the following:

(a)  Identification of specific measures taken to achieve, and an analysis of whether such measures resulted in, adequate capacity in the WCTS within that Sewershed to collect and convey and treat anticipated peak flows, without SSOs or Prohibited Bypasses at the WWTPs.

(b)  An analysis of the degree to which sources of Excessive I/I were removed, and the degree to which Excessive I/I removal alleviated capacity constraints.

(c)     Identification of all measures taken to eliminate, and an analysis of whether such measures resulted in the elimination of, all cross-connections and SSOs caused by physical degradation of sewers, inadequate Pump Station capacities, or inadequate Pump Station reliability.

## C. Comprehensive Performance Evaluation ("CPE") and Composite Correction Program ("CCP") for the Savanna Street WWTP

29.     CPE.  Within fifteen (15) months after the Date of Entry of this Consent Decree, the City shall submit to EPA for review and approval a CPE for the Savanna Street WWTP.  The CPE shall be consistent with the EPA publications *Improving POTW Performance Using the Composite Correction Approach,* EPA CERI, October 1984, and *Retrofitting POTWs,* EPA CERI, July 1989, and the most current edition of MDEQ's *Guidance for the Design of Publicly Owned Wastewater Facilities*.  The purpose of the CPE is to identify flow and/or loading rate restricted treatment process unit(s) at the Savanna Street WWTP.  Upon approval by EPA, the City shall implement the CPE in accordance with the schedule contained therein.  The CPE shall include, at a minimum, the following:

(a)     An in-depth diagnostic evaluation of the capacity and operation of the Savanna Street WWTP and its ability to provide Secondary Treatment to all dry and wet weather flow and otherwise meet all terms of the NPDES Permit.

(b)     An evaluation of the major individual unit processes, identification of all performance-limiting factors, prioritization of performance-limiting factors, and a comprehensive assessment of the ability to improve performance with a CCP.

(c)     Identification of whether the design requirements for the Savanna Street WWTP are consistent with the most current edition of MDEQ's *Guidance for the Design of Publicly Owned Wastewater Facilities.*

(d)     Identification of design flow capacity requirements for the Savanna Street WWTP to adequately treat 100% of the peak annual dry weather flow, including providing Secondary Treatment without experiencing a Prohibited Bypass.

(e)     Identification of design capacity requirements to adequately treat 100% of the peak wet weather flow, including providing Secondary Treatment for all flows without experiencing a Prohibited Bypass.  The CPE may include estimated wet weather flow anticipated after performance of I/I reduction efforts identified in the Rehabilitation Plans for the WCTS and after sludge/solids removal at the Savanna Street WWTP.

(f)     Identification of design requirements necessary to treat sewage to the level established by the most current MDEQ effluent permit requirements, including to the extent feasible any planned TMDLs to be implemented by MDEQ.

(g)      A schedule and procedures that the City will use to prepare a Composite Correction Plan ("CCP"), as set forth below, based on the results of the CPE.

(h)     Use of flow modeling and other appropriate techniques to evaluate Savanna Street WWTP capacity and operation, taking into account the net (cumulative) increase or decrease to the existing volume of wastewater introduced to the Savanna Street WWTP as a result of the City's actual and anticipated increases in flow from the authorization of new sewer service connections and/or from existing sewer service connections pursuant to Paragraph 33,

and the reduction of I/I into the WCTS as a result of any remedial measures taken pursuant to Section VI.B of this Consent Decree.

       (i)     A schedule for submission of the CCP as set forth below; provided, however, that for submission of the CCP, such schedule shall not exceed twelve (12) months after EPA's approval of the CPE.

     30.    CCP.  Pursuant to the schedule set forth in the approved CPE, the City shall submit to EPA for review and approval a CCP as described below.  The purpose of the CCP is to identify rehabilitation and/or upgrades to the Savanna Street WWTP to address the problems identified in the CPE as more particularly described below.  To the extent applicable, the CCP shall be consistent with the EPA publications *Improving POTW Performance Using the Composite Correction Approach,* EPA CERI, October 1984, and *Retrofitting POTWs,* EPA CERI, July 1989; and the most current edition of MDEQ's *Guidance for the Design of Publicly Owned Wastewater Facilities*.  Upon approval by EPA, the City shall implement the remedial measures in the approved CCP in accordance with the expeditious schedules contained therein.

     The CCP shall include, at a minimum, the identification of specific Type 1, Type 2 and Type 3 remedial measures, as such terms are used in the above-referenced EPA publications and as further clarified below.   Type 1 and Type 2 remedial measures shall include, minor process changes, minor equipment additions or enhancements, or flow configuration changes to meet NPDES Permit effluent limits and to maximize Secondary Treatment of peak wet weather flow through the Savanna Street WWTP.  For purposes of this Paragraph 30, Type 3 remedial measures shall include any capital improvements, including, without limitation, the addition of a clarifier of equal size to the existing clarifiers at the Savanna Street WWTP and Biological

Nutrient Removal ("BNR"), necessary for the Savanna Street WWTP to meet the May 4, 2012 NPDES Permit effluent limits including nutrient limits. The CCP shall also include expeditious schedules for the implementation of such measures; provided, however, that all Type 1 and Type 2 measures shall be completed within twenty-four (24) months after EPA's approval of the CCP and all Type 3 measures shall be completed within sixty (60) months after EPA's approval of the CCP.

### D. Capacity, Management, Operations and Maintenance Programs

31.     The City shall develop and implement the Capacity, Management, Operations and Maintenance ("CMOM") programs as provided below. All CMOM programs shall be developed in accordance with EPA Region IV guidance, as set forth in the CDROM disk attached hereto as Appendix D. The City shall ensure that each CMOM program has a written, defined purpose; a written, defined goal; is documented in writing with specific detail; is implemented by trained personnel; has established performance measures; and has written procedures for periodic review. The Parties recognize that the City may need or want to revise the CMOM Programs set forth below during the term of this Consent Decree. Such revisions shall not be considered modifications to the Consent Decree for purposes of Section XIX (Modification). The City must obtain EPA's prior written approval of any revision to the substance of any CMOM Program required by this Consent Decree and shall place copies of any such revised Program in the PDR in accordance with the provisions of Section V. The City may revise the form of any CMOM Program required by this Consent Decree without EPA's approval and shall provide a copy of any revised Program to EPA and MDEQ, and place a copy of any such revised Program in the PDR within seven (7) Days after making such revision.

32.   <u>Training Program</u>.  Within twelve (12) months after the Date of Entry of this Consent Decree, the City shall submit to EPA for review and approval a Training Program, including a schedule for full implementation of the program not to exceed twelve (12) months after its approval by EPA.  The Training Program shall include, at a minimum, the following:

(a)   <u>Technical Training</u>.  The technical training component shall include, at a minimum, the following:

(i)  employee technical training and refresher technical training requirements (curriculum) that ensure that each City employee has a level of knowledge, commensurate with duties, of the overall functions of the City's infrastructure;

(ii)  a description of outside technical training and networking opportunities, such as conferences and seminars, that are made available to City employees;

(iii)  a description of the extent to which employee certification, at the State or at the City level, is required as a basis for obtaining or maintaining a position;

(iv)  records of technical training, including on-the-job training, which shall be maintained in an information management system and shall describe the degree to which completed technical training and on-the-job training is tied to promotion and pay; and

(v)  a description of the technical training required before an employee can undertake specific work assignments or tasks.

(b)   <u>Skills Training</u>.  The skills training component shall include, at a minimum, the following:

(i)  employee skills training and refresher skills training requirements (curriculum) that ensure that each City employee has a level of knowledge, commensurate with

duties, of the specific equipment to be used and the procedures to be followed in carrying out duties;

(ii)  a description of outside skills training opportunities, such as manufacturers' training, that are made available to employees;

(iii)  a description of the extent to which employee certification, at the State or at the City level, is required as a basis for obtaining or maintaining a position;

(iv)  records of skills training, including on-the-job training, which shall be maintained in an information management system) and shall describe the degree to which completed skills training and on-the-job training is tied to promotion and pay; and

(v) a description of the skills and on-the-job training required before an employee can undertake specific work assignments or tasks.

(c)      Safety Training.  The safety training component shall include, at a minimum, the following:

(i)  employee safety training and refresher safety training requirements (curriculum) that ensure that each City employee has level of knowledge regarding on-the-job safety that is commensurate with the employee's equipment and work environment;

(ii)  a description of the extent to which employee safety certification at the State or at the City level is required as a basis for obtaining or maintaining a position;

(iii)  records of safety training, including on-the-job training, which shall be maintained in an information management system and shall describe the degree to which completed safety training and on-the-job training is tied to promotion and pay; and

(iv)  a description of the safety training required before an employee can undertake specific work assignments or tasks.

33.   Capacity Assurance Program.  Within fifty-four (54) months after the Date of Entry of this Consent Decree, the City shall submit to EPA for review and approval a Capacity Assurance Program ("CAP"), including a schedule for full implementation of the program not to exceed twelve (12) months after EPA approval of the CAP.  Pursuant to the capacity assessment performed in accordance with Paragraph 24.(c) above, the CAP shall identify each Sewershed or part of a Sewershed with insufficient capacity under either peak wet weather, or average conditions, or both.  It shall also analyze all portions of the WCTS that hydraulically impact all known SSOs and all components of a WWTP that may contribute to violations of the NPDES Permits.  The CAP shall assess peak flow capacity of the West Bank Interceptor, all Pump Stations, all Major Sewer Gravity Lines, all Force Mains and siphons and their respective related appurtenances, all known SSO locations, and any other portions of the WCTS that must be assessed so as to allow a technically-sound evaluation of the causes of SSOs and Prohibited Bypasses at the WWTPs for existing and proposed flows.  The CAP shall enable the City to authorize new sewer service connections, or increases in flow from existing sewer service connections, only after the City certifies that the analysis procedures contained in the approved CAP have been used and that the City has determined, based on those procedures, that there is Adequate Treatment Capacity, Adequate Transmission Capacity, and Adequate Collection Capacity as set forth below.  The Capacity Assurance Program shall include, at a minimum, the following:

(a)      The technical information, methodology, and analytical techniques, including the model or software, to be used by the City to calculate collection, transmission, and treatment capacity.

(b)      The means by which the City will integrate its certification of Adequate Treatment Capacity, Adequate Transmission Capacity, and Adequate Collection Capacity with the issuance of building permits by the City and the City's acquisition of new or existing sewers from other owners.

(c)      The means by which the City will integrate its certification of Adequate Treatment Capacity, Adequate Transmission Capacity, and Adequate Collection Capacity with the requirements of Mississippi Commission on Environmental Quality Regulation WPC-1, Section I.C.1.(b) and Sections VI.B.2 and VI.B.4., regarding the certification of capacity for the construction of new sewer lines that provide new flow into the City's Sewer System.

(d) The technical information, methodology, and analytical techniques, including the model or software, to be used by the City to calculate the net (cumulative) increase or decrease in volume of wastewater introduced to the WCTS as a result of the City's authorization of new sewer service connections and increases in flow from existing connections and the completion of: (i) specific projects that add or restore collection or transmission capacity to the WCTS or add or restore Secondary Treatment capacity at a WWTP ("Capacity Enhancing Projects"), (ii) specific projects that reduce peak flow through removal of I/I ("I/I Projects"), and (iii) permanent removal of sewer connections ("Removal of Connections").

(e)      An Information Management System capable of tracking the accumulation of banked credits, earned pursuant to Paragraph 33.(i) below, from completion of Capacity

-46-

Enhancing Projects, I/I Projects and Removal of Connections; the capacity-limited portion of the Sewershed in which those credits were earned; and the expenditure of such credits on future increases in flow from new or existing sewer service connections in that capacity-limited portion of the Sewershed.

(f)     All evaluation protocols to be used to calculate collection, transmission, and treatment capacity including, but not limited to, standard design flow rate rules of thumb regarding pipe roughness, manhole head losses, as-built drawing accuracy (distance and slope), water use (gallons per capita per day), projected flow impact calculation techniques, and metering of related existing peak flows (flows metered in support of analysis and/or manual observation of existing peak flows).  The City may identify sewer line segments which have been specifically designed and constructed to operate under surcharge conditions (e.g., with welded or bolted joints) and identify the level of surcharge for those segments.

(g)     Capacity Certifications.   Except as provided in Paragraphs 33.(h), (i), (j) and (k) below, after twelve (12) months of EPA's approval of the CAP, the City shall authorize a new sewer service connection, or additional flow from an existing sewer service connection, only after it certifies that the analysis procedures contained in the approved CAP have been used and that the City has determined, based on those procedures, that there is Adequate Treatment Capacity, Adequate Transmission Capacity, and Adequate Collection Capacity as defined below:

(i) Treatment Capacity Certifications.  The City's certification of "Adequate Treatment Capacity" shall confirm that, at the time the WWTP receives the flow from a proposed sewer service connection(s) or increased flow from an existing sewer service connection(s), when combined with the flow predicted to occur from all other authorized sewer

service connections (including those which have not begun to discharge into the WCTS), the WWTP will not be in "non-compliance" for quarterly reporting as defined in 40 C.F.R. Part 123.45, Appendix A.  In addition, the City's certification of "Adequate Treatment Capacity" shall confirm that the new or increased flow to the WWTP will not result in a Prohibited Bypass.

(ii)  Transmission Capacity Certifications.  The City's certification of "Adequate Transmission Capacity" shall confirm that each Pump Station, through which the proposed additional flow from new or existing sewer service connections would pass to the WWTP receiving such flow, has the capacity to transmit, with its largest pump out of service, the existing one (1) hour peak flow passing through the Pump Station, plus the addition to the existing one (1) hour peak flow predicted to occur from the proposed connection, plus the addition to the existing one (1) hour peak flow predicted to occur from all other authorized sewer service connections which have not begun to discharge into the WCTS.

(iii)  Collection Capacity Certifications.  The City's certification of "Adequate Collection Capacity" shall confirm that each Major Gravity Line, through which the proposed additional flow from new or existing connections would pass, has the capacity to carry the existing one (1) hour peak flow passing through the Major Gravity Line, plus the addition to the existing one (1) hour peak flow from the proposed connection, plus the addition to the existing one (1) hour peak flow predicted to occur from all other authorized sewer service connections which have not begun to discharge into the WCTS without causing a Surcharge Condition.

(iv)  Definition of "One (1) Hour Peak Flow" and "Surcharge Condition". The terms set forth below are defined herein only for purposes of implementation of the CAP.

-48-

The City agrees that it shall not use these definitions for purposes of establishing any design criteria for the implementation of rehabilitation measures to the Sewer System.  The term "one (1) hour peak flow" shall mean the greatest flow in a sewer averaged over a sixty (60) minute period at a specific location expected to occur as a result of a representative 2 year-24 hour storm event.  Except for the West Bank Interceptor as set forth below, the term "Surcharge Condition" shall mean the condition that exists when the supply of wastewater resulting from the one (1) hour peak flow is greater than the capacity of the pipes to carry it and the surface of the wastewater in manholes rises to an elevation greater than twenty-four (24) inches above the top of the pipe or within three (3) feet of the rim of the manhole, and the sewer is under pressure or head, rather than at atmospheric pressure, unless the City has, pursuant to Paragraph 33.(f) above, identified that pipe segment and manhole as designed to operate in that condition, in which case the identified level of surcharge will be used.  For the West Bank Interceptor, the term "Surcharge Condition" shall mean the condition that exists when the supply of wastewater resulting from the one (1) hour peak flow is greater than the capacity of the Interceptor to carry it and the surface of the wastewater rises to an elevation within three (3) feet of the rim of any manhole.  The City agrees to not construct additional manholes for the West Bank Interceptor and to not increase the elevation of existing manholes except to ensure that the elevation is no higher than five (5) feet above the Base Flood elevation as that term is defined at 44 C.F.R. § 59.1.

(h)     Minor Sewer Connections.  For minor sewer service connections, the City may elect to perform a monthly capacity analysis for each Sewershed or part of a Sewershed by certifying that the Sewershed has adequate capacity, as defined above, to carry existing peak

flows and the additional flows generated by all such minor sewer service connections projected

to be approved in the subsequent month.  For any Sewershed or part of a Sewershed which can

be so certified, the City may approve these projected minor sewer service connections without

performing individual certifications for each connection.  For the purposes of this paragraph

only, a "minor sewer service connection" is a connection with an average flow not to exceed

2,500 gallons per day.

      (i)    Capacity for Treatment, Transmission, and Collection in Lieu of

Certification.  The City may authorize a new sewer service connection, or additional flow from

an existing sewer service connection, even if it cannot satisfy the requirements of Paragraph

33.(g), provided the City certifies that all of the following provisions, where applicable, are

satisfied:

      (i)  the City is in substantial compliance with this Consent Decree;

      (ii)  the sewer lines which will convey the proposed additional flow from

new or existing sewer service connections have not experienced dry weather SSOs due to

inadequate capacity within the previous twelve (12) Months; or, in the alternative, the causes of

any dry weather SSOs due to inadequate capacity have been eliminated;

      (iii)  the City has identified the sewer line segment(s), Pump Station(s)

and/or wastewater treatment systems that do not meet the conditions for certification of

Adequate Treatment Capacity, Adequate Collection Capacity, and/or Adequate Transmission

Capacity;

      (iv)  the City shall complete, prior to the time the proposed additional flow

from new or existing sewer service connections is introduced into the WCTS, specific Capacity

-50-

Enhancing Projects, I/I Projects, and/or Removal of Connections which will add sewer capacity or reduce peak flows to the identified sewer line segment(s), Pump Atation(s), and wastewater treatment system(s) in accordance with the factors set forth in Paragraphs 33.(i)(v) and (vi) below;

(v)  where the City has undertaken specific Capacity Enhancing Projects that provide for additional off-line storage or additional Secondary Treatment capacity, and/or specific Removal of Connections to satisfy the requirements of Paragraph 33.(i)(iv) above, the estimated added capacity resulting from such projects must be equal to or greater than the estimated amount of any proposed additional flow;

(vi)  where the City has undertaken specific I/I Projects or Capacity Enhancing Projects, other than those that provide for additional off-line storage or additional Secondary Treatment capacity, to satisfy the requirements of Paragraph 33.(i)(iv) above, the estimated reduction in peak flows or added capacity resulting from such projects must exceed the estimated amount of any proposed additional flow by a factor of 3:1;

(vii)  commencing within twelve (12) months of EPA's approval of the CAP and annually thereafter, the City has performed a review of specific Capacity Enhancing Projects and I/I Projects undertaken to determine if actual added capacity and peak flow reductions are in line with what the City originally estimated for such projects; and the City has used the results of this review to adjust future estimates as necessary;

(viii)  any new sewer service connection or increase in flow to an existing connection authorized prior to the completion of a necessary added capacity or peak flow reduction project as set forth above shall be conditioned upon completion of such project prior to

the time that the new sewer service connection or flow increase is introduced into the WCTS; and

    (ix)  in implementing the provisions of this Paragraph 33.(i), the City may use a "banking credit system" for the sewer line segment(s), pump station(s), and/or wastewater treatment systems for which the City is not able to satisfy the conditions set forth in Paragraph 33.(g) above.

    (j)  Essential Services.  Notwithstanding the above provisions, the City may authorize a new sewer service connection, or additional flow from an existing sewer service connection, even if it cannot certify that it has Adequate Transmission Capacity, Adequate Collection Capacity, and/or Adequate Treatment Capacity as defined above for health care facilities, public safety facilities, and public schools and, subject to EPA review and approval, for government facilities; and in those cases where a pollution or sanitary nuisance condition exists, as determined by the local county health department or its regulatory successor, as the result of a discharge of untreated wastewater from an on-site septic tank.

    (k)  Existing Illicit Connections.  Notwithstanding the provisions above, the City may authorize a new sewer service connection, or additional flow from an existing sewer service connection, even if it cannot certify that it has Adequate Transmission Capacity and/or Adequate Collection Capacity and/or Adequate Treatment Capacity as defined above for any illicit connections or discharge of wastewater to the stormwater system or to waters of the State. For purposes of this subparagraph, the term "illicit connection" shall mean any connection resulting in a discharge to the municipal separate storm sewer system ("MS4") that is not

composed entirely of storm water, except for discharges allowed under a NPDES permit or waters used for firefighting operations.

(l)   Certifications.  All certifications pursuant to this Paragraph 33 shall be made by a professional engineer registered in the State of Mississippi and shall be approved by a responsible party of the City as defined by 40 C.F.R. § 122.22(b).  The City shall maintain all such certifications, and all data on which the certifications are based, in its offices for inspection by EPA and MDEQ.  EPA and MDEQ may request, and the City shall provide, any and all documentation necessary to support any certification made by the City pursuant to this Paragraph 33, and make available, to the extent possible, individuals providing such certifications to meet with EPA and MDEQ.

34.   Sewer Overflow Response Plan ("SORP").  The City submitted to MDEQ a SORP on September 28, 2011, pursuant to the MDEQ Agreed Order I.  MDEQ approved the SORP on October 10, 2011.  A copy of the SORP is attached hereto as Appendix E and hereby incorporated herein by reference.  The City shall continue to implement the SORP as an enforceable obligation under this Consent Decree.

35.   Inter-Jurisdictional Agreement Program.  Within twenty-four (24) months after the Date of Entry of this Consent Decree, the City shall submit to EPA for review and approval an Inter-Jurisdictional Agreement Program for when the City reopens or renews existing agreements or enters into new agreements that cover the collection, conveyance, and treatment of sewage by the City from municipal satellite sewer systems and/or large volume sewer customers. The program shall delineate the minimum provisions to be set forth in these agreements with which the contracting municipality or large volume sewer customer must comply.  Such

provisions shall include requirements on the contracting party to properly manage, operate, and

maintain its sewage collection and conveyance systems including, without limitation, the

management of FOG and the minimization of peak flows into the City's Sewer System by

excluding, to the maximum reasonable extent, I/I.  In addition, such provisions shall include

requirements on the contracting party to ensure that any of its municipal satellite sewer systems

and/or large volume sewer customers also properly manage, operate, and maintain their sewage

collection and conveyance systems.  The program shall also delineate provisions addressing the

term or life of these agreements; mechanisms for appropriate modification of the agreements;

and mechanisms for enforcement of the agreements (including a description of the legal support

necessary to develop, oversee and enforce the agreements) which may include provisions

permitting termination of the agreement and physical disconnection from the City's Sewer

System within a reasonable time not exceeding two (2) years upon the failure of the contracting

party to comply with its management, operations, and maintenance obligations.

     The City represents that it currently has in place agreements covering the collection,

conveyance, and treatment of sewage with all municipal satellite sewer systems that may or may

not currently satisfy the requirements of the Inter-Jurisdictional Agreement Program as set forth

above.  The City represents that these existing agreements may expire or terminate before or

after the Date of Entry of this Consent Decree.  When any of these currently existing agreements

expire or terminate, the City may, but shall not be required to, renew any such agreement or enter

into a new agreement covering the collection, conveyance, and treatment of sewage from such

other municipal satellite sewer system.  In the event the City does reopen or renew such an

agreement or enters into any new agreement, each agreement shall be consistent with the requirements of this Inter-Jurisdictional Agreement Program.

36.   Private Lateral Program.   Within twenty-four (24) months after the Date of Entry of this Consent Decree, the City shall submit to EPA for review and approval Private Lateral Program, including a schedule for full implementation of the program not to exceed twelve (12) months after its approval by EPA.  The Private Lateral Program shall include, at a minimum, the following:

(a)   A legal review of the City's sewer use ordinance to ensure that the City has the authority to require customers to repair or replace Private Laterals that may contain defects and/or improper connections that:

(i)  are potential sources of I/I to the WCTS that may cause or contribute to SSOs or other violations of the NPDES Permits;

(ii) allow for the possible exfiltration of wastewater onto or below the surface of the ground that could then enter the stormwater system; or

(iii) allow roots and/or debris to enter the WCTS through cracks, holes, or poorly sealed joints, thus restricting flow and increasing the likelihood of SSOs.

(b)   If the legal review indicates a need to amend the legal authority in order to assume better control over problems with capacity on the Private Laterals, the Plan shall include the proposed revisions to the ordinance with a schedule for proposing the draft ordinance to the City Council for adoption.

(c)   An enforcement response guide to address Private Laterals that contain defects and/or improper connections.  The enforcement response guide shall:

(i)  identify the process that the City will follow to require customers to repair or replace the identified Private Laterals;

(ii)  set forth a series of graduated enforcement responses by the City, which may include termination of services, in the event a customer fails to repair or replace the identified Private Laterals;

(iii)  describe the notice the City provides to customers to require repair or replacement of identified Private Laterals and the process a customer must follow in order to challenge the City's determination that repair or replacement is necessary or the City's enforcement response, such as termination of services; and

(iv)  identify the process a customer must follow to request a waiver of any of the obligations to properly operate and maintain Private Laterals imposed by the City's sewer use ordinance and the process the City will use to consider granting and revoking such waivers.

(d)     Establishment of technical and legal staffing to ensure effective implementation of the enforcement response guide.

(e)     An information management system.

37.     Water Quality Monitoring Program.  Within twenty-four (24) months after the Date of Entry of this Consent Decree, the City shall submit to EPA for review and approval a Water Quality Monitoring Program, including a schedule for full implementation of the program not to exceed twelve (12) months after its approval by EPA.  Water Quality Monitoring Program described below shall identify SSOs originating at sewer pipe creek crossings and other isolated or remote sewer locations adjacent or in proximity to waterways; locate the source or sources of

-56-

such SSOs; and assess the impact upon the environment and public health of such SSOs. The Water Quality Monitoring Program shall also include standard sampling and quality assurance procedures and an information management system. The Water Quality Monitoring Program is in addition to any other sampling required by the NPDES Permits. The Water Quality Monitoring Program shall include, at a minimum, the following:

(a)     Routine Water Quality Monitoring Component. The City shall develop and implement a Routine Water Quality Monitoring component to detect SSOs originating at or in proximity to stream crossings or other isolated and remote sewer locations. This component shall provide for scheduled sampling during both dry and wet weather periods from a network of monitoring stations located in each of the City's Sewersheds. The Routine Water Quality Monitoring component shall propose the exact number and location of monitoring points depending upon drainage configuration and other factors, but in no event shall the number of monitoring points be less than twelve (12) monitoring points. The Routine Water Quality Monitoring component shall include a map of all sampling locations, and shall specify sampling frequency and sampling parameters, including pH, dissolved oxygen, and fecal coliform and/or *E. coli* bacteria. The City may elect to specify one or both of fecal coliform and *E. coli* bacteria as a sampling parameter.

(b)     Investigative Water Quality Monitoring Component. The City shall develop and implement an Investigative Water Quality Monitoring component to determine whether the WCTS and/or any WWTP is a source of pollution identified as a result of complaints, routine water quality monitoring pursuant to Paragraph 37.(a) above, or by other means. This component shall specify the conditions under which the City will initiate an

investigation under this Paragraph 37.(b).  The Investigative Water Quality Monitoring component shall include a requirement for development of a map of all actual sampling locations, and shall specify a protocol for determining sampling parameters to be used depending on the type of pollution identified or suspected.  The Investigative Water Quality Monitoring component shall include the following:

(i) <u>Dry Weather Monitoring</u>.  The purpose of dry weather monitoring shall be to detect chronic line leaks.  Dry weather sampling shall be conducted for a definite period of time, e.g., one week ("Testing Period").  During the Testing Period, the City shall collect fecal coliform and/or *E. Coli* bacteria samples at least once a day at locations to be investigated.

(ii) <u>Wet Weather Monitoring</u>.  The purpose of wet weather monitoring shall be to detect capacity problems.  The wet weather sampling period shall be defined using rainfall and stream stage data or sewer flow data.  During the sampling period, the City shall collect fecal coliform and/or *E. Coli* bacteria samples at least two (2) times a day at locations to be investigated.

(iii) <u>Location of Source of Release</u>.  If necessary, the isolated stream segment shall be sampled at defined intervals to identify the source of the release.  Fecal coliform and/or *E. Coli* bacteria samples shall be taken in each of the monitoring locations.  After repair of the source, the City shall take additional samples to ensure that the repair has been successful.

(c) <u>Spill Impact Water Quality Monitoring Component</u>.  The City shall develop and implement a Spill Impact Water Quality Monitoring component to assess any

impact upon public health and the environment of pollution resulting from SSOs, and to assist in assessing the need for any environmental and/or public health response. The City shall consult with EPA, MDEQ, and public health authorities during development and implementation of the Spill Impact Water Quality Monitoring component. As part of the Spill Impact Water Quality Monitoring component, the City shall develop protocols for mapping all actual sampling locations, for determining the frequency and duration of sampling (depending upon the potential impact of the spill on public health and the environment), and for sampling for pH, dissolved oxygen, and fecal coliform and/or *E. coli* bacteria. The sampling protocol shall include sampling upstream (control) and downstream of the spill. The sampling protocol also shall identify the circumstances under which the City shall sample for those Priority Pollutants known to be present in the wastewater of any Significant Industrial User that discharges into the portion of the WCTS upsewer of the SSO. The Water Quality Monitoring information management system shall contain a list of the Priority Pollutants, if any, in wastewater discharged by any Significant Industrial User to the WCTS, and the lines affected by any such discharge.

(d) <u>Quality Assurance, Sampling, Data Analysis</u>. The City shall use analytical procedures, sample containers, preservation techniques, and sample holding times that are specified in 40 C.F.R. Part 136. Upon request, the City shall allow split or duplicate samples to be taken by EPA, MDEQ, or their authorized representatives. In addition, EPA and MDEQ shall have the right to take any additional samples that EPA or MDEQ may deem necessary.

(e) <u>Water Quality Reporting</u>. The City shall report, pursuant to the requirements of Section IX (Reporting Requirements), the following information:

(i)  the actions which have been taken under the Water Quality Monitoring Program during the previous Calendar Quarter, including the dates and times of all sampling;

(ii)  a summary of all results of sampling during the previous Calendar Quarter; and

(iii)  all actions including, but not limited to, data collection, which are scheduled for the next Calendar Quarter.

38.    Pump Station Operations Programs.  Within twelve (12) months after the Date of Entry of this Consent Decree, the City shall submit to EPA for review and approval Pump Station Operations Programs, including a schedule for full implementation of the programs not to exceed twelve (12) months after their approval by EPA.  The Pump Station Operations Programs shall include, at a minimum, the following:

(a)    Routine Pump Station Operations Program.  The Routine Pump Station Operations Program shall be developed to ensure proper Pump Station operations that will necessitate prevention of Pump Station failure.  This program shall include, at a minimum, the following:

(i)  procedures for reading and recording information appropriate to each Pump Station including, as applicable, pump run-time meter readings, start counters, amperage readings, checking and resetting conditions, wet-well points, grease accumulations, and any other information that is necessary for the proper operation of a Pump Station;

(ii)  development of standard inspection routes and schedules; and

(iii)  provisions for needs determination, establishing priorities and scheduling, number of crews and personnel (including, where appropriate, contract crews), standard forms, records and performance measures, and an information management system.

(b)     Emergency Pump Station Operations Program. The Emergency Pump Station Operations Program shall be developed to necessitate emergency operations in the event of Pump Station failure.  This program shall provide guidance and ensure timely response to atypical situations in the WCTS through the use of written standard emergency operating procedures for each type of Pump Station and shall include, at a minimum, the following:

(i)  emergency contact information;

(ii)  location(s) of auxiliary power including portable or fixed emergency generators applicable to each Pump Station;

(iii)  location(s) of portable pumping equipment;

(iv)  guidance for initiating auxiliary power with portable or fixed generators;

(v)  guidance for installing portable pumps during high flow;

(vi)  applicable contingency plans; and

(vii)  standard forms, records and performance measures and an information management system.

39.     Fats, Oils and Grease ("FOG") Control Program.   Within twenty-four (24) months after the Date on Entry of this Consent Decree, the City shall submit to EPA for review and approval a FOG Control Program, including a schedule for full implementation of the

program not to exceed twelve (12) months after its approval by EPA.  The FOG Control Program shall include, at a minimum, the following:

      (a)     The legal authority to control the discharge of FOG into the WCTS, including the ability to implement a permit and enforcement program.

      (b)     Specification of accepted devices to control the discharge of FOG into the WCTS.

      (c)     Establishment of standards for the design and construction of FOG control devices including standards for capacity and accessibility, site map, design documents, and as-built drawings.

      (d)     Establishment of FOG control device management, operations, and maintenance standards, or best management practices, that address onsite record keeping requirements, cleaning frequency, cleaning standards, use of additives, and ultimate disposal.

      (e)     Establishment of construction inspection protocols, including scheduling, inspection report forms, and inspection record keeping requirements, to assure that FOG control devices are constructed in accordance with established design and construction standards.

      (f)     Establishment of compliance inspection protocols, including scheduling, inspection report forms, and inspection record keeping requirements to assure that FOG control devices are being managed, operated, and maintained in accordance with the established management, operations, and maintenance standards or best management practices.

      (g)     Establishment of a FOG disposal manifest system.

      (h)     Establishment of an enforcement program, including specific enforcement mechanisms, to ensure compliance with the FOG Control Program.

(i)     Establishment of a compliance assistance program to facilitate training of FOG generators and their employees.

(j)     Establishment of a public education program directed at reducing the amount of FOG entering the WCTS from private residences.

(k)     Establishment of staffing (technical and legal) and equipment requirements to ensure effective implementation of the FOG Control Program.

(l)     A FOG characterization study that shall indentify the sources of FOG causing problems in the WCTS and the best method or mechanism for addressing those sources.

(m)     A list of current commercial establishment FOG generators including a description of their FOG generating processes and average daily discharge volume.

(n)     Establishment of performance indicators to be used by the City to measure the effectiveness of the FOG Control Program.

40.     <u>Pump Station Preventive Maintenance Programs</u>.  Within twelve (12) months after the Date of Entry of this Consent Decree, the City shall submit to EPA for review and approval Pump Station Preventive Maintenance Programs, including a schedule for full implementation of the programs not to exceed twelve (12) months after their approval by EPA. The Pump Station Preventive Maintenance Programs shall include, at a minimum, the following:

(a)     An electrical maintenance component which shall provide guidance to managers and field personnel responsible for electrical maintenance to ensure that preventive maintenance on Pump Station electrical components are performed on a routine basis.  This component shall include meter calibration schedules for any meter used to record data collected at or from a Pump Station.

-63-

(b)     A mechanical maintenance component that shall provide guidance to managers and field personnel responsible for mechanical maintenance to ensure that preventive maintenance on Pump Station mechanical components are performed on a routine basis.

(c)     A physical maintenance component that shall provide guidance to managers and field personnel responsible for physical maintenance (pipes, walls, inverts, covers, etc.) to ensure that preventive maintenance on Pump Station physical components are performed on a routine basis.

(d)     A Pump Station repair component that shall serve as a reactive maintenance system to repair Pump Stations that are currently in a state of disrepair but still cost-effective to service.  This component shall provide for the identification, prioritization, scheduling, and repair of Pump Stations on a timely basis once a Pump Station has deteriorated beyond the scope of the preventive maintenance programs.  This component shall include, at a minimum, the following:

(i)  guidance outlining when a Pump Station is to be placed in the Pump Station Repair Program;

(ii)  a prioritized inventory of Pump Stations in need of repair;

(iii)  an ongoing inventory of completed repairs;

(iv)  a work schedule for repairs; and

(v)  standard forms, records and performance measures, and an information management system.

41.     <u>Gravity Line Preventive Maintenance Program</u>.  Within fifteen (15) months after the Date of Entry of this Consent Decree, the City shall submit to EPA for review and approval a

-64-

Gravity Line Preventive Maintenance Program, including a schedule for full implementation of the program not to exceed twelve (12) months after its approval by EPA.  The Gravity Line Preventive Maintenance Program shall include, at a minimum, the following:

(a)     A preventive hydraulic cleaning component which shall include protocols for implementing routine hydraulic cleaning component of the preventive maintenance program for Gravity Sewer Lines.  This component shall include provisions for needs determination, establishing priorities and scheduling, number of crews and personnel (including, where appropriate, contract crews), hydraulic cleaning equipment to be used, standard hydraulic cleaning maintenance procedures, standard forms, records and performance measures, and an information management.

(b)     A preventive mechanical cleaning component which shall include protocols for implementing routine mechanical cleaning component of the preventive maintenance program for Gravity Sewer Lines.  This component shall include provisions for needs determination, establishing priorities and scheduling, number of crews and personnel (including, where appropriate, contract crews), mechanical cleaning equipment to be used, standard mechanical cleaning maintenance procedures, standard forms, records and performance measures, and an information management system.

(c)     A root control component which shall include protocols, methods, and approaches for implementing a root control component of the preventive maintenance program for Gravity Sewer Lines.  This component shall include provisions for needs determination, establishing priorities and scheduling, number of crews and personnel (including, where appropriate, contract crews), root control methods and approaches, root control maintenance

-65-

procedures, standard forms, records and performance measures, and an information management system.

(d)     A manhole preventive maintenance component which shall include protocols, methods, and approaches for implementing a routine inspection and maintenance component of the preventive maintenance program for Gravity Sewer Lines. This component shall include provisions for needs determination, establishing priorities and scheduling, number of crews and personnel (including, where appropriate, contract crews), inspection methods and approaches, standard maintenance procedures, standard forms, records and performance measures, and an information management system.

(e)     A prioritized and expedited schedule for implementation of the Program for the West Bank Interceptor.

42.     WWTP Operations and Maintenance Program.  Within fifteen (15) months after the Date of Entry of this Consent Decree, the City shall submit to EPA for review and approval a WWTP Operations and Maintenance Program, including a schedule for full implementation of the program not to exceed twelve (12) months after its approval by EPA.  The WWTP Operations and Maintenance Program shall include, at a minimum, the following:

(a)     Equipment, Parts, and Material Inventory.  The City shall inventory its WWTPs' operating equipment and materials and evaluate the impacts of the loss of use or failure of each major system component.  The City shall develop an inventory control system which shall have the capability of tracking spare parts use and inventory, as well as generating inventory replenishment needs reports.  The City's inventory control system shall also include the following elements:

-66-

(i)  prioritization of WWTP components as critical, semi-critical, or non-critical which shall allow the City to focus its maintenance capabilities and spare parts inventories on the WWTP components and potential failures that would have the greatest impact on treatment capacity, Prohibited Bypassing, and NPDES Permit compliance;

(ii)  identification of critical spare parts and materials, and procedures to ensure that these parts and materials are stored and maintained in inventory at the WWTP;

(iii)  a list of where the remaining spare parts may be secured to enable the repair or replacement of such equipment in a minimum amount of time and to ensure proper operation of the WWTP; and

(iv)  tracking of spare parts use and inventory, as well as generating inventory replenishment needs reports.

(b)      Sludge Processing and Removal.  Not inconsistent with the requirements of the MDEQ Agreed Order I, the maintenance program shall include sludge removal procedures, schedules, and standard practices for the WWTPs and from any storage lagoons, wet weather storage cells, equalization ponds, or any other wet weather storage facility that is, or is planned for use by, a WWTP.

(c)      Preventive Maintenance.  The City develop and implement a preventive maintenance system for the WWTPs to ensure that preventive and corrective maintenance is conducted and that equipment integral to proper operation and maintenance, treatment units, and tanks are maintained so as to achieve compliance with the NPDES permit.  The preventive maintenance system shall include, at a minimum, the following:

(i)   identification of equipment used in the treatment of wastewater liquids and biosolids;

(ii)   identification of the standard procedures to conduct preventive maintenance of such WWTP equipment;

(iii)   identification of the frequency and duration of preventive maintenance necessary to ensure that all WWTP equipment is maintained in such a way so as to achieve compliance with the NPDES permit;

(iv)   identification of the training and education required for maintenance personnel to perform the standard preventive maintenance procedures;

(v)   procedures for recognition of indicators that corrective maintenance on WWTP equipment is necessary;

(vi)   procedures for the generation of work orders for preventive and corrective maintenance of WWTP equipment;

(vii) procedures for the generation of purchase orders associated with preventive and corrective maintenance of WWTP equipment;

(viii)  examples of the types of  reports and forms which will be used in implementing the preventive maintenance system;

(ix)  a system for tracking preventive and corrective maintenance activities and histories including the generation of summary reports each month that identify major equipment failures occurring in the previous month and the end-of-month status of preventive and corrective maintenance work orders issued or outstanding in the previous month for equipment; and

(x)  procedures to ensure that failures of equipment and/or loss of power supply during abnormal and emergency conditions are corrected in a timely fashion so as to limit the downtime of the facility or component.

43.    <u>Financing & Cost Analysis Program</u>.  Within eighteen (18) months after the Date of Entry of this Consent Decree, the City shall submit to EPA for review and approval a Financing and Cost Analysis Program.  The Financing and Cost Analysis Program shall include, at a minimum, the following:

(a)    A process (including a schedule of implementation) that regularly analyzes, projects, plans, and finances management, operating, and maintenance costs of its Sewer System, including those management, operating, and maintenance costs associated with labor and equipment needed to properly implement the CMOM programs required pursuant to this Consent Decree.

(b)    A process (including a schedule of implementation) that regularly analyzes, projects, plans, and finances capital improvements to its Sewer System, including those capital improvements required pursuant to this Consent Decree.  Capital improvement financing shall be planned using, at a minimum, a five (5)-year planning horizon followed by annual updates.

(c)    A process, including a schedule of implementation, to ensure that life cycle cost analysis is incorporated into its operations cost analyses, maintenance cost analyses, and management cost analyses for all Sewer System equipment and infrastructure.

(d)     A process, including a schedule of implementation, to establish its annual budget and set customer rates that assures that the budget and rates are based on the programs referenced in Paragraph 43.(a) through (c) above.

**D.  Work under MDEQ Orders Enforceable under this Consent Decree**

44.     As set forth in Section 2.D of the MDEQ Agreed Order I, the City has agreed to implement a Sludge and Solids Removal Plan that provides for the removal and proper disposal of excess, accumulated sludge/solids from the Savanna Street WWTP storm diversion cells.  The Parties agree that the City shall implement the Sludge and Solids Removal Plan as an enforceable obligation under this Consent Decree.  In addition, as set forth in Sections 2.B., C. and D. of the MDEQ Order II, the City has agreed to implement certain remedial measures to address NPDES permit effluent limitation violations at the Presidential Hills WWTP.  The Parties agree that the City shall implement such remedial measures as an enforceable obligation under this Consent Decree.

## VII.  CIVIL PENALTY

45.     The City shall pay the sum of $437,916 as a civil penalty to be paid in four (4) installments of $109,479.  The first installment shall be due within thirty (30) Days after the Date of Entry of this Consent Decree.  The second installment shall be due within seven (7) months after the Date of Entry of this Consent Decree, the third installment shall be due thirteen (13) months after the Date of Entry of this Consent Decree, and the fourth installment shall be due nineteen (19) months after the Date of Entry of this Consent Decree.  The second, third and fourth installment payment of the civil penalty shall also include an additional sum for interest accrued on the unpaid portion of the principal amount calculated from the Date of Entry of this

Consent Decree until the date of the payment. The Financial Litigation Unit ("FLU") of the U.S. Attorney's Office for the Southern District of Mississippi, 500 One Jackson Place, 188 E. Capital Street, Jackson, Mississippi 39201 (601-955-4480), shall send to the City a calculation of the interest due for the second, third and fourth installment payment. The City may pay any installment payment prior to the due date, but must contact the FLU in advance for a determination regarding the amount of interest to be included with the payment. In the event any installment payment includes an overpayment, the amount of the overpayment shall be applied to the remaining principal.

46.     The City shall pay to the United States sixty percent (60%) of each installment of the civil penalty plus any interest due by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice in accordance with written instructions to be provided to the City by the FLU. At the time of payment, the City shall send a copy of the EFT authorization form and the EFT transaction record, together with a transmittal letter, which shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in United States et al. v. City of Jackson, and shall reference the civil action number and DOJ case number 90-5-1-1-09841, to the United States in accordance with Section XVI of this Decree (Notices); by email to acctsreceivable.CINWD@epa.gov; and by mail to:

> EPA Cincinnati Finance Office
> 26 Martin Luther King Drive
> Cincinnati, Ohio  45268.

In the event that full cash payment of any installment to the United States is not made within the due date for such installment, the City shall also pay to the United States interest on the balance

-71-

due from the original due date to the date of payment, at the rate calculated pursuant to 28 U.S.C. § 1961.

47.     The City shall pay to the State forty percent (40%) of each installment of the civil penalty plus any interest due by check payable to the "Mississippi Department of Environmental Quality." Each check shall reference the case name and civil action number herein and shall be sent to:

> Mississippi Department of Environmental Quality
> Attn: Mona Varner
> P. O. Box 2329
> Jackson, Mississippi 39225

## VIII. SUPPLEMENTAL ENVIRONMENTAL PROJECT

48.     The City shall satisfactorily implement and complete a Supplemental Environmental Project ("SEP") in accordance with all provisions of Appendix F of this Consent Decree.  The SEP shall be completed in accordance with the schedule set forth in Appendix F.

49.     As more particularly described in Appendix F, the SEP shall consist of projects to reduce extraneous flows entering the WCTS through defective private laterals and through illicit connections from residential properties the owners of which face financial hardship.  The City may use contractors or consultants in planning and implementing the SEP.

50.     With regard to the SEP, the City certifies the truth and accuracy of each of the following:

(a)     That all cost information provided to EPA in connection with EPA's approval of the SEP is complete and accurate and that the City in good faith estimates that the cost to implement the SEP is $875,000.

-72-

(b)     That, as of the date of executing this Consent Decree, the City is not required to perform or develop the SEP by any federal, state, or local law or regulation and is not required to perform or develop the SEP by agreement, grant, or as injunctive relief awarded in any other action in any forum.

(c)     That the SEP is not a project that the City was planning or intending to construct, perform, or implement other than in settlement of the claims resolved in this Consent Decree.

(d)     That the City has not received and will not receive credit for the SEP in any other enforcement action.

(e)     That the City will not receive any reimbursement for any portion of the SEP from any other person.

(f)     That the City is not a party to any open federal financial assistance transaction that is funding or could be used to fund the same activity as the SEP, and that, to the best of its knowledge and belief after reasonable inquiry, there is no such open federal financial transaction that is funding or could be used to fund the same activity as the SEP, nor has the same activity been described in an unsuccessful federal financial assistance transaction proposal submitted to EPA within two (2) years of the date of this settlement (unless the project was barred from funding as statutorily ineligible).  For the purposes of this certification, the term "open federal financial assistance transaction" refers to a grant, cooperative agreement, loan, federally-guaranteed loan guarantee or other mechanism for providing federal financial assistance whose performance period has not yet expired.

51.   <u>SEP Completion Report</u>.  Within thirty (30) Days after the date set for completion of the SEP, the City shall submit a SEP Completion Report to EPA for review and approval.  The SEP Completion Report shall contain all of the following information:

(a)   A detailed description of the SEP as implemented.

(b)   A description of any problems encountered in completing the SEP and the solutions thereto.

(c)   An itemized list of all eligible SEP costs expended.

(d)   Certification that the SEP has been fully implemented pursuant to the provisions of this Consent Decree.

(e)   A description of the environmental and public health benefits resulting from implementation of the SEP (with a quantification of the benefits and pollutant reductions, if feasible).

52.   EPA may, in its sole discretion, require information in addition to that described in the preceding Paragraph, in order to evaluate the City's SEP Completion Report.

53.   After receiving the SEP Completion Report, EPA shall notify the City whether or not the City has satisfactorily completed the SEP.  If the City has not completed the SEP in accordance with this Consent Decree, stipulated penalties may be assessed under Section X of this Consent Decree.

54.   Disputes concerning the satisfactory performance of the SEP and the amount of eligible SEP costs may be resolved under Section XII of this Decree (Dispute Resolution).  No other disputes arising under this Section shall be subject to Dispute Resolution.

55.    Each submission required under this Section shall be signed by an official with knowledge of the SEP and shall bear the certification language set forth in Paragraph 16.

56.    Any public statement, oral or written, in print, film, or other media, made by the City making reference to the SEP under this Consent Decree shall include the following language: "This project was undertaken in connection with the settlement of an enforcement action, United States et al. v. City of Jackson, taken on behalf of the U.S. Environmental Protection Agency and the Mississippi Department of Environmental Quality under the Clean Water Act and the Mississippi Air and Water Pollution Control Law."

## IX.  REPORTING REQUIREMENTS

57.    The City shall submit the following reports:

(a)    Quarterly Reports.  Beginning thirty (30) Days after the first full three (3) month period following the Date of Entry of this Consent Decree, and thirty (30) Days after each subsequent three (3)-month period thereafter until termination of the Consent Decree, the City shall submit to EPA for review and approval a Quarterly Report that shall include the following:

(i)    the date, time, location, source, estimated duration, estimated volume, receiving water (if any), and cause of all SSOs occurring in the applicable three (3)-month period in a tabulated electronic format; and

(ii)    the date, time, estimated duration, estimated volume, and cause of all Prohibited Bypasses occurring in the applicable three (3)-month period in a tabulated electronic format.

(b)    Semi-Annual Reports.  Beginning thirty (30) Days after the first full six (6)-month period following the Date of Entry of this Consent Decree, and thirty (30) Days after

each subsequent six (6)-month period until termination of the Consent Decree, the City shall submit to EPA for review and approval a Semi-Annual Report. Each Semi-Annual Report shall include, at a minimum:

(i) A description of projects and activities completed and milestones achieved during the previous applicable six (6)-month period pursuant to the requirements of this Consent Decree, in Gantt chart or similar format, including a description of the status of compliance or non-compliance with the requirements of this Consent Decree and, if applicable, the reasons for non-compliance. If any non-compliance cannot be fully explained at the time the report is due, the City shall include a statement to that effect in the report. The City shall investigate to determine the cause of the non-compliance and then shall submit an amendment to the report, including a full explanation of the cause of the non-compliance, within thirty (30) Days after submission of the Semi-Annual Report.

(ii) A summary of significant projects and activities anticipated to be performed, and milestones anticipated to be achieved, in the successive applicable six (6)-month period to comply with the requirements of this Consent Decree, in Gantt chart or similar format.

(iii) Any additional information the City determines is appropriate to demonstrate that the City is implementing the remedial actions required under this Consent Decree in an adequate and timely manner.

(c)     Annual Reports.  Beginning sixty (60) Days after the first full twelve (12)-month period following the Date of Entry of this Consent Decree, and sixty (60) Days after each subsequent twelve (12)-month period until termination of this Consent Decree, the City shall

submit to EPA for review and approval an Annual Report. Each Annual Report shall cover the most recent applicable twelve (12)-month period and shall include, at a minimum:

(i) A summary of the CMOM Programs implemented or modified pursuant to this Consent Decree, including a comparison of actual performance with any performance measures that have been established.

(ii) A trends analysis of the number, volume, duration, and cause of the City's SSOs for a twenty-four (24)-month period updated to reflect the SSOs that occurred during the previous twelve (12)-month period except that the first Annual Report shall only include the first twelve (12) months.

(iii) A trends analysis of the number, volume, duration, and cause of all Prohibited Bypasses for a twenty-four (24)-month period updated to reflect the Prohibited Bypasses that occurred during the previous twelve (12)-month period except that the first Annual Report shall only include the first twelve (12) months.

58.     Whenever any violation of this Consent Decree or any other event affecting the City's performance under this Consent Decree or its NPDES Permits may pose an immediate threat to the public health or welfare or the environment, the City shall notify EPA and MDEQ orally or by electronic or facsimile transmission as soon as possible, but no later than twenty-four (24) hours after the City first knew of the violation or event. This procedure is in addition to the requirements set forth in the preceding Paragraph.

59.     All reports shall be submitted to the persons designated in Section XVI of this Consent Decree (Notices).

60.     Each report by the City under this Section shall be submitted in accordance with the provisions of Paragraph 16 of this Consent Decree.  The certification requirement in Paragraph 16 does not apply to emergency or similar notifications where compliance would be impractical.

61.     The reporting requirements of this Consent Decree do not relieve the City of any reporting obligations required by the CWA or its implementing regulations, the Mississippi Air and Water Pollution Control Law or its implementing regulations, or by any other federal, state, or local law, regulation, permit, or other requirement.  Notification to EPA or MDEQ pursuant to this Section of an anticipated delay shall not by itself excuse the delay or otherwise satisfy the notification requirements set forth in Section XI (Force Majeure).

62.     Any information provided pursuant to this Consent Decree may be used by the United States or the State in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

## X.  STIPULATED·PENALTIES

63.     The City shall be liable for stipulated penalties to the United States and the State for violations of this Consent Decree as specified below, unless excused under Section XI (Force Majeure).  A violation includes failing to perform any obligation required by the terms of this Consent Decree, including any work plan or schedule approved under this Consent Decree, according to all applicable requirements of this Consent Decree and within the specified time schedules established by or approved under this Consent Decree.

64.     If the City fails to pay the civil penalty required to be paid under Section VII of this Decree (Civil Penalty) when due, the City shall pay a stipulated penalty of $1,000 per day for each day that the payment is late.

65.     The following stipulated penalties shall accrue for each violation identified below:

(a)     <u>SSOs Reaching Waters</u>.  For each SSO that reaches waters of the United States or the State, a stipulated penalty may be assessed as follows:

| If SSO Occurs: | Penalty Per SSO Per Day: |
|---|---|
| Within 7 years from Date of Entry | $ 500 |
| 7 years or more from Date of Entry but before 10 years from Date of Entry | $1,000 |
| 10 years or more from Date of Entry | $2,000 |

(b)     <u>Prohibited Bypasses</u>.  For each Prohibited Bypass, a stipulated penalty may be assessed as follows:

| If Prohibited Bypass Occurs: | Penalty Per Prohibited Bypass: |
|---|---|
| After April 30, 2014 but before 7 years from Date of Entry | $1,000 |
| 7 years or more from Date of Entry | $10,000 |

(c)     <u>Failure to Timely Submit Deliverable</u>.  For each day the City fails to Timely submit any Deliverable, a stipulated penalty for each such Deliverable may be assessed as follows:

-79-

| Period of Noncompliance: | Penalty Per Deliverable Per Day: |
|---|---|
| 1-30 days | $500 |
| More than 30 days | $2,000 |

(d)     Failure to Timely Implement Work. For each day the City fails to Timely

implement any Work (other than work pursuant to the MDEQ Agreed Orders I and II or the

Timely submittal of a Deliverable or the implementation of the SEP), daily stipulated penalties

may be assessed for each such item of Work as follows:

| Period of Noncompliance: | Penalty Per Violation Per Day: |
|---|---|
| 1 - 30 days | $500 |
| 31 - 60 days | $1,000 |
| 61-180 days | $2,000 |
| More than 180 days | $5,000 |

(e)     Failure to Timely Implement SEP Milestones. For each Day the City fails

to Timely implement a SEP milestone set forth in Section VIII or Appendix F, daily stipulated

penalties may be assessed as follows:

| Period of Noncompliance: | Penalty Per Violation Per Day: |
|---|---|
| 1 - 30 days | $500 |
| More than 30 days | $1,000 |

(f)     Failure to Complete the SEP. After receiving the SEP Completion Report,

in the event EPA notifies the City that the City has failed to satisfactorily complete the SEP in

accordance with the terms of this Consent Decree as described in Section VIII and Appendix F

(including the allowable expenditures for the SEP), a stipulated penalty of $375,000 may be

-80-

assessed if the City cannot certify, with supporting documentation, that at least fifty (50) percent

of the required amount of money has been spent on the SEP; and a stipulated penalty of

$300,000 may be assessed if the City has certified, with supporting documentation, that at least

fifty (50) percent of the required amount of money has been spent on the SEP.  Notwithstanding

the foregoing, if EPA determines that the City has made good faith efforts to satisfactorily

complete the SEP and has certified, with supporting documentation, that at least ninety (90)

percent of the required amount of money has been spent on the SEP, the City shall not be liable

for any stipulated penalty.

      (g)     <u>Failure to Remove Sludge from the Savanna Street WWTP Storm</u>

<u>Diversion Cells</u>.  For each Day the City fails to Timely remove sludge from the Savanna Street

WWTP storm diversion cells in accordance with the schedule required by the MDEQ Agreed

Order I, a stipulated penalty of $100 per day may be assessed.

      (h)     <u>Failure to Comply with the MDEQ Agreed Order II</u>.  For each Day the

City fails to Timely submit its compliance plan or, once that plan is implemented, to meet the

ammonia limits for the Presidential Hills WWTP as set forth in the MDEQ Agreed Order II, a

stipulated penalty of $100 per day may be assessed.

    66.    Stipulated penalties under this Section shall begin to accrue on the day after

performance is due or on the day a violation occurs, whichever is applicable, and shall continue

to accrue until performance is satisfactorily completed or until the violation ceases.  Stipulated

penalties shall accrue simultaneously for separate violations of this Consent Decree.

    67.    For stipulated penalties set forth in Paragraphs 64 and 65.(a) through (f), the City

shall pay stipulated penalties to the United States and the State within sixty (60) Days of a

written demand by EPA.  For stipulated penalties set forth in Paragraphs 64 and 65.(a) through (f), the City shall pay fifty percent (50%) of the total stipulated penalty amount due to the United States and fifty percent (50%) to the State.  For stipulated penalties set forth in Paragraphs 65.(g) and (h), the City shall pay stipulated penalties to the State within sixty (60) Days of a written demand by MDEQ.

68.     The United States may in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due under this Consent Decree pursuant to Paragraphs 64 and 65.(a) through (f).  MDEQ may in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due under this Consent Decree pursuant to Paragraphs 65.(g) through (h).

69.     Stipulated penalties shall continue to accrue as provided in Paragraph 66, during any Dispute Resolution, but need not be paid until the following:

(a)     If the dispute is resolved by agreement or by a decision of the United States, after consultation with the State, that is not appealed to the Court, the City shall pay all accrued penalties determined to be owing, together with interest, within thirty (30) Days of the effective date of the agreement or the receipt of the United States' decision or order.

(b)     If the dispute is appealed to the Court and the United States prevails in whole or in part, the City shall pay all accrued penalties determined by the Court to be owed, together with interest, within sixty (60) Days of receiving the Court's decision or order, except as provided in Paragraph 69.(c) below.

(c)     If the District Court's decision is appealed, the City shall pay all accrued penalties determined to be owed, together with interest, within fifteen (15) Days of receiving the final appellate court decision.

70.    The City shall pay stipulated penalties owing to the United States in the manner set forth and with the confirmation notices required by Paragraph 46, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.  The City shall pay stipulated penalties owing to the State in the manner set forth in Paragraph 47.

71.    If the City fails to pay stipulated penalties according to the terms of this Consent Decree, the City shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due.  Nothing in this Paragraph shall be construed to limit the United States or the State from seeking any remedy otherwise provided by law for the City's failure to pay any stipulated penalties.

72.    Subject to the provisions of Section XIV of this Consent Decree (Effect of Settlement/Reservation of Rights), the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States and the State for the City's violation of this Consent Decree or applicable law; provided, however, the State agrees that is shall only assess stipulated penalties for those matters addressed in Paragraphs 65.(g) through (h) pursuant to either this Consent Decree or the MDEQ Agreed Orders I and II, but not both.

## XI. **FORCE MAJEURE**

73.     "Force majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of the City, of any entity controlled by the City, or of the City's consultants and contractors, that delays or prevents the performance of any obligation under this Consent Decree despite the City's best efforts to fulfill the obligation.  The requirement that the City exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any such event (a) as it is occurring and (b) after it has occurred to prevent or minimize any resulting delay to the greatest extent possible.  "Force Majeure" does not include the City's financial inability to perform any obligation under this Consent Decree.

74.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a force majeure event, the City shall provide notice orally or by electronic or facsimile transmission to EPA and MDEQ, within seventy-two (72) hours of when the City first knew that the event might cause a delay.  Within seven (7) Days thereafter, the City shall provide in writing to EPA and MDEQ an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; the City's rationale for attributing such delay to a force majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of the City, such event may cause or contribute to an endangerment to public health, welfare, or the environment.  The City shall include with any notice all available documentation supporting the claim that the delay was attributable to a force

majeure event. Failure to comply with the above requirements shall preclude the City from asserting any claim of force majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. The City shall be deemed to know of any circumstance of which the City, any entity controlled by the City, or the City's contractors knew or should have known.

75.     If EPA, after a reasonable opportunity for review and comment by MDEQ, agrees that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by EPA, after a reasonable opportunity for review and comment by MDEQ, for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation. EPA will notify the City in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

76.     If EPA, after a reasonable opportunity for review and comment by MDEQ, does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, EPA will notify the City in writing of its decision.

77.     If the City elects to invoke the dispute resolution procedures set forth in Section XII (Dispute Resolution), it shall do so no later than fifteen (15) Days after receipt of EPA's notice. In any such proceeding, the City shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the

-85-

effects of the delay, and that the City complied with the requirements of Paragraphs 73 and 74 above.  If the City carries this burden, the delay at issue shall be deemed not to be a violation by the City of the affected obligation of this Consent Decree identified to EPA and the Court.

## XII.  DISPUTE RESOLUTION

78.     Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree.  The City's failure to seek resolution of a dispute under this Section shall preclude the City from raising any such issue as a defense to an action by the United States or the State to enforce any obligation of the City arising under this Consent Decree.

79.     <u>Informal Dispute Resolution</u>.  Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations.  The dispute shall be considered to have arisen when the City sends the United States a written Notice of Dispute.  Such Notice of Dispute shall state clearly the matter in dispute.  The period of informal negotiations shall not exceed twenty (20) Days from the date the dispute arises, unless that period is modified by written agreement between the United States and the City.  The United States shall consult with the State during the period of informal negotiations.  If the United States and the City cannot resolve a dispute by informal negotiations, then the position advanced by the United States shall be considered binding unless, within forty-five (45) Days after the conclusion of the informal negotiation period, the City invokes formal dispute resolution procedures as set forth below.

80.   <u>Formal Dispute Resolution</u>.  The City shall invoke formal dispute resolution

procedures, within the time period provided in the preceding Paragraph, by serving on the United

States and the State a written Statement of Position regarding the matter in dispute.  The

Statement of Position shall include, but need not be limited to, any factual data, analysis, or

opinion supporting the City's position and any supporting documentation relied upon by the

City.  The United States shall serve its Statement of Position within ninety (90) Days of receipt

of the City's Statement of Position.  The United States' Statement of Position shall include, but

need not be limited to, any factual data, analysis, or opinion supporting that position and any

supporting documentation relied upon by the United States.  The United States shall consult with

the State during preparation of its Statement of Position.  The United States' Statement of

Position shall be binding on the City, unless the City files a motion for judicial review of the

dispute in accordance with the following Paragraph.

81.   <u>Judicial Dispute Resolution</u>.  The City may seek judicial review of the dispute by

filing with the Court and serving on the United States and the State, in accordance with Section

XVI of this Consent Decree (Notices), a motion requesting judicial resolution of the dispute.

The motion must be filed within ten (10) Days of receipt of the United States' Statement of

Position pursuant to the preceding Paragraph.  The motion shall contain a written statement of

the City's position on the matter in dispute, including any supporting factual data, analysis,

opinion, or documentation, and shall set forth the relief requested and any schedule within which

the dispute must be resolved for orderly implementation of the Consent Decree.  The United

States shall respond to the City's motion within the time period allowed by the Local Rules of

this Court.   The United States shall consult with the State during preparation of its response. The City may file a reply memorandum, to the extent permitted by the Local Rules.

      82.    Standard of Review.

      a.    Disputes Concerning Matters Accorded Record Review.  Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraphs 80 and 81 pertaining to the adequacy or appropriateness of plans, procedures to implement plans, schedules or any other items requiring approval by EPA under this Consent Decree; the adequacy of the performance of work undertaken pursuant to this Consent Decree; and all other disputes that are accorded review on the administrative record under applicable principles of administrative law, the City shall have the burden of demonstrating, based on the administrative record, that the position of the United States is arbitrary and capricious or otherwise not in accordance with law.

      b.    Other Disputes.  Except as otherwise provided in this Consent Decree, in any other dispute brought under Paragraphs 80 and 81, the City shall bear the burden of demonstrating that its position complies with this Consent Decree and furthers the objectives of the Consent Decree.

      83.    The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of the City under this Consent Decree, unless and until final resolution of the dispute so provides.  Stipulated penalties with respect to the disputed matter shall continue to accrue from the first day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 69.  If the City does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section X (Stipulated Penalties).

## XIII.  RIGHT OF ENTRY AND INFORMATION COLLECTION AND RETENTION

84.     The United States, the State, and their representatives, including attorneys, contractors, and consultants, shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times, upon presentation of credentials, to:

(a)     Monitor the progress of activities required under this Consent Decree.

(b)     Verify any data or information submitted to the United States or the State in accordance with the terms of this Consent Decree.

(c)     Obtain samples and, upon request, splits of any samples taken by the City or its representatives, contractors, or consultants.

(d)     Obtain documentary evidence, including photographs and similar data.

(e)     Assess the City's compliance with this Consent Decree.

85.     Upon request, the City shall provide EPA and MDEQ or their authorized representatives splits of any samples taken by the City.  Upon request, EPA and MDEQ shall provide the City splits of any samples taken by EPA or MDEQ.

86.     Until five (5) years after the termination of this Consent Decree, the City shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in its or its contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession or control, and that relate in any manner to the City's performance of its obligations under this Consent Decree.  This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures.  At any time during this information-retention period, upon request by the United

States or the State, the City shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

87.     At the conclusion of the information-retention period provided in the preceding Paragraph, the City shall notify the United States and the State at least ninety (90) Days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph and, upon request by the United States or the State, the City shall deliver any such documents, records, or other information to EPA or MDEQ.  The City may assert that certain documents, records, or other information is privileged under the attorney-client privilege or any other privilege recognized by federal law.  If the City asserts such a privilege, it shall provide the following:

(a)     The title of the document, record, or information.

(b)     The date of the document, record, or information.

(c)     The name and title of each author of the document, record, or information.

(d)     The name and title of each addressee and recipient.

(e)     A description of the subject of the document, record, or information.

(f)     The privilege asserted by the City.

However, no documents, records, or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

88.     The City may also assert that information required to be provided under this Section is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2.  As to any information that the City seeks to protect as CBI, the City shall follow the procedures set forth in 40 C.F.R. Part 2.

89.     This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or the State pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of the City to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

## XIV.  **EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS**

90.     This Consent Decree resolves the civil claims of the United States and the State for the violations alleged in the Complaint filed in this action through the Date of Lodging of this Consent Decree.

91.     The United States and the State reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree, except as expressly stated in Paragraph 90. This Consent Decree shall not be construed to limit the rights of the United States or the State to obtain penalties or injunctive relief under the CWA, the Mississippi Air and Water Pollution Control Law, or their implementing regulations, or under other federal or state laws, regulations, or permit conditions, except as expressly specified in Paragraph 90.  The United States and the State further reserve all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed by, the City's Sewer System, whether related to the violations addressed in this Consent Decree or otherwise.

92.     In any subsequent administrative or judicial proceeding initiated by the United States or the State for injunctive relief, civil penalties, other appropriate relief relating to the Sewer System or the City's violations, the City shall not assert, and may not maintain, any

-91-

defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or the State in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 90 of this Section.

93.     This Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local laws or regulations.  The City is responsible for achieving and maintaining complete compliance with all applicable federal, State, and local laws, regulations, and permits; and the City's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein.  The United States and the State do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that the City's compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA, the Mississippi Air and Water Pollution Control Law, or with any other provisions of federal, State, or local laws, regulations, or permits.

94.     This Consent Decree does not limit or affect the rights of the City or of the United States or the State against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against the City, except as otherwise provided by law.

95.     This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XV.  COSTS

96.     The Parties shall bear their own costs of this action, including attorneys' fees,

except that the United States and the State shall be entitled to collect the costs (including

attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any

stipulated penalties due but not paid by the City.

## XVI.  NOTICES

97.     Unless otherwise specified herein, whenever notifications, submissions, or

communications are required by this Consent Decree, they shall be made in writing and

addressed as follows:

To the United States:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
Box 7611 Ben Franklin Station
Washington, D.C.  20044-7611
Re: DOJ No. 90-5-1-1-09841

Karl Fingerhood
Environmental Enforcement Section
U.S. Department of Justice
Box 7611 Ben Franklin Station
Washington, D.C. 20044-7611

and

Chief, Clean Water Enforcement Branch
Water Protection Division
U.S Environmental Protection Agency, Region 4
ATTN:  Brad Ammons
61 Forsyth Street, S.W.
Atlanta, GA  30303
(404) 562-9769

To EPA:

Chief, Clean Water Enforcement Branch
Water Protection Division
U.S Environmental Protection Agency, Region 4
ATTN: Brad Ammons
61 Forsyth Street, S.W.
Atlanta, GA 30303
(404) 562-9769

To the State/MDEQ

Chief, Environmental Compliance and Enforcement Division
Office of Pollution Control
Mississippi Department of Environmental Quality
ATTN: Rusty Lyons
P.O. Box 2261
Jackson, MS 39225-2261
(901) 961-5588

To the City:

Mayor
City of Jackson, Mississippi
ATTN: Harvey Johnson, Jr., Mayor
P.O. Box 17
Jackson, MS 39205-0017
(601) 960-1084

Director, Department of Public Works
City of Jackson, Mississippi
ATTN: Dan Gaillet, P.E.
P.O. Box 17
Jackson, MS 39205-0017
(601) 960-2091

98.     Any Party may, by written notice to the other Parties, change its designated notice

recipient or notice address provided above.

99.     Notices submitted pursuant to this Section shall be deemed submitted upon mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XVII. **EFFECTIVE DATE**

100.     The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XVIII. **RETENTION OF JURISDICTION**

101.     The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Consent Decree or entering orders modifying this Consent Decree, pursuant to Sections XII and XIX, or effectuating or enforcing compliance with the terms of this Consent Decree.

## XIX. **MODIFICATION**

102.     The terms of this Consent Decree, including any attached appendices, may be modified only by a subsequent written agreement signed by all the Parties.  Other than a modification made pursuant to Paragraph 72 (Force Majeure), when the modification constitutes a material change to this Decree, it shall be effective only upon approval by the Court.  Non-material changes to this Consent Decree (including appendices) may be made by written agreement of the Parties without Court approval, and the Parties may by mutual agreement determine whether a modification is non-material.

103.     Any disputes between the United States, the State, and the City concerning modification of this Consent Decree shall be resolved pursuant to Section XII of this Consent

Decree (Dispute Resolution), provided, however, that, instead of the burden of proof provided by

Paragraph 82, the Party seeking the modification bears the burden of demonstrating that it is

entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XX. **TERMINATION**

104.    This Consent Decree may be terminated when the United States determines that

the City has satisfactorily completed performance of its compliance (Section VI) and SEP

(Section VIII) obligations required by this Consent Decree, provided that the City has fulfilled

all other obligations of this Consent Decree, including payment of the civil penalty under Section

VII of this Consent Decree and any accrued stipulated penalties as required by Section X of this

Consent Decree not waived or reduced by the United States.  The City may serve upon the

United States a Request for Termination, certifying that the City has satisfied those requirements,

together with all necessary supporting documentation.

105.    Following receipt by the United States of the City's Request for Termination, the

United States and the City shall confer informally concerning the Request and any disagreement

that they may have as to whether the City has satisfactorily complied with the requirements for

termination of this Consent Decree.  If the United States, after consultation with the State, agrees

that the Consent Decree may be terminated, the United States and the City shall submit, for the

Court's approval, a joint stipulation terminating the Consent Decree.

106.    If the United States, after consultation with the State, does not agree that the

Consent Decree may be terminated, the City may invoke Dispute Resolution under Section XII

of this Consent Decree.  However, the City shall not seek Dispute Resolution of any dispute

regarding termination, under Paragraph 80 of Section XII, until one hundred-twenty (120) Days after service of its Request for Termination.

## XXI. **PUBLIC PARTICIPATION**

107.    This Consent Decree shall be lodged with the Court for a period of not less than thirty (30) Days for public notice and comment in accordance with 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate. The City and the State each consent to entry of this Consent Decree without further notice and agrees not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Consent Decree, unless the United States has notified the Parties in writing that it no longer supports entry of the Consent Decree.

## XXII. **SIGNATORIES/SERVICE**

108.    Each undersigned representative of the City, EPA, the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice, MDEQ, and the State certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

109.    This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis. The City agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

## XXIII. **INTEGRATION**

110.     This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  Other than Deliverables that are subsequently submitted and approved pursuant to this Consent Decree, no other document, nor any representation, inducement, agreement, understanding, or promise, constitutes any part of this Consent Decree or the settlement it represents, nor shall it be used in construing the terms of this Consent Decree.

## XXIV. **FINAL JUDGMENT**

111.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States, the State, and the City.  The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

## XXV. APPENDICES

112.     The following appendices are attached to and incorporated into this Consent Decree:

"Appendix A" is the MDEQ Agreed Order I entered into by MDEQ and the City on September 10, 2010, as amended.

"Appendix B" is the MDEQ Agreed Order II entered into by MDEQ and the City on August 23, 2011.

"Appendix C" is a map of the Sewersheds comprising the City's WCTS.

"Appendix D" is the CDROM disk containing EPA Region IV guidance on Capacity, Management, Operations and Maintenance ("CMOM") programs.

"Appendix E" is the City's SORP.

"Appendix F" is the Supplemental Environmental Project.

Dated and entered this __ day of _____, 20__.

                              _____

                              UNITED STATES DISTRICT JUDGE
                              Southern District of Mississippi

WE HEREBY CONSENT to the entry of this Consent Decree, subject to the public notice and comment provisions of 28 C.F.R. § 50.7:

FOR PLAINTIFF UNITED STATES OF AMERICA:

IGNACIA S. MORENO
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

KARL J. FINGERHOOD
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044-7611
Telephone:  202-514-7519
Facsimile:  202-616-2427

WE HEREBY CONSENT to the entry of this Consent Decree, subject to the public notice and comment provisions of 28 C.F.R. § 50.7:

**FOR PLAINTIFF UNITED STATES OF AMERICA (Continued):**


GREGORY K. DAVIS
United States Attorney
Southern District of Mississippi


SAMUEL LYNN MURRAY (MS Bar ID No. 3690)
Assistant U.S. Attorney
Southern District of Mississippi
501 E. Court St., Suite 4.430
Jackson, MS 39201
Telephone: (601) 973-2853
Fascimile: (601) 965-4023

WE HEREBY CONSENT to the entry of this Consent Decree, subject to the public notice and comment provisions of 28 C.F.R. § 50.7:

**FOR PLAINTIFF UNITED STATES OF AMERICA (Continued):**

MARY J. WILKES
Regional Counsel
United States Environmental Protection Agency
Region 4
61 Forsyth Street
Atlanta, GA 30303

WILLIAM B. BUSH, JR.
Associate Regional Counsel
United States Environmental Protection Agency
Region 4
61 Forsyth Street
Atlanta, GA 30303
Telephone: 404-562-9538
Facsimile: 404-562-9487

WE HEREBY CONSENT to the entry of this Consent Decree, subject to the public notice and comment provisions of 28 C.F.R. § 50.7:

**FOR PLAINTIFF UNITED STATES OF AMERICA (Continued):**


PAMELA J. MAZAKAS
Acting Office Director
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency


MARK POLLINS
Division Director
Water Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency


CAROL DEMARCO
Water Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency
1200 Pennsylvania Ave., NW (2243A)
Washington, DC 20460
Telephone: 202-564-2412
Facsimile: 202-564-0024

FOR PLAINTIFF STATE OF MISSISSIPPI BY AND THROUGH THE MISSISSIPPI
COMMISSION ON ENVIRONMENTAL QUALITY AND THE MISSISSIPPI
DEPARTMENT OF ENVIRONMENTAL QUALITY:


TRUDY D. FISHER
Executive Director
Mississippi Department of Environmental Quality
P.O. Box 2261
Jackson, MS 39225


CHRISTOPHER G. WELLS
Senior Attorney
Office of Pollution Control
Mississippi Department of Environmental Quality
P.O. Box 2261
Jackson, MS 39225
Telephone: 601-961-5545
Facsimile: 601-961-5674

FOR THE CITY OF JACKSON:


HARVEY JOHNSON, JR.
Mayor
City of Jackson, Mississippi
P.O. Box 17
Jackson, MS 39205-0017
Telephone:  601-960-1084
Facsimile:  601-960-2504


PIETER TEEUWISSEN
City Attorney
Office of the City Attorney
P.O. Box 2779
Jackson, MS 39205-2779
Telephone: 601-960-1799
Facsimile: 601-960-1756


TERRELL S. WILLIAMSON
Legal Counsel
Office of the City Attorney
P.O. Box 2779
Jackson, MS 39205-2779
Telephone: 601-960-1799
Facsimile: 601-960-1756