# APPENDIX A

BEFORE THE MISSISSIPPI COMMISSION
ON ENVIRONMENTAL QUALITY

MISSISSIPPI COMMISSION ON
ENVIRONMENTAL QUALITY

COMPLAINANT

VS.

ORDER NO. **5823 10**

CITY OF JACKSON
PO BOX 17
JACKSON, MISSISSIPPI 39205-0017

RESPONDENT

### AGREED ORDER

COME NOW the Mississippi Commission on Environmental Quality ("Commission"), acting through the staff and Executive Director of the Mississippi Department of Environmental Quality ("MDEQ"), Complainant, and the City of Jackson, Respondent, in the above captioned cause and agree as follows:

1.

This Agreed Order addresses the following violations relating to Respondent's Savannah Street Waste Water Treatment Facility (the "SSWWTF") and its associated collection system:

A. On March 21, 2009, a 100 million gallon per day ("MGD") influent pump failed at the SSWWTF. On March 27, 2009, discharges of untreated wastewater were observed from manholes located near the State Fairgrounds, the east end of High Street, and at Eubanks Creek near I-55 as a result of such wastewater backing up into the collection system due to the pump failure. On March 30, 2009, Respondent notified Complainant of these discharges that occurred as a result of a 100 MGD pump failure. Water samples taken on April 2, 2009 from the Pearl River indicated that impacts, as a result of the discharges, violated water quality

standards. Respondent was contacted by Complainant on April 20, 2009, and notified that these discharges constituted violations of NPDES Permit No. MS0024295 (the "Permit) (see Conditions T-24: Proper Operation, Maintenance, and Replacement, T-25: Duty to Mitigate, and T-30: Bypassing- Prohibition of Bypass.)

B. On July 22, 2009, MDEQ staff observed Respondent diverting a portion of the SSWWTF's influent wastewater into the storm diversion cells located at the SSWWTF. On July 22, 2009, Respondent also released wastewater from the storm diversion cells and blended this flow into the main effluent from the SSWWTF. This blended flow was then discharged from the SSWWTF's Outfall 001. Respondent's actions were the result of the SSWWTF not having sufficient storage and/or treatment capacity to handle the volume of influent wastewater. The SSWWTF's storage and/or treatment capacity has been limited by the accumulation of excess sludge and solids in the storm diversion cells and in the aeration basins and secondary clarifiers within the SSWWTF as a result of, at least in part, Respondent's sludge handling facilities being unavailable to properly process the sludge and solids for disposal. This accumulation of sludge and thus this diversion of wastewater on July 22, 2009 constitutes a violation of the Permit (see Conditions T-24: Proper Operation, Maintenance, and Replacement and T-25: Duty to Mitigate).

C. Mississippi Code 49-17-29 prohibits the discharge of any wastes into any waters of the State which reduce the quality of those waters. Complainant notified Respondent of the following discharges within the collection system:

i. On August 11, 2009, MDEQ confirmed a discharge of untreated wastewater from a manhole located off Browning Street near Clinton. The discharge continued several days following MDEQ notifying Respondent of the discharge. Water samples taken on August 20, 2009 from Bakers Creek indicated that impacts, as a result of the discharge, violated water quality standards.

ii. On August 24, 2009, MDEQ confirmed a discharge of untreated wastewater from a lift station near the Brookwood Subdivision in south Hinds

County. The discharge continued several days following MDEQ notifying Respondent of the discharge. Water samples taken on August 27, 2009 from an unnamed tributary entering Trahon Creek indicated that impacts, as a result of the discharge, violated water quality standards.

D. On June 24, 2009, Complainant notified Respondent that land application activities of wastewater treatment sludges had been conducted on properties without a current, valid permit in violation of Section II of the Mississippi Nonhazardous Waste Management Regulations. Further, Respondent failed to timely submit applications for permit reissuance for the Jackson Landfill, Parcel 2 and Parcel 3 Landfarm, Jackson Biosolids Beneficial Agricultural Application Sites, and the Berry Land Application Site in violation of Solid Waste Management Permit No. SW02501A0005, No. SW02501C0420, No. SW0250030464, and No. SW0250030468, respectively.

2.

In lieu of a formal enforcement hearing concerning the specific violation(s) listed above, Complainant and Respondent agree to settle this matter as follows:

A. Respondent agrees to pay and Complainant agrees to accept a civil penalty in the amount of $240,000.00. Respondent shall pay this penalty to MDEQ within thirty (30) days after this Agreed Order has been executed by the MDEQ Executive Director, or her designee (the "Effective Date").

B. On or before August 31, 2010, Respondent shall submit to MDEQ for approval a Sewer Overflow Response Plan ("SORP") that will establish timely and effective methods and means of: (a) responding to, cleaning up, and/or minimizing the impact of all sanitary sewer overflows ("SSOs"); (b) timely reporting the location, volume, cause, impact, and other pertinent information of all SSOs to the appropriate regulatory agencies; and (c) notifying the potentially impacted public.

  i. For purposes of the SORP and this Agreed Order, the following definitions

shall apply:

(a) "SSO" shall mean an overflow, spill, or release of wastewater from Respondent's Sewer System including: (i) Unpermitted Discharges; (ii) any overflows, spills, or releases of wastewater, including those that may not have reached waters of the State or waters of the United States; and (iii) all Building Backups.

(b) "Unpermitted Discharge" shall mean a discharge of pollutants which reaches waters of the United States or the State from (i) the Sewer System, (ii) a Wastewater Treatment Plant ("WWTP") through a point source not specified in an NPDES Permit, or (iii) a WWTP which constitutes a prohibited Bypass.

(c) "Building Backup" shall mean a wastewater backup into a building that is caused by blockages, malfunctions, or flow conditions in the Sewer System. A wastewater backup into a building that is caused by a blockage or other malfunction of a Private Lateral is not a Building Backup.

(d) "Sewer System" shall mean the Wastewater Collection Transmission Systems ("WCTS") and the WWTPs.

(e) "Wastewater Collection and Transmission Systems" or "WCTS" shall mean the municipal wastewater collection and transmission systems, including all pipes, force mains, gravity sewer lines, lift stations, pump stations, manholes and appurtenances thereto, which are owned or operated by Respondent.

(f) "Wastewater Treatment Plant" or "WWTP" shall mean devices or systems used in the storage, treatment, recycling, and reclamation of municipal wastewater. For purposes of this Agreed Order, this definition shall include all facilities owned, managed, operated, and maintained by Respondent, including but not limited to the following facilities: Savanna Street WWTP, Trahon/Big Creek WWTP and Presidential Hills WWTP.

(g) "Bypass" shall have the meaning set forth at 40 C.F.R. § 122.41(m).

(h) "Private Lateral" shall mean that portion of a sanitary sewer conveyance pipe, including that portion in the public right of way, that extends from the wastewater main to the single-family, multi-family, apartment or other dwelling unit or commercial or industrial structure to which wastewater service is or has been provided.

ii. Within twenty-four (24) hours of the time Respondent first becomes aware of an SSO, Respondent shall provide in an oral report to MDEQ the location of the SSO by street address or any other appropriate method (i.e., latitude-longitude). The oral report shall be given to MDEQ's Environmental Compliance and Enforcement Division's Municipal and Private Facilites Branch at (601) 961- 5171.

iii. Respondent shall also provide a written report to MDEQ for all SSOs within 5 days of the time Respondent becomes aware of the SSO. Respondent shall maintain a copy of any written reports prepared pursuant to this subparagraph for a period of not less than five (5) years from the date of the SSO. The written report shall contain the following:

(a) Location of the SSO by street address, or any other appropriate method (i.e., latitude-longitude);

(b) Estimated date and time when the SSO began and stopped, or if it is still an active SSO, the anticipated time to stop the SSO;

(c) Steps taken to respond to the SSO;

(d) Name of the receiving water, if applicable;

(e) An estimate of the volume (in gallons) of sewage discharged;

(f) Description of the Sewer System component from which the SSO was released (such as manhole, crack in pipe, pump station wet well or constructed overflow pipe);

(g) Estimate of the SSO's impact on public health and to water quality in the receiving water body;

(h) Cause or suspected cause of the SSO;

(i) The date of the last SSO at the same location;

(j) Steps taken or to be taken to reduce, eliminate, and prevent reoccurrence of the SSO and a schedule of major milestones for those steps; and

(k) Report of all notifications to the public and other agencies or departments.

If submitted within 24 hours of the SSO, this written report may be submitted in lieu of providing oral notification as stated in 2.B.ii. above.

iv. Respondent shall maintain for all SSOs, for a period of not less than five (5) years from the date of the SSO, all records documenting the steps that have been and will be taken to prevent the SSO from recurring, including work order records associated with investigation and repair activities related to the SSO. Respondent shall also maintain for a period of not less than five (5) years from the date of the SSO a list and description of complaints from customers or others regarding an SSO.

v. The SORP shall provide procedures for responding to SSOs to minimize the environmental impact and potential human health risk of SSOs. The SORP shall include, but not be limited to, the following:

(a) A detailed description of the actions Respondent will undertake to immediately provide notice to the public (through the local news media or other means including signs or barricades to restrict access) of the SSO;

(b) A detailed description of the actions Respondent will undertake to provide notice to appropriate federal, state or local agencies/authorities;

(c) A detailed plan (including the development of response standard operating procedures) to minimize the volume of untreated wastewater transmitted to the portion of the Sewer System impacted by the events precipitating the SSO to minimize overflow volumes;

(d) For Building Backups, the SORP shall include a detailed plan describing the standard operating procedures to be followed by Respondent personnel in responding, including:

   (1) A description of methods for communicating with customers about how to report Building Backups and how to obtain clean-up;

   (2) A description of Respondent's response to Building Backups, including:

      (A) The timeframe for responses;

      (B) The measures taken to cleanup Building Backups caused by conditions in Respondent's Sewer System. Such measures shall include procedures necessary to disinfect and/or remove items potentially contaminated by Building Backups, and shall include wet vacuuming or other removal of spillage, wiping floors and walls with cleaning solution and disinfectant, flushing out and disinfecting plumbing fixtures, carpet cleaning and/or replacement and other appropriate measures to disinfect and/or remove items potentially contaminated by Building Backups; and

      (C) The measures taken to correct or repair conditions in the Sewer System causing or contributing to Building Backups; and

      (3) A description of Respondent's follow-up process to insure adequacy of cleanup.

  (e) A detailed plan of the resources to be used to correct or repair the condition causing or contributing to the SSO;

  (f) A plan to ensure the preparedness, including response training of Respondent's employees, contractors, and personnel of other affected agencies necessary for the effective implementation of the SORP in the event of a SSO;

  (g) Identification of SSO locations within the sewershed served by each pump station and those locations at which a SSO is likely to occur first in the event of pump station failure for each pump station; and

  (h) Pump station-specific emergency procedures, bypass/pump-around strategies, and estimated storage capacity (i.e., maximum volume of sewage that can be stored in the event of a pump station failure or repair without causing a SSO and estimated time during which sewage can be stored before a SSO will occur). In the event that a repair may cause or lengthen the time of a SSO, the SORP shall provide a procedure for determining when additional storage or pump around will be needed.

vi. Respondent shall provide adequate training necessary for its employees, contractors, and personnel of other affected agencies to effectively implement the SORP. The SORP shall provide training guidelines to ensure adequate response training is provided to management and field personnel responsible for responding to SSOs. Respondent shall establish procedures, and provide adequate training to response personnel for estimating volumes of wastewater released during SSOs.

vii. Respondent shall identify and include in the SORP a list of those SSO locations within the sewershed that has been recorded as overflowing more

than once in the past two (2) years and those locations at which a SSO is likely to occur first in the event of pump station failure for each pump station. Respondent shall establish routine inspection routes to be performed after each rain event. The inspection routes shall include all SSOs identified as occurring more than once in the past two (2) years and those pump stations that are not monitored at a central location via telemetry, SCADA, or other remote monitoring devise.

viii. Respondent acknowledges that the SORP to be implemented as a part of this Agreed Order may be deemed interim in nature despite being approved by MDEQ and, as a result, MDEQ and/or the United States Environmental Protection Agency may require additional measures to be included in the SORP.

C. On or before August 31, 2010, Respondent shall submit to MDEQ for approval a written plan to address the proper maintenance of all pumps in the influent pump station at the SSWWTF. This plan should also include a contingency plan to be implemented in the event of pumps in the pump station failing or otherwise being taken off line to ensure adequate influent flow into the SSWWTF.

D. On or before November 30, 2010, Respondent shall submit to MDEQ for approval a Sludge and Solids Removal Plan that shall provide for the removal and proper disposal of excess, accumulated sludge/solids from the SSWWTF's storm diversion cells. The Sludge and Solids Removal Plan shall identify the minimum amount of sludge/solids that are to remain in the storm diversion cells, so as to achieve the maximum design capacity of the storm diversion cells as certified by a Professional Engineer licensed in the State of Mississippi. The Sludge and Solids Removal Plan shall also include, at a minimum, a schedule for completion of removal and disposal activities not to exceed September 1, 2011. The plan shall take into account the flow during the sludge/solids removal so as to minimize the environmental impact of the removal process. The Plan shall provide for Respondent to demonstrate that the minimum amount of sludge to remain in the

storm diversion cells has been achieved using acceptable measuring techniques. The plan shall also address sludge management to include proper storage and proper disposal. After Respondent has commenced sludge/solids removal, the Plan shall also provide for Respondent to submit weekly Status Reports to MDEQ that shall include, at a minimum, the hours of sludge removal operations performed, the quantity of sludge/solids removed, any operational setbacks experienced (weather, equipment failure, etc.), and an analysis of Respondent's progress to complete work under the Plan on or before the September 1, 2011 deadline.

E. On or before November 30, 2010, Respondent shall submit to MDEQ for approval a Sludge and Solids Removal Plan that shall provide for the removal and proper disposal of excess, accumulated sludge/solids from the SSWWTF's aeration basins and secondary clarifiers within the SSWWTF. The Sludge and Solids Removal Plan shall identify the minimum amount of sludge/solids that are to remain in the aeration basins and the secondary clarifiers so as to achieve the maximum secondary treatment of all flow discharged from the SSWWTF as certified by a Professional Engineer licensed in the State of Mississippi. The Sludge and Solids Removal Plan shall also include, at a minimum, a schedule for completion of removal and disposal activities not to exceed March 31, 2011. The plan shall take into account the flow during the sludge/solids removal so as to minimize the environmental impact of the removal process. The Plan shall provide for Respondent to demonstrate that the minimum amount of sludge to remain in the aeration basins and the secondary clarifiers has been achieved using acceptable measuring techniques. The plan shall also address sludge management to include proper storage and proper disposal. After Respondent has commenced sludge/solids removal, the Plan shall also provide for Respondent to submit weekly Status Reports to MDEQ that shall include the hours of sludge removal operations performed, the quantity of sludge/solids removed, any operational setbacks experienced (weather, equipment failure, etc.), and an analysis of Respondent's progress to complete work under the Plan on or before the March

31, 2011 deadline.

F. On or before August 31, 2010, Respondent shall submit to MDEQ for approval an engineering study on its sludge handling and disposal practices associated with the SSWWTF. To eliminate the current and any future accumulation of excess sludge at the SSWWTF, this study, at a minimum, shall determine the need for additional sludge dewatering facilities, additional land application sites, and alternative means of final disposal. The study shall include a schedule, not to exceed June 30, 2011, for actions to be taken by Respondent to address and provide for these additional needs to be met for its sludge handling and disposal practices.

G. Respondent shall immediately cease the land application of waste on properties that do not have a current, valid permit under Section II of the Mississippi Nonhazardous Waste Management Regulations and on properties that Respondent once held a solid waste management permit for such activities but did not submit a reissuance application 180 days prior to expiration.

3.

In addition to the penalty set forth in Paragraph 2.A. of this Agreed Order, Respondent agrees to pay a stipulated penalty of $100 per day each day after the expiration of any deadline set forth in Paragraphs 2.B. – 2.G. until each item has been completed. MDEQ shall have the discretion to calculate and notify Respondent of the amount of accrued stipulated penalties on a periodic basis, which shall be no more frequently than monthly. Respondent agrees to pay the entire amount of the accrued stipulated penalties within 30 days of receipt of such notification from MDEQ.

4.

Notwithstanding the provision by this Agreed Order for stipulated penalties to accrue in certain circumstances, the Commission reserves the right to conduct a separate enforcement action concerning any violation by Respondent of this Agreed Order or of the laws or regulations within the jurisdiction of the Commission. If the Commission conducts a separate enforcement action concerning a violation for which stipulated penalties are provided in this Agreed Order, the Commission will be deemed to have waived the right to collect stipulated penalties in lieu of

the right to conduct the separate enforcement action. In that separate enforcement action, the Commission may seek penalties, injunctive relief, or other appropriate relief different from or in the excess of the amount of stipulated penalties included in this Agreed Order, up to and including the statutory maximum penalty.

5.

Nothing in this Agreed Order shall limit the rights of MDEQ or the Commission in the event Respondent fails to comply with this Agreed Order. The Agreed Order shall be strictly construed to apply to those matters expressly resolved herein.

6.

The civil penalty imposed in Paragraph 2.A of this Agreed Order addresses only those specific violations asserted in Paragraph 1. Nothing contained in this Agreed Order shall limit the rights of MDEQ, the Commission, or the United States Environmental Protection Agency to take enforcement or other actions, including the imposition of injunctive relief and/or penalties, against Respondent for past violations not specifically addressed herein and for future violations of any law, rule, regulation and/or permit.

7.

Respondent understands and acknowledges that it is entitled to an evidentiary hearing before the Commission pursuant to Miss. Code Ann. Section 49-17-31 (Rev. 2003), and that it has made an informed waiver of that right.

ORDERED, this the __10__ day of __September__, 2010.

MISSISSIPPI COMMISSION ON
ENVIRONMENTAL QUALITY

BY: _____
TRUDY D. FISHER
EXECUTIVE DIRECTOR
MISSISSIPPI DEPARTMENT
OF ENVIRONMENTAL QUALITY

AGREED, this the _____ day of _____, 2010.

CITY OF JACKSON

BY: _____

TITLE: _____

STATE OF Mississippi

COUNTY OF Hinds

PERSONALLY appeared before me, the undersigned authority in and for the jurisdiction aforesaid, the within named Harvey Johnson, Jr. who first being duly sworn, did state upon his/her oath and acknowledge to me that he/she is the Mayor of the City of Jackson and is authorized to sign and enter this Agreement on behalf of the City of Jackson.

SWORN AND SUBSCRIBED BEFORE ME, this the 3rd day of August, 2010.

_____

NOTARY PUBLIC

My Commission expires: Feb. 13, 2014

BEFORE THE MISSISSIPPI COMMISSION
ON ENVIRONMENTAL QUALITY

MISSISSIPPI COMMISSION ON
ENVIRONMENTAL QUALITY

COMPLAINANT

VS.

AMENDMENT TO
AGREED ORDER NO. 5823 10

JACKSON POTW, SAVANNA STREET
PO BOX 17 DEPARTMENT OF PUBLIC WORKS
JACKSON, MISSISSIPPI 39205-0017

RESPONDENT

## ORDER AMENDMENT

Mississippi Commission on Environmental Quality Order No. 5823 10, previously issued on September 10, 2010, in the above captioned matter, came before the Executive Director of the Mississippi Department of Environmental Quality (MDEQ) on Respondent's request for amendment. Having considered Respondent's request, the Executive Director finds that the requirements outlined in the above-referenced Order should be amended as follows:

1.

Paragraph 2.A. of Agreed Order No. 5823 10 is amended to read as follows:

Respondent agrees to pay, and Complainant agrees to accept, a civil penalty in the amount of $240,000.00. Respondent shall pay this penalty to MDEQ in four equal installments in accordance with the following schedule:

| Installment Due Date | Installment Amount |
| --- | --- |
| October 15, 2010 | $60,000.00 |
| February 15, 2011 | $60,000.00 |
| May 15, 2011 | $60,000.00 |
| August 15, 2011 | $60,000.00 |

Case 3:12-cv-00790-HTW-LGI   Document 2-2   Filed 11/20/12   Page 16 of 19

2.

This Order Amendment shall not, and is not intended to, supersede Order No. 5823 10, except to the limited extent described in Paragraph 1 above. Except as amended by Paragraph 1 above, all terms and conditions of Order No. 5823 10 shall remain in full force and effect.

ORDERED, this the __11__ day of __October__, 2010.

MISSISSIPPI COMMISSION ON
ENVIRONMENTAL QUALITY

BY: _____
TRUDY D. FISHER
EXECUTIVE DIRECTOR
MISSISSIPPI DEPARTMENT
OF ENVIRONMENTAL QUALITY

ENF20090002

Page 2 of 2

ECED

BEFORE THE MISSISSIPPI COMMISSION
ON ENVIRONMENTAL QUALITY

MISSISSIPPI COMMISSION ON
ENVIRONMENTAL QUALITY

COMPLAINANT

VS.

AMENDMENT TO
AGREED ORDER NO. 5823 10

JACKSON POTW, SAVANNA STREET
PO BOX 17 DEPARTMENT OF PUBLIC WORKS
JACKSON, MISSISSIPPI 39205-0017

RESPONDENT

## AGREED ORDER AMENDMENT

Mississippi Commission on Environmental Quality Agreed Order No. 5823 10, previously issued on September 10, 2010, and amended on October 11, 2010, in the above captioned matter, came on this day for reconsideration upon the joint request of the Mississippi Commission on Environmental Quality, Complainant, and Jackson POTW, Savanna Street, Respondent, and the Executive Director of the Mississippi Department of Environmental Quality having received additional information in this cause, finds that the requirements outlined in the above-referenced Order should be amended as follows:

1.

Paragraph 2.D. of Agreed Order No. 5823 10 is amended to read as follows:

On or about December 3, 2010, Respondent submitted to MDEQ for approval its "Savanna Street Wastewater Treatment Plant Sludge Removal Plan." That plan contained four alternative proposals for the removal and proper disposal of excess, accumulated sludge/solids from the SSWWTF's storm diversion cells. The plan included, for each such

alternative, a schedule for completion of removal and disposal activities. After considering the alternative proposals, MDEQ tentatively approved implementation of "Option 2A" contained in the plan, but requested additional, clarifying information regarding implementation of that option. On June 3, 2011, Respondent submitted to MDEQ its "Savanna Street Wastewater Treatment Plant Sludge Removal Plan Addendum," and on July 19, 2011, Respondent submitted its "Sludge Removal Plan Addendum II." Those documents provided additional details regarding certain aspects of the sludge removal plan, including sludge excavation and dewatering and odor control. However, in the addendum, Respondent reserved the right to choose at a later date, depending upon contractor capabilities and resource availability, among various alternatives for sludge excavation, dewatering, and ultimate disposal. MDEQ has now approved the implementation of Option 2A of the sludge removal plan, as supplemented by the Savanna Street Wastewater Treatment Plant Sludge Removal Plan Addendum and Sludge Removal Plan Addendum II. Respondent shall immediately begin implementation of the plan. In accordance with the schedule of implementation provided for in the plan, Respondent shall notify MDEQ, in writing, on or before May 1, 2012, which alternatives for sludge excavation and dewatering Respondent will implement. After Respondent has commenced sludge/solids removal, the Respondent shall submit quarterly Status Reports to MDEQ that shall include, at a minimum, the hours of sludge removal operations performed, including the hours of dredging operations and ultimate disposal operations, the quantity of sludge/solids removed, the method(s) of disposal used, any operational setbacks experienced (weather, equipment failure, etc.), and an analysis of Respondent's progress to complete work under Option 2A on or before the December 31, 2017, deadline. In any event, Respondent, in accordance with the implementation schedule, shall remove all sludge not later than April 30, 2014 and shall dispose of all removed sludge no later than December 31, 2017.

2.

This Order Amendment shall not, and is not intended to, supersede Order No. 5823 10, or any previous amendment thereof, except to the limited extent described in Paragraph 1 above.

Except as amended by Paragraph 1 above, all terms and conditions of Order No. 5823 10, as previously amended on October 11, 2010, shall remain in full force and effect.

ORDERED, this the __29__ day of __September__, 2011.

MISSISSIPPI COMMISSION ON
ENVIRONMENTAL QUALITY

BY: _____
TRUDY D. FISHER
EXECUTIVE DIRECTOR
MISSISSIPPI DEPARTMENT
OF ENVIRONMENTAL QUALITY