IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
(Jackson Division)

| | |
|---|---|
| THE UNITED STATES OF AMERICA )<br>and THE STATE OF MISSISSIPPI, )<br>   )<br>   Plaintiffs, )<br>   )<br>   v. )<br>   )<br>THE CITY OF JACKSON, MISSISSIPPI, )<br>   )<br>   Defendant. )<br>_____ ) | Case No. 3:12-cv-790  TSL-JMR |

**MEMORANDUM IN SUPPORT OF JOINT MOTION TO ENTER CONSENT DECREE**

The United States of America and the State of Mississippi submit the following Memorandum in support of their Joint Motion to Enter the Consent Decree lodged in this matter.

**INTRODUCTION**

On November 20, 2012, Plaintiff, the United States of America, on behalf of the United States Environmental Protection Agency ("EPA") and the State of Mississippi ("State"), on behalf of the Mississippi Department of Environmental Quality ("MDEQ"), (referred to collectively herein as "Plaintiffs"), with the consent of the Defendant, the City of Jackson ("Jackson"), lodged with the Court a proposed Consent Decree in the above-captioned action ("proposed Consent Decree") (Docket No. 2 at attachment 1).  This memorandum is submitted in support of the motion by the United States requesting that this Court enter the proposed Consent Decree.  The proposed Consent Decree addresses the claims in both the Plaintiffs' complaint in this matter for various violations of the Clean Water Act ("CWA") and the Mississippi Air and Water Pollution Control Law ("MAWPCL").  The complaint alleges, among other violations, sanitary sewer overflows ("SSOs") (which are defined as any release of sewage from the sewer

1

system including those releases that do not reach water of the United States such as basement backups), from Jackson's sewer system, as well as discharges from its Savanna Street, Trahon, and Presidential Hills wastewater treatment plants ("WWTPs") in violation of the terms of its National Pollutant Discharge Elimination System ("NPDES") permits.

The goals and objectives of the proposed Consent Decree are to eliminate SSOs from Jackson's sewer system and to address violations of its NPDES permits at its WWTPs.

At the time of lodging the proposed Consent Decree, the United States informed the Court that, pursuant to 28 C.F.R. § 50.7, before seeking entry of the proposed Consent Decree, notice of lodging of the proposed Consent Decree must be published in the Federal Register for public review and comment as provided in the proposed Consent Decree.

Notice of the proposed Consent Decree was published in the Federal Register on December 3, 2012, 77 Fed. Reg. 71633-01 (2012), 2012 Westlaw 5986867. The thirty-day public comment period began on the date the notice was published in the Federal Register and closed on January 3, 2013. During this time a copy of the proposed Consent Decree and its appendices was available on the U.S. Department of Justice website at http://www.usdoj.gov/enrd/Consent_Decrees.html. The United States did not receive any comments from the public on the proposed Consent Decree. Pursuant to Paragraph 107 of the proposed Consent Decree the City has consented to its entry without further notice.

## BACKGROUND

I. THE JACKSON SEWER SYSTEM

Jackson is a "city" within the meaning of the State of Mississippi Code (M.C.A. 1972, § 21-1-1) and was incorporated in 1833. As a result, Jackson is a "municipality," as that term is defined by Section 502(4) of the Clean Water Act ("CWA"), 33 U.S.C. § 1362(4). The group

within Jackson government that is responsible for the provision of sewage management is the Water/Sewer Division of the Public Works. Jackson owns and operates three wastewater treatment plants, the Savanna Street Wastewater Treatment Plant ("Savanna St. WWTP"), the Trahon/Big Creek Wastewater Treatment Plant ("Trahon WWTP") and the Presidential Hills Wastewater Treatment Plant ("Presidential Hills WWTP"). The Savanna St. WWTP is regulated pursuant to National Pollutant Discharge Elimination System ("NPDES") Permit Number MS0024295, the Trahon/Big Creek WWTP is regulated pursuant to NPDES Permit Number MS0044059, and the Presidential Hills WWTP is regulated pursuant to NPDES Permit Number MS0030295. These three NPDES permits were issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, by the State of Mississippi Department of Environment Quality ("MDEQ"), which is authorized by the U.S. Environmental Protection Agency ("EPA") to implement the CWA in the State of Mississippi. In addition, Jackson owns and operates the collection and transmission system ("CTS") for its sewer system which includes approximately 890 miles of gravity sewer lines, including approximately 17,800 manholes, 95 pump stations, and associated pressurized force mains. Jackson's CTS is a separate sewer system designed to convey only municipal sewage, not storm water. See, Plaintiffs' Complaint at ¶¶ 6 and 17-20.

II.     CLEAN WATER ACT - PERTINENT PROVISIONS

In Section 101(a) of the CWA, 33 U.S.C. § 1251(a), Congress declared that the objective of the CWA "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," and that "it is the national goal that, wherever attainable, an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation shall be achieved by July 1, 1983." 33 U.S.C. § 1251(a)(2). To achieve these goals, Congress made it unlawful for any person to discharge any pollutant from a

point source into the waters of the United States, except in compliance with an NPDES permit issued by EPA or an authorized state.  33 U.S.C. §§ 1311(a), 1342, 1362.

An authorized state can issue NPDES permits authorizing the discharge of pollutants from identified locations into waters.  NPDES permits must contain requirements that govern the relevant discharges, such as the amounts and types of pollutants that can be discharged, operation and maintenance ("O&M") of wastewater collection and treatment facilities, and monitoring and reporting of discharges.  Any discharge to waters that does not occur from a permitted authorized location is thus unlawful under the CWA.  In a further effort to achieve its objectives, the CWA also requires that states adopt "water quality standards," subject to EPA review and approval.  33 U.S.C. § 1313(c).  In addition, Jackson's acts and omissions in violation of the CWA also violate the MAWPCL.

III.    SUMMARY OF COMPLAINT ALLEGATIONS

   A.  Statutory Basis

Section 301(a) of the CWA, 33 U.S.C. § 1311, prohibits the discharge of pollutants by any person except in compliance with that section, and, inter alia, Section 402 of the CWA.  Section 402 of the CWA, 33 U.S.C. § 1342, establishes a system for the issuance of NPDES permits by EPA or approved states to point sources, such as municipal wastewater treatment plants, for discharges of pollutants to waters of the United States.  Similarly, Miss. Code Ann. § 49-17-29(2) prohibits the discharge of pollutants to waters of the State except in accordance with an NPDES permit.  The NPDES permits must contain requirements that govern the relevant discharges, such as the amounts and types of pollutants that can be discharged and operation and maintenance of wastewater collection and treatment facilities.  CWA subsections 309(a)(3), (b) and (d) authorize the commencement of an action for appropriate relief, including permanent or

temporary injunctions and civil penalties, against any person who violates, inter alia, Section 301 of the CWA, including allowing discharges not authorized under any permit and noncompliance with any condition or limitation in NPDES permits issued under Section 402 of the CWA.  Miss. Code Ann. § 49-17-43(2) authorizes the State to commence an action for injunctive relief and civil penalties for violations of the CWA and the MAWPCL.  Plaintiffs' Complaint seeks injunctive relief and civil penalties for violations by Jackson of the CWA, the MAWPCL, and its MDEQ NPDES permits.  The Court has supplemental jurisdiction over Mississippi's state law claims under the MAWPCL pursuant to 28 U.S.C. § 1367(a) because the state law claims are related to the federal law claims and form part of the same case or controversy.

     B.  Description of Violations

          1.     Unpermitted Discharges.

Since at least October 2007,[1] Jackson allowed Sanitary Sewer Overflows ("SSOs") from unpermitted locations within the Sanitary Sewer System ("SSS") to be discharged to waters of the United States and waters of the State.  Such discharges are in violation of Section 301 of the Act and the MAWPCL, as they are not authorized by any NPDES permit.[2]

          2.     Failure to Comply with Permit Conditions - Improper Operation and Maintenance.

In addition to the discharges noted above, since at least October 2007 through the date the complaint was filed, Jackson's sewer system has experienced SSOs from various unpermitted locations within its SSS that did not reach navigable waters of the United States, or waters of the State.  These spills evidence Jackson's failure to comply with the operation and maintenance

---

[1] The Complaint only covers violations from October 2007 through the date the Complaint was filed.
[2] See, Plaintiffs' Complaint at ¶¶ 32-37 (First Claim for Relief).

("O&M") provisions of its NPDES permits.[3]

        3.       Failure to Comply with Effluent Limitations in Permits.

Since at least October 2007, Jackson failed to comply with Section 1 of its NPDES permits by discharging effluent that failed to comply with effluent limitations established in its NPDES permits from each of its WWTPs.[4]

        4.  Failure to Report Sanitary Sewer Overflows.

Each of Jackson's NPDES Permits for its three WWTPs and associated sewer systems contain notification provisions when there are overflows of sewage. In addition to the discharges noted above, since at least October 2007 through the date the complaint was filed, Jackson has failed to provide the required notification of overflows of sewage, within the required timeframes, from its three WWTPs and associated sanitary sewer systems.[5]

        IV.    TERMS OF THE PROPOSED CONSENT DECREE

A. Injunctive Relief

The proposed Consent Decree establishes a judicially enforceable framework for ensuring that Jackson develops effective long term plans for sewer system improvements and implements those plans in an expeditious manner to achieve compliance with the CWA as expeditiously as practicable. As a result, many significant plans will be formulated and extensive capital projects will be planned and implemented throughout the Consent Decree's term. The goals of the proposed Consent Decree are to ensure enforceability, fairness and consistency with other municipal decrees; to prioritize the sequence of remedial activities based on the severity of the various systemic problems, their impact on public health and the environment, and realistic completion deadlines for the projects to bring Jackson into compliance

---

[3] See, Plaintiffs' Complaint at ¶¶ 38-43 (Second Claim for Relief).
[4] See, Plaintiffs' Complaint at ¶¶ 44-50 (Third Claim for Relief).
[5] See, Plaintiffs' Complaint at ¶¶ 51-55 (Fourth Claim for Relief).

with the CWA.

The proposed Consent Decree will require Jackson to implement comprehensive injunctive relief to assess and rehabilitate a majority of its collection system within approximately 18 years to eliminate wet weather/capacity-related SSOs and develop and implement specific Capacity, Management, Operation and Maintenance ("CMOM") programs that the EPA determined were missing or deficient. The goal of this injunctive relief is to eliminate SSOs from its CTS and achieve compliance with the NPDES Permits including eliminating prohibited bypasses of secondary treatment at the Savanna Street WWTP.

Specifically, the remedial actions in the proposed Consent Decree consist of a phased approach for the evaluation and rehabilitation of the CTS (Section VI.B); the development and implementation of a Comprehensive Performance Evaluation ("CPE") and Composite Correction Program ("CCP") for the Savanna Street WWTP (Section VI.C); the development and implementation of CMOM programs to insure proper O&M of the sewer system (Section VI.D); and the implementation of certain work set forth in the MDEQ Agreed Orders (Section VI.E).

Jackson has already begun substantial work aimed at coming into compliance with the CWA.  Pursuant to an Agreed Order with MDEQ, Jackson has established a Sewer Overflow Response Plan ("SORP") to ensure timely and effective response, recording and reporting, and appropriate public notice, of sewer overflows and the City's response thereto.  See, MDEQ Agreed Order I (Appendix A to proposed Consent Decree, Court Docket No. 2-2).  Pursuant to MDEQ Agreed Order I, Jackson also has submitted a Pump Maintenance Plan for all of its pumps in the influent pump station at the Savannah Street WWTP.  Id.  Jackson is also implementing a Sludge and Solids Removal Plan at the Savannah Street WWTP to remove excess accumulated sludge/solids from the facility's storm diversion cells so that they could


again achieve their maximum design storage capacity.  Id.  In addition, pursuant to a separate Agreed Order with MDEQ, Jackson was required to submit a plan to MDEQ to bring its Presidential Hills WWTP into compliance with its NPDES permit by May 31, 2014. See, MDEQ Agreed Order II (Appendix B to proposed Consent Decree, Court Docket No. 2-3).  The work under these Agreed Orders is incorporated into the proposed Consent Decree and once entered shall be enforceable as an obligation under the Consent Decree.  See, proposed Consent Decree at ¶ 44.

Under the Consent Decree, the evaluation and rehabilitation of Jackson's CTS consists of a multi-phased program which will result in a prioritized analysis and evaluation of the CTS, the identification of deficiencies, and the correction of those deficiencies.  The first phase of the project involves the West Bank Interceptor.  The West Bank Interceptor is a major sewer collection line that runs along the Pearl River.  Jackson will first develop and implement a West Bank Interceptor Work Plan and a West Bank Interceptor Rehabilitation Plan pursuant to which it will conduct sewage flow monitoring and inspection of the West Bank Interceptor to identify and remediate any structural deficiencies in the West Bank Interceptor.  See, proposed Consent Decree at ¶¶ 22-23.

Jackson will also develop and implement a Prioritization Work Plan and a Prioritization Report pursuant to which it will estimate the severity of inflow and infiltration ("I/I") within each sewershed comprising the CTS; map the sewer system; assess the capacity of the CTS; and establish sewershed priorities for further evaluation and rehabilitation. Jackson will also develop and implement a Sewershed Evaluation Plan that will outline how sewersheds or groups of sewersheds will be assessed in phases pursuant to the approved schedules set forth in the Prioritization Report.  These evaluations will determine the extent of rehabilitative needs and

corrective actions Jackson will perform in the CTS pursuant to an Evaluation Report/Rehabilitation Plan to meet the objectives of the proposed Consent Decree. Such rehabilitative needs and corrective actions shall be completed for the sewersheds or groups of sewersheds in accordance with an approved schedule as set forth in the Evaluation Report/Rehabilitation Plan for that sewershed or groups of sewersheds. See, proposed Consent Decree at ¶¶ 24-28.

Under the Consent Decree, Jackson will conduct a CPE and a CCP for the Savanna Street WWTP. The CPE consists of an in-depth diagnostic evaluation of the capacity and operation of the Savanna Street WWTP and its ability to comply with the NPDES Permit, including eliminating prohibited bypasses. Based on this evaluation, the CCP shall identify rehabilitative needs and corrective actions to address problems identified in the CPE which shall be completed on or before 60 months after the EPA's approval of the CCP. See, proposed Consent Decree at ¶¶ 29-30.

The proposed Consent Decree requires that Jackson implement certain CMOM programs. The CMOM programs that Jackson will develop and implement include the following: Training Program; Capacity Assurance Program (which shall enable Jackson to authorize new sewer service connections, or increases in flow from existing sewer service connections, only after Jackson certifies that the analysis procedures contained in the approved CAP have been used and that Jackson has determined, based on those procedures, that there is adequate treatment, transmission, and collection capacity); Inter-Jurisdictional Agreement Program (which will ensure that new agreements with municipal satellite sewer systems, pursuant to which Jackson accepts the satellite's wastewater, will require such satellite sewer system to properly manage, operate, and maintain its collection system to minimize peak flows entering into Jackson's

collection system and to comply with the CWA pretreatment program requirements); Private Lateral Program (which will provide for the identification of sources of inflow and infiltration from private laterals); Water Quality Monitoring Program (which shall provide for routine, investigative, and spill impact water quality monitoring and reporting); Pump Station Operations Program and Pump Station Preventive Maintenance Program (which will provide for systematic operations and maintenance procedures such as inspection protocols, communication strategies, written standard operating procedures, preventative and corrective maintenance schedules and procedures, inventory management, information management, and performance measures for Jackson's pump stations); Fats, Oils and Grease Control Program (which will provide for the effective management and control of the introduction of grease into the collection system from food service establishments and private residences); Gravity Line Preventive Maintenance Program (which will provide for systematic operations and maintenance procedures such as inspection protocols, communication strategies, written standard operating procedures, preventative and corrective maintenance schedules and procedures, inventory management, information management, and performance measures for the gravity portion of the CTS); WWTP Operations and Maintenance Program (which will provide for systematic operations and maintenance procedures such as inspection protocols, communication strategies, written standard operating procedures, preventative and corrective maintenance schedules and procedures, inventory management, information management, and performance measures for the WWTPs); and Financing and Cost Analysis Program (which shall ensure timely and effective financial planning for the performance of the work required under the proposed Consent Decree).  See, proposed Consent Decree at ¶¶ 31-43.

B. Civil Penalty

The proposed Consent Decree requires Jackson to pay a civil penalty in the amount of $437,916 to be paid in four installments. Sixty percent of each payment shall go to the United States with the remaining 40% going to the State. This penalty is significant for any municipality and is consistent with the range of penalties assessed in similar municipal CWA cases.

C. Supplemental Environmental Projects ("SEPs")

The proposed Consent Decree requires Jackson to implement a federal SEP valued at $875,000. See, Appendix F to proposed Consent Decree. Through this SEP, Jackson has agreed to perform repairs to defective private laterals[6] owned by low-income residents who likely could not afford to perform such repairs on their own.

D. Stipulated Penalties

The proposed Consent Decree provides for stipulated penalties to be paid to EPA and the State. See, Proposed Consent Decree at Section X. For example, EPA may assess against Jackson stipulated penalties for prohibited bypasses occurring after April 30, 2014; for SSOs that reach waters of the United States or State; for failure to timely submit a deliverable required under the Consent Decree; for failure to timely implement work required under the Consent Decree; for failure to timely implement SEP milestones; for failure to complete the SEP or to spend the agreed-upon amount on a SEP; for failure to remove sludge from the Savanna Street WWTP Storm Diversion Cells; and for failure to comply with MDEQ Agreed Order II. In general, the amount of the stipulated penalty increases the more delinquent Jackson is in meeting a requirement of the Consent Decree.

---

[6] Private lateral is the portion of the sanitary sewer conveyance pipe that extends from the wastewater main to the single family, multi-family, apartment, or other dwelling unit or commercial or industrial structure to which wastewater service is or has been provided.

E.  Termination

The proposed Consent Decree is subject to termination only after Jackson certifies that all requirements of the Consent Decree have been met, including the completion of the federal SEP, payment of all penalties, submission and approval of all required plans, and completion of all the work and implementation of all the requirements in the approved plans.  Any motion seeking termination of the Consent Decree must be reviewed and approved by this Court.  See, Consent Decree at Section XX.

F.  Summary

Many significant plans will be formulated and extensive capital projects will be planned and implemented throughout the Consent Decree's term.  This settlement approach underscores the importance of establishing a judicially enforceable framework for ensuring that Jackson develops effective long term plans for sewer system improvements and implements those plans in an expeditious manner.  The goals of the proposed Consent Decree are to ensure enforceability, fairness and consistency with other municipal decrees; to prioritize the sequence of remedial activities based on the severity of the various systemic problems, their impact on public health and the environment, and realistic completion deadlines; and to allow and encourage meaningful public and judicial review.

The provisions of the proposed Consent Decree ensure enforceability by including the key standard provisions in standard language found in the municipal decrees around the country, clear firm deadlines, penalties, stipulated penalties, and termination only upon approval of the Court.  The substantive requirements for these plans and projects adhere to the CWA, EPA guidance and policy, and other SSO consent decrees the United States has negotiated.  The schedules and deadlines are consistent with those across the country as well.  The proposed

Consent Decree provides that Jackson's submittals, once approved, will be incorporated and become an enforceable part of the Consent Decree.

    G.  Public Comment Period

As described above, the United States published a notice of lodging the proposed Consent Decree in the Federal Register and invited public comment for a period of 30 days thereafter. See, 77 Fed. Reg. 71633-01 (2012), 2012 Westlaw 5986867.  A copy of the Consent Decree was available for review on the Department of Justice's website.  In addition, the Department of Justice issued a press release announcing the lodging of the proposed Consent Decree, advised that there would be a 30 day public comment period, and providing a link to the proposed Consent Decree.  See, "U.S. and Mississippi Announce Clean Water Act Agreement with the City of Jackson," Department of Justice, Office of Public Affairs, issued November 20, 2012, and available at http://www.justice.gov/opa/pr/2012/November/12-enrd-1399.html.  In addition, EPA established a website that provided additional information about the settlement, as well as a including a link to both the Press release mentioned above, and the proposed Consent Decree. See,  http://www.epa.gov/enforcement/water/cases/cityofjacksonmississippi.html.  The United States did not receive any public comments on the proposed Consent Decree.

## **ARGUMENT**

V.  STANDARD OF REVIEW FOR MOTION TO ENTER

The general test applied by courts in the Fifth Circuit in determining whether to approve a consent decree is to ascertain whether the decree is fair, adequate, and reasonable, Cotton v. Hinton, 559 F.2d 1326, 1330 (5th Cir. 1977), and consistent with the objectives of the statute under which the action was brought, United States v. City of Miami, 664 F.2d 435, 441 (5th Cir. 1981) (Rubin, J., concurring).  See also, United States v. Browning-Ferris Indus. Chem. Servs.,

Inc., 704 F. Supp. 1355, 1356 (M.D. La. 1988) (consent decree under several environmental statutes approved as "fair, adequate and reasonable.") "The trial court in approving a settlement need not inquire into the precise legal rights of the parties nor reach and resolve the merits of the claims or controversy." City of Miami, 664 F.2d at 441 n.13 (Rubin, J., concurring). The court does not "substitute its judgment for that of the parties to the decree." United States v. Wallace, 893 F. Supp. 627, 631 (N.D. Tex. 1995).[7]

A consent decree "is a highly useful tool for government agencies, since it maximizes the effectiveness of limited law enforcement resources." United States v. City of Jackson, 519 F.2d 1147, 1151 (5th Cir. 1975.) In addition, "[p]ublic policy strongly encourages the settlement of cases." Ho v. Martin Marietta Corp., 845 F.2d 545, 547 n.2 (5th Cir. 1988). The presumption in favor of settlement "is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA which enjoys substantial expertise in the environmental field." United States v. Akzo Coatings of America, Inc., 949 F.2d 1409, 1436 (6th Cir. 1991) (citing United States v. Cannons Eng'g Corp., 899 F.2d 79, 84 (1st Cir. 1990)). Accord, United States v. City of Alexandria, 614 F.2d 1358, 1362 (5th Cir. 1980) ("a consent decree proposed by a private defendant and government agency . . . carries with it a presumption of validity"):

> [t]he Justice Department and the [defendant] have been in a genuinely adversary posture[,] . . . there is no hint that the settlement has been motivated by any improper considerations[,]   . . . it appears to have been arrived at after mature, deliberate and informed consideration on both sides[,] [and] [i]t has been approved by the Department of Justice and the [defendant,] . . . [s]uch a settlement is entitled to a presumption of validity, which ordinarily may be

---

[7] See also, Ruiz v. McKaskle, 724 F.2d 1149, 1152 (5th Cir. 1984) (quoting Cotton v. Hinton, 559 F.2d at 1330) (in the absence of fraud or collusion, the court should be hesitant to substitute its own judgment for that of counsel); In re: Tutu Water Wells CERCLA Litigation, 326 F.3d 201, 209 (3rd Cir. 2003) (quoting Cannons, 899 F.2d 79, 84 (1st Cir. 1990) (relevant standard is not whether settlement is one which the court itself might have fashioned, or considers as ideal, but whether the proposed decree is fair, reasonable, and faithful to the objectives of the governing statute.)

>overcome only if its provisions are not within reasonable bounds or are illegal, unconstitutional or against public policy.

United States v. Texas Educ. Agency, 679 F.2d 1104, 1108 (5th Cir. 1982).

VI. THE DECREE IS FAIR, REASONABLE AND CONSISTENT WITH THE CWA

The proposed Consent Decree meets the three-part test for district court approval of a settlement: The decree is fair, reasonable, and consistent with the CWA. Accordingly, the Court should enter the proposed Consent Decree.

A. The Proposed Consent Decree is Fair

Procedural fairness requires consideration of the "candor, openness, and bargaining balance" of the negotiation process. See, e.g., Wallace, 893 F. Supp. at 632.[8] As the test for procedural fairness is whether there were "arms length settlement negotiations conducted in good faith by experienced legal counsel," Wallace, 893 F. Supp. at 632, this settlement readily meets the test.[9] In this case, the settlements are the result of good faith, arms-length bargaining between Plaintiffs and Jackson, represented in the negotiations by experienced counsel.

Further, the proposed Consent Decree reflects the parties' careful and informed

---

[8] Some opinions also address "substantive" fairness, which requires that a consent decree apportion liability fairly across multiple defendants. See, e.g., Wallace, 893 F. Supp. at 632 (citing Cannons). Substantive fairness comes into play in multiple-defendant environmental matters when non-settlors object that a settlement leaves them too large a share of liability. Here, however, the settlement does not allocate proportionate liability for response costs or damages, but rather targets a specific penalty to a specific defendant. Thus, the substantive fairness factor is not applicable. In this settlement, the controlling factors will be whether the settlement is reasonable, adequate, and consistent with the CWA.

[9] In stating that a court should attempt to assess the fairness of the negotiation process, the Northern District of Texas' Wallace opinion and other district court opinions within the Fifth Circuit follow the First Circuit's Cannons opinion. See, e.g., Wallace, 893 F. Supp. at 632 (citing Cannons, 899 F.2d at 86). Not all courts, however, agree that inquiry into the negotiation process is necessary or advisable. Under an alternative view, the nature of the bargaining process normally would be irrelevant because the essential question before the court is the *objective* reasonableness of the terms of the proposed decree. See, e.g., Spectra-Physics, Inc. v. Superior Court, 198 Cal.App.3d 1487, 1494, 244 Cal.Rptr. 258, 261 (Cal. App. 6 Dist. 1988) ("objective reasonableness of the settlement is the matter in issue"). We are aware of no opinion in which the Fifth Circuit itself adopts Cannons's holding regarding procedural fairness. In addition, there is at least a suggestion in Fifth Circuit precedent that the Fifth Circuit might *not* follow Cannons on the procedural-fairness issue. See, e.g., Cotton v. Hinton, 559 F.2d at 1330 ("inquiry should focus upon the terms of the settlement"). If the Cannons test applies, however, it was certainly met here.

assessment of the merits of the Plaintiffs' claims, the costs, risks, and delays that litigation would entail and the benefits that will accrue from an immediate start of the injunctive measures contained in the proposed Consent Decree.  If the proposed Consent Decree is not entered, Plaintiffs are confident they would ultimately prevail on the claims alleged in the Complaint, as liability under the CWA and MAWPCL is strict, but it would likely take years to litigate over the highly complex scope and schedule of the necessary injunctive relief, with costly expert witness discovery, and with no guaranty that the result would be more expeditious or more beneficial to the environment than that embodied in the proposed Consent Decree.  Further, litigation over the appropriate injunctive relief would consume a tremendous amount of the parties' and the Court's limited resources -- resources that would be better devoted toward remedying the environmental problems at issue here.  Of course, as with any settlement, the Consent Decree is the product of compromise in which, "in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation."  United States v. City of Jackson, Miss., 519 F.2d 1147, 1152 (5th Cir. 1975) (*quoting* United States v. Armour & Co., 402 U.S. 673, 682 (1971)).  But, "[t]he trial court should not make a proponent of a proposed settlement 'justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes.'"  Cotton, 559 F.2d at 1330 (*citing* Milstein v. Werner, 57 F.R.D. 515, 524-25 (S.D.N.Y. 1972)).  Furthermore, courts should be sensitive to the "resources consumed by the federal agencies in negotiating these decrees, as well as the chance justly to finalize a matter that otherwise would burden agencies and courts."  United States v. Allegheny-Ludlum Indus., Inc., 517 F.2d 826, 851 (5th Cir. 1975).

      Finally, in evaluating a settlement under environmental statutes, fairness should also be

considered in light of the effect of the decree on non-signatories – in this case, the public. The citizens of Jackson will benefit from this settlement because it requires Jackson to eliminate SSOs and to take other measures to fully comply with the law. The schedules specified in and required by the proposed Consent Decree are expeditious and reasonable. If the parties instead litigated this case, it could be years before an order for injunctive relief is obtained, and there is certainly no assurance that such an order would provide for more complete or more expeditious relief. In short, for all of these reasons, this Court should find that the proposed Consent Decree is fair to the public and the parties.

      B. The Proposed Consent Decree Is Reasonable

Although not binding on this court, the Sixth Circuit, in reviewing a similar Clean Water Act Consent Decree with the City of Lexington, Kentucky, recently held that the most important criterion for the Court to consider in determining whether a proposed Consent Decree is reasonable is its likely effectiveness as a vehicle for cleansing the environment. United States v. Lexington-Fayette Urban County Gov't, 591 F.3d 484, 489 (6th Cir. 2010)(citations omitted). The proposed Consent Decree will bring Jackson's SSOs into compliance with the CWA in a manner that is consistent with the CWA. The proposed Consent Decree contains schedules that are "as expeditious as practicable" and subject to backstop dates that are appropriately stringent. Finally, the proposed Consent Decree calls for a $437,916 civil penalty to be paid to the Plaintiffs and $875,000 in a SEP to assist low income homeowners make repairs to their private lateral connections to the sewer system and improve and protect water quality. See, Envtl. Conservation Org. v. City of Dallas, 529 F.3d 519, 531 (5th Cir. 2008)(noting penalty in consent decree "represents the federal government's discretionary resolution of the level of penalty needed"). Furthermore, the proposed Consent Decree requires Jackson to address its remaining

violations within a short period of time, with enforceable deadlines, and stipulated penalties should they fail to achieve compliance.

To be sure, it might in theory have been possible for the Plaintiffs to have negotiated a tighter deadline for certain projects or a higher stipulated penalty under certain circumstances. As discussed above, however, the issue for this Court is not whether these are the best possible settlements the Plaintiffs could have negotiated, but whether the settlements provide a reasonable approach to obtaining CWA compliance in this matter. Where the costs of the necessary remedial work will be truly enormous, as here, reasonableness certainly allows consideration not only of how fast it would be physically possible to complete that work, but also of the impact the required costs will have on the community and other important public needs. Whether or not this settlement struck the perfect balance between expeditious compliance and economic burden, it struck a balance that is reasonable in achieving CWA compliance.

C. The Proposed Consent Decree is Consistent with the Clean Water Act

Finally, the proposed Consent Decree is consistent with the CWA and comports with the specific statutory policies that underlie this case. The overarching goal of the CWA is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The proposed Consent Decree furthers those goals, as discussed above, by obtaining Jackson's compliance with the CWA in a manner that is as expeditious as practicable. As the proposed Consent Decree is consistent with the CWA, the Court should approve it. See, City of Miami, 664 F.2d at 441 (Rubin, J., concurring)

In addition, the proposed Consent Decree is in the public interest:

> [t]he court should . . . bear in mind the flexibility of the public interest inquiry: the court's function is not to determine whether the resulting array of rights and liabilities "is the one that will best serve society," but only to confirm that the resulting settlement is "'within the reaches of the public interest.'"

18

United States v. Microsoft Corp., 56 F.3d 1448, 1462 (D.C. Cir. 1995) (emphasis in original; citations omitted).  The proposed Consent Decree serves the public interest in the many ways discussed above, by bringing Jackson's sewer system into compliance in the manner required by the CWA and by providing appropriate redress to the public in the imposition of a significant penalty and the expenditure of a significant amount of money on a SEP.  The proposed Consent Decree more than meets the requirement that it be "within the reaches of the public interest."  Id.

## CONCLUSION

For all the foregoing reasons, the proposed Consent Decree should be approved and entered by the Court, as it is fair, reasonable, and carefully designed to bring about compliance with the CWA.  Entry of the Consent Decree is warranted and appropriate.

Dated: March 1, 2013

>Respectfully submitted,
>
>IGNACIA S. MORENO
>Assistant Attorney General
>United States Department of Justice
>Environment and Natural Resources Division
>
>           /S/Karl J. Fingerhood            
>KARL J. FINGERHOOD
>Trial Attorney (PA Bar ID No. 63260)
>Environmental Enforcement Section
>Environment and Natural Resources Division
>U.S. Department of Justice
>P.O. Box 7611
>Washington, D.C.  20044
>     Telephone:  (202) 514-7519
>     Facsimile:   (202) 514-009
>
>karl.fingerhood@usdoj.gov
>
>GREG DAVIS
>United States Attorney
>Southern District of Mississippi

                                          SAMUEL LYNN MURRAY
                                        (MS Bar ID No. 3690)
                                        Assistant U.S. Attorney
                                        Southern District of Mississippi
                                        501 E. Court St., Ste. 4.430
                                        Jackson, MS 39201
                                        Tel: 601-973-2835
                                        Fax: 601-965-4032

Of Counsel:

WILLIAM B. BUSH, JR.
Associate Regional Counsel
United States Environmental Protection Agency
Region 4
61 Forsyth Street
Atlanta, GA 30303
       Telephone: 404-562-9538
       Fax: 404-562-9486

                                        ATTORNEYS FOR PLAINTIFF
                                        UNITED STATES OF AMERICA

Dated:  March 1, 2013
                                  ___/S/ Christopher G. Wells with permission by KJF_____
                                  CHRISTOPHER G. WELLS
                                  Senior Attorney
                                  Office of Pollution Control
                                  Mississippi Department of Environmental Quality
                                  P.O. Box 2261
                                  Jackson, MS 39225
                                      Telephone: 601-961-5545
                                      Facsimile: 601-961-5674

                                  Chris_Wells@deq.state.ms.us

ATTORNEY FOR PLAINTIFF STATE OF MISSISSIPPI BY AND THROUGH THE MISSISSIPPI COMMISSION ON ENVIRONMENTAL QUALITY AND THE MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL QUALITY