IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
(Northern Division)

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| and the STATE OF MISSISSIPPI, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Case No. 3:12-cv-790-HTW-LGI |
| ) | |
| v. ) | |
| ) | **PLAINTIFFS' REPORT REGARDING** |
| ) | **STATUS CONFERENCE AND ORDER** |
| THE CITY OF JACKSON, MISSISSIPPI, ) | **IN DRINKING WATER CASE** |
| ) | |
| Defendant. ) | |
| ) | |

## I.     Introduction

Plaintiffs in this case ("Sewer Case")—the United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), and the State of Mississippi, acting through the Mississippi Commission on Environmental Quality and the Mississippi Department of Environmental Quality (collectively "MDEQ")—respectfully submit this report to address a May 9, 2023, minute order issued in a separately filed case, *United States v. City of Jackson*, case no. 3:22-cv-00686-HTW-LGI (hereinafter "Drinking Water Case"), and to provide information about matters discussed during a May 9, 2023, status conference held in the Drinking Water Case. Both the minute order and status conference focused on the City of Jackson's sewer system—the subject of a consent decree among the Parties in this case (i.e., the United States, MDEQ, and the City). Importantly, MDEQ did not attend the status conference because it is not a party in the Drinking Water Case.

The United States and MDEQ appreciate the severity of the problems facing the City's sewer system and the Court's interest in expediting the resolution of this matter. Plaintiffs will continue to approach this matter, as well as the Drinking Water Case, with a level of attention commensurate with the sewer and drinking water problems facing the citizens of Jackson.

To those ends, and in response to the minute order and status conference, Plaintiffs respectfully file this report to provide Plaintiffs' views on:

(1) the appropriate method of negotiating a resolution to the City's noncompliance with the Consent Decree, including Plaintiffs' request for rescission of the minute order requiring the Parties to file a joint proposed order by May 23, 2023, or suggestion in the alternative for the Parties to provide the Court a status update by June 23, 2023,

(2) the importance of maintaining the confidentiality of settlement discussions and application of the Court's existing confidentiality order,

(3) legal restrictions that would, as Plaintiffs understand it, prevent the drinking water system's interim third-party manager ("ITPM") from fully implementing his Financial Management Plan, especially as to the sewer system's debt, and

(4) administrative consolidation of this case with the Drinking Water Case.

**II.     Background**

As a general matter, this case is about the City's violations of the Clean Water Act ("CWA") and the corresponding state law. Specifically, the City's Wastewater Collection and Transmission System ("WCTS," or sewer system) discharges untreated sewage during events known as Sanitary Sewer Overflows ("SSOs"), and the City bypasses appropriate treatment at its Savanna Street Wastewater Treatment Plant ("WWTP") before sewage is discharged into the Pearl River. As stated in the Parties' Joint Status Report filed May 5, 2023 (Dkt. No. 29), the Consent

1

Decree here has the objective of causing the City to achieve and maintain full compliance with the CWA, the Mississippi Air and Water Pollution Control Law ("MAWPCL"), and the City's National Pollutant Discharge Elimination System Permits, including the elimination of all SSOs. Dkt. No. 10 ¶ 7. To achieve this objective, the Consent Decree mandates, among other things: (1) the evaluation and rehabilitation of the City's WCTS, the Savanna Street WWTP, and the main transmission pipe to the Savanna Street WWTP, known as the West Bank Interceptor; (2) the development and implementation of numerous programs to ensure proper Capacity, Management, Operations, and Maintenance ("CMOM") of the WCTS; and (3) the implementation of certain work required by two prior agreed orders between the City and MDEQ. The Consent Decree requires that all required rehabilitative needs and corrective actions be completed no later than June 1, 2030.

Since entry of the Consent Decree, the City has achieved minimal progress under the Consent Decree, both with respect to developing and implementing plans to evaluate and rehabilitate the WCTS and with respect to implementing certain already developed CMOM programs. The City is still experiencing numerous bypasses, SSOs, and a deteriorating WCTS. *See* Dkt. No. 29 at 4.

### III. Plaintiffs Are Working Diligently Towards Agreed-Upon and Effective Relief and Therefore Seek Recission/Amendment of the Minute Order

We appreciate the Court's attention and concern with quickly resolving the City's noncompliance with the Consent Decree and the associated SSOs, bypasses, and other problems plaguing the City's sewer system. We share the Court's serious concern and advise the Court that we continue to work expeditiously and in good faith in discussions with the City. As noted in the Joint Status Report, the Parties and their lawyers, technical staff, and consultants have had several discussions to resolve the City's noncompliance with the Consent Decree and the condition of the

sewer system. Dkt. No. 29 at 7. Communications among the Parties have been frequent and regular and are ongoing. While we cannot provide the Court with details as to the substance of the negotiations because there is a Confidentiality Order in place (Dkt. No. 30) and because providing such details would not advance the Parties' ability to reach a mutual resolution, as explained in the next section, Plaintiffs can continue to apprise the Court of the status of negotiations.

Plaintiffs also note that the Consent Decree remains in effect, and no party has requested relief from it pursuant to Federal Rule of Civil Procedure 60.[1] Plaintiffs have not yet moved to enforce the terms of or levied stipulated penalties under the Consent Decree. As such, there is no pending request or motion before the Court to resolve.

Considering all these circumstances, Plaintiffs request that the Court rescind its order in the Drinking Water Case and allow the Parties to negotiate an agreement among themselves or, in the alternative, allow the Parties until June 23, 2023, to provide the Court a status update.

### IV. Settlement Negotiations Should Remain Confidential, Should Not Be Disclosed to the Court, and Should Not Be Discussed in Open Court

Settlement negotiations between the Parties should proceed privately and in accordance with the Confidentiality Order. The Plaintiffs understand and agree with the Court's concern that an effective short-term plan is needed to limit risks to public health and bring the City into compliance with federal and state law. Plaintiffs believe that an effective plan is most likely to be

---

[1] A consent decree, once entered into, cannot be repudiated by either party and will be summarily enforced. *See United States v. City of New Orleans*, 731 F.3d 434, 439 (5th Cir. 2013). Should the City seek to modify the Consent Decree, it would bear "the burden of establishing that a significant change in circumstances warrants revision of the decree." *Id.* Financial inability to afford the work does not meet the standard under Fed. R. Civ. P. 60(b)(6), *id.* at 441, and the Parties specifically negotiated language that "force majeure" does not include the City's financial inability to perform the work in the Consent Decree. Consent Decree, Dkt. No. 10 ¶ 73.

developed through confidential negotiations between the Parties, where ideas can be exchanged freely and discussed with relevant experts and decisionmakers.

First, as to Confidentiality Orders, the parties in both this case and the Drinking Water Case have requested, and the Court has entered, Confidentiality Orders that apply to Settlement Communications, as that term is defined in the Orders.  Sewer Case, Dkt. No. 19; Drinking Water Case, Dkt. No. 20.  The Confidentiality Orders apply to the United States, MDEQ, the Mississippi State Department of Health ("MSDH"), the City of Jackson, and the ITPM, Ted Henifin.  Sewer Case, Dkt. No. 30; Drinking Water Case, Dkt. No. 20.  Under these agreements, none of the participants may disclose settlement communications with anyone other than the participants to those agreements.  Sewer Case, Dkt. No. 19 ¶ 5; Drinking Water Case, Dkt. No. 20 ¶ 7.  The Parties and the ITPM have agreed that maintaining the confidentiality of settlement communications helps "facilitate the free exchange of information [and] the expression of unvarnished opinions" and ultimately "enhance[s] the likelihood of a successful outcome."  Sewer Case, Dkt. No. 17 ¶ 9; Drinking Water Case, Dkt. No. 19 ¶ 13.  This is particularly true in a matter of public importance, where proposals or ideas could confuse or mislead the public if they are disclosed before being reviewed and evaluated by the government decisionmakers with authority to bind the government.

Revealing settlement discussions or proposals to the Court—whether in open court or in closed sessions—would violate the Confidentiality Orders and could jeopardize the ability of the Parties to finalize an agreement.  It undermines the trust the Parties have in each other because it demonstrates that the Parties cannot have the open and free exchange to which they agreed and

that the Court ordered. Thus the Confidentiality Orders should be obeyed by all participants in future proceedings.[2]

While the Court is within its authority to encourage settlement and impress upon the Parties the urgency of the situation, the Plaintiffs respectfully request that the substance and details of any settlement agreement be worked out among the Parties without the involvement of the Court. The Parties should continue their ongoing efforts to reach both short-term and long-term resolutions of these cases through confidential negotiations limited to the Parties and the ITPM, as appropriate, in accordance with the Confidentiality Orders and in a manner that protects the Court's impartiality for future proceedings in these cases.

Second, the Court may be asked in the future to approve a consent decree or consent decree modification, or to interpret or enforce any settlement agreement. The Court would also be the ultimate trier of fact in the Sewer Case and the Drinking Water Case if the Parties' agreements are breached and the claims in the complaint are adjudicated. In those circumstances, the Court's firsthand involvement in settlement negotiations could raise an appearance of impropriety. *See In re Actos (Pioglitazone) Prod. Liab. Litig.*, 274 F. Supp. 3d 485, 502 (W.D. La. 2017) ("[T]o avoid any possible future conflict, [the Court] should not be intimately involved in the forging of a settlement the Court might be called upon to interpret or enforce."); *Buntion v. Quarterman*, 524 F.3d 664, 672 (5th Cir. 2008) (noting that the Supreme Court has found presumptive bias where the judicial decisionmaker had "the dual role of investigating and adjudicating disputes and complaints"); *cf. In re Vioxx Prod. Liab. Litig.*, 388 F. App'x 391, 396 (5th Cir. 2010) (affirming judge's decision not to recuse when he administered a settlement but "played no role in drafting

---

[2] Of course Plaintiffs do not question the appropriateness of the Court and the ITPM discussing matters that are not Settlement Communications.

5

the private settlement agreement reached by the parties . . . [and took] no position as to what types of claims should or should not have been included in the settlement").

As further recognition of the importance of confidentiality in the settlement process to ensure a fair adjudication of claims, Federal Rule of Evidence 408 generally prohibits the admission of evidence of settlement offers or discussions to prove or disprove the validity or amount of a disputed claim to or to impeach a witness. Plaintiffs do not question the Court's ability to segregate inadmissible evidence from its consideration, but limiting the Court's exposure to such evidence would remove any doubt as to its influence, while also facilitating a freer discussion of settlement possibilities between the Parties. Thus, avoiding even a question of improper involvement is in the best interest of resolving the important issues in this case.

Plaintiffs therefore request that the negotiations in this matter proceed in accordance with the Confidentiality Orders.

V.      The ITPM's Financial Management Plan Faces Legal Obstacles

During the status conference, the ITPM's Financial Management Plan[3] was a topic of discussion. While the Plan was developed pursuant to the ITPM's obligations under the Drinking Water Case, the Plan addressed the combined financial capability of both the drinking water and sewer systems. As set forth in the Plan and as the ITPM acknowledged during the status conference, effective implementation of the Plan depends on revising rates to increase billing revenues and on retiring the drinking water and sewer systems' combined debt of $290 million. As stated by counsel for the United States at the status conference, implementation of the Plan—especially with regard to the sewer system's debt—faces legal obstacles.

---

[3] Available at https://jxnwtr.com/wp-content/uploads/2023/01/JXN-Water-Financial-Management-Plan-01272022.pdf (last visited May 17, 2023).

First, the Financial Management Plan depends on increasing revenues by billing customers for water based on property values rather than consumption. As the ITPM's report for the quarter ending March 31, 2023, ("Quarterly Report")[4] states at page 12, the Mississippi Legislature passed a statute requiring consumption-based billing for water. The ITPM has stated that he is conducting a legal review of the legislation and will determine his options in the second or third quarter of this year. It is possible that options selected by the ITPM could result in legal challenges.

Second, the Financial Management Plan depends on using monies authorized by Congress under the Disaster Relief Supplement Appropriations Act, 2023, Division N ("Disaster Relief Act") of the Consolidated Appropriations Act, 2023, to retire all the debt of both the drinking water and sewer systems. As the United States noted during the status conference and the ITPM's Quarterly Report states at page 6, legal restrictions currently do not allow the ITPM to spend the Disaster Relief Act funds to retire all of the City's drinking water and sewer debt.

The Plan identified total outstanding debt impacting the City's drinking water system and sewer system in the amount of $283,326,485.90, as of December 31, 2022. Attachment A: Declaration of Mark Nuhfer ("Nuhfer Decl.") ¶ 12. This includes $168,895,000 in outstanding General Bond Resolution debt associated with Water and Sewer Revenue bonds through FY 2041; $81,979,591.17 in outstanding Clean Water State Revolving Funds ("CWSRF") loan principal; and $32,451,894.69 in outstanding Drinking Water State Revolving Funds ("DWSRF") loan principal. *Id.* As the ITPM's Quarterly Report recognizes, absent Congressional action, the Disaster Relief Act appropriations may be used to retire only DWSRF-eligible debt, or approximately $32.4 million, and not the total $283 million.

---

[4] Available at https://jxnwtr.com/wp-content/uploads/2023/05/Quarterly-Report-Jan-Mar-2023.pdf (last visited May 18, 2023).

Congress passed the Disaster Relief Act in December 2022. In Division N of the Act, Congress authorized $450 million dollars for Drinking Water State Revolving Funds to address the City's drinking water crisis and $150 million for technical assistance and grants under Section 1442(b) of the Safe Drinking Water Act. *See* https://www.congress.gov/117/bills/hr2617/BILLS-117hr2617enr.pdf at page 759 (last visited May 17, 2023). The Purpose Statute, 31 U.S.C. § 1301, provides that appropriated funds may be used only for authorized purposes as defined in an appropriation. Because the Disaster Relief Act is specifically intended for the City's drinking water system, use of funds must be limited to eligible drinking water projects and activities as specified in the appropriation and cannot be applied to any sewer system projects or Clean Water Act projects, including the payment of sewer debt. In short, the funds appropriated in the Disaster Relief Act may be used to pay debt incurred for the City's drinking water system but not for the City's sewer system.

Based on the ineligibility of CWSRF debt (i.e., sewer system debt) and a lack of sufficient documentation to demonstrate the General Bond Revenue debt's eligibility (i.e., documentation to demonstrate that proceeds from the debt were used to pay for DWSRF-eligible drinking water projects and activities), EPA communicated to the ITPM on May 2, 2023, that the only portion of the City's existing debt that may be retired with Disaster Relief Act funds is the $32,451,894.69 in outstanding DWSRF loan principal. On May 18, 2023, the ITPM communicated to the United States that he identified approximately $90 million in debt associated with the water metering system that he believes can be paid down with DWSRF-drinking water funds. The determination

8

of whether any funds are actually eligible for retiring the DWSRF debt is subject to review by MSDH[5] and EPA, pending receipt of supporting records. Nuhfer Decl. ¶¶ 13-17.

Accordingly, as acknowledged by the ITPM, retirement of all the debt as proposed in the Plan would first require an amendment to the text of the Congressional appropriation. *See* Quarterly Report at 6. Based on these restrictions, Plaintiffs understand that the Financial Management Plan may not be implementable as currently drafted.

### VI.  Administrative Consolidation of the Sewer Case and the Drinking Water Case Would Be Beneficial

During the status conference, the Court asked the United States about its view on consolidating the Sewer Case and the Drinking Water Case. The United States understood the Court to mean a consolidation of cases for administrative purposes, which it supports. We understand that administrative consolidation would cause the Court to link the two cases in the Court's Electronic Case Filing (ECF) system, such that a party in either case need only file in the lower-filed case number and that the parties in both cases would receive notices, including notices of status conferences, regardless of whether they were docketed under the Sewer Case or the Drinking Water Case.

However, the United States and MDEQ oppose any substantive consolidation. The two cases should remain substantively separate to avoid confusion of the issues and parties, which are particular to each case in material ways. There is certainly some overlap in the parties and the compliance challenges facing the City that require coordination between the cases; for that reason,

---

[5] Pursuant to its authority under Section 1413 of the SDWA, 42 U.S.C. § 300g-2, for primary enforcement responsibility for public water systems, MSDH administers the Drinking Water State Revolving Fund in Mississippi, called the Drinking Water Systems Improvements Revolving Loan Fund (DWSIRLF) Program.

reassignment of the Sewer Case such that both cases are under one judge has been beneficial and will likely result in efficiencies for the parties to both matters.

At the same time, the cases are more distinct than they are similar. They differ substantively in important ways:

- underlying statutory and regulatory schemes for compliance (e.g., the Clean Water Act in this case and the Safe Drinking Water Act in the Drinking Water Case);
- procedural histories and postures, and accordingly, legal standards for relief;
- state regulatory agencies (MDEQ in the Sewer Case and the MSDH in the Drinking Water Case);
- funding availability; and
- timelines for project implementation and funding.

Indeed, the cases may not proceed in parallel given that the relief under a potential agreement on the sewer system will by its nature involve entirely different projects with their own milestones, schedules, and funding sources compared to the existing interim stipulated order governing the drinking water system. Lastly, given the strong public interest in the progression of the cases and to limit confusion, it is critical that the public have an accurate understanding and record of the proceedings, the laws and regulatory authorities applicable to each system, and the accountable parties in the respective cases.

**VII.    Conclusion**

The United States and MDEQ appreciate the Court's time and attention to the important matters involved in this case and the Drinking Water Case. Plaintiffs are working expeditiously with the City to address the City's noncompliance with the Consent Decree, the CWA, and the MAWPCL. For the reasons above, Plaintiffs respectfully request that the Court rescind the May

10

9, 2023, minute order in the Drinking Water Case (case no. 3:22-cv-00686-HTW-LGI) as the Parties continue to work towards resolution, or provide the Parties until June 23, 2023, to provide the Court a status update.  If the Court has additional questions, Plaintiffs suggest a further status conference in this case, consistent with the Parties' Joint Status Report (Dkt. No. 29).

Respectfully submitted,

**ATTORNEYS FOR UNITED STATES OF AMERICA:**

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division

/s/ Karl Fingerhood
/s/ Angela Mo
KARL FINGERHOOD (PA Bar No. 63260)
ANGELA MO (CA Bar No. 262113)
Senior Counsels
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
Post Office Box 7611
Washington, DC 20044-7611
Telephone: (202) 514-7519
             (202) 514-1707
Email:  Karl.Fingerhood@usdoj.gov
        Angela.Mo@usdoj.gov

DARREN J. LAMARCA
United States Attorney for the Southern District of Mississippi

/s/ Angela Givens Williams
ANGELA GIVENS WILLIAMS
Chief, Civil Division
Assistant United States Attorney
MS Bar No. 102469
United States Attorney's Office
501 East Court Street, Suite 4.430
Jackson, Mississippi 39201
Telephone: (601) 973-2820

Email: angela.williams3@usdoj.gov

Of Counsel:
MICHELE WETHERINGTON
Associate Regional Counsel
U.S. EPA Region 4
61 Forsyth St. SW
Atlanta, Georgia 30303

SUZANNE ARMOR
Associate Regional Counsel
U.S. EPA Region 4
61 Forsyth St. SW
Atlanta, Georgia 30303

**ATTORNEYS FOR STATE OF MISSISSIPPI**, ACTING THROUGH THE MISSISSIPPI COMMISSION ON ENVIRONMENTAL QUALITY AND THE MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL QUALITY:

/s/ Gretchen Zmitrovich
GRETCHEN ZMITROVICH (MS Bar No. 101470)
DONNA J. HODGES (MS Bar No. 9561)
Senior Attorneys
Mississippi Department of Environmental Quality
Post Office Box 2261
Jackson, Mississippi 39225-2261
Telephone: (601) 961-5050
Facsimile: (601) 961-5349
Email: gzmitrovich@mdeq.ms.gov
dhodges@mdeq.ms.gov