```
1                    IN THE UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2                            NORTHERN DIVISION

3

4    THE UNITED STATES OF AMERICA AND
     THE STATE OF MISSISSIPPI                           PLAINTIFFS
5
     VERSUS               CIVIL ACTION NO. 3:12-CV-00790-HTW-LGI
6
     THE CITY OF JACKSON, MISSISSIPPI,
7    AND JXN WATER                                      DEFENDANTS

8

9                          STATUS CONFERENCE
               BEFORE THE HONORABLE HENRY T. WINGATE,
10               UNITED STATES DISTRICT COURT JUDGE,
                           JULY 31, 2023,
11                      JACKSON, MISSISSIPPI

12
     APPEARANCES:
13
     FOR THE PLAINTIFFS:    KARL J. FINGERHOOD, ESQ.
14                          ANGELA GIVENS WILLIAMS, ESQ.
                            ANGELA MO, ESQ. (VIA VIDEO)
15                          GRETCHEN L. ZMITROVICH, ESQ.
                            DONNA J. HODGES, ESQ.
16                          ROY FURRH, ESQ.

17   FOR THE DEFENDANTS:    CATORIA PARKER MARTIN, ESQ.
                            TERRELL S. WILLIAMSON, ESQ.
18

19

20

21
     REPORTED BY:
22
         CANDICE S. CRANE, RPR, RCR, CCR #1781
23       OFFICIAL COURT REPORTER
         501 E. Court Street, Suite 2.500
24       Jackson, Mississippi  39201
         Telephone:  (601)608-4187
25       E-mail:  Candice_Crane@mssd.uscourts.gov
```

## TABLE OF CONTENTS

Style and appearances.....................................  1

Certificate of Court Reporter........................... 70

1              **IN OPEN COURT, JULY 31, 2023**

2

3      THE COURT:  Good morning.  We're here this morning on

4 a status conference involving the consolidation of the sewer

5 system with that of the water system.  I have the order from

6 the sewer system that has been submitted to me for my

7 signature.  Mistakenly the press has concluded that I had

8 already signed this order, but of course, as you know, I

9 have not.  It's just a simple mistake that the press made.

10      But I want to go over some things with this proposed

11 order.  More specifically, I want to discuss the differences

12 between the water system order and that of the sewer system

13 order.

14      So then let me have everyone identify him and herself

15 for the record starting on my right.

16      MR. FINGERHOOD:  Good morning, Your Honor.  Karl

17 Fingerhood with the U.S. Department of Justice.

18      THE COURT:  Good morning.

19      MS. WILLIAMS:  Good morning, Your Honor.  Angela

20 William with the U.S. Attorney's Office.

21      MS. ZMITROVICH:  Gretchen Zmitrovich, Mississippi

22 DEQ.

23      THE COURT:  Yes, good morning.

24      MR. FURRH:  Roy Furrh, Mississippi DEQ.

25      THE COURT:  Yes, good morning.

1          MS. HODGES:  Donna Hodges, Mississippi DEQ.

2          THE COURT:  Good morning again.

3          Anybody else on my right-hand side?  I guess not.  I

4    turn to the left side.

5          MR. HENIFIN:  Good morning, Your Honor.  Ted Henifin,

6    interim third-party manager.

7          THE COURT: All right.  Good morning.

8          MS. WILSON:  Good morning, Your Honor.  Melissa

9    Wilson counsel for Ted Henifin, third-party manager.

10         THE COURT:  Thank you.

11         MS. MARTIN:  Good morning, Your Honor.  Tori Martin

12   here on behalf of the City of Jackson.

13         THE COURT:  Good morning.

14         MR. WILLIAMSON:  Terrell Williamson here on behalf of

15   the City of Jackson.

16         THE COURT: All right.  Good morning.

17         Now, I have with that this proposed stipulated order

18   on the sewer system.  It has been signed off by all of the

19   parties.  Are there any parties who are in disagreement with

20   this proposed order?  If so, can I see your hands?

21         I see no hands; therefore, I conclude that all of you

22   as signatories to this stipulated order are in agreement,

23   but I want to turn to the city.

24         Ms. Martin, would you go to the podium, please?  Good

25   morning again.

1          MS. MARTIN:  Good morning, Your Honor.

2          THE COURT:  There are some differences between the

3     sewer system proposed order and that of the water system

4     order that has already been entered.  Do you agree?

5          MS. MARTIN:  Yes, Your Honor.

6          THE COURT:  So for this record and for the benefit of

7     anyone who wishes to know those differences, could you

8     highlight them for me, please?

9          MS. MARTIN:  Your Honor, I think that I can.  One of

10    the major differences between the two is in the drinking

11    water stipulated order, the City of Jackson receives all

12    revenue from the public.  The difference is in the sewer

13    waste water order, the revenue will all now be paid through

14    the third-party manager through JXN Water; that's a major

15    difference between the two documents.

16         Now all revenue will flow through JXN Water, and JXN

17    Water will separate out the amount that is owed back to the

18    City of Jackson for sanitation.  So water and sewer will be

19    paid directly, and so instead of the City of Jackson making

20    a payment to the third-party manager based on a budget and

21    the revenue that's coming in.  The difference will be that

22    the third-party manager will be paying the City of Jackson

23    the portion that is owed for sanitation; that's a major

24    difference.

25         One of the other major differences is this order has

1  a requirement for communication between the public works

2  director and the third-party manager.

3        THE COURT:  Say it again now.  The difference between

4  what now?

5        MS. MARTIN:  The difference between the drinking

6  water order and the waste water order is this order has a

7  requirement for communication between the public works

8  director and the third-party manager.  But that's something

9  that is happening I think organically through the drinking

10  water order, but this order actually specifically states

11  that there's a requirement that it occur.

12        THE COURT:  Now, this communication is obligatory by

13  this order that they communicate, but it is not obligatory

14  that the third-party manager take the direction of the

15  public works director, is it?

16        MS. MARTIN:  That is correct, Your Honor.  It is just

17  they communicate consistently, which is already occurring in

18  the drinking water order by virtue of a meeting that they

19  have once a week or once every other week.  It's once a

20  week.  And so in this order, it's just actually stated in

21  the order that that occur.

22        THE COURT:  That there must be consultation, but as I

23  said, it does not mean there has to be obedience.

24        MS. MARTIN:  Correct.  There is no -- the third-party

25  manager does not direct the public works director.

1          THE COURT:  Right.  The next major distinction that

2    you see?

3          MS. MARTIN:  The next major distinction between the

4    two orders is, I think we refer to it in here as a

5    transition plan, and it's essentially the requirement that

6    this -- another big difference between the two orders, the

7    drinking water order does not have a timeline.  It does not

8    have a deadline in it when the order will end and when the

9    consent decree will begin.

10         The difference in waste water is that in the waste

11    water order, we already had a consent decree, so this order

12    stays that consent decree during the pendency of this order.

13    And what this order says is that it will only last for four

14    years.  At the end of that four years, there's a transition

15    plan that's discussed in this order, and that transition

16    plan is different than what's in the drinking water order.

17         And so it's a dedicated conversation between the city

18    and the third-party manager to talk about how to transition

19    the system back from the control of the third-party manager

20    to the city.  But at the same time -- and I can't remember

21    now if this is in the order or not.  Court's indulgence for

22    a minute if I may?

23         THE COURT:  Okay.

24         MS. MARTIN:  Your Honor, I apologize.  We are

25    still -- the negotiations for this order is still covered by

1  the confidentiality agreement, so I wanted to make sure I

2  did not violate the confidentiality agreement.

3       But it is included in this order that at the same

4  time during that four years, the City of Jackson will be

5  renegotiating the consent decree with the Department of

6  Justice and the Mississippi department of environmental

7  quality and the EPA.

8       THE COURT:  Okay.

9       MS. MARTIN:  And I think those are the major

10  differences between the two documents.  It's possible I left

11  something out, but from my recollection, those are the main

12  differences between the two documents.

13       THE COURT:  So then on the aspect of money revenues

14  coming in, it's a redirection of how the moneys will be

15  allocated once they come in?

16       MS. MARTIN:  Correct, Your Honor, it will be

17  redirected.  So instead of the city receiving the money and

18  then paying a portion of that revenue to the third-party

19  manager, now the third-party manager will be receiving the

20  funds and then directing a portion to the City of Jackson.

21       THE COURT:  The oversight responsibilities of this

22  Court remain the same; do they not?

23       MS. MARTIN:  I would say so, Your Honor.

24       THE COURT:  Because both orders have similar language

25  that the Court shall be the oversight or at least maintain

1    the oversight over the operations of the third-party

2    manager; correct?

3         MS. MARTIN:  Correct, Your Honor.  This Court retains

4    jurisdiction.

5         THE COURT:  Not only just jurisdiction, but

6    oversight.

7         MS. MARTIN:  Correct.

8         THE COURT:  How do you view oversight?

9         MS. MARTIN:  The third-party manager reports to the

10   Court.

11        THE COURT:  Several places in here, in the order,

12   maintain if there is some disagreement among some of the

13   entities involved, that those disagreements would be

14   submitted to the Court for resolution.

15        MS. MARTIN:  Correct.  That's a dispute resolution,

16   which there was a dispute resolution section in the drinking

17   water order as well.  I do believe it's expanded in this

18   order.

19        THE COURT:  That's what I was looking at, so how much

20   expansion do we have in this order?

21        MS. MARTIN:  If I recall correctly, Your Honor, it

22   really is -- the expansion is about the transition plan, and

23   if there are disagreements I think with the transition plan,

24   I think -- and I apologize, Your Honor.  I was not prepared

25   to discuss this in as much detail today, because it's been

 1    maybe two weeks since I actually went back through the

 2    entire order.  But I believe it's the transition plan as far

 3    as dispute resolution, that's a difference.  And I cannot

 4    remember if part of the dispute resolution also includes --

 5    and I forget the terminology we used.  Give me just a

 6    second, Your Honor.

 7         No, I think that's the only difference.  I'm looking

 8    at that section now, and everything else I think was in the

 9    same -- it's the same as what was in the drinking order.

10    The only difference is that it's saying its with regard to

11    sewer as opposed to drinking water.

12         THE COURT:  Okay.  And then there's a provision for

13    public comment.

14         MS. MARTIN:  Correct, Your Honor.

15         THE COURT:  Now, talk to us about that.

16         MS. MARTIN:  It is my understanding -- and I will

17    defer to the Department of Justice for a better description

18    of this.  But it's my understanding that there's a statutory

19    requirement that the -- that it applies to waste water that

20    doesn't apply to drinking water that requires that there be

21    a 30-day period for comment.

22         It's also my understanding just based on our internal

23    research that on the waste water side, the public has the

24    ability to intervene in the action.  There is a right of

25    action for the public on the waste water side, but there is

1  not that right on the drinking water side.  So it's my

2  understanding that the 30-day comment period is a statutory

3  requirement for waste water.

4       THE COURT:  And that's a comment requirement; is that

5  correct?

6       MS. MARTIN:  I believe that's what it is.  But,

7  again, I would defer to the Department of Justice.  I'm not

8  as familiar with that procedure.

9       THE COURT:  Okay.  Then I'll go to the Department of

10  Justice.  Thank you.

11       MS. MARTIN:  Okay.  Thank you, Your Honor.

12       MR. FINGERHOOD:  Good morning, Your Honor, Karl

13  Fingerhood.

14       THE COURT:  Yes, Mr. Fingerhead (sic).  Good morning

15  again.

16       MR. FINGERHOOD:  There are some other differences,

17  too, in the order.  Part of it is just because, you know,

18  there are different statutes involved.  You know, likely the

19  drinking water fixes will hopefully be implemented in a much

20  shorter timeframe than what will be needed for the sewer

21  system.

22       There are, like, with respect to the city and ITPM

23  disputes, there's also an additional provision, because

24  Mr. Henifin now oversees both water and sewer, if the city

25  has a concern about how he's allocating resources between

1   the two, that's something that they can raise in dispute

2   resolution.

3        So there are some other differences, you know,

4   language dealing with liability for building backups.  In

5   addition to the transition plan that Ms. Martin was

6   referring to, there's also a -- I think we call it a further

7   measures plan, which really is more targeted at what type of

8   injunctive relief will be needed in the future to fix the

9   sewer system and get it back into compliance with the Clean

10  Water Act and state law.

11       I'm just trying to see what other there are -- there

12  is a provision, too, that if the third-party manager has

13  substantially complied with the order and the city

14  demonstrates that it is capable of taking the system back,

15  that they can ask the Court to have that happen.  In the

16  event that does happen and they fail to meet the

17  requirements of the order, there's a provision that provides

18  for certain stipulated penalties for their failure to meet

19  those.

20       I think those are some of the general differences,

21  the final of which you mentioned was the 30-day comment

22  period.  The agreement does have the 30-day comment period.

23  As Ms. Martin noticed, this is I guess a supplement to the

24  consent decree that was entered in 2013; that consent decree

25  was subject to a public comment period.

1          The drinking water act case, as Your Honor is aware,

2    was not, but we would submit that was a far different

3    situation.  While the sewer issues are severe, in the

4    drinking water case both the President of the United States

5    and the governor of the state had declared a state of

6    emergency.  In the Clean Water Act case, there hasn't been a

7    similar type of declaration.

8          Since the original consent decree was subject to

9    public comment, we thought it would be appropriate to have

10   public comment on the stipulated order.  As this Court is

11   aware, there is keen public interest in both the drinking

12   water issues and the sewer system issues, so we wanted to

13   have the opportunity for the citizens to have an opportunity

14   to weigh in with their thoughts on the stipulated order.

15   And then as outlined in the notice of lodging, we would

16   consider those, and if the appropriate DOJ and EPA officials

17   believe that the agreement, in spite of any comments that

18   may be adverse to the agreement, if they still thought it

19   was in the public interest and fair and reasonable, they

20   would ask the Court to approve.

21          THE COURT:  Let's talk about this public comment.

22   Were any submitted back in 2013?

23          MR. FINGERHOOD:  I can't recall.  I was involved in

24   the case back then, but I think at that time there were

25   probably --

```
 1         MR. WILLIAMSON:  There were not public comments.
 2         MR. FINGERHOOD:  There were not?  Okay.
   Mr. Williamson was also involved back then, too, so we did
 3
 4   not receive any public comment.
 5         You know, we have received some comments already.
 6   In relation to the drinking water act case, we sought some
 7   public input.  And we had a couple of questions, too, asking
 8   whether people had also been experiencing sewer issues, and
 9   if so, how those had impacted them.  So we have gotten some
10   responses to those questions as well already.
11         THE COURT:  Have you received any comments which are
12   helpful?
13         MR. FINGERHOOD:  I think, yeah.  Well, certainly on
14   the Safe Drinking Water Act side and --
15         THE COURT:  Well, I'm --
16         MR. FINGERHOOD:  -- and in the Clean Water Act
17   case, --
18         THE COURT:  Well --
19         MR. FINGERHOOD:  -- the formal public comment period
20   hasn't opened but --
21         THE COURT:  Well, stop one second.  I'm really asking
22   about the sewage case.
23         MR. FINGERHOOD:  Okay.
24         THE COURT:  So back in 2013 and now, have you
25   received any comments which in any respect are helpful?  And
```

1    I put that in quotation marks, because I don't know how

2    those comments can even be helpful.  But nevertheless, have

3    you received any such that you deem as being helpful?

4         MR. FINGERHOOD:  Well, as was stated before, we did

5    not receive any comments during the public comment period on

6    the original Clean Water Act Consent Decree.  We expect that

7    to be different with respect to the stipulated order.

8         But although it wasn't in the context of the public

9    comment period, we have heard from at least several groups.

10   For example, the Pearl River Keeper has been concerned with

11   the sewage overflows into the Pearl River and also the

12   city's, you know, procedures for reporting and, you know,

13   noticing, putting up signs, et cetera.  So those have been

14   helpful and have been things that we've discussed with the

15   city and MDEQ, and I know they've also been in touch

16   directly with both MDEQ and the city with their concerns.

17   And that's just one example that I can think of off the top

18   of my head.

19        THE COURT:  Okay.  Are you familiar with this public

20   comment provision and how it has been applied in other

21   states?

22        MR. FINGERHOOD:  I mean, I only practice in federal

23   courts but its -- I mean, as far as federal courts are

24   concerned, it's the same process that the Department of

25   Justice and EPA follow.  They have a 30-day comment period;

1    sometimes it's longer than that.  They use a similar process

2    for making, you know, rulemaking, et cetera.  And then at

3    the end of the period, they are -- or summarize the

4    comments, and then if it's administrative, then the

5    administrative body will consider the comments and decide

6    whether or not to approve or modify the rule.

7        In federal courts, the decision-makers at EPA and DOJ

8    will review the memorandum and the comments, you know,

9    summarize the comments and decide whether or not it meets,

10   you know, the fair, reasonable, and in the public interest

11   standard and determine whether or not they should seek court

12   approval or modification.

13       THE COURT:  Okay.  But those comments will be

14   submitted to the Court?

15       MR. FINGERHOOD:  Yes, they are submitted.  We will

16   submit all the comments as well as a summary, and then we

17   would submit kind of our -- whatever the decision of the

18   people with the appropriate authority, we would inform the

19   Court of that and either ask the Court to move forward or

20   modify or seek to withdraw.  But just speaking personally, I

21   think that's unlikely with respect to this case.

22       THE COURT:  But the courts, when the courts have

23   received these public comments, have been called upon to

24   respond to these comments by some sort of written

25   pronouncement.  Would you not agree?

1          MR. FINGERHOOD:  Right.  The Court -- if we did

2     present this to the Court for its approval, the Court would

3     have to make a finding whether or not it agreed that the

4     settlement was fair, reasonable, in the public interest, and

5     so the case law is clear, too, that the Court is not a

6     rubber stamp for a determination of the EPA and DOJ

7     authorities.  The Court has its own authority to review and

8     make that ultimate determination if it's fair, reasonable,

9     and in the public interest.

10          THE COURT:  All right.  Thank you so much.

11          MR. FINGERHOOD:  I'm sorry?

12          THE COURT:  I said thank you so much.

13          MR. FINGERHOOD:  Oh, you're welcome.

14          THE COURT:  Mr. Henifin, would you go to the podium,

15     please?

16          MR. HENIFIN:  Yes, Your Honor.

17          THE COURT:  Good morning.

18          MR. HENIFIN:  Good morning.

19          THE COURT:  Now, of course, you are familiar with all

20     the provisions of this proposed stipulated order on the

21     sewer matter.

22          MR. HENIFIN:  Yes, Your Honor.

23          THE COURT:  And you are the interim manager,

24     third-party manager, and this order focuses upon what your

25     duties shall be.

1          MR. HENIFIN:  Yes, sir.

2          THE COURT:  Do you see anything in this agreement

3     which would pose any dilemmas for you?

4          MR. HENIFIN:  No, Your Honor.

5          THE COURT:  And do you see any duties that would be

6     called upon you relative to the sewer matter that would

7     conflict with your duties under the water matter?

8          MR. HENIFIN:  No, Your Honor.

9          THE COURT:  And would you be able to work on both

10     matters comfortably and efficiently?

11          MR. HENIFIN:  Yes, Your Honor.

12          THE COURT:  Will you have to allocate different times

13     as to when you'd be doing sewer as opposed to when you'd be

14     doing water?

15          MR. HENIFIN:  Not different times.  I'll be doing all

16     of it together, but there will be times when I will be

17     focused on the financial ends that are just sewer.  The most

18     challenging piece here is making sure that none of the water

19     money is spent on the sewer system, so a little more

20     financial attention to funding and how that works.

21          And then getting the entire revenue stream also means

22     I inherit the outstanding debt and the requirements that go

23     with that, so there's a little bit more focus on that

24     especially in these early weeks.

25          THE COURT:  And how much -- what percentage of your

1  time do you think you'll have to devote to that?

2      MR. HENIFIN:  In these early weeks, a significant

3  percent of the time.  I can't guess yet, but I'd say maybe

4  half my time.

5      THE COURT:  And will that have any adverse effect

6  upon the practicality of the objectives that have to be

7  addressed relative to alleviating the sewer problem?

8      MR. HENIFIN:  I don't believe so, Your Honor.

9      THE COURT:  Overall right now, where would you say we

10 are on the sewer problem?

11     MR. HENIFIN:  I think we're lined up and ready to go.

12 I think it's improved even with your just attention and the

13 city's focus over the last few months since we've been

14 talking about sewer.  There have been some improvements.

15     THE COURT:  You know at one time, we talked about the

16 number of hot spots that need immediately addressing.  Has

17 there been a significant reduction thus far even though this

18 is just at the beginning?

19     MR. HENIFIN:  I think when the city's contractor went

20 out and reviewed when we were talking 250, they did find

21 that several had been taken off that list; that's how we got

22 to the 215 or so that are in this order.  I can't tell you

23 if any of those are still on the -- you know, have been

24 resolved in the short period of time since that's happened,

25 but there is a definite focus on trying to get these

1    resolved.

2         THE COURT:  And on the timeframe, I know what the

3    order calls for here, the proposed order.  Do you think we

4    can complete the mission within that timeframe?

5         MR. HENIFIN:  Finances will be a driving factor in

6    that.  There isn't a dedicated source of money for the

7    sewer.  Again, I'm going to have to use as much water money

8    on the operational maintenance for water to offset some

9    local revenues.

10        I need to spend a lot of time and my staff needs to

11   spend a lot of time getting people to pay their bills, so we

12   have more local revenue.  That -- that becomes critical

13   under this scenario, because in the water order, the city

14   was paying, you know, a part of their budget directly to me

15   and not -- the entire revenue stream was not technically my

16   focus, even though I was running the WSBA under that order.

17        We need -- at the 56 percent rate at which we're

18   collecting revenue today and the number of properties that

19   don't have accounts, we'll be laser focused on trying to get

20   that resolved quickly to start that local revenue.  The more

21   local revenue we have, the more money we can direct to

22   sewer.  When we can offset some of those water charges we'd

23   normally be paying for with local revenue -- we can offset

24   that with the federal revenue if it's truly water charges on

25   the O&M side with the grant we're getting for the water

1    side, which frees up local revenue for the sewer side.

2         So that's the magic that has to happen.  And the

3    order calls for me to look for more funding, just like the

4    water order did, and I plan to be approaching various state

5    officials as well as federal to look for more dollars to

6    apply to the sewer issue.

7         THE COURT:  Give me an idea of what your strategy

8    will be to increase revenue on the sewer side.

9         MR. HENIFIN:  Well, the strategy is, one, we have to

10   clean up the billing accounts --

11        THE COURT:  Well, that's what I want to start with.

12        MR. HENIFIN:  So we've already got -- they're already

13   working on our accounts now, Horne.  I've retained Horne to

14   do some data analytics and mapping for us in conjunction

15   with our mapping efforts already going, and data clean up

16   work is underway today on the water accounts, which are the

17   sewer accounts essentially.

18        So we're already pretty far along in that line, so by

19   this fall, we would have confidence that we know where the

20   accounts that don't have accounts -- where the people are

21   that are using water and not paying for it are sometime late

22   this fall, and we can start trying to get their accounts

23   open and get them in line.  And we're going to start, you

24   know, actually shutting people's water off for nonpayment

25   sometime this month.  And I'll meet with you before that, so

1    you'll know when that's going to happen.  So they will

2    understand that we have to start getting folks to pay their

3    bills.

4         THE COURT:  Sometime ago we had some estimate of the

5    percentage of people who were not paying.  Has that changed?

6         MR. HENIFIN:  We're still at -- we think we've got

7    about 7,000 properties that don't even have accounts, and,

8    again, our collection rate today is about 56 percent of the

9    ones that do have accounts.

10         THE COURT:  What's been --

11         MR. HENIFIN:  It hasn't really changed.  Movement has

12    gone nowhere actually on collection efforts, and we haven't

13    started shutting people off.  Once we start shutting off, we

14    think we will see a tremendous difference on the payment for

15    the people that have accounts.

16         The work we're doing on cleaning up the data is to

17    identify the addresses that get water, potentially get

18    water, and don't have accounts.  And that's the effort we're

19    putting in at the moment.

20         THE COURT:  That number seems to have gone up.  I

21    seem to recall when we first had our discussion on the

22    number of people who were not paying, it was somewhere

23    around 6,000.

24         MR. HENIFIN:  It's somewhere in that five-to-seven

25    range most likely.

1          THE COURT:  Okay.

2          MR. HENIFIN:  I don't have the exact number, Your

3     Honor.

4          THE COURT:  Could it be higher than 7,000?

5          MR. HENIFIN:  I don't think so, but I don't think it

6     would go any higher than that just based on the preliminary

7     work I've seen.

8          THE COURT:  We'll be able to -- will we be able to

9     determine how long these people have gone without paying?

10          MR. HENIFIN:  Likely not.

11          THE COURT:  That we'll just have to look at the

12     present tense; is that so?

13          MR. HENIFIN:  In most cases.

14          THE COURT:  And then for those people who have not

15     paid, the response is going to be, eventually if they still

16     refuse to pay, their water would just be shut off?

17          MR. HENIFIN:  Yes, Your Honor.

18          THE COURT:  Any other penalties?

19          MR. HENIFIN:  There will be penalties for tampering

20     with meters once we do get meters in.  And even today, there

21     have been folks that have tampered with their meters once

22     they're shut off; there will be penalties for that.  There

23     will be penalties for having to come back out and shut them

24     off, again, if they haven't paid.  Removing meters has

25     penalties, so there's a variety of penalties that could go

```
1    into place.
2         And we don't want to be punitive to people that can't
3    afford it so there's -- you've got to walk a fine line
4    between a customer assistance for those that can't afford
5    it, and those that are just actually just choosing not to
6    pay.  So this is a -- it's a complicated and challenging
7    process going forward.  But we'll be doing the best we can
8    to ensure everyone is paying their fair share, and that
9    those that can't afford to pay are connected with resources
10   to help them pay.
11        THE COURT:  Let's talk about the procedure that's
12   going to be involved in the determination of who is paying,
13   who is not paying, what penalties to impose.  And what would
14   be the procedure for those people to get back online and
15   start paying?
16        And then whether they will have to pay all at one
17   time or whether they will be allowed to submit partial
18   payments, et cetera?
19        MR. HENIFIN:  We don't have it all chiseled in stone
20   yet, Your Honor, but we would be offering -- for those that
21   can't afford to pay, we would be offering payment plans, and
22   we can design those in a variety of ways.
23        For those the process, essentially, you get a notice,
24   a written notice you're delinquent.  Then they've got
25   roughly 30 days, and then we send a notice out just before
```

1   we cut them off saying in seven days, you're going to be cut

2   off.  And then they get cut off, and we put a door hanger on

3   their door telling them they've been cut off and here's the

4   number to call, which is our 601-500-5200 number, to get

5   service reestablished.  And they need to go make payment,

6   and we'll see proof of payment when they go to one of our

7   payment sites immediately, and we can schedule to turn them

8   back on ideally the same day.

9         It's the same process as was in place for many, many

10  years.  I think -- I don't know when the city stopped.

11  Probably during COVID, did you stop cutoffs or before that?

12        MS. MARTIN:  Your Honor, Tori Martin.

13        We actually -- we restarted shutoffs in August of

14  '22; is that right?  It was August of '22 because it was

15  before -- right around the same time as the emergency.

16  Right before the emergency in August, we restarted shutoffs.

17        MR. HENIFIN:  Essentially, we'd be following a

18  similar process, almost the same one the city did.  It's the

19  one pretty much aligned with the Public Service Commission's

20  guidance on how they do shutoffs for other water systems,

21  and most utilities follow a similar path.

22        THE COURT:  What percentage of the system experienced

23  shutoffs?

24        MR. HENIFIN:  I don't have that, Your Honor.

25        THE COURT:  Let me turn to the city, Ms. Martin.

1      MS. MARTIN:  Excuse me, Your Honor.  I was trying to

2  confer to make sure what I said previously was accurate.

3      What was your question?

4      THE COURT:  Well, did -- what you said previously,

5  was it accurate?

6      MS. MARTIN:  It was, yes, Your Honor.  We started the

7  shutoffs and then the emergencies happened and we stopped,

8  because people didn't have water.  But we had just restarted

9  them back.

10     THE COURT:  What percentage of the system experienced

11  shutoffs?

12     MS. MARTIN:  Now that, Your Honor --

13     THE COURT:  Roughly -- roughly how many --

14     MS. MARTIN:  Very, very small -- a very, very small

15  portion.  I think at the time, the consultants that we were

16  working with had advised that we should do it, but we should

17  do it at a very low rate, so that it would kind of send a

18  message to the public that we were doing it.  But it was --

19  I mean, I would say of the however many accounts that we

20  have, 50, 100.

21     MR. WILLIAMSON:  It was no more than a hundred.

22     MS. MARTIN:  Yeah, no more than a hundred.  It was a

23  very small number, because the other reality for us was once

24  you start shutoffs, we had to make sure we could manage on

25  the back end restarting.  So once people paid, we had to

1    make sure we had sufficient personnel that would be able to

2    go back out and turn the water on.

3          MR. WILLIAMSON:  Correct.

4          MS. MARTIN:  So I know it was a very low number.

5    We're estimating 100 right now, but it was a low number.

6          MR. WILLIAMSON:  It was no more than that.

7          MS. MARTIN:  Yeah.

8          THE COURT:  Now, the notice that went out on the

9    proposed shut outs -- I mean, shutoffs, did it advise the

10   targets that if they had extraordinary circumstances that

11   they could --

12         MS. MARTIN:  That I do not recall, but I know at that

13   time, we were already including that it was -- under the

14   state legislature at the time, there was a program where if

15   people had gone a significant period of time without paying

16   their bill, they could set up a payment plan.  So I do not

17   know if it was specific to the people that we were targeting

18   to cut off, but I do know we were advertising that payment

19   plan at that time because we had been consistently

20   advertising.

21         It was a plan where, essentially, if you've made the

22   payments I think it was ten -- was it ten times in a row?

23   It was set up through the legislature because it was -- the

24   legislature had a fear that if we -- we could not forgive

25   the past few payments, but what we could do is set up

1    payment plans.  And I know that that program was active at

2    the time where people could come in and sign up, and as long

3    as they made that payment for a significant period of time,

4    we would not shut them off.  So I know that program was

5    available, but I don't know if it was targeted toward the

6    people we were cutting off.  But I do know we were

7    advertising it as a city at that time.

8         THE COURT:  And then those people who were targets

9    who had disabled people in the household, were they provided

10   any notice that they could rely upon that in trying to get a

11   reasonable pay plan, and in the meantime, continue the water

12   coming in for those people in the household who were

13   suffering disabilities?

14        MS. MARTIN:  Not to my knowledge.  Not to my

15   knowledge.

16        THE COURT:  So then any household containing people

17   of disability would have to communicate that to whom?

18        MS. MARTIN:  To the -- they would have to call in to

19   WSBA.  They would have to communicate to WSBA.  And there

20   was an appeal process that was already set up for

21   individuals who felt like they had been inaccurately listed

22   for a shut off.  There was already an appeal process in

23   place.  But they would have had to communicate that

24   information directly to WSBA, and then WSBA would have

25   started the appeal process.

1          THE COURT:  And how long would the appeal process

2     take?

3          MS. MARTIN:  That I am not 100 percent certain.  I

4     don't know.  They could have revolved it.  If they didn't --

5     so the way the appeal process worked is if the supervisor

6     didn't resolve it at their level, if they didn't reverse the

7     decision I guess at their level, then it was moved forward

8     to the next step.  And I think the next step, was it the

9     city council or was it a group?

10          MR. WILLIAMSON:  It was a special hearing officer.

11          MS. MARTIN:  It was a special hearing officer that

12     would have advanced the hearing.  If the supervisor at WSBA

13     couldn't resolve it, then it advanced to that group.  So I

14     really -- I have no idea how long it would normally have

15     taken, because we had just restarted the process back right

16     before the water crisis hit.

17          THE COURT:  Well, to your knowledge would that

18     process take more than a week for instance?

19          MR. WILLIAMSON:  Sure.

20          MS. MARTIN:  I would assume so.  I would assume so

21     just to get the hearing officer and get everything.  I think

22     it would take at least a week just for the supervisor to

23     make a determination on whether or not they were going to

24     reverse a decision, because to my knowledge, they were

25     investigating internally first before they advanced it to

1    the next step.

2        THE COURT:  So was there an emergency provision

3    relative to review?

4        MR. WILLIAMSON:  There --

5        MS. MARTIN:  Yeah, I'm going to defer to Terrell

6    Williamson.

7        MR. WILLIAMSON:  Your Honor, if somebody appealed

8    that decision, then their water was not cut off, and it was

9    stayed until that procedure was completed.  So they were not

10   in danger of having their water cutoff during that process.

11       THE COURT:  Where are these directions contained, and

12   how would they be provided to the public at large?

13       MR. WILLIAMSON:  Well, they're available.  It's a

14   city ordinance, they're available online.  They're available

15   from the city clerk's office.  They would have been

16   available from the water-sewer business administration

17   office.

18       THE COURT:  All right.  Thank you.

19       MR. WILLIAMSON:  You're welcome.

20       THE COURT:  Mr. Henifin, do you consider that

21   discussion on notice to be sufficient?

22       MR. HENIFIN:  We're going to revisit the entire

23   process before we start our cutoffs, so we will be looking

24   at their notice provisions and how they were handling it

25   prior to the ITPM, the effective date of our order.  And

1    then we will make a recommendation on how we would like to

2    go forward, and then we would advertise that and start that

3    process.

4        THE COURT:  How much time do you think you will need

5    from this point forward for you to have some notion of the

6    procedure that you'll be employing?

7        MR. HENIFIN:  I think I'll have the procedures pretty

8    well drafted by the end of this month, by the end of August,

9    the month that we're about to go into; I keep thinking it's

10   August.  But by the end of August, and we'd like to have

11   this in place in September, so we're moving quickly.

12       THE COURT:  So between now and that time period,

13   there won't be any shutoffs?

14       MR. HENIFIN:  No, Your Honor.  We haven't done any

15   since we started, because we didn't have a process in place.

16   We weren't confident we knew which accounts had good meters,

17   good reads.  We're getting to the point now where we've got

18   about 70 percent of the meters installed, and we've got a

19   good history on what they're reading.  And we're confident

20   that those are correct and accurate at this point.

21           So based on that, we're going to be focused on

22   specific sets of accounts that have had meters installed for

23   a period of time, been getting good reads, and people are

24   not paying their bills.

25           THE COURT:  So at this juncture now, would you like

1    there to be some declaration in the news that shutoffs are

2    coming if one does not pay one's bill?

3        MR. HENIFIN:  We will be putting that word out there

4    soon, yes, Your Honor.  In fact, it's already -- at all the

5    community meetings I've been at lately, we've been talking

6    that it's coming.  Some of the council members are reminding

7    their constituents that they've got to pay their bills if

8    it's going to work.  So we've been getting a lot of support

9    I think where we need to.

10        And this will be advertised publicly.  We'll have a

11   campaign going as soon as we've got the process in place and

12   know we have the capability.  As Ms. Martin mentioned, you

13   have to have the capability to both shutoff and turn off

14   effectively and quickly, so we need to make sure we've got

15   everything in place when we pull that trigger.  Yes, Your

16   Honor.

17        THE COURT:  But the public needs to be advised as

18   quickly as possible now for those people who might have to

19   save up some money.

20        MR. HENIFIN:  Yes, Your Honor.

21        THE COURT:  And then on these partial payments,

22   again, I know you have not gotten to the specifics yet, so

23   you don't know what percentage of their outstanding bill

24   they would be required to pay?

25        MR. HENIFIN:  No, I don't, Your Honor.

1       THE COURT:  So you don't know how much monies will be

2   involved in these partial payments to keep their water on?

3       MR. HENIFIN:  Not at this point, Your Honor.

4       THE COURT:  So -- and there's no one they can call to

5   get this information at this point, is there?

6       MR. HENIFIN:  Not yet.  We're developing that as fast

7   as we can.

8       THE COURT:  So the public is simply advised at this

9   point --

10       MR. HENIFIN:  Pay your bill.

11       THE COURT:  -- pay your bill, and if you can't pay

12   all your bill, --

13       MR. HENIFIN:  Call us, and we'll help you.

14       THE COURT:  -- who do they call?

15       MR. HENIFIN:  Call our call center at 601-500-5200.

16       THE COURT:  Say that number again, please.

17       MR. HENIFIN:  601-500-5200.

18       THE COURT:  And so if they cannot pay at this point,

19   that's the number they need to call, because once the

20   shutoff occurs, it might be a measure of time before the cut

21   on would resume.

22       MR. HENIFIN:  We hope not.  We hope not.  We would

23   make it fast if they're going to pay their bill.  But they

24   should reach out now and be prepared, and we actually are

25   getting calls and people are making -- even without

1  shutoffs, people are getting payment plans today at our call

2  center.

3        THE COURT:  Is there any estimate on if everybody

4  pays, how much more revenue would be available?

5        MR. HENIFIN:  We should -- we're approaching -- we're

6  on track for somewhere around 36 million this year for water

7  and sewer revenues at that 56 percent roughly.  So we should

8  be somewhere closer to 60 to 70 million if people were

9  paying their bills, so almost double.

10        THE COURT:  Almost double.  And what impact would

11  that have upon the work that yons in the future for you?

12        MR. HENIFIN:  So on the sewer system, we're going to

13  be limited largely by available funds.  So if you look at

14  the find-and-fix work we're doing on the water system, which

15  is a very -- we're going to do a comparable program

16  immediately on sewer where we're sending out contractors on

17  a time and material with an engineer to oversee what's going

18  on, and they basically take the list and are given direction

19  where to go and make the repair.

20        And some of these sewer repairs are replacing a pipe,

21  say, between manhole to manhole, so a little bit bigger than

22  just digging down on a waterline and fixing a particular

23  leak.  There's a whole wide variety.

24        But they don't know what they're going to get into,

25  so that's why it's done on time and material.  We've already

1    got two more contractors lined up and ready to go.  We've

2    got the TV camera contractor to clean and inspect to

3    identify exactly what needs to be done.  We've got the

4    engineering contractor that has worked with the city for

5    many, many years, a very specialized firm that's done a lot

6    of the detailed field work on the sewer system here.  He's

7    lined up to manage a lot of that work.

8            So our limitation will be dollars, because on the

9    drinking water side -- as you'll see in the quarterly report

10   when you get it today -- we've spent somewhere upwards of

11   $8 million on find and fix in just the last -- since we got

12   the money, which was eligible -- we could reimburse back to

13   February when we started the find-and-fix work.  From

14   February to today, so it's five, six months.  We're spending

15   more than -- what I'm trying to get to, we're spending more

16   than a million dollars a month on the water side, and we're

17   going to have to limit ourselves to less than a million

18   dollars a month just by finances on the sewer side unless we

19   start seeing revenues start coming in.

20           THE COURT:  Sometime ago before the sewer matter was

21   placed on my docket, we talked about the sewage problem, and

22   in stages, how it has to be addressed; that the cause of

23   sewage backing up in the homes in the various areas of the

24   homes causing people to have to desert their homes to go

25   somewhere healthy, that the priority would be to address the

1  home situation before there was an address of the sewage

2  problems out in the open from some busted pipe.

3      So how are we doing now on the homes?  Because, you

4  know, when we first looked at all of that, you identified

5  how many hot spots were out in the open on the surface and

6  how sewage was spewing from those pipes.  But then when we

7  talked about what kind of priority should be allocated

8  towards the work in repairing, you then informed me of the

9  number of houses that had to be addressed first.

10      So how are we doing now on the houses?

11      MR. HENIFIN:  I'm not aware of any recent house

12  backups, or I haven't heard of one.  But that's all related

13  to what we're doing in the system.  So the way to prioritize

14  this is we will be plotting where houses have experienced

15  sewage backups into their houses, and then you look on the

16  sewer line downstream and try to find what the root cause

17  is.  And then you take care of that in the area where the

18  houses have had past history of sewage backing into their

19  houses.

20      A number of those issues may end up being on the

21  proper -- the line from the house to the city to the street,

22  which is the property owner's responsibility.  And my

23  understanding, at least anecdotally, is a number of our

24  sewer backups have been really due to failure of that pipe,

25  and so we need to understand -- because they own it all the

1    way to the main under our current configuration.  So if you

2    can imagine the sewer line from your house extends from your

3    house under the street and into the sewer line somewhere

4    near the center line of the street, so you even are

5    responsible for the piece from your property line all the

6    way to the sewer main under the street.

7            So I wouldn't imagine you would have to hire a

8    plumber to dig up your street to fix your sewer line, but

9    that, theoretically, is where a lot of the problems are.

10   So we'll be working on some proposals maybe to change that

11   or that model a little bit.

12           But, anyway, we're going to start with areas where

13   there's been a history of sewage backing into the houses and

14   work away from those to make sure we've got those areas

15   first, and then we'll be hitting the hot spots as we go.

16   And we'll have to continue to stop the hot spots as they

17   develop, because we don't want the list to grow.  So there's

18   a multifaceted approach to how we take these first few

19   months as a triage.

20           THE COURT:  I've found that only a few people in the

21   public outside of folk with your expertise and the city, et

22   cetera, fully understand the ownership differences between

23   the pipes that run into the house from the center of the

24   street and the pipes that run down the street that are part

25   of the city property.

1          And when I have been called upon to address some

2     people on various issues, I have mentioned that, and they

3     have not understood that.  They have this mistaken

4     impression that a pipe that comes to their home still are --

5     those pipes are city property, and that the city's

6     responsible for that.  And a number of these people do not

7     understand their ownership and their responsibilities with

8     regard to that.  So at present, that can't be changed until

9     the city direction is changed or the ordinance or laws,

10    whatever, how we got there.

11         But what advertisements are being put out to the

12    public on that particular matter, so they could have an

13    appreciation of what they own and what they are responsible

14    for?

15         MR. HENIFIN:  That will have to be part of our public

16    education process, and we haven't started that, Your Honor,

17    on the sewer side.

18         THE COURT:  Right, that's what I was thinking.  You

19    see, it has not started on the sewer side, and so most

20    people to whom I have talked think all those pipes belong to

21    the city.  Now, again, they don't understand what they are

22    responsible for.

23         They also don't understand what the cost could be if

24    they have to replace their pipes, the ones for which they

25    are responsible.  And I suppose that's going to be part of

1  this public announcement, too; correct?

2       MR. HENIFIN:  Yes, Your Honor.

3       THE COURT:  In addition, there is some effort to try

4  and get some funding to support that for the homeowner;

5  correct?

6       MR. HENIFIN:  Yes, Your Honor.

7       THE COURT:  But that has not resulted in success at

8  this point?

9       MR. HENIFIN:  We've got a little bit of money that

10  came as a supplemental environmental project with the

11  consent decree about 800 or -- 600 to $700,000 that's

12  remaining in that fund exactly for replacement of those

13  privately owned sewer laterals.  So that will be a program

14  we'll be putting in place using that funding that was,

15  again, put in place as a supplemental environmental project

16  as part of the consent decree that was entered in 2013.

17       THE COURT:  This is what you were going to tell me

18  just a moment ago; correct?

19       MR. FINGERHOOD:  Yes, Your Honor.  That is part of

20  the stipulated order, that the money that's been held in

21  escrow for the supplemental environmental project will be

22  turned over to Ted as part of the stipulated order to allow

23  him to provide relief for people who need repairs to their

24  private laterals and have affordability considerations.

25       THE COURT:  But it won't be enough to cover the

1  entire city?

2       MR. HENIFIN:  No, Your Honor.

3       MR. FINGERHOOD:  No, it won't, Your Honor,

4  unfortunately.

5       THE COURT:  And what percentage of the city would be

6  covered by that money?

7       Now, I know that there's an effort afoot to get more

8  money, and so this problem is a solution in the making and

9  that there will be some partial solutions based on some of

10  the partial money.  But as of present, we haven't even gone

11  forward with a plan to replace those pipes that come from

12  the city structure to the household.

13       MR. HENIFIN:  Correct.

14       THE COURT:  But, nevertheless, if we were to do that

15  today, we would not have enough to cover the entire city.

16       MR. HENIFIN:  That's probably about, rough numbers,

17  maybe 1,200 to 1,500.  That's enough to do 1,200 to 1,500

18  connections out of 60,000.

19       THE COURT:  Right.  That's out of -- but that's

20  present.  And the notion would be to get more money later

21  for these homeowners, so they won't have to finance this out

22  of their --

23       MR. HENIFIN:  We may have some other creative ideas,

24  too, Your Honor.

25       THE COURT:  I expect that.  In fact, the people with

1   whom I have spoken on this matter, I have emphasized that

2   there will be other, as you just put it, "creative ideas" to

3   get some hard dollars to support the homeowners as we try to

4   move to a phase where the homeowner will not have to finance

5   the repairs on their property and their pipes that are

6   there.

7         Now, let me turn to something that's related to that.

8   When we had the last status conference and allowed people to

9   voice their sentiments concerning their response to the

10  water progress, a number talked about brown water that was

11  coming out of the system.

12        Do you have an estimate of how many homes experienced

13  brown water because the pipes that came to their homes that

14  was their property needed repairing or cleaning?

15        MR. HENIFIN:  I don't have that estimate, Your Honor.

16        THE COURT:  But would you agree that there were pipes

17  and are pipes that are responsible for that?

18        MR. HENIFIN:  Yes, Your Honor.  There's any number of

19  causes potentially that could be on the city or on the

20  private property owner.  It could be their line from their

21  meter to the house is an old, galvanized line, and it's got

22  some rust in it; so the water that gets to their house

23  ultimately might have some discoloration from their own

24  line.  Their internal plumbing could have issues.  Their hot

25  water tank could have gotten some rust in the bottom that

```
1   got stirred up.
2          There's any number of sources, so we are working
3   towards a solution where we can try to sample those as soon
4   as we get those complaints.  Because right now, we hear
5   about it in a public meeting, and it's too late to verify or
6   do anything without some realtime response.  We're working
7   on setting a contract in place to make that happen here in
8   the next month or so.
9          THE COURT:  Are you aware that some homeowners -- not
10  many, I would imagine less than 10 or 15 -- have sent their
11  water off to some other source for it to be tested?
12         MR. HENIFIN:  I have heard rumor of it anecdotally.
13  I've not seen any test results from anybody.  There's
14  also --
15         THE COURT:  You know anything --
16         MR. HENIFIN:  There's also, I learned this week, that
17  Brown University has a study on it --
18         THE COURT:  That's what I was just about to
19  mention --
20         MR. HENIFIN:  -- I just --
21         THE COURT:  -- Brown University.
22         MR. HENIFIN:  I just learned -- learned about it.
23  They told me that their results to date match what I've been
24  telling everybody:  The water's safe.
25         THE COURT:  You got that today?
```

1    MR. HENIFIN:  I got that Friday, I believe, Your

2  Honor.

3    THE COURT:  I have not seen that, but that's what I

4  was waiting on.

5    MR. HENIFIN:  Like, I asked for their actual study

6  results, and if they're sample testing, if they would

7  provide that; and I think they're planning to do that.

8    THE COURT:  That's what I'm waiting on, because I'm

9  aware of the people who -- or the person who highlighted

10  that who triggered that study, and I was waiting on the

11  response of the study.  So I have not seen what you just

12  said.

13    MR. HENIFIN:  I just got it Friday, and I will

14  forward it on to you, Your Honor.

15    THE COURT:  Would you please do so?  Because they had

16  said they thought it was going to be different, and I had

17  asked them to be sure I got a copy.  But I have not gotten

18  it yet.

19    MR. HENIFIN:  At this point, I just have an email

20  that has that statement in there, and I've asked for the

21  actual results to be shared.  But I will share that with

22  you.

23    THE COURT:  But your email says that it --

24    MR. HENIFIN:  Their results match with what we've

25  found, no problems.

1          THE COURT:  Okay.  And what is that result?  State

2     that, so the press will understand what your results were

3     that you anticipate the Brown University study confirming.

4          MR. HENIFIN:  Yeah.  And they're only -- they're not

5     looking at a wide variety of constituents.  They're adding

6     lead and copper to their sampling this year, I think this

7     fall.

8          Up to this point, they've been looking at standard

9     water chemistry, which is turbidity, so they would

10     understand, you know, that the water meets all Safe Drinking

11     Water Act requirements looking at turbidity and PH and the

12     other factors, any kind of bacteria.  They're measuring for

13     all of those and not finding any -- I won't say anything,

14     because I haven't seen the complete set.  But the email that

15     I got said that their samples are in line with -- or their

16     test results are in line with what we've been saying:  The

17     water is safe and meets Safe Drinking Water Act

18     requirements.

19          THE COURT:  As I said before, I asked that that be

20     sent to me, and I asked that last week.  I also was aware

21     when they said they first were submitting their samples, but

22     at first I didn't know if Brown was going to do anything

23     relative to those samples.  But after I was told that Brown

24     was going to go forward on its own little study, then I

25     asked if they had a conclusion of those matters to please

```
 1   get them to me, and then I will share them with everybody

 2   else.  So that's where we are --

 3          MR. HENIFIN:  Yes, Your Honor.

 4          THE COURT:  -- or that's where I am on this matter of

 5   the study.

 6          One other matter, I understand there's some people in

 7   the community trying to sell water filters.  Are you aware

 8   of that?

 9          MR. HENIFIN:  No, Your Honor.

10          THE COURT:  I've had some telephone calls where some

11   persons have asked me, without identifying themselves,

12   whether water filters are safe and required, and that there

13   are some people who are in the community trying to sell

14   water filters maintaining that this is going to provide

15   water safety where we don't have it.  Some anonymous folk

16   have called and told me about this, but you're not aware of

17   this.

18          MR. HENIFIN:  I'm not.  But, you know, nationwide

19   there is this problem.  If you go into any Home Depot or

20   Lowe's and go in the door, there's the bottled water.  And

21   they have pictures of the inside of pipes, and they have

22   threatening language about this is what you're drinking.

23          I mean, the whole industry around bottled water, big

24   bottled water coolers, and whole-house filters, it's to

25   their benefit to tell you your tap water is bad, and they're
```

1 doing this across the country.  It's not unique to Jackson

2 by any stretch of the imagination.  It's a scare tactic to

3 try to get people to put filters in their house and spend a

4 lot of money or buy cooler giant bottles of water and spend

5 a lot of money.  It -- people -- you know, we can't -- "we,"

6 municipal water organizations, are up against a huge

7 industry both on the filtered side, whether it's whole-house

8 filters or pitcher filters, and then the bottled water side

9 who have endless amounts of resources to do advertising and

10 convince and scare and drive people to use things they don't

11 need.  And it's sort of capitalism at its worst; I'm not

12 sure.  You know, create the problem to get people to buy

13 your product.

14   I was in the grocery store in Fondren Thursday night.

15 A gentleman in front of me had a case of water on the

16 bottom.  I asked him where he stayed.  He said he stayed in

17 Fondren.  I said you don't need that water.  I said I'll buy

18 you your groceries if you put the water back.  I did; he put

19 it back.

20   THE COURT:  He did, huh?

21   MR. HENIFIN:  He put it back.  We've just got to

22 change people's mindset.

23   THE COURT:  Wait, wait, wait, hold it.  So you bought

24 the groceries?

25   MR. HENIFIN:  It wasn't a lot.

1           THE COURT:  Well, how much --

2           MR. HENIFIN:  He didn't go back and get more.  It was

3    a very small cart full of groceries.

4           THE COURT:  Well, that's why I was asking, because I

5    want to know can you meet me at the grocery store?

6           MR. HENIFIN:  I will.  If you're going to put your

7    bottled water back, I'll definitely meet you at the grocery

8    store.

9           THE COURT:  That's going to be my major shopping day.

10   I'll have about four or five carts of groceries, you know,

11   and I just have to be careful to put one carton of water

12   over there so you can pay for it.

13          Well, all right.  Mr. Henifin, is there anything else

14   that you would like to advise me about, and correspondingly,

15   advise the public about at this point?

16          MR. HENIFIN:  I don't believe so, Your Honor.  I

17   think we're in -- I appreciate the parties, one, putting

18   confidence in me to do this.  And, two, to do this at a very

19   rapid pace to get this order to you.

20          Again, I think the Department of Justice thought it

21   would be impossible.  They've I think beat their water

22   record, so I'm not saying they can do this all the time.

23   But when the issue's that critical, I think they can rise to

24   the occasion.

25          So I think we've got a good order from all parties,

1    and I'm proud to be named as the third-party administrator

2    of the sewer system.  Nothing like a winning ticket, lottery

3    ticket there.  So I'm looking forward to what I can do and

4    how I can leverage the latitude you've provided and they've

5    provided in the order to get work done quickly, so we can

6    get the sewage off the street.  So I'm all about that, Your

7    Honor.  But I'm looking forward to when you sign it, so we

8    can get started.

9          THE COURT:  All right.  Thank you.

10          So let me go around the room to see if there are any

11    additional comments, and I'll start on my right over here.

12          Any additional comments?

13          MR. FINGERHOOD:  Just a quick comment, Your Honor.

14    My --

15          THE COURT:  Go to the podium, please.

16          MR. FINGERHOOD:  Yes, Karl Fingerhood, Department of

17    Justice.  Just a quick comment, my counsel from MDEQ

18    reminded me that on the private lateral issue, there is

19    another concern, because the private lateral is owned by the

20    building owner.  And so there's a concern with renters

21    because, you know, they're not eligible for that program, so

22    there are a number of renters who are experiencing problems

23    with the private lateral.  But unless the owner of the

24    apartment building gets involved, some will still suffer the

25    consequences.

```
 1          THE COURT:  All right.  Thank you.
 2          Well, let me hear from you all back there on this
 3   point.  Go to the microphone, please.  Identify yourself.
 4          MS. ZMITROVICH:  Gretchen Zmitrovich with the
 5   Department of Environmental Quality.
 6          THE COURT:  Would you spell your last name?
 7          MS. ZMITROVICH:  Z-m-i-t-r-o-v-i-c-h.
 8          THE COURT:  All right.  Thank you.
 9          MS. ZMITROVICH:  Yes.  In the original consent
10   decree, the supplemental environmental project that was
11   approved by the parties was to replace the private laterals
12   for -- and there's an affordability criteria, so the owner
13   of the house has to be a certain income level.  And I know
14   when we first rolled out the program, we had trouble finding
15   enough homeowners that qualified so even if -- because the
16   renter would be low income, but the homeowner would not be
17   low income.  And I don't know if -- because we stopped that
18   program under the consent decree when there was lack of
19   money.  I don't know if we still have that issue or not if
20   y'all --
21          MS. MARTIN:  I'll talk about the issue when we talk
22   later.
23          MS. ZMITROVICH:  Okay.  Yeah.  I don't know if we
24   have found enough people to qualify, but there is that
25   income restriction.  I just didn't want the media to get out
```

1    that it is available to everyone, because it's not.  It's

2    available only to certain people who meet the income

3    affordability in the program.

4         THE COURT:  Who own the property?

5         MS. ZMITROVICH:  Yes, the actual homeowner.

6         THE COURT:  So then renters who may be low income

7    will be dependent upon the property owner's eligibility for

8    the system?

9         MS. ZMITROVICH:  Correct, under the way it was

10   originally approved, and I think the city has more

11   information apparently.

12        THE COURT:  Well, let me hear from the city.  Is that

13   based on low income for the property owner as well as the

14   renter?

15        MS. MARTIN:  It's just the property owner.  It's just

16   the property owner; the property owner has to qualify.  But

17   we do have a significant number of property owners who have

18   qualified, so it's our understanding that the $600,000, we

19   already have a list of people that have qualified that meet

20   the low-income requirements that are property owners.

21        What the Department of Justice and the DEQ said

22   earlier is correct that in the apartment situation, the

23   property owner of that apartment complex would not qualify

24   normally, and so those renters cannot do the application to

25   receive that funding.  But we do have a large number of

1    homeowners who have gone through that process and have

2    qualified, and we believe that there is a list of homeowners

3    that are in line to do that.

4         What I will add to that is, there is a process to my

5    knowledge from the risk management point of view where those

6    homeowners -- you know, what Mr. Henifin was explaining is

7    that whenever somebody has an issue, they have to go through

8    and do their research.  Well, if the city comes in and we

9    research our line and we know there isn't a problem with our

10   line, that still puts the responsibility on the homeowner to

11   hire a plumber to do the research on their internal lines.

12        And there are some homeowners that are running into

13   issues, because that's an expense to get a plumber out there

14   to actually research where the problem is in their line.

15   You had a good description of this earlier about the line

16   running from the street -- or I think maybe Mr. Henifin --

17   the line running from the street to the house, they have to

18   do that initial investigation work to determine that that

19   problem exists.  But it's our understanding there are a

20   number of homeowners that have gone through that process,

21   have paid the plumber to come in.  They know the problem is

22   in their lines, and there is a list of them that are waiting

23   to get that work done.

24        THE COURT:  And what's the average repair cost?

25        MS. MARTIN:  That, Your Honor, I'm not sure.  From

1    the risk management side, it varies.  And risk management

2    normally gets these, because we get a lot of claims that

3    come in.  And risk management falls under the legal

4    department, that's the only reason why I have as much

5    knowledge about this as I do.

6         But on the risk management side, we get the claims

7    in, we will send public works out to make sure it's our not

8    our line.  I think that the cost varies, because I have seen

9    claims that range anywhere from $200 to $2,000.  I think it

10   just depends on what the issue is in the line and how

11   much -- because what Mr. Henifin was explaining earlier

12   about them having to put the camera down there, that's much

13   more expensive than if the plumber can just come in and with

14   a snake or something determine there's something clogging it

15   or what it is clogging it.  But I think it just varies; the

16   cost varies depending on what the problem is in the line.

17        THE COURT:  Let's talk about the plumber for a

18   moment.  Are we talking about certified plumbers?

19        MS. MARTIN:  That is up to that individual homeowner

20   who they hire to come in and do that research, but I have

21   seen claims from certified plumbers.

22        THE COURT:  Well, what I'm asking is, is from whom

23   would you take these results?  Would you take it from anyone

24   that says I am a plumber?

25        MS. MARTIN:  No, Your Honor.  I think we require --

1  we typically look them up on, you know, the state contractor

2  list.  We will make sure it's a board-certified plumber

3  before we will accept that estimate or that quote from them.

4      Again, what I'm talking about is a situation where

5  we've told them it's not on the city side.  And -- and for

6  what it's worth, it's a lot of back and forth, because we

7  will come in, the public works department will have a person

8  that will come in, they'll do the research, they'll say it's

9  not our line.  Well, then the homeowner will go and get a

10  plumber, and that plumber might come in and they might say,

11  well, it is on the city's side.  And so what I've seen in

12  risk management is a lot of back and forth.

13      The city has no control over who that individual

14  hires to do the research, but for this program, to my

15  understanding, it is required that it is a certified plumber

16  that does that research.  But the city up to this point has

17  not been paying for the individual --

18      THE COURT:  Slow down some.

19      MS. MARTIN:  I apologize.

20      THE COURT:  The city up to this point?

21      MS. MARTIN:  The city up to this point has not been

22  paying for the homeowner's plumber.  The city doesn't have

23  the resources to pay for somebody to come in and check your

24  line.  We can't do that, that's almost like the city giving

25  you a gift.  We can't do that.  So the responsibility is on

1    that individual homeowner to hire a plumber and get them to

2    research on their side what the problem is in the line.

3            THE COURT:  And they can't qualify for the moneys

4    unless they meet the financial --

5            MS. MARTIN:  Correct.

6            THE COURT:  -- requirements?

7            MS. MARTIN:  Correct, Your Honor.  They would have to

8    meet their financial requirements, which is -- I think is

9    low income.

10           MR. WILLIAMSON:  Low and moderate.

11           MS. MARTIN:  And I apologize, Your Honor.  Terry is

12   the attorney -- Terrell Williamson is the attorney that is

13   assigned to public works, and so he typically is the one

14   that's on the front lines, as the attorney anyway, when

15   these issues come up.  So if I could beg the Court's

16   indulgence to see what comment he's trying to make to me to

17   be sure what I'm saying is accurate?

18           THE COURT:  Go ahead.

19           MS. MARTIN:  Thank you, Your Honor.

20           So, Your Honor, it's not just low income.  It's low

21   and moderate income, that's the requirement.

22           THE COURT:  Low and moderate?

23           MS. MARTIN:  Correct, Your Honor.

24           THE COURT:  What's the distinction by the city?

25           MS. MARTIN:  It's a higher income limit for moderate.

1    I don't know what the actual number is, but it's a higher

2    income.  So low income, you know, is defined as -- it's one

3    income limit for low income.  It's a higher income limit for

4    moderate.

5          THE COURT:  And does our co-counsel know what that

6    is?

7          MS. MARTIN:  Do you know what those numbers are?

8          MR. WILLIAMSON:  Your Honor, what we use is, you

9    know, the census and the, you know, Housing and Urban

10   Development classifications for moderate income and low

11   income, so whatever the federal government sets those at for

12   the City of Jackson.

13         THE COURT:  So you go to the federal guidelines on

14   this?

15         MR. WILLIAMSON:  Yes, Your Honor.

16         THE COURT:  Okay.  And that same guideline applies to

17   the homeowner and not the renter?

18         MR. WILLIAMSON:  That's correct, Your Honor.  That

19   was -- that was what we negotiated with the Justice

20   Department in the original consent decree, and if my

21   recollection serves me correct that was -- so the

22   supplemental environmental project that we negotiated was to

23   benefit low-and-moderate-income persons, and the position of

24   the Justice Department at that time was that if you made an

25   improvement to rental property that was not owned by

1    somebody that was low or moderate income, that did not

2    necessarily benefit somebody that was -- you know, that was

3    a low or moderate income person, so that was the reason that

4    distinction was made.

5         THE COURT:  Okay.  Thank you.

6         MS. MARTIN:  That's all I have, Your Honor.

7         THE COURT:  Did you finish what you were telling me?

8         MS. ZMITROVICH:  Yes, Your Honor.

9         THE COURT:  Mr. Henifin, so how does this change your

10   approach, if it does at all?

11        MR. HENIFIN:  For the lateral program, Your Honor?

12        THE COURT:  That's right.

13        MR. HENIFIN:  So we'll review it from top to bottom

14   and see if there's -- there's actually a very different

15   approach I'd like to take that we haven't presented anywhere

16   in public yet, and I'm not quite ready to.  And I need a

17   little bit more legal research on that, but we'll be

18   prepared to maybe think a little further out of the pipe.

19        THE COURT:  That was not a pun, was it?

20        MR. HENIFIN:  No, I wouldn't pun in front of you,

21   Your Honor.

22        THE COURT:  All right.  Mr. Henifin, thank you.

23        MR. HENIFIN:  You're welcome.

24        THE COURT:  Anybody else over here to the left?  I

25   just heard from the city.  Was there anything else the city

1   has to offer on this entire proposed stipulated order on the

2   sewer system?

3          MS. MARTIN:  No, Your Honor, not at this time.

4          THE COURT:  All right.  From what I've heard thus far

5   and what I've read, then I don't see any reasons why I

6   should not sign this order and this matter should go into

7   effect almost immediately; is that correct?

8          MR. HENIFIN:  (Nods affirmatively).

9          MR. FINGERHOOD:  Good morning, Your Honor, Karl

10  Fingerhood from the Department of Justice.  If you signed

11  it, it would be an order of the court, but it would not be a

12  stipulated order if you did not allow for the public comment

13  period to take place.

14         THE COURT:  And that's, what, 30 days or 45 days?

15         MR. FINGERHOOD:  Thirty days.

16         THE COURT:  Thirty days.  Because then I have to

17  consider the comments that will be rendered at that time?

18         MR. FINGERHOOD:  Correct, Your Honor.

19         THE COURT:  All right.  Thank you.  Give me just

20  about five minutes while I turn and have a discussion here,

21  so you all can recess for about five minutes.  Okay?  Make

22  it ten minutes.

23                 (A brief recess was taken.)

24         THE COURT:  The ultimate purpose of this status

25  conference was for me to address the proposed stipulated

1    order on the sewer system.  The Court already has on record

2    the order on the water system, so I needed to read carefully

3    everything in the sewer system proposed order to be sure

4    that there are no conflicts, dilemmas, changes that would

5    warrant the Court's nonsignature.

6         I have gone through everything in this sewer system

7    order, and then the only few questions I've had, I have

8    posed this morning during this last session.  I'm satisfied

9    with those questions, at least the answers to those

10   questions.

11        And so since I am satisfied, then I have now signed

12   this order the 31st day of July 2023, so that we can move

13   forward now on the sewer system, along with the progress

14   that is being made and has been made on the water system.

15   So then I will put the sewer system order in the record.

16   I will now file it.

17        And one final time, does anyone have any objections

18   to anything contained within this proposed order?

19        Over here to my right, any objections?  Anybody?

20        Hold it.  So then I'm going to put this order in.

21        No objections over here?

22        MR. FINGERHOOD:  Your Honor, Karl Fingerhood,

23   Department of Justice.  If you are inclined to enter the

24   order, then I guess it would strike out the stipulated.  It

25   would just be an order.

```
 1          THE COURT:  I will.  Okay.  I am so inclined.  And
 2     the word "stipulated" will be stricken, and I can do that
 3     myself or you can just send another cover sheet.  But I can
 4     just strike it out and put my initials here.
 5          Any objections to my doing that?
 6          MR. FINGERHOOD:  Whatever the Court prefers, Your
 7     Honor.
 8          THE COURT:  Okay.  Over here, any objections at all?
 9          MS. MARTIN:  Your Honor, we don't have any
10     objections.  We might have to take -- make a revision to
11     what's in the minutes now since it's no longer stipulated,
12     but we don't have an objection to moving forward.
13          THE COURT:  Is there any objection to my just simply
14     striking out the word "stipulated," and putting my initials
15     there in place, or would you rather give me another cover
16     sheet?
17          MS. MARTIN:  I think that's fine with us.
18          THE COURT:  Which one you want?  How would you like
19     to proceed?
20          MS. MARTIN:  If the Department of Justice and the DEQ
21     is fine, we're fine with you striking it out and initialling
22     the change.
23          THE COURT:  Okay.  I'll do that.  So then I am now
24     striking, and I'm putting my initial right above the strike
25     "HTW".  I have signed it the 31st day of July 2023, and it
```

1    will be filed, Terri.

2         Now, one last matter, the water case and the sewer

3    case are technically still separate cases.  I propose to

4    consolidate them.  Any objection?

5         MR. FINGERHOOD:  Your Honor, Karl Fingerhood,

6    Department of Justice.  We don't have an objection to

7    consolidating them for administrative purposes.  There -- we

8    did draft the orders, so they would not conflict.  We may

9    have to make some small revisions to some of the financial

10   provisions because of the way they are now in this -- in the

11   original drinking water order, because we've revised things

12   in the sewer order to reflect kind of the changes and how

13   the money's flowing and how it will be accounted for, et

14   cetera.  And so we have no objection to consolidating them

15   for administrative purposes.

16        For I guess substantive consolidation, I think the

17   two matters are on different timelines as far as when the

18   long-term solutions will be implemented.  And although

19   there's no time limit on the drinking water order, we do

20   expect that one to be shorter term than the order you just

21   entered on the Clean Water Act side; that one will last four

22   years -- it's envisioned to last four years followed by

23   consent decree modification.  The drinking water is a

24   shorter term to also be followed by a consent decree.

25        So because there's different statutes, different

1    timeframes, the sewer fix will probably take at least a

2    decade or more to get everything back into compliance with

3    the Clean Water Act and state law.  I think the drinking

4    water would be well under that timeframe, so that's why I

5    would request --

6         THE COURT:  So then --

7         MR. FINGERHOOD:  -- they not be administratively

8    consolidated.

9         THE COURT:  Okay.  What about back there?

10        MS. ZMITROVICH:  Gretchen Zmitrovich again.  I think

11   it's the state's preference to keep them separate also.  The

12   parties are different, even though it's the State of

13   Mississippi.  The State of Mississippi is actually the

14   health department for the drinking water and DEQ for the

15   sewer, and like Mr. Fingerhood said, the issues are just

16   different and the timeframes are different.

17        THE COURT:  Do you have any objection to

18   consolidating them administratively?

19        MS. ZMITROVICH:  I do not, no.

20        THE COURT:  Thank you.  Let's go over here then.

21        MS. MARTIN:  Your Honor, Tori Martin for the City of

22   Jackson.  We would also note an objection not for

23   administrative purposes, but for all the reasons that have

24   been stated previously, different timelines, different

25   future for both systems.  The drinking water system has a

1  very different future than the wastewater system, and also

2  the parties are different.  But we would also note, the

3  state is actually not a party in the drinking water lawsuit.

4  The state is a party in the waste water lawsuit, and so for

5  the same reasons that have been stated.

6          THE COURT:  Well, do you have an objection to a

7  consolidation administratively?

8          MS. MARTIN:  We do not, Your Honor.

9          THE COURT:  Okay.  Thank you.

10         Mr. Henifin, you are mentioned, of course,

11 prominently in both.  Do you see any practical distinctions

12 that should be brought to the Court's attentions as to

13 whether these two should be consolidated on a venture

14 greater than merely administrative?

15         MR. HENIFIN:  No, Your Honor.  I think the

16 administrative consolidation makes sense.

17         THE COURT:  Okay.  Thank you so much.

18         All parties here agree the administrative

19 consolidation makes sense, and thus there are no objections

20 thereto.  So the Court will do that.

21         Now, I need to have a proposed order submitted to the

22 Court on this matter.  Who is going to submit the proposed

23 order to the rest of the parties here and get those

24 signatures, and then submit the order to the Court?

25         MR. FINGERHOOD:  Your Honor, Karl Fingerhood.  I

1  volunteer to draft a proposed order, circulate it amongst

2  the parties, and then try and have an agreed order to submit

3  to Your Honor on that.

4      THE COURT:  All right.  Thank you.  Please submit the

5  agreed order as soon as it is completed.

6      Now, that takes care of all other business the Court

7  wanted to handle at this session.  Are there any other

8  matters the Court needs to address?  Let's start again over

9  here to my right.

10     MR. FINGERHOOD:  No, Your Honor.

11     MS. ZMITROVICH:  No, Your Honor.

12     THE COURT:  Over here to my left?

13     MS. MARTIN:  No, Your Honor.

14     THE COURT:  And, Mr. Henifin?

15     MR. HENIFIN:  No, Your Honor.

16     THE COURT:  Then thank you all very much.  I will --

17 I have given my courtroom deputy the stipulated order.  She

18 will cause it to be filed in the next few minutes, and as

19 soon as I get the proposed order on the administrative

20 consolidation, then I will sign it, too.

21     Thank you all very much.

22     MS. BARNES:  All rise.

23 ************************************************************

24     THE COURT:  All right.  We're back on record.  All

25 parties are present.  Who wants to point out the problem

1    here?

2         MR. FINGERHOOD:  Your Honor, Karl Fingerhood,

3    Department of Justice.  I wouldn't call it "a problem."  We

4    just were wanting to clarify I think if you were going to

5    enter the document as an order of the court, that in

6    addition to striking stipulated, you also should probably

7    strike the signature pages from the parties as well.

8         Also, we were unclear what the Court's intent was

9    with respect to the public comment provision.

10         THE COURT:  Well, previously you said that the public

11    comment provision was required.  Are you changing that now?

12    Are you saying now it is not required?

13         MR. FINGERHOOD:  I -- I don't believe I said it was

14    legally required, but we would prefer it be just given the

15    public interest.  It's not -- a public comment period is

16    required for a consent judgment.  This is somewhat

17    different, a stipulated order.  But because the original

18    agreement was subject to a public comment period, given the

19    public interest and also the fact this is not an emergency

20    as was the drinking water situation, we wanted to have a

21    public comment period.  And that was something that came

22    from both high-ups at DOJ and EPA.

23         THE COURT:  So you prefer to leave into the order the

24    public comment?

25         MR. FINGERHOOD:  Well, if it's entered as an order of

 1    the court, the way it's written, I don't think that would

 2    really work.

 3         THE COURT:  Well, then what if we just leave in

 4    "stipulated?"  I had taken it out a few moments ago, but it

 5    has not been filed.  So since it has not been filed, would

 6    you prefer that "stipulated" remains in the order?

 7         MR. FINGERHOOD:  So if the -- if the order is subject

 8    to the public comment period, then I think that is basically

 9    the order that we did file as a stipulated order.

10         But if the order is entered effective today, that is

11    not what, you know, the people at DOJ and EPA with approval

12    authority, that's not what they had agreed to.

13         THE COURT:  They agreed to have a public comment

14    section?

15         MR. FINGERHOOD:  Correct.

16         THE COURT:  Okay.  So then you don't -- so then you

17    want "stipulated" to remain in the order?

18         MR. FINGERHOOD:  If -- if the -- if we do include

19    that it's effective after the public comment period, and we

20    report back to the process I outlined earlier in the

21    hearing, if that --

22         THE COURT:  Then the order would not go into effect

23    today?

24         MR. FINGERHOOD:  Right.

25         THE COURT:  It could only go into effect after the

1    public comment period has run?

2        MR. FINGERHOOD:  Right.  And Your Honor determines

3    that it's fair, reasonable, and in the public interest based

4    on the response to comment.

5        THE COURT:  Okay.  So then in order to preserve the

6    order without it having to be renegotiated or modified, then

7    the Court needs to withdraw its strike of "stipulated" and

8    leave it like originally submitted to the Court with the

9    word "stipulated" still in it; correct?

10        MR. FINGERHOOD:  That's correct, Your Honor.

11        THE COURT:  And then after the public comment section

12    or time period has expired, then the Court can order the

13    matter to go into effect if the Court is satisfied from the

14    public comment period that there is nothing that would

15    interfere with the orders going into effect?

16        MR. FINGERHOOD:  Correct, Your Honor.

17        THE COURT:  Okay.  What do you all say on this?

18        MS. ZMITROVICH:  Gretchen Zmitrovich for MDEQ.  It's

19    our position that if the Court is going to enter the order

20    today, we request you take away "stipulated," take out the

21    public participation, and remove our signatures.  If it's

22    not going to be effective today, we would request we keep it

23    as we negotiated, and the Court would enter it after the

24    30-day comment period.

25        THE COURT:  All right.  Thank you.

1          What says the city?

2          MS. MARTIN:  Your Honor, Tori Martin on behalf of the

3     city.  I think we have a similar position, which is if we --

4     for us, it's mainly the fact that if the order is modified,

5     that then would require us to take it back to the city

6     council if it's an agreed order.

7          If it's -- the reason why we were in favor of taking

8     out "stipulated" is because we thought we were modifying the

9     order.  But if the order stays the same and is not effective

10    until August 31st, I think everything stays the same for the

11    City of Jackson.

12         THE COURT:  All right.  Then the Court reverses its

13    direction with regard to the word "stipulated," and the

14    Court leaves that in the order.  One second.

15         My law clerk just informed me that the news media has

16    just reported there will be no public comment section.

17    Well, we will do a short order merely saying that we

18    modified the order, and there will be a public comment

19    opportunity.  We'll put that order in now, and I will have

20    my law clerk to call some of the news people who were here

21    in the courtroom and tell them that's been changed.

22         Any problem with that?

23         MR. FINGERHOOD:  No, Your Honor.

24         MS. ZMITROVICH:  No, Your Honor.

25         MS. MARTIN:  No, Your Honor.

1          THE COURT:  That's how we'll proceed then.  There

2     will be a public comment opportunity, and we then will

3     publish that in the next few minutes and call up the news

4     media and tell them that it has been changed.  And of

5     course, you all can tell them the same thing, and just tell

6     them that we have all decided to put in the originally

7     submitted order that called for a public comment; that upon

8     further reflection, we want the public to have an

9     opportunity to render a public comment.

10          So therefore we changed it, but at the time that this

11     was modified, the press had already left.  And this was

12     taken up subsequent to the departure of the press, so it's

13     no fault of theirs.  I will put that in the order I will

14     send out within the next 30 minutes.  Is that fine?

15          MR. FINGERHOOD:  Thank you, Your Honor.

16          MS. ZMITROVICH:  Yes, it's fine.

17          THE COURT:  And here?

18          MS. MARTIN:  Yes, Your Honor.

19          THE COURT:  Is there anything else we need to think

20     about?

21          MR. FINGERHOOD:  No, Your Honor.

22          THE COURT:  Okay.  Then who's the brainchild that

23     came up with this?

24          MS. WILLIAMS:  All heads bowed.

25          THE COURT:  Thank you.

 1          MS. WILLIAMS:  And we probably owe Ms. Candice

 2    something.

 3          THE COURT:  All right.  Then, Candice, thank you so

 4    much.

 5          THE REPORTER:  You're welcome, Judge.

 6    ***************************************************************

1          **CERTIFICATE OF COURT REPORTER**

2

3          I, Candice S. Crane, Official Court Reporter for the

4    United States District Court for the Southern District of

5    Mississippi, do hereby certify that the above and foregoing

6    pages contain a full, true, and correct transcript of the

7    proceedings had in the forenamed case at the time and place

8    indicated, which proceedings were stenographically recorded

9    by me to the best of my skill and ability.

10         I further certify that the transcript fees and format

11   comply with those prescribed by the Court and Judicial

12   Conference of the United States.

13         THIS, the 6th day of August, 2023.

14

15                            /s/ Candice S. Crane, RPR, RCR, CCR

16                            Candice S. Crane, RPR, RCR, CCR #1781
                              Official Court Reporter
17                            United States District Court
                              Candice_Crane@mssd.uscourts.gov
18

19

20

21

22

23

24

25