## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

United States of America, *et al*.

     *Plaintiffs*,

v.

The City of Jackson,

     *Defendant*.

Case No. 3:12-cv-790-HGW-LGI

---

United States of America,

     *Plaintiff*,

- and -

Mississippi Poor People's Campaign and People's Advocacy Institute,

     *Intervenors-Plaintiffs*,

v.

The City of Jackson,

     *Defendant*.

Case No. 3:22-cv-686-HGW-LGI

---

### [PROPOSED] COMPLAINT-IN-INTERVENTION FOR DECLARATORY AND INJUNCTIVE RELIEF TO REMEDY VIOLATIONS OF THE SAFE DRINKING WATER ACT

### PRELIMINARY STATEMENT

1.    The Jackson water crisis is not just one crisis, but a confluence of multiple crises: an infrastructure crisis, a financial crisis, a climate crisis, a public health crisis, and increasingly, a crisis of public trust. Decades of state disinvestment have deprived the majority-Black city of

1

Jackson, Mississippi, of adequate resources to maintain and repair its crumbling public water system. In recent years, state officials have actively undermined Jacksonians' ability to make much-needed improvements to the system and more broadly, govern themselves and determine the fate of their city. A series of climate disasters has roiled the already fragile water system, driving it into total collapse in August and September of 2022.

2.      One year has passed since then and, while some progress has been made Jackson residents still do not have verifiably safe water to drink. Beginning in 2020, the U.S. Environmental Protection Agency ("EPA") initiated a series of administrative enforcement actions that culminated in the filing of the above-captioned lawsuit against the City of Jackson in November 2022. The interim third-party manager ("ITPM"), appointed by this Court to temporarily assume control of and stabilize the water system, has made strides in addressing the short-term infrastructure crisis.

3.      The Parties to this action have not taken adequate steps to ensure that the ITPM is placing residents' health front and center in his response. And they have utterly failed to address the growing crisis of public confidence in the safety of the water and the accountability of the ITPM's office, which is exempt from open records and public procurement laws. Jackson residents and community groups who have played an essential role in responding to the water crisis have been shut out of the confidential settlement negotiations among the federal and state government, the City, and the ITPM in this matter.

4.      After the initiation of this action and the appointment of the ITPM, Congress allocated hundreds of millions of dollars of federal disaster relief appropriations to Jackson's water system. This historic infusion of federal funds has bolstered Jackson residents' hopes for a

desperately needed overhaul of the water system; it also dramatically raises the stakes for the ITPM's tenure, this litigation, and the consent decree that will likely result from it.

5.      The water flowing through the city's pipes into Jackson residents' homes continues to present a serious risk of lead and microbial contamination to the people who consume it, and who depend on it for a range of basic human needs. Residents need safe, accessible water now, and a seat at the table in designing a solution that will provide them with a sustainable, publicly-owned, locally-controlled, and democratically-accountable water system for many years to come. Jackson residents have a human right to clean water; they deserve abundant, high-quality, and affordable drinking water flowing from their taps.

6.      Intervenors-Plaintiffs Mississippi Poor People's Campaign and People's Advocacy Institute (collectively, the "Jackson Community Groups" or "Groups") are two Jackson-based community groups that have mobilized in response to the water crisis, helping to launch and coordinate a rapid-response effort that distributed millions of bottles of water and thousands of filters and home testing kits to Jackson residents affected by the crisis. They continue to provide mutual aid and disseminate critical information to residents, and to advocate for a robust community role in developing and implementing solutions to the water crisis.

7.      The Jackson Community Groups seek to intervene in *United States v. Jackson*, No. 3:22-cv-686, pursuant to the citizen-suit provision of the Safe Drinking Water Act ("SDWA"), 42 U.S.C. § 300j-8, to seek declaratory, injunctive, and other appropriate relief that this Court deems necessary and just, to redress the City's violations of the SDWA and implementing regulations, and to secure an enforcement role that enables them to put Jackson residents' health and wellbeing at the center of short- and long-term solutions to the water crisis.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 42 U.S.C. § 300j-8 (SDWA's citizen-suit provision), and may award Intervenors-Plaintiffs all necessary injunctive and declaratory relief pursuant to SDWA, 42 U.S.C. § 300j-8, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Intervenors-Plaintiffs' claims occurred in this District.

## PARTIES

10.      Plaintiff United States, by the authority of the Attorney General and at the request and on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), brought this action under Sections 1414 and 1431 of SDWA, 42 U.S.C. §§ 300g-3 and 300i.

11.      Defendant the City of Jackson (the "City") is the owner and an operator of a "public water system" (the "PWS," or "system") as defined by SDWA. 42 U.S.C. § 300f(4); 40 C.F.R. § 141.2. As an owner and operator of a PWS, the City is also a "supplier of water." 42 U.S.C. § 300f(5); 40 C.F.R. § 141.2. The City's PWS is a large public water system for purposes of SDWA. 40 C.F.R. § 141.2.

12.      Intervenor-Plaintiff Mississippi Poor People's Campaign Mississippi ("MS-PPC") is an unincorporated association based in Mississippi and a state-based chapter of the Poor People's Campaign: A National Call for Moral Revival. MS-PPC is dedicated to uniting people across Mississippi to challenge the evils of systemic racism, poverty, the war economy, ecological

devastation, and religious nationalism. MS-PPC brings this action on behalf of itself and its members.

13.　　Intervenor-Plaintiff People's Advocacy Institute ("PAI") is a Mississippi non-profit corporation headquartered in Jackson, Mississippi. PAI is a community-based organization that serves as a resource and training incubator for transformative justice in the South. PAI brings this action on behalf of itself and its members.

14.　　Together, MS-PPC and PAI are referred to herein as the "Jackson Community Groups" or "Intervenors-Plaintiffs."

15.　　The Jackson Community Groups are "persons" to which Congress granted an unconditional right to intervene in this SDWA enforcement action. 42 U.S.C. § 300j-8(b)(1)(B). The SDWA defines "person" to include, *inter alia*, an "individual, corporation, company, association, [or] partnership." *Id.* at § 300f(12). The Jackson Community Groups meet this standard because Mississippi PPC and PAI are an association and a non-profit corporation, respectively.

16.　　In response to the water crisis, the Jackson Community Groups, through their leadership of and participation in the Mississippi Rapid Response Coalition, helped mobilize staff and extensive networks of volunteers and supporters to distribute approximately two million bottles of water to Jackson residents, ensure that hundreds of homes had access to water filters and home testing kits, conducted wellness checks on vulnerable community members, disseminated information regarding boil water notices and other water safety concerns, and fielded frequent inquiries from residents regarding water access and safety. The Jackson Community Groups had to scale back their investment in other campaigns, programs, and core activities, or put them on hold, in order to shift resources toward responding to the crisis.

17.     The Jackson Community Groups have staff as well as supporters and volunteers (hereinafter "constituents") who are directly impacted by the water crisis and face grave risks from consuming potentially contaminated water from Jackson's PWS. The Jackson Community Groups have constituents who live in Jackson and consume water from Jackson's PWS to cook, drink, bathe, and serve other basic human needs in their homes, schools, and workplaces. Many of the Jackson Community Groups' constituents—including those who are pregnant, nursing, caring for young children, elderly, disabled, or infirm—have been forced to seek out water from other sources to guarantee their and their families' safety, and often face significant barriers in doing so.

18.     Without intervention from this Court, the Jackson Community Groups and their constituents will continue to suffer grave harms—including risks to their health and livelihood from potential lead and microbial contamination—as a result of Defendant's violations of the SDWA and implementing regulations.

**STATUTORY AND REGULATORY FRAMEWORK**

19.     The Jackson Community Groups incorporate by reference paragraphs 9 to 24 of the United States' Complaint, Doc. 1, summarizing the statutory and regulatory framework governing this complaint under the SDWA, Mississippi SDWA, National Primary Drinking Water Regulations, 40 C.F.R. Part 141, and Mississippi Primary Drinking Water Regulations, Miss. Admin. Code § 15-20-72.

20.     Section 1449 of the SDWA grants "any person" the right to commence an enforcement action against a party "who is alleged to be in violation of" the Act's requirements. 42 U.S.C. § 300j-8(a)(1).

21.     When the federal or state government has already commenced and is diligently prosecuting a SDWA enforcement suit, other persons cannot bring a new citizen suit with respect

to that same violation, but they "may intervene as a matter of right" in the government's action. 42 U.S.C. § 300j-8(b)(1)(B).

22.     Accordingly, the Jackson Community Groups have an unconditional right to intervene in the above-captioned action under Section 1449 of the SDWA. *See* Fed. R. Civ. P. 24(a)(1).

23.     The Jackson Community Groups are also entitled or alternatively, permitted to intervene under the general rules governing intervention in federal court. *See* Fed. R. Civ. P. 24(a)(2) and 24(b)(1)(B). As Intervenors- Plaintiffs, the Jackson Community Groups are entitled to seek declaratory and injunctive relief, and any other relief this Court deems just and proper, under the SDWA and implementing regulations.

## FACTUAL BACKGROUND

24.     The Jackson Community Groups incorporate by reference the factual allegations contained in paragraphs 25 to 122 of the United States' Complaint, Doc. 1, and provide the following additional factual background:

### *Jackson's water crisis is rooted in systemic racism*

25.     Jackson residents are in the throes of a drinking water crisis that has been decades in the making. The roots of the crisis can be traced back to Jacksonians' successful efforts to wrest control of their city from the hands of segregationist white élites who excluded Black residents from political participation and many aspects of civic life. Decades of state disinvestment from the capital city's infrastructure and state actions undermining Jackson's self-governance ensued.

26.     After years of civil rights struggles to restructure city government and combat disenfranchisement, Jacksonians elected the city's first Black city council member in 1985 and its first Black mayor in 1997. The State's disinvestment from the Capitol City began shortly thereafter

with state dollars decreasingly being allocated to Jackson and more resources flowing to the predominantly white areas outside of Jackson.

27.     For example, the State took majority control of the one-percent sales tax approved by Jackson voters for use to improve the city's roads and infrastructure.  The willful neglect by the State, combined with white flight to the city's suburban areas, continued as the face of local political leadership and demographics shifted.

28.     Between 1980 and 2020, Jackson lost nearly 25% of its population, shifting the city's demographics to a majority-Black population and a significantly poorer population. In the 1990s alone, close to 35,000 white residents left the city.

29.     Tax dollars thereafter began to flow out of Jackson as a result of white flight. Despite being home to several of the State's major hospitals, universities, and other large employers, the income and property taxes of white and wealthier residents who fled the city have not been reinvested in Jackson, instead contributing to the State and the suburban towns to which they relocated.

30.     According to the most recent data published by the U.S. Census Bureau, Jackson's current population is over 80 % Black, and over a quarter of Jackson residents are living below the poverty line, with most households earning less than $40,000 per year.

31.     The crumbling public water infrastructure inherited by Jackson's current-day residents and local government leadership is the result not only of neglect and disinvestment, but of active state efforts to stymie local leaders' and residents' attempts to repair, improve, and adequately fund the system. Those actions are part and parcel of state officials' campaign to undermine local Black leadership and self-governance in Jackson.

32.     In recent years, the State of Mississippi ("State") has actively "derailed Jackson's attempts to fund water infrastructure," according to a Title VI civil rights complaint filed with the EPA in September 2022.[1] As the Title VI complaint details, the State's racially-motivated actions have stripped the Jackson—and its overwhelmingly Black population—of its power to self-govern and resolve its infrastructure and water issues.

33.     The State's assault on Jackson is not limited to water issues. In April 2023, Governor Reeves signed into law the controversial House Bill 1020 ("H.B. 1020"). H.B. 1020 usurps Jackson and Hinds County residents' right to democratic self-governance by creating a separate court system, with its own judges and prosecutors who are appointed by state officials instead of elected by local voters, and by significantly expanding the jurisdiction and power of the un-democratically-accountable Capitol Police. H.B. 1020 is the subject of litigation pending before this Court.

### The PWS's crumbling infrastructure that led to the EPA's administrative involvement and most recent water crisis

34.     Decades of State disinvestment have left Jackson with a water infrastructure that is physically crumbling and outdated, inadequately staffed, and deeply in debt. The system is failing to meet basic requirements on a day-to-day basis and is vulnerable to total collapse in the face of increasingly frequent climate disasters and other shocks to the system.

35.     As detailed in the United States' Complaint, Jackson's water treatment and distribution system has been plagued by myriad problems in recent years, including:

---

[1] NAACP, *Complaint Under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and 40 C.F.R. Part 7 Regarding Discrimination by the State of Mississippi Gravely Adversely Impacting the Drinking Water System for the City and the Health and Well Being of the People of Jackson, Mississippi*, Sept. 27, 2022, https://perma.cc/G9DG-PHW8.

- Severe staffing shortages at the system's two surface water treatment plants, O.B Curtis and J.H. Fewell, including failing to have a Class A certified operator onsite at the treatment plants at all times;

- Operation and maintenance issues at both plants and the groundwater system;

- Lack of optimized corrosion control at the treatment plants to prevent lead present in the distribution system from leaching into the water;

- Major issues with filtration at both plants, including an ongoing need for repair or replacement of conventional filters at both plants and membrane filters at O.B. Curtis;

- Concerns regarding chemical disinfection and pH treatment at the plants;

- Failing to restore to service the pumps at O.B. Curtis after an electrical panel was damaged in a fire;

- High turbidity (cloudiness) in the water due to the failure to adequately filter the water at the treatment plants, which can increase the likelihood of disease-causing pathogens in the water;

- Thousands of line breaks in the distribution system in recent years, at a rate more than triple one industry benchmark;

- An aging distribution system that includes century-old small-diameter pipes;

- Inconsistent, infrequent, and improper monitoring and sampling of water at the treatment plants and in the distribution system;

- Failure to develop an alternative water source plan to provide water to residents in the wake of certain triggering events.

36.     After an EPA National Enforcement Investigations Center ("NEIC") compliance inspection in February 2020 encountered various problems with Jackson's PWS, including operator staffing shortages and operation and maintenance issues at O.B. Curtis, J.H. Fewell, and the groundwater system, and turbidity exceedances at both plants, the EPA engaged in a series of administrative enforcement actions and related negotiations with the City.

37.     As detailed in the United States' complaint, EPA's enforcement proceedings against the City included:

- An Emergency Administrative Order, effective April 2, 2020 (Doc. 1-2), and later amended on May 28, 2020 (Doc. 1-3), predicated on the EPA's finding of an imminent and substantial endangerment to persons served by the system, including the potential presence of microbial contamination from *E. Coli*, *Cryptosporidium*, and *Giardia* in the drinking water, and requiring the City to take various steps to abate that danger, including, *inter alia*, providing alternative water supplies to residents following specified triggering events, develop a Comprehensive Equipment Repair Plan ("CERP").

- Three Notices of Noncompliance issued on May 11, 2020, April 27, 2021, and January 25, 2022, for violations of the SDWA and federal and state drinking water regulations, including, *inter alia*, the failure to have a Class A certified operator onsite at the system's treatment plants at all times, failure to install optimal corrosion control at J.H. Fewell, and failure to repair or replace the electrical panel powering the pumps at O.B. Curtis that had been damaged in an electrical fire and restore the pumps to service.

- An Administrative Consent Order, effective July 1, 2021, between the EPA and the City (Doc. 1-4) [hereinafter "Consent Order"]. Under the Consent Order, the City agreed to, *inter alia*, create a comprehensive staffing plan to ensure a Class A operator is onsite at both treatment plants at all times and implement the CERP, including returning the filters at J.H. Fewell to fully operational and functional status and repairing and rehabilitating the conventional and membrane filtration systems at O.B. Curtis.

38.     In winter 2021, storms and freezing temperatures caused water lines to burst and equipment to fail at O.B. Curtis, resulting in a systemwide boil water notice and leaving many Jacksonians without potable water for weeks.

39.     In July 2022, EPA issued an assessment of the Jackson PWS's distribution system detailing a litany of problems, including an extensive history of line breaks, failure to collect and record continuous pressure data, failure to consistently meet water quality parameters for pH and alkalinity, failure perform routine flushing of the distribution system, infrequent cycling of storage tanks and poor mixing performance ratios, considerable staffing problems, and billing and metering issues leading to substantial loss of water revenue and the departure of large customers.

40.     In early August 2022, climate disaster struck Jackson's water system again when Mississippi experienced flooding from record rainfalls.

41.     The flooding caused intake pumps at the O.B. Curtis plant, which was already on the brink of collapse, to fail completely, leading to a "catastrophic loss of pressure in the distribution system" in late August 2022. Doc. 1 at ¶ 2.

42.     On August 29, 2022, Mayor Chokwe Antar Lumumba declared a "water system emergency" in response to the crisis. The next day, Governor Reeves and President Biden issued emergency declarations for Mississippi, prompting the formation of a unified command composed of federal, state, and local agencies dedicated to responding to the acute phase of the crisis.

43.     Water pressure and service was not restored until about September 6, 2022. But the crisis did not end there.

44.     In December 2022, several days of freezing temperatures burst water lines and strained the already fragile system to near failure, leaving thousands of residents once again without water and subject to boil water notices.

45.     Jackson Public Schools began 2023 with remote classes, closing their campuses due to low or no water pressure and an ongoing boil water notice affecting much of the city.

46.     On January 19, 2023, the City issued a public notice concerning ongoing violations of the Lead and Copper Rule.

47.     The situation is so dire that three local hospitals have left the Jackson's PWS completely, drilling their own wells to have access to safe and reliable sources of drinking water. The City of Byram and major customers, including Millsaps College and the state fairgrounds, are also considering leaving the system as a result of the escalating crisis.

### *The United States files the instant suit against the City, resulting in the appointment of the interim third-party manager*

48.     On November 29, 2022, the United States filed the above-captioned action under Sections 1414 and 1431 of the SDWA against the City. Doc. 1 at ¶ 4. The action was filed at the

request and on behalf of the EPA, after the MSDH requested that the EPA take the lead in the SDWA enforcement process with the City. *Id*. at p.1 & ¶ 122.

49.     The same day, the United States filed an unopposed motion for entry of an interim stipulated order ("ISO") (Doc. 3), which was promptly granted by the Court (Doc. 5). The Court entered the ISO on the docket, staying the case until May 29, 2023 (Doc. 6).

50.     The ISO appointed an Interim Third-Party Manager ("ITPM"), Ted Henifin, to assume control over Jackson's water system and its water and sewer billing system as a "short-term method to stabilize the drinking water system." Doc. 3 at 9.

51.     The ISO confers on the ITPM expansive authority and decision-making powers over all aspects of the operation and finances of Jackson's PWS. The ITPM is authorized to, *inter alia*, enter into and modify contracts, make purchases and payments, apply for grants and loans, hire his own staff as well as direct city and ITPM staff, change the rates and fees charged to consumers, and implement capital projects in accordance with the Priority Project List attached to the ISO. *See* Doc. 6 at 7–12. The ISO also requires the ITPM to develop a financial management plan for the water system and billing administration taking into consideration the system's short-, mid-, and long-term needs. *Id*. at 10–11.

52.     Under the ISO, the ITPM is shielded from public records requests, exempted from public procurement laws, and cannot be sued or called to testify without leave of court in any case except for this one, subject to 28 U.S.C. § 959(a). *Id*. at 10, 14, 23.

53.     The ITPM has no obligation under the ISO to formally engage with or report back to the public other than maintaining a public website and producing Quarterly Status Reports to the Parties and Court in this litigation.

54.    In 2022, Congress allocated $600 million in federal disaster relief grant funds earmarked for Jackson's water system. This infusion of federal funds represents a manifold increase in the funds under the ITPM's control.

55.    On February 17, 2023, the Court granted, at the parties' joint request (Doc. 19), a stipulated confidentiality order governing settlement communications (Doc. 20). The order permits the ITPM, as well as the State, through MSDH and the Mississippi Department of Environmental Quality ("MDEQ"), to participate in settlement negotiations and receive and send confidential settlement communications as non-party "participants" in the litigation.

56.    After he was appointed as the ITPM, Mr. Henifin established JXN Water, Inc., a Mississippi for-profit corporation.

57.    On April 4, 2023, the Court granted the parties' joint motion (Doc. 22) to amend the ISO to allow Mr. Henifin to act through JXN Water, Inc. to carry out his responsibilities as the ITPM (Doc. 23).

58.    On May 3, 2023, after holding a hearing on the matter, the Court granted JXN Water's request (Doc. 24) to amend the ITPM's professional budget to include, *inter alia*, an additional $339,500 for community outreach staffing and other forms of support (Doc. 25).

59.    On May 17, 2023, the Court entered a stipulated order staying the case for an additional six months (Doc. 29). The case is now stayed until November 29, 2023.

### *Residents and community groups have mobilized to respond to the crisis*

60.    In the face of a mounting and multifaceted crisis, residents and community groups, including the Jackson Community Groups and their constituents, geared into action, stepping up to fill a void left by government actors.

61.    The Jackson Community Groups helped form the Mississippi Rapid Response Coalition (the "MRRC") in 2020 amid the early days of the COVID-19 pandemic.

62.    MRRC comprises over thirty organizations and individuals. In addition to the Jackson Community Groups, One Voice MS, the Southern Poverty Law Center, Immigrant Alliance for Justice and Equity, Alternate ROOTS, Mississippi Votes, Mississippi Moves, Operation Good, Strong Arms of Mississippi, Mississippi Black Women's RoundTable and other groups also participate in the coalition.

63.    The MRRC provides "rapid response"—including disseminating information, providing assistance, and mutual aid—to community members across Mississippi during times of infrastructure, climate, and public health crises.

64.    The Jackson Community Groups, through the MRRC, played a critical role in responding to the Jackson water crisis.

65.    When the entire system collapsed in August and September 2022, the Jackson Community Groups and other MRRC members mobilized to provide bottled water via home delivery and neighborhood distribution points across Jackson's seven wards.

66.    Through its organizational members' (such as MS-PPC's and PAI's) staff and constituents, the MRRC distributed around two million bottles of water to Jackson residents.

67.    Through its organizational members' (such as MS-PPC's and PAI's) staff and constituents, the MRRC has notified residents of boil water notices via door-to-door canvassing, performed phone wellness checks for residents, and distributed water filters and EPA-certified water testing kits to Jackson residents.

68.    In 2023, PAI established a resource call center to receive calls from Jackson residents and provide information to them regarding the water crisis.

69.     The Jackson Community Groups have worked to ensure Jackson residents' representation and co-leadership in developing short- and long-term solutions to the water crisis by providing extensive input through all available channels to the EPA, the City, and the ITPM.

70.     The Jackson Community Groups have hosted People's Assemblies (a form of participatory community meeting) and the Groups' representatives have attended over twenty town halls to learn about and share Jackson residents' perspectives on the water crisis. Leaders of the Jackson Community Groups have also engaged in countless informal conversations and informational exchanges regarding water issues through door-to-door canvassing, in-person meetings, and online interactions with their members, supporters, and constituents who live, work, and study in Jackson.

71.     The Jackson Community Groups have then brought community perspectives on the water crisis to the attention of government officials by participating in public meetings with the ITPM, City officials, and the EPA and the U.S. Department of Justice ("DOJ").

72.     Leaders from the Jackson Community Groups and other MRRC member organizations have also attended several status conference hearings in this case to observe and during the most recent occasion, participate in the proceedings before this Court.

73.     On July 11, 2023, the Jackson Community Groups submitted a Community Statement through an online portal established by the DOJ in connection with this case to solicit community input on long-term solutions to the water crisis.[2]

74.     In the Community Statement, the Jackson Community Groups laid out their vision for full transparency during the ITPM's tenure as manager of Jackson's public water system;

---

[2] Ltr. from MS-PPC & PAI to U.S. EPA Region 4 re: Request for Community Input on the Jackson Water Crisis (July 11, 2023), https://bit.ly/3Lvhge4.

advocated for a collaborative process of dynamic community input, co-design, and accountability in developing long-term solutions to the crisis; underscored the importance of keeping Jackson's water system publicly-owned and locally-controlled; and explained the dire need for conveying more frequent, accessible, and evidence-based information to the public about water quality and providing immediate access to clean water for all Jackson residents *now*.

75.     On July 12 and 13, 2023, Danyelle Holmes of MS-PPC and Brooke Floyd and Rukia Lumumba of PAI were among the individuals who addressed this Court during a status conference held for community members to share their experiences and concerns regarding ongoing issues with the water system under the control of the ITPM. At the hearing, Ms. Lumumba read from the Community Statement and delivered a copy of the statement to the Court and the Parties and Participants.

76.     On August 9, 2023, the Jackson Community Groups filed an Emergency Petition with the EPA under Section 1431 of the SDWA, 42 U.S.C. § 300i, calling on the agency to take immediate action to abate imminent and substantial endangerment to Jackson residents from potential lead and microbial contamination in the drinking water.

77.     Building off of the United States' Complaint in this case and the EPA's preceding enforcement actions, as well as publicly-available data and Jackson residents' lived experiences after the appointment of the ITPM, the Emergency Petition highlights the serious ongoing threats to residents' health posed by consuming the water and the EPA, DOJ, and ITPM's failure to meaningfully inform residents about water quality issues and engage residents in the process of repairing the system. The Emergency Petition calls on the EPA to address these deficiencies, including by ordering more frequent reporting of water quality data, increasing community involvement, ensuring that the ITPM prioritizes public health and safety needs when implementing

the priority project list, and facilitating the distribution of bottled water under certain circumstances, as well as water filters and home testing kits.

> ### *Jackson residents continue to face serious health threats from the drinking water and the ITPM and government actors have not adequately responded*

78.     Jackson residents and other consumers of Jackson's public water system continue to face an imminent and substantial danger from the system's drinking water.

79.     The EPA declared that Jackson's water presented an imminent and substantial endangerment in April 2020 when it issued its Emergency Administrative Order, and again when it filed the above-captioned action in November 2022.

80.     In June 2023, EPA acknowledged in a press release that "[t]here continues to be an imminent danger that the system could fail again and return to boil water notice[s]."[3]

81.     Aside from blanket, unsupported statements from the ITPM and the EPA administrator that the water is safe to drink, Jackson residents have no verifiable basis from which to conclude that regulatory violations have been remedied.

82.     Jackson residents continue to experience low pressure and cloudy, discolored, and foul-smelling water coming out of their taps.

83.     The community has not been informed of the progress of the system's ability to remedy noncompliance with SDWA and regulating entities have not sought to meaningfully engage community input and leadership in the enforcement process.

84.     JXN Water's website previously contained a reference to community meetings in all seven wards in June 2023.  Some or all of those meetings were never held, and the information

---

[3] Press Release, EPA, *Biden-Harris Administration Invests $115 million in Funding to Respond to the Drinking Water Emergency in Jackson, Mississippi*, June 6, 2023, https://bit.ly/48qjQvB.

has since been taken down from the website. The website's events page has not been functioning for several months.

85.     There is no publicly available information on how the ITPM's increased budget for community engagement will be invested.

86.     The Community Engagement Manager, for which the ITPM sought additional funding, has not been selected and the government entities have not regularly, meaningfully engaged with the Jackson Community Groups or their constituents to seek input.

87.     Applicable government entities have consistently focused on highlighting improvements to water distribution functions and funding sources, but do not provide real-time or adequate updates on contaminant testing to inform residents' decisions on how to protect their health and safety.

88.     The government entities' websites offer limited data about current water quality tests completed at the water treatment plants and provide inconsistent guidance on boil water notices.

89.     The conditions in Jackson's drinking water system are ripe for lead and microbial contamination.

**Risk of lead contamination due to lack of optimal corrosion control and Jackson's aging distribution system**

90.     The EPA's Lead and Copper Rule requires all large PWSs to identify and implement optimal corrosion control programs by January 1, 1997. The City has not done so.

91.     For at least the last seven years, Jackson's water system has consistently violated the requirement to maintain optimal corrosion control treatment. According to reports by the EPA and MSDH, the water system violated the requirement for every consecutive monitoring period from January 2016 through December 2022.

92.     Consistent maintenance of optimal corrosion control is needed to minimize the risk of lead leaching into Jackson residents' water through lead service lines, goosenecks, solder, and interior plumbing when these materials come in contact with water flowing through the system.

93.     There is lead present in Jackson's water system, and in interior plumbing within some Jackson residents' homes.

94.     According to the most recent quarterly report, the ITPM has estimated the lead service line replacement project will cost $88 million across a 10-year construction period.

95.     In 2016, Jackson water samples exceeded the EPA's "lead action level" of 15 parts per billion. An action level is the concentration of a contaminant in the drinking water that triggers additional treatment or other requirements under the SDWA.

96.     MSDH's website states that, as of 2019 (the most recent year for which this data is available on MSDH's website), Jackson's system has lead-containing service lines, but Jackson has not submitted a materials evaluation report as encouraged by guidance from the USEPA.

97.     The age of Jackson's distribution system and many Jacksonians' homes also makes the presence of lead more likely. The use of lead service lines was banned in 1986, indicating that lead service lines are more likely to be found in older cities and homes built before 1986.There is no current publicly available inventory of distribution system materials for the city, and regulators have not verified whether the water system's selected sampling sites are adequate lead monitoring locations.

98.     A current MSDH advisory recommends, given the threat of lead in the water system, that children five and under and all pregnant people "should use filtered water (NSF53

certified filter) or bottled water for drinking and cooking," and that "[b]aby formula should be 'ready-to-feed' or prepared using only filtered water or bottled water."[4]

99. The ITPM's public statements conflict with MSDH advisories.

100. Lead exposure can affect virtually every system in the body, particularly the developing brains of young children. The harms from lead exposure can include cognitive impairment, decreased red blood cell survival, kidney damage, coronary heart disease, and impaired reproductive function. According to the Centers for Disease Control ("CDC"), even low levels of lead "have been shown to affect learning, [the] ability to pay attention, and academic achievement," effects that are "permanent."[5]

101. There is no safe level of lead to consume. The scientific community has not identified any threshold of lead in blood below which there are no adverse health impacts.

102. Frequent boil water notices addressing potential microbiological contamination—an all-too-familiar reality for Jacksonians in recent years—can exacerbate the lead problem, because boiling water concentrates lead.

**Risk of microbial contamination and other harms from inadequate filtration and disinfection**

103. The EPA has determined that Jackson's water system has failed in recent years to meet filtration and disinfection requirements required to control for turbidity and microbial growth.

104. Turbidity (cloudiness) is a measurement used to indicate water quality and filtration effectiveness. The EPA has set turbidity requirements because higher turbidity levels are often associated with higher levels of disease-causing microorganisms.

---

[4] MS State Dept. of Health, *Lead and Jackson Water: Recommendations for Homeowners, Schools and Facilities*, https://bit.ly/48r5ew7 (last visited Sept. 11, 2023) (recommendations under "Homeowners and Parents").
[5] CDC, *Lead Poisoning Prevention*, https://bit.ly/3LACWFH (last updated Sept. 2, 2022).

105.    Proper filtration at the treatment plants is critical to reducing the risk of microbial contamination in drinking water. Filtration removes contaminants, microbes, and other particulates from the water that can provide a substrate for microbes to grow and can render the disinfection process less effective.

106.    EPA and MSDH inspections have repeatedly flagged the dire state of the filters and membrane at both O.B. Curtis and J.H. Fewell.

107.    After turbidity exceedances in January 2020, MSDH noted in its February 2020 Sanitary Survey that the conventional filters at both treatment facilities were long overdue for rehabilitation, that filter media needed to be replaced and underdrains and/or valving needed repairs to ensure operational reliability. Later that year, these issues remained unaddressed.

108.    The latest ITPM quarterly reports focus on a plan to upgrade Filter 5 at O.B. Curtis and show that work on Filters 24 and 26 at J.H. Fewell is progressing. However, there are no details regarding assessment and repair of the remaining filters at either plant.

109.    The ITPM's most recent report admits that "no completion date can be established until extent of repair/remediation/replacement work can be determined," listing "[f]ilters" at both O.B. Curtis and J.H. Fewell among the items with no completion date.

110.    Recent publicly available data indicate that continuous monitoring still faces operational challenges related to accurate sampling.

111.    Issues with the chemical disinfection process at the water treatment plants in Jackson also signal a potential threat to consumers' health.

112.    The treatment plants' disinfection process uses two chemicals—free chlorine to meet Disinfectant Concentration and Contact Time requirements at the plant, and chloramines as the disinfectant residual in the distribution system.

113.   The chemical disinfection process is an essential step in treating water to kill potentially harmful and disease-causing pathogens.

114.   Publicly available data measuring the amount of disinfectant entering the distribution systems shows wide variations, particularly at O.B. Curtis.

115.   The ITPM's most recent Quarterly Report states that chemical feed improvements are not expected to be complete until late 2024.

116.   The turbidity monitoring point at O.B. Curtis was recently moved to a point after filtration and disinfection, but upstream from corrosion control treatment, as a way to prevent "false" boil water notice triggers caused by post-filtration treatments.

117.   Harmful pathogens can also enter drinking water once it leaves the plant, as it travels through the distribution system due to low or fluctuating water pressure. Microorganisms that passed through the treatment process can grow in the distribution system, especially where there is low or undetectable disinfectant residual.

118.   Reduction or loss of pressure in the distribution system can cause lines to pull in untreated water from outside of the system through cracks, breaks, and joints, introducing contaminants into the water. Corroding iron inside of galvanized service lines in the distribution system can provide a surface for biofilms to grow, allowing some pathogens to flourish, thus further compromising water quality.

119.   Brown, foul-smelling water from customer taps strongly suggests microbial growth and corrosion in these pipes, resulting in degradation of water quality.

120.   The limited chloramines data that is publicly available indicates that nitrification— a process in which bacteria convert ammonia into nitrite and nitrate—is occurring, which can further fuel bacterial growth.

121.    Corroded interior pipe surface plus a low disinfectant residual provides a medium for any bacteria already present in the system to latch onto and propagate.

122.    Jackson's water system continues to experience low-pressure events.

123.    These reductions in pressure, which can cause microbe-contaminated water to be siphoned into the system—along with increased microbial and biofilm growth resulting from widely fluctuating water quality from the treatment plants and corrosion in the distribution system—contribute to a grave risk of microbial contamination in the water consumed by Jackson residents.

124.    Water contaminated with microbes—whether viruses, bacteria like *Legionella*, or parasites like *Cryptosporidium* or *Giardia*—can sicken and sometimes kill people.

125.    According to the EPA, "Human exposure [to microbial-contaminated drinking water] can cause gastrointestinal, respiratory, eye, ear, nose, and throat irritation; skin diseases; [and,] impairment of cells of the digestive tract and organs."[6]

126.    Some people, including infants, children, elderly people, and those with compromised immune systems, are particularly susceptible to developing severe illness from microbial contamination.

127.    There are few ways for the public—or federal authorities—to know whether the most recent problems Jackson residents observe at their taps pose the same threat that EPA declared in November 2022 or a new threat that remains unidentified and undetected.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Exceedances of Turbidity Limits

---

[6] EPA, *Water Quality Topics: Pathogens*, https://bit.ly/3PP1bm2 (last visited Sept. 10, 2023).

(SDWA Section 1449, 42 U.S.C. § 300j-8(b)(1)(B); 40 C.F.R. §§ 141.173(a)(2) and (a)(1); Miss. Admin. Code § 15-20-72.1.7.4)

128.    Intervenors-Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs, as well as paragraphs 1 to 122 and 147 to 153 of the United States' Complaint, Doc. 1, as if fully set forth fully here.

129.    Intervenors-Plaintiffs bring this Cause of Action in recognition of the decades-long disinvestment of financial support and other resources to the City of Jackson and its PWS by the State of Mississippi and other governmental actors, and allege as follows.

130.    Under Subpart P (Enhanced Filtration and Disinfection – Systems Serving 10,000 or More People) of the National Regulations and the implementing State Regulations, the turbidity level of representative samples of the System's filtered water must at no time exceed 1 nephelometric unit ("NTU"). 40 C.F.R. § 141.173(a)(2) (setting forth turbidity requirements for systems using conventional filtration); Miss. Admin. Code § 15-20-72.1.7.4 (requiring compliance with 40 C.F.R. § 141.173).

131.    The turbidity levels of filtered water samples from the System taken on June 27 and June 28, 2022, and July 18, 2022, exceeded 1 NTU—ranging as high as 2.5 NTU—in violation of 40 C.F.R. § 141.173(a)(2) and Miss. Admin. Code § 15-20-72.1.7.4.

132.    Under Subpart P (Enhanced Filtration and Disinfection – Systems Serving 10,000 or More People) of the National Regulations and the implementing State Regulations, the turbidity level of representative samples of the System's filtered water must be less than or equal to 0.3 NTU in at least 95% of the measurements taken each month. 40 C.F.R. § 141.173(a)(1); Miss. Admin. Code § 15-20-72-1.7.4.

133.    In February 2021, the System failed to meet that standard, in violation of 40 C.F.R. § 141.173(a)(1) and Miss. Admin. Code § 15-20-72-1.7.4.

134.    In 2022, the System again violated turbidity standards.

135.    Under Section 1449 of the SDWA, 42 U.S.C. § 300j-8, Intervenors-Plaintiffs Jackson Community Groups are entitled to injunctive and declaratory relief to remedy the violations. Unless enjoined by an order of the Court, violations of the National Regulations and the State Regulations are likely to recur.

## SECOND CAUSE OF ACTION

### Failure to Timely Proceed with General Filter Rehabilitation at J.H. Fewell
(SDWA Section 1449, 42 U.S.C. § 300j-8(b)(1)(B))

136.    Intervenors-Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs, as well as paragraphs 1 to 122 and 155 to 160 of the United States' Complaint, Doc. 1, as if fully set forth fully here.

137.    Intervenors-Plaintiffs bring this Cause of Action in recognition of the decades-long disinvestment of financial support and other resources to the City of Jackson and its PWS by the State of Mississippi and other governmental actors, and allege as follows.

138.    To address turbidity exceedances at J.H. Fewell and as required by task no. 6 of the Consent Order's CERP, the City developed an initial scope of work to rehabilitate the filters at J.H. Fewell to return them to fully operational and functional status. *See* Consent Order at Appendix A (CERP), task no. 6. Upon EPA approval of the scope of work, the CERP would be updated to include the individual tasks and timeframe.

139.    EPA approved the City's initial scope of work for the general filters on December 13, 2021, and a revised scope of work on February 4, 2022. Under task no. 6.B of the scope of work, the City agreed to issue a notice to proceed to begin the engineering design process within eight months of the City's execution of Drinking Water State Revolving Fund ("DWSRF") Loan No. 3.

26

140.    The City and the State executed DWSRF Loan No. 3 on September 30, 2021, so the notice to proceed to begin the engineering design process was due to be issued by May 30, 2022.

141.    On April 4, 2022, the City requested an extension and proposed to start the design process on July 1, 2023. EPA denied this extension.

142.    Thus, as of the filing of this action in November 2022, the City had not timely issued the notice to proceed to begin the engineering design process and still has not timely begun the design process to rehabilitate the general filters at J.H. Fewell, in violation of Paragraph 40 and task no. 6 of the CERP (Appendix A) of the Consent Order.

143.    Under Section 1449 of the SDWA, 42 U.S.C. § 300j-8, Intervenors-Plaintiffs the Jackson Community Groups are entitled to injunctive and declaratory relief to remedy the violation. Unless enjoined by an order of the Court, violations of the Consent Order—and of the underlying National and State Drinking Water Regulations—are likely to continue.

### THIRD CAUSE OF ACTION

**Failure to Install Corrosion Control Treatment**
(SDWA Section 1449, 42 U.S.C. § 300j-8(b)(1)(B); 40 C.F.R. §§ 141.80(e) and 141.83; Miss. Admin. Code § 15-20-72.1.3.2)

144.    Intervenors-Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs, as well as paragraphs 1 to 122 and 162 to 169 of the United States' Complaint, Doc. 1, as if set forth fully here.

145.    Intervenors-Plaintiffs bring this Cause of Action in recognition of the decades-long disinvestment of financial support and other resources to the City of Jackson and its PWS by the State of Mississippi and other governmental actors, and allege as follows.

27

146.    Under Subpart I (Control of Lead and Copper) of the National Regulations and the implementing State Regulations, the System's lead action level is exceeded if the concentration of lead in more than ten percent of tap water samples collected during any monitoring period is greater than 0.015 mg/L (i.e., if the 90th percentile lead level is greater than 0.015 mg/L). 40 C.F.R. § 141.80(c); Miss. Admin Code § 15-20-72.1.3.2 (incorporating National Regulations on lead and copper).

147.    When the lead action level is exceeded, the System shall implement all applicable water treatment requirements specified by the State under 40 C.F.R. § 141.83. 40 C.F.R. § 141.80(e). Under 40 C.F.R. § 141.83, the System must complete source water monitoring and make treatment recommendations to the State within 180 days after the end of the monitoring period during which the lead action level was exceeded. 40 C.F.R. § 141.83(a)(1).  The State then makes a determination regarding source water treatment and, if necessary, may require the public water system to install and operate such treatment. 40 C.F.R. § 141.83(a)(2)-(3).

148.    The System exceeded the lead action level of 0.015 mg/L for the monitoring periods of January-June 2015, January-June 2016, and July-December 2016. 164. MSDH issued a compliance plan to the City on February 12, 2016, to address the lead action level exceedances. 165.

149.    The City conducted an optimal corrosion control treatment ("OCCT") study between October 2016 and April 2017 and provided the recommended treatment technique to MSDH on June 13, 2017.

150.    The MSDH concurred with the recommended treatment technique and set a deadline of May 31, 2019, for the City to complete installing the treatment at J.H. Fewell. At the City's request, MSDH later extended the deadline to December 29, 2019.

151.    As of the filing of this action in November 2022, the City had not completed installing OCCT at J.H. Fewell, in violation of the National Regulations and the State Regulations. *See* 40 C.F.R. §§ 141.80(e) and 141.83[7]; Miss. Admin. Code § 15-20-72.1.3.2.

152.    Under Section 1449 of the SDWA, 42 U.S.C. § § 300j-8, Intervenors-Plaintiffs the Jackson Community Groups are entitled to injunctive and declaratory relief to remedy the violation. Unless enjoined by an order of the Court, violations of the National Regulations and the State Regulations are likely to continue.

## PRAYER FOR RELIEF

Intervenors-Plaintiffs request that this Court:

1. Declare that Defendant is in violation of the SDWA and implementing regulations, as pleaded in the First through Third Causes of Action in this Complaint-in-Intervention;

2. Enjoin Defendant from ongoing and future violations of the SDWA and implementing regulations;

3. Order the implementation of measures to ensure robust community participation, information sharing, and public accountability in this action and in the long-term governance of Jackson's public water system, including but not limited to:

   a. Requiring the formation of a Community Water Board composed of Jackson residents and other directly-impacted stakeholders to monitor and enforce compliance with any affirmative measures agreed to by the Parties or ordered by

---

[7] Intervenors-Plaintiffs note that the corresponding paragraphs in the United States' Complaint regarding the City's failure to implement optimal corrosion control, Doc. 1 at ¶¶ 166-68, appear to allege a violation of 40 C.F.R. § 141.82 (entitled "Description of corrosion control treatment requirements"), although the complaint does not cite to that section.

this Court to ensure the health and safety of residents and other consumers of the public water system;

b.  Appointing a Community Ombudsperson, selected and agreed to by the Community Water Board, to facilitate community input and oversight regarding the maintenance, repair, re-design, and management of the system;

c.  Creating a system for the Jackson Community Groups and Jackson residents, along with federal, local, and state government entities, to regularly test the PWS for lead and other water contaminants, with no cost to the Groups or the residents, including any technical assistance to educate the Groups and residents about the water testing results.

d.  Making local workforce development, training and education, and hiring local workers a priority in the resolution of this action and overall stabilization of Jackson's PWS;

e.  Ensuring that all entities involved in short- and long-term operation of the system or significant portions thereof are subject to Mississippi's open records and public procurement laws;

f.  Erecting protections to prevent private companies or other government entities from assuming ownership or control of the system;

4.  Grant appropriate equitable relief to mitigate the health and medical risks and harm resulting from Defendant's violations;

5.  Award Intervenors-Plaintiffs their reasonable attorneys' fees and costs;

6.  Grant such other and further relief as the Court deems just and proper.

Dated: September 25, 2023                    Respectfully Submitted,


                                            /s/Joshua Tom
                                            Joshua Tom (MS Bar No. 105392)
                                            Claudia Williams Hyman (DC Bar No. 241431)*
                                            American Civil Liberties Union of Mississippi
                                            101 South Congress St.
                                            Jackson, MS 39201
                                            601.354.3408 ext. 112
                                            jtom@aclu-ms.org
                                            cwilliamshyman@aclu-ms.org

                                            Emily Early (GA Bar No. 810206)*
                                            Jessica Vosburgh (Ala. Bar No. 1710-A00Y)*
                                            Mikaila Hernández (NY Bar No. 6048334)*
                                            The Center for Constitutional Rights
                                            666 Broadway Avenue, Floor 7
                                            New York, New York 10012
                                            (212) 614-6464
                                            eearly@ccrjustice.org
                                            jvosburgh@ccrjustice.org
                                            mhernandez@ccrjustice.org

                                            Lori Sherman, IN Bar No. 31102-53*
                                            Kathleen Roblez, NC Bar No. 57039*
                                            Ashley Mitchell, NC Bar No. 56889*
                                            Caitlin Swain, NC Bar No. 57042*
                                            Forward Justice
                                            P.O. Box 1932
                                            Durham, NC 27721
                                            (919) 323-3889
                                            lsherman@forwardjustice.org
                                            kroblez@forwardjustice.org
                                            amitchell@forwardjustice.org
                                            cswain@forwardjustice.org

                                            *PHV applications forthcoming

                                            Counsel for Intervenors-Plaintiffs Mississippi Poor
                                            People's Campaign and People's Advocacy
                                            Institute