IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
(Northern Division)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| and the STATE OF MISSISSIPPI, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | Case No. 3:12-cv-790-HTW-LGI |
| v. | ) | (Clean Water Act Case) |
| | ) | |
| THE CITY OF JACKSON, MISSISSIPPI, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 3:22-cv-00686-HTW- |
| v. | ) | LGI |
| | ) | (Safe Drinking Water Act Case) |
| THE CITY OF JACKSON, MISSISSIPPI, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF MISSISSIPPI POOR PEOPLE'S
CAMPAIGN AND THE PEOPLE'S ADVOCACY INSTITUTE'S
UNOPPOSED MOTION FOR LEAVE TO INTERVENE
IN SAFE DRINKING WATER ACT CASE**

## I.      **INTRODUCTION**

For decades, the people served by Jackson's public water system ("PWS"), who are predominately Black residents, have endured variable water pressure, discolored and foul-smelling water, hundreds of boil water notices ("BWNs") triggered by the risk of disease-causing pathogens in the water, and more recently, several complete water shut-offs.  These frequent, dangerous disturbances force Jackson residents to live without—as this Court has acknowledged—a "precious commodity":[1] reliable access to clean water for consumption and hygiene.  Through their grassroots advocacy and community organizing, Proposed Intervenors the People's Advocacy Institute ("PAI") and Mississippi Poor People's Campaign ("MS-PPC") (collectively, the "Jackson Community Groups" or "Groups") have navigated this governmental neglect through monumental community efforts to provide one another with clean, safe water.

To illustrate, the Jackson Community Groups and their supporters and volunteers (hereinafter collectively the "constituents") have sought to: (a) secure a protected role for the local community to participate in this litigation and reach equitable and sustainable resolutions to the water crisis, including a PWS co-designed by community; (b) ensure frequent distribution of accessible, accurate, scientifically-driven data to Jacksonians about the status of the PWS and water quality to build public accountability and residents' trust in government; and (c) obtain immediate alternative water sources for Jacksonians whose water is not safe to drink or who otherwise cannot confirm the safety of their water (hereinafter collectively, the "health and economic interests")—all issues that will be affected by the outcome of this case.  While the Groups respect the federal government's recent efforts through the above-captioned enforcement action to resolve decades of water quality and infrastructure failures, the current Parties do not—

---

[1] Tr. of Status Conference at 58, ln. 18, *USA v. City of Jackson*, No. 3:22-cv-00686 (Jan. 12, 2023).

and *cannot*—adequately represent these particular interests of the Groups and their constituents—everyday Jackson residents who are experts of the lived experience of surviving the PWS's failures.  Rather, it is MS-PPC and PAI who adequately represent these health and economic interests due to their deep expertise in community organizing, outreach, and engagement.

Both Groups have built extensive networks across Jackson that enable them to quickly and consistently receive and disseminate water-related information, supplies, and other resources to residents.  They have also regularly organized residents to develop and impress upon the government—including the U.S. Environmental Protection Agency ("EPA"), the City of Jackson ("City"), and this Court—their oral and written demands for access to a safe and equitable PWS. Because the Groups and their constituents' concerns remain unaddressed, it is time for community members—as represented by the Groups—to become parties to this case and be fully engaged in the redevelopment of their PWS.  The Groups thus seek to intervene in this case on three bases:

*First*, the Groups are entitled to intervention by right under Fed. R. Civ. P. 24(a)(1). The Motion is timely, as it was filed just months after the Court stayed the case a second time and before it has issued any dispositive rulings.  In addition, the Safe Drinking Water Act (the "SDWA") grants the Groups "an unconditional right to intervene," Fed. R. Civ. P. 24(a)(1), when, as here, the EPA brings a civil enforcement action, *see* 42 U.S.C. § 300j-8(b)(1)(B).

*Second*, the Groups are entitled to intervention by right under Fed. R. Civ. P. 24(a)(2) because none of the existing parties adequately represents the Groups and their constituents in implementing specific solutions for safe water by centering information-sharing and public accountability in this litigation.  As a result, the Parties are not ensuring that residents are equipped as future enforcement partners, and the resolution of this case without a formal role for the Groups will impede their ability to protect their and their constituents' particular interests.

*Third*, alternatively, the Groups meet the requirements for permissive intervention under Fed. R. Civ. P. 24(b)(1)(B) because their request is timely; their claims share common questions of law and fact surrounding the SDWA violations underlying this case; and intervention would not unduly delay this case or prejudice the adjudication of the original Parties' rights in this action. For these reasons, the Groups should be granted intervention as a matter of right or alternatively, be allowed to permissively intervene, and to plead their claims and relief as "Intervenors-Plaintiffs" in their "proposed Complaint-in-Intervention," attached to their Unopposed Motion for Leave to Intervene as Exhibit A.

## II.  FACTUAL BACKGROUND

### A.  The Groups seek to protect their and their Jackson-based constituents' access to a safe, equitable public water system through their organizing work.

Since May 1, 2020, more than 320 BWNs have been issued for the PWS.  Doc. 1 ¶ 42.  On average, twice as many BWNs were issued for Jackson neighborhoods with zip codes with a median household income of less than $50,000 than more affluent areas.[2]  Jackson also suffered at least two total water system failures between February 2021 and August 2022, which forced hundreds of thousands of Jacksonians to live without potable water for weeks last fall, Doc. 1 ¶¶ 64-92, and left many lower-income residents dependent on water bottles and other relief distributed by the Groups, *see* Declaration of Danyelle Holmes, attached to Mot. for Leave to Intervene ("Mot.") as Exhibit B, ¶¶ 13, 34, 36, 40, 39, 65; Declaration of Brooke Floyd, attached to Mot. as Exhibit C, ¶¶ 11, 18, 21, 25-26, 28, 63.

As alleged in Title VI complaints filed with the EPA and the U.S. Department of Treasury, the failure of Jackson's PWS is the consequence of decades of state mismanagement and racially

---

[2] Robert Samuels & Emmanuel Martinez, *The Problems in the Pipes*, Wash. Post. (Feb. 18, 2023), https://bit.ly/3LnQQLd.

discriminatory underfunding by Mississippi.[3]  The State is reported to have continually impeded Jackson's ability to finance necessary repairs and recruit skilled water plant operators and other crucial staff—for example, by placing significant limitations on Jackson's receipt of the $42 million the City is slated to receive under the American Rescue Plan.[4]

Because the state and local government failed to protect public health in Jackson by providing access to clean drinking water, the Groups stepped to the forefront of the community response to this water crisis.  MS-PPC—which has approximately 2,600 supporters throughout Mississippi and hundreds of supporters in Jackson who help execute its work—and PAI—which has thousands of supporters throughout Jackson and across the nation—are a social justice campaign and a non-profit organization, respectively.  Ex. B ¶¶ 16, 6, 27, 35, 65; Ex. C ¶¶ 5-6, 14, 17-26.  Both Groups are dedicated to the social, economic, and physical safety of Jacksonians—many of whom are their supporters and volunteers.  Ex. B ¶¶ 19, 20-22, 28, 53, 65; Ex. C ¶¶ 5-6, 11-16, 52, 71.

MS-PPC unites people across Mississippi to challenge systemic racism, poverty, and ecological devastation through community organizing and mutual aid, including rallies, marches, and government advocacy.  Ex. B ¶¶ 7, 10, 16, 19, 29.   PAI is a non-profit community resource, training and capacity-building incubator for transformation justice in the South.  By engaging communities in electoral justice efforts, People's Assemblies, Alternatives to Incarceration

---

[3] *See* NAACP, *Compl. Under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and 40 C.F.R. Part 7 Regarding Discrimination by the State of Mississippi Gravely Adversely Impacting the Drinking Water System for the City and the Health and Well Being of the People of Jackson*,  p. 11-14 (Sept. 27, 2022), https://perma.cc/G9DG-PHW8; *see also* S. Poverty Law Ctr., Compl. Under Title VI of the Civil Rights Act of 1964, against Miss. Dep't of Envion. Quality & State of Miss, to U.S. Dep't of Treas'y (May 2, 2023), *available at* https://bit.ly/3PBwvo9.

 Kaitlyn Howell, *U.S. Treasury asked to investigate Jackson water crisis funding*, TV-12, Jackson Miss, WJTV News (May 5, 2023), https://bit.ly/48eiunF.

[4] *Id.*

Initiatives, and an intentional grassroots process for cultivating ideas and developing solutions, PAI builds community capacity and inspires self-determination and community-driven solutions to violence and social injustice facing far too many communities.  Ex. C ¶¶ 5, 12-16, 59.

Each Group is also a leading member of the Mississippi Rapid Response Coalition (the "MRRC" or "Coalition"), which is composed of over 30 organizations throughout Mississippi, and provides rapid response support to community members in times of crisis caused by natural disasters or infrastructure failures.  Ex. B. ¶¶ 9-12; Ex. C ¶¶ 8-10.  Founded in 2020, the MRRC has provided support during the COVID-19 pandemic and natural disasters, including the water crisis at the crux of this case.  *See* Ex. B ¶¶ 9-13; Ex. C ¶¶ 8-10, 19-25.

The historical underfunding of the PWS led the Groups in their individual organizational capacities, and on behalf of MRRC, to financially source and provide alternative water sources and related supplies to meet the daily needs of Jackson's economically vulnerable residents— oftentimes causing them to redirect resources away from their other programming.  *See* Ex. B ¶¶ 33-40; Ex. C ¶¶ 11, 17-27.  Through their work with the MRRC, MS-PPC and PAI have distributed over 2 million water bottles through home delivery and distribution sites; dispersed over 2,000 water filters and countless water testing kits; notified residents of BWNs; and established a resource call center to inform residents about the status of the water and to receive calls about residents' water-related concerns.  Ex. B ¶¶ 33-40; Ex. C ¶¶ 11, 21, 23-27, 53, 57.

The Groups also do wellness checks on residents concerning their water needs, particularly on the elderly, families, and those living with disabilities. *See* Ex. B. ¶¶ 34, 36, 51; Ex. C ¶ 19. Because of their consistent presence in the community, the Groups are regularly contacted by Jackson residents about their frustrations with exorbitant water bills; poor communication on the status of BWNs; discolored, odorous, or oily water; and lack of consistently running water; and

suspicions that Jackson's water has caused or exacerbated health concerns. Jacksonians frequently report they do not feel they have safe water to cook, drink, bathe, and care for themselves and their families. Ex. B, ¶¶ 14-15, 34, 59, 64-65; Ex. C ¶¶ 53, 46, 71. Indeed, the Mississippi State Department of Health ("MSDH") has a current advisory for pregnant women and children under five to not drink tap water without taking precautions.[5]

In response to these reports, the Groups and their constituents have led, organized, and participated in countless rallies, community and private meetings, and city town halls, where they have shared the concerns of the Groups and their constituents around the water crisis, and urged all levels of government to meaningfully respond. Ex. B ¶¶ 16, 45, 49-53, 62; Ex. C ¶¶ 58-64, 74.

**B.** **The Commencement of this Suit, the ISO, and the Confidentiality Order.**

In response to the City's inability to provide Jacksonians with safe water over several years, the EPA issued an Emergency Order in April 2020, citing the poor conditions of the PWS as presenting an imminent and substantial endangerment to residents. Doc. 1 ¶ 56. In May 2020, April 2021, and January 2022, the EPA issued subsequent Notices of Noncompliance to the City for violating the SDWA. *Id.* ¶ 65. On November 29, 2022, due to the City's noncompliance with these Orders, the EPA filed this action against the City for its failure to comply with the SDWA, alleging claims relating to failures and deficiencies in the PWS's staffing and filtration, disinfection, and corrosion control processes. *Id.* ¶¶ 1-4. The EPA requested an injunction to force the City to remedy these violations and to comply with the SDWA, state regulations, and the EPA's previous administrative orders. *Id.* at 30-41

On the day of filing, the Court granted the United States' unopposed request for, and entered, an Interim Stipulated Order ("ISO") that appointed an Interim Third-Party Manager

---

[5] Miss. State Dep't of Health, *Lead and Jackson Water: Recommendations for Homeowners, Schools and Facilities*, https://bit.ly/48r5ew7 (last visited Sept. 20, 2023).

("ITPM") as a means to "increase the [PWS]'s stability. Doc. 6 at 4; Doc. 5. The Court immediately stayed the action for six months until May 29, 2023. Doc. 6, Section XI, ¶ 28. The ISO attaches a Project Priority List that the ITPM must implement in accordance with an Implementation Schedule to address the vital needs of the PWS, including an Alternative Water Source Plan ("AWSP") "for the immediate provision of alternative water—at least one gallon per person per day" when certain triggers are met. *Id.*, App'x A ¶ 4. Despite continuous operational issues since November 2022 that have left Jacksonians without consistent access to potable water, *supra* pp. 3-5, an AWSP has yet to be implemented.[6]

The ISO gives the ITPM broad authority and decision-making powers over all aspects of the PWS, *see* Doc. 6, "more power than [the ITPM said he] would have given himself."[7] The ITPM has no obligation to formally engage with or report back to the public on his progress in implementing the ISO other than in Quarterly Status Reports, and the ISO exempts the ITPM from Mississippi's open records and contract procurement laws. Doc. 6, Section 4, ¶¶ 16, 17. In addition, the ITPM can enter into or modify contracts on behalf of the City and employ staff, without notice to community. *See id.* ¶ 16. Moreover, the ITPM is not required to prioritize Jackson contractors or workers or conduct outreach to local workers about prospective work. *See generally id.* Finally, the ISO grants the ITPM access to an unprecedented amount of federal funding to make improvements to the PWS, giving him—with little oversight from the City and no oversight from the community—financial control of and fiduciary responsibility over, the ITPM Professional, Operations and Maintenance, and Capital Improvements Accounts. *Id.* ¶¶ 11-13.

In February 2023, per the Parties' request, the Court entered an Order for Confidentiality

---

[6] *See* Edward Henifin, Consolidated Report of Activities ("Quarterly Report") for the Quarter Ended June 30, 2023, at 39 (July 31, 2023), *available at* https://bit.ly/3r2fdY7.
[7] JXN Water, *JXN Water Town Hall*, Facebook (Mar. 7, 2023), https://bit.ly/3ExAbBd.

of Settlement Discussions that keeps confidential all settlement communications among the Parties and interested "non-party Participants," which are the ITPM, the MSDH, and the Mississippi Department of Environmental Quality ("MDEQ").  Doc. 20 at 1.  For this reason, among others, the Groups and their constituents have no ongoing real-time insight or updates from the Parties or Participants as to the daily safety of the PWS or progress on the ISO or this case.  Ex. B. ¶¶ 36-37, 46, 58-60, 64; Ex. C ¶¶ 66-69, 71-72.

While the ITPM has established a website where he posts Quarterly Reports and requests proposal requests, Doc. 6, Section IV, ¶¶ 16, 17.b,[8] there is not on the website, or elsewhere, more frequently shared, publicly accessible data on the PWS, such as monthly reports on water sampling and testing results or the status of PWS improvements, including real-time delays.[9]  Instead, the Groups and their constituents must rely on infrequent general statements from the EPA and ITPM that the water is safe, and lengthy reports of technical jargon from the ITPM that come only every three months.  *See* Ex. B ¶¶ 37, 45-46, 57-60; Ex. C ¶¶ 48-49, 67-69, 72-73.[10]  As even the ITPM has admitted, "[t]here's just a general lack of full understanding [among residents] of what [JXN Water is] doing."[11]

In May 2023, the Court again stayed the case until November 2023.  Doc. 29.

### C. The Groups' and their constituents' advocacy before the EPA, City, and Court.

Throughout the pendency of this case, the Groups have represented in numerous fora their and their constituents' interests in seeking a role in the immediate and long-term solutions to

---

[8] JXN Water, Inc.,  https://bit.ly/3PRuowU (last visited Sept. 20 2023).
[9] *Id.*
[10] *See, e.g.*, Henifin, Quarterly Report Ended June 30, 2023, *supra* n.6; Anthony Warren and Joseph Doehring, WLBT, *Jackson mayor stands behind comments on water; doesn't apologize for providing filters to residents*, https://bit.ly/3rhKxlv (Jun. 21, 2023); Nikki Carvajal, *CNN*, *Biden announces initial $115 million investment in Jackson, Mississippi, water infrastructure*, June 6, 2023, https://bit.ly/45K3wUN.
[11] Tr. of Status Conference at 351, *U.S.A. v. Jackson*, Case No. 3:22-cv-686-HTW-LGI (July 13, 2023).

Jackson's water crisis—particularly considering the indefinite period for which the ITPM will manage and administer the PWS.  *See* Ex. B ¶¶ 43-44, 49-53; Ex. C ¶¶ 58-65.  For example, in the spring and again, in the summer of 2023, the Groups met with the EPA to share their and their constituents' experiences with discolored, foul-smelling, water and low to no water pressure; the need for a publicly controlled water system; concerns about the ITPM's unexplained cancellations of, and failure to reschedule, meetings with community; lack of an AWSP, particularly one informed by community; lack of real-time, accessible communication systems for impacted residents to be alerted to indicators of unsafe water such as BWNs and to report water issues; and the lack of information about the use of federal funds for the PWS, particularly who is being granted contracts.  Ex. B ¶¶ 49-52, 60; Ex. C ¶¶ 52, 56, 60-62.

In July 2023, the Groups raised the above concerns and their corresponding proposed solutions in a meeting with Jackson's Mayor Lumumba, the City Attorney, and other local officials, *see* Ex. B ¶ 52, and soon thereafter, submitted them in writing to the EPA via their Community Statement, *see* Ex. B. ¶¶ 66-69.  Several days later, the Groups' representatives appeared before this Court at a status conference to orally share in open court these concerns and their proposed solutions.  Ex. B. ¶¶ 47-48; Ex. C ¶ 65.

Finally, on August 9, 2023, the Groups filed with the EPA a Petition for Emergency Action under the Safe Drinking Water Act, 42 U.S.C. § 300i, to Abate the Imminent and Substantial Endangerment to Jackson Residents from Lead and Microbial Contamination in Drinking Water (the "Petition").  Ex. A. ¶ 69.  Their Petition details technical concerns with the current state of the PWS, supported by an engineer's expertise in water treatment processes, and requests that the EPA provide immediate, interim relief to ensure Jackson residents have access to safe water; real-time information about the safety of their water; and a role for community in the enforcement and

development of community-driven solutions to this crisis.  *Id.*

To date, the EPA has not responded to the Petition.  Nor has the EPA or any Parties or Participants in this case answered the Group's calls over the last year for meaningful information sharing, community engagement, and systemic water relief.  Ex. B ¶¶ 53-54, 62; Ex. C ¶¶ 70-74. For example, while the most recent Implementation Schedule in the ITPM's Quarterly Report lists October 2023 as the AWSP completion date, the AWSP is still being negotiated.[12]  Moreover, since the extension of the stay, the Groups have not seen any rollout of community outreach, Ex. B ¶¶ 53-54, 62; Ex. C ¶¶ 71-74[13]—despite approval of a Spring 2023 request for an additional $339,500 to the ITPM's budget for "Community Outreach and Community Benefit Management," including "significant local engagement with the community and development of a robust community benefit plan," Doc. 29 ¶ 6(b).  Indeed, the ITPM's latest quarterly report ending June 30, 2023, says efforts to gather community input on revenue approaches and governance have been postponed, with no indication when they will be rescheduled.[14]

## III.   LEGAL ARGUMENT

MS-PPC and PAI seek intervention as of right, or alternatively permissive intervention. *See* FRCP 24(a)-(b).[15]  A court shall grant **intervention by right** when a non-party timely moves

---

[12] *Compare* Henifin, *Quarterly Report Ended June 30, 2023,* at 30, 39, *supra* n.6 (indicating plan to submit to EPA revised plan of scope for AWSP and projecting October 2023 timeline for AWSP implementation), *with* Henifin, *Quarterly Report Ended Mar. 31, 2023*, at 26, *available at* https://bit.ly/3PGzDPT (noting negotiations on AWSP would be complete and plan submitted to parties by June 30, 2023).

[13] *See also generally* JXN Water, Inc., *supra* n.8.

[14] *See* Henifin, *Quarterly Report* at 28, *supra* n.6.

[15] Although this case is stayed, the Groups request that this Court exercise its discretion to lift the stay to consider their Motion for Leave to Intervene, particularly considering the urgency of health issues.  *See United States v. New-Indy Catawba, LLC*, No. 0:21-CV-02053-SAL, 2022 WL 18357257, at *1 & n.1 (D.S.C. Sept. 15, 2022) (lifting stay to consider motion to intervene); *Prime Source Bldg. Prod., Inc. v. United States*, 494 F. Supp. 3d 1307, 1313 (Ct. Int'l Trade 2021) (lifting stays in pending actions "solely for purpose of court's ruling on [intervention] motions"); *cf. Briscoe v. City Of New Haven*, No. 3:09-CV-

to intervene and either: (1) a federal statute provides that non-party "an unconditional right to intervene" in the action or (2) the non-party has a sufficient interest in the litigation that may be affected or impaired, as a practical matter, by the disposition of the action, and is not adequately represented by an existing party in the litigation.  Fed. R. Civ. P. 24 (a)(1)-(2); *see also Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015).

A court also may grant **permissive intervention** if a non-party makes a "timely" motion to intervene and has a "claim or defense" that shares with the main action a "common question of law or fact."  Fed. R. Civ. P. 24(b)(1).  Under either analysis, "Rule 24 is to be liberally construed," *Texas*, 805 F.3d at 656, and intervention should be granted "when no one would be hurt and the greater justice could be attained," *Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994) (internal quotations omitted).  Here, MS-PPC and PAI meet both standards.

### A.  <u>The Groups Are Entitled to Intervene as of Right under FRCP 24(a)(1) and (a)(2).</u>

#### 1.  **The Groups' Motion to Intervene is timely.**

An application for "intervention of right" must be "timely."  Fed. R. Civ. P. 24(a)(1)-(2). In determining timeliness, courts consider four factors:

> (1) the length of time during which the would-be intervenor actually knew or reasonably should have known of its interest in the case before it petitioned for leave to intervene; (2) the extent of prejudice that existing parties to the litigation may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as it knew or reasonably should have known of its interest in the case; (3) the extent of the prejudice that the would-be intervenor may suffer if intervention is denied; and (4) the existence of unusual circumstances militating either for or against a determination that the application is timely.

*Ford v. City of Huntsville*, 242 F.3d 235, 239 (5th Cir. 2001) (quoting *Sierra Club v. Espy*, 18 F.3d 1202, 1204-1205 (5th Cir. 1994)).  The timeliness inquiry is not a test; rather, it is contextual, to

---

1642, 2010 WL 166752, at *4 (D. Conn. Jan. 12, 2010) (declining to reconsider denial of renewed motion to stay where granting stay would "effectively deny[,] the motion to intervene" and thus, intervenor's opportunity to file brief expressing position on pending motion to dismiss—"presumably one of the purposes for which [intervenor] . . . sought to intervene").

be determined from all circumstances. *Wal–Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 834 F.3d 562 (5th Cir. 2016); *Stallworth v. Monsanto Co.*, 558 F.2d 257, 266 (5th Cir. 1977) ("[T]imeliness . . . is relative, not absolute."). The Groups' Motion meets each timeliness factor.[16]

*First*, the Groups seek to intervene shortly after they actually knew or reasonably should have known of their interest in the case. When assessing this factor, courts may consider the length of time that putative intervenors realized their interests would not be protected by existing parties. *See, e.g.*, *Sierra Club*, 18 F.3d at 1206 (recognizing as "gauge of promptness" "speed with which the would-be intervenor acted when it became aware that its interests would no longer be protected by the original parties" (citing *Stallworth*, 558 F.2d at 264)). Here, the Groups moved to intervene shortly after realizing their interests would not be protected by the EPA, City, or Participants in late Spring 2023, based on continued delays in updates to the PWS, the continued stay of this case, and the ongoing role of the ITPM. *Supra* pp. 8-10.

The Groups have voiced their and their constituents' demands for water-related data sharing, alternative water supplies, and meaningful inclusion in the processes to resolve the PWS's failures, by organizing, attending, and speaking at numerous public events that the EPA, the City, and the ITPM have attended. They also have submitted those demands in writing on multiple occasions. Yet, the Parties and Participants have taken little to no action in response. Indeed, since the July status conference before this Court, neither the Parties nor the ITPM has publicly addressed the Groups' Community Statement or Petition; proposed or implemented a community engagement plan, despite the ITPM's increased budget therefore; released an AWSP; or increased information sharing about the PWS—signaling that the health and economic interests of the Groups and their constituents are not being represented here. *Supra* pp. 4-10.

---

[16] The Groups submit that there are no unusual circumstances to be considered under the fourth factor and therefore, do not apply it here. *Accord Ford*, 242 F.3d at 240.

*Second*, the existing Parties would suffer no prejudice from delay because there has been none.  When ruling on intervention as of right, "[t]he prejudice to be considered . . . is that created by the intervenor's delay in seeking to intervene after it has learned of its interest in the action . . . ."  *Ceres Gulf v. Cooper*, 957 F.2d 1199, 1203 (5th Cir. 1992) (finding no prejudice to existing party who would incur additional expenses if intervention were granted because putative intervenor was not dilatory in intervening); *Ford*, 242 F.3d at 239-240 (5th Cir. 2001).  Here, as noted above, the Groups did not delay to protect their and their constituents' interests: they move to intervene a few weeks after the Court's July conference, when they realized no Party or Participant represented their and their constituents' needs for alternative water sources; increased sharing of accessible PWS-related data; and the community's institutionalized role to advocate for their meaningful involvement in crafting and implementing equitable solutions to the crisis.

Moreover, the Groups are moving only four months into the second stay of this case, before the City's filing of a responsive pleading; any discovery; or any request for, or filing of, substantive judgments, including a fairness determination of a proposed settlement.  The Fifth Circuit has concluded that motions to intervene were timely filed at similar or even later stages of litigation, where the intervenor did not "dawdle."  *E.g., Stallworth*, 558 F.2d at 267 (granting intervention where motion was filed less than one month after learning of interest in case upon entry of consent order); *cf. Wal-Mart*, 834 F.3d at 565-566 (finding intervention timely when filed before discovery progressed).  Thus, no Party is prejudiced by intervention at this juncture.

*Third*, the Groups and their constituents would suffer substantial prejudice if intervention were denied.  With the unprecedented influx of federal funding, there currently exists a unique, but short, window of opportunity for racial, economic, and environmental justice to prevail in this long-term endeavor that will echo for the next several generations of Jacksonians.  In a case that

could address decades of systemic divestment and environmental injustice that has deprived low-income Black communities in Jackson from something as precious as clean, safe drinking water, *process matters*, and that process should include community co-design and decision-making—both of which are nearly impossible without intervention.  Simply put, without intervention, the Groups and their constituents—residents most acutely affected by this water crisis—will continue to be systematically locked out of the opportunity to be active parties, with legal rights as intervenors, in co-leading short- and long-term resolutions to the crisis.

The Groups therefore meet the timeliness factors, and their motion is timely.

### 2.  The Jackson Community Groups have an unconditional right to intervene under FRCP 24(a)(1) based on SDWA's Citizen Participation Provision.

The SDWA gives the Groups "an unconditional right" to intervene.  *See* Fed. R. Civ. P. 24(a)(1).  The SDWA grants any "person" the right to commence an enforcement action against anyone "who is alleged to be in violation of any [SDWA] requirement" unless the government is "diligently prosecuting" the same violation.  42 U.S.C. § 300j-8(a)(1), (b)(1)(B).  Although persons cannot file their own suit to enforce the same claims that the government is enforcing, they "may intervene as of right" in the government's action under section 1449 of the SDWA:

> No civil action may be commenced [to enforce compliance with SDWA]. . . if the [EPA] Administrator . . . has commenced and is diligently prosecuting a civil action in a court of the United States to require compliance with such requirement, *but in any such action in a court of the United States, any person may intervene as a matter of right* . . . .

42 U.S.C. § 300j-8(b)(1)(B) (emphasis added); *see United States v. Hooker Chemicals & Plastics Corp.*, 749 F.2d 968, 981 (2d Cir. 1984) (explaining citizen intervention under section 1449); *cf. In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 894 F.3d 1030, 1033 (9th Cir. 2018) (explaining Clean Air Act grants "any person" right to bring civil action

challenging its violation, unless "Administrator or State has commenced and is diligently prosecuting a civil action," in which "any person may intervene as a matter of right").[17]

Courts have found—and the United States has conceded—that analogous provisions of federal environmental statutes confer an unconditional right to intervene. *See, e.g.*, *United States v. Drummond Co., Inc.*, No. 2:19-CV-00240, 2020 WL 5110757, \*1-\*3 (N.D. Ala. Aug. 31, 2020) (explaining EPA did not oppose intervenor's timely motion for intervention in CAA case because movants had statutory right to intervene under 42 U.S.C. §§ 7604(a)(1), 7604(b)(1)(B)); *United States v. City of Baton Rouge*, No. 01-978, 2012 WL 1392980, \*1 (M.D. La. Apr. 20, 2012 (noting government conceded plaintiffs had "statutory unconditional right to intervene" in CWA case). *But see id.* (government opposed intervention only on timeliness).

Citizen enforcement of environmental laws "reflect[s a] deliberate choice by Congress to widen citizen access to the courts" based on concerns that "administrative enforcement might falter or stall." *See Friends of the Earth v. Carey*, 535 F.2d 165, 172 (2d Cir. 1976) (discussing CAA's citizen suit provision, which parallels SDWA's); *see also Drummond*, 2020 WL 5110757, at \*3 (highlighting Congress's purpose in providing intervention right was "so that citizens can advocate for full enforcement" of environmental statutes). Even in cases where the government initiated its own action, Congress viewed citizen involvement as an important guard against under-enforcement and provided citizen groups with a "broad" right to intervene in "recognition of the fact that the agencies involved [in enforcement actions] might not always prosecute to the fullest extent possible or protect all interests." *United States v. Ketchikan Pulp Co.*, 74 F.R.D. 104, 107

---

[17] This Court may look to case law interpreting identical provisions contained in other environmental statutes such as the Clean Water Act ("CWA"), 33 U.S.C. § 1365(b)(1)(B), and Clean Air Act ("CAA"), 42 U.S.C. § 7604(b)(1), because these statutes all follow the same "tripartite structure for citizen suits – a right of action, qualified by a notice requirement and a 'diligent prosecution' bar, which in turn is leavened by a right to intervene," *In re Volkswagen*, 894 F.3d at 1038 (using CWA and SDWA cases to interpret CAA right of intervention).

(D. Alaska 1977) (interpreting CWA's intervention provision).  Thus, the Groups should be "welcomed participants in the vindication of environmental interests."  *Cf. Friends of the Earth*, 535 F.2d at 172; *Glazer v. Am. Ecology Env't Servs.*, 894 F. Supp. 1029, 1034 (E.D. Tex. 1995).

Here, the EPA has filed an enforcement action against the City seeking relief under Sections 1414 of the SDWA, 42 U.S.C. §§ 300g-3.  *Supra* p. 6.  The federal government's commencement of this suit therefore precludes the Groups from filing their own citizen action based on these claims.  But MS-PPC—an association—and PAI—a non-profit organization—and their constituents are "person[s]" to which Congress granted an unconditional right to intervene in this SDWA enforcement action.  *See* 42 U.S.C. § 300f(12) (defining "person" as an "individual, corporation, . . . association, [or] partnership . . . ."); *cf. ACORN v. Edwards*, 842 F. Supp. 227 (E.D. La. 1993) (finding community organization could bring suit under SDWA).  Accordingly, the Groups may intervene as of right under subsection 1449 of the SDWA.[18]

**3.  The Groups are entitled to intervene as a matter of right under Fed. R. Civ. P 24(a)(2) because they claim interests in the subject matter of this litigation, disposition of this action will impair their ability to protect those interests, and the existing Parties are not adequately representing those interests.**

The Groups are also entitled to intervene as of right under Fed. R. Civ. P. 24(a)(2):

On timely motion, the court must permit anyone to intervene who claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

FRCP 24(a)(2); *see In re Lease Oil Antitrust Litig.*, 570 F.3d 244, 247 (5th Cir. 2009) (outlining three requirements for intervention by right under Rule 24(a)(2)). A court's analysis under subsection (a)(2) "is a flexible one, which focuses on the particular facts and circumstances

---

[18] The Groups seek to plead three of the same SDWA violations that the United States pleads in its Complaint. *Compare* Ex. A, ¶¶ 127-51 (First through Third Causes of Action), *with* Doc. 1 ¶¶ 146-69 (Fourth through Sixth Causes of Action).

surrounding each application," requiring intervention as of right to "be measured by a practical rather than technical yardstick." *Edwards v. City of Houston*, 78 F.3d 983, 999 (5th Cir. 1996) (internal quotations omitted). Courts should resolve all "doubts . . . in favor of the proposed intervenor," *Entergy Gulf States Louisiana, L.L.C. v. U.S. E.P.A.*, 817 F.3d 198, 203 (5th Cir. 2016), and "allow intervention when no one would be hurt and the greater justice could be attained," *Wal-Mart*, 834 F.3d at 565. The Groups satisfy each element of Rule 24(a)(2).

### a. **MS-PPC and PAI and their constituents have health and economic interests in the subject matter of this action.**

Federal Rule of Civil Procedure 24(a)(2) sets a low bar for the interest required for intervention by right: "All that is required . . . is an interest in the property or other rights that are at issue," *Diaz v. Southern Drilling Corp.*, 427 F. 2d 1118, 1124 (5th Cir. 1970), and that the interest is "direct, substantial, [and] legally protectable," *Ross v. Marshall*, 426 F.3d 745, 757 (5th Cir. 2005). The Fifth Circuit has therefore warned against defining "property or transaction" too narrowly in the context of intervention. *Ford*, 242 F.3d at 239.

A legally protectable interest does not mean the interest must be enforceable; rather, the "interest is sufficient if it is of the type the law deems worthy of protection, even if the intervenor does not have an enforceable legal entitlement or would not have standing to pursue her own claim." *La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 306 (5th Cir. 2022); *see also Field v. Andarko Petroleum Corp.*, 35 F.4th 1013, 1019 (5th Cir. 2022) (explaining Rule 24 protects property and non-property interests). Further, in a case like the instant one that involves a public interest question brought by public interest groups, "the interest requirement may be judged by a more lenient standard." *See La Union del Pueblo Entero*, 29 F.4th at 305-06.

For example, in *Texas*, three Jane Does moved to intervene to protect their interests in receiving deferred action and employment authorization under the federal Deferred Action for

Parents of Americans and Lawful Permanent Residents program.  805 F.3d at 660.  The Fifth

Circuit held that applicants had the right to intervene even when they were "not individuals seeking

to defend a governmental policy that they supported on ideological grounds; rather they were the

intended beneficiaries of the program being challenged."  *Id.* at 661.

Similarly, here, MS-PPC and PAI are not only seeking to enforce the SDWA, but they also

seek to protect the interests of the intended beneficiaries of this action—the Groups themselves as

well as their constituents, who have been and continue to be harmed by the lack of access to clean

and safe water to consume and use for daily hygiene.  The Groups and their constituents have had

to dip into their own pockets to buy bottled water and other supplies for the community while still

having to pay often outrageous water bills for water that residents cannot reliably use.  *Supra* p. 5.

Thus, the Groups' and their constituents' exposure and threatened exposure to contaminated

drinking water and uncertainty about their water safety constitute legally protectable health and

economic interests for purposes of intervention.  *Sierra Club*, 18 F.3d at 1207 (intervenors'

"economic interests" at stake); *cf. also Consol. Cos., Inc. v. Union Pac. R.R. Co.*, 499 F.3d 382,

386 (5th Cir. 2007) (threatened health harm from pollution of water supply constituted legally

protected interest); *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 556-

57 & n.23 (5th Cir. 1996) (same).

The Groups also aim to vindicate their and their constituents' interests in participating in

settlement negotiations with the goal of achieving a long-term role for community in the

management of the PWS—an interest the Fifth Circuit has relied on to grant intervention under

subsection (a)(2) on different factual grounds.  *See League of United Latin Am. Citizens, Dist. 19

v. City of Boerne*, 659 F.3d 421, 434 (5th Cir. 2011) (finding voter had right to intervene to

challenge modifications to Voting Rights Act consent decree because it would affect his interest

in selecting city council members).  The Groups believe that they and their constituents can no longer be ignored, dismissed, or pushed to the margins when critical decisions about the PWS that affect their daily health and economic interests are being made.  Thus, they seek to create and protect opportunities for formal community agency for themselves and their constituents in this case in order to build a more just and accountable PWS.  Accordingly, the Groups have direct, substantial, and legally protectable health and economic interests in this case's subject matter.

### b. The Groups' and their constituents' health and economic interests will be significantly impaired if intervention is denied.

An intervenor must be "so situated that the disposition of the action may as a practical matter impair or impede the intervenor's ability to protect that interest." Fed. R. Civ. P. 24(a)(2).  An intervenor need only show that "there is a possibility that [its] interests could be impaired or impeded." *La Union del Pueblo Entero*, 29 F.4th at 307.  A court should look to "practical consequences" of denying intervention. *Fund for Animals v. Norton*, 322 F.3d 728, 735 (D.C. Cir. 2003).  This inquiry "is not limited to consequences of a strictly legal nature." *Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1498 (9th Cir. 1995).

Here, the scope of problems with Jackson's water crisis is so enormous that the likely outcome of this lawsuit includes structural changes in the City's administration, funding, and governance of the PWS, which may affect future water rates and accessibility to, and usage of, the PWS for the Groups and their constituents.   And because of their continued lack of access to scientifically-backed, easy-to-understand water quality data, the Groups are unlikely to be able to rely on the Parties' generalizations that their water is safe to consume or use, particularly when they continue to experience issues with their own water supply. *Supra* pp. 5-7, 8-10.  Thus, without the Court's grant of a formalized right to the Groups to participate in this case as intervenors, the Groups' ability to protect their and their constituents' health and economic interests to access and

co-design an equitable, transparent PWS will be practically impaired.

Moreover, the disposition of this lawsuit, without the formal participation of the Groups as intervenors, may potentially result in a *stare decisis* effect.  *See Sierra Club*, 18 F.3d at 1207 (citation omitted) (finding putative intervenors' ability to protect their interests would be impaired by precedential effect of adverse resolution in case).  Specifically, it would erase the Groups' ability to legally protect their and their constituents' health and economic interests through the exercise of their rights as intervenors to "brief[ ] . . . issues, present[ ] . . . evidence, and . . . appeal." *Id.* at 1207 (identifying legal rights associated with intervention).

### c.   **The existing Parties do not adequately represent the Groups' and their constituents' health and economic interests.**

Section (a)(2) imposes a minimal burden on putative intervenors to show that existing parties' representation of their interests "may be" inadequate.  *Guenther v. BP Ret. Accumulation Plan*, 50 F.4th 536, 543 (5th Cir. 2022); *Berger v. N.C. Conf. of the NAACP*, 142 S. Ct. 2191, 2195-96 (2002) ("Rule 24(a)(2)'s test . . . presents proposed intervenors with only a minimal challenge . . . ." (alteration omitted)).  To make this showing, movants must overcome two presumptions of adequate representation.  *Brumfield v. Dodd*, 749 F.3d 339, 345 (5th Cir. 2014).

### i.   **The Groups seek ultimate objectives that no Party is pursuing, and their and their constituents' health and economic interests diverge from the Parties' and Participants' interests.**

The first presumption arises when the intervenor "has the *same ultimate objective* as a party to the lawsuit," which can be overcome by showing "adversity of interest, collusion, or nonfeasance on the part of the existing party."  *Texas*, 805 F.3d at 661-63 (emphasis added).  "An intervenor can establish adversity of interest 'if its interests diverge from the putative representative's interests in a manner germane to the case.'"  *La Union del Pueblo Entero*, 29 F.4th at 308 (finding presumption overcome where intervenor sought to uphold amendments to Texas

Code on merits, while defendants sought to uphold amendments on immunity and standing).

Although the Groups and the EPA both aim to enforce the SDWA to bring the PWS into compliance with legal standards, the Groups' "ultimate objectives" are to institutionalize a role for community in this case; achieve greater information accessibility related to water quality and safety; and access alternative water supplies—none of which the Parties have identified as ultimate objectives in this case. But if the Court finds the Groups share the same ultimate objective with existing Parties and therefore find this presumption applies, the Groups easily overcome it by showing a divergence of interests between their and constituents' interests and the Parties' and Participants' interests on several grounds.

*First*, the Groups seek greater information-sharing and government accountability regarding the status and safety of the water and access to alternative water solutions beyond what the Parties and Participants have sought or agreed to in this case. On several occasions, the Groups have informally and formally submitted to the Parties concrete solutions on how to improve information accessibility, including regularly scheduled meetings and more frequent communication between a community representative, the ITPM, the City, and/or EPA, and subjecting the ITPM to open records requests and state procurement laws. *Supra* pp. 8-10. Yet, to the Groups' knowledge, none of these solutions have been addressed in or incorporated here.

*Second*, the EPA is a federal government entity tasked with representing the broader public interest in enforcing federal environmental law, and not merely the above-mentioned narrower economic and health concerns of data sharing and public accountability that the Groups are primarily interested in. *Cf. Sierra Club*, 18 F.3d at 1208 (finding minimal burden met where government represented broad public interest, not just intervening timber industry's economic concerns). Moreover, the City is focused on defending itself in a federal lawsuit brought by the

EPA, which is not an objective of the Groups.  Thus, while the Groups have exhausted multiple routes to ensure advancement of the health and economic interests in this case, *supra* pp. 8-10, neither the EPA nor the City has indicated an intent to support or advocate for them here.

*Third*, the non-party Participants also do not adequately represent the Groups' and their constituents' health and economic interests as residents who must use, ingest, and expose themselves to the vulnerabilities of the PWS.  The ITPM, for example, is an officer of the Court, taking on duties of the City's administration in operating and managing the PWS, which means his interests inherently diverge from those of the Groups.  And while MS-PPC and PAI acknowledge the ITPM's weighty efforts thus far, his direct updates to the public have been limited to broad statements as to the safety of Jackson's water, without supporting data or meaningful community engagement, or lengthy technical Quarterly Reports.  *Supra* p.8.

The MSDH and MDEQ—state agencies—likewise do not have an interest in elevating, much less advocating for, the Groups' specific health and economic interests.  These agencies are primarily concerned with enforcing the City's compliance with the SDWA.  *See* Doc. 1 ¶ 19. Further, given the State's extensive record of attempting to siphon power away from, and deny resources to, Jacksonians, *supra* pp. 3-4, the Groups have reason to anticipate that the State's position on any issue related to Jacksonians' self-governance may diverge from the Groups'.

In sum, the Groups seek some objectives that no existing Party or Participant is pursuing, and despite having some overlapping objectives, the Parties' representation is inadequate because their ideas on how to execute those objectives are profoundly distinct from Groups'.

> **(2) While the EPA is a government actor charged with representing the Groups' and their constituents' interests, those interests are in fact different from, and will not be represented by, the U.S. EPA.**

The *second* presumption applies where an existing party "is a governmental body or officer

charged by law with representing the interests of the intervenor, which can be overcome by showing that the intervenor's interest is in fact different from that of the governmental party and that the interest will not be represented by the existing governmental party." *Texas*, 805 F.3d at 662. As with the first presumption, all that is required to satisfy the inadequacy of representation is that the government's more extensive interests *might* result in inadequate representation. *See Brumfield*, 749 F.3d at 346.

To illustrate, in *Brumfield*, the federal government sought to enjoin Louisiana from unauthorized school vouchers in school districts that were under federal desegregation orders, and the parents of students who received the vouchers moved to intervene. 749 F.3d at 346. Even though Louisiana and the movant-parents both sought to maintain the voucher program, the court found inadequate representation by the State. It reasoned that the state had many additional, more extensive interests, including maintaining its relationship with the federal government and with courts with continuing desegregation jurisdiction, whereas the parents took a different jurisdictional position and were only concerned about keeping their vouchers. *Id.*; *see also Entergy*, 817 F.3d at 204-06 (allowing intervention because conservation groups' interests in prompt document disclosure, opposing case stay, and requesting bifurcation sufficiently diverged from EPA's interests in protecting third-party confidential business information); *Heaton v. Monogram Credit Card Bank of Ga.,* 297 F.3d 416, 425 (5th Cir. 2002) (finding inadequate representation by government agency because government represented broader interest than private entity's); *John Doe No. 1 v. Glickman*, 256 F.3d 371, 381 (5th Cir. 2001) (same).

MS-PPC and PAI overcome this second presumption for similar reasons. Here, while the EPA is charged with representing the interests of all Jackson residents generally, the Groups are primarily specifically interested in ensuring increased information sharing, alternative water

23

sources, and an institutionalized role for them and their constituents in this case, and beyond, in resolving the water crisis.  Indeed, as noted above, the EPA has yet to respond to the Groups' advocacy on behalf of their and their constituents who are more narrowly concerned about the community's role in the co-development of solutions to the crisis and public accountability.  But even if the EPA signaled it would pursue such health and economic interests, it cannot adequately vindicate these *specific* interests because, like the government in *Brumfield*, it is a public servant that must act in good faith to represent *additional*, *broader* interests in enforcing federal environmental laws.  *Cf. La Union del Pueblo*, 29 F.4th at 309 (finding neither Texas nor its officials could vindicate intervenors' interests while acting in good faith).

To illustrate, the EPA cannot adequately represent in this case the narrow interest of the Groups and their constituents in consistent access to scientifically-backed, easy-to-understand water quality data.  The EPA and the ITPM have asked the Groups and their constituents to trust their assessments and recommendations about the safety of water without accessible data, evidence, and relationship building, when the Groups and their constituents continue to face issues with their water and are under the MSDH's ongoing water advisory.  *Supra* p. 9-10.

The examples of diverging interests continue.  While the ITPM's Project Priority List includes an AWSP, it has yet to be implemented; the Groups and their constituents therefore continue to divert resources to fill the void caused by the lack of access to clean, safe water through bottled water and filter distribution efforts throughout Jackson.  *Supra* pp. 3, 5-6.  Such distribution efforts should be a responsibility that falls on the EPA and ITPM, and federal funds should be used for these efforts—not the Groups' and their constituents' limited resources.

Because the Groups meet all elements for intervention as of right, their Motion to Intervene should be granted.

B. **Alternatively, the Groups meet permissive intervention under FRCP 24(b)(1)(B).**

The Groups also satisfy the standard for permissive intervention. "On timely motion, a court *may permit* anyone to intervene who has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B) (emphasis added). "In exercising its discretion [to grant permissive intervention], the court must [then] consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3); *see also Stallworth*, 558 F.2d at 269 (explaining grant of permissive intervention "is a two-stage process").

Here, for the same reasons the Groups' request for intervention as of right is timely, *supra* pp. 11-144, so too is their request for permissive intervention. Fed. R. Civ. P. 24(b). Additionally, the Groups' claims have questions of law and fact in common with this litigation. Their proposed Complaint-in-Intervention pleads the same three violations of the SDWA that the EPA pleads in its Complaint. *See supra* p. 16 n.18. Moreover, the same operative facts regarding Jackson's water infrastructure crisis at issue in the original Complaint are the factual bases for the Groups' requested intervention and community-informed relief—namely, the fragility of Jackson's aging water infrastructure and the urgent health and safety needs to create solutions to stabilize the PWS and equitably provide safe water in the short- and long-term. *See* Doc. 1 ¶¶ 2-3, 25-122; Ex. A ¶¶ 1-5, 24-47, 78-127.

Finally, given the early stage of this case and its extended stay since the filing of the Complaint, *see supra* p.13, granting permissive intervention will neither unduly delay this proceeding nor prejudice the adjudication of the rights of the original parties. Indeed, there is no timeline as to when the Parties may finalize and publicly release the proposed consent decree for public comment—assuming the Parties even reach an agreement to resolve the litigation—and the

stay in this case remains for another two months.  Thus, the procedural posture of this case renders this case ripe for intervention *now*.

Intervention would also serve the interests of judicial economy and the efficient administration of this case by allowing the Groups to help the Parties and Court reach a stronger resolution to this case sooner than later.  Through their intervention, the Groups seek to ensure the equity and sustainability of any proposed resolution of this case—including a proposed and final consent decree—and ultimately, of the PWS through enhanced data sharing mechanisms, alternative water relief, and institutionalized community engagement.  If intervention is granted, the Parties and the Court would have ample time to consider, and integrate into this case, the Group's demands as early as practicable.  Permissive intervention should therefore be granted.

## IV.   CONCLUSION

For the above reasons, the Groups respectfully request that this Court grant their Motion for Leave to Intervene; grant them status as "Intervenors-Plaintiffs" as of right under Rule 24(a)(1) and (2) or alternatively, permissively under Rule 24(b)(1)(B); and order the Clerk to file on the Group's "[proposed] Complaint-In-Intervention," Ex. A, pursuant to Fed. R. Civ. P. 24(c).

Respectfully submitted, this 25th day of September 2023.

/s/ Joshua Tom
Joshua Tom (MS Bar No. 105392)
American Civil Liberties Union of Mississippi
101 South Congress St.
Jackson, MS 39201
601.354.3408 ext. 112
jtom@aclu-ms.org

Emily Early (GA Bar No. 810206)*
Jessica Vosburgh (Ala. Bar No. 1710-A00Y)*
Mikaila Hernández (NY Bar No. 6048334)*
The Center for Constitutional Rights
666 Broadway Avenue, Floor 7

New York, New York 10012
(212) 614-6464
eearly@ccrjustice.org
jvosburgh@ccrjustice.org
mhernandez@ccrjustice.org

Lori Sherman, IN Bar No. 31102-53*
Kathleen Roblez, NC Bar No. 57039*
Ashley Mitchell, NC Bar No. 56889*
Caitlin Swain, NC Bar No. 57042*
Forward Justice
P.O. Box 1932
Durham, NC 27721
(919) 323-3889
 lsherman@forwardjustice.org
 kroblez@forwardjustice.org
 amitchell@forwardjustice.org
 cswain@forwardjustice.org

*PHV applications forthcoming

Counsel for Proposed Intervenors-Plaintiffs
Mississippi Poor People's Campaign and People's
Advocacy Institute