IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


UNITED STATES OF AMERICA,                          PLAINTIFF
STATE OF MISSISSIPPI

VS.                          CIVIL ACTION NO. 3:12CV790-HTW-LGI

THE CITY OF JACKSON, MISSISSIPPI,                  DEFENDANT
JXN WATER


**TRANSCRIPT OF STATUS CONFERENCE**


BEFORE THE HONORABLE HENRY T. WINGATE
UNITED STATES DISTRICT JUDGE


FEBRUARY 27, 2024
JACKSON, MISSISSIPPI


(APPEARANCES NOTED HEREIN.)


REPORTED BY:  TERI B. NORTON, RMR, FCRR, RDR
              Mississippi CSR #1906
_____

501 EAST COURT STREET, SUITE 2.500
JACKSON, MISSISSIPPI  39201
TERI_NORTON@MSSD.USCOURTS.GOV
(601)608-4186

```
 1    FOR THE PLAINTIFF, UNITED STATES OF AMERICA:

 2          ANGELA GIVENS WILLIAMS, ESQUIRE
            MITZI DEASE PAIGE, ESQUIRE
 3          U.S. ATTORNEY'S OFFICE
            501 EAST COURT STREET, STE. 4.430
 4          JACKSON, MISSISSIPPI  39201

 5          KARL J. FINGERHOOD, ESQUIRE
            U.S. DEPARTMENT OF JUSTICE
 6          ENVIRONMENTAL ENFORCEMENT SECTION
            POST OFFICE BOX 7611
 7          WASHINGTON, DC  20044

 8          ANGELO MO, ESQUIRE     (VIA ZOOM)
            U.S. DEPARTMENT OF JUSTICE, ENRD
 9          150 M STREET, N.E., ROOM 2.900
            WASHINGTON, DC  20002

10

11    FOR THE PLAINTIFF, STATE OF MISSISSIPPI:

12          ROY FURRH, ESQUIRE
            DONNA J. HODGES, ESQUIRE
13          MS DEPARTMENT OF ENVIRONMENTAL QUALITY
            515 EAST AMITE STREET
14          JACKSON, MISSISSIPPI  39201

15          CHRISTIN B. WILLIAMS, ESQUIRE
            LATESHYA MARTIN, ESQUIRE
16          MS STATE DEPARTMENT OF HEALTH
            POST OFFICE BOX 1700
17          JACKSON, MISSISSIPPI  39215-1700

18

19    FOR THE DEFENDANT, CITY OF JACKSON:

20          TERRELL S. WILLIAMSON, ESQUIRE
            OFFICE OF THE CITY ATTORNEY
21          455 EAST CAPITOL STREET
            JACKSON, MISSISSIPPI  39201
22

23    FOR THE DEFENDANT, JXN WATER:

24          CHARLES MITCHELL MCGUFFEY, ESQUIRE
            FORMAN, WATKINS & KRUTZ, LLP
25          POST OFFICE BOX 22608
            JACKSON, MISSISSIPPI  39225-2608
```

```
 1            FRANK PAUL CALAMITA, ESQUIRE
              AQUALAW, PLC
 2            6 S.5TH STREET
              RICHMOND, VIRGINIA  23219
 3
     FOR THE INTERVENOR PLAINTIFF:
 4
              EMILY C.R. EARLY, ESQUIRE
 5            MIKAILA HERNANDEZ, ESQUIRE
              THE CENTER FOR CONSTITUTIONAL RIGHTS
 6            666 BROADWAY AVENUE, FLOOR 7
              NEW YORK, NEW YORK  10012
 7

 8   ALSO PRESENT:

 9   TED HENIFIN, THIRD-PARTY MANAGER

10   SUSAN RICHARDSON - CITY OF JACKSON  (VIA ZOOM)

11   PATRICK BLACK, DHS (VIA ZOOM)

12   AZANDE WILLIAMS, DHS (VIA ZOOM)

13   SUZANNE ARMOR, EPA (VIA ZOOM)

14   JIM VINCH, EPA (VIA ZOOM)

15   MICHELLE WETHERINGTON, EPA (VIA ZOOM)

16   MICHAEL CRESWELL, EPA (VIA ZOOM)

17   MCKENNA RANEY-GRAY, ACLU

18   AYANNA HILL, ACLU

19   CLAUDIA WILLIAMS HYMAN, PLAINTIFF INTERVENORS, MISSISSIPPI POOR
     PEOPLE'S CAMPAIGN, AND PEOPLE'S ADVOCACY INSTITUTE (VIA ZOOM)
20

21   DANIELLE HOLMES, MISSISSIPPI POOR PEOPLE'S CAMPAIGN (VIA ZOOM)

22   BROOKE FLOYD, PEOPLE'S ADVOCACY INSTITUTE (VIA ZOOM)

23

24

25
```

 1             **THE COURT:**  Call the case, please.

 2             **THE CLERK:**  Your Honor, this is United States of

 3    America versus City of Jackson, Civil Action No.

 4    3:12cv790-HTW-LGI, and related case, Civil Action No.

 5    3:22cv686-HTW-LGI.  We are here this morning for a status

 6    conference.  At this time, I'm going to ask that the parties

 7    state their names for the record, starting with the plaintiff

 8    in the courtroom.

 9             **MR. FINGERHOOD:**  Good morning, Your Honor.  Karl

10    Fingerhood with the U.S. Department of Justice, Environmental

11    Protection.

12             **THE COURT:**  Good morning to you.

13             **MS. WILLIAMS:**  Good morning, Your Honor, Angela

14    Williams with the U.S. Attorney's Office representing the

15    United States.

16             **MS. PAIGE:**  Good morning, Your Honor.  Mitzi Dease

17    Paige with the U.S. Attorney's Office as well.

18             **MR. FURRH:**  Good morning.  Roy Furrh with the

19    Mississippi Department of Environmental Quality.

20             **MR. HODGES:**  Good morning, Your Honor.  Donna Hodges

21    with the Mississippi Department of Environmental Quality.

22             **MS. MARTIN:**  Good morning, Your Honor.  Lateshya

23    Martin with the Mississippi State Department of Health.

24             **MS. CHRISTIN WILLIAMS:**  Good morning, Your Honor.

25    Christin Williams with the Mississippi State Department of

 1  Health.

 2      **MR. WILLIAMSON:**  Good morning, Your Honor, Terry

 3  Williamson with the City of Jackson.

 4      **THE COURT:**  Good morning.

 5      **MR. HENIFIN:**  Good morning, Your Honor.  Ted Henifin,

 6  third-party administrator.

 7      **MR. CALAMITA:**  Good morning, Your Honor.  Paul

 8  Calamita, counsel to Mr. Henifin.

 9      **MR. MCGUFFEY:**  Good morning, Your Honor.  Mitch

10  McGuffey, also counsel to Mr. Henifin.

11      **THE COURT:**  Good morning.  Did I miss anybody?

12      Okay.  Now, I have some people on the monitor.  Terri,

13  let's introduce those persons.

14      **MS. MO:**  Good morning, Your Honor.  Angela Mo with

15  the Department of Justice.

16      **THE COURT:**  Good morning.  Next?

17      **MR. VINCH:**  Good morning, Your Honor.  This is Jim

18  Vinch from the United States Environmental Protection Agency in

19  Washington, D.C.

20      **THE COURT:**  Okay.  Thank you.

21      **MS. RICHARDSON:**  Susan Richardson Kilpatrick Townsend

22  on behalf of the City of Jackson.

23      **THE COURT:**  All right.  Thank you.

24      **MR. BLACK:**  Patrick Black and Azande Williams on

25  behalf of the Mississippi Department of Human Services.

1           **THE COURT:**  Good morning.

2           **MS. ARMOR:**  Good morning, Your Honor.  Suzanne Armor,

3    U.S. Environmental Protection Agency, Atlanta, Georgia.

4           **THE COURT:**  Okay.  Good morning.

5           **MS. WETHERINGTON:**  Michelle Wetherington, also EPA in

6    Atlanta.

7           **MR. CRESWELL:**  Michael Creswell, also EPA in Atlanta,

8    sir.

9           **THE COURT:**  Good morning to both of you.

10          **MS. HERNANDEZ:**  Mikaila Hernandez (unintelligible).

11          **THE COURT:**  My court reporter could not hear you.

12   Could you repeat it one more time?

13          **MS. HERNANDEZ:**  Mikaila Hernandez for the putative

14   intervenor plaintiffs, People's Advocacy Institute and

15   Mississippi Poor People's Campaign.

16          **THE COURT:**  Thank you so much.  That's due to our

17   poor equipment.  It has nothing to do with you.

18      All right.  Next?

19          **MS. EARLY:**  Good morning, Your Honor.  Emily Early,

20   also here on behalf of the proposed intervenor plaintiffs,

21   Mississippi Poor People's Campaign, and the People's Advocacy

22   Institute.  And we also have two of our client representatives

23   with us, Danielle Holmes of the Mississippi Poor People's

24   Campaign, and Brooke Floyd of the People's Advocacy Institute.

25          **THE COURT:**  Next?

1          **MS. HYMAN:**  Good morning, Your Honor.  This is

2     Claudia Williams Hyman, also appearing with the proposed

3     plaintiff intervenors, Mississippi Poor People's Campaign, and

4     People's Advocacy Institute.

5          **THE COURT:**  All right.  Thank you.  Anybody else?

6          All right, then.  Welcome all of you.  There are a number

7     of matters that I want to address here, and I will leave some

8     time and opportunity for people to bring up a new subject, and

9     I will make the determination whether we ought to delve into

10    anything beyond what I had planned for us to do, but we will

11    address each one and see where we are going on all of these

12    things.

13         Ms. Early?  Ms. Early?

14              **MS. EARLY:**  Yes, Your Honor.

15              **THE COURT:**  Can you hear me?

16              **MS. EARLY:**  Yes, I can.

17         **THE COURT:**  My doctors tell me I don't drink enough

18    water.  I saw you bring a great big jug to your lips a couple

19    of seconds ago.

20              **MS. EARLY:**  Yes, sir.

21         **THE COURT:**  And then after that, you brought another

22    jug to your lips in a different container.  Is that all of that

23    water or is it something else?

24              **MS. EARLY:**  No, one is coffee, and the other is

25    water.

1          **THE COURT:**  Wait a minute.  You are mixing your

2     coffee and water?

3          **MS. EARLY:**  I think it is pretty much all the same.

4     One just gives me more pep in my step.

5          **THE COURT:**  Oh, that's what it is.  I just finished

6     telling my courtroom deputy, Terri, just about 15 minutes ago,

7     when she brought me some coffee, I'm not a coffee drinker, but

8     she brought me some anyway, because we've been doing some work

9     on this thing and she wanted to make sure that I had, as you

10    just put it, pep in my step, and so she then brought me this

11    coffee.  And I think she is trying to get me started on coffee,

12    but it's not working, Terri.  But anyway --

13         **MS. EARLY:**  You have to drink a lot of it.

14         **THE COURT:**  That's what it is?  I couldn't help but

15    notice that you had this jug that you started off with, and

16    then you went to some other kind of container.  So the first

17    one was water?  Is that it?

18         **MS. EARLY:**  Yes.  We all need it.

19         **THE COURT:**  And the second one was coffee, you are

20    telling me.  Is that it?

21         **MS. EARLY:**  Yes, sir.  Yes.

22         **THE COURT:**  And you say it works?

23         **MS. EARLY:**  It does, yeah, at least psychologically

24    it does.  I tell myself it does and I need it to function.

25         **THE COURT:**  Maybe I need to try that, then, because

1    when I wake up at 2 and 3:00 in the morning, I just can't go

2    back to sleep, and so maybe I need to try it.

3         **MS. EARLY:**  Try it and let us know how it works.

4         **THE COURT:**  I'm going to do that.  Is it any kind of

5    special coffee?  Does it have a sign on it?

6         **MS. EARLY:**  No, just plain coffee.

7         **THE COURT:**  Just plain coffee.  Guaranteed to keep me

8    up.  Is that it?

9         **MS. EARLY:**  Yes, sir.

10        **THE COURT:**  I will be working on that, then.  Because

11   I woke up this morning at 2:00.  So I thought I would try some

12   coffee, so I told Terri about it.  So she went and fixed me

13   some coffee this morning.  But I'm not a coffee drinker, so it

14   doesn't do me any good.  I'm not sleepy, though.  But I'm not a

15   coffee drinker.  But I had to comment on it because I saw you

16   taking two containers.  That's all.

17        **MS. EARLY:**  I promise, it's just coffee.

18        **THE COURT:**  Okay.  I'm just meddling.  That's all.

19        **MS. EARLY:**  Understood.

20        **THE COURT:**  All right.  Let's start.  Representatives

21   of the ACLU, are you out there?

22        **MS. RANEY-GRAY:**  Yes, Your Honor.

23        **THE COURT:**  Please stand.  Now, who are you?

24        **MS. RANEY-GRAY:**  I'm McKenna Raney-Gray with the ACLU

25   of Mississippi.

1          **THE COURT:**  Okay.  How long have you been with the

2     ACLU?

3          **MS. RANEY-GRAY:**  Two and a half years.

4          **THE COURT:**  Welcome.

5          **MS. RANEY-GRAY:**  Thank you.

6          **THE COURT:**  I see someone else standing.

7          **MS. HILL:**  Yes, Your Honor.  I'm Ayanna Hill with the

8     ACLU.

9          **THE COURT:**  Okay, then.  Good morning to you too,

10    then.

11         **MS. HILL:**  Good morning.

12         **THE COURT:**  Okay, then.  Did I miss anybody who wants

13    the record to show you are present?  Terri, is there someone

14    else?

15         **THE CLERK:**  No, sir, that's all I'm aware of.

16         **THE COURT:**  Thank you very much.  As I said, this is

17    a status conference, and there are a number of items that I

18    would like to have addressed.  Mr. Henifin is going to lead the

19    discussions on these various matters.  I will leave some time

20    for questions and also some time for other topics that might

21    concern us after Mr. Henifin has gone down the list of those

22    matters that he and I have discussed that we would like to have

23    some airways on.  So Mr. Henifin, are you ready to go?

24         **MR. HENIFIN:**  Yes, Your Honor.

25         **THE COURT:**  How, Mr. Henifin, go to the podium,

1    please.  How are you today?

2         **MR. HENIFIN:**  I'm well.  How are you this morning?

3    Either with or without coffee.

4         **THE COURT:**  Yeah, but you know what that answer is.

5    Mr. Henifin, of course, knows that I've been sick, and I have

6    had COVID.  Nobody jump up and run, please.  My doctors tell me

7    I'm no longer contagious, and I have moved away from contagion

8    for the last four weeks or five weeks.  I am now in that

9    element of post contagion where now I'm just trying to get well

10   from how the disease has sort of affected my body, but I'm told

11   I am not -- I'm not active anymore, but I'm in that post stage

12   where my doctors are telling me that it's going to take some

13   time for my body to heal itself.

14        That is very disconcerting to me, as it would be to you,

15   but it is especially disconcerting because at the time that

16   COVID struck me for the second time, and the worst time, I was

17   in the midst of training for some athletic events, and those of

18   you who are out there that have been around me, you know how

19   I'm always doing contests.  So the half marathon was coming up,

20   and in addition, the triathlon was coming up.  That's where you

21   swim a half mile and then ride your bike for about 30 miles,

22   and then after that, you run or walk for five or seven miles

23   and then add up all your times to see how well you did.

24        I was ahead of my training schedule for that, as well as

25   ahead of my schedule for my bike, because this is during that

1    time period where I should be getting ready for my hundred-mile

2    bicycle ride.  So I was quite delighted that I was ahead of my

3    training for all of those, and then COVID had other ideas.  So

4    I had to go to the emergency room twice and had to visit with

5    my cardiologist three times because of the effects of COVID on

6    me.

7          And so I am now in the post COVID stage, but I can't do

8    anything athletic.  In fact, for me to walk from here to my

9    office is a strain, as Mr. Henifin, you saw me suffering.

10          **MR. HENIFIN:**  Yes, Your Honor.

11          **THE COURT:**  So I can barely walk, but it's going to

12    be okay, though.  So that's what I anticipate, that maybe

13    another two weeks of this stuff, because I've been down now for

14    about six weeks, I think.  But anyway, as soon as I get to

15    where I should be, then I will go back to my training, I hope.

16          In the meantime, this matter is set, and I can handle this

17    because for me to sit up here does not bother me as I would be

18    bothered if I had to actually walk somewhere.  So now that I'm

19    seated, I'm okay.  But when I get ready to leave out of here,

20    it's not going to be okay.

21          Now, Mr. Henifin, we met earlier --

22          **MR. HENIFIN:**  Yes, Your Honor.

23          **THE COURT:**  -- and talked about the subjects that

24    need to be discussed at this status conference, and I had asked

25    that you give us a list of those so that everybody here would

1    understand which ones are on the list to be discussed.  And

2    could you, then, very slowly read off that list, Mr. Henifin?

3              **MR. HENIFIN:**  Yes, Your Honor.

4              **THE COURT:**  So that everybody here knows the order in

5    which we will take these subjects and what those subjects would

6    be.

7              **MR. HENIFIN:**  Yes, Your Honor.  So the first item

8    will be an update on the last quarterly report and the status

9    of the water and sewer systems, which I will provide.

10             **THE COURT:**  Okay.

11             **MR. HENIFIN:**  The second item is related to the EPA

12   grant funding and some discussion around how that process is

13   moving forward.

14             **THE COURT:**  The grant funding, that is, how the

15   mechanism you receive your moneys --

16             **MR. HENIFIN:**  Yes, Your Honor.

17             **THE COURT:**  -- to try to satisfy your indebtedness to

18   all of the project managers on the various ones that are being

19   operated.

20             **MR. HENIFIN:**  Yes, Your Honor.

21             **THE COURT:**  Next?

22             **MR. HENIFIN:**  The next item is on the SNAP data.  And

23   we have created a rate classification, customer classification

24   based on their receiving SNAP benefits.  We have had some

25   struggles getting the data we need to make the categorical --

1  the customers automatically put into that category if they are

2  receiving those benefits.  We will discuss where we are on

3  that.

4         **THE COURT:**  That's very important for us to discuss.

5  First of all, we want to provide some remedy to those who have

6  some difficulty in paying for water services, and we also want

7  to be sure that the public understands exactly where that

8  dilemma is at the present time, because this whole matter of

9  this SNAP data and approach was revealed some time ago, almost

10 a month ago, if not longer, when we looked at how we could

11 address that matter for those people who are financially

12 without.

13        **MR. HENIFIN:**  Yes, Your Honor.

14        **THE COURT:**  And we want to be sure that we've looked

15 at every opportunity to provide them some relief.  And we don't

16 want people to think that we have forgotten them because we

17 have not moved on that to the final completion.  So we want to

18 be sure they know exactly where we are and why we are somewhat

19 stalled on that matter.

20        **MR. HENIFIN:**  Yes, Your Honor.

21        **THE COURT:**  Correct?

22        **MR. HENIFIN:**  Yes, Your Honor.

23        **THE COURT:**  Okay.  Next matter.

24        **MR. HENIFIN:**  And then there's the lawsuit from

25 Lakeland Seniors.  It's a senior facility here in Jackson.

1  They are asking your permission to -- or you are granting them

2  leave to sue myself, JXN Water, over some flooding that

3  occurred before we were even in existence.

4          **THE COURT:**  Okay.  And they have to get permission

5  from this Court --

6          **MR. HENIFIN:**  Yes, sir.

7          **THE COURT:**  -- to wage a lawsuit against you and

8  others connected with this court matter.  And I will hear them

9  as to what they wish to say on that particular point before we

10  adjourn.  Now, is there another subject?

11          **MR. HENIFIN:**  I believe the rest would be open for

12  future updates and any other items you want to take up, Your

13  Honor.

14          **THE COURT:**  Okay.  So that's what we plan on

15  discussing.  On this last matter, the one involving this

16  lawsuit, which is asking for permission to proceed, you have

17  with you your counsel; is that correct?

18          **MR. HENIFIN:**  Yes, Your Honor.

19          **THE COURT:**  Now, introduce your lawyers again.  Of

20  course, I know who they are, but let's make sure that the

21  record is clear that they are here.  So introduce them again.

22          **MR. HENIFIN:**  We have Mitch McGuffey, Paul Calamita,

23  and they will be discussing the Lakeland -- we have developed

24  the motion on Lakeland.  They will be discussing that in

25  detail.  I will also ask them to discuss the SNAP issue when we

1    get to that.

2          **THE COURT:**  So your counsel have filed a motion in

3    regard to the lawsuit.

4          **MR. HENIFIN:**  Yes, Your Honor.

5          **THE COURT:**  And what is the title of your lawsuit,

6    the motion?

7          **MR. MCGUFFEY:**  Your Honor, just for clarification,

8    Lakeland Seniors is the one -- is actually the movant.  They

9    have filed a motion for leave to file suit against JXN Water.

10   We have filed responses in opposition for a bevy of reasons

11   that I'm happy to go over now or when we get to that issue.

12         **THE COURT:**  No, no, just wait.  I will get to you

13   later.

14         **MR. MCGUFFEY:**  That will work.  But the motion itself

15   is filed in the consolidated docket, I believe it is Document

16   Number 50.  It is a motion for leave to sue JXN Water.

17         **THE COURT:**  Okay.  You heard the list of topics to be

18   discussed, and so I put that down near the end of the four

19   topics that we are going to discuss right off with Mr. Henifin

20   and with you.  But you will have the opportunity to make a

21   presentation on this matter concerning the lawsuit.

22         **MR. MCGUFFEY:**  Your Honor, before we get to that,

23   counsel for Lakeland Seniors has not appeared today.  Do you

24   want me to reach out to them?

25         **THE COURT:**  Would you do so, please?

1          **MR. MCGUFFEY:**  I would be happy to.

2          **THE COURT:**  And I was going to ask you that same

3   question because I didn't see them here either, and I wanted

4   them here to hear you on this matter.

5          **MR. MCGUFFEY:**  Yes, Your Honor.

6          **THE COURT:**  So there are four major topics that I

7   wanted us to cover.  And perhaps some people in the audience

8   representing other organizations would have some additional

9   topics they would like to inquire about, and so then I intend

10  to take those two.  So we are all set up to go through all of

11  these matters.  And after each one of these topics, then I will

12  open the floor for discussion on that particular topic so that

13  we can keep the apples and apples together as opposed to

14  combining the apples and the oranges and so that we can know

15  exactly where we are on each one of these topics.

16         Now, Mr. Henifin, are you prepared to go forward now?

17         **MR. HENIFIN:**  Yes, Your Honor.

18         **THE COURT:**  Okay.  Mr. Henifin, of course, everybody

19  here knows who you are.  And could you then introduce yourself

20  and give just a brief background on how we come to this spot

21  with you?  Again, all of us know that, but nevertheless, if

22  someone from outside this circle picks up this transcript, then

23  I want them to fully understand who you are and how you got to

24  be where you are.

25         **MR. HENIFIN:**  Yes, Your Honor.  I'm Ted Henifin, the

1    interim third-party manager.  I was named that in the interim

2    stipulated order signed on November 29, 2022, in the water

3    case.  And in October of this year, October 5th, I believe the

4    actual order was signed for the sewer case.  In both cases I'm

5    the interim third-party manager to basically manage and operate

6    and get the water system stable as well as sustainable moving

7    forward.  There's a list of projects in both of those that I'm

8    to initiate and get moving, and -- we lost video or maybe

9    lost --

10              **THE COURT:**  Are you saying we lost some connection?

11              **THE CLERK:**  We lost our video connection.

12              **THE COURT:**  Go ahead and get us back together.

13              **THE CLERK:**  They are back.

14          **MR. HENIFIN:**  They are back.

15        (Off-Record)

16          **MR. HENIFIN:**  So that's what got us here was the four

17    parties that negotiated the interim stipulated order.  The City

18    of Jackson, Mississippi State Department of Health, the EPA,

19    and the Department of Justice came together and negotiated an

20    order and produced it and presented it to you for signing,

21    which you did, and in that order, the four parties agreed to

22    name me as the interim third-party manager.  I'm still not

23    exactly sure how I got to that point, but I've taken the job

24    and trying to do my best to improve the water and sewer system

25    here in Jackson.

1          **THE COURT:**  All right.  Now, then, Mr. Henifin, let's

2     take up topic number one.

3          **MR. HENIFIN:**  Sure.  It's great -- it's happy when

4     you can come in front of the Court and talk about some real

5     positives that have happened over the course of the last year.

6          We now have the water system operating.  To our knowledge,

7     no one has seen it operate this way in over 20 years.  We have

8     one member of our staff who has been working in the Jackson

9     Water System for 20 years.  No one can recall when the system

10    actually operated the way it was designed.

11         The water systems are designed to treat water from your

12    water source and pump it into a series of pipes, push it out

13    through your community.  You have a number of elevated storage

14    tanks throughout the system that during periods of low use,

15    typically in the middle of the night, water flows into the

16    tanks, and then during the times of the day when people are

17    using water, it comes out of the tanks, but it is set at an

18    elevation to create pressure in the system, and you do that

19    throughout the system.  So in an ideal world, you are pumping

20    water at a pretty constant rate out of your treatment plants.

21    It serves folks' needs, and as it needs additional water, the

22    tanks provide that water and pressure throughout the city.

23         Prior to this, we were trying to create all the pressure

24    from our two treatment plants, the O.B. Curtis plant up near

25    the reservoir and the J.H. Fewell plant down here at waterworks

1    curve.  We had to push as much water and a high pressure into

2    the system at that point to try to get it to go through the

3    whole system.  A combination of the valves we have opened, the

4    pipes we have fixed, have allowed the system to start behaving

5    the way the water system was designed to behave.

6        As a result, we have been able to take plants offline for

7    periods of time to do required maintenance, which we have never

8    been able to do before without impacting the rest of our

9    customer base.  We have been able to reduce the pressure coming

10   out of the plants, which will help us from breaking pipes as we

11   move forward.

12       We have also seen the demand drop down to somewhere

13   between 40 and 42 million gallons a day.  This summer we were

14   above 58 million gallons a day, largely due to leakage or loss

15   of water throughout the system.  So we are gaining on the

16   reduction in losses.  We are gaining because we are not having

17   to put it out as a high pressure, and the lower pressure we can

18   put water out, the less is going to squeeze out in some of

19   these unfound leaks.

20       We are still highly committed to finding the rest of the

21   leaks.  We are still losing a tremendous amount of water.  We

22   have got much better data today than we have had in the past

23   through our meters.  About 98 percent of our new meters are

24   installed.  They are AMI meters, meaning they send a signal

25   every hour to let us know how much water has gone through the

1   meter on an hourly basis.  We can see things that we have never

2   been able to see, like property that might have a leak on it.

3        During the freeze, we identified some high-use meters that

4   we were seeing a lot of water go through them on vacant

5   property.  One in particular that has been our poster child for

6   this has been the former putt-putt and golfing facility on

7   North State Street.

8            **THE COURT:**  Tell us about that.  You have already

9   briefed me on that.  But we are talking about a facility on

10  North State Street that was an amusement park, putt-putt, and

11  it's been there for years and years and years.  In fact, it

12  might have been there when I was in high school, which means

13  that it is really a relic.

14       Now, that facility at one time was highly used, but then

15  over the course of time, it has gone into disrepair and has not

16  been utilized like it was at one point.

17           **MR. HENIFIN:**  Correct.

18           **THE COURT:**  Now, then, it is a facility that covers a

19  number of acres, and I believe there's a -- isn't there a

20  driving range out there too?

21           **MR. HENIFIN:**  There was a driving range in the back.

22  Yes, Your Honor.

23           **THE COURT:**  Right.  It was a driving range, a golf

24  driving range out there.  And then there's the putt-putt, and

25  it was out there, but that facility currently is closed.

1    **MR. HENIFIN:**  It looks very abandoned.  I've only got

2    history in Jackson since the fall of '22, and I know it's

3    looked abandoned since the time I've been here driving past it.

4    I can't tell you when it became abandoned, but I can tell you

5    it is very abandoned.

6          **THE COURT:**  But I think it has been abandoned for

7    quite awhile.

8          Now, then, that facility, nevertheless, at one time

9    consumed a lot of water, but it was not consuming -- it has not

10   been consuming water lately.

11         **MR. HENIFIN:**  It should not have been.

12         **THE COURT:**  Okay.  Now, you investigated that because

13   you investigated that facility and its consumption of water, or

14   what might have been a consumption, along with other leaks at

15   facilities that did not, should not have been registering as

16   utilizing water.

17         So, question, how large is that facility?

18         **MR. HENIFIN:**  So the amount of water that was being

19   consumed at that point in time when we were looking for

20   large-using meters was about 600,000 gallons a day.

21         **THE COURT:**  600,000 gallons per day?

22         **MR. HENIFIN:**  Yes, Your Honor.

23         **THE COURT:**  Now, give me another comparison so I know

24   what 600,000 gallons a day would amount to.

25         **MR. HENIFIN:**  You trust my math skills right now?

1          **THE COURT:**  No, I'm just saying how many residences

2    would that have covered?

3          **MR. HENIFIN:**  A normal residence would use about 300

4    gallons a day.  So 600,000, that's 2,000 residences --

5          **THE COURT:**  About 2,000.  And we are talking about

6    treated water?

7          **MR. HENIFIN:**  Yes, Your Honor.

8          **THE COURT:**  That means it's been to the plants.  It's

9    water that's been drawn off the reservoir and treated, and then

10   it was sent to the homes?

11         **MR. HENIFIN:**  Correct.

12         **THE COURT:**  So in this particular case, the water was

13   sent out to this facility, but it was just sitting there,

14   correct?

15         **MR. HENIFIN:**  Yes, Your Honor.  There shouldn't have

16   been any use at the facility at that point in time.

17         **THE COURT:**  And did you find that the water had

18   actually been utilized by anybody?

19         **MR. HENIFIN:**  The abandoned property looked a lot

20   more like a wetland when we approached it in January.

21   Hopefully it has dried up since we turned the water off, but

22   yes, there was a huge area that basically was just flooded on

23   the property.

24         **THE COURT:**  And this is treated water that was

25   sitting there in a flood-like situation?

1              **MR. HENIFIN:**  Yes, Your Honor.

2              **THE COURT:**  Now, so you went out there with your crew

3     to investigate.

4              **MR. HENIFIN:**  Yes, Your Honor.

5              **THE COURT:**  Now, pick it up from there.  What did you

6     find?

7              **MR. HENIFIN:**  So we found there was definitely water

8     there.  We searched for the meter, found where the meter was

9     installed and had the meter shut off and removed, since there

10    was no longer anybody using the water.  So we were able to stop

11    that flow entirely.  But again, that's a reduction of 600,000

12    per day that we were putting through the system just to be

13    dumped out on an abandoned piece of property.

14             **THE COURT:**  Okay.  So that matter has been rectified?

15             **MR. HENIFIN:**  Yes, Your Honor.

16             **THE COURT:**  In order for that water to be

17    reactivated, that is, continued to flow, what would have to be

18    done?

19             **MR. HENIFIN:**  The property owner would have to repair

20    the leaks so that when we turn the meter back on, you would not

21    see flow, basically pressure test the system before we can turn

22    the meter back on.

23          The nice thing about our meters right now, again, we get

24    hourly reads from all of them, so we can see exactly when they

25    are leaking.  And if the water consumption never goes to zero

1    during a day, it typically indicates that there is leaking

2    water somewhere on the property, whether it is a drip in a

3    faucet or a running toilet that the owner might not know about,

4    or in this case, a large discharge into an abandoned property.

5         We had a church that had a broken line in the woods behind

6    their property that was part of their service.  We continue to

7    find these through better data.

8         The meter project, for the record, I was against at this

9    time last year.  I was trying to find ways not to install

10   meters.  They have proven to be very valuable data tools for us

11   to see leaks in the system, identify places we need to look

12   harder.  So we are actually going to add some data analysis

13   contractors to help us look at this data in a closer manner to

14   make sure we are picking up every place that might have excess

15   water usage.  And in the case of existing residential

16   commercial customers, be able to reach out to them and let them

17   know that we are seeing excessive use through their meter, and

18   they might want to look at investigating their own property for

19   leaks to avoid those high bills that would be associated with

20   those leaks.

21        **THE COURT:**  Now, I'm not sure that at the present

22   time you have the statistic that I'm about to ask you about.

23   At one time when -- well, back when we first started, we looked

24   at the amount of treated water that was earmarked for the homes

25   in Jackson and how much of that treated water was actually

1    arriving at its intended destination.  I seem to recall that at

2    one time that you advised me that only about 54 percent or

3    somewhere around in there was actually making it to the homes,

4    and the rest of the treated water was a mystery because it was

5    not reaching the intended homes or businesses, which meant that

6    there were some leaks along the way that had to be discovered

7    and addressed.  Otherwise, the pipes were losing all of this

8    treated water with the concomitant loss of person power,

9    chemicals, time, not to mention trust in the system by the

10   public.

11        Now, how close was I on the amount of water that was

12   actually being delivered?

13        **MR. HENIFIN:**  It was really about a third was getting

14   to the meters.  And when we were doing this last year and using

15   some national averages and estimates based on the number of

16   properties we served, we thought that it was somewhere around

17   15 million gallons a day should satisfy our customers.

18        We now have better data, again, through the meters.  We

19   know that it varies between 15 and 18 million gallons a day is

20   what goes through the meters to our customers.  We had been

21   putting out in excess of 50 million gallons a day up until

22   January, and then after the freeze, we fixed a few things,

23   including the golf course waste of water and some others.  We

24   are down now to about 42 million gallons a day going out of the

25   plants, 18 million gallons a day being consumed by our

1    customers, leaving that delta of 26 million gallons a day

2    still, somewhere in the 16 million to 26 million gallons a day

3    still being lost.  So we have made progress, but we are nowhere

4    near where we need to be.

5            THE COURT:  Okay, then.  So what you are telling me

6    is that we are still losing some water through leaks?

7            MR. HENIFIN:  At least 25 million gallons a day,

8    maybe, somewhere in that range, down from 30 or 35.  It's a

9    positive.  We are moving in the right direction.

10            THE COURT:  Right.  And this has a cost, as I stated

11    earlier, a cost due to personnel involvement, which means their

12    efforts to provide safe, clean water has come to naught with

13    regard to that amount of water that is being lost and that

14    amount of water which has not made it to its intended

15    destination.  Some of that water has simply proceeded back into

16    the soil when it has been lost through the pipes.  Is that

17    correct?

18            MR. HENIFIN:  I think the majority at this point, for

19    what we are looking for, we have largely found I think most of

20    the visible leaks that are breaching the surface, or a great

21    number of those, but I believe what we are finding -- what we

22    believe is happening today is that water is leaking out of

23    breaks in water lines under streets and under dirt and moving

24    its way to find its path of least resistance, which ends up

25    into a broken sewer line, and then the water moves to our sewer

1  treatment plant, having never been used by anybody.

2       We now have data on the characterization of the sewage

3  going into the treatment plant at Savanna Street, which is our

4  main wastewater treatment plant, and it's about one-third of

5  the concentration you would expect for regular sewage, meaning

6  it is highly diluted.

7       We also don't see a change in flow during the day that you

8  would expect.  People use their water when they wake up in the

9  morning.  A lot of water goes into the sewer with morning

10  showers, getting ready for work, getting ready for school.  It

11  flattens out during the day a significant amount, maybe a

12  little bump at lunchtime, and then when everyone gets home,

13  fixing dinner, washing clothes, doing the things they do, we

14  see a second peak.  So they call that a diurnal pattern that

15  you see in sewage.  It's an interesting thing to watch how the

16  sewage use goes during the day.

17       We don't see the diurnal pattern at our sewer treatment

18  plant, the Savanna Street plant, meaning there's some source of

19  consistent water filling those sewage pipes.  We are confident

20  that's where the majority of the 20-million-plus that we are

21  losing is somehow getting into the sewer maybe in multiple

22  locations throughout the city.

23       We are now turning our investigation into how do we find

24  where that is getting in and how do we correct it so we fix the

25  water lines and the sewer lines so that the water is not

1    flowing out of the water lines and into the sewer lines.  So

2    that is a re-prioritization for where we are looking for leaks.

3    We expected it somewhat, but we just received the data in the

4    last couple of months to really highlight the fact that what's

5    getting to the sewage treatment plant is highly diluted and it

6    doesn't have this pattern you would expect to see with just

7    sewage where you can see this diurnal pattern during the day.

8           **THE COURT:**  And please tell us how this affects water

9    pressure across the city.

10          **MR. HENIFIN:**  All of those leaks make it harder to

11   maintain pressure.  So as we continue to find and fix those

12   leaks, the system pressure should --

13          (Telephone interruption).

14          **THE COURT:**  That was my doctor's office calling.  He

15   wants me.

16          **MR. HENIFIN:**  Don't miss your appointment, Your

17   Honor.

18          **THE COURT:**  What I'm saying is, they want my body.

19   Go ahead.

20          **MR. HENIFIN:**  So the combination of these things have

21   really changed our focus to finding where the drinking water is

22   getting into the sewer and ending up at the treatment plant.

23   At least now we have got a new target, and that's really

24   because we have received new data to help us understand that.

25   And we really do think we have maxed out on the visible leaks.

1    We still get leaks every day, breaks.  We have got crews

2    working on them.  But the major leaks, like the golf course one

3    that you visited, and we had another one down off of McDowell

4    Road that was similar in size, and again, we had the

5    600,000 gallons a day at the golf course.  So we are picking up

6    the big ones, and we are continuing to work on the small ones

7    as they occur, but we are really focused now on how is it

8    getting from the water system to the sewer system.

9        But again, from a system pressure standpoint, the system

10   is holding pressure very well because of the way the system is

11   operating with the elevated tanks and the lower pressure is

12   coming out of the plant.  We have now opened almost 360 valves

13   that were closed on the system, which, again, is why it is

14   working better.  And we have fixed 11 valves that were frozen

15   totally and couldn't operate.  We have had more than a thousand

16   leaks repaired.

17       And the boil water notices continue to be issued on a

18   small scale around these fixes.  So those aren't going to go

19   away anytime soon.  There are a lot of people focused on boil

20   water notices.  They haven't been -- the last quarter there

21   were no -- up until the last -- the whole last year, we didn't

22   have any citywide boil water notices.  We had the little bobble

23   with the Mississippi Department of Health on an E. coli issue

24   that caused a one-day, day-and-a-half citywide outage.  That

25   was in early January.  You are aware of that issue.  We talked

1    about that.

2         **THE COURT:**  Why don't you say something else about

3    that because we were dismayed about that boil water notice.  So

4    why don't you say something about that because --

5         **MR. HENIFIN:**  Yes, Your Honor.

6         **THE COURT:**  -- that boil water notice doesn't appear

7    to have been justified.

8         **MR. HENIFIN:**  So the requirement for the water system

9    is to test in this distribution system.  There are 120

10   locations that we test.  You draw a sample and you are looking

11   for fecal bacteria in those samples, and we do that every month

12   from those 120 locations, so we are constantly pulling samples.

13   The only certified lab to do those samples in Central

14   Mississippi is the state labs.  We have a contract with the

15   health department's laboratory.  And we turn those samples in

16   to the State, and they do the analysis and provide the results.

17        In this particular case, we turned in our samples for that

18   particular day.  We don't sample all 120 in the same day.  It

19   is throughout the month.  It makes it easier on our staff to

20   get their rounds done.  They turn those samples in for analysis

21   usually in the afternoon, and then we get results.  It's an 18

22   or 24-hour test, depending on which method they are using.

23   They will provide us the results.

24        This is done by water systems, community water systems

25   across the United States.  It's a very routine process.  Rarely

1    do you get a positive test for fecal bacteria, and in this case

2    it was E. coli.  And we were notified of the positive test the

3    day after we turned in the samples.  We also learned that

4    neighboring community, Flowood, had two positive tests as well

5    at the same time.  It seemed a little suspicious just because

6    they are so rare to happen, to have two communities have two

7    samples basically in the same analysis period to have positive

8    E. coli results.  It seemed suspect.

9         The EPA procedures, the rules allow a second confirmation

10   sample to be taken the next day, both from the locations that

11   tested positive and then upstream and downstream of those

12   within your system.  We took those samples as soon as we heard

13   that the first set of samples had the positives.  Those were

14   tested the next day, and they turned out to be negative, which

15   indicated that perhaps it was a false positive the first day,

16   but without confirmation, EPA doesn't assess any penalty or any

17   violation.  Essentially, it should have just gone away after

18   the confirmation.

19        Unfortunately, EPA has given primacy to the states for all

20   of the drinking water enforcement requirements.  States can be

21   more stringent than the federal standards.  They can't be less

22   stringent.  In this case, Mississippi has taken an extremely

23   conservative approach in the past where the minute they get the

24   positive E. coli first sample, unconfirmed, they issue a boil

25   water notice.  So that's what they did in this case.  They

1    lifted it after we got the confirmation samples back, but

2    again, I have understood they have made some emergency changes

3    to their process to align with the EPA standards onboard, and I

4    think that ultimately will be put into their regulations for

5    the process.

6        So at the end of the day, I think we are going to be in

7    alignment with EPA for future issues like this where we would

8    get opportunity to provide confirmation samples before the boil

9    water notices are issued citywide.

10            **THE COURT:**  So that boil water notice did not

11    indicate a backwards step?  It did not indicate that there was

12    some sort of oversight or failure on the part of JXN Water?

13            **MR. HENIFIN:**  Correct.  I mean, it's a problem that

14    when you have the boil water notice because you have those

15    positive E. coli samples, that is a failure.  You have got some

16    sort of bacteria entering the water system, and you've got to

17    figure out why and how.  But the confirmation sample said it

18    isn't in the water system, so we had no further action at that

19    point.

20            **THE COURT:**  Right.  So the confirmation system didn't

21    confirm?

22            **MR. HENIFIN:**  Correct.

23            **THE COURT:**  The confirmation system that ordinarily,

24    if there was a problem, would have said that, yes, you have

25    some E. coli in your system?

1          **MR. HENIFIN:**  Yes, sir.

2          **THE COURT:**  But when this matter was retested, even

3     the very next day, that confirmation system did not confirm

4     that we had E. coli in our system?

5          **MR. HENIFIN:**  Correct.

6          **THE COURT:**  Now -- and that testing procedure, that

7     protocol, is there for just that reason, to determine if a

8     water system actually is experiencing a problem or whether this

9     is sort of a haphazard result that could be the result of just

10    some error on the test part.

11         **MR. HENIFIN:**  The sample could have gotten

12    contaminated during the sampling process, the lab could have

13    had an error during the analysis process, lots of places for

14    error in that whole process.  And it's amazing we -- when I'm

15    using "we," it's water systems across the United States --

16    don't have more problems when you are looking at how

17    challenging it is to get a very clean sample into a sterile

18    bottle to a lab and get tested in a fairly short period of

19    time.  It is ripe for problems and errors, but the system works

20    very well as it currently stands.

21         **THE COURT:**  We were concerned about there being an

22    error because, according to the report on this E. coli from two

23    different water systems, they were essentially identical in

24    their report, but nevertheless, the water would have emanated

25    from two different water systems.

1          **MR. HENIFIN:**  Correct.

2          **THE COURT:**  And that seemed to be strange that you

3    would get almost identical findings from two different water

4    systems but nevertheless have a report on the same E. coli.

5    When they retested, they didn't find confirmation.

6          **MR. HENIFIN:**  Correct.

7          **THE COURT:**  And then when we retested, we did not

8    find any confirmation.

9          **MR. HENIFIN:**  Yes, Your Honor.

10          **THE COURT:**  So then we were concerned as to the

11    potential of error in a matter of that situation where it just

12    didn't seem to pass the test of confirmation, and it just

13    seemed as though there were two systems that were reporting the

14    same findings on one day but not reporting it thereafter.  But

15    meanwhile, the boil water notice had gone out, which alerted

16    the public.  And unfortunately, some of the public thought,

17    here we go again on boil water notices.  When we did the

18    confirmation tests, we saw there was nothing we needed to do

19    because it looked like that whole matter was just an error of

20    some type.  Now, is that what we found?

21          **MR. HENIFIN:**  And I know the health department, to

22    their credit, lifted the order as soon as we got our

23    confirmation sample.  That's not what they normally would have

24    done, so that's nice and in short order.  I know they have done

25    a complete review of that process.  They didn't find error that

1    really happened.  If an error happened in the lab, they weren't

2    able to determine it at point in time.

3        So it still remains a mystery somewhat as to how we got

4    the positive E. colis from Flowood and ours, but I think,

5    again, the positive is that the procedures are changing to wait

6    for a confirmation sample before they would issue a boil water

7    notice.

8            **THE COURT:**  And as I said, what alerted us initially

9    to the possibility that this was simply a mistake is that we

10   have virtually identical findings from two different systems,

11   two different water systems.  And then when both performed the

12   test again, neither registered positive.  And so that's what

13   initially called our attention to this whole matter.

14           **MR. HENIFIN:**  Yes, Your Honor.

15           **THE COURT:**  And thus even though that was the case,

16   we still didn't just conclude that that must have been a

17   mistake.  We still went back into our system to check to see if

18   there was something we should know about, and we found nothing.

19           **MR. HENIFIN:**  Yes, Your Honor.

20           **THE COURT:**  Is that correct?

21           **MR. HENIFIN:**  Yes, Your Honor.

22           **THE COURT:**  And the other system also checked, and

23   they found nothing.

24           **MR. HENIFIN:**  Yes, Your Honor.

25           **THE COURT:**  So then the question was, where did it

 1    come from?  And the only thing we could conclude was that it

 2    was a giant mistake.

 3          Now, anything else on this update?

 4          **MR. HENIFIN:**  So I was going to go quickly to the

 5    sewer side of the house.

 6          **THE COURT:**  Hold it.  Don't move.  Terri, come here.

 7          (Off-Record)

 8          **THE COURT:**  Now, to the sewage problem.

 9          **MR. HENIFIN:**  Just a quick update there that was in

10    the quarterly report as well.  We have priority projects listed

11    there.  Number two is the 215 locations that had dry weather

12    overflows at the time we entered the order.  We have resolved

13    44 of those completely and 45 were under construction at the

14    beginning of January.  We think by now we've got all of those

15    done by now as well, so we are somewhere close to 100 complete

16    out of the 215 in the first quarter, a little over the first

17    quarter.  So you recall when we are talking about this last

18    July, we thought it might take three or four years to get to

19    all of those, and we are making great progress.  We feel real

20    positive.  We have the staff and contractors doing that work,

21    and they are really doing a fabulous out there to resolve these

22    longstanding issues within neighborhoods.

23          Priority project number 3 is cleaning and TV inspection

24    contracts.  We are required under the order to do a hundred

25    miles per year.  In this first quarter, we completed just under

1   25, so slightly under pace to get to the hundred, but we will

2   pick it up.  Again, we had to start things from scratch, so we

3   expect to easily meet that hundred miles of cleaning and TV

4   inspection done by the end of the year.

5        On priority project number 4, that was investigating the

6   outstanding 2200 open service requests that we got from the

7   city.  We have done more than -- we have investigated more than

8   1300 and cleared those and closed those up to this point.  So

9   we are on pace to get the rest of those done this quarter and

10  perhaps be done by the end of this current quarter and

11  investigating those outstanding.  And a lot of those just

12  hadn't been looked at, and so when we get to them, we went out

13  there and they had already been resolved but just hadn't gotten

14  the paperwork cleaned up.  So that work is in process.

15       We responded to 128 new sanitary sewer overflows during

16  the quarter.  Most of those we were able to resolve unless they

17  were on the private property piece of the overflow.  We have a

18  lot of overflows that occur because of the sewer line that goes

19  from the house to the main line, and most of those are in the

20  right-of-way.  So the current situation for Jackson is that we

21  have got the property owner responsible for the sewer line from

22  their house to the main sewer line.

23       One example has been a woman that lives on Raymond Road.

24  The main is toward the other side of the street from her.  You

25  would have to dig up two lanes of traffic on a big road to fix

1    her problem in her line.  We think that is a real challenge

2    going forward, and we are going to propose to the parties a

3    process to where we might be able to change that in the coming

4    weeks.  So that proposal will come so that we can take some

5    responsibility and make those repairs on that privately owned

6    piece within that public right-of-way.  That is coming, but

7    that is where a lot of these SSOs continue to crop up and we

8    can't resolve because it is on private property.  It is

9    technically the line on the property, but we have some

10   solutions we are working on.

11       So we had one pump station sanitary sewer overflow during

12   the quarter, and we resolved that at the time we found it.

13   There are 99 pump stations, so there's a lot of opportunity for

14   some overflows there when the line leaving the pump station has

15   a problem, but we took care of that one.

16       We had no West Bank Interceptor overflows during that

17   first quarter, which is great.  We have had a few since then

18   this quarter, but we are working on, as another priority

19   project, just to understand what repairs are needed to keep the

20   West Bank Interceptor working and not overflowing.

21       And then we had prohibitive bypasses on Savanna Street.

22   And this is an ongoing problem.  So a prohibitive bypass, more

23   flow shows up at the treatment plant than can be put through

24   the process.  So then they divert that flow to some storage

25   basins, and then when those basins are full, they have to

1   divert it to the Pearl River.  That is something that we don't

2   want to ever happen.

3           So we have got a couple of things moving to try to help

4   address that, one of which is we are working with the Corps of

5   Engineers to develop a project to dredge these storage basins,

6   because they have lost a lot of capacity because they haven't

7   been cleaned out in a long time.  That will provide additional

8   capacity to hold the wastewater until the rain event drops down

9   and we can put it through our treatment process.

10          The other piece is, the treatment plant has some

11  maintenance and operation issues that keep it from running at

12  full capacity.  We are working hard to identify how we can make

13  those repairs so that the treatment plant can actually treat

14  more flow than currently is pushed through it.

15          So there are a couple of things happening there that

16  really weren't highlighted when we entered the order, and we

17  knew we had problems with the sewage coming out in the streets,

18  and that's job one.  If anything goes in anyone's houses, job

19  one, it's a big priority.  But we have had some wet weather

20  overflow issues which we knew we would have, and that's not

21  something we are totally focused on, but these bypasses at the

22  treatment plant are indicative of us really needing to make

23  some investments in the Savanna Street treatment plant to

24  eliminate that in the future.  We are working on that.

25          Other than that, I think the bottom line is we are making

1    great process in the relatively short time we have been

2    working.  We are at a year in the water system and one quarter

3    in the sewer system.  And I think the team we have put together

4    are both JXN Water staff and local contractors we are working

5    with, and the appreciation and support we are getting from the

6    citizens of Jackson has been overwhelming.  They thank our

7    contractors constantly.  They don't get upset when we have to

8    close roads and dig up yards.  They are very appreciative of

9    the work we are doing.  And we are all going to get through

10   this together, and we are making great progress towards that

11   end.  I think that's the positive we would like to leave for

12   this last quarterly report.

13       **THE COURT:**  Now, let's talk about the quantum of

14   complaints.  When we started this venture, there were numerous

15   myriad complaints about what was transpiring and not

16   transpiring.  A call center was set up, and even that had some

17   controversy because it was moved somewhere where it appeared

18   that that would be a better place to address all of these calls

19   that were coming in.  We kept track of the response times that

20   were being recorded for the critics of the system to be able to

21   report and to understand how fast we were getting back to them.

22       So then with regard to those caller oral complaints, how

23   has JXN Water fared?

24       **MR. HENIFIN:**  We are still seeing a high volume of

25   calls.  In fact, as we get more focused on billing and

1  collection, the call volume goes up as meters have been

2  installed.  We handled 30,000 calls last quarter, just

3  approximately 30,000, and we did those --

4  　　　　　**THE COURT:**  That is 30,000 over how many months?

5  　　　　　**MR. HENIFIN:**  Over three months.

6  　　　　　**THE COURT:**  Over three months.  And how many people

7  are answering these calls?

8  　　　　　**MR. HENIFIN:**  So we've got four dedicated during the

9  time frame between 8 and 5 on weekdays, but then the call

10  center itself has about 30 folks able to pick up other calls.

11  So our dedicated folks can do a pretty much deep dive and

12  resolve issues a little better than the rest of the staff.

13  　　　The way it is set up is there are specialties within the

14  call center.  We are not their only client.  They have got

15  multiple clients.  So there are folks that sit in the call

16  center, and if they are available and our call folks are tied

17  up, then the call rolls to one of these other less specialized

18  people to answer the call and either resolve the issue or

19  elevate it to someone else who can resolve it.  It hasn't been

20  perfect, but with those 30,000 calls, our average wait time is

21  just over two minutes, two minutes and one second.

22  　　　　　**THE COURT:**  You made a comparison at one point as to

23  what the response time was prior to JXN Water setting up this

24  center.  What was that response time?

25  　　　　　**MR. HENIFIN:**  The response time could be measured in

1    hours in the previous -- towards the end of Jackson's running

2    of their water system.  Their staff had been pretty decimated

3    at that point, just people leaving and not being replaced.  So

4    the wait times were excruciatingly long at that point in time.

5              **THE COURT:**  And you said hours, didn't you?

6              **MR. HENIFIN:**  Yes, sir.

7              **THE COURT:**  So does that mean that people just stayed

8    on the telephone line waiting to be heard?

9              **MR. HENIFIN:**  Yes, Your Honor.  We have all done it.

10   You know, maybe you put it on speaker and go about your

11   business while you are waiting for someone to answer the phone.

12   Whether it is a water complaint, or a credit card question,

13   unfortunately that's not heard of.  Trying to change an airline

14   reservation can take that long these days.

15             **THE COURT:**  And so now what is the average response

16   time?

17             **MR. HENIFIN:**  So it's a little over two minutes to

18   get an answer on the phone.  And there are cases where folks

19   have to wait longer.  That's an average.  There are some cases

20   where they get picked up on the first call.  And we still don't

21   have a great work order tracking system yet, so we don't have a

22   full tracking of every completed item that gets called in, but

23   that should go into effect here in the next few months.  We

24   have been building a lot of systems that weren't existing when

25   we got here, and we are making great progress there, but

1    there's still lots of work to be done.

2        **THE COURT:**  I want to highlight one endeavor in

3    particular which I think sort of sums up the lengths you have

4    been going to try to resolve some of these complaints.  Every

5    now and then I have some telephone call which advises me of a

6    complaint, and then I then pass it on to you.  And after

7    passing it on to you, then I monitor to see what transpired as

8    a result of that report.

9        These complaints run the gamut.  Some folk are complaining

10   about wet soil under their homes that they think contain some

11   contaminants.  Some complain of the woodwork in the house, the

12   flooring that they say has been contaminated and needs to be

13   addressed.  Some have gone so far as to say they think they

14   need to move out of their particular house because it has been

15   irretrievably damaged.  And then there are those who think that

16   they have contracted some disease from maybe some contaminated

17   water, and they want to be examined by some doctor or medical

18   professional to verify or to determine that they are wrong in

19   what they think.  I'm thinking about one in particular who

20   called me, and they called because they thought they had some

21   portion of everything I just stated, and then I passed it on to

22   you.

23       **MR. HENIFIN:**  Thank you.

24       **THE COURT:**  As I have on some others.  And I

25   mentioned this because you handled this last one I just

1    mentioned, just like you handled all the others, and that you

2    and your staff went out and investigated.

3        Now, without calling the name of our friend who had made

4    the complaints, who now, incidentally, is satisfied --

5            **MR. HENIFIN:**  That's good to hear.

6            **THE COURT:**  -- that you had made some deep

7    investigation on this matter, would you tell me what you

8    investigated?

9            **MR. HENIFIN:**  Sure.  In this case, we ended up

10   sending Dr. King -- we have a contract with a local

11   environmental firm.  Dr. King tested the air and water and soil

12   at the house and found --

13           **THE COURT:**  All right.  Now, Dr. King, tell me about

14   Dr. King's credentials.

15           **MR. HENIFIN:**  Dr. King has been in the business of

16   environmental testing and analysis for over 20 years, has their

17   own firm here in Jackson, highly qualified Ph.D., and

18   personally gets involved in these investigations, then again,

19   subcontractors that do some of the sampling and analysis, but

20   highly qualified right here local, a brilliant woman, great to

21   have her as a resource, and she is under contract with us to do

22   some of these investigations.  So she did a number of the

23   investigations.  We had the ditch cleaned next --

24           **THE COURT:**  Well, hold it.  Let's take one step at a

25   time.

1          **MR. HENIFIN:**  Yes, sir.

2          **THE COURT:**  So this caller had a number of concerns?

3          **MR. HENIFIN:**  Correct.

4          **THE COURT:**  First of all, she thought that her house,

5     which sits on blocks and had an air space under it, had been

6     contaminated by water that was disease-ridden.  Secondly, she

7     thought that this had impregnated the wood under her house.

8     Next, there's a ditch next to her house, and she thought that

9     the ditch had overflowed on more than one occasion, which led

10    to some problems.  And then she thought that this overflow

11    carried some contamination which had a deleterious effect on

12    her health.

13         Now, these were all matters that sorely concerned her.

14    She was highly disturbed because she said that she had been

15    trying to call to report these matters before JXN Water came

16    onto the scene for some two years, I believe, and that she had

17    been left on the telephone with no one answering, and that she

18    couldn't seem to get her complaint through.  And even when

19    someone finally came out, they gave her some answers that were

20    problematical to her because they didn't address what her

21    concerns were.  And it was at that stage where she called me up

22    and I then referred her to you.

23         Now, then, tell me what you did.

24         **MR. HENIFIN:**  So other than bringing Dr. King in to

25    do those investigations, I had the ditch cleaned out as well,

1    which we didn't find any problems with, but it could have used

2    a little maintenance, so we took care of that.  And then,

3    finally, I tried to go under the house myself, but I'm a little

4    too big.  There wasn't a great access.  It's a fairly low

5    house.  But I took photos at various locations to understand

6    what was happening under the house.

7            **THE COURT:**  Now, did you all snake some sort of

8    equipment under the house?

9            **MR. HENIFIN:**  I just stuck my hand and my camera in

10   at various locations.

11           **THE COURT:**  Okay.  So then you and your folk looked

12   under the house --

13           **MR. HENIFIN:**  Yes, Your Honor.

14           **THE COURT:**  -- and then tested the soil?

15           **MR. HENIFIN:**  We tested the soil.

16           **THE COURT:**  So then when you tested the soil, you

17   were looking to see if the soil was contaminated.

18           **MR. HENIFIN:**  Yes, Your Honor.

19           **THE COURT:**  What did you find?

20           **MR. HENIFIN:**  It was not.  We couldn't find any

21   contamination of any of the soil, any of the samples that were

22   taken, whether they were air, soil, water.  That covers what we

23   did.

24           **THE COURT:**  Now, this air sample that you are talking

25   about, you tested the air in the house?

1              **MR. HENIFIN:**  Yes, Your Honor.

2              **THE COURT:**  You also tested the wood that was under

3     the house?

4              **MR. HENIFIN:**  Yes, Your Honor.

5              **THE COURT:**  And you tested various places in the

6     house to see if they were contaminated.

7              **MR. HENIFIN:**  I'm not saying we are going to do this

8     every time someone has a complaint, but this one wouldn't go

9     away.

10             **THE COURT:**  I know, but this one was tested in the

11    manner in which it was because our caller was -- it showed

12    where she had made complaints for over two years.

13             **MR. HENIFIN:**  Yes, Your Honor.

14             **THE COURT:**  As well as the household across the

15    ditch, who had made complaints for over some two-year time

16    period and had not gotten a response.  And so then my thought

17    and your thought was that someone who has been waiting this

18    length of time to get an answer needed to get a complete

19    answer.

20             **MR. HENIFIN:**  Yes, sir, and she had moved out of her

21    house, Your Honor.  She wasn't even living in it then.  She was

22    afraid to live in it.

23             **THE COURT:**  That's right.  She moved in with her

24    daughter because she was concerned about all of this.  So then

25    you tested under the house, and you tested the ditch, even had

1    weeds and everything else cut down in the ditch.

2        **MR. HENIFIN:**  Yes, Your Honor.

3        **THE COURT:**  And that was infested with mosquitoes?

4        **MR. HENIFIN:**  Not at the time we cleaned it, but I'm

5    sure at some point it was.

6        **THE COURT:**  Yeah.  And then you made all of the

7    tests, and then you had Dr. King involved to explain to her

8    whether she actually had some sort of malady as a result of

9    that.  She has and had a malady, but it was not attributable to

10   any contaminated water.  She has a malady which I won't go

11   into, but it has a number of causes beyond contamination, and

12   she did not have any physician that said that she had a

13   contamination that caused her ailment because of any kind of

14   water.  And so then Dr. King examined her.  Is that correct?

15       **MR. HENIFIN:**  Well, provided the information.

16   Because she's not a medical doctor.  She provided her the

17   information she knew about, the connection between the

18   environmental issues, the environment she was in and the

19   particular malady she had and was able to explain there wasn't

20   a connection based on the results she had received.

21       **THE COURT:**  And then since I had been involved at one

22   time, then I wanted to get all the literature and read it and

23   get what I could from her on this medical matter and study it

24   to determine if any of that was involved in anything JXN Water

25   was doing, because her complaints started well before JXN Water

1   had gotten involved in this.

2          **MR. HENIFIN:**  Yes, Your Honor.

3          **THE COURT:**  Now, in terms of time, how much time did

4   you spend on that matter?

5          **MR. HENIFIN:**  We probably spent, over the course of

6   several months, maybe 40 man-hours, not including Dr. King's

7   contract.

8          **THE COURT:**  Okay.  The aim was to determine if her

9   complaint had any substance to it and to be sure that she

10  understood where JXN Water was coming from on this matter.

11  Now, didn't you talk to her personally?

12         **MR. HENIFIN:**  Yes, Your Honor.

13         **THE COURT:**  Didn't you also write her a letter?

14         **MR. HENIFIN:**  Yes, Your Honor.

15         **THE COURT:**  So haven't there been other people who

16  have had some concerns, but nevertheless, once they have been

17  afforded the information that you have discovered, recognized

18  that their complaint was not viable concerning what they

19  thought they had?

20         **MR. HENIFIN:**  Yes, Your Honor.  We have a process set

21  up for discolored water, odor -- odoriferous water or anything

22  like that.  We will first check the street to make sure there's

23  not a systemwide problem.  If we still find it, if we don't

24  find anything on the street, we report the house where the

25  complaint is, and if we need to at that point, we bring

1    Dr. King in to do water sampling and testing.  It only happens

2    maybe five times a month at this point.  But we do encourage

3    people if they are having discolored water, some challenge, to

4    please call the call center and let us know the address and the

5    time and we can investigate those.

6        We see some social media posts from time to time with

7    people showing pictures of brown water in the bathtub, but if

8    we don't have actual address and time, we really can't address

9    that.  And we do a lot of repairs.  We have done a thousand

10   repairs.  That might cause the water to stir up and might get a

11   little dirt in the lines at that point.  Even though it gets

12   super chlorinated, it has no health issues, it can cause

13   discoloration.  And we all know we still have hundreds of miles

14   of small diameter pipe that can cause discoloration with any

15   kind of disturbance in the flow in those neighborhoods that are

16   served by that small diameter pipe.

17       So discolored water is still going to be an issue, but

18   we've gotten systems in place to be able to respond and help

19   folks understand what the issue is, how to actually drain their

20   own -- flush their own house.  Many times we find it is a water

21   heater issue that started in the water heater in the house.  So

22   we have lots of -- we are getting lots of experience in dealing

23   with discolored water issues.  We just show folks that it's

24   safe, what the cause may have been, and how to resolve it by

25   flushing their own systems.

1          **THE COURT:**  Now, this discolored water, when that

2    discoloration is the product of pipes which fall under the

3    jurisdiction of the homeowner, then they are not within the

4    jurisdiction of JXN Water.

5          **MR. HENIFIN:**  Correct.  We will help advise them.  Is

6    it only discolored when you run your hot water?  If they say

7    yes, then we say likely a hot water issue.  You might want to

8    call a plumber.  You can drain your hot water tank entirely and

9    then refill it and see if that resolves the problem.  We try to

10   provide as much advice as we can around the issue and the

11   information we get from the customer.

12         **THE COURT:**  But if the pipe that is causing the

13   problem falls within the shoulders -- falls upon the shoulders

14   of the homeowner, then the homeowner has to make the repairs at

15   the homeowner's expense?

16         **MR. HENIFIN:**  Yes, Your Honor.

17         **THE COURT:**  I know it's kind of hard to state what's

18   an average cost of repair for something like that.  I know each

19   one may have to be evaluated on its own merits, because you

20   don't know how large the problem is, whether there is a main

21   pipe to the house or smaller pipe, how long the problem has

22   been going on.  But when your people go out to inspect all of

23   this, do they seek to give any kind of estimate as to how much

24   this might cost?

25         **MR. HENIFIN:**  No, Your Honor, we don't try to take a

1    guess at that, but we encourage them to call a local plumber to

2    come out and deal with their issues.

3           **THE COURT:**  And after you have made your

4    investigation, and recommended that a local plumber be called

5    in, do you explain to the homeowner why this is a matter for

6    the homeowner?

7           **MR. HENIFIN:**  Yes.  Overwhelming majority understand

8    that.  Once we have walked them through that and show them

9    we're not having an issue on the street, their neighbor is not

10   having an issue, it is definitely in their house, they seem

11   very accepting that we have done an explanation, we have done

12   an investigation, and they thank us.  And I'm guessing most of

13   them call a plumber and figure it out.

14          **THE COURT:**  Now, here's a question that we have not

15   discussed recently.  We discussed it some time ago, but we have

16   not come to a conclusion yet as to what can be done, but are

17   there moneys for which the homeowner can apply or might be able

18   in the future to apply for to address matters like this?

19          **MR. HENIFIN:**  There aren't any on the drinking water

20   side.  On the sanitary sewer side, that is where we find the

21   biggest challenges, they own the line from their house to the

22   sanitary sewer main, which is out in the street, and that

23   section that is in the right-of-way is the area that we have

24   some money for, as part of a supplemental environmental project

25   that was part of the original consent decree.  So we are still

1    working on some procedures on how to get that money in place

2    and let folks access those funds to fix that part of their

3    sewer service line that goes from their house all the way to

4    the street.  There are a number of cases where those need some

5    work.

6         **THE COURT:**  And do you have any idea how long it

7    might be before that system has worked out its kinks?

8         **MR. HENIFIN:**  I'm hoping within the next three

9    months, we will have that process and proposal.  We will

10   present it again to the parties and to the Court, and then I

11   will hopefully have a way to move forward from there.

12        **THE COURT:**  So can I say then at our next report,

13   quarterly report --

14        **MR. HENIFIN:**  Yes, Your Honor.

15        **THE COURT:**  -- I will hear more about how successful

16   that particular project is?

17        **MR. HENIFIN:**  It might be the following quarterly

18   report because we are already two months into this quarter, and

19   I can't guarantee we will get it in place by March, but by

20   June, the quarter that ends June 30th, we will definitely --

21        **THE COURT:**  That will tell us the number of people

22   that have been able to take advantage of some moneys?

23        **MR. HENIFIN:**  It will tell us how the process will

24   work from that point forward.  We probably won't have many that

25   have been able to take advantage yet, but we will have it in

1    place so that we can start advertising and promoting how that

2    project works.

3           **THE COURT:**  Do you know how much money will be set

4    aside for that type of project?

5           **MR. HENIFIN:**  There's $600,000 and some change for

6    that that the City had put aside for the supplemental

7    environmental project.  They had done some work under that.

8    That started with the consent decree in 2013, and I think they

9    did about $150,000 worth of work before we took it over and the

10   moneys were moved to JXN Water.

11          **THE COURT:**  Okay.  So this is something that's going

12   to be on the next report or the report after that?

13          **MR. HENIFIN:**  The following one, correct.

14          **THE COURT:**  But nevertheless, it will be the subject

15   of a report, and the public should understand that we are

16   sensitive to the problem and that we are working on it.

17          **MR. HENIFIN:**  Yes, Your Honor.

18          **THE COURT:**  Okay.  Thank you.  Now, then, is that the

19   end of your report?

20          **MR. HENIFIN:**  I think that's the end of the status

21   report.  Yes, Your Honor.

22          **THE COURT:**  Now, then, don't move.  Let's start over

23   here.  Do we have any particular question which deals with his

24   subject that you just heard?

25          **MR. FINGERHOOD:**  No, Your Honor.

1    **THE COURT:**  Okay.  Do you speak for your entire team?

2    **MS. WILLIAMS:**  He does, Your Honor.  The only thing I

3    would add has nothing to do with this.  We would ask for a

4    brief comfort break at the next available moment.

5    **THE COURT:**  We are going to do that.  This is the

6    next available moment.  I just wanted to go down the row and

7    see if there is something else, because then what we are going

8    to do is take a break.  And then when we come back after the

9    break, when Mr. Henifin has wet his whistle, then he will be

10    prepared to go to the next point.

11    Now, is there somebody else over here?

12    **MR. FURRH:**  Your Honor, the State doesn't have

13    anything.  That would include MDEQ and Mississippi State

14    Department of Health.

15    **THE COURT:**  Have I exhausted this side over here?

16    Let's switch sides of the aisle.  Over here.

17    **MR. WILLIAMSON:**  Yes.  The City of Jackson doesn't

18    have any questions, Your Honor.

19    **THE COURT:**  Okay.  Thank you.

20    Do we have anything else on it?  Anything else the legal

21    team wants to add on this subject that we just got off?

22    **MR. CALAMITA:**  No, Your Honor.

23    **THE COURT:**  So you are not going to create a

24    difficulty for yourself?

25    **MR. CALAMITA:**  No, sir.

1          **THE COURT:**  Okay.  Now, it's a status conference, and

2    I want to make sure that anybody who has a question can ask it.

3    So is there anybody sitting in the gallery who has a comment?

4    ACLU?

5          **MS. RANEY-GRAY:**  Your Honor, I don't have anything to

6    add, but I would defer to anything that my colleagues on the

7    Zoom would have to ask.

8          **THE COURT:**  Why don't you stand right there.  All

9    right.  Colleagues with ACLU, do you all have something that

10   you wish to add or question?

11         **MS. EARLY:**  No, Your Honor, not in relation to the

12   quarterly status report.

13         **THE COURT:**  Okay.  Anybody else?  I don't see any

14   hands.  One more time.  Anybody?  Ms. Early, are you hydrated

15   now?

16         **MS. EARLY:**  Yes, sir.

17         **THE COURT:**  Okay.  All right, then.  Thank you all.

18       Now, I'm going to move now to our next subject, but we are

19   going to take a break first.  My court reporter takes her

20   breaks at certain times, and I always want to make sure that

21   her delicate fingers can get the rest that her fingers deserve.

22   So we are going to take a break, and when we come back, we will

23   talk about the funding.  Correct?

24         **MR. HENIFIN:**  Yes, Your Honor.

25         **THE COURT:**  That will be the next one.  So for those

1    of you out there who are going to be with us on the next one,

2    then look through your notes on funding, grant funding, because

3    Mr. Henifin is going to discuss grant funding and some of the

4    situations that we need to bring to your attention.

5        So we are going to take a 20-minute recess, and my court

6    reporter -- Teri, is that enough time for you?

7            **COURT REPORTER:**  Yes, sir.

8            **THE COURT:**  Mr. Henifin, you have been working your

9    vocal cords.  Is that enough time for you?

10            **MR. HENIFIN:**  Yes, Your Honor.

11            **THE COURT:**  Okay, then.  Then we are going to come

12    back on grant funding in 20 minutes.  We will be in recess

13    until then.

14        **(RECESS TAKEN AT 11:41 A.M. UNTIL 12:19 P.M.)**

15            **THE COURT:**  All right.  We are back on the record.

16    Mr. Henifin, are you ready to go forward?

17            **MR. HENIFIN:**  Yes, Your Honor.

18            **THE COURT:**  The second item for discussion is grant

19    funding.  Now, let me just set this topic.  When you choose

20    projects and managers who will be working on these various ones

21    for JXN Water, then you have endeavored to only give projects

22    to those people who are reliable, competent, as a good manager

23    should be.  There's been a great deal of interest in these

24    projects around the city and outside the city.  Companies

25    outside the state and outside the city have applied.  And you

1   make the determination.  I don't get involved in making that

2   determination.  That is you.  But we have these people who have

3   applied, but early on, we found that there was one particular

4   area in which we had some trust issues in the sense that a lot

5   of the companies that wanted to do business were afraid they

6   weren't going to be paid timely.

7           **MR. HENIFIN:**  Yes, Your Honor.

8           **THE COURT:**  Apparently Jackson has developed a

9   reputation of not paying on time.  So my first question is, did

10  you find that to be true, that a number of project managers

11  complained that they were not being paid on time?

12          **MR. HENIFIN:**  Yes, Your Honor.  We started trying to

13  hire contractors.  That was the first thing that a lot of them

14  talked about was how am I going to get paid, how fast am I

15  going to get paid, will I get paid, due to the history they had

16  had in this region.

17          **THE COURT:**  In fact, I recall one sore topic that

18  astounded me when I was concerned about some of the pipes that

19  carry sewage were stopped up, and I couldn't understand why

20  their condition still persisted.  You might remember at one

21  point I was going to pay my own money out of my pocket and have

22  one of these environmental companies come in and drill out some

23  of these pipes.  One pipe bothered me so much because it was

24  close to a retirement home.

25          **MR. HENIFIN:**  Yes, Your Honor.

1          **THE COURT:**  And the sewage, the raw sewage was coming

2    directly out of the ground very close to that retirement home

3    for senior citizens.  And I said that I was going to go ahead

4    and go into my own pocket and pay this particular company to

5    come drill out some of the pipes, and I would not actually

6    recompense, and you told me to think carefully on that because

7    I was under the impression that we had one or two bad

8    situations, and the figure you gave me was 257.  So then you

9    asked me was I going to do all 257.  I didn't know that we had

10   that many.  That was the first tour that we had.

11         **MR. HENIFIN:**  Yes, Your Honor.

12         **THE COURT:**  So I decided that we needed to check with

13   the system, the City, to see if they had snake trucks, that is,

14   trucks that had the coil, the wire, and they could snake out

15   these particular pipes.  I was informed that there were three

16   such trucks that the City owned.  So then I thought, well, that

17   takes care of that issue.  Just get those trucks out there in

18   the field working, and we could accomplish a lot.

19         But then you informed me that that was not as simple

20   because the three trucks were not serviceable.  And I asked you

21   where were they, and you told me they were in the shop and they

22   had been in the shop for a while.

23         So then I said, well, why can't we just get them out?  And

24   you informed me that the City said that they couldn't get them

25   out right then.  Correct?

1          **MR. HENIFIN:**  Yes, Your Honor, that's my

2    understanding.  They didn't have the money to pay the bill at

3    that point.

4          **THE COURT:**  They didn't have the money to pay the

5    bill.  So these trucks were left in the shop.  Later on, the

6    City said it bought another truck.  I didn't quite understand

7    what moneys they used to buy a truck if they didn't have moneys

8    to get three of them out of the shop, but I need not worry long

9    because that matter was quickly explained, that that new truck

10   broke too.  And it went into the shop; is that right?

11         **MR. HENIFIN:**  I believe so, Your Honor.

12         **THE COURT:**  Well, and then after that, we had a

13   problem with no trucks being out there.  Well, the fact that

14   the City said, or somebody said the City said, that they didn't

15   have any money to get those trucks out of the shop, was

16   symptomatic of what some of the project managers were telling

17   us about the moneys they expected to be paid for the projects

18   they were working on for the City but could not get paid.  So

19   then when JXN Water took over, you had to deal with that image.

20         **MR. HENIFIN:**  Yes, Your Honor.

21         **THE COURT:**  So you were very, very concerned that JXN

22   Water would be able to show that it could pay its bills and

23   would pay its bills.  So there was a certain protocol set up to

24   pay these amounts, because otherwise, you would have problems

25   and did have some problems with some reputable companies not

1   desiring to work on Jackson projects, even though by that time,

2   it would be a project under the tutelage of JXN Water, because

3   they were afraid this was merely a carryover from the City.

4   And so they wanted to be paid because they had employees who

5   otherwise would go somewhere else to work or refuse to work on

6   the projects we wanted them to work on.

7        So all in all, we took that situation or that reputation

8   that the City had very, very, very seriously and just wanted to

9   be sure whether it was true or not that we paid our bills

10  timely.

11       So the mechanism that was in place at first was what kind

12  of mechanism?  Describe how it first worked before there was a

13  change.

14            **MR. HENIFIN:**  Yes, Your Honor.  The grant -- the

15  grant we are referring to is the larger of the two grants.

16  This is the one that pays for all the projects getting done,

17  and that was awarded to us in May of 2023.  At that point in

18  time, the process that's in place, was in place, was the grant

19  moneys would be loaded into this -- basically a portal, online

20  portal system where I could draw them down as necessary to pay

21  invoices and pay expenses.  The grant was approved in May was

22  approved at a level of $115 million and some change, and when I

23  prepared the grant application, you project how much you are

24  going to spend in the first, second, and third year of the

25  grant, and I projected 44 million for that first year.  So

1    every time I needed to pay an invoice, I could go online to the

2    system.  That money would be pulled down and put right into our

3    bank account.  And at the same time I could be paying the

4    invoice and trying to make sure that the invoice doesn't show

5    up at the bank before the money that the federal government has

6    loaded down.  And the system worked very, very well.  The

7    federal system puts money in the account the same day if you do

8    it before, like, 2:00 in the day and it is less than a million

9    dollars.  Otherwise, it is the next day.  The money goes right

10   into our bank account, the bills get paid electronically, the

11   next day, basically, to our contractors.

12        And we were finding this -- and again, largely I thought

13   this was going to be a challenging system back when we first

14   had conversations with the EPA on how this grant funding would

15   work.  It turned out the system worked very, very well, and we

16   got very used to being able to get an invoice, review it and

17   process it for payment within a day or two as opposed to weeks.

18   And our contractors got very comfortable with knowing that they

19   would see a payment in their bank accounts within a few days of

20   them submitting an invoice.

21        It is critical for our smaller contractors.  We have our

22   paving contractors, a very small contractor.  He is able to

23   bill monthly.  We have got one of our pipe repair contractors

24   that actually invoices us weekly and needs that cash flow to be

25   able to pay his people.

1    And so everyone is used to this mechanism, which was very
2    successful from May until the end of December, when essentially
3    I had gone through the 44 million, and again, that was a
4    projection made in March of last year before we knew what we
5    were even going to be doing.  And they -- I asked for
6    additional funding as I saw that racking up, and 15 more
7    million was put into the account at that point in time.

8    Since then, we are down to $73,000 in the account.  I'm
9    holding more than $6 million worth of invoices that need
10   payment, and EPA is talking about changing the process to a
11   reimbursement process.  I haven't seen anything official on
12   that, but I do know that the bank account is empty essentially
13   at this point in time.  I'm sitting on invoices that should
14   have been paid weeks ago.  So as a result, they are talking
15   about switching to a reimbursement process.

16   You realize I have no cash reserves, so in a reimbursement
17   process, the way they've done one invoice so far is I submit
18   the invoice to EPA in DC, they review it, they process it, they
19   okay it, then they put money in the bank account, and then I
20   can pay the contractor.  Lots of steps and lots of time lost.
21   I'm really concerned, if that processed continued, what would
22   happen in a potential government shutdown, but we haven't had
23   one yet.  We might have one in the next week or so.  But it is
24   adding significant time and administrative challenges to our
25   paying our contractors.  We are deviating from what they are

1   used to.  I'm getting a lot of calls and e-mails from

2   contractors saying, hey, what did I do wrong, why haven't I

3   gotten paid yet, recognizing that it is a very different

4   process today than it was in December that got us to this

5   point.

6       Largely we have built a great rapport with our

7   contractors.  Our success is based on the fact that they are

8   doing wonderful work for us, they respond when we need them,

9   they work long hours, they work during emergencies, and that's

10  because you build a relationship with the contractor that they

11  can trust what you are saying and you can trust that they are

12  doing what they need to do.  We are kind of violating that at

13  this point.

14      So my ask today, Judge, is just that if EPA is going to

15  consider a change from that original process, that they bring

16  it to you first so we can understand the merits and the reasons

17  and decide how to go forward from there.

18      **THE COURT:**  So at this point, what is the amount of

19  money that you are expected to pay out on invoices?

20      **MR. HENIFIN:**  I'm holding about $6 million worth of

21  invoices today.

22      **THE COURT:**  Today.  And you have, what did you say,

23  $75,000 in the bank?

24      **MR. HENIFIN:**  73.

25      **THE COURT:**  73.  Not even the benefit of that extra

1   2,000.  So just $,000.

2           **MR. HENIFIN:**  $73,000 and some change.

3           **THE COURT:**  And some change on this 6 million-dollar

4   outstanding bill.

5           **MR. HENIFIN:**  I'm a little concerned about letting

6   people continue to work without knowing that I've got money to

7   pay them.  That's my reputation and trust on the line.

8           **THE COURT:**  Because when you engage these project

9   managers from time to time, you are engaging them to do

10  emergency work.

11          **MR. HENIFIN:**  Yes, Your Honor.  Almost everything we

12  are doing is under a time and material emergency type of

13  contract.

14          **THE COURT:**  So when you call them up and you tell

15  them you have a problem at a certain address of a certain

16  quantity of problem or a volume, then you have homeowners who

17  are waiting for that to be rectified.  So the homeowner now is

18  disturbed because nothing happens, because the project managers

19  don't go out there because they are afraid they aren't going to

20  be paid.

21          **MR. HENIFIN:**  We haven't gotten there yet, but that

22  is sort of the direction I think we are headed.

23          **THE COURT:**  Well, that's why I brought this up,

24  because at present, if you have $6 million already due and

25  owing, some of these project managers might not be as excited

1    about working for JXN Water, just like they weren't excited

2    about working for the City of Jackson --

3            **MR. HENIFIN:**  Correct.

4            **THE COURT:**  -- when Jackson was going through these

5    problems.  That's one of the first major problems we

6    encountered when we started working on all of these various

7    projects, that these people didn't want to come in and work for

8    the City, and the City had an awful reputation for not being

9    able to pay its bills.

10        You know, we heard all kinds of horror stories how long

11   some of these project managers had been waiting around for

12   their money, and thus they weren't interested in taking on

13   another project after they had not been paid on the first

14   project.

15        So that was a huge concern of ours.  Wouldn't you agree?

16           **MR. HENIFIN:**  Yes, Your Honor.

17           **THE COURT:**  We thought we had addressed it when we

18   first started paying off some of these project managers within

19   a certain amount of time, and these people then saw a

20   distinction between the protocol of JXN Water as opposed to

21   what they had imagined from the City of Jackson.  But under the

22   system as it has now developed, it looks like we are being

23   slammed back into that same system that had befallen the city

24   of Jackson.  Wouldn't you agree?

25           **MR. HENIFIN:**  We are definitely headed that

1    direction, yes.

2         **THE COURT:**  So now we have a number of invoices that

3    have not been serviced and a number of contractors who have a

4    bitter taste in their mouth now developing.

5         Now, to what extent have you been successful in explaining

6    to these contractors that we are working on that project, that

7    we are working on getting their moneys as fast as we can.

8         **MR. HENIFIN:**  So I've been informing them as they

9    have asked.  I haven't put any broad statement out across, but

10   as they've asked why they haven't been paid yet, I've said

11   there has been a change in EPA, and most of them all say,

12   that's how the government works.  They kind of resigned -- they

13   figured that kind of thing would happen at some point.  It's

14   not how we would like to continue to do business.

15        **THE COURT:**  I know that when I got involved in this

16   that persons with invoices were calling, first of all, to try

17   to determine how long it's going to be but thankful that they

18   were being paid timely.  And one of the first compliments that

19   I heard on behalf of JXN Water and you was that they were being

20   paid timely and thus did not worry about accepting subsequent

21   contracts.  And now some people are beginning to call about

22   this whole matter.  But it's not much you can do if your moneys

23   have not been released.  Am I correct?

24        **MR. HENIFIN:**  That is correct.  I have no reserves.

25   I can't front the money from any pot of money that I don't

1    have.  I'm reserveless, so it's a challenge.

2        **THE COURT:**  Right now you have about $73,000.  When

3    do you expect to be able to draw down on your next installment?

4        **MR. HENIFIN:**  EPA told me in an e-mail yesterday I

5    should expect to hear something today or tomorrow on ten

6    million dollars to pay these bills.

7        **THE COURT:**  That you should expect to hear something

8    on ten million?

9        **MR. HENIFIN:**  (Nodding affirmatively).

10        **THE COURT:**  That would take care of our outstanding

11    invoices, correct?

12        **MR. HENIFIN:**  Yes, Your Honor.

13        **THE COURT:**  And leave a little bit over for the next

14    group that's going to surface.

15        **MR. HENIFIN:**  Correct, probably early March.

16        **THE COURT:**  What does that say for the future?  Will

17    we have to go through the same problems again in the future

18    where these contractors and contract managers say that they

19    have outstanding invoices and that we have to fear that some of

20    these contractors will lump us into the same category,

21    reputational category, that the City was in when we started?

22        **MR. HENIFIN:**  The future is a little cloudy at the

23    moment.

24        **THE COURT:**  So what do you have as a solution to this

25    particular matter so that we don't run into this particular

1    problem?  Because just imagine, as I'm sure you have and

2    already experience nightmares over it, that here you have been

3    making tremendous progress on the city's woes concerning sewage

4    and water, as you described earlier today, that you are winning

5    back the confidence of the citizenry, that now they are saying

6    we have pressure, we are having rapid responses, but all that

7    is contingent upon your work crews being able to complete their

8    work timely.  If they walked off the job or refused to take the

9    job, then that's going to be a tremendous setback.

10           **MR. HENIFIN:**  Absolutely, Your Honor.

11           **THE COURT:**  So then what -- and I also recognize that

12   the kind of reputation that you are aiming for JXN Water to

13   earn is wrapped up with how the public views you yourself,

14   because they are calling you asking for their money.  And you

15   are the ones who selected them in the first place to do this

16   work, and you are the one who are asking these contractors to

17   go out in the middle of the night, early mornings, and perform

18   this work, perform it well and quickly.  And so then there's a

19   trust element here that they know that if they stop working on

20   some other small job over here and take this bigger job over

21   here for the City, that they are going to be paid timely.  And

22   if you can't pay them timely and don't pay them timely, they

23   could lose trust in you, in which case they might do what they

24   start doing with the City, which is pay us first or show us

25   that you can pay us before we go out to do any work, because

1    you already owe us on some other invoices.

2        So then to be sure that we don't have this kind of

3    situation in the future where you are down to $73,000, where

4    you have six million dollars worth of invoices, what do you

5    propose?

6        **MR. HENIFIN:**  Well, my proposal would be to return to

7    the status quo where the grant funding is loaded in annual

8    chunks into the system so I can drop down as these costs are

9    extended.  This grant is an emergency measures grant under an

10   authorization that has never been used before, and it's

11   supposed to be just for this, for quick work to resolve

12   emergency situations.  EPA has not used this grant, that I'm

13   aware of, before.  We are learning together, and I think it has

14   proven to be very successful in how much we have succeeded to

15   fix the system in a short period of time.

16       I also recognize it is also a bridge, because this grant

17   will end, because we have got $150 million authorization total

18   in the grant.  We have gone through 60 million of it already in

19   the first year.  It will get us another year, maybe year and a

20   half before we need to be generating enough local revenue to

21   not be dependent on that grant to offset these costs.  But we

22   need that time, and we need this money now to get us to that

23   point in time, recognizing that this is an emergency grant,

24   short in duration but critical from getting us from where we

25   are today to where we need to be, recovering revenue locally,

1    generating the money we need to make these repairs and do this

2    O & M work with our own local dollars, which we are confident

3    and laid out in the financial plan that this year we expect to

4    collect 80 percent of what is owed us, the next year 85, and

5    the next year 90, and the following year 95.  And the bridge in

6    all of that is, for the first 3 years, this federal grant.  And

7    without that, we just don't have the revenue to offset and have

8    reserves and make the payment.

9         And they aren't saying they aren't going to give us the

10   rest of the 150 million, but the way they are trying to deliver

11   it is making it very challenging, for the reasons you've just

12   said.  If we went back to the status quo, which was they loaded

13   44 million into the grant based on the first year projection,

14   they added money to it when I said the projections weren't

15   exact, because we were shooting blind anyway, and in March of

16   2023, when we set that in place, they would load the next

17   year's amount into the system so I could draw that down to keep

18   paying the bills that we are incurring right now, and when we

19   get to the end of that, get down to around 5 million is when I

20   sounded the alarm in November.  I was at five million, and I

21   said we are going to need more of that, at 15, to get us to the

22   end of the year.  And I started sounding the alarm that that

23   was going away and we needed additional funds, and that's when

24   we started getting into this whole reimbursement process.

25        If we went back to the status quo, I think everything

1    would be great.

2              **THE COURT:**  And how well are we doing on

3    accountability?

4              **MR. HENIFIN:**  We can provide invoices for every penny

5    of federal dollars we have expended out of that grant.  We can

6    tie it exactly to the contractor through an invoice on every

7    penny of the 55 million and change we have spent to date.

8              **THE COURT:**  And I have talked to you about this.

9              **MR. HENIFIN:**  Yes, you have.

10             **THE COURT:**  And the figures that I need to examine to

11   see what accountability there is for every dime, every penny,

12   that's available, is it not?

13             **MR. HENIFIN:**  Yes.  In my quarterly report, I even

14   listed all of the invoices for that quarter against every

15   project that was there.  So it's very easy to review and see.

16             **THE COURT:**  Okay.  So then since you have gone

17   through the Court, that is, through me on this, then I have a

18   record of these things, correct?

19             **MR. HENIFIN:**  Yes, Your Honor.

20             **THE COURT:**  And so then I understand the projects,

21   who is providing them, how much they will cost, and what the

22   payments are going to be for all of those.  That's the check

23   and balance on this point, correct?

24             **MR. HENIFIN:**  Yes, Your Honor.

25             **THE COURT:**  Because we can't have a system that's set

1  up without accountability.

2          **MR. HENIFIN:**  Agreed.

3          **THE COURT:**  And also we need a system that is

4  transparent.

5          **MR. HENIFIN:**  Agreed.

6          **THE COURT:**  Because we are using the public coffers

7  here.  And so we have always agreed on these things, have we

8  not?

9          **MR. HENIFIN:**  Yes, Your Honor.

10          **THE COURT:**  So then now that we have identified what

11  could be a serious thorn in our side on credibility, because

12  here we are in the midst of having the same kind of

13  self-abasing flaw that it seems the City had when it was given

14  the reputation of not making payments, we have to do something

15  with that if we are going to continue to enjoy the trust of our

16  vendors, correct?

17          **MR. HENIFIN:**  Correct.

18          **THE COURT:**  Otherwise, we can't count on calling

19  these people in the middle of the night and telling them to go

20  do things.

21          **MR. HENIFIN:**  Yes, Your Honor.

22          **THE COURT:**  So now you have gotten some moneys from

23  EPA.  What dialogue have you had with EPA on this particular

24  circumstance?

25          **MR. HENIFIN:**  So there was a compliance assistance

1    team that visited us in mid November, and they were concerned

2    about tying the individual drawdowns back to individual

3    invoices, which at the time I didn't know that that was really

4    a main concern of theirs.

5        So since that time, we have been recording individual

6    invoices against each draw that we make against the grant,

7    which should satisfy that requirement.  We haven't been able to

8    go back and spend the time to do the forensics to identify each

9    draw that was done previously, back as early as March -- I

10   mean, as May, to show how that tied to a particular invoice.

11   We are drawing money down, trying to pay things, did not

12   understand that there was a recordkeeping requirement like

13   that.  I still haven't found where that shows in any of the

14   grant agreement documents.

15       What I did agree to in the grant agreement was that money

16   that was pulled down would be obligated within five days or up

17   to 15 days.  The goal is five but up to 15 days.  And currently

18   I only draw money down as I'm paying invoices, so it is

19   obligated within hours of money hitting the bank account.

20       But again, compliance assistance came down to see how we

21   were doing.  Those have been fast and furious, first time this

22   grant has been used.  I think if that was the only issue, we

23   have of course corrected it now to make sure we have that

24   information for future audits or looks or assistance visits,

25   but what we do have is invoices that tie to every penny that

1  has been drawn down and used.  We just couldn't tie specific
2  invoices to specific drawdowns early in this process.
3      So the dialogue with them has been they will issue some
4  letter or report -- I have yet to see any of that -- that will
5  change this from the current process to a reimbursement
6  process.  And in the interim, I'm just having conversations
7  with the grant office at EPA, to have them put money in the
8  account in some form or fashion so I can pay bills, and I'm at
9  their mercy as to when that happens and how that happens.
10     **THE COURT:**  But you are not in favor of their
11 reimbursement system?
12     **MR. HENIFIN:**  I just don't see how it can work
13 because I don't have reserves to front -- you know, if we get
14 into this delay of them providing a reimbursement, I have got
15 no money to pay these invoices.  Quite frankly, I don't really
16 want to tell contractors to go out and work if I don't know
17 that I have money in the bank to pay them.
18     That's a really challenging contractual situation.  Most
19 people don't enter a contract, especially in the federal
20 government, without having money to pay it.  So I have got an
21 IOU potentially to pay my bills.  I'm not very comfortable not
22 having the money in the bank to make this happen.
23     **THE COURT:**  Contrast the amount of time it would take
24 to pay the contractors under the reimbursement system as
25 opposed to the system that you favor.

1          **MR. HENIFIN:**  I've got one example because we have

2     done one complete reimbursement.  It was for a Jacobs invoice.

3     Jacobs is the contractor operating the treatment plants on a

4     reimbursement basis right now.  So we get a pretty extensive

5     invoice from them on a monthly basis.  I had a 2.5 million and

6     change invoice that I didn't have money to pay.  EPA asked me

7     to submit it to them in DC and they would process it and

8     approve it and then move money.  So that process took about two

9     weeks.  Normally I would have just taken the invoice, reviewed

10    it in a few hours, and then drawn the money down and processed

11    the payment probably the next day.  So they've gone from within

12    a day or two to within two to three weeks of receiving it.

13         I'm not sure what they do when they are reviewing this.

14    If they've got questions or stop payment or -- I mean, I've

15    already incurred the cost.  I've authorized the contractor to

16    work.  Someone in DC decides that something is wrong with an

17    invoice and stops payment?  They aren't even here.  They aren't

18    familiar.  I don't know what value they can add from reviewing

19    these invoices.

20         **THE COURT:**  I asked you that question.  Have you got

21    an answer as to --

22         **MR. HENIFIN:**  I still don't know where we are.  They

23    haven't given me anything in writing as to why we are in this

24    predicament, what the ultimate outcome is going to be, when I

25    can expect a writing from them.  I've got nothing to bring in

1    front of you and say, Judge, this isn't working because I don't

2    know what process we are in, other than I don't have money to

3    pay bills, and I used to have money to pay bills.

4          **THE COURT:**  So where are we now?

5          **MR. HENIFIN:**  Waiting on ten million to show up in

6    the bank today, tomorrow.

7          **THE COURT:**  And then after that?

8          **MR. HENIFIN:**  Pardon?

9          **THE COURT:**  And then after that?

10         **MR. HENIFIN:**  I will start asking again for the next

11   amount of money so that I don't run out again, hopefully.

12         **THE COURT:**  Will that have any bearing on what

13   contracts you are letting?

14         **MR. HENIFIN:**  It depends on how this all plays out.

15   I can't tell you yet, Your Honor, where all of this lands.  I

16   can just tell you I'm very uncomfortable having folks work on a

17   time and material contract with no ability to pay them.

18         **THE COURT:**  This 6 million you mentioned, that's the

19   sum total right now that's outstanding?

20         **MR. HENIFIN:**  In rough numbers, yes, sir.  They are

21   still working today.  One of those contractors is the one that

22   bills weekly.  I have got two bills from two weeks ago, two

23   bills from last week, and I expect to see two invoices by the

24   end of this week from that one contractor.  It's a very small

25   contractor doing great work for us, but they will be waiting on

1   half a million dollars by the end of this week, which is a make

2   or break for a small contractor.  He has bought equipment, he

3   is working hard for us, put in safety requirements, doing

4   everything we asked them to do, and now we are going to be

5   dragging our feet in getting them their payments.

6          **THE COURT:**  Who has been your contact person with

7   EPA?

8          **MR. HENIFIN:**  It would be great to say there was one.

9   There is one in the office of water, grants.  She has been very

10  cooperative, very helpful, has no control or relation over the

11  office of grants and debarment, which are the ones that have to

12  approve the money to go in.  We have asked for a single point

13  of contact, a decision-maker somewhere in EPA, because these

14  two silos don't talk to each other, and they have not been able

15  to provide us who that person we can go to when we are having a

16  challenge like this.

17         **THE COURT:**  So you are in limbo?

18         **MR. HENIFIN:**  Yes, Your Honor.

19         **THE COURT:**  How long have you been in limbo?

20         **MR. HENIFIN:**  Since the end of December, beginning of

21  January.

22         **THE COURT:**  So that's January, all of March -- I

23  mean, January --

24         **MR. HENIFIN:**  All of February.  We have two days of

25  February left.

1          **THE COURT:**  Right.  All of February.

2          **MR. HENIFIN:**  Yes, sir.

3          **THE COURT:**  And you still don't know when the money

4    is coming in?

5          **MR. HENIFIN:**  No, Your Honor.

6          **THE COURT:**  Just any day now?

7          **MR. HENIFIN:**  Yes, Your Honor.

8          **THE COURT:**  What about counsel over here for EPA?

9          **MR. HENIFIN:**  I would love to hear what they have to

10   say about it, Your Honor.

11         **THE COURT:**  Have you spoken with them?

12         **MR. HENIFIN:**  No, I have not.

13         **THE COURT:**  You've called up the principals, I take

14   it.

15         **MR. HENIFIN:**  I have been talking to the staff that's

16   been working -- we did have -- my lawyers had conversations

17   with the Department of Justice.  Remember, you called a status

18   conference a few weeks ago related to this issue because I was

19   highlighting it, and they agreed to make some quick changes and

20   make that payment for the 2.5, which didn't take days, it took

21   weeks, but we agreed to delay the status conference on the good

22   word that they would fix this, but it hasn't been done.

23         **THE COURT:**  When you were referring just then to your

24   team, you pointed towards your team of lawyers.

25         **MR. HENIFIN:**  Mr. Calamita, I believe, had direct

1    conversations with Mr. Fingerhood.

2         THE COURT:  Is there any particular reason why you

3    had to go through your lawyers?

4         MR. HENIFIN:  Because things weren't happening at the

5    staff level.

6         THE COURT:  Well, what I'm getting to is, was there

7    any concern that you could end up in a lawsuit because of the

8    failure of these moneys to come forward?

9         MR. HENIFIN:  I don't think I was really worried

10   about a lawsuit, but I just thought we needed to get this

11   rectified at some level where we could continue to work the way

12   we were working before, and it didn't seem to be happening with

13   the staff members at EPA that were helpful but not able to

14   resolve it.

15        THE COURT:  Is there any specific time period

16   mentioned in the contract as to when these vendors would be

17   paid?

18        MR. HENIFIN:  No, Your Honor.

19        THE COURT:  Did any of the contractors ask for a time

20   period?

21        MR. HENIFIN:  Most of them had a standard net 30.

22        THE COURT:  Say that again.

23        MR. HENIFIN:  Payment within 30 days.

24        THE COURT:  Payment within 30 days?

25        MR. HENIFIN:  And we are still beating that at this

1     point, but that's not the level of service we've established.

2     We want to pay within a week, again, to build that trust, to

3     make sure they are ready to jump when a deep freeze hits.  We

4     had 16 crews working round the clock.  They are doing that

5     because we have built a great relationship with these

6     contractors.  So as that starts eroding, because we are going

7     to take advantage of every day we have got to wait to pay them

8     until the 30th day, that's just not how you build trust.  It's

9     not how you build relationships.

10         **THE COURT:**  If I ask a question which invades

11     attorney-client relationship, then you don't have to answer.

12     But based on what your attorneys have told you about their

13     negotiations with the EPA, are you optimistic there might be

14     some favorable change?

15         **MR. HENIFIN:**  No, Your Honor, not from where we stand

16     today.

17         **THE COURT:**  What does that mean?  That you think EPA

18     will still endorse or embrace a system which does not work?

19         **MR. HENIFIN:**  I believe so, Your Honor, but I've yet

20     to -- again, I'm flying blind, not having anything in writing,

21     nothing to base that on other than phone calls and

22     conversations.

23         **THE COURT:**  Are you satisfied that you have laid out

24     your case to EPA as well as you can?

25         **MR. HENIFIN:**  Yes, Your Honor.

1          **THE COURT:**  All right.  Will you have a seat, please,

2     and I will come right back to you in just a moment.

3     Mr. Fingerhood, did you follow this discussion?

4          **MR. FINGERHOOD:**  Yes, I did, Your Honor.

5          **THE COURT:**  So please dip into that reservoir of

6     wisdom you possess and tell us how to work this out.

7          **MR. FINGERHOOD:**  It might be more of a kiddie pool,

8     but I appreciate the judge's confidence.

9          **THE COURT:**  If it's going to work it out, that's

10    fine.

11         **MR. FINGERHOOD:**  We have -- we appreciate Ted's

12    comments and concerns, and we have been and we will be

13    discussing them further within EPA and DOJ and would like the

14    opportunity to discuss with Ted's attorneys and Ted.

15         You know, the grant process is a complex process.  You

16    know, they have their own set of rules.  And, you know, I do

17    want to say that the federal government is not the city, that

18    so far we have maintained our full faith and credit as far as

19    paying our bills, so I think that's a distinguishing factor.

20         So, you know, I think their -- as Ted alluded to, there's

21    a learning curve here when we initially negotiated the

22    stipulated order, we didn't know about the money that Congress

23    was going to appropriate.  And they did eventually appropriate

24    $6 million of money that is specific to -- can only be used for

25    Safe Drinking Water Act costs.  So it's an unfortunate

1    circumstance that this happened, but there is a grants process.

2    As Ted said, there has been no final decision made about this

3    process, but, you know, when the contracts are net 30 and he's

4    still meeting the contracts, it seems like there hasn't been,

5    you know, a violation there.

6         So I understand the confidence building, but it is -- the

7    federal government has, you know, provided these grant funds,

8    but they are subject to federal grant rules, and so we -- you

9    know, we have recently become aware of, you know, some

10   differences of opinion between, you know, Ted, as he indicated

11   he wants to pay these right away, and on the other hand,

12   there's kind of the process of, you know, what the grants

13   office does.  You know, there has to be a balance there.

14        So, you know, as Ted acknowledged, there is no final

15   decision, nothing before the Court right now, but we would like

16   to -- we have had some initial discussions with Ted's attorney,

17   and we would like to continue with those dialogues both with

18   our client and with Mr. Calamita and his client and, you know,

19   see where those goes before this -- if it does end up before

20   the Court.

21        **THE COURT:**  Well, you have stated that there's a

22   difference in the responsible parties for the moneys, the

23   federal government versus the City of Jackson.  I appreciate

24   that, in a limited way, that if I am a vendor on the system and

25   I need some money to pay my bills and that money is held up for

1    an inordinate long time, as what the City has been accused of,

2    then it doesn't matter what the identity is, whether it's the

3    federal government or the state government.  What's important

4    is that I didn't get paid.  What's important is that my debt

5    obligations went unheeded.  And further, what's important is

6    that I'm losing workers who want to be paid, regardless.  So do

7    you see any way out of this predicament at this point?

8         MR. FINGERHOOD:  Well, I would like to explore

9    discussions further both within DOJ, EPA, and with the ITPM and

10   its counsel.  But as I mentioned too, this is a large amount of

11   federal funds, and, you know, there are their own set of

12   requirements for the use of the funds.  And so it is kind of a

13   balancing act.  I think -- I think a lot of government

14   contractors may think that, you know, getting paid within a

15   week is somewhat unheard of.  I think it's -- as Ted indicated,

16   it's probably more like a 30-day payment period is more of the

17   norm and may even be longer.  I think that's maybe the

18   commercial norm.  It may even be longer for government

19   contracts.

20        Like I said, I'm stepping into the baby pool.  I'm not a

21   contract lawyer or a grants lawyer, but I am learning a lot, as

22   well as learning about SNAP, which we will be discussing a

23   little later too.

24        So I think we would like to, at least before something

25   comes before the Court, have an opportunity to engage in this

1   dialogue and see where it ends.  And I think that was similar

2   to what Ted was proposing is that if there does remain a

3   difference of opinion, it would be teed up for the Court

4   appropriately.  Right now there hasn't been any final agency

5   decision that would be reviewable.  There's an administrative

6   process for that.  And there are other issues remaining, and it

7   may be that those can be teed up for Your Honor.

8            **THE COURT:**  I would just like to have it resolved as

9   fast as possible because the matters of the heart concerning

10  reputation are difficult to reverse once they are set in stone.

11  And for those contractors who have lived in this looking glass

12  involving the City, when they felt like they weren't getting

13  paid, and the City's reputation, whether rightly or wrongly

14  attributed, has permeated down to the workers, who are the ones

15  who prepare the actual finished product.  And when their

16  authority figures say, we just don't have the money to pay you

17  because we haven't been paid, then the workers don't care

18  whether it's the federal government or the state government.

19  All they know is that they performed a chore for which they

20  didn't get paid, and they have bills from other persons who

21  really don't care who is responsible for those bills, but they

22  didn't get paid, and they then started looking around outside

23  of town just trying to see if they can hook on with somebody

24  else who can employ them, and if they have to go outside the

25  state to get a job, then they are lost to us for the duration

1   of that particular contract.

2        So that could have lasting effect upon us where we are

3   trying to get these matters done as fast as possible and also

4   to make sure that people know this is not any critical company

5   that they had problems with before, if they had problems.

6        Now, of course, we don't know the extent of what those

7   problems may have been that they said they have, but we really

8   don't want to have to get into that.  We don't want to have to

9   call out anybody else or to say how we are in a much better

10  position than somebody else.  We just want to have the moneys

11  available to us so that we can go ahead and pay these people.

12       Now, I asked you at the top of our dialogue here whether

13  you would be able to call upon your vast experience and tell us

14  what we need to do in order to make this process seamless.  As

15  you stand there now, do you have thoughts on the matter?

16  Because won't you be the lead person who will have to talk to

17  the folk back in DC who may not have even been down here?

18       **MR. FINGERHOOD:**  On that last point, I will not be

19  the ultimate decider.  Those will be the people above me.

20       **THE COURT:**  Won't you be making recommendations?

21       **MR. FINGERHOOD:**  I will be making recommendations.

22       **THE COURT:**  That's what I'm getting to.

23       **MR. FINGERHOOD:**  We have had some initial discussions

24  with Ted's attorney, but we do have a confidentiality order,

25  and I think we would be better engaging in those discussions

1    subject to that before I just start airing my own personal

2    views in court.

3                **THE COURT:**  Okay.  But you will be involved in the

4    process?

5                **MR. FINGERHOOD:**  Oh, yes, and others at DOJ and EPA.

6    And like I said, we intend to have a dialogue, not just on the

7    government's side but with Ted and his attorneys.

8        And you know, just going back to another point the Court

9    raised, I understood -- and I'm sorry to refer to him as Ted.

10                **MR. HENIFIN:**  It doesn't bother me.

11                **MR. FINGERHOOD:**  You can call me Karl.

12        But, you know, we've known each other a couple of years,

13    so I apologize for the informality before the Court.  But Mr.

14    Henifin indicated that, you know, his preference is to pay

15    within I think he said five days, and he's experienced 2 to 3

16    weeks, but I don't think he has said anybody has fallen outside

17    of that 30-day window.

18        Now, I understand his concern with the reputation, but I

19    do think, you know, that the contractors are still getting paid

20    within kind of what their expectations are.  So, you know, it

21    hasn't fallen outside of that, and, of course, I think that's a

22    good thing.  But I think the contractors are getting paid

23    within the time frame they expect.  When they get paid sooner

24    than that, I'm sure they appreciate that, but, you know, I

25    think as a lawyer, if you look at the contract, it says payment

1    within 30 days, and that's what you can expect.

2          **THE COURT:**  Now, on this process.  How long do you

3    think it would take before you have a suggestion to Mr.

4    Henifin?

5          **MR. FINGERHOOD:**  I mean, again, I think we would like

6    to address -- we would like to address this in the near future.

7          **THE COURT:**  And what is near future?

8          **MR. FINGERHOOD:**  You know, I would say within two to

9    three weeks, and that's kind of an outside time frame.

10          **THE COURT:**  Now, that's a pretty long time, isn't it,

11    two or three weeks?

12          **MR. FINGERHOOD:**  Not considering that, again, you are

13    dealing with -- you know, we have to bring in certain

14    decision-makers from EPA and DOJ and then work with Mr. Henifin

15    and his counsel, I don't think it's too unreasonable.

16          **THE COURT:**  Well, now, you, yourself, have a stake in

17    this matter because you certainly want EPA to be highly

18    regarded in its efforts to assist Jackson here, but there's

19    another reason too.  Now, you have been down here an awful lot

20    in the last few months.  Do you consider yourself now a citizen

21    of Jackson?

22          **MR. FINGERHOOD:**  I have spent a great deal of time,

23    and I do enjoy my trips here.  There are great people, great

24    food, and soon to be a great water and sewer system.

25          **THE COURT:**  Now, have you bought a house down here

1    yet?

2         **MR. FINGERHOOD:**  Not yet, but I did show my wife

3    something that -- I saw a list that said Mississippi was --

4    listed somewhere as one of the least expensive places to

5    retire.

6         **THE COURT:**  Well, you've been down here an awful lot,

7    and so you are like a citizen of Jackson now.  So you want to

8    make sure your water is okay and your sewage is all right.

9    Correct?

10        **MR. FINGERHOOD:**  Yes.

11        **THE COURT:**  That's what I thought.

12        **MR. FINGERHOOD:**  And I think that's not just me

13   personally but that's shared by EPA, and I think just, you

14   know, based on the feedback we got in connection with the Clean

15   Water Act stipulated order, the citizens are seeing some

16   results too, which is great news for everyone.

17        **THE COURT:**  I know you are going to try to work this

18   matter out as fast as you can, but as soon as you get some

19   suggestion here, could you shoot a letter to me, as well as the

20   other parties here, what your suggestion is, unless you are of

21   the opinion that it still should be confidential?

22        **MR. FINGERHOOD:**  Yes, we will advise the Court, and

23   either publicly or under seal, if appropriate, but we can do

24   it.

25        **THE COURT:**  All right.  Thank you very much.

1          Now, then, Mr. Henifin, are there any other points on this

2     matter of grant funding that you need to discuss with the

3     Court.

4               **MR. HENIFIN:**  Could I have my counsel speak?

5               **THE COURT:**  Sure.

6               **MR. CALAMITA:**  Thank you, Your Honor.  I will be

7     brief.  Paul Calamita for Mr. Henifin.

8          First of all, I want to say Mr. Fingerhood and EPA have

9     had communication with me trying to, for the moment, maintain

10    the status quo while this matter is brought to Your Honor's

11    attention for resolution.

12         I did want to mention, just my first point would be, I

13    want no more burdens, no more red tape, no more process on Mr.

14    Henifin than we absolutely need to have.  While he gets up here

15    and gives you kind of a happy story of all the progress, what I

16    don't want anybody to lose sight of is this is unprecedented.

17    Every single thing Mr. Henifin does is a life of the utility

18    event for other utilities around the country, well-run

19    utilities with money, huge challenges, managing grants, water

20    sewer program.  All these projects that you hear about, the

21    water plants, the distribution system, the sewage treatment

22    plants and the collection system, this is unprecedented.  This

23    hasn't been done before.  I didn't think he was that good.  And

24    I'm going to tell you, I know nobody who could replace him.

25         But the band width for continuing -- you know, things are

1    only going to get harder as he tries to have a financial

2    management plan and an ultimate structure for this.  But no

3    more burdens, and I see this as a burden.  That's number one.

4         Number two, the review, the post work review by EPA

5    officials in Washington creates uncertainty as to whether he's

6    is going to get paid.  Mr. Henifin told you he has $73,000.

7    For a public utility to have $73,000 is like the five cents you

8    put in your sock drawer when you go home at night, Your Honor.

9    That is no money.

10        The first time EPA kicks something back and says, this is

11   not right, we have nothing to pay it.  And all of that trust,

12   everything just collapses.

13        And the third point, which I think is the most important

14   point, Your Honor, we have a grant agreement that says Mr.

15   Henifin can pull down money, that -- the regulation doesn't say

16   it, but EPA's guidance and the grant condition says he needs to

17   pay out within five days.  So if he pulls down a million

18   dollars, the grant agreement says you pay it out within 5 days.

19   The grant agreement doesn't say it is done on a reimbursement

20   basis.  That is a punishment for somebody who is not operating

21   in accordance with the grant agreement.

22        We think we are operating in accordance with the grant

23   agreement, so we would love to maintain the status quo for the

24   reasons I have mentioned.  If EPA feels that somehow we are not

25   in compliance, we would like to see that in writing, Your

1    Honor, because I have not seen that.  And I think we can cross

2    that bridge if we see that, but I really do think that -- I

3    heard Mr. Fingerhood say we are going to kind of maintain the

4    status quo until they make some decisions.  I think that can be

5    the end of it for today, Your Honor.  But I did want to impress

6    upon you that going to the reimbursement basis puts more time

7    and effort on my client, and there needs to be a really good

8    reason, because it will take him away from doing the things for

9    the citizens who have suffered long enough.

10       And I guess the last thing I should say is, Mr. Henifin

11   competes with everybody around him for contractors.  We are

12   short contractors.  We are short everybody, but we are

13   particularly short contractors.  And the idea that they came to

14   Jackson to be part of the solution, but we still compete with

15   the surrounding communities for those contractors.  And these

16   are some big projects.  We have got to pull people from

17   different parts of the country.

18       So paying promptly is one of the things we can do to make

19   sure that they continue to respond to our calls, because our

20   citizens have suffered too long.  And if paying promptly helps

21   get sewage out of their yards and their street and maintain

22   water for their houses, we need to pay promptly, not within 30

23   days, Your Honor.

24       I will be happy to answer any questions.  Otherwise, I'm

25   done.

1          **THE COURT:**  So not within 30 days but to pay

2    promptly.  So put some meat on that skeleton.  What do you mean

3    by pay promptly?  It's -- apparently, it's some time period

4    which is less than 30 days.

5          **MR. CALAMITA:**  We are looking for a competitive

6    advantage over the other utilities around us who do not have

7    the problems and whose folks have not suffered like ours have.

8    One of the ways we can do that, Your Honor, is paying them

9    almost immediately, which is the practice of Mr. Henifin.  No

10   one else does that.  So we are trying to overcome decades of

11   not getting paid and people not wanting to work for Jackson.

12   We have that today.  Mr. Henifin has been trying to hire some

13   other professionals who will not work for JXN Water.  It

14   continues until this day.  You didn't get an audit when you

15   were supposed to get an audit, Your Honor, because the auditors

16   won't -- I'm not sure if we even --

17          **MR. HENIFIN:**  We finally got one.

18          **MR. CALAMITA:**  We finally got one.  But we were told

19   no.  So there's a lot of folks -- and there is also some

20   liability with this system, Your Honor, that the surrounding

21   utilities don't have.  Their utilities function pretty well.

22   If you come in and you are a contractor for Mr. Henifin, you

23   are taking on some risk, that this weak utility -- you know, it

24   is off life support, but we are still in kind of critical,

25   critical condition.  We are not stable.  And if you are a

1    contractor, you know you are taking on more liability than if

2    you go work across the river or across a jurisdictional line on

3    a much more stable system.  So one of the things we can do is

4    pay them promptly.

5        We don't think that hurts the federal government.  It's

6    consistent with our grant, Your Honor.  And we don't think

7    Jackson should be punished by having to go to a reimbursement

8    basis.  That said, we are having conversation, we are open to

9    hear any concern, but I have yet to hear a single concern, Your

10   Honor, that causes me to think we are not fully in compliance

11   with our grant agreement.

12       **THE COURT:**  Now, I asked Mr. Fingerhood to keep me

13   informed as to any suggestion that EPA might offer on this

14   matter.  What I have from you thus far is that 30 days may be

15   too long for a vendor to await payment, whereas a lesser period

16   is more preferrable.  So can you tell me where you are on this

17   point between those two extremes?

18       **MR. CALAMITA:**  Mr. Henifin pays me promptly, Your

19   Honor, and I greatly appreciate it, personally, but one of the

20   charges for Mr. Henifin was to try to use as many local

21   contractors.  And he has gone out and spent a lot of time with

22   those folks to make sure you are going to get good value, that

23   they know what they are doing, they are going to fix it right

24   the first time, they are going to get good value, they clean

25   the streets.  I've see them after hours, Your Honor, 5, 6,

1  7:00, out there sweeping up, which you never saw before.  They

2  are motivated.  And prompt payment and confidence in prompt

3  payment, not that somebody in Washington can trump Mr.

4  Henifin's decisions about his contract -- I think that sends a

5  terrible message.  So the reimbursement approach I don't think

6  is wise for the system, certainly at this time, and I'm not

7  aware of any problems that would warrant that punitive change

8  in the relationship.

9      But again, I do appreciate the agencies trying to maintain

10 the status quo right now as we try to work through these

11 things.  I think Mr. Fingerhood's commitment to you to alert

12 you if the agencies do feel they need to propose a change is a

13 good way to leave things for this afternoon, Your Honor.

14      **THE COURT:**  What is the critical time period that the

15 contractors ordinarily would respond to this as too much time?

16      **MR. CALAMITA:**  Respond to --

17      **THE COURT:**  That they might say this is too much time

18 to wait.

19      **MR. CALAMITA:**  Well, their invoices provide for 30

20 days, Your Honor.

21      **THE COURT:**  So any time period beyond 30 days?

22      **MR. CALAMITA:**  Any time period beyond --

23      **THE COURT:**  But the contractors like to be paid prior

24 to 30 days, right?

25      **MR. CALAMITA:**  I think the key here is that Mr.

1    Henifin has a course of dealing and a course of performance
2    with these contractors, and if they see a change in that, the
3    antenna goes up, because of decades of working in Jackson.  And
4    if they find out that now there are contracts that he's already
5    signed, Your Honor, quite frankly, on your behalf -- he works
6    for you -- whether it gets paid or not is now subject to
7    somebody in Washington's decision, I'm not sure that
8    contractors who are spending a lot of time and money are going
9    to be happy to understand that.

10        Normally, as Ted said, when a public entity signs a
11   contract, they have the dollars in the bank, they know they can
12   pay it.  It's not subject to somebody else to decide whether
13   they can pay it or not.  So this is a very unusual
14   circumstance.  And again, unless EPA can identify specific
15   noncompliance with the grant, Your Honor, we think we should
16   maintain the status quo.

17        **THE COURT:**  My last question, still related to my
18   former question, when do we get into that murky water where a
19   contractor says, this is too long?  One week, two weeks, three
20   weeks?

21        **MR. CALAMITA:**  I think for the smaller ones, Mr.
22   Henifin has tried to use local folks.  And we have found some
23   fantastic local folks who are doing great work.  And you heard
24   he gets invoices twice a week, Your Honor.  And those people,
25   you know, prompt payment really matters to those small

1    contractors.  And, quite frankly, there's a lot of work around,

2    and we would like to keep them.  We would like to maintain that

3    course of performance.

4        I can't tell you, Your Honor, if they got paid in two or

5    three weeks instead of two or three days, whether that would

6    change whether they want to work with Mr. Henifin, but I think

7    if I am them, I would want to understand why is this change

8    necessary.  Has Mr. Henifin done something wrong?  Is money

9    running out?  Change like that in payment, there is usually a

10   reason, and that will cause some anxiety.  And quite frankly, I

11   worry they may think twice when the phone rings and Mr. Henifin

12   needs them to do something.  So that's what we would want to

13   avoid unless there is a very good reason, Your Honor, to go to

14   that type of process.

15           **THE COURT:**  Thank you very much.  Mr. Fingerhood, is

16   there something else you want to add to this?

17           **MR. FINGERHOOD:**  Not at this time, Your Honor.

18           **THE COURT:**  Okay.  I will await your submission to

19   me.

20           **MR. FINGERHOOD:**  Actually, on that, I think what we

21   would prefer is that we -- if there is something like that, we

22   would communicate it first to Ted and his counsel.

23           **THE COURT:**  I expect that.

24           **MR. FINGERHOOD:**  Before --

25           **THE COURT:**  I expect that.  Thank you so much.

1    Anything else, Mr. Henifin?

2            **MR. HENIFIN:**  On that issue, no.  Ready to move to

3    SNAP?  Do we have a little bit of time to deal with that or

4    not?

5            **THE COURT:**  Well, I tell you what.  We have two more

6    items to discuss, SNAP being the most important on it, and then

7    there is one more after that.  Correct?

8            **MR. HENIFIN:**  Yes, Your Honor.

9            **THE COURT:**  Let's do SNAP, and then -- let's see --

10   is there anybody here who is either diabetic or suffering from

11   some ailment where you need to eat on time, because you are

12   already late, but nevertheless, where you need to eat before a

13   certain time period, where we could allocate 30 minutes for

14   SNAP, and I think that -- and then Mr. Henifin, what's that

15   last one?

16           **MR. HENIFIN:**  It was the Lakeland Seniors, and I

17   think we could postpone altogether, Your Honor, rather than

18   deal with that.

19           **THE COURT:**  You had said that.  Let's just do SNAP

20   and we can come back on another date and do this last one.

21           **MR. HENIFIN:**  Yes, Your Honor.

22           **THE COURT:**  That's on giving permission for the

23   possibility of a lawsuit.  Counsel, you are standing up.  Come

24   forward.

25           **MR. BAILEY:**  I represent Lakeland Seniors.  I'm Simon

1    Bailey.  And if the Court wants to defer that motion, that is

2    fine.  I was just going to ask to be excused if that's the

3    case.

4         **THE COURT:**  Okay.  On that particular matter, how

5    much time do you think you need for that argument on that.

6         **MR. BAILEY:**  I don't think much time at all.  I think

7    I can speak for five minutes, they could speak for five or ten,

8    and I could rebut in five, so it shouldn't take long.  But it

9    is up to them whether they are ready to go forward on that

10   today or would rather defer it.  Again, I'm open to either.

11        **THE COURT:**  Let me ask you, I know Mr. Henifin had

12   made a statement to me earlier that that matter might not be

13   ripe yet.  Mr. Henifin, am I correct?

14        **MR. HENIFIN:**  No, Your Honor, I think we are pretty

15   set.  The decision you make here may influence some other

16   issues we have pending as well.  So we were ready to do this

17   today.  I think we have made the full motion.  We have

18   everything we need.  I think opposing counsel has got what they

19   need.  It is a matter of you hearing it, and we can put the

20   SNAP off and come back next week or whenever you want to

21   schedule it.

22        **THE COURT:**  I kind of wanted to go ahead and hear on

23   SNAP.  Counsel, you are standing?

24        **MR. MCGUFFEY:**  Yeah, Your Honor, I would sort of echo

25   what Mr. Henifin said.  The matter has been fully briefed.  I

1    think briefing closed on the motion for leave sometime in

2    November, and actually, we have worked well together.  They

3    have held off serving the underlying lawsuit which has been

4    served against the City of Jackson and against UMMC.  They have

5    held off serving us sort of in deference to your authority to

6    be able to decide whether or not they can move forward or not.

7    So I do think the matter is ripe to be decided.

8        I would also add that there has been a second motion for

9    leave to file suit filed by a totally unrelated party, not

10    represented by Mr. Bailey, that has at least a portion --

11    raises at least a portion of the same argument.  So whether it

12    gets decided today or sometime soon, I do think we are going to

13    need to hear from the Court on some of those core issues,

14    especially those issues that are relevant to both motions.

15        I would agree with his time frame if we want to take it up

16    today, but again, Mr. Bailey and I both work down the street,

17    so you are on the more locally issues, and you don't need Mr.

18    Calamita and Mr. Fingerhood present for those if you want to

19    set us for a hearing on another day.

20        **THE COURT:**  Let's do that then.  My courtroom deputy

21    will notify you, but I'm going to try to get to you this week.

22        **MR. BAILEY:**  I understand.

23        **THE COURT:**  We will try to set up a time period where

24    we can hear oral argument.  Let's go to SNAP.

25        **MR. HENIFIN:**  So the issue here, as you are well

1    aware, we created a rate customer classification based on their

2    receiving SNAP benefits.  The idea was if we are going to be

3    collecting and shutting water off from everybody in the city to

4    get our collection rate back to where it needs to be, the water

5    needs to be affordable for everyone.  And there is a class of

6    our customer base that is challenged economically, and they

7    have already been recognized as a special class of customers by

8    the U.S. Government and the State of Mississippi as SNAP

9    beneficiaries.  So they qualify for essentially food assistance

10    and help with a nutrition program.

11    We wanted to build off of that and use that same

12    classification to determine if they also should be eligible for

13    water at a reduced rate that is commensurate with their income.

14    So at that, we created the SNAP customer classification.

15    We recognize that to get the most customer participation, the

16    best way for that to happen would be a connection to the SNAP

17    rolls and automatically run that through our billing system to

18    look for matches based on names and addresses that are both in

19    the SNAP benefit rolls and that are customers of JXN Water, and

20    those customers would be automatically enrolled in the customer

21    classification for SNAP and receive the SNAP rate, which is

22    approximately $30 lower than a regular rate.  And again, it

23    works well with the economics based on the SNAP income levels

24    that are published by the federal government.

25    So we think this is a great solution to provide affordable

1   water to folks that otherwise will be shutting off if they

2   can't afford to pay their bill and go without water altogether.

3   Shutoffs are a blunt instrument, but it is the only way to get

4   folks paying their bills regularly.  And the last thing we want

5   to do is shut off someone who really can't afford their water.

6   So we have built in some customer assistance programs and some

7   other things, but the critical part of this is the SNAP benefit

8   or the SNAP rate classification, and to automatically

9   categorize folks into that was really the best solution all the

10  way around.

11      We estimate 15,000 accounts are receiving SNAP benefits

12  within the city of Jackson.  If we don't do this categorically,

13  where we automatically put them in based on SNAP data, we

14  believe only a fraction of the folks will come forward to fill

15  out forms or provide proof of their SNAP benefits to JXN Water.

16  And that's played out across the country in similar programs,

17  none of them are SNAP based, where if you put an added burden

18  on the customer to prove they are eligible for something,

19  immediately you see a significant drop in the number of people

20  that actually file for or decide to get the benefit they have

21  earned basically by the classification where they are at.

22      We expect to see a very low turnout for that and a very

23  small number of people actually receiving the benefit of this

24  customer classification that we have created.  So we really, to

25  be successful, we need the SNAP data to run it against our

1   customer database.  We have approached the State on that and

2   gotten the answer no.  I would like my lawyer, Mr. Calamita, to

3   discuss the restrictions that have been cited under the federal

4   law and how we think we still qualify under those restrictions,

5   if that is okay with you, Your Honor.

6              **THE COURT:**  That is okay with me.

7              **MR. CALAMITA:**  Thank you, Your Honor.  I will be very

8   brief.

9        As Mr. Henifin indicated, in addition to trying to provide

10  a significant reduction in monthly rates for the benefit of

11  people who really can't afford it, who have already been

12  identified by the federal government, if we don't do that, we

13  are going to end up wasting a lot of JXN Water dollars chasing

14  those people and collecting turn-offs/turn-on.

15       So when we think about a viable utility going forward,

16  this is a key part of it, making sure that all of our rate

17  payers have rates they can actually afford to pay.  Otherwise,

18  we waste more public dollars chasing bad debt.  So that's a key

19  part of it.

20       We filed a motion, Your Honor, asking the Court to order

21  the State to give us the list of SNAP recipients, and the

22  State -- there has been a response focusing largely on privacy

23  concerns and burden.  And in thinking about it and talking to

24  counsel, my thought, Your Honor, is that we would file a

25  revised motion to go kind of right to the heart of the matter

1    and ask you to order the federal government -- the State has

2    come up with a number of horribles.  I don't think I agree with

3    any of them personally, Your Honor, but rather than spend a lot

4    of time on that, we think a more direct route that takes all of

5    the State concerns out is to ask the Court to order the federal

6    government to quarterly give Mr. Henifin, an officer of the

7    Court, the latest SNAP list, and then JXN Water will compare

8    that to their single-family apartment or residential customers.

9        I think Mr. Henifin has been upfront when he adopted this

10   rate pursuant to the special order, that people in multi-family

11   housing or different facilities, we are not going to be able to

12   reach them, but we think we can reach, you know, 80, 90 percent

13   of the folks who are -- who would benefit from these rates if

14   we get the list.  If we don't get the list, Your Honor -- I

15   have 300 utilities clients across the country.  When the

16   customer has to do something to get a benefit, typically we

17   would see like a 30-percent participation rate.  So if we have

18   to do mailers or put stuff online, there's all sorts of

19   reasons:  People don't trust the government, they are

20   embarrassed, they don't have time, they just don't understand.

21       So we really see this as a critical for those folks who

22   are most vulnerable, who have suffered a long time, Your Honor,

23   in this community, to give them -- for them to pay a fair rate

24   and to reach as many of them as possible.  It won't be perfect.

25   We won't be able to reach them all because of confidentiality

1    concerns, like somebody who is in an apartment building and the
2    landlord pays the rent.  There we are going to have to have a
3    separate system over time for them to authorize us to talk to
4    their landlord about they get a reduced rent, if that's what
5    they authorized.

6        But we think in the way we are asking for it, we can get
7    most of those folks, subject to an order from the Court about
8    how your agent -- your officer, Your Honor, provides the
9    confidentiality around that list.  I can't believe, as I stand
10   here today, that the federal government, who came to your court
11   for jurisdiction over this public health emergency, can't
12   provide an officer of the Court with the SNAP list pursuant to
13   whatever confidentiality provisions they would like to suggest
14   to the Court, Your Honor.  That is really all I have.

15       We would propose to amend our motion, ask the Court to do
16   that.  I don't know the position the federal government would
17   take, but unless you have questions, Your Honor, that's all I
18   have.

19           **THE COURT:**  Just one to start off with.  What
20   empirical data do you have to say that people won't respond?

21           **MR. CALAMITA:**  I can get it for you, Your Honor, but,
22   for example, Kansas City, Missouri is a client.  They have a
23   general fund subsidy program.  Thirty percent of the eligible
24   people participate, after years, Your Honor, of trying to get
25   people to do it.  And that's what I hear with other folks.

1      My understanding is, the SNAP program here in Jackson,

2  only 70 percent of the people who would get a check are getting

3  a check.  And this program has been around for a long time.

4  Some people are too embarrassed to participate in these

5  programs.  Others don't take the time.  They may be on drugs,

6  Your Honor.  I have no idea.  It is disheartening that we can't

7  get people in need to take advantage of these programs, but

8  that's been my experience.  I don't have specific numbers, but

9  I can get you some if you want to see, Your Honor.

10      We are convinced, though, we have to do it where the State

11  sends a mailer -- by the way, the State has worked with us to

12  try to come up with some alternatives, but we know those

13  alternatives will reach a far -- the penetration or the

14  participation rate will be so low that it won't achieve the

15  objective we are trying to do, which is fair rates for people

16  particularly who have suffered for a long time, Your Honor, and

17  avoiding the public utility cost of having to chase people who

18  really can't pay and shouldn't have to pay a rate they can't

19  pay for these basic human services, Your Honor.

20          **THE COURT:**  Thank you.

21          **MR. CALAMITA:**  Thank you.

22          **THE COURT:**  Is there a representative from the

23  federal government here?

24          **MR. FINGERHOOD:**  Yes, Your Honor.  Can I indulge the

25  Court for one minute for a quick side bar with Mr. Henifin?

1          **THE COURT:**  Okay.

2      (Mr. Fingerhood confers with Mr. Henifin.)

3          **MR. FINGERHOOD:**  Okay.  Never mind.

4          **THE COURT:**  Okay.  Then on this matter of an order

5  from this Court on SNAP to divulge the identities, any

6  problems?

7          **MR. FINGERHOOD:**  Yes, we do have a problem with that.

8  The problem is there is a law that protects the confidentiality

9  of this information.  And we appreciate that the counsel for

10  ITPM noticed this up and we had an opportunity to respond.  We

11  also filed a supplemental declaration.

12      I won't go through all of the arguments there, but, you

13  know, we acknowledge the good intentions of the SNAP rate plan,

14  but there are statutes that protect the confidentiality.  And I

15  think as explained in the declaration that we submitted

16  yesterday, releasing a blanket release of SNAP participants

17  could actually have an additional chilling effect on people

18  deciding to participate in the program.

19      As Mr. Calamita alluded to, you know, there's not a

20  hundred percent participation by people who are eligible for

21  the program.  I think a blanket release of this information

22  would be problematic.

23      More importantly, as far as his proposed order, in the

24  declaration at paragraph 10, USDA does not have this

25  information.  It's the State that has the information.  USDA

1    does require that the State maintain the confidentiality of the

2    information and provides certain penalties and safeguards that

3    the State has to comply with to ensure the confidentiality of

4    the information.  So the State, you know, has to keep this

5    information confidential as well.

6        They alluded to a couple of exceptions to this statute,

7    and as we explained in our brief, although Mr. Henifin is an

8    officer of the Court, the exception applies to federal

9    assistance programs, such as the National School Lunch Program,

10   or Women, Infant and Children Program, also known as WIK.  So

11   that exception does not apply.

12       He references some cases that limited amounts of SNAP

13   recipient information was related in the context of discovery.

14   As we explain in those cases, here the SNAP recipients are not

15   parties to this action and haven't consented to the release.

16       Now, while there are federal laws and state laws that

17   protect the confidentiality, we did indicate that we are

18   willing to do some sort of workaround where, you know, either

19   the State would let the SNAP recipients know that they are

20   eligible for this program, that is, essentially, instead of

21   paying $40 a month, they could pay ten dollars a month.  So

22   they would be informed of this.  There would be some sort of

23   return post card, you know, and we are, of course, willing to

24   work out all of the mechanics and the details to ensure that

25   whatever we would work out would comply with the law, but

1    basically, these people would agree that their information

2    could be disclosed to Mr. Henifin for the purpose of receiving

3    essentially a 75-percent reduction in their bill, which I think

4    is a pretty large incentive.

5         And I know Mr. Calamita said there may be anecdotal

6    evidence that it won't work.  I think before we try and do

7    something that could possibly violate federal and state laws,

8    that it's worth at least a shot.

9         So as I said, one last thing, you know, it's -- it would

10   be, in our opinion, burdensome for the state to provide this

11   information on a quarterly basis.  It's my understanding that

12   this information is updated annually during a certification or

13   recertification process.  So that's an additional problem.

14        And I was trying to think of an analogy.  I understand and

15   acknowledge, as I said, the good intentions of this, but, you

16   know, I've been going through this recently with a daughter

17   who's attending college.  I mean, colleges could reach more

18   eligible students with financial aid if, for example, a state

19   college could say, all right, State of Mississippi, give us all

20   the names of all the students with income under this level.

21   Sure, they could reach a lot more people, but there's laws that

22   prevent that and also confidentiality concerns.

23        People would be more reluctant to -- you know, I filled

24   out the FAFSA, and I said, I give you consent to get my tax

25   information from the IRS, and we would propose something

1    similar here.  Again, I think a blanket release of this

2    information could have a chilling effect on the program, the

3    SNAP program as a whole, put aside the participation from

4    recipients in this water benefit.  If people know that their

5    information is going to be released without their consent, that

6    could have a chilling effect on the SNAP program itself.

7            **THE COURT:**  So then how would you help Mr. Henifin?

8            **MR. FINGERHOOD:**  Well, as I suggested, I think the

9    State could send out, like, either -- either set up a website

10   or something and say, if you consent to us -- there's this

11   program out here.  You can pay $10 instead of $40.  If you

12   consent to participating in this program, go to this website,

13   enter this code, or it could be, you know, a pre-addressed

14   envelope that said, if you agree to us giving this information

15   to JXN Water, please sign this postage prepaid card and drop it

16   in the mail.

17           There are, I think, things that could be done along those

18   lines that would be consistent with the state and federal laws,

19   and also, you know, maybe we wouldn't get a hundred percent,

20   but I think, as I said before, given a 75-percent discount, $10

21   versus $40 a month, I think it would be pretty successful and

22   certainly worth trying.

23           **THE COURT:**  All right.  Thank you.  Mr. Henifin, when

24   you mail out your bill statements, couldn't you also mail out a

25   letter concerning the SNAP benefits?

1          **MR. HENIFIN:**  Yes, we could.

2          **THE COURT:**  And just tell them to sent it back in the

3     enclosed envelope?

4          **MR. HENIFIN:**  We could do that.  High administrative

5     costs, but we could do that.

6          **THE COURT:**  Like how high?

7          **MR. HENIFIN:**  Just mailing out to -- we can't

8     identify the customers -- we'd have to send it to all of our

9     customers, because we don't know the subset.  So we are sending

10    60,000 pieces of mail out.  Potentially 60,000 return, so we

11    would have to open, sort, hand to someone to go to the account,

12    change the account classification.  It's a lot of work, manual

13    work that, again, is bypassed with a database that can just be

14    run against our database.  So you are talking a couple of hours

15    of a data specialist versus weeks worth of manual work to deal

16    with 60,000 pieces of mail.

17         **THE COURT:**  So obviously you feel you could cut down

18    a lot of time just by getting a list.

19         **MR. HENIFIN:**  Absolutely, Your Honor.

20         **THE COURT:**  And to acquire a list, are you then in

21    favor of filing a lawsuit with this Court to try to get that

22    list?

23         **MR. HENIFIN:**  Yes, I am.

24         **THE COURT:**  Okay.  And prior to filing that lawsuit,

25    do you expect to enter into any settlement negotiations on that

1    motion with the other side?

2            **MR. HENIFIN:**  I would be happy to enter any

3    negotiations prior to filing it.

4            **THE COURT:**  Who will be negotiating that matter?

5            **MR. HENIFIN:**  That's a good question.  I would

6    assume -- at this point, if the federal government really

7    doesn't have the data, then we are back to dealing with the

8    state, and we would be negotiating with the Mississippi

9    Department of Human Services and the State of Mississippi.

10           **THE COURT:**  And if you have to go the motion route,

11   how long before you file your motion?

12           **MR. HENIFIN:**  We could file it next week, Your Honor.

13           **THE COURT:**  All right.  Let's do that, then, and see

14   where we are.

15           **MR. HENIFIN:**  Yes, Your Honor.

16           **THE COURT:**  Mr. Fingerhood.

17           **MR. FINGERHOOD:**  If I may be heard.  I think one -- I

18   think one suggestion that we had, rather than Mr. Henifin

19   sending it out to all of his customers, I think the State might

20   be willing to send it specifically to the SNAP beneficiaries.

21   There would be some small administrative cost there, but, you

22   know, like I said, a post card or something that says, "We

23   consent to your release of this information."

24       I certainly think that is probably a better use of the

25   money than spending money -- more money on lawyers and

 1    involving a judge's time on this.

 2              **THE COURT:**  But the State says it might be an

 3    invasion of privacy to identify these people.

 4              **MR. FINGERHOOD:**  Well, no, the State already knows.

 5    They don't want to give the information to JXN Water unless the

 6    recipients have consented to the release of the information.

 7    So the State -- I don't know if they send monthly

 8    communications or what, but the idea I had, and I haven't

 9    really talked this over with the State, the State is -- at

10    least this part of the State is not a party to this lawsuit.

11    So I think they are here on Zoom listening, but they haven't

12    been served with anything.  I think they -- I sent them a copy

13    of the papers.

14         But the idea would be that the State, you know, would send

15    this mailer that we would work with JXN Water in drafting,

16    saying you could be paying ten dollars instead of forty dollars

17    per month on your bill.  If you would like to do that and you

18    are okay with us providing your name and address to JXN Water,

19    sign this card and send it back.

20              **THE COURT:**  So you are saying the Court nor Mr.

21    Henifin will see the actual names of persons who are thought to

22    be on SNAP in the Southern District of Mississippi?

23              **MR. FINGERHOOD:**  Right.  They will only get that

24    information once a post card has been returned saying, yeah,

25    sure, sign me up, I consent to you giving my name and address

1  to JXN Water.

2  **THE COURT:**  Okay.  Thank you.  Counsel or Mr.

3  Henifin, either one, what do you think about this suggestion?

4  **MR. CALAMITA:**  A couple of quick things.  First, when

5  the federal government starts with "We don't have the list,"

6  Your Honor, it's their program, it's their money, they have

7  delegated it to the State.  They could get that list in 30

8  seconds, Your Honor, probably 15 seconds.

9  So it is disappointing.  You usually start with your best

10  argument, and to start with that one I don't think is

11  productive.  That's number one.

12  Number two, again, Mr. Henifin is a federal official in

13  the role -- for purposes of this role, and as we've briefed and

14  will brief again, the rules do allow release of this

15  information for federally -- equivalent federal programs trying

16  to focus on low income folk.

17  And while we were sitting here, I did quickly Google, Your

18  Honor, forgive me, but the Department of Health and Human

19  Services says that for 2018, the Low Income Energy Subsidy

20  Program that is well-known, been around for years, lots of

21  advertising, less than 30-percent participation nationwide.

22  So if we do it their way, by sending a notice, we are

23  going to miss a lot of folks, Your Honor, who have suffered,

24  who we're trying to help.  I do believe that -- we are all

25  worried about privacy.  I don't see any reason why they can't

1  give quarterly, indefinitely, Mr. Henifin the list pursuant to

2  confidentiality so that he can provide an automatic benefit to

3  those folks with no privacy concern whatsoever.  JXN Water

4  pursuant to a Court's confidentiality order would hold those

5  quarterly lists.

6       You know, we just think that, otherwise, it is going to be

7  years, Your Honor, and we are not going to be successful in

8  getting these people in, and we are going to have problems with

9  collection.  It is going to undermine the utility.  I

10  apologize, Your Honor, for making you make a tough call, but we

11  don't think -- we think it warrants asking the federal

12  government to provide us with that list.  And if they have to

13  oppose that, we certainly understand it, but we are not going

14  to be successful any other way.

15       **THE COURT:**  Okay.  What you want me to do with this

16  is ask them whether they are going to submit it?

17       **MR. CALAMITA:**  No, we are going to submit it, Your

18  Honor, unless you tell us not to, because Mr. Henifin works for

19  you, but we are going to ask you for that order probably next

20  week.  And we will not ask the State for it.  We are going to

21  ask the federal government, because the State has raised a

22  number of issues, like, they may lose the program.  The federal

23  government may take it back if they inappropriately release the

24  list.  So to avoid all of those issues, which I do not believe

25  are valid, we will file an order asking you to order the United

1    States to provide you with that list, to provide Mr. Henifin,

2    your agent, your officer, with that list quarterly, and we

3    think it's the right thing to do.  It's a necessary thing to do

4    in this public health emergency, Your Honor, and to move this

5    utility forward.

6         Everybody says they want a viable utility on the other

7    side of that.  That is an extraordinary request and will be an

8    extraordinary accomplishment, and they are going to have to

9    work with us occasionally on some very unique things.

10        The last thing I will say is, this isn't precedential,

11   Your Honor.  There is no other utility I'm aware of in the

12   country that has a Court-appointed official with a SNAP rate

13   adopted.  This is like a unicorn.  It is not precedential.  And

14   I believe the Court can impose appropriate confidentiality

15   requirements, which we have done it for far more significant

16   things than a SNAP list in the history of the federal

17   judiciary.

18        Thank you for hearing us on this, Your Honor.  We are

19   passionate about it, because we care and it's critical to us

20   being able to move forward.

21             **THE COURT:**  Thank you very much.

22             **MR. FINGERHOOD:**  Just one thing, Your Honor, and I

23   don't want to be facetious, but, you know, there are a lot of

24   great things that JXN Water could do if there weren't laws on

25   the books.  I mean, theoretically, you could say, well, you

1    know, why don't we just have the IRS send all the tax

2    information, and then we can target rates based on income.

3    Well, there's laws against that.  There's a law that prohibits

4    this.  There's a declaration from USDA that indicates this

5    could potentially cause damage to the SNAP program itself.  Put

6    aside, you know, this is an established program that has helped

7    hundreds of thousands of people in Mississippi, probably

8    millions throughout the country.  And, number one, we say they

9    don't have this information.  The State maintains the

10   information.  Number two, it could damage this valuable

11   program.

12        So I don't see the big deal about working out something

13   where they send out a post card.  You know, and that's fully

14   consistent with the laws on the books.  But if they want to

15   bring a lawsuit and fight this and take it to the Fifth

16   Circuit, that's a lot of money that could be used on fixing the

17   system.

18             **THE COURT:**  Thank you very much.

19             **MR. WILLIAMSON:**  Your Honor --

20             **THE COURT:**  Yes.

21             **MR. WILLIAMSON:**  -- can I just be heard briefly on

22   this, Your Honor?

23             **THE COURT:**  Okay.

24             **MR. WILLIAMSON:**  Terry Williamson, counsel for the

25   City of Jackson.  We do support the SNAP benefit rate, but I

 1     would like for the Court to bear in mind that whatever relief

 2     that you decide to grant, that there's not going to be an

 3     officer of the Court who is going to be running, you know, the

 4     City of Jackson Water System forever, you know.  It's going to

 5     go back to some entity that's not going to have a federal

 6     officer.  And however this works out, it needs to -- somebody

 7     else is going to have to, you know, carry this program forward

 8     in the future.

 9         So just bear that in mind, because what I hear Mr.

10     Calamita's basis for providing this information is that, you

11     know, Mr. Henifin is an officer of the Court, you know, this is

12     kind of a quasi-federal program, and that won't be the case

13     forever.  Thank you.

14             **THE COURT:**  Well, don't move yet.  We have had that

15     discussion.  In fact, we had that discussion this morning.  Mr.

16     Henifin and I had that discussion, that at some point there

17     will be some kind of determination somewhere on this about what

18     form this will take, I guess was the question.  But we are well

19     aware that when this matter first surfaced, that the timetable

20     was generally thought to be four years, wasn't it?  But that's

21     not been decided.  So that has not been decided, but I'm just

22     saying that we fully recognize that there could be a sunset on

23     this at some point.

24         I can't stay here with you all forever.  So I know you

25     want me to go ahead and do that, but I really can't.  And for

1    some strange reason, Mr. Henifin seems to prefer Virginia over

2    Mississippi and he thinks at some point he might be going home,

3    but he doesn't know when yet.  But we understand that, so don't

4    think we have overlooked any of these things here.  We have

5    tried our best to anticipate everything that could come up,

6    that might come up, and to work with it.  So we just haven't

7    gotten there yet.  We just have so many other things that are

8    on our plates, and so we are just moving, but we do understand

9    there are other issues down the road.

10          I think Mr. Henifin pointed to some of those things back

11    when he was making his comments about where the system is right

12    now and that we still have a number of things that need to be

13    addressed.  So that particular issue has not raised its head

14    yet, but it probably will at some point.  But we will see.  But

15    thank you for reminding us of it, though.

16          **MR. WILLIAMSON:**  Thank you.

17          **THE COURT:**  Mr. Henifin, am I correct that we do

18    recognize that --

19          **MR. HENIFIN:**  This isn't forever?

20          **THE COURT:**  -- that all good things come to an end?

21          **MR. HENIFIN:**  Absolutely, Your Honor.  This marriage

22    is going to end at some point.  A happy divorce.

23          **MR. CALAMITA:**  Can I just mention on that topic, Your

24    Honor, we know it is going to end.  Our strategy, Your Honor,

25    if we can do it our way and automatically apply this rate to

1   these folks, when it ends and there is no longer a federal

2   officer running a quasi-federal program, to quote Mr.

3   Williamson, we will then be able to send out that notice to

4   everybody and saying, hey, if you have been enjoying the SNAP

5   eligible and you want to continue enjoying that benefit, send

6   the State this letter.  We think we will get much better

7   participation two or three years down the road than if we try

8   to start the less than 30 percent that a number of these other

9   programs, like energy assistance, home energy assistance.

10       So that's our strategy, Your Honor, we know it is going to

11  end, but we are trying to reach as many as people as we can as

12  quickly as we can, not only for their benefit, but for the

13  viability of the rate structure for the system and the future

14  financial stability of the utility.  Thank you, Your Honor.

15           **THE COURT:**  Thank you.  All right.  Thank you.

16       I think the morning and the first part of the afternoon

17  has been productive, and we still have one other matter that I

18  told you that I will contact the parties most effective to make

19  an argument.

20       Ms. ACLU?  Yes, ma'am.

21           **MS. RANEY-GRAY:**  Thank you, Your Honor.  I think one

22  of my co-counsel on Zoom had one point we wanted to make about

23  SNAP, if you will permit that.

24           **THE COURT:**  What is your one point you want to make?

25           **MS. HERNANDEZ:**  Thank you, Your Honor.

1          So we just wanted to make sure that the record reflected

2    that we provided -- proposed plaintiff intervenors provided

3    extensive feedback on the rate change because there wasn't any

4    public commentary period or opportunity for the community to

5    weigh in on these rate changes.  So we went ahead and put

6    together some extensive feedback and sent that feedback on the

7    proposed rate changes and water affordability options and other

8    considerations under the SNAP program to Mr. Henifin and his

9    attorneys, as well as the City of Jackson.  And to date, we

10   have not heard back or any response to that.  But we would be

11   happy to send our feedback to the Court and to the EPA if that

12   will be helpful for your consideration as well.

13          **THE COURT:**  Could you just go ahead and send it to

14   us, as you put it, for our consideration?  Would you go ahead

15   and do that now?

16          **MS. HERNANDEZ:**  Yes, we would be happy to, Your

17   Honor.

18          **THE COURT:**  Okay.  Who prepared it, by the way?

19          **MS. HERNANDEZ:**  That would be the attorneys for the

20   proposed plaintiff intervenors of People's Advocacy Institute

21   and the Mississippi Poor People's Campaign.

22          **THE COURT:**  I'm not making any promises, but I do

23   want to look at it.

24          **MS. HERNANDEZ:**  Yes, sir.

25          **THE COURT:**  Okay.  Anything else from anybody?

1          **MR. BLACK:**  Your Honor, may I speak?

2          **THE COURT:**  Who is this?

3          **MR. BLACK:**  Patrick Black.  I'm general counsel for

4     the Mississippi Department of Human Services.

5          **THE COURT:**  Go ahead.

6          **MR. BLACK:**  We had submitted a letter to the Court.

7     We are not a party to this action, and so we did not file a

8     response.  We were made aware of the situation via the DOJ.  I

9     will say that Mr. Henifin and myself have been in conversation

10    related to the proposed SNAP rate for some time now.  And

11    MDHS's position has been clear and consistent that we cannot

12    provide the data as requested due to federal law.  However, we

13    proposed alternative manners in which this can potentially be

14    achieved, but all of the feedback from Mr. Henifin has been

15    that it's not going to be successful because of government

16    mistrust or low client turnout.  However, I would point out

17    that the SNAP program is a client-driven program.  They come to

18    MDHS seeking that benefit.

19         Additionally, government trust, I would be concerned and

20    remiss not to say anything about government trust if MDHS turns

21    over all of our private clients' information to another

22    program.  At what point are we any better then?  We will

23    undermine our own credibility.

24         I would also point out that Mr. Henifin's initial

25    estimation of how many Jacksonians this would reach has been

1   greatly inflated.  In his filing, he believes that that's

2   39,000.  MDHS pulled a Hinds SNAP data, and it was only 20,000.

3   Now, that includes all of Hinds County.  So to narrow that down

4   further to just those zip codes that are COJ-eligible would

5   further shrink that number even more.  So we have concerns

6   about the reach.  We have concerns about the privacy.

7   Additionally, we have some concerns about the overly burdensome

8   requirement that this program is seemingly wanting to shift to

9   MDHS.  Everything is MDHS could send a mailer.  Well, any

10   mailer would be an unallowable cost for this agency.  We can't

11   cover that.  It would also require our staff who are paid via

12   the U.S. Department of Agriculture's grant time.  That's not an

13   allowable expense.  We have also pointed that out to them.

14        The USDA, under their own declaration, has said as much,

15   that any sort of breach would be against our State plan, which

16   could essentially jeopardize the entire state's program.  So

17   instead of affecting it potentially, sub to 20,000 Jacksonians,

18   it could affect over 200,000 Mississippians, who are also just

19   as important and also just as in need.

20        I also, like Mr. Williamson, had concerns about what

21   happens when this quasi-federal program is no longer in

22   service.  I can't participate.  I can't provide that data to

23   them then.  It also is kind of short-sighted in that it does

24   not account for any SNAP participants who are rolling off or

25   make them come on after the federal conservatorship is over.

1          **THE COURT:**  Go ahead.

2          **MR. BLACK:**  So I think that MDSH is not unwilling to

3   work with the City of Jackson.  Unfortunately, the manner in

4   which they are seeking is not legally viable and, quite

5   frankly, not worth the risk of losing the entire state SNAP

6   program.  I do think we could work with them, but it is going

7   to require some outreach on their part, which they seem totally

8   unwilling to do, based on the idea that government trust and

9   just client empathy is not available.  But that can't be --

10  those can't overrule federal law and our own clients' privacy.

11         **THE COURT:**  Do you have another suggestion?

12         **MR. BLACK:**  Well, we had said that if they wanted to

13  develop a -- there's been talk of the State developing a

14  westbound site.  Well, we don't have the ability to create a

15  website.  We are also a grant-funded organization, and so I

16  have no means in which to establish a website for the City of

17  Jackson's Water Service.  Mailers, I can't do that without

18  cost.  But if the City of Jackson were to create some sort of

19  mailer, if the City of Jackson wanted to create a way for them

20  to self verify or opt in, they could then provide that

21  information to MDHS, and we could provide a simple yes or no

22  without breaching our client's confidentiality.

23         But the manner in which they are wanting to do it

24  currently is -- it's overly broad and breaches all federal and

25  state policies related to the administration of the SNAP data.

1        Additionally, the idea now that they would sue the federal

2    government for this data, unfortunately, like counsel has

3    stated, this is not the federal government's data.  It is a

4    federal grants program that is administered by the State.  So

5    the funds come to the State, but it is our clients and our

6    data.  And it is our duty to protect those clients data.

7        **THE COURT:**  All right.  Back to my last question.

8    What's your solution?

9        **MR. BLACK:**  Again, I'm happy to work with the City to

10   try to find a workaround, but I don't have one other than the

11   ones I suggested, which they have rejected outright at this

12   time.

13       **THE COURT:**  So you don't have a suggestion now?

14       **MR. BLACK:**  I mean, my suggestion would be that the

15   City of Jackson do the outreach and get the opt-in waiver from

16   their clients, and then we can provide them a yes or no.

17       **THE COURT:**  Well, okay.  Should you formulate a

18   possible project and a possible approach, would you be so kind

19   as to drop me a line on it?

20       **MR. BLACK:**  Yes, sir.  I will direct you to the

21   letter that I think we copied you on in which we did give some

22   alternative ways in which we could comply with federal privacy

23   rights but also hopefully get them the clients' participation

24   in their program that they would like.

25       **THE COURT:**  What was that last part?

1          **MR. BLACK:**  Excuse me, sir?

2          **THE COURT:**  That last part.  You would like

3    to furnish something --

4          **MR. BLACK:**  We could furnish them a way -- we could

5    then provide them a simple yes or no as to whether that client

6    is actually a SNAP member.

7          **THE COURT:**  All right.

8          **MR. BLACK:**  Without breaching the client's entire

9    privacy.

10         **THE COURT:**  All right.  Thank you.

11         **MR. BLACK:**  Thank you.

12         **THE COURT:**  Does anybody have anything else on this?

13    All right.  Thank you all so much.  And for those on the

14    last matter, then we will contact you and let you know what our

15    schedule looks like, and you can tell us whether you can meet

16    that schedule.  If not, we will try to work with your schedule.

17    Thank you very much.

18                         (HEARING CONCLUDED)

19

20

21

22

23

24

25

1

2

3                              CERTIFICATE OF COURT REPORTER

4

5          I, Teri B. Norton, RMR, FCRR, RDR, Official Court

6    Reporter for the United States District Court for the Southern

7    District of Mississippi, appointed pursuant to the provisions

8    of Title 28, United States Code, Section 753, do hereby certify

9    that the foregoing is a correct transcript of the proceedings

10   reported by me using the stenotype reporting method in

11   conjunction with computer-aided transcription, and that same is

12   a true and correct transcript to the best of my ability and

13   understanding.

14         I further certify that the transcript fees and format

15   comply with those prescribed by the Court and the Judicial

16   Conference of the United States.

17

18

19

20   s/ *Teri B. Norton*
     TERI B. NORTON, RMR, FCRR, RDR
21   OFFICIAL COURT REPORTER

22

23

24

25