```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                              NORTHERN DIVISION

 3

 4   UNITED STATES OF AMERICA,                        PLAINTIFF
     STATE OF MISSISSIPPI
 5
     VERSUS                    CIVIL ACTION NO. 3:12-cv-00790-HTW-LGI
 6
     THE CITY OF JACKSON, MISSISSIPPI,                DEFENDANT
 7   JXN WATER

 8

 9
                            STATUS CONFERENCE
10            BEFORE THE HONORABLE HENRY T. WINGATE,
                UNITED STATES DISTRICT COURT JUDGE,
11                         MAY 28, 2024,
                         JACKSON, MISSISSIPPI
12

13

14

15                    (APPEARANCES NOTED HEREIN.)

16

17

18

19

20

21
     REPORTED BY:
22
         CAROLINE MORGAN, CCR #1957
23       OFFICIAL COURT REPORTER
         501 E. Court Street, Suite 2.500
24       Jackson, Mississippi  39201
         Telephone:  (601)608-4188
25       E-mail:  Caroline_Morgan@mssd.uscourts.gov
```

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFF UNITED STATES OF AMERICA:

 3       ANGELA GIVENS WILLIAMS, ESQUIRE
         U.S. ATTORNEY'S OFFICE
 4       501 EAST COURT STREET, STE. 4.430
         JACKSON, MISSISSIPPI 39201
 5
         KARL J. FINGERHOOD, ESQUIRE
 6       U.S. DEPARTMENT OF JUSTICE
         ENVIRONMENTAL ENFORCEMENT SECTION
 7       POST OFFICE BOX 7611
         WASHINGTON, DC 20044
 8
         ANGELO MO, ESQUIRE (VIA ZOOM)
 9       EZEKIEL PETERSON, ESQUIRE (VIA ZOOM)
         U.S. DEPARTMENT OF JUSTICE, ENRD
10       150 M STREET, N.E., ROOM 2.900
         WASHINGTON, DC 20002
11
     FOR THE PLAINTIFF STATE OF MISSISSIPPI:
12
         ROY FURRH, ESQUIRE
13       DONNA J. HODGES, ESQUIRE
         MS DEPARTMENT OF ENVIRONMENTAL QUALITY
14       515 EAST AMITE STREET
         JACKSON, MISSISSIPPI 39201
15
     FOR THE DEFENDANT CITY OF JACKSON:
16
         TERRELL S. WILLIAMSON, ESQUIRE
17       SHERIDAN A. CARR, ESQUIRE (VIA ZOOM)
         SUSAN RICHARDSON, ESQUIRE (VIA ZOOM)
18       PATRICK TOWNSEND, ESQUIRE (VIA ZOOM)
         OFFICE OF THE CITY ATTORNEY
19       455 EAST CAPITOL STREET
         JACKSON, MISSISSIPPI 39201
20
     FOR THE DEFENDANT JXN WATER:
21
         FRANK PAUL CALAMITA, ESQUIRE (VIA ZOOM)
22       AQUALAW, PLC
         6 S. 5TH STREET
23       RICHMOND, VIRGINIA 23219

24

25
```

```
 1      MALISSA WILSON, ESQUIRE
        FORMAN WATKINS & KRUTZ, LLP - Jackson
 2      P.O. BOX 22608
        210 E. Capitol St., Suite 2200
 3      Jackson, MS 39225-2608

 4


 5

        ALSO PRESENT:
 6
        SUZANNE ARMOR, EPA (VIA ZOOM)
 7
        JIM VINCH, EPA (VIA ZOOM)
 8
        MICHELLE WETHERINGTON, EPA (VIA ZOOM)
 9
        AYANNA HILL, ACLU (VIA ZOOM)
10
        RACHEL FRISK, USDA (VIA ZOOM)
11
        LORI LASHA SHERMAN (VIA ZOOM)
12
        CHRISTIN WILLIAMS (VIA ZOOM)
13
        AZANDE WILLIAMS, DHS (VIA ZOOM)
14
        PATRICK BLACK, DHS (VIA ZOOM)
15

16

17

18

19

20

21

22

23

24

25
```

|    |    |
|----|----|
| 1  | **IN OPEN COURT, MAY 28, 2024** |
| 2  |    |
| 3  | THE COURT:  We are still trying to work out our |
| 4  | difficulties, and we have not been able to complete that. |
| 5  | So we are going to try audio on the telephone to see if it |
| 6  | works.  We are not sure it is.  We don't know what the |
| 7  | problem is, but we have been having some technical |
| 8  | difficulties for a while now. |
| 9  | So let's try to see what we can do.  If we can't do |
| 10 | this comfortably, then I will just have to reschedule this. |
| 11 | But it's important that we get everything down on the |
| 12 | record, and if Caroline here has difficulty picking up the |
| 13 | speakers, then that's what I'll have to do. |
| 14 | So we have been waiting since, I guess, about 9:30 to |
| 15 | get this situation resolved.  That's before you all got |
| 16 | here.  But we found out this morning that we had a problem, |
| 17 | and our technical people have been working since about that |
| 18 | time or maybe even a little before that.  But certainly they |
| 19 | have been working since 9:30.  And Terri has been working |
| 20 | longer than that because she's the one who detected the |
| 21 | problem when she was getting the courtroom ready. |
| 22 | So, Terri, let's call the case and see how far we can |
| 23 | get. |
| 24 | THE COURTROOM DEPUTY:  Your Honor, this is United |
| 25 | States versus City of Jackson, Civil Action Number |

1    3:12-cv-790-HTW-LGI, as well as United States of America

2    versus City of Jackson, Civil Action Number

3    3:22-cv-686-HTW-LGI, and we are here this morning for a

4    status conference.

5         At this time I am going to ask the parties to state

6    their names for the record starting with plaintiffs.  We are

7    going to start with the people that are actually in the

8    courtroom.

9         MR. FINGERHOOD:  Good morning, Your Honor.  Karl

10   Fingerhood from the U.S. Department of Justice,

11   Environmental Enforcement Section.

12        MS. ANGELA WILLIAMS:  Good morning, Your Honor.  Angela

13   Williams from the -- with the U.S. Attorney's Office for the

14   United States.

15        THE COURT:  All right.

16        MR. FURRH:  Good morning, Your Honor.  Roy Furrh with

17   the Mississippi Department of Environmental Quality.

18        THE COURT:  All right.

19        MS. HODGES:  Good morning.  Donna Hodges with the

20   Mississippi Department of Environmental Quality.

21        THE COURT:  All right.  Good morning to you.

22        MS. WILSON:  Good morning.  Malissa Wilson on behalf of

23   the interim third-party manager.

24        THE COURT:  All right.  Good morning.

25        MR. WILLIAMSON:  Good morning, Your Honor.  Terry

```
 1        Williamson on the behalf of the City of Jackson.
 2             THE COURT:  All right.  And good morning to you.
 3             MS. HILL:  Good morning, Your Honor.  Ayanna Hill with
 4        the ACLU representing the intervenor plaintiffs.
 5             THE COURT:  All right.  Thank you.
 6             All right.  Do we have all of the plaintiffs?
 7             Okay.  Now let's go to the other party.
 8             THE COURTROOM DEPUTY:  Can we have those that are on
 9        the teleconference to introduce themselves for the record
10        starting with the plaintiff?
11             MS. MO:  Good morning, Your Honor.  This is Angela Mo
12        with the U.S. Department of Justice, and I also have here on
13        the phone Ezekiel Peterson with the U.S. Department of
14        Justice; we have Rachel Frisk from the U.S. Department of
15        Agriculture; and we have from the U.S. Environmental
16        Protection Agency Michelle Wetherington, Suzanne Armor, and
17        Jim Vinch.
18             THE COURT:  Good morning to all of you.
19             Next?
20             MS. SHERMAN:  Good morning, Your Honor.  This is Lori
21        Sherman with FORWARD JUSTICE on behalf of the intervenor
22        plaintiffs.
23             THE COURT:  All right.  Next?
24             MS. CARR:  Good morning, Your Honor.  Sheridan Carr on
25        behalf of the City of Jackson.
```

```
1          THE COURT:  All right.  Thank you.

2          MS. RICHARDSON:  Your Honor, Susan Richardson with

3    Patrick Townsend, on behalf of the City of Jackson.

4          THE COURT:  Thank you.

5          MR. CALAMITA:  Your Honor, Paul Calamita on behalf of

6    the interim third-party manager.

7          THE COURT:  All right.  Good morning to you.

8          MR. BLACK:  Your Honor, this is Patrick Black, general

9    counsel for the Mississippi Department of Human Services.

10   We are nonparties.

11         MS. ASONDA WILLIAMS:  Asonda Williams with the

12   Mississippi Department of Human Services.

13         THE COURT:  All right.  Thank you.

14         MS. CHRISTIN WILLIAMS:  Good morning.  This is -- Your

15   Honor, this is Christin Williams on behalf of the

16   Mississippi State Department of Health.  We are also a

17   nonparty.

18         THE COURT:  All right.

19         All right.  We're ready to get started.  This is a

20   status conference.  Am I missing anyone who was expected to

21   be on the line?  All right.  I hear no answers.

22         I called this conference to determine where we are on

23   the issue involving the identification of SNAP

24   beneficiaries.

25         Ms. Williams, you communicated with the Court at one
```

1    point when the Court asked who was or would be the proper

2    party to speak on behalf of the Government's issue with

3    regard to SNAP identifications.  Am I correct?

4        MS. ANGELA WILLIAMS:  Yes, Your Honor, the Court is

5    correct.

6        THE COURT:  Okay.  Now, speak directly into the

7    microphone, and tell me, then, who is the individual who you

8    earmarked or identified as being the person who would be

9    able to clarify the Government's position on production of

10    the list of persons who are SNAP beneficiaries.

11        MS. ANGELA WILLIAMS:  Your Honor, from a factual

12    perspective, the Government identified Rachel Frisk.  She is

13    the director for the Program Administration and Nutrition

14    Division of the Supplemental Nutrition Assistance Program at

15    the United States Department of Agriculture, and she also

16    submitted two declarations to the Court.

17        THE COURT:  Okay.  Now, before I turn to the

18    declarations and to that person, I noticed that Mr. Henifin

19    is not present.  His counsel is.  And so --

20        MS. WILSON:  Yes, Your Honor.

21        THE COURT:  -- is he expected to be here?

22        MS. WILSON:  No, he is not, Your Honor.

23        MR. CALAMITA:  Your Honor, this is Paul Calamita on

24    behalf of Mr. Henifin.

25        He is on -- currently on an airplane.  Given the short

1    notice for this, he was unable to join us this morning.

2        THE COURT:  Okay.  So then you are waiving his

3    presence?

4        MR. CALAMITA:  Yes, Your Honor.

5        THE COURT:  Okay.  And you're agreeing with that?

6        MS. WILSON:  Yes, we agree.  I agree, Your Honor.

7        THE COURT:  Okay.  All right.  Thank you so much.

8        Now then, Ms. Williams, what is the status of this

9    controversy relative to the production of documents

10    identifying SNAP recipients in Mississippi?

11        MS. ANGELA WILLIAMS:  Your Honor, the USD- -- the

12    United States on behalf of the USDA submitted a letter to

13    the Court notifying the Court of the information that USDA

14    had, which we did not believe is responsive to the Court's

15    order.

16        The United States also filed a motion to stay the

17    Court's order for -- so that the United States could

18    determine whether and how -- if it would appeal.

19        We also advised the Court last week that the Solicitor

20    General had given authority to appeal or seek appellate

21    review of the Court's decision, and so we filed a motion to

22    stay pending that.

23        And then on Friday, the interim third-party manager

24    indicated that he did not have any opposition to the stay if

25    the United States was going to appeal by the 31st of May,

1    which the United States then indicated that it would.  And

2    so that is where we are.

3        THE COURT:  I don't understand the United States's

4    position relative to a potential appeal of the Court's

5    order.  So what I want is someone to explain to me the

6    United States's position before we get to that point of an

7    appeal, because maybe there is some way we can resolve the

8    issue without that consequence.

9        So who is that person I need to talk to?

10        MS. ANGELA WILLIAMS:  Mr. Fingerhood was prepared to

11    speak to the Court from a legal perspective.  If the Court

12    had any further questions, we did have Ms. Frisk available

13    for the Court from a factual perspective.

14        THE COURT:  Now, who is the person you identified

15    earlier who is going to speak on behalf of the Government?

16        MS. ANGELA WILLIAMS:  Ms. Frisk is the -- is the person

17    we identified earlier.  She is not a lawyer.  She is the

18    director of the program -- the director for Program

19    Administration and Nutrition Division of the Supplemental

20    Nutrition Assistance Program.

21        THE COURT:  So then Mr. Fingerhood is the person who

22    should provide the legal position that the United States is

23    taking on this matter?

24        MS. ANGELA WILLIAMS:  Yes, Your Honor.

25        THE COURT:  Mr. Fingerhood, is that correct?

1     MR. FINGERHOOD:  Yes, Your Honor.

2     THE COURT:  Now, Mr. Fingerhood, would you go to the

3 podium then?  Take any notes you need, because I would like

4 to have a thorough communication with you on this matter.

5     MR. FINGERHOOD:  Certainly.  Good morning, Your Honor.

6 Karl Fingerhood.

7     THE COURT:  Good morning, Mr. Fingerhood.

8     THE COURTROOM DEPUTY:  Mr. Fingerhood, can you let the

9 lectern up some?

10     MR. FINGERHOOD:  Good morning, Your Honor.  Karl

11 Fingerhood, U.S. Department of Justice, Environmental

12 Enforcement Section.

13     As was indicated before, the third-party manager does

14 not oppose a stay.

15     THE COURT:  But now, the stay was only until Friday; is

16 that correct?

17     MR. FINGERHOOD:  Right.  Well, it -- to file any notice

18 of appeal, and then it would be pending the appellate

19 procedure.

20     THE COURT:  So what's the benefit of a stay?  I don't

21 quite understand that.

22     MR. FINGERHOOD:  Well, I think we, respectfully, have a

23 disagreement with whether or not the third-party manager can

24 be considered a federal assistance program as a matter of

25 law, and I think that is the issue that would be taken up on

1    appeal.

2         THE COURT:  Now, aren't you with EPA?

3         MR. FINGERHOOD:  EPA is my client.  I'm with the

4    Department of Justice.

5         THE COURT:  So how did you get wrapped up in this

6    matter?

7         MR. FINGERHOOD:  Well, there was the motion that was

8    filed, and -- and perhaps the civil division may have gotten

9    involved earlier.  But we ended up briefing the matter, and

10   U.S. Department of Agriculture is the federal agency that

11   has oversight of the SNAP program.  And so, you know, we --

12   we ended up doing the briefing with assistance from counsel

13   in their office, and, you know, that's how we got to where

14   we are today.

15        THE COURT:  Well, clarify your involvement here, if you

16   don't mind, Mr. Fingerhood, because I thought that you were

17   with EPA and EPA was concerned with rectifying this matter

18   here in the City of Jackson.

19        MR. FINGERHOOD:  Well, I represent the EPA.  In this

20   particular issue, I'm representing the U.S. Department of

21   Agriculture.

22        THE COURT:  Now, did they specially appoint you?

23        MR. FINGERHOOD:  No.

24        THE COURT:  So how did you end up being on the

25   agricultural side?

1    MR. FINGERHOOD:  Well, the motion was filed, and the

2    Department of Justice needed to respond on behalf of the

3    Federal Government.  So since Ms. Williams and Ms. Mo and

4    myself were already involved in the case, we were the ones

5    who ended up working with USDA and filing the -- the legal

6    papers.

7    THE COURT:  USDA doesn't have attorneys?

8    MR. FINGERHOOD:  They do.  But like EPA, I don't

9    believe the USDA attorneys can appear in federal court.

10   Usually it's the Department of Justice who would represent

11   them in federal court.

12   THE COURT:  The last two or three occasions -- maybe

13   two or three, I don't know -- it appears that when you have

14   appeared, you have been in opposition to the third-party

15   manager or what the Court hopes to achieve by its efforts

16   here on this litigation.

17   MR. FINGERHOOD:  Well, with respect to the matter that

18   is presently before the Court, we have indicated numerous

19   times that we're willing to -- we don't have an opposition

20   to having SNAP participants opt in.  What -- our concern is

21   that their private information is being given to someone

22   without their consent, and so...

23   THE COURT:  All right.  Now, before you get to that --

24   MR. FINGERHOOD:  Okay.

25   THE COURT:  -- I'm still trying to clarify your

1    presence and position that you're taking.  Perhaps, that's a

2    valid position.  I'm not saying that it's not.  But I was

3    kind of surprised to see you stand to state what the

4    opposition is, because it would appear to me that when we

5    have had opposition from the Government, it has always come

6    through you.  And so then I'm wondering what your position

7    is on this dilemma concerning the City of Jackson.

8         The last time you were here, we were in a dispute on --

9    on money being released and whether there was some

10   difficulty on that.  And then before that, there was some

11   other issue -- I need to think back for a moment -- but you

12   appeared to be on the other side of where the people here --

13   here were.

14        So is there some particular reason why EPA would find

15   itself in opposition to the efforts being brought here on

16   behalf of the citizenry of Jackson in trying to get their

17   water issue straight?

18        MR. FINGERHOOD:  Well, on this particular matter, I

19   don't think EPA has taken any position.  I'm an attorney

20   with the Department of Justice.  I represent EPA in this

21   matter.  In this particular instance, I'm representing the

22   U.S. Department of Agriculture, but as an attorney with the

23   Department of Justice, my position is to make sure that the

24   laws of the United States are executed faithfully and

25   according to the law.

1      So I think last time the issue was -- you know, there

2   was a question of whether or not the Court had jurisdiction

3   because the administrative process had been played out, and

4   so that was the argument I made here.

5      There are concerns about the privacy of the SNAP

6   recipients' information, and so that's why I'm here today

7   representing that position.

8      THE COURT:  Do you look for issues to contest these

9   matters so as to stall the efforts to resolve these water

10  issues?

11     MR. FINGERHOOD:  No, I do not.  And I think if you

12  would talk to the third-party manager and his counsel and

13  even counsel for the state agency, we've been in contact

14  from before the papers were filed to discuss other

15  alternatives that we thought would -- would work and not

16  violate the law, but those -- unfortunately, those

17  discussions didn't pan out.

18     THE COURT:  For instance, Mr. Fingerhood, when I first

19  came in on the water case and then later took on the sewage

20  case, one of the first things that bothered me was that EPA

21  had done a consent order with the City of Jackson back when

22  this lawsuit -- back when the sewage case was filed.  But,

23  nevertheless, that case sat there for 13 years, and nobody

24  seemed to care that the citizens in Jackson were suffering.

25     EPA didn't file a motion to hold the City in contempt,

1    and this all went on for 13 years until I picked it up, and

2    I voluntarily reached over and took the case so that it

3    could move.

4         So all that time, the case just sat there in limbo.  So

5    EPA didn't have any real concern, it seems to me.  And then

6    after I picked the case up and started pushing for some

7    resolution on the various matters, that's the first time

8    that the docket reflects anything from EPA since the lawsuit

9    was filed and since the consent order came in.  Other than

10   that, nothing happened for that length of time.  So now --

11        MR. FINGERHOOD:  Your Honor --

12        THE COURT:  So now, when EPA appears through you, it

13   has been a -- a representation which is contrary.

14        Now, again, some of it I wonder about.  Just like the

15   last time we were here about the money, why the money

16   couldn't be released that we expected to be released so we

17   could get started.  But then when we tried to put together

18   the water case and the sewage case, we had problems out of

19   EPA, and I heard from you on that, where it appeared that

20   you were negative in some degrees, and so then we had to

21   work through all of that.

22        So what I'm asking is, here you are now, and I did not

23   expect you to be the -- the standard-bearer, but here you

24   are again, and you have a barrier that you are telling us

25   that we need to observe.  If there is a true legal barrier,

1       then certainly I want to do that.

2           And, in fact, I have in mind a potential solution to

3       this matter that I would like to throw out in just a moment

4       that might make everybody happy on this particular matter.

5       But I just cannot ignore the many times that EPA has

6       appeared, and it doesn't seem to me that EPA is being

7       necessarily helpful, but instead, EPA is telling us all of

8       the things we can't do and from time to time has threatened

9       to pull out of this agreement, that we will get to the

10      bottom of our problems, be able to resolve them.

11          So I understand the -- the nature of justice, having to

12      protect the citizenry.  I don't quarrel with that.  But,

13      nevertheless, the voice that's speaking has not said

14      anything for quite a while, and then when it does speak, it

15      seems to be negative.  Instead of proposing positive

16      matters, it appears that what I'm hearing are negative

17      matters constantly.  And so here I'm trying to work with my

18      third-party manager to try and move forward, and then we

19      hear from EPA on what we can't do, but I don't hear from EPA

20      what we should do, can do.  Don't hear from that.

21          And keep in mind that the backdrop that this Court is

22      speaking against is a 13-year history where EPA did

23      absolutely nothing except let the citizens of Jackson

24      suffer.

25          So, now, if that description is incorrect or if I have

1    missed something that was more pronounced in a positive way

2    from EPA during this time period, instead of threatening

3    from time to time to pull out of this agreement, then,

4    Mr. Fingerhood, would you please tell me?  Because I would

5    hate to be wrong about my assessment here.

6         So if there is something that I need to know, will you

7    please tell me, other than the raw statement that you have

8    made from time to time, is that as a representative of

9    justice, the Justice Department, that you have to be sure

10   that everything is done right.

11        Well, surely the other side of ensuring that things are

12   done right carries with it the possible knowledge of how to

13   do it right, since you started off as a party in the -- in

14   this litigation.  So -- and I'm talking about the sewage

15   case especially.

16        Now, so then before we get to what I would hope to be a

17   resolution on the matter after I heard you tell me all of

18   the broken parts here, then can you tell me just where EPA

19   actually stands?

20        MR. FINGERHOOD:  Well, first, I do want to go back to

21   the sewer consent decree.  I was one of the attorneys

22   involved in negotiating that, along with Mr. Williamson,

23   who's in the courtroom here.  I do think it was more -- the

24   consent decree was entered in 2013, so it was more of a

25   ten-year period, and I do think a review of the docket sheet

1    does show that at some point we did have several

2    conversations with the City and their counsel.  And

3    Ms. Richardson is one of the attorneys on the phone, and we

4    had several meetings with them to try and get the City into

5    compliance.  And then in order to, I guess, maybe increase

6    the awareness of the City's failure to comply with the

7    consent decree, we reopened the sewer case and started

8    filing regular joint status reports.

9         During that time, we were regularly meeting with the

10   City and determining, based on their financial situation,

11   what they could afford to do and how quickly they could do

12   it.  There were meetings, not just with attorneys but also

13   with engineers and also financial experts, looking at what

14   the City could afford to pay.

15        This is -- predates the -- the interim stipulated order

16   on the Drinking Water Case where Congress appropriated some

17   additional funding for the City.  So we had numerous

18   conversations.  We were filing regular status reports with

19   Judge Lee.  And so I would say that we were taking action.

20        As the Court knows, I've been here many times, and I

21   personally have a stake in seeing things succeed here.  I

22   think everybody wants this to succeed, but we also have to

23   make sure that, you know, in doing that, we comply with the

24   laws of the United States.

25        THE COURT:  These interim reports you're talking about

1    that you said you filed with Judge Lee when he had the case,

2    none of that is on record.  It's not on the docket sheet.

3        MR. FINGERHOOD:  I bel- -- they might be under the --

4    before the cases were combined, they may be on the older

5    entries, which I'm not sure were carried over to the

6    combined docket.  But I have filed copies that I can provide

7    the Court if --

8        THE COURT:  Could you provide those?  Because I thought

9    I looked at the old documents, and all I saw was that the

10   case was filed, that there was a consent decree, and then

11   the rest of the docket is silent.  There is nothing else on

12   it.  That's what I have.

13       But, now, if you have some interim reports that you

14   filed in another court, then I would like to see them, if

15   you don't mind.  Is that okay?

16       MR. FINGERHOOD:  Oh, certainly.

17       THE COURT:  Okay.  Then I would like to see those.  I

18   would like to see what was said during that time period.

19   And then if I see that you actually did file some matters in

20   another court, that even though the docket sheet remains

21   silent, then I'll alter my comments on what you all did

22   during that 13-year period.  Because if you look at the

23   docket sheet, there's nothing except the case was filed and

24   that there was a consent decree between the City and EPA,

25   and that's all.  There's nothing else on the docket sheet.

1          So now, having delved into that, let's move on.  What I

2   want to know, then, is on this matter of the SNAP

3   identifiers, you have, in consult with the agriculture

4   department, raised an objection to releasing the identities

5   of those persons to Ted Henifin, correct?  And you construe

6   that as a violation of the beneficiaries' privacies,

7   correct?

8          MR. FINGERHOOD:  Yes, your honor.

9          THE COURT:  Now, we all agree, and I think we would

10  agree without hesitation, that those beneficiaries of SNAP

11  benefits would be in favor of having their water bills

12  reduced.  Now, that just seems to be common approach and

13  common sense, correct?  So they would want to have the

14  benefits that we wanted to provide once we had their names

15  so that we would know to whom to provide the benefits.

16         Now -- one second.

17             (An off-the-record discussion was held.)

18         THE COURT:  Now, back to where I was.  So, then --

19  okay.  I'm back on.

20         So, then, everyone agrees that they would want the

21  reduced rates.  Now, do you have a suggestion as to how we

22  could do that?

23         MR. FINGERHOOD:  Yes, Your Honor.  As we have proposed

24  before, because there is a significant benefit to the

25  recipients, we think an opt-in program where they could

1    somehow fill out a postcard or something that would verify

2    that they're a SNAP recipient, that would be way that they

3    could opt in.  It's not releasing their personal information

4    without their consent.  They can essentially opt in, but in

5    exchange, they get that discount on their water bill.

6        And so that was something we proposed and think, you

7    know, with appropriate publicity and given the amount of

8    discount involved, that that would be something that would

9    be workable and comply with the law.

10       THE COURT:  What do you think would be an acceptable

11   mode of communication from them?  You named postcard.  Would

12   a postcard be sufficient?

13       MR. FINGERHOOD:  Well, first, let me just make a couple

14   points for the record.  First of all, I want to clarify that

15   EPA doesn't have a role in the SNAP program, and so that's

16   why I said they have no position, that they don't oppose it

17   or support it.  They have no role in SNAP.  It's USDA.

18       The SNAP program is administered by the states.  The

19   Federal Government provides the funding, so the State is the

20   one that has the information.  And we did have joint

21   discussions between the -- the third-party manager and the

22   State about possible work-arounds that would allow people to

23   opt in, because, you know, the State -- and they're not a

24   party to this, but they are on the phone, and, you know,

25   they are probably in a better position to talk about the

1    mechanics.

2         But I think, you know -- just from my own, you know,

3    two cents' worth, I think there are probably ways that

4    people could opt in or could be something said in the bills

5    themselves that would advise people of this.  As far as what

6    would be needed, I don't know.  Maybe, like, they could send

7    in a Xerox of their -- I think the SNAP beneficiaries

8    actually receive, like, a -- it's almost like a credit card,

9    and so they could -- I mean, I don't know.  I think the

10   people with the State would have more expertise, but I do

11   think there would be ways to do it that would not be a large

12   inconvenience but also protect the privacy of the people who

13   perhaps didn't want to participate or perhaps, you know,

14   they're in a vulnerable situation; for example, at a -- you

15   know, a homeless shelter or, you know, a battered women's

16   shelter or something like that where they didn't necessarily

17   want that information to -- to be released.

18        THE COURT:  So then who would be the person to speak on

19   behalf of USDA?

20        MR. FINGERHOOD:  We have Rachel Frisk, who we have

21   indicated before has already submitted a couple declarations

22   in this matter.  But also I think as far as, you know, an

23   opt-in program, as I said, because the State has the

24   beneficiary information, you know, I would kind of defer to

25   them in the first instance as far as what alternatives would

1    be possible with respect to an opt-in program.

2        THE COURT:  Okay, then.  She's on the line?

3        MR. FINGERHOOD:  Ms. Frisk?  Yes.

4        THE COURT:  And so then I will hear from her.  Thank

5    you.  I'll get back to you.  I want you to come in later and

6    chime in and tell me any other legal matters you think the

7    Court should consider, if the Court hasn't done so already.

8    All right?  Thank you.

9        MR. FINGERHOOD:  Thank you, Your Honor.

10        THE COURT:  And then after she speaks, I would like to

11   hear from the representative of Mr. Ted Henifin and to get

12   his perspective, through his counsel, on this matter.

13        Now, then, let's start off with Ms. Frisk.  Hello?

14        MS. FRISK:  Hello, Your Honor.  This is Rachel Frisk.

15        THE COURT:  And how are you today?

16        MS. FRISK:  I'm okay.  Thank you.

17        THE COURT:  Now, spell your last name, please.

18        MS. FRISK:  It's F-R-I-S-K.

19        THE COURT:  F-R-I-S-K, Frisk.

20        MS. FRISK:  Correct.

21        THE COURT:  All right.  Now, then, Ms. Frisk, how would

22   you resolve this matter?

23        MS. FRISK:  What Mr. Fingerhood was just going over is

24   what we usually recommend when we are asked questions like

25   this.  So when questions come in about how a state could

1    share data, SNAP data, SNAP household data, with another

2    party that does not meet the kind of limited exception in

3    the Food and Nutrition Act for data sharing, we suggest kind

4    of an outreach approach whereby the state agency can provide

5    some outreach to the SNAP recipients about a program and

6    have them opt in.

7         THE COURT:  Describe the outreach program.

8         MS. FRISK:  I'm sorry.  You're breaking up.  Can you

9    say that again?

10        THE COURT:  Yes.  Describe the outreach program.

11        MS. FRISK:  Thank you.  Typically, so the SNAP state

12    agency, using funding from the other entity but not SNAP

13    funding, would be able to contact their SNAP households and

14    share information on another program's benefits, such as the

15    one we're talking about today.

16        And in the -- you know, in the instance in Mississippi,

17    as just noted, they can probably speak best to how they

18    would do that.  Every state agency might take a slightly

19    different approach, but -- whether it's, you know, as you

20    noted, through a postcard or a letter or a code or something

21    or some reference to their website or the relevant website

22    of the program, they can reach out to their SNAP households,

23    let them know about the potential benefit available to them,

24    and then take various approaches or -- not the State.

25    Sorry.  Not Mississippi SNAP state agency, but let them know

these are various approaches they could take to opt in to

that program that is available to them as SNAP households.

THE COURT:  Do you know whether this approach has been

taken anywhere else in the country?

MS. FRISK:  So we -- we receive questions about this a

lot, which is a positive sign.  States often are seeking

ways to support low-income households in various ways, such

as through tax credits that are state tax credits.

Recently we have received questions about states who

passed supports for college students and want to, you know,

provide those to low-income recipients.  And so we get -- we

get questions about this particular thing often, and we do

recommend this approach often.  I do not have information

on, you know, success rate, but this is -- this is typically

what we recommend.

THE COURT:  So who handles that effort?

MS. FRISK:  The state agency that is -- or -- sorry.

The state agency is -- is responsible for protecting the

SNAP data.  The other party that doesn't meet the exceptions

for data sharing or other -- you know, receiving data on

SNAP households is responsible for kind of providing the

materials about their program to the state agency that

administers the SNAP program, and then the SNAP state agency

would be the one sharing it to their SNAP households.  But,

again, SNAP funding cannot be used for that purpose of them

1    sharing that information.

2       THE COURT:  So do you know of any outreach program

3    currently in effect in Mississippi whereby this approach is

4    being utilized?

5       MS. FRISK:  I do not know of one in Mississippi, but

6    the state agency may -- may know of some.

7       THE COURT:  And the state agency is described as what?

8       MS. FRISK:  The SNAP state agency in Mississippi is the

9    Mississippi Department of Human Services.

10      THE COURT:  Now, do I have anyone on the telephone from

11   the Department of Human Services?

12      MR. BLACK:  Yes, sir.  This is Patrick Black, general

13   counsel for the Mississippi Department of Human Services.

14      THE COURT:  Have you followed this discussion?

15      MR. BLACK:  Yes, sir.  I -- we are a nonparty to this

16   action; however, we have provided the Court with a letter

17   that was dated February 22nd, 2024, advising of our position

18   on the matter as well as incorporating the DOJ's arguments.

19      We've also been in discussion with the third-party

20   administrator on ways in which this could be achieved.

21   However, to date, the third party had not been willing to

22   engage in those alternatives.

23      THE COURT:  Name me those alternatives.  How many are

24   there, first of all?

25      MR. BLACK:  Well, they all require an opt-in approach,

1    and the third party's position to now has been that that

2    would be unsuccessful.

3         THE COURT:  Say that again, please.

4         MR. BLACK:  The opt-in approach -- it is my

5    understanding via communication that the opt-in approach

6    would not be successful, which is why they have not pursued

7    it.

8         THE COURT:  Why wouldn't it be successful?

9         MR. BLACK:  Their argument has been that low government

10   trust, low participation rate.  However, I would point out

11   that SNAP is a client-driven program which you voluntarily

12   must come forward and apply for.  So I -- I don't know that

13   that is a -- a good approach, because it's the same -- I

14   mean, I don't know that that would hold water in that our

15   clients come to us, just like the water clients would need

16   to come to them and say, we would like the lower rate.

17        THE COURT:  So how many approaches are you suggesting?

18        MR. BLACK:  What we -- like Ms. Frisk suggested, we

19   have -- we have said that we would send out a mailer to our

20   clients.  However, we cannot -- the City of Jackson would

21   have to pay for our employees' time, the cost of the mailer,

22   any -- any cost associated with it.  We can't utilize SNAP

23   funds for that type of outreach, so the City of Jackson

24   would have to pay for all of that.

25        We also, you know, suggested that there be some sort of

1    outreach, and that could be conducted by the City of

2    Jackson, whether that be community events, social media,

3    creating a website.  Today, I can't speak to whether any of

4    those have been implemented.

5        THE COURT:  Do you have any other suggestions?

6        MR. BLACK:  No, sir.  Unfortunately, all of our

7    suggestions are limited to some sort of opt-in protocol due

8    to the federal regulations.

9        THE COURT:  It would be an opt-in program not to be

10   furnished out of SNAP money but through some other financial

11   means, such as self-help on behalf of the SNAP

12   beneficiaries.  Is that what you are saying?

13       MR. BLACK:  Well, it would be an opt-in in that if the

14   City of Jackson wished for us -- wished to pursue that sort

15   of alternative, they would have to pay for all of the cost

16   and expense for the City to -- I mean for the agency to

17   administer that.  The recipient would receive some sort of

18   communication, whether it be email or mailer, and that they

19   would be directed, I assume, however the City of Jackson

20   would like to do it, that they, you know, go to a website or

21   go -- you know, call and allow -- and give them permission

22   to reach out to Mississippi Department of Human Services and

23   then we could verify their benefits, and then we would be

24   able to do that.

25       THE COURT:  Okay.  Any other suggestions that you think

1   would comport with the federal law?

2       MR. BLACK:  No, sir.  Unfortunately, under our reading

3   of the federal regulation, we cannot share this data with

4   the City of Jackson.  They are not a federal assistance

5   program.  So without a SNAP recipient's authorization, I

6   can't provide that.

7       And as Ms. Frisk has notified the Court in her letter,

8   any sort of disclosure by MDHS to the -- to the JXN Water

9   program could potentially result in a total withdrawal of

10  all SNAP funds as a breach of privacy.  So we're --

11      THE COURT:  Excuse me.  But you are saying a total

12  withdrawal of all SNAP funds from the State of

13  Mississippi --

14      MR. BLACK:  Right.

15      THE COURT:  -- from the State of Mississippi?

16      MR. BLACK:  That's correct.  So USDA'S position is that

17  would be a breach of our privacy control under federal law,

18  and, therefore, it could -- could be entire SNAP program,

19  which serves 300,00 Mississippians, in jeopardy.

20      THE COURT:  Okay.  Have you done that before?  Has --

21  has that program been subjected to that type of penalty

22  before anywhere else?

23      MR. BLACK:  I can't speak to that, Your Honor.

24      THE COURT:  And who would be the administrator or

25  administrative office that would make that determination?

1          MR. BLACK:  The United States Department of

2     Agriculture.

3          THE COURT:  And what office would that be?  What

4     department?

5          MR. BLACK:  That's USDA, Ms. Frisk, who you just spoke

6     with.

7          THE COURT:  Okay.  Then let me turn back to her again.

8     Do you have anything else you want to offer before I turn

9     back to her?

10         MR. BLACK:  No, sir.

11         THE COURT:  All right.  Ms. Frisk?

12         MS. FRISK:  Yes, Your Honor.

13         THE COURT:  Do you agree with his comments?

14         MS. FRISK:  I do.

15         THE COURT:  And so then you are saying that unless

16    that -- no, not unless, but you're saying that should the

17    State comply with this order, that you would recommend

18    litigation and appeal this matter?

19         MS. FRISK:  I'm sorry.  Under the Food and Nutrition

20    Act, it is USDA's job to assess how the State administers

21    the program and whether it administers SNAP in mind with

22    statute and regulations.  There are penalties in the Act

23    when a state does not administer the program consistent with

24    statute and regulations, and this prohibition on disclosing

25    SNAP recipient data except in limited circumstances is in

1    the statute.

2        So as noted, if Mississippi were to disclose this data,

3    they would be at risk of suspension or disallowance of

4    program funding, which could, yes, lead to a total

5    suspension from operating SNAP.

6        THE COURT:  Okay.  All right.  Thank you.  Just hold

7    on.  I need to hear from counsel for Mr. Henifin, and then

8    I'll get back to you.

9        Now, counsel for Mr. Henifin.  Yes?

10       MS. WILSON:  Your Honor, counsel Paul Calamita is --

11       MR. CALAMITA:  Your Honor, Paul Calamita on behalf of

12   the interim third-party manager.  We appreciate your time

13   this morning.

14       Two things:  First, Mr. Henifin did have conversations

15   with Mr. Black about these alternate opt-in approaches,

16   which we do not think would be successful, as similar

17   programs have had a penetration rate of less than 30 percent

18   where there are opt-in heating subsidy programs and other

19   subsidy programs.  That's number one.

20       Number two, Mr. Henifin doesn't have the staff to -- to

21   go out and solicit and manage these folks.  He was hoping to

22   get the existing list.  This list -- the State has the list.

23   We feel we're a unicorn-type program.  We do feel we're a

24   federal grant program for these folks.  This is a program

25   implemented through federal court, an officer of the court,

 1    and a federal stipulated order.

 2          We don't think there's any precedential risk to either

 3    the State or Federal Government that anybody else is going

 4    to show up like this.  So we feel like the risk to the

 5    agencies was very small, very minor.

 6          There was a federal order that gave them both political

 7    and legal cover.  We're disappointed that they feel they

 8    have to appeal it, but we really think this is the only

 9    way -- in getting the list is the only way to really provide

10    the benefit we're trying to provide.

11          And in terms of the financial stability of the utility,

12    getting the list lets 10,000 -- I don't know the exact

13    number because we've never seen the list.  10,000 we'll use

14    as -- I'll just use as a number, lets them pay an equitable

15    rate while also avoiding cost to the utility of having to

16    chase those people who have suffered so much from when they

17    can't pay the rates, the non-SNAP rate.

18          So to really implement the rate schedule that the

19    third-party manager implemented, without objection from any

20    of the parties, we need that list.  I don't see why

21    Mr. Henifin can't be trusted with that list as an officer of

22    the court when every administrator, every school in the

23    state of Mississippi gets that list for both -- there's a

24    breakfast list and a lunch list.  So I think they're making

25    mountains out of molehills in terms of the -- the

1    confidential.

2        And the one other thing I would say is we did have

3    conversations with Mr. Black, which we appreciated.  I

4    wasn't aware, through those conversations, that Mr. Black

5    had clearance even to work with us on the opt-in programs

6    that he mentioned.

7        So, Mr. Black, if you now have clearance so that those

8    are actually viable opportunities, you know, that's one

9    thing.  But even if they are viable, Mr. Henifin is adamant

10   he doesn't believe they will achieve what he's trying to

11   achieve.

12       Last word was we have two people in Jackson who have

13   signed up for the SNAP rate.

14       THE COURT:  And what publicity was provided to those

15   two people to get them to sign in?

16       MR. CALAMITA:  We have -- we have information about the

17   SNAP rate on our web page.  Mr. Henifin has an outreach

18   coordinator, multimedia, which is something I don't do.  But

19   I think we've pushed out into a lot of the normal media

20   channels, Facebook and whatever the social media.

21   Mr. Henifin has somebody who handles that.  So I think we

22   have pushed that out, and last -- again, last I heard, there

23   were two people who had contacted us for the SNAP rate.

24       THE COURT:  So what is your response to Ms. Frisk's

25   warning that if this information is provided, that

1  Mississippi's SNAP program could be put in suspension or

2  canceled?

3      MR. CALAMITA:  Well, Your Honor, that would be the

4  classic Federal Government cutting off their nose to spite

5  their face, Your Honor.  The idea that they would -- they

6  would harm 200 -- or 300,000 needy Mississippians because a

7  list was given to an officer of a federal court shocks me.

8  That's number one.

9      But to avoid even that the highly unlikely, if not

10  un- -- completely unrealistic, scenario, Your Honor, we had

11  consented to a stay of the order pending appeal.  And the

12  appeal has a sole issue of whether the interim third-party

13  manager's rate schedule qualifies as a federal grant

14  program.  If it does, we get the list.  If it doesn't, we

15  don't get the list.

16      I will say, Your Honor, so my resolution would be let

17  them appeal.  In the interim, I have an -- I would love to

18  hear from Mr. Black.  Like, the email notice to the SNAP

19  folks who are eligible I think is -- would be of interest to

20  us as an interim step.

21      We did not like postcards, Your Honor, because, quite

22  frankly, I thought that was crazy.  They can't give

23  Mr. Henifin the list, but we can send, through public mail,

24  all the SNAP people a postcard inviting them to check the

25  box and send it back?  I mean, every mail carrier would know

1    they were a SNAP beneficiary.  That just -- that didn't make

2    any sense to us, Your Honor.  We do care about these

3    individuals' privacy.

4        So we are willing to stay Your Honor's order, which we

5    greatly appreciated, during appeal, and we would welcome the

6    opportunity if there is an email option -- even though that

7    would put an administrative burden on Mr. Henifin to sign

8    these people up, you know, we would do that during appeal.

9    We just don't think it's going to be as effective as getting

10   the list.

11       THE COURT:  All right.

12       MR. CALAMITA:  Now, Your Honor, while we have

13   Mr. Black, I would urge the Court to get an answer to that

14   question as to whether the State has clearance to support

15   Mr. Henifin on any opt-in options.

16       THE COURT:  All right.  Mr. Black, could you answer

17   that?

18       MR. BLACK:  Yes, sir.  I have made clear to all parties

19   that we're available for an opt-in that's within compliance

20   with the federal regulation.  However, in response to the

21   idea of an email, we're happy to do that.  However, emails

22   are not a required field when applying for SNAP benefits, so

23   I cannot guarantee what percentage of Jacksonians would

24   actually receive an email, because that is not a required

25   field when applying for SNAP benefits with the Department of

1    Human Services.  And -- and if JXN Water does not want to

2    send out a postcard, then -- so we're -- we're limited in

3    our scope of how many potential families would actually be

4    reached.

5         THE COURT:  Mr. Black, how many --

6         MR. BLACK:  Yes, sir.

7         THE COURT:  -- how many persons or entities are in

8    receipt of a list at present?  And if you don't know the

9    number, describe for me those persons/entities who do

10   receive a list.

11        MR. BLACK:  I'm assuming, Your Honor, that you're

12   asking about who we share our data with?

13        THE COURT:  That's right.

14        MR. BLACK:  Yes.  I can speak to that.  Counsel makes

15   reference to the school lunch program, and we do share our

16   data with the Department of Education.  However, unlike the

17   municipal water system, the school lunch program is a

18   federal assistance program that is promulgated by statute of

19   the Federal Government.  The Mississippi Department of

20   Education administers that benefit program, and so,

21   therefore, we have a limited ability, as a federal

22   assistance program, to share that data with the Department

23   of Education.

24        We have a memorandum of understanding with the

25   Department of Education which outlines the regulations and

1   confidentiality.  We also -- it outlines the ability and the

2   process for sharing that data, how they are to

3   confidentially store and administer that program, and that's

4   our normal protocols for when we do.  That is the only

5   instance that I'm aware of, at present, that we share any

6   sort of SNAP data.

7        THE COURT:  So this sharing process and allowance is

8   not provided by statute?

9        MR. BLACK:  It is provided by statute.

10       THE COURT:  Or is this an agreement that the parties

11  made between themselves?

12       MR. BLACK:  No.  It is provided by statute, and,

13  therefore, we have a -- a data-sharing agreement which

14  outlines all of the protocols in which that share may occur.

15       THE COURT:  Well, what is the statutory basis for that

16  allowance?

17       MR. BLACK:  The statutory basis is 7 CFR, Section

18  272.1, I believe.

19       THE COURT:  7 CFR --

20       MR. BLACK:  272 --

21       THE COURT:  272 --

22       MR. BLACK:  -- .1(c).

23       THE COURT:  What does it say?

24       MR. BLACK:  That it -- the relevant part, it requires

25  that we withhold that and we can only disclose the

1    information of SNAP applicants or recipient households in

2    the restricted allowances:  one, persons directly connected

3    with the administration or enforcement or the provision of

4    the Food and Nutrition Act, other federal assistance

5    programs, federally assisted state programs providing

6    assistance on a means-tested basis to low-income

7    individuals, or general assistance programs which are

8    subject to the joint processing requirement as outlined in

9    Section 273.2(j)(2).

10       We can also allow it for persons directly connected

11   with the administration or enforcement of the program;

12   persons directly connected with the verification of

13   immigrant status; and persons directly connected with the

14   child support program; employees of the Comptroller

15   General's Office of the United States for auditing purposes;

16   local, state, or federal law enforcement officials under an

17   investigation; or local, state, or federal law enforcement

18   for potential investigations for crimes; local education

19   agencies administering the National School Lunch Program,

20   which I have referenced before.  And that's it.

21       THE COURT:  There's no general allowance as an

22   exception --

23       MR. BLACK:  No.

24       THE COURT:  -- where it's for the -- the health and

25   welfare of the recipients?

1    MR. BLACK:  No, sir.  There is no health or welfare

2    exception under the federal law.

3    THE COURT:  And then in order for Mississippi to be

4    within the target of cessation of SNAP benefits, do you have

5    to go -- do you have to file something specifically?

6    MR. BLACK:  I'm sorry, sir.  Can you repeat your

7    question?

8    THE COURT:  Would your agency have to file something

9    specifically asking for that possibility?

10    MR. BLACK:  If we had a question related to whether or

11    not a sharing of the data fell within one of the limited

12    exceptions and we were -- we had a question or it was

13    ambiguous, we could go to the USDA, who is the federal

14    program administer, and seek guidance.

15    THE COURT:  And then -- go ahead.  Hello?

16    MR. BLACK:  Yes, sir.  We could -- we could go to

17    Ms. Frisk from the USDA and ask if that would qualify.

18    THE COURT:  In this instance, can I resort to that?  Or

19    can I have Mr. Henifin actually file a written request?

20    MR. BLACK:  Well, I don't know that a written request

21    is necessary since Ms. Frisk has already made her position

22    known to the Court in a letter as well as that the -- JXN

23    Water does not qualify as a federal assistance program under

24    the current regulation.

25    THE COURT:  And you say that she has already responded

1    in writing to that effect?

2        MR. BLACK:  Yes, sir.  As well as her oral testimony

3    here today.

4        THE COURT:  Okay.  Now, just hold on just for a moment.

5        MS. BLACK:  Yes, sir.

6        THE COURT:  And let me go back to the representative of

7    Mr. Henifin.

8        Counsel?

9        MR. CALAMITA:  Yes, Your Honor.

10       THE COURT:  Do you have anything else you would like to

11   offer on this controversy?

12       MR. CALAMITA:  Your Honor, Mr. Black was correct in

13   listing the programs that can receive the information.  The

14   catch-all is other government assistance programs, and we

15   believe that the rate schedule established by the interim

16   third-party manager constitutes an other government

17   assistance program.

18       Again, Your Honor, a very unique one that had -- that

19   really would not have any precedential impact.  We don't

20   ever see -- I have done this 31 years, Your Honor.  I have

21   never seen this situation before.  Don't expect to see it

22   for the rest of my career.  And they have a federal order

23   finding that this rate program is a -- constitutes a

24   government assistance program.

25       So there is no reason the State and Federal Government

1    have to appeal.  They could simply provide the list without

2    any liability for either.

3         THE COURT:  Okay.  Well, then, let me go back to

4    Mr. Black.

5         MR. BLACK:  Yes, sir.

6         THE COURT:  So, Mr. Black, if you furnish the list, who

7    would you expect to be aggrieved by the furnishing of such?

8    You don't expect the SNAP beneficiaries to complain, so then

9    who would you expect to claim victimhood by the furnishing

10   of the information?

11        MR. BLACK:  Well, the United States Department of

12   Agriculture and both MDHS, administers of the SNAP program,

13   do not agree with counsel's position that a municipal water

14   system qualifies as a federal assistance program as outlined

15   under the federal regulations.

16        This, again, is a municipal water system that

17   currently, we concede, is under a federal consent decree,

18   but that does not qualify it as a federal assistance

19   program.

20        Additionally, I would argue that it is short-sighted by

21   JXN Water to try to have this for three years because

22   once -- at that conclusion of the federal consent decree,

23   they no longer have any ability to receive SNAP data.  And

24   SNAP -- SNAP benefits are only for short periods of time.

25   So all of those people may have been removed from the SNAP

1    roll and you're not going to have a means to obtain that

2    data.

3         So, again, this is a -- a Band-Aid to a bigger problem,

4    which is why you need an opt-in approach.

5         THE COURT:  Now, let's talk about this matter of an

6    appeal.  There was an agreed order that would move the right

7    to appeal to this coming Friday.  Why did you pick this

8    coming Friday?

9         MR. BLACK:  Your Honor, I can't speak to that.  The

10   Mississippi Department of Human Services is not a party to

11   this matter.  I think you'll have to speak with DOJ.

12        THE COURT:  All right.  Let me go back to

13   Mr. Fingerhood, then.  Mr. Fingerhood, do you know the

14   answer to that?

15        MR. FINGERHOOD:  Yes, Your Honor.  We have been advised

16   that was the deadline that was suggested by the third-party

17   manager, and we confirmed with our appellate folks that they

18   could file it by that date.  They may be able to file it a

19   day or so early.  We are already Tuesday, so it would be

20   this Friday that it would have to be filed by.  So...

21        THE COURT:  And why this Friday?

22        MR. FINGERHOOD:  Oh, it could be filed before, but --

23        THE COURT:  No.

24        MR. FINGERHOOD:  -- possibly before then, but that --

25        THE COURT:  And why not after?

1      MR. FINGERHOOD:  Oh.  Well, that -- I believe the

2  third-party manager wants to get it filed as soon as

3  possible so that process starts.

4      THE COURT:  So there's nothing magical about Friday?

5      MR. FINGERHOOD:  No.  No.  It's just I think the point

6  was sooner rather than later was why they picked this

7  Friday.

8      THE COURT:  I see.  All right.  Thank you.  I'll come

9  right back to you in just a moment.

10          (An off-the-record discussion was held.)

11     THE COURT:  Mr. Fingerhood, could you go back to the

12  podium?

13     MR. FINGERHOOD:  Yes, Your Honor.

14     THE COURT:  Mr. Fingerhood, I want to do some research

15  on this that might make an appeal unnecessary, or I might

16  agree with Henifin's attorney to say go through the appeal

17  and let's get an answer from the next court.  But before any

18  of that happens, I would like to study this statute and a

19  couple of decisions that might weigh on this particular

20  matter.

21      So here's what I'm proposing in the short term; that

22  is, you all had an agreement to stay this matter until this

23  coming Friday.  I would like to have an agreement to stay

24  this matter until Friday week.  Not this coming Friday but

25  the Friday thereafter.  That will give me time to look

1    through the law on this particular issue and to answer some

2    other questions I have about this matter, and then for this

3    Court to initiate a status conference Thursday week; that

4    is, the day before that, so not this Thursday but Thursday

5    week.  Then I should be completely through with my recess --

6    my research and have my position all outlined.

7        So we would not -- we would go past this week, and then

8    next week on Thursday, I'll have a status conference to tell

9    you what I think about this matter.  And then on -- and then

10   Friday, if the determination is that you should proceed with

11   your appeal, then you will do it at that time, if you are

12   going to do it at all.

13       But meanwhile, that will give this Court enough time to

14   look at some thoughts that it has on this matter, and I

15   might not wait until Thursday to actually reveal those

16   thoughts.  I might send out a letter before then for the

17   parties to consider.  But certainly by Friday week, then

18   I'll be finished with anything I need to look at.

19       But I do have some ideas I would like to explore.

20   That's why I wanted to call a status conference today to see

21   precisely what is being said here about this matter.

22       Now, Mr. Fingerhood, what about that?

23       MR. FINGERHOOD:  I would be amenable to that, Your

24   Honor.  I think we could take the proposed order and perhaps

25   change the date and maybe insert, as you suggested, the

 1    Thursday -- I don't have a calendar, but whatever those
 2    dates are, the Thursday before -- a week from the 31st.  I
 3    guess it would be the 7th.
 4         THE COURT:  Okay.
 5         MR. FINGERHOOD:  So the 6th would be the status
 6    conference; the 7th would be -- the stay would run until the
 7    7th.
 8         THE COURT:  That's right.  It would evaporate then, if
 9    need be.  We might make a decision -- we might come together
10    on some of my ideas before that.  I do have some other ideas
11    I would like to put forward.  So that will give me time to
12    look at them and see if they have any vitality.  Now --
13         MR. FINGERHOOD:  Can I just double-check with the other
14    half of my brain trust?
15         THE COURT:  Okay.
16         MR. FINGERHOOD:  You already met the other one.
17         THE COURT:  Okay.
18         MR. BLACK:  Your Honor?
19         THE COURT:  Let me hear from Mr. Fingerhood first.
20         Yes?
21         MR. FINGERHOOD:  Just to clarify, yes, the stay, I
22    think as we described in the proposed order, would run
23    until, I guess, Friday, the 7th.  Is that what Your Honor is
24    proposing?  And then we would file -- if it was determined
25    that we wanted to invoke our appellate rights, that would be

1    when we would need to do that.

2        THE COURT:  Okay.  Thank you.

3        Now, then, I heard someone on the telephone.  Who was

4    that?

5        MR. BLACK:  Yes, sir.  Your Honor, this is Patrick

6    Black for MDHS.

7        I just wanted to let the Court be aware, I will not be

8    available for the status conference on the 6th,

9    unfortunately.  However, I am a nonparty, but I will not be

10   able to -- if the Court needed my input or had any questions

11   for me.  I will be available on that following Monday,

12   though.

13       THE COURT:  Well, then, we could get you on telephone.

14   What about that, like you are now?  You will not be

15   available, period?

16       MR. BLACK:  No, sir, I will not be, unfortunately.

17       THE COURT:  Okay.  Now, we are not going on a vacation

18   to Hawaii, are we?

19       MR. BLACK:  Alaska.

20       THE COURT:  I should have known.  Okay.  You would say

21   Alaska.  You don't know how many times I have planned a trip

22   to Halaska -- Alaska and had it fall through for something

23   like this.  Every time I plan a trip to Halaska -- Alaska --

24   now I got Halaska.  But every time I plan a trip to Alaska,

25   something goes wrong.  But okay.  We'll work it out with

1    you.

2         Okay.  Mr. Fingerhood?

3         MR. FINGERHOOD:  Yes, Your Honor.  Just one more

4    clarification.  I think this was also in the proposed order.

5    But if we do, in fact -- the United States does, in fact,

6    pursue its appellate rights, we would want the stay, of

7    course, to last until, you know, the decision is rendered

8    and the mandate is issued and all that process.

9         THE COURT:  Yes, I understand.

10        MR. FINGERHOOD:  Okay.

11        THE COURT:  Then do I have an objection from anyone?

12        All right.  Silence means something.  I have not heard

13   anything yet.  Going, going, gone.  All right, then.

14        Mr. Fingerhood, would you circulate the modified order?

15        MR. FINGERHOOD:  I will, Your Honor.

16        THE COURT:  All right.  And then once it reaches my

17   desk, then I'll sign it.  In the meantime, we'll start doing

18   our research and then putting in good order the suggestions,

19   if any, that we come up with so that we can try to deal with

20   this expeditiously.

21        All right.  Thank all of you for being available in

22   person and by phone.  I'm sorry about all of the

23   difficulties we had this morning.  But we had a lot of

24   difficulties, and my stalwart courtroom deputy been working

25   on this matter all morning long trying to get it so that it

1    would cooperate with us.  But try as she could and enlisting

2    all the support in the building of our IT experts, we didn't

3    quite get it like we wanted to.

4        We'll try to determine what our problems are with the

5    system, because this is not the first time we have had

6    problems with the system, but we'll get it all together, and

7    I thank all of you for being so patient with us.

8        Next time, I think I'll just have to put my own muscle

9    to it and show them how we are supposed to do this stuff.

10   Of course, somebody will have to show me the on and off

11   button, but as soon as I get past that -- but as soon as I

12   get that, I'll be dealing.  So I just want you all to know

13   that we shouldn't have this again if I'm putting my muscle

14   on it.

15       But thank you all so much, and I'm signing off, and

16   I'll be back in contact with you.  Thank you much.

17                   (Court adjourned at 12:06 p.m.)

18   ****************************************************************

19

20

21

22

23

24

25

**COURT REPORTER'S CERTIFICATE**

I, Caroline Morgan, Official Court Reporter for the United States District Court for the Southern District of Mississippi, do hereby certify that the above and foregoing pages contain a full, true, and correct transcript of the proceedings had in the forenamed case at the time and place indicated, which proceedings were stenographically reported by me to the best of my skill and ability.

I further certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

THIS, the 30th day of May, 2024.

/s/ Caroline Morgan, CCR

Caroline Morgan CCR #1957
Official Court Reporter
United States District Court
Caroline_Morgan@mssd.uscourts.gov