```
 1                IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                          NORTHERN DIVISION

 3


 4   UNITED STATES OF AMERICA, ET AL.               PLAINTIFFS

 5   VERSUS                      CIVIL ACTION NO. 3:12-CV-790-HTW-LGI

 6   THE CITY OF JACKSON, MISSISSIPPI, ET AL.        DEFENDANTS

 7

 8

 9
                           STATUS CONFERENCE
10          BEFORE THE HONORABLE HENRY T. WINGATE,
               UNITED STATES DISTRICT COURT JUDGE,
11                        MARCH 18, 2024,
                        JACKSON, MISSISSIPPI
12

13

14

15                  (APPEARANCES NOTED HEREIN.)

16

17

18

19

20

21   REPORTED BY:
22
         CAROLINE MORGAN, CCR #1957
23       OFFICIAL COURT REPORTER
         501 E. Court Street, Suite 2.500
24       Jackson, Mississippi  39201
         Telephone:  (601)608-4188
25       E-mail:  Caroline_Morgan@mssd.uscourts.gov
```

```
 1   FOR THE PLAINTIFF, UNITED STATES OF AMERICA:

 2        KARL J. FINGERHOOD, ESQUIRE
          U.S. DEPARTMENT OF JUSTICE
 3        ENVIRONMENTAL ENFORCEMENT SECTION
          POST OFFICE BOX 7611
 4        WASHINGTON, DC 20044

 5        ANGELA GIVENS WILLIAMS, ESQUIRE (VIA ZOOM)
          MITZI DEASE PAIGE, ESQUIRE
 6        U.S. ATTORNEY'S OFFICE
          501 EAST COURT STREET, STE. 4.430
 7        JACKSON, MISSISSIPPI 39201

 8        ANGELA MO, ESQUIRE (VIA ZOOM)
          U.S. DEPARTMENT OF JUSTICE, ENRD
 9        150 M STREET, N.E., ROOM 2.900
          WASHINGTON, DC 20002
10
     FOR THE PLAINTIFF, STATE OF MISSISSIPPI:
11
          ROY FURRH, ESQUIRE
12        DONNA J. HODGES, ESQUIRE
          MS DEPARTMENT OF ENVIRONMENTAL QUALITY
13        515 EAST AMITE STREET
          JACKSON, MISSISSIPPI 39201
14
     FOR THE DEFENDANT, CITY OF JACKSON:
15
          TERRELL S. WILLIAMSON, ESQUIRE
16        DREW MARTIN, ESQUIRE
          KEYONA HENRY, ESQUIRE
17        OFFICE OF THE CITY ATTORNEY
          455 EAST CAPITOL STREET
18        JACKSON, MISSISSIPPI 39201

19   FOR THE DEFENDANT, JXN WATER:

20        CHARLES MITCHELL MCGUFFEY, ESQUIRE
          MALISSA WILSON, ESQUIRE
21        FORMAN, WATKINS & KRUTZ, LLP
          POST OFFICE BOX 22608
22        JACKSON, MISSISSIPPI 39225-2608

23        FRANK PAUL CALAMITA, ESQUIRE (VIA ZOOM)
          AQUALAW, PLC
24        6 S.5TH STREET
          RICHMOND, VIRGINIA 23219
25
```

```
1    FOR THE INTERVENOR PLAINTIFF:

2            EMILY C.R. EARLY, ESQUIRE (VIA ZOOM)
             MIKAILA HERNANDEZ, ESQUIRE (VIA ZOOM)
3            JOSHUA TOM, ESQUIRE
             THE CENTER FOR CONSTITUTIONAL RIGHTS
4            666 BROADWAY AVENUE, FLOOR 7
             NEW YORK, NEW YORK 10012
5

6    ALSO PRESENT:

7    TED HENIFIN, THIRD-PARTY MANAGER
     SUSAN RICHARDSON (VIA ZOOM)
8    SUZANNE ARMOR (VIA ZOOM)
     JIM VINCH (VIA ZOOM)
9    SUZANNE RUBINI (VIA ZOOM)
     GERALD KUCIA, ESQUIRE (VIA ZOOM)
10   JONATHAN M. BARNES, ESQUIRE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | **IN OPEN COURT, MARCH 18, 2024** |
| 2 | |
| 3 | THE COURT:  Terri, call the case, please. |
| 4 | THE COURTROOM DEPUTY:  Your Honor, this is United |
| 5 | States of America versus City of Jackson, Civil Action |
| 6 | Number 3:12-cv-790-HTW-LGI, as well as related case |
| 7 | 3:22-cv-686-HTW-LGI.  We are here this morning for a status |
| 8 | conference, and at this time, I'm going to ask the parties |
| 9 | to state their names for the record, starting with the |
| 10 | plaintiff. |
| 11 | THE COURT:  All right.  Please do so. |
| 12 | MR. FINGERHOOD:  Good morning, Your Honor.  Karl |
| 13 | Fingerhood, U.S. Department of Justice, Environmental |
| 14 | Enforcement Section. |
| 15 | THE COURT:  All right.  Good morning. |
| 16 | MS. PAIGE:  Good morning, Your Honor.  Mitzi Dease |
| 17 | Paige, U.S. Attorney's Office here in Jackson, Civil Division. |
| 18 | THE COURT:  Okay.  Good morning to you. |
| 19 | MS. PAIGE:  Good morning. |
| 20 | MR. FURRH:  Good morning, Your Honor.  Roy Furrh with |
| 21 | the Mississippi Department of Environmental Quality. |
| 22 | THE COURT:  All right. |
| 23 | MS. HODGES:  Good morning, Your Honor.  Donna Hodges |
| 24 | with the Mississippi Department of Environmental Quality. |
| 25 | THE COURT:  All right. |

```
1            MR. MARTIN:  Drew Martin with the City of Jackson.

2            THE COURT:  Okay.

3            MR. WILLIAMSON:  Terry Williamson, City of Jackson.

4            THE COURT:  All right.

5            MR. HENIFIN:  Ted Hinifin, interim third-party manager.

6            THE COURT:  All right.

7            MS. WILSON:  Malissa Wilson, counsel for the interim

8     third-party manager, Ted Hinifin.

9            THE COURT:  All right.

10            MR. MCGUFFEY:  Mitch McGuffey, also counsel for the

11     interim third-party manager.

12            THE COURT:  Okay.

13            MR. TOM:  Good afternoon, Your Honor.  My name is

14     Joshua Tom.  I'm here for --

15                 (Courtroom deputy interruption.)

16            Good afternoon, Your Honor.  My name is Joshua Tom.

17     I'm here on behalf of the proposed intervenors, Mississippi

18     Poor People's Campaign, and the People's Advocacy Institute.

19            THE COURT:  All right.  Thank you so much.

20            MR. BARNES:  Good morning, Your Honor.  This is

21     Jonathan Barnes for Lakeland Seniors.  We are not a party,

22     but we are interested -- interested party to the action.

23            THE COURT:  All right.  Good morning.

24            MR. CALAMITA:  Your Honor, Paul Calamita, also for the

25     interim third-party manager.
```

```
1           THE COURT:  All right.  Thank you.  Good morning.

2           MR. VINCH:  This is Jim Vinch, an attorney with the

3    United States Environmental Protection Agency in Washington,

4    D.C.

5           THE COURT:  Okay.  Good morning.

6           MR. KUCIA:  Gerald Kucia on behalf of the Mississippi

7    Department of Health.

8           THE COURT:  All right.  Good morning.

9           MS. WILLIAMS:  Angela Givens Williams, Your Honor, on

10   behalf of the United States.

11          THE COURT:  Okay.  Next?

12          MS. MO:  And Angela Mo with the U.S. Department of

13   Justice Environmental Enforcement Section on behalf of the

14   United States.

15          THE COURT:  All right.  Next?

16          MS. ARMOR:  Good morning, Your Honor.  Suzanne Armor,

17   United States Environmental Protection Agency.

18          THE COURT:  All right.  Next?

19          MS. RICHARDSON:  Good morning, Your Honor.  Susan

20   Richardson for Patrick Townsend on behalf of the City of

21   Jackson.

22          THE COURT:  All right.  Good morning.

23          MS. RICHARDSON:  Good morning.

24          MS. RUBINI:  Good morning, Your Honor.  Suzanne Rubini

25   U.S. EPA Region 4.
```

1          THE COURT:  Okay.  Thank you.

2          Next?  Did I miss anyone?

3          Okay.  Did I miss -- go ahead.

4          MS. EARLY:  Hi.  Emily Early on behalf of the proposed

5     plaintiff intervenors, Mississippi Poor People's Campaign,

6     and the People's Advocacy Institute.

7          THE COURT:  All right.  Good morning to you.

8          MS. EARLY:  Good morning.

9          THE COURT:  Now, did I miss anyone?

10         MS. HERNANDEZ:  Yes, Your Honor.  Just Mikaila

11    Hernandez for the proposed intervenor plaintiff, People's

12    Advocacy Institute, and Mississippi Poor People's Campaign.

13         THE COURT:  Okay.  Thank you.  Good morning to you.

14         Now, again, did I miss anyone?

15         All right.  Does not appear that I have missed anyone.

16         There are a number of matters I want to address.  First

17    of all, I want to address a pressing concern of Mr. Henifin

18    relative to the moneys that need to be provided for the

19    vendors who have been given contracts and are awaiting

20    payments for same.

21         So then I'll start with Mr. Henifin.  Mr. Henifin,

22    would you go to microphone, make sure that it's on, and give

23    us a comprehensive overview of what's happening here.

24         MR. HENIFIN:  Yes, Your Honor.  Thank you.

25         So we were in this courtroom on the 27th of February,

1    and I left under the impression that we were going to return

2    to the status quo of grant funding appearing in the account,

3    in the ASAP account, for me to draw down and pay vendors as

4    I needed it.

5        The grant was approved at 115 million.  Initial

6    allocation was 44 million based on the first year budget.

7    We've received another 15 in December, and then the day

8    after our status conference, I received 10 million to pay

9    the outstanding invoices I was holding at that time.  EPA

10   had been talking about a reimbursement model, but we had not

11   seen anything in writing at that point.

12       So when we left the courtroom, I was under the

13   impression that they would provide any proposed changes to

14   the Court before they instituted those.  So then I received

15   the first writing from EPA on this subject on March 8th,

16   Friday afternoon, where they provided the report of their

17   compliance assistance visit, spent the weekend responding to

18   those findings, and sent my response on Wednesday, March

19   13th.

20       On -- surprised on March 15th to get a notice of

21   special conditions from EPA that didn't take into account

22   any of the information we provided as a result of the

23   response to their -- to their report from the compliance

24   assistance visit.  So from that, I take it that they just

25   unilaterally put these forward.  I received it from the

1    Office of Grants and Debarment about 16 minutes before you

2    received it in the court, and so, again, I didn't see where

3    the process that we had laid out in this courtroom on the

4    27th played out the way I thought it was going to play out,

5    where they would provide that in writing to you, you could

6    consider it, we could ask questions, we could have some

7    discussion before it went into effect.

8        But the letter that I received on the 15th, just last

9    Friday, said it was effective immediately, that we would be

10   in a reimbursement mode.  So I have been sending invoices,

11   because when I received the $10 million on February 28th, at

12   the time when I was in the courtroom, I said we had about 7

13   million outstanding invoices at that point in time.  Paid

14   those invoices on the 28th after receiving the $10 million,

15   and then in the subsequent days, ran the rest of the money

16   down with other eligible invoices that needed to be paid, so

17   effectively was out of money again in the first week of

18   March.

19       Been notifying EPA's Office of Water Grants folks about

20   that and sending them invoices as they've come in, and now

21   we are over $10 million in outstanding invoices that are now

22   in the possession of EPA's Office of Water, and they are

23   asking questions about those invoices.  Again, raising the

24   issue, if they decide to dispute an invoice or not pay an

25   invoice, I've got no reserves to pay that.  I have put

1    contractors out in the field, told them they were authorized

2    to do the work.  I've got nothing to pay them if I don't

3    have these grant funds in the bank or at least available at

4    that point in time.

5        So this is putting us in a very tough position, and if

6    this continues, I'm going to be forced to the tell the

7    contractors they're operating at their own risk.

8        THE COURT:  So now, at present, you have some

9    outstanding invoices, which total to approximately 10

10   million?

11       MR. HENIFIN:  Yes, Your Honor.

12       THE COURT:  The last time we were here, you mentioned

13   the problem you were having on acquiring moneys to pay the

14   vendors, and at that time, there was an agreement, I

15   thought, that had been reached that you were going to be

16   given enough moneys to pay those vendors.

17       Was that your understanding?

18       MR. HENIFIN:  Yes, Your Honor.

19       THE COURT:  So instead of getting that money, you are

20   saying that, instead you have now been told that EPA will

21   only pay on a reimbursement system.  Is that correct?

22       MR. HENIFIN:  Yes, Your Honor.

23       THE COURT:  Now, a reimbursement system means that if

24   you award projects to various contractors, that they would

25   be performing those contracts at their own peril.  Is that

1    so.

2         MR. HENIFIN:  That's how I understand it, yes, Your

3    Honor.

4         THE COURT:  Because then if they are awarded the

5    contracts and if then during the award period they perform,

6    they still have to have trust that EPA is going to release

7    the funds to you to release to them?

8         MR. HENIFIN:  Yes, Your Honor.

9         THE COURT:  And if EPA does not release the funds, then

10   what happens?

11        MR. HENIFIN:  I have got no money to pay them, so they

12   would have to sue me, I guess.  I'm not really sure.

13        THE COURT:  And at present, there are about $10 million

14   outstanding?

15        MR. HENIFIN:  That's correct, Your Honor.

16        THE COURT:  And tell us how long that sum of money has

17   been outstanding for these vouchers.

18        MR. HENIFIN:  These are only about a week old at this

19   point, Your Honor, since the 8th of March.

20        THE COURT:  And I would imagine, Mr. Henifin, that the

21   trust and the confidence of the contractors is vital to this

22   procedure, because you have to pick the appropriate vendor

23   whom you think to be the best and ablest to perform the

24   work.  But if they are not certain or confident that they'll

25   be paid, then we will be in danger of some of these best and

1    ablest not accepting the work.

2        MR. HENIFIN:  That's a potential, Your Honor, yes.  I

3    actually have one of those invoices is older than March 8th,

4    because I overlooked payment on an invoice to one of our

5    consultants that's now -- was originally submitted on

6    January 25th, so we're waiting on that payment as well.

7        THE COURT:  So this concern that I just announced, has

8    that been a concern enumerated by any of the vendors or

9    potential vendors?

10       MR. HENIFIN:  I have gotten questions lately about,

11   asking if they've done something wrong, because their

12   payments aren't coming the way they used to come.  I've been

13   explaining to them that the payment method or the -- or the

14   way the money flows from EPA has changed, they are not doing

15   anything wrong, I'll get them paid as soon as I get the

16   money from EPA.

17       THE COURT:  You said they have asked whether they've

18   done something wrong?

19       MR. HENIFIN:  They were concerned that I was

20   withholding payment for some other reason.

21       THE COURT:  And in the past before EPA took this

22   position, what was the timeframe that they were being paid,

23   the interval?

24       MR. HENIFIN:  We would typically pay within a week of

25   receiving an invoice, often within days.

```
 1          THE COURT:  Okay.  And we are beyond that now?

 2          MR. HENIFIN:  Yes, Your Honor.

 3          THE COURT:  Well, have you gotten any letters of

 4   complaints by any vendors at this point?

 5          MR. HENIFIN:  No letters, Your Honor.  Just a couple of

 6   phone calls.

 7          THE COURT:  And did you explain to them why the

 8   payments on these invoices, these payments have not been

 9   made?

10          MR. HENIFIN:  Yes.  I told them that the EPA process

11   had changed, and I was waiting on getting additional funds.

12          THE COURT:  And did any of these vendors issue any

13   threats of discontinuation?

14          MR. HENIFIN:  No, they did not.

15          THE COURT:  And where are these vendors with regard to

16   their completion of their particular projects?

17          MR. HENIFIN:  On the case of one of the biggest ones,

18   Jacobs, there's isn't a -- has a completion date.  They are

19   running the plants, so we depend on them totally to provide

20   the safe-treated drinking water that goes into the system.

21   So the longer we delay payment on them, the more they may be

22   scratching their head about entering a long-term contract.

23          Our current method at the current time, we are in a

24   reimbursable contract with them, hoping to enter a 10-year

25   contract with them when we resolve a few issues we've got
```

1    outstanding on some liability language.  But once that's

2    done, we would like to enter a 10-year deal with them.

3    Obviously, this might put some shade on that.

4         THE COURT:  When did you find out that EPA was not on

5    the same thought processes that you were on with regard to

6    the timely payment of those vouchers?

7         MR. HENIFIN:  Really it just -- it started after

8    Christmas.  The first of the year, they started saying that

9    because of the compliance assistance visit and their

10   findings, that they weren't going to fund the grant the way

11   they had in the past.  So they didn't provide anything in

12   writing, but what they didn't do is provide any money in the

13   account.  So it's, essentially, we have been waiting on the

14   official letter or report from EPA since the beginning of

15   the year when they stopped putting money into the grant

16   account.

17        THE COURT:  Did they tell you why they found it

18   necessary to change the procedure?

19        MR. HENIFIN:  They had a few issues in that they had

20   expressed in -- verbally to me, and then in writing when we

21   did get the report this past Friday, or the 8th, rather, two

22   weeks ago, a week ago Friday, that we couldn't reconcile

23   specific drawdowns with specific invoices.  That was because

24   at the time, we didn't realize that was needed.  We can

25   reconcile every dollar we've spent to eligible grants

1     expenses, but they were under the impression that I needed

2     to be able to prove every time I drew money down and say

3     exactly what that was -- what invoice that went to pay for,

4     which we didn't understand that as a requirement of the

5     grant when we took the money.

6          Once they pointed that out in November, we changed our

7     process to do that.  So now every time we drawn money down,

8     we get a receipt, PDF file from the system that the EPA

9     uses.  We annotate that with the specific invoices that that

10    drawdown went for, and the money moves almost immediately

11    from EPA to our bank account to our vendors, in very short

12    order.

13         THE COURT:  Apparently you didn't recognize that EPA

14    was reserving, to itself, the right to refuse to pay?

15         MR. HENIFIN:  Correct.

16         THE COURT:  And that's EPA is now saying.  Is that

17    correct?

18         MR. HENIFIN:  Essentially.

19         THE COURT:  And did the EPA give you a reason why they

20    wanted to change the -- the protocol for payment?

21         MR. HENIFIN:  Again, it's because they said I wasn't

22    following their normal grant procedures, they couldn't -- I

23    couldn't, at the time, tie specific invoices to specific

24    draws.

25         So after receiving the written report on Friday the

1    8th, I spent the next five days going back and doing the

2    forensic accounting to tie those back together and provided

3    that information to them on the 13th.  So we have now gone

4    back and tied every draw to eligible grant expenses and

5    provided all of that data to EPA.

6         THE COURT:  So where is EPA now after you have done

7    that?

8         MR. HENIFIN:  They didn't respond to that, instead they

9    sent their letters putting the special conditions on us for

10   not doing that.

11        THE COURT:  Okay.  With whom have you been dealing?

12        MR. HENIFIN:  So largely, I deal with the Office of

13   Water.  I think part of the challenge here is the Office of

14   Water is who -- from EPA, is who negotiated this stipulated

15   order, who has been at the table the whole time and been a

16   good partner.  And they are -- also have a grant management

17   group in the Office of Water, and I have been dealing with

18   them directly.

19        On top of that, now, you have got the Office of Grants

20   and Debarment, and that group seems to operate totally

21   independent of the Office of Water, and there is no

22   connection.  We're not sure where they come together, if

23   they ever come together.  So they seem to be operating very

24   independently from the Office of Water, under the umbrella

25   of EPA.

```
1          THE COURT:  And who is present here today?

2          MR. HENIFIN:  From either of those?

3          THE COURT:  That's right.

4          MR. HENIFIN:  I don't believe we have -- we've got some

5     lawyers online, I think, from the Office of Water that are

6     in -- on the Zoom call, nobody from the Office of Grants and

7     Debarment that I recognize.

8          THE COURT:  Have you ever talked to somebody directly

9     from that office?

10          MR. HENIFIN:  I have met with them when they came to

11     town doing their compliance assistance visit in November,

12     and I have had a -- at least one virtual meeting with some

13     of their folks, and I have had a couple of phone calls.

14          THE COURT:  So then who makes the decision, the final

15     decisions, on these matters?

16          MR. HENIFIN:  I would assume the matter that we have in

17     front of us is the Office of Grants and Debarment, would

18     make the final decision.

19          THE COURT:  Not Water?

20          MR. HENIFIN:  Not the Office of Water, I don't believe,

21     but I'm not privy, really, to the inner workings of EPA.

22          THE COURT:  But water is the one who comes here?

23          MR. HENIFIN:  Yes, Your Honor.

24          THE COURT:  To talk about what the decisions are on

25     these matters?
```

1          MR. HENIFIN:  Yes, Your Honor.

2          THE COURT:  And from whom do you get your

3     correspondence in writing?

4          MR. HENIFIN:  Most of the time, it has been Office of

5     Water until this past -- you know, a week ago Friday was the

6     first time I have gotten correspondence directly from the

7     Office of Grants and Debarment, for the exception of when

8     they set up the compliance assistance visit, I got some

9     correspondence from them back in November.

10          THE COURT:  What was your understanding -- when we

11     started this process and you were dealing with EPA, what was

12     your understanding as to which branch you were going to be

13     dealing with?

14          MR. HENIFIN:  I don't really think in terms of

15     branches.  I think in terms of United States Environmental

16     Protection Agency, how those people have introduced

17     themselves on these calls.  And I would think that, at some

18     point, whoever dealt with the -- the negotiation of this

19     order -- these orders, actually, two of them, that that

20     would be the people we would be dealing with, and they would

21     work their inner EPA issues out amongst themselves.

22          THE COURT:  From the way you are describing this, is

23     that there are two wings of EPA, at least, and from the way

24     you describe it, I'm not sure they talk to each other.

25          MR. HENIFIN:  It doesn't appear to.  Thankfully, we are

1    not dealing with soil or trash or air.  We would have a

2    whole bunch of different wings of EPA floating around.

3         THE COURT:  But these two wings that we are talking

4    about now, do you have any confidence that they talk to each

5    other?

6         MR. HENIFIN:  I think there's some communication, but I

7    don't know, you know, at what level and it's, you know,

8    whose got the controlling decision-making power.

9         THE COURT:  Do you know whether they have the same

10   lawyers, or they have different attorneys?

11        MR. HENIFIN:  They are all represented by the

12   Department of Justice, Your Honor.

13        THE COURT:  Well, but the ones that are coming here to

14   report?

15        MR. HENIFIN:  I have not seen anyone from the Office of

16   Grants and Debarment.

17        THE COURT:  So you don't know whether the ones who are

18   here represents the other wing?

19        MR. HENIFIN:  I know they operate with the Office of

20   Water.  I have no idea if they operate -- or if they

21   represent the Office of Grants and Debarments.

22        THE COURT:  Let's talk about the problem that you're

23   having now on this different approach that is supposed to be

24   followed now, this approval process after the vendors have

25   been let, and after they may have even done the work.

1        Have you talked to EPA here about your situation?

2        MR. HENIFIN:  I have talked to the Office of Water

3    about this many times, their grant folks.  Again, they have

4    been cooperative and seem to want to help, but I don't know

5    they have got any control over what the Office of Grants and

6    Debarment is doing.

7        THE COURT:  In other words, you don't know whether they

8    have the power?

9        MR. HENIFIN:  Correct.

10        THE COURT:  Did you ask them did they have the power?

11        MR. HENIFIN:  We asked for a decision-maker at one

12    point, said who -- where does this come together, and who

13    makes the decisions?  But we have never received a single

14    point of contact that can combine those two.

15        THE COURT:  I seem to recall that this question on the

16    decision-making -- maker was proposed to EPA some time ago?

17        MR. HENIFIN:  Yes, Your Honor.

18        THE COURT:  In fact, seems like that was as far back as

19    maybe during the Christmas?

20        MR. HENIFIN:  Probably right after the holidays, yes,

21    Your Honor.

22        THE COURT:  When -- because I remember I asked that

23    question, and so you are saying you did not get an answer

24    since that time as to who makes the decision?

25        MR. HENIFIN:  No, Your Honor.

1        THE COURT:  I guess that also means that you didn't get

2   an answer as to who has the power to deny the request?

3        MR. HENIFIN:  Correct.

4        THE COURT:  Let's talk about the appeal process.

5   There's an appeal process for their latest decision.  Is

6   that correct?

7        MR. HENIFIN:  Yes, there is.  So we followed that and

8   filed that appeal this morning.  But there doesn't seem to

9   be a timeframe at which they have to make a decision on the

10  appeal.  There's a clear timeframe for us to appeal within

11  30 days, but there is no timeframe on the response to the

12  appeal.

13       THE COURT:  Well, if there is no timeframe for EPA to

14  resolve the matter, does that mean that the vendors would be

15  sitting without money for quite a while?

16       MR. HENIFIN:  Potentially, yes, Your Honor.

17       THE COURT:  Tell me about the appeal process.

18       MR. HENIFIN:  It seemed fairly straightforward.  They

19  required that I had to submit the basis of the appeal by

20  email to a Mr. Hughes, and I did that this morning with the

21  basis of appeal.  I had really listed five points, that they

22  failed to consider our response to the technical assistance

23  review, which, again, I submitted on the 13th, and they sent

24  this letter on the 15th.

25       I've submitted a corrective action plan, which solves

1    most of the issues.  Unsupported -- which I submitted the

2    corrective action plan with this appeal.  Unsupported

3    drawdowns, again, that was covered by the March 13th

4    response.

5        I talked about the grants are supporting the emergency

6    restoration of water and sewer, and that the -- you know,

7    JXN Water is a new entity that was formed for this purpose

8    by the stipulated order and has no financial reserves, can't

9    pay invoices prior to drawing them down, as would typically

10   happen in a reimbursement model.  You know, we are not

11   dealing with a city with any kind of reserves.  We are

12   dealing with a private entity that has no reserves.

13       I asked for specific relief, which was the other piece

14   of a appeal that was supposed to be in there.  It's very

15   simple.  Immediate review and approval of the corrective

16   action plan, immediate withdrawal of the special conditions

17   upon approval without waiting for the corrective action plan

18   to be fully implemented, and that the balance of the 115

19   million approved grant be made available in the ASAP System

20   by 22 March with the approval --

21       THE COURT:  Could you slow down some?

22       MR. HENIFIN:  I'm sorry.

23       THE COURT:  Okay.

24       MR. HENIFIN:  Got rolling.

25       So the last one would be that the balance of

1           $115 million approved grant be made available in the ASAP

2      System by March 22nd, and the approval of the $30 million

3      amendment that has been pending be approved by April 1st.

4           So those were the relief sought and the basis of

5      appeal, and that was submitted this morning.

6           THE COURT:  And you have no idea how long EPA might

7      take on resolving that matter?

8           MR. HENIFIN:  No, Your Honor.

9           MS. WILSON:  The Court's indulgence, Your Honor?

10          MR. HENIFIN:  My lawyer is telling me they have

11     180 days to respond, Your Honor.

12          THE COURT:  Who has 180 days?

13          MR. HENIFIN:  EPA, to respond to the appeal.

14          THE COURT:  So they have six months to respond?

15          MR. HENIFIN:  Yes, Your Honor.

16          THE COURT:  If they have that length of time to

17     respond, six months, what -- what adversities might we

18     suffer during that time period?

19          MR. HENIFIN:  I think we could have some stopped work

20     if this is continued to languish.  We could continue

21     local-funded work, and we might have to stop the

22     grant-funded work until we can get this resolved, which,

23     essentially, is all the Drinking Water work, and I'm not

24     really sure how we deal with Jacobs who is under contract to

25     operate the plants.

 1          THE COURT:  So that 180 days begins to run when?

 2          MR. HENIFIN:  When I submit the appeal, which was

 3     today, this morning.

 4          THE COURT:  Okay.

 5          MR. HENIFIN:  I'm appealing their decision they gave us

 6     Friday.  I took three days to -- over the weekend, to submit

 7     my appeal.  They are going to take 180 days to decide

 8     whether or not to grant that.  This is not Atypical of EPA,

 9     Your Honor.

10          THE COURT:  What do you mean by that?

11          MR. HENIFIN:  They typically put very short time frames

12     on folks.  Like, I had a 30-day window to make this appeal,

13     and if I didn't appeal it in 30 days, it was a final

14     decision.  That's normal EPA language, but yet, there is no

15     clock ticking on them, or it's a very slow clock or a

16     calendar ticking to get to their decision point.

17          THE COURT:  And if they take six months to make a

18     decision, that would be most adverse to the progress that

19     we've been making?

20          MR. HENIFIN:  This is such an unusual situation, Your

21     Honor.  We are in an emergency trying to -- the funds we're

22     talking about, are under a special section of the Safe

23     Drinking Water Act for emergency measures.  We are trying to

24     spend these down quickly to solve the problems here in

25     Jackson.  We have made incredible progress on the water

1    system.  Largely, because we have had this money available,

2    and we've been able to hire contractors and move quickly to

3    make that happen.

4        As that arose, I guess they forgot that this was an

5    emergency less than a year ago -- or a little over a year

6    ago, and we were desperate for solving this problem.  But

7    now that we've got it going, well, business is usual, I

8    guess.  We'll revert back to slow federal government motion.

9        That is not what we are here for.  That's not what that

10   1442(B) Section of the Safe Drinking Water Act was all

11   about.  It's about emergency measures.  We need to be

12   moving.  We can't wait six months for decisions.  We can

13   barely wait six days for decisions.

14       THE COURT:  You said something at one point that if we

15   couldn't get that money timely, you might have to shut down

16   all efforts that are now being waged?

17       MR. HENIFIN:  On the -- with the -- that are being paid

18   for with federal funding, yes, Your Honor.

19       THE COURT:  That are federal-funded projects.  And

20   might have to resort to moneys that we could get out of the

21   local rendition of moneys.

22       MR. HENIFIN:  Which aren't adequate.

23       THE COURT:  That's what I was about to ask.  Because

24   that's what my understanding is, it's not adequate.

25       MR. HENIFIN:  Correct.  You know, we are under a lot of

1    pressure to bring in more local revenue, which we are

2    working very hard on the billing system, disconnects, trying

3    to get people to paying their bills.  We were up to, last

4    month, 65 percent of those billed pay their bills.

5        We started the severance process, meaning we have

6    started automatically cutting letters out of our billing

7    system, to tell people they are going to be shut off if they

8    don't pay within 21 days.

9        So all of that is moving forward to try to increase

10   folks payment.  We have worked hard at getting meters in the

11   ground, making a lot of progress.  But we knew we would

12   never get to the 80 to 90 percent collection rate within the

13   first few months.  Our target this year is to try to get to

14   80 percent from our current 65, but that's for the year.

15   That's going to be a challenge.  We are already three months

16   into the year, and we're not getting to that point, but we

17   are going to continue to do our best to do that.

18       That increases the amount of local revenue, but we are

19   paying $1.6 million a year on private debt -- I mean,

20   $1.6 million a month, which is really hurting us on the cash

21   flow perspective.  There is potential that we can retire

22   some of that debt using the other federal funding we have

23   got, which is the state revolving loan fund.

24       But we are challenged to make that work due to some

25   statutory restrictions on the money, can only be used for

1    Drinking Water projects, and, unfortunately, we haven't been

2    able to tease out of the 160 million in private debt that is

3    outstanding, how much was used for Drinking Water projects

4    and how much was used for sewer projects, and EPA wants

5    invoices and proof of payment before they would let us

6    retire any of that debt using the state revolving loan fund

7    money.

8        That's a pretty convoluted conversation I just had, and

9    I'm sorry.  I live in this world right now, and it's a bit

10   confusing.  But, essentially, we are going broke with $450

11   million in the bank that could solve some of the problem,

12   but we can't get everybody to play along with trying to

13   figure out how to actually get the debt retired, or at least

14   a portion of it that's eligible to be retired with the

15   $450 million that Congress provided us through the state

16   revolving loan fund.

17       Different issue all together than the grants.  Grants

18   is 150 million, 450 is a state resolving loan fund for

19   infrastructure projects or debt retirement or both, and

20   that's a different issue than the one we were talking about

21   earlier.  But it is every bit as troublesome, because our

22   local cash flow is stretched to the extreme, due to the debt

23   we are carrying on this system.

24       THE COURT:  Identify the EPA people with whom you've

25   had this conversation.

1          MR. HENIFIN:  As far as the local revenue issues, or

2     the grant issues?

3          THE COURT:  The grant issue.

4          MR. HENIFIN:  The grant issues have been with Deborah

5     and Treita (phonetically) from the Office of Water and

6     Grants.  And I'm sorry I don't have their last names in

7     front of me.  It's somewhere here.

8          And then I have gone on the record in both the --

9     copied the whole water distribution -- there is a whole list

10    of lawyers, many of them are on the call, in the Office of

11    Grants and Debarment that received all of this information

12    as we have been sending out the emails.

13         THE COURT:  And your attorneys?

14         MR. HENIFIN:  And my attorneys, of course.

15         THE COURT:  Have they been in contact with some of the

16    attorneys from EPA?

17         MR. HENIFIN:  Yes.  And from Department of Justice.

18         THE COURT:  And have they discussed these issues that

19    now we're discussing?

20         MR. HENIFIN:  Looking at Mr. Calamita to see him nod

21    his head yes or no, or --

22         MR. CALAMITA:  Your Honor, if I may, we have had some

23    conversation, but I got no advanced notice of the EPA

24    decision to put Mr. Henifin on a reimbursement basis.  First

25    I learned of it was Friday, at the same time Mr. Henifin was

1    notified.

2        THE COURT:  You did not know about it beforehand?

3        MR. CALAMITA:  I did not, Your Honor.  And I -- when we

4    left the status conference on February 27th, I thought the

5    understanding was that we would have conversation with --

6    with the agencies about that decision before they made that

7    decision, and those conversations did not occur.

8        THE COURT:  All right, Mr. Calamita.  Thank you.

9        Is there anything else I need to go over right now?

10        MR. HENIFIN:  I don't think so, Your Honor.

11        THE COURT:  Okay.  Thank you, Mr. Henifin.

12        Well, then, I should turn to EPA now.  Who is going to

13    speak for EPA?  But before you start speaking, good morning

14    to you, again.

15        Now, but before you start, could you educate me on your

16    hierarchy at EPA as it addresses or concerns the crisis we

17    have here in Jackson?  Who the decision-makers are, and what

18    process you go through, and what authority, if any, you have

19    to bind EPA when you are here?

20        MR. FINGERHOOD:  Well, I'll address the -- that last

21    question first, Your Honor.

22        THE COURT:  Okay.

23        MR. FINGERHOOD:  Good morning, Karl Fingerhood.

24        THE COURT:  Yes.

25        MR. FINGERHOOD:  I represent the Department of Justice

1    in the enforcement action that was brought with respect to

2    the Safe Drinking Water Act and the Clean Water Act.  I do

3    not represent EPA with respect to the grants issue.  That is

4    an administrative process.  That process has begun, and as

5    the ITPM stated, he has begun the process to appeal that.

6    That is not before this Court and will not be ripe until

7    there is a final agency decision once those appeal rights

8    have been exhausted.

9         Just quick side note, I think the 180-day is an outside

10   time limit.  I do understand and, again, I'm not an expert

11   in the grant area of law, but I have been advised that once

12   the appeal has been issued, there's a 15-day period where

13   the decision officer is supposed to acknowledge receipt and

14   then advise if there is additional information, et cetera,

15   that will be necessary for the administrative process.

16        So I do not represent the Office of Grants and

17   Debarment.  As you know, there was hundreds of millions of

18   dollars that was appropriated for Jackson.  Those are

19   federal taxpayer funds and are subject to the laws that --

20   and regulations that apply to federal grants.

21        The Office of -- EPA's Office of Grants and Debarment

22   is the office that's in charge of ensuring that those

23   regulations are complied with.  They have reviewed this, and

24   we did share the correspondence with Your Honor, and there

25   has been -- as the ITPM indicated, he did respond, and there

1   is -- the administrative process is beginning now.

2       There is a law as part of that grant process that when

3   someone is placed on a reimbursement basis, the -- the

4   invoices, the properly submitted invoices, are to be paid

5   within 30 days, which, I believe, is consistent with the

6   contracts the ITPM indicated he has with his vendors.  I

7   believe that in the instances where concern payments have

8   been processed on, kind of, a reimbursement basis, it is

9   usually taken place around a two week timeframe, which while

10  not as fast as the ITPM was previously playing the vendors,

11  it's within the timeframe that is in the contracts with the

12  vendors and within the 30-day reimbursement timeframe.

13      So there is a process as part of the EPA decision where

14  Mr. Henifin -- I'm sorry, the ITPM in JXN Water, can take

15  certain steps to have the advance payment model reinstated,

16  and he has raised those in his appeal that was filed this

17  morning.  And, again, I can't speak for the administrator

18  process, but I would assume that since they are now being

19  submitted, they will be reviewed and decided, and there will

20  be some follow-up conversations.

21      I can say this, that the Office of Grants and Debarment

22  has received the communications regarding the grants issues,

23  both the 3/13 one and this morning, and have advised the

24  appropriate staff in that office that they are reviewing it

25  expeditiously, the Office of Grants and Debarment will be in

 1    touch with the ITPM and JXN Water in short order regarding

 2    the administrative action.

 3          One other point I want to address quickly is, I think

 4    there were assertions that somehow under reimbursement

 5    model, the entire invoices may not be paid, I don't believe

 6    and, again, I'm speaking outside of my area of expertise,

 7    but I don't believe that to be the case.  I think if there

 8    were specific items and invoice that were -- there may need

 9    additional support or something, that would be pointed out,

10    and perhaps, that might be the type of thing.  But I don't

11    think they would just not be paid, and as I said, the stat-

12    -- the regulations itself provide that reimbursement

13    invoices, when appropriately submitted, are to be paid

14    within 30 days.

15          THE COURT:  You've been here since I have been involved

16    in seeking solutions to this emergency matter.

17          What is your prediction as to how a six-month delay on

18    the reimbursement system would impact on the efforts that

19    this Court and Mr. Henifin have been trying to accomplish?

20          MR. FINGERHOOD:  Well, first, Your Honor, I don't think

21    it would be -- at most, it would be a six-month delay.  That

22    also doesn't consider the indication from the Office of

23    Grants and Debarment that there are certain -- and it is in,

24    I think, Section 3 of the notification that they sent out

25    this past Friday there are steps that JXN Water and the ITPM

1    can take to get the advanced payment model reinstated.  One

2    of those was to get a grants manager or someone to assist

3    Mr. Henifin to kind of do the -- make these procedural

4    changes, et cetera, that the Office of Grants and Debarment

5    have been requesting.

6        And also, you know, the third-party manager has a lot

7    of on his plate in addition to all of the engineering, et

8    cetera.  It would be, I think, helpful in my own personal

9    opinion and apparently in the opinion of the Office of

10    Grants and Debarment, helpful to have somebody that they can

11    contact with any type of accounting questions and things

12    like that, for example -- for dealing with processing of the

13    grant funding.

14        THE COURT:  So who do you recommend?

15        MR. FINGERHOOD:  Who would I recommend?

16        THE COURT:  Yes.  Give me a name.

17        MR. FINGERHOOD:  Oh, well, the third-party manager

18    indicated that he plans on retaining someone from HORNE

19    accounting, which is a regional.  I think they are a Top 25

20    nationwide accounting company, and I think they have several

21    offices in Mississippi, including one in the Jackson area.

22    I don't know, specifically, who the third-party manager has

23    identified at that office, but, you know, I think they have

24    been working on things related to Jackson and the water

25    issues for some time.  Is that correct?  Yes.

```
1            THE COURT:  So then who would you recommend?  You got a

2       person's name?

3            MR. FINGERHOOD:  Oh, I have had -- I personally have

4       had no dealing with HORNE, but it is my understanding they

5       are a well-represented accounting firm, and would have, you

6       know, CPAs and people of those types of qualifications that

7       would be available to work.  I don't know who the

8       third-party manager at JXN Water has been working with at

9       that office.  I don't know if it's a person they're

10      currently working with, or if they have someone else in that

11      office in mind, but...

12           THE COURT:  And who -- and have you ever worked with

13      this company you're now possibly suggesting?

14           MR. FINGERHOOD:  Oh, well, first --

15           THE COURT:  Or even the procedure?

16           MR. FINGERHOOD:  First let me qualify that I -- this

17      was from Mr. Henifin -- or, I'm sorry, the third-party

18      manager's communication to EPA.  He recommended this company

19      that he was going to find someone there.  So I have no

20      involvement in this recommendation.  I just do know of the

21      company, because I think they are somewhat well-known

22      locally, and may have also been involved in some other

23      earlier matters involving either the sewer or water system.

24           THE COURT:  Have you ever seen this procedure applied?

25           MR. FINGERHOOD:  Actually, I do think it's fairly
```

 1    common.  Again, this is not my area of expertise, but I do

 2    think that when you have a large federal grant, that the

 3    grantee does frequently retain someone.

 4        And there are -- just from a Google search, there are a

 5    number of entities that specialize in grants management, and

 6    so there is -- you know, I think the practice is somewhat

 7    established that there is an industry of people who are

 8    experienced in, you know, the requirements of federal grants

 9    and what is needed, and, you know, the procedural

10    requirements, the best practices, et cetera, to be

11    implemented, and so there is -- there are a number of

12    entities and individuals that provide those services

13    nationwide.

14        THE COURT:  Is EPA taking this case seriously?

15        MR. FINGERHOOD:  Yes.

16        THE COURT:  Well, let me tell you why I ask that

17    question:  You filed this -- this matter in a certain year.

18    Do you recall what year you all filed this case?

19        MR. FINGERHOOD:  We filed the Drinking Water Case in

20    November of 2022.

21        THE COURT:  And you also filed the sewage case,

22    correct?  When did you file it?

23        MR. FINGERHOOD:  That was originally filed in 2013, and

24    then, as the Court's aware, we negotiated an interim order

25    on that part of the case.  I think that was entered

1    September 30th of 2023, right before the new fiscal year, I

2    believe.

3        THE COURT:  But then 13 years went by, and EPA did

4    nothing.  Is that so?

5        MR. FINGERHOOD:  Well, I wouldn't characterize it as

6    that.  We were in constant dialogue with the city about

7    issues that had not been addressed under the consent decree.

8    I think there -- also MDEQ is involved in those discussions.

9    There were administrative orders issued, and --

10        THE COURT:  It's not on a docket sheet.

11        MR. FINGERHOOD:  No.  These were -- these were done,

12    again, administratively, so they wouldn't be on the docket

13    sheet, but there was communication.  The city, again, had

14    indicated that their precarious financial condition

15    prevented them from being able to afford some of the things

16    that EPA had requested.  So there was an ongoing dialogue

17    during that time period.

18        THE COURT:  Well, then, who dropped the ball during

19    those 13 years?

20        MR. FINGERHOOD:  I guess --

21        THE COURT:  I'm just -- I'm just responding based on

22    what the docket sheet shows.  The docket sheet is silent.

23    So it doesn't show that anything.  All it shows is that the

24    case was filed, and then later on, it shows that I took over

25    after I went and requested the case, because I saw that

1   nothing had been done.  But in the interim, there was

2   nothing.

3       So did somebody drop the ball during that time period?

4       MR. FINGERHOOD:  Well, as I said, there were ongoing

5   discussions.  You know, I think part of those discussions

6   were if the United States and MDEQ were to bring a renewed

7   enforcement action with spending additional limited city

8   funding on litigation and related expenses be in the best

9   interest of the United States and the citizens of Jackson,

10  or would it be better to continue it -- dialogue about

11  trying to get the work done.

12      Unfortunately, you know, those discussions were not as

13  fruitful as were hoped, and I think -- you know, I don't

14  know if I could blame -- lay the blame at one person's feet.

15  I mean, I certainly was part of that, and I was involved in

16  it.

17      THE COURT:  Well, I was moved to ask the question,

18  because when I picked up the file and saw that nothing had

19  been done in 13 years, and then when I recognize that the

20  water case and the sewage case had some relationship to each

21  other, and I asked if I could be assigned the sewage case

22  along with the water case, because I already had the water

23  case.  And then after I managed to get the sewage case

24  assigned to me too, because of the interaction between the

25  two, and I thought that that would move these whole matters

1     more rapidly.

2         Then I remember some difficulty we had with trying to

3     merge the consent orders, and even when we were trying to

4     merge the consent orders, I remember the difficulty that

5     surfaced, was EPA had some objections that, at first, I

6     didn't quite understand.  And EPA then submitted its

7     objections to the merger of the two, and after a process, we

8     finally worked out all of that to get it merged, and then

9     the next time, there was a problem from EPA on how the

10    moneys were going to be paid.

11        So we did this hearing not that long ago, and frankly,

12    I'm on the side of Mr. Henifin who says that he left here

13    with a certain understanding.  I -- I guess I made the same

14    mistake, because I left here with the same mistake, too.  I

15    thought that we had agreed that some moneys were going to be

16    provided that he could pull down and get the vendors paid,

17    because we were afraid that if the vendors were not timely

18    paid, that they might withdraw their interest in working on

19    these various projects.  And so I thought that was a matter

20    that was already discussed and decided, and so then I now

21    find out that EPA has endorsed another approach.

22        And, Counsel, do you recall any discussion that before

23    you adopted another approach that you would inform the Court

24    of the possibility of another approach?  Because I don't

25    recall any notification on your conversion from one system

1          to another.

2                 So do you agree with that, or is it something that I

3          missed and Mr. Henifin missed and his lawyers missed?  Is

4          there something there that we just were confused about?

5                 MR. FINGERHOOD:  Well, Your Honor, we did provide the

6          -- the March 8th report to the Court, to chambers, which

7          provided -- that was the initial basis of the notice letter.

8          That was issued on the 15th.  We provided that to the Court,

9          and then when the notice letter was issued on the 15th, we

10         provided that to the Court as well.

11                THE COURT:  That you were going to a reimbursement

12         procedure?

13                MR. FINGERHOOD:  Right.

14                THE COURT:  So is that where you are now, that you have

15         now decided -- and I'm saying "you," that's EPA.  So now EPA

16         now is on a reimbursement system now?

17                MR. FINGERHOOD:  That EPA Office of Grants and

18         Development has made that decision.  I don't represent them.

19         That's an administrative decision that's been issued.  I

20         have no authority to tell them what to do or not to do.

21         That was an administrative decision, and that's not before

22         the Court either at this time.

23                THE COURT:  Well, can you tell me the hierarchy -- the

24         hierarchy at EPA relative to decision-making on these

25         matters that concern JXN Water?

1        Can you tell me then the hierarchy, so we know who is

2    making the decisions about moneys and the other matters that

3    are so vital to the continuation of our efforts to solve our

4    problems down here without some third person making the

5    decision, whom we haven't even seen?

6        So can you tell me then, the hierarchy, place.

7        MR. FINGERHOOD:  Yes, Your Honor.  It's my

8    understanding that, for example, on the Clean Water Act side

9    and Safe Drinking Water Act side, it's EPA's Region 4 in

10   conjunction with EPA headquarter's Office of Water.

11       With respect to --

12       THE COURT:  Okay.  Now, let me get these down, so I

13   know who I'm talking about.

14       Okay.  So you are saying that it's Region 4?

15       MR. FINGERHOOD:  EPA Region 4.

16       THE COURT:  Now, who is that?

17       MR. FINGERHOOD:  That would be some of the folks on the

18   call, Suzanne Rubini and Suzanne Armor and Michael Creswell.

19   And they also have a team of engineers they work with.  Jim

20   Vinch is the headquarters attorney with the Office of Water,

21   and, again, those are the individuals with the Safe Drinking

22   Water Act and the Clean Water Act issues.  There is also

23   Michelle Wetherington who have -- on the Clean Water Act

24   side of things --

25                     (Court reporter interruption.)

1          I'm sorry.  Michelle Wetherington is also involved in

2     the Clean Water Act.  She is an attorney at EPA Region 4.

3          Now, with respect to the grant funding, there is a part

4     of the Office of Water that I think the third-party manager

5     referred to, and they deal with the initial phase of, you

6     know, invoices and working the system, but ultimately, it's

7     my understanding that EPA's Office of Grants and Debarment

8     has final say over that process, along with EPA's Office of

9     General Counsel.  And those -- both of those offices are

10    located, I believe, at EPA headquarters in D.C.

11         THE COURT:  How many people are we talking about?

12         MR. FINGERHOOD:  Well, with respect to -- I would say

13    there is probably at least a half dozen people I have seen

14    on emails.  But as far as, you know, the specific issues and

15    the appeals, there were people named in the correspondence

16    between the Office of Grants and Debarment and the

17    third-party manager.

18         And so those -- I think those -- at least those two

19    people, one was the officer who will be I think -- I forget

20    what the formal title is, but I think he is the final

21    decision-maker of the office of dispute.  His name is

22    escaping me.

23         And then also there's -- I believe there was Keva

24    Lloyd, who is someone who was offered as a person that JXN

25    Water could contact with questions about, you know, the

1    process, and how it -- it would work.

2        THE COURT:  This change that was made in the protocol

3    on paying the vendors, was that a committee decision, or a

4    one-person decision?

5        MR. FINGERHOOD:  I think it was made by the Office of

6    Grants and Debarment by several people.

7        THE COURT:  It sounds like a committee.  So then is

8    that a committee decision, basically -- well, because here

9    is why I'm asking the question on this:  And I don't think I

10   got an answer to the question I asked a few moments ago.  I

11   asked whether we were misinformed or misheard last time we

12   were together, that EPA was going to follow the same

13   reimbursement system.

14       Now, did we just make that up or get confused?

15       MR. FINGERHOOD:  Well, there was the 10 million

16   reimbursement that was processed.  I think, perhaps, while

17   we were in court last time, or shortly after that.  It's my

18   understanding that after that was issued, the Office of

19   Grants and Debarment, along with the EPA's Office of General

20   Counsel, made the decision reflected in both -- the

21   decisions reflected in both the March 8th report and the

22   March 15th notice.

23       THE COURT:  So how much time went by from the time you

24   were in court last time, and we talked about these matters,

25   and some of us here apparently got the wrong impression of

1   what you actually said, how much time went by before you

2   sought to clarify and it say, no, we are going to employ

3   another system?

4        MR. FINGERHOOD:  I think it was approximately two

5   weeks.

6        THE COURT:  Two weeks?  And during that two-week

7   period, were you submitted or did you have any additional

8   documents before you to change your mind?

9        MR. FINGERHOOD:  It was not up to me.  And, as I

10  indicated at the last status conference, you know, I think

11  Your Honor referred to my vast pool of knowledge on this

12  issue --

13       THE COURT:  I did.

14       MR. FINGERHOOD:  -- and I think I referred back

15  somewhat jokingly, but also somewhat seriously, that I was

16  more like a kiddy pool of knowledge.  So I do think part of

17  it was misunderstanding on my part, as far as this being an

18  entirely administrative process for which is totally

19  separate and apart from the Department of Justice, and even

20  EPA Region 4 and headquarters who have been working on the

21  Safe Drinking Water Act and Clean Water Act side.

22       THE COURT:  Okay.  So then just to complete that line

23  of thought, when we had that conversation about leaving

24  things in place, what you are telling me is that you didn't

25  know that your superiors were going to change it?

1          MR. FINGERHOOD:  Well, as I said, they're not my

2     superiors.  It's a totally different part.

3          THE COURT:  Well, you didn't know that there was going

4     to be an alteration by a group of folk who had primary

5     authority?

6          MR. FINGERHOOD:  Right.  I was -- I was not fully aware

7     of the separateness of the process, and I understand the

8     meaning for -- or the -- I guess the appropriateness of it,

9     being a separate process.  But, yeah, I was not fully aware

10     of the separateness of the process.  And I knew -- I think I

11     referred -- when I was here before that, I knew there was an

12     administrative process involved, but I did not understand

13     how it was totally separate from any process that I had been

14     involved in and that EPA Region 4 had been involved in on

15     the Clean Water Act and Safe Drinking Water Act side.

16          THE COURT:  Are you also saying that that puts you in

17     an awkward position?  And let me say something else on that.

18          What I mean by that is this:  After we had that

19     conversation here last time, you were aware that Mr. Henifin

20     was going to go forward on hiring contractors, and that if

21     it took two weeks to tell him that the procedure is

22     different, then he would know that when he engaged them.

23          And, further, some of them had already been engaged on

24     other projects.  Therefore, they were rightfully under the

25     assumption that they would be paid timely.  And so then when

1    he was told that that is not necessarily the case, then do

2    you appreciate the difficulty you placed him in?  Or are you

3    saying that he had no difficulty?

4         MR. FINGERHOOD:  No.  As I understand, as he has

5    expressed, that, you know, he likes to pay the contractors

6    on a much quicker timeframe.  I think -- and I think I

7    stated even at the last status conference that, you know --

8    and that's before I knew there was actually a regulation

9    that requires a grantee on a reimbursement basis to, you

10   know, receive the funds within a 30-day period.  Although it

11   would perhaps be longer than what had Mr. -- the third-party

12   manager had been doing in practice, it was still consistent

13   with the terms of the contract.  In that, again, this is

14   federal money, not city funds, and so the federal

15   government, you know, pays its bills on time, and there's

16   still full faith and credit in the federal government

17   funding.

18        THE COURT:  So then you would understand and not

19   quibble with the Court's choice, should I decide to resort

20   to this approach I'm now considering, to write a short

21   opinion or notice to the public, especially to the vendors,

22   that this inability to pay within the timeframe we had been

23   paying is because EPA chose to change its system without

24   notice to us within a two-week period.

25        Would you understand if I did that how that would be a

1    salvation issue for Mr. Henifin's integrity and confidence

2    that he didn't do anything wrong here, but EPA simply

3    changed its mind?

4        MR. FINGERHOOD:  Well, I don't know if that -- like I

5    said before, Your Honor, this is meant to be a temporary

6    change, and there is a process for him to be reinstated to

7    the advance payment model.  So there is that option, which

8    he has already availed himself of.

9        I also think that, at some point, there was frustration

10   on a point of the third-party manager about this dialogue

11   with the Office of Grants and Debarment.  So there was an

12   indication that they wanted some sort of final decision that

13   they could take before Your Honor.  This is not that

14   decision.  This is an administrative action.  There is no

15   proceeding before this Court, and it would not be ripe until

16   the administrative appeals process had been exhausted.

17       THE COURT:  And you had said there's an expedited

18   approach that Mr. Henifin can take?

19       MR. FINGERHOOD:  Right.

20       THE COURT:  What is that expedited process?

21       MR. FINGERHOOD:  Well, I said that -- I had read that

22   quote from the Office of Grants and Debarment that

23   indicated, and this is just the latter part, they've advised

24   the appropriate staff of both the March 13th communication

25   and the appeal notification that was filed this morning.

1    They are reviewing it expeditiously and will be in touch

2    with the third-party manager in short order regarding the

3    administrative action.

4        THE COURT:  Okay.  That's as close as you can get to

5    naming how long it would take, correct?

6        MR. FINGERHOOD:  At this time, yes.  And, again,

7    because these are not -- I don't represent this part of EPA.

8        THE COURT:  I know you've said that, and I understand

9    that.

10        MR. FINGERHOOD:  Okay.

11        THE COURT:  Right?  So there's another part of EPA,

12    just like that 13-year wait when this lawsuit was filed on

13    the sewage side, and nothing was done by EPA.

14        MR. FINGERHOOD:  Well, actually, that I -- that was not

15    another part of EPA.  That was -- I was part of the initial

16    group that negotiated the consent decree.  So, I mean, I do

17    take some responsibility for that, although -- although

18    nothing appeared on the docket, there were ongoing

19    discussions about how to proceed and how to get the city

20    back into compliance.  Those aren't reflected in the docket,

21    but I was a part of those, and so I do take some of the

22    blame for that.

23        THE COURT:  Well, if there were some things that were

24    done and some documents that were generated, then I would

25    like to see those documents, because I have looked at the

1    docket sheet and there is nothing there for 13 years.  But

2    if there was something that was done, then I would like to

3    see it to give you adequate credit for what was done during

4    that 13 years, because right now, it looks to me like

5    nothing done.  There's --

6        I mean, the docket sheet was just amazing.  I mean, I

7    just see where the case was filed.  Then I see where a

8    consent order was put in, and then 13 years went by, and

9    meanwhile the citizens of Jackson suffered that here it is

10   you have a lawsuit filed by EPA, and EPA could say that,

11   look, we have filed a lawsuit, so we're trying to move this

12   thing along, but the citizens of Jackson were suffering

13   during those 13 years.

14       And in addition, the citizens of Jackson didn't know to

15   go and look at a docket sheet and see that there was

16   absolutely nothing done.  I mean, that's -- it's just a

17   matter showing that there was a filing, and then after that,

18   a consent order, and after that, nothing, and -- just

19   nothing.  And I was amazed over that, and because I was so

20   amazed over that, and working so hard at that time on the

21   water matter and recognizing that the water case and the

22   sewage case had some family relationship between the two,

23   then I went and asked for the sewage case.

24       It was not assigned to me.  I went and asked for it,

25   because I felt like the two need to be worked together.  And

 1    the consent decree needed to be worked together.  And so

 2    then we all tried to marry these consent decrees and finally

 3    got those together, and that took a while.  And then after

 4    that, this matter of money, you know, surfaced, trying to

 5    get that decided, but the people of the City of Jackson have

 6    just suffered this entire time.

 7         And that's why I started off with the question on

 8    whether EPA was really serious about this lawsuit, you know,

 9    because it just seems to be some interruptions here and

10    there, and -- but, you know, but I can't say that the

11    interruptions are not fitting and appropriate from your

12    standpoint and from the regulations that you are calling,

13    but I would appreciate knowing all the regulations that you

14    say that you have to operate under and the ways that we can

15    move this matter quickly ahead so that I can give you credit

16    for what you're doing, because I would hate to determine

17    that you all are not serious about this matter, because this

18    is a grave matter for 160,000 folk, at a minimum, and there

19    they are out there just suffering, you know, on all of this

20    stuff here.  And -- and not to mention that some of us have

21    had to learn a whole lot more than we ever cared to learn

22    about water and sewage, you know.

23         So -- you know, so I have spent weekends trying to read

24    up on these things and trying to be sure that we can push

25    this as fast as possible.  So then I would like to be

1    informed about what was done during this 13 years.  If there

2    is something in there that says that EPA during those

3    13 years was actually moving towards a resolution.  But I

4    certainly didn't see it, and once I picked this case up, it

5    certainly was not apparent that anything has been done, like

6    I said before.

7         So if there are some regulations that haunt us at

8    present, and I need to know about these regulations, then I

9    would like very much that you submit them to me, you know,

10   because it seems like we came into this case about the same

11   time.  That's what I was thinking.  But apparently, that's

12   not correct, because you actually came to the case when you

13   filed it.

14        MR. FINGERHOOD:  Yes, sir.

15        THE COURT:  But that's right.  But then when you filed

16   it, when you filed this lawsuit, that is the sewage lawsuit,

17   were you -- well, I guess I don't need to ask that question.

18   I was going to ask you whether you looked down here in

19   Jackson and say I need to file that lawsuit, so I'm going to

20   go down there and file it.  But actually you probably were

21   assigned it, you know, but I don't know.

22        But, nevertheless, you seem to have been working

23   diligently on this matter, and so then I would not like to

24   draw a negative conclusion about this matter without knowing

25   all the players and all of the pieces of litigation.

1          So then if you would be so kind to tell me what

2     administrative orders were put in during that 13-year

3     period, because I don't have any of that on my desk.  You're

4     saying there were some.

5          MR. FINGERHOOD:  Actually, Your Honor, I do remember

6     now with some prompting from one of my colleagues.  As I

7     mentioned, we were considering how to --

8          THE COURT:  You were considering?

9          MR. FINGERHOOD:  I thought I heard someone.

10          THE COURT:  You did.  But go ahead.

11          MR. FINGERHOOD:  We were --

12          THE COURT:  They're not ghosts.  You did hear

13     something.

14          Terri, what's the story?

15          THE COURTROOM DEPUTY:  Someone on Zoom is not muted.

16          THE COURT:  Oh, okay.  Somebody on Zoom was not muted.

17     And can everybody mute on Zoom?

18          Okay.  Go ahead.

19          MR. FINGERHOOD:  So we were considering how to best

20     move the case forward.  So we did a few years, I think,

21     before the --

22          THE COURT:  I'm sorry.  Say what now?

23          THE COURTROOM DEPUTY:  It's Ms. Rubini.  Suzanne Rubini

24     needs to mute.

25          THE COURT:  Okay.  Tell her.

1          THE COURTROOM DEPUTY:  Ms. Rubini, we need you to mute

2     your microphone, please.  Thank you.

3          THE COURT:  Okay.  Now, go ahead.

4          MR. FINGERHOOD:  So I think a few years before the

5     drinking water system issue arose, or the emergency arose,

6     the water issues had also been, you know, under the watch of

7     EPA and MSDH.  We started filing joint status reports in the

8     Clean Water Act case.  We were trying to get the -- a

9     consent decree.  We were discussing a modification of the

10    consent decree, and so we did file reports on a regular

11    basis with the Court about those and providing some

12    background as far as what was going on.

13          In the interim, you know, the first one obviously had

14    some -- a lot more detail, but then in the subsequent

15    reports, we were updating the Court.  And, again, this was

16    not before Your Honor, but a different judge, on what had

17    occurred since the time of the last status report.  So there

18    is -- some of that should be in the docket.

19          THE COURT:  Okay.  It's not on the docket.  But I can

20    look through the files and see if I could find that, and if

21    I can't, I will notify you.  But I would like to be up to

22    snuff on everything that happened during that time period.

23    It would probably be very informative for me, so then I'll

24    have an idea what was happening.

25          So let's now address the present.  On the crisis that

1    we are having right now on this money, do you get involved

2    in this process at this point at all?

3        MR. FINGERHOOD:  The grants process and also the

4    disbursing of the funds pursuant to the grant, no, I have no

5    involvement.  I think, as I indicated, there are a couple of

6    people at the Office of Water who I think will still be

7    involved in this on a reimbursement basis, but the

8    administrative appeal and issues related to the

9    correspondence on March 8th and March 15 are all within the

10   Office of Grants and Debarment and EPA Office of General

11   Counsel.

12       THE COURT:  Oh, okay.  A few moments ago I said that to

13   be sure that the vendors out here don't look with

14   displeasure upon Mr. Henifin because he was acting on what

15   he thought to be the situation of hiring contractors and

16   allow them to go to work and recognizing that they would

17   expect to be paid within a week, and he thought he had the

18   capability of doing that because the money is there, so then

19   should I write a short note as just an explanation?  Would

20   that be something that would trouble EPA?

21       MR. FINGERHOOD:  Well, I think there may be information

22   in the March 15th letter that describes the process for JXN

23   Water being placed back on the -- the advanced payment

24   model.  I think, you know, that's in that letter already,

25   and also there's the provision that indicates that vendors

1   are to be paid within 30 days when a grantee is on the

2   reimbursement model.

3        THE COURT:  Well, should I decide to do that, this

4   notice will be neutral and benign, just to say here are the

5   facts, and contractors and the public should understand that

6   Mr. Henifin is working diligently in the manner in which he

7   said he would, hiring contractors in the manner in which he

8   said he would, expecting them to perform their projects with

9   a high degree of competence, as he said he would, and we ran

10  into a situation here where EPA has changed its mode of

11  reimbursement and may have to -- and Mr. Henifin may have to

12  go through an appellate process, which might take some time,

13  but which was not expected because of the conversation that

14  was had earlier, and without casting any other aspersions,

15  let it go with that, just so the public understands where we

16  are.

17       You know, I have, what, two, three?  I think I've done

18  about three clarification letters.  I just did one last week

19  on this new act that the Mississippi Legislature is

20  contemplating, and I'm going to make sure that the public

21  understood the parameters of that and understood that one

22  could read it as thinking that something else had gone into

23  effect when actually it has not, and so then I just did a

24  short note to the public to let them know that.  So I might

25  do the same thing here just to make sure that we are all on

1     the same page.

2         Now, is there anything else you want to tell me about

3     this?  Because you've been gracious enough to answer my

4     questions here.  You want to talk to your brain trust over

5     there?

6         MR. FINGERHOOD:  Yeah, I do want to mention one thing

7     first.  With all due respect, I would be a little hesitant

8     about the approach Your Honor is suggesting to the extent it

9     could be construed as some kind of court order, because, as

10    I said, this is -- and then this matter is not before the

11    Court, and so I do have that concern.

12        You know, Mr. Henifin -- I'm sorry, the third-party

13    manager, and JXN Water, they could issue a press release

14    that they're entitled to do that.  And, you know, if EPA

15    feels it's necessary to issue their own press release, they

16    could do that.  But I would be concerned with something

17    coming from the Court to the extent it could be construed as

18    some sort of court order or finding of something that we

19    contend is not before the Court.

20        THE COURT:  Well, to one extent it is.  I mean, because

21    Mr. Henifin said at one point that if he can't pay his

22    contractors, that he might suspend operations.  Now, as the

23    third-party manager, that would be his call on that.  He

24    will have to report to me about that, but, nevertheless, if

25    he can't pay his vendors, then I certainly understand that.

1           And I also understand, at this juncture, that he might

2      not be able to pay them, not for any defect or default on

3      his part, but because of the unfortunate change by EPA on

4      this matter, which happened when he was in the process of

5      hiring contractors.  And they had a right to rely upon past

6      conduct, and so they did, I'm sure.

7           So I'm not so sure you're right on that, that that's

8      not a fight that, you know, I'm not in at this point,

9      because I want this thing to be done as fast as possible, as

10     competently as possible, by the contractors who are deemed

11     to be the best that we can get without creating any ire

12     amongst them where they aren't interested in further

13     contracts with the JXN Water, and that was certainly --

14     that's a certain possibility if these people go out and they

15     spend time with their workers and then find out they can't

16     be paid.  That was one of the big complaints that when I

17     came in on the water case, contractors said they had against

18     the city, and that was one of the -- one of the notions or

19     factors that I wanted to be sure that was not present at the

20     present time, whether the city was guilty or not.

21          I'm not saying that the city was guilty.  I'm just

22     saying that that's something that the contractors said, and

23     they said that in open court here, that they couldn't get

24     paid.  Now, I told them -- I believe I said at the time that

25     I'm not getting into that.  We're going forward so that we

1    are going forward.  But if this matter here surfaces and

2    these people can't be paid, then I can't say that's not a

3    matter that doesn't concern the Court and the Court's order,

4    because the overall scheme that concerns this Court is to

5    try and get these things done, is to try and get the water

6    repaired, sewage repaired, and try to get these things done.

7        And here it is all this effort that has gone into

8    identifying the various defects, the various problems that

9    need to be addressed, the -- the eruptions on the water

10   side, the eruptions on the sewage side, the standing of raw

11   sewage all over the city, the fissures in various pipes and

12   the loss of water that has already -- had already been

13   processed, those are things that are right on my plate.

14       And so if I can't get those things repaired, then it

15   does concern me.  And if I can't find appropriate

16   contractors out here because they said they don't want to

17   work on these things anymore because they can't get paid,

18   well, that certainly concerns us.

19       But I'll see what position I take on this.  But,

20   nevertheless, I know what my end game is, and I'm trying to

21   make sure we get there as fast as possible.

22       Now, is there anything else you want to say to me?  If

23   so, I'll hear it.  I'd ask you if you've consulted with

24   Ms. Brain Trust over there.

25       MS. PAIGE:  Thank you, Your Honor.

1          THE COURT:  Okay.  You like that name?

2          MS. PAIGE:  I'll take it.

3          MR. FINGERHOOD:  So I have a few points I would like to

4     clarify.

5          THE COURT:  Okay.  Go right ahead.

6          MR. FINGERHOOD:  First of all, you know, the

7     reimbursement process has been in place since Friday.  I

8     think it's somewhat speculative to suggest that people are

9     not going to get paid.  As I said, the statute requires

10    payment within 30 days.

11         None of the changes that have been proposed, and, as I

12    noted, these are intended to be temporary, prevent JXN Water

13    or the third-party manager from using the funds for eligible

14    expenses related to the drinking water system.  EPA is

15    committed to the success of the system and stands ready to

16    provide grant funding on receipt of the approval invoices

17    and is committed to working with JXN Water and the ITPM to

18    provide technical assistance and improve JXN Water grant

19    management capabilities.

20         On the Drinking Water side, I believe there were a

21    couple of administrative orders issued by EPA and MSDH

22    before the -- both the freeze issues that happened the year

23    before and then the collapse in August of 2020 -- I'm sorry,

24    2022 -- actually, one was in 2020, and then in 2021, to try

25    and get the city into compliance with the Safe Drinking

1     Water Act.

2          On the -- on the Clean Water Act, as I noted before, we

3     were in discussions and did file status reports, and we

4     worked with the city, their outside attorneys, their outside

5     consultants, EPA engineers, and had meetings in person,

6     virtual meetings, we had monthly calls trying to figure out

7     what we could do to get the consent decree back on track.

8          We started discussing modification to the consent

9     decree, and unfortunately, when things kind of erupted on

10    the Drinking Water Act side, you know, the primary attention

11    was focused on that.  But there were discussions that were

12    going on between all of the parties involved trying to get

13    the city back into compliance.

14         The fact that, you know, there was some time gap, I

15    think we -- you know, we -- we would say that that is

16    unfortunate, but there were -- even during those time

17    periods, there was communication between the city and the

18    EPA on a technical level between the engineers indicating

19    what was going on and what could be done to fix it.  And in

20    the interim, the city did bring in an outside contractor to

21    start operating the sewage treatment plants, and that was a

22    step in the right direction.  They were making some progress

23    on some of the projects under the consent decree, but they

24    were falling behind the timetable that was established under

25    the consent decree.

```
1          THE COURT:  All right.  Thank you very much.

2          MR. HENIFIN:  Your Honor?

3          THE COURT:  Yes, Mr. Henifin, go right ahead.

4          MR. HENIFIN:  So, you know, we're all here today.

5     We're here in Jackson because four parties came together and

6     negotiated an interim stipulated order, started with the

7     Drinking Water.  In paragraph -- subparagraph 6-T of that

8     agreement the U.S. EPA signed onto, it said,

9     "Notwithstanding subparagraph 6-M, comply with the terms,

10    conditions, and assurances of any current --

11         THE COURT:  Not too fast.  Go ahead.  Notwithstanding?

12         MR. HENIFIN:  "Notwithstanding subparagraph 6-M, comply

13    with the terms, conditions, and assurances of any current or

14    future grant or loan that funds the system, or, if

15    compliance is not practicable, comply to the extent

16    practicable."

17         So I would argue that they agreed to that, the four

18    corners of this document, and this grant, we're complying to

19    the extent practicable, and they're changing the rules on us

20    as we move along.  I also point out that Mr. Fingerhood

21    mentioned the March 8th letter as having noticed that the

22    reimbursement process was going to start.  It did not.  It

23    just purely provided the report of the findings from the

24    compliance assistance visit.  We knew nothing about the

25    reimbursement process until the 15th, when the letter showed
```

1        up in my mailbox, e-mail box, and yours as well that day.

2            And finally, and this is a challenging project overall,

3        and this just adds extra burden.  And, sure, we're going to

4        hire another grant assistance person through HORNE and waste

5        some more federal dollars, because we've yet to misspend,

6        misappropriate, or been pointed to for misusing any federal

7        dollars.  We haven't.  We can prove every dollar we've used.

8            The system was working fine.  We're not meeting the

9        exact letter of the grant law potentially, but, again, I

10       think that the deal we negotiated -- and we didn't, I'm not

11       party; they named me a third-party manager at that point.

12       They're just piling on additional burdens.

13           So this may not sound like much, but now I'm reviewing

14       an invoice, I forward it to EPA, EPA asks additional

15       questions, I research that, get that back to them, and then

16       I have to pester them week after week asking:  When am I

17       going to see money to pay my contractors?  That's all in the

18       normal course of business that we're -- you know, our hair

19       is on fire.  We are working very, very hard, and it doesn't

20       seem like the four parties, especially the EPA part of this

21       party, is helping.

22           But that's where I am at the moment, Your Honor.

23           THE COURT:  All right.  Thank you very much.

24           MR. FINGERHOOD:  Can I just state something?  As I

25       noted in the outset, and it might have gotten lost, you

1    know, the --

2    THE COURT:  Speak up.  Thank you.

3    MR. FINGERHOOD:  There's a lot of federal money

4    involved here.  There's a lot of people paying attention to

5    how it's being used, a lot of good is being done with that

6    money.  And so that's why, you know, the -- I think, you

7    know, as the third-party manager might view this as kind of

8    a paperwork headache, but I also think it's important for

9    the public to have transparency and know that the funds are

10   being spent appropriately.  And there are kind of processes

11   to ensure that, you know, that is the case, and that's why I

12   believe the Office of Grants and Debarment got involved.

13   One quick thing.  I think what I said is that the March

14   8th technical assistance report served as the basis for the

15   notice letter, not that it was mentioned in there, but I

16   think that was the -- at least my understanding of reading

17   those documents, is that's what they based the change on.

18   Again, it's meant to be temporary change, but, again,

19   because of the amount of federal funds involved, that is why

20   I understand they believe this is necessary.  And, you know,

21   as Mr. Henifin just indicated, this is -- that's why you

22   need to have a grants manager or someone of that type to

23   help assist, because he has a lot of other stuff going on

24   and it would be, we think, helpful to have someone assist

25   and work with the grants people to ensure that things move

1    smoothly on a going-forward basis.

2        THE COURT:  One second.  I really don't understand

3    those comments, because things were going along quite

4    smoothly before.  And then we apparently had some

5    bureaucrats in D.C. who decided to do something else without

6    any real explanation of why they were doing it.

7        So I really don't understand those comments.  We have

8    made a lot of progress here.  We're just trying to keep the

9    progress going, and we can't keep it going if we can't pay

10   the vendors.  It would seem to me that EPA in D.C. would

11   have known this and wouldn't have waited two weeks to tell

12   Mr. Henifin that the rules of the game had changed, and so I

13   don't see where hiring some other person to assist on this

14   matter is something that he needed.

15       The process was going along fine.  The people were

16   being paid.  We were moving and getting things done.  The

17   wrinkle in this whole matter came when EPA changed the

18   rules.  So I don't quite understand why he needs to hire

19   somebody else.  He was doing fine before that.  The process

20   was not complicated.  He was searching out people of

21   competence, checking out their credentials, their past

22   history, working with the city and other people and other

23   entities, hiring them and getting the job done.

24       We have made so much progress under that system, and

25   then the way I look at it, EPA then decided that it wanted

1    to change the rules without any real explanation.  That's

2    why I asked the question earlier whether EPA took this as a

3    serious matter, because one could look at the history of

4    this thing and say EPA has not done that and that it has

5    been obstructionist.  And so I hate to say that.  And so I'm

6    going to be looking to see what needs to be done here and

7    whether the Court needs to shore up its efforts by any other

8    written opinions on this matter.

9        But I just don't understand that comment.  I really

10   don't, so I don't need to say anything else about it.  But

11   this system on advanced payments was working quite fine, and

12   there has been, the way I see it, no complaints that any

13   moneys were spent on contractors who didn't do their job or

14   didn't do it well.

15       I've tried to keep up as much as possible with the

16   amounts being spent on contractors, the payment dates for

17   those contractors, the projects that they have been doing,

18   and I think that the projects have gone quite well.  So I

19   was taken aback sometime ago when EPA stopped the money, and

20   we had to have a powwow on it.  And I thought everybody had

21   worked towards a common goal when they said, okay, here's

22   what we'll do; we will maintain the protocol we've utilized

23   so far.  And then to find out that that's been changed.

24       So I don't quite understand the thrust of the words,

25   and let's just see if we can go ahead and work towards a

1    resolution on this matter.  You know, because I would like

2    to think that all of us have the same goals of trying to

3    satisfy the water needs of a city and to reach a conclusion

4    that would allow the citizenry to enjoy their constitutional

5    right to clean water and to move forward like every other

6    city that's well run.  So we'll see.

7        All right.  Thank you so much.

8        MR. FINGERHOOD:  One last thing, Your Honor.

9        THE COURT:  Go ahead.  Did your brain trust signal you

10   for something else?

11       MR. FINGERHOOD:  There are terms and conditions that

12   come with a grant.  The -- as I have noted many times, this

13   matter is not before the Court, but we did provide the

14   correspondence to the Court, which indicates the rationale

15   that the Office of Grants and Debarment had with respect to

16   the issues that led to the March 15th decision.

17       They said there is a road map to put the third-party

18   manager back on an advanced payment model, and that's

19   spelled out.  Also as an appendix, there is kind of a

20   history of the back and forth between the third-party

21   manager and the grants people about these issues.  So there

22   has been a dialogue that's been going on.

23       THE COURT:  I'm going to pull everything out, and,

24   again, go back over it one more time.  But I just want to

25   work out how best we get back to the advanced payment

1    schedule, because it's just too hard to expect or too dismal

2    to expect that folk want to be on a system where they can't

3    be guaranteed to get paid after they have already expended

4    their efforts.

5        So we'll all get back together on this.  And we're

6    going to see what we can get done and what kind of timeframe

7    we're looking at, because we have to try and move forward

8    fast on this.  And so I will look at all the regs again, and

9    see if there's anything in there that I have questions

10   about.  And if so, then without requiring you to leap onto a

11   plane and come down here, we can do it by telephone and see

12   what we can get done on that.  Okay?

13       MR. FINGERHOOD:  Thank you, Your Honor.

14       THE COURT:  Okay.  Thank you very much.

15       Now, I assume that Ms. Brain Trust has communicated all

16   she needs to communicate.  Is that so, Ms. Paige?

17       MS. PAIGE:  For the most part, yes, Your Honor.  If I

18   could just say one thing?  And that is the report that

19   Mr. Fingerhood referred to earlier does lay out substantial

20   issues that JXN Water has and has not complied with.  And so

21   as a result of the noncompliance, that is why the action was

22   taken by the Office of Grants and Debarment.  And so we

23   would ask Your Honor to look back very carefully at those

24   things and that sequence of events that have led to this.

25       And the only other thing I'd say, Your Honor, is that

```
1    there's been no proven impact.  He has not shown that none
2    of his vendors will not be paid.  He hasn't given it a
3    chance.  He said in the last hearing that there would be two
4    weeks, but the two weeks was the outset for the amount of
5    time that he's had.  So he hasn't proven any impact.  It's a
6    change in the process, and it's because of things that JXN
7    Water has not implemented.  And we're giving him the road
8    map to try to do that.  It's not pointing the finger at him.
9    It's just making sure that the taxpayer dollars are spent in
10   the way that they're supposed to be.  He signed the -- an
11   agreement that said that he would operate within those
12   confines, and we're just asking him to do that.
13        THE COURT:  Well, now, you heard him read off a
14   paragraph from the consent order.  Did you hear that?
15        MS. PAIGE:  I did.
16        THE COURT:  Okay.  And it also said that, if practical,
17   unless it was not practical, that EPA would agree to that.
18   So are you saying that it's not practical?
19        MR. FINGERHOOD:  Your Honor, if I may, I don't believe
20   in tag team attorneys here.  But there also were terms and
21   conditions in the actual grant itself, but "practicable"
22   means -- I think you know it's something that can be done,
23   and I think what the Office of Grants and Debarment have
24   laid out in their letter are things that can be done.  If
25   it's impracticable, that would mean something that he could
```

1   not do.  But I think that the belief is that these are

2   things and procedures that he can do, and so that's -- that

3   language is --

4       THE COURT:  You know what I thought?  What I thought in

5   the spirit in which you were addressing me before that these

6   are things that he's working towards and make sure he gets

7   them.  Once he's notified of all these regulations and

8   stuff -- and there are quite a few regulations -- that he's

9   doing that.  And just like he's been working hard to try and

10  satisfy all the regulations that come with this grant of

11  money, which is a large sum of money, which also has some

12  impact on the Court, because I have to review it.  I have to

13  review the expenditures on these matters, so he is not the

14  only one who is looking at that.

15      And so just as he has his duties to perform to make

16  sure he is trying to do things as expeditiously as possible,

17  so do the other parties to this litigation, which is what I

18  spoke about earlier.  And, of course, I don't know how long

19  all counsel at your table have been involved for 13 years,

20  you know, on the -- on this matter, at least on the sewage

21  matter.  But then there are a whole lot of questions about

22  that, but as I said before, we need not get into all those

23  matters, because what we're trying to do is go forward.  And

24  so we're not trying to put logs on the fire.

25      What we're trying to do is just make sure we go

1    forward, because, if so, there's a whole lot that could be

2    said and a whole lot of -- of irritation that could be

3    mentioned on this matter.  So let's not do that.  So thank

4    you so much.

5        MR. FINGERHOOD:  Thank you.

6        THE COURT:  There is a motion for leave to file suit by

7    the Lakeland Seniors.  Are these parties here?  These are

8    lawyers?

9        MR. MARTIN:  Judge, if I could, Drew Martin, for the

10   city.  I don't think University Medical Center would have

11   gotten notice that the Court was going to hear that today,

12   and they are one of the parties to that litigation.

13       THE COURT:  You say you don't think they got notice?

14       MR. MARTIN:  I assume they didn't.  I don't think

15   anybody's here for UMC.  Is that correct?  The Court -- I

16   think the Court -- well, the email I saw was Friday

17   afternoon, and the city is prepared to move forward with

18   that motion if the Court wants to hear it.  I just wanted to

19   advise the Court that UMMC probably doesn't have anyone

20   here.

21       THE COURT:  Okay.

22       MR. MARTIN:  In fact, does not have anyone here.

23       THE COURT:  Do I have everybody else here?

24       MR. MARTIN:  I believe so.  And, Judge, the reason they

25   wouldn't have gotten the notice is because they're not a

1    party to this litigation; that is, the consent decree

2    stipulated order litigation.  They would have only seen it

3    on the docket that is the underlying litigation with

4    Lakeland Seniors and the city and UMMC.

5         THE COURT:  Okay.  Now, who is the respondent in that

6    motion?

7         MR. MARTIN:  Well, I think JXN Water is.  The city

8    filed a response as well, but certainly JXN Water is

9    probably the primary respondent, I would think.

10         THE COURT:  Okay.  Let's do this, unless it interferes

11    with your schedules too much.  It is now 11:58, and so we

12    can take a lunch break, and take a lunch break until 1:30.

13    Let me see -- 12:00 to 1:30.  In the meantime, you can call

14    up the missing party and see if that attorney would be

15    available later at 1:30, both in body and mind, to go

16    forward on the motion.  If not, then I'll just simply set it

17    for another day.

18         MR. MCGUFFEY:  We can do that, Your Honor.

19         MR. MARTIN:  Yes, sir, we can do that.

20         THE COURT:  Okay.  So then I'll see you all back here

21    at 1:30 then.  Okay?

22         MR. MARTIN:  Thank you, Judge.

23         THE COURT:  All right.  That's for everybody else.  See

24    you at 1:30.

25         MR. CALAMITA:  Your Honor?

1        THE COURT:  Yes?

2        MR. CALAMITA:  Your Honor, before we close, there's

3    just one thing I have to correct.  The last representative

4    from the Department of Justice suggested that Mr. Henifin

5    was in noncompliance with this grant.  Your Honor, that is

6    not correct.

7        They raised four issues.  The first is that he was not

8    tying his drawdowns to specific invoices.  That has not been

9    the case since November.  As soon as he was notified, he

10   changed that practice.  He's in full compliance.

11       The second issue was that he was holding on, he drew

12   down extra money, which is contrary to the regulations, but,

13   again, that is not a current practice.  That practice has

14   stopped.  He only draws down against a specific invoice.

15       The third was that he's paying excess payroll, Your

16   Honor.  And what that is is supplemental pay that he's

17   paying to some of the key JXN Water people.

18       Your Honor considered specifically and at length, that

19   supplemental pay last July in your status conference, and in

20   your order on that status conference, you approved that

21   supplemental pay, Your Honor.  EPA, last Friday in their

22   letter, or two weeks ago, disapproved what Your Honor had

23   proved and said that the grant money can't cover that

24   supplemental pay.  Mr. Henifin disagrees vehemently, but he

25   has acquiesced so that that supplemental pay will come from

1    other funds.

2         And the last allegation of noncompliance is that he

3    doesn't have adequate institutional controls over the

4    grants, which we think is absolutely incorrect, Your Honor.

5    We had told the Department of Justice that Mr. Henifin, last

6    year, put a bid out, a six-figure position, Your Honor, in

7    Jackson, Mississippi for somebody to manage these grants and

8    did not get any acceptable people, and the conversation I

9    had with DOJ, Your Honor, was that he would redo that job

10   posting on Indeed to see if he could get somebody.

11        Instead, he's going to use HORNE.  But that's the last

12   thing they say that he's in noncompliance for, he didn't

13   have institutional controls.  That institutional control

14   requirement is a vague one.  It's a narrative requirement.

15   It doesn't say he has to have an outside person.

16        My view was he was doing it perfectly fine.  But,

17   again, we have yielded to them, so as we sit here today, I

18   don't think there's a single allegation of noncompliance,

19   and if we had had the opportunity to talk to them, as the

20   Court contemplated in the last status conference, I don't

21   think we would be going down this path.

22        And the last thing I'll say is the harm here, which is

23   today's harm, for Your Honor and Mr. Henifin, is that every

24   contract he signs, he really doesn't know if he can pay it,

25   Your Honor, because some independent party who, by the way,

 1    in the same letter disapproved the supplemental pay for the

 2    city employees.  So it's not like the grants people aren't

 3    willing to, you know, put their views on these contracts on

 4    things that are most critical to us, like, how we pay our

 5    people.

 6        When Mr. Henifin signs a contract for somebody to make

 7    a repair, he doesn't know that he's going to have money to

 8    do that.  And none of my other clients are in that position,

 9    and, quite frankly, nobody on this -- in the status

10    conference today signs contracts they don't know whether or

11    not they can pay.

12        So I'll would stop there, but I would ask the Court I

13    think this should be expeditiously resolved, because

14    Mr. Henifin, the couple of outstanding allegations are no

15    longer accurate, and the one or two that they raised,

16    Mr. Henifin has conceded on, so I would hope it's not

17    six months.  I would hope it's two weeks, and we get back to

18    the proper approach where Mr. Henifin knows he can pay a

19    contract when he signs it.

20        Thank you, Your Honor.

21        THE COURT:  Okay.  All right then.  Now, for the people

22    who are going to be here -- counsel, you want to add

23    something?

24        MR. FINGERHOOD:  Just quickly, Your Honor.

25        THE COURT:  Okay.

1          MR. FINGERHOOD:  All those matters can be raised

2     administratively.  And, in fact, I believe Mr. Henifin has

3     already raised those in -- at least many of those in the

4     papers he's already submitted to the EPA Office of Grants

5     and Debarment.

6          THE COURT:  Well, that's my understanding, that those

7     things have already been raised.  I read all those, and --

8     but like I said before, that I would hate to see the parties

9     devolve into challenges to each other on matters that's

10    supposed to be handled administratively, because if that's

11    the case, then the Court has enough matters that he could

12    bring up concerning EPA.  And so -- but that's not why we're

13    here.  We're here to try and see if we can reach a

14    resolution on it.  Thank you.

15         Yes?

16         MR. TOM:  Good afternoon, Your Honor.  Joshua Tom, on

17    behalf of the proposed intervenor plaintiff.  I just wanted

18    to raise whether Your Honor expected to hear that motion

19    today?  We'd be happy to talk about that today or at another

20    time of the Court's choosing.

21         THE COURT:  Who are your opposite numbers?  Are they

22    here today?

23         MR. TOM:  Yes.  Everybody's here -- all of the people

24    that should be here are here today.

25         THE COURT:  Are you prepared to go forward on that?

1          MR. TOM:  If we could do that, yes, sir.

2          THE COURT:  I had put it down --

3          MR. TOM:  Okay.

4          THE COURT:  -- to go forward on it, because then I was

5      going to hear this first one, I told everybody 1:30, now

6      it's going to be 1:45, because we're going to be at 1:45

7      pretty soon.  But I had put it down to hear it, so I would

8      like to hear it.

9          MR. TOM:  That's great.  Thank you, Your Honor.

10         THE COURT:  So unless -- unless it's causing some

11     serious problems on schedule-wise for some of the other

12     persons involved with that motion, I'd like to go forward on

13     it.

14         MR. TOM:  That's great.

15         THE COURT:  Okay.

16         MR. TOM:  All right.

17         THE COURT:  We'll see what we have.  1:45 then on the

18     first one.

19                 (A recess was taken at 12:08 p.m.)

20     ****************************************************************

1               **COURT REPORTER'S CERTIFICATE**

2

3           I, Caroline Morgan, Official Court Reporter for the

4    United States District Court for the Southern District of

5    Mississippi, do hereby certify that the above and foregoing

6    pages contain a full, true, and correct transcript of the

7    proceedings had in the forenamed case at the time and place

8    indicated, which proceedings were stenographically reported by

9    me to the best of my skill and ability.

10          I further certify that the transcript fees and format

11   comply with those prescribed by the Court and Judicial

12   Conference of the United States.

13          THIS, the 27th day of March, 2024.

14

15                         /s/ Caroline Morgan, CCR

16                         Caroline Morgan CCR #1957
                           Official Court Reporter
17                         United States District Court
                           Caroline_Morgan@mssd.uscourts.gov
18

19

20

21

22

23

24

25