```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                        NORTHERN DIVISION

 3


 4   UNITED STATES OF AMERICA, ET AL.              PLAINTIFFS

 5   VERSUS                    CIVIL ACTION NO. 3:12-CV-790-HTW-LGI

 6   THE CITY OF JACKSON, MISSISSIPPI, ET AL.       DEFENDANTS

 7

 8

 9
                           STATUS CONFERENCE
10            BEFORE THE HONORABLE HENRY T. WINGATE,
                UNITED STATES DISTRICT COURT JUDGE,
11                     MARCH 18, 2024,
                     JACKSON, MISSISSIPPI
12

13

14

15                   (APPEARANCES NOTED HEREIN.)
16

17

18

19

20

21
     REPORTED BY:
22
         CAROLINE MORGAN, CCR #1957
23       OFFICIAL COURT REPORTER
         501 E. Court Street, Suite 2.500
24       Jackson, Mississippi  39201
         Telephone:  (601)608-4188
25       E-mail:  Caroline_Morgan@mssd.uscourts.gov
```

```
 1   FOR THE PLAINTIFF, UNITED STATES OF AMERICA:

 2          KARL J. FINGERHOOD, ESQUIRE
            U.S. DEPARTMENT OF JUSTICE
 3          ENVIRONMENTAL ENFORCEMENT SECTION
            POST OFFICE BOX 7611
 4          WASHINGTON, DC 20044

 5          ANGELA GIVENS WILLIAMS, ESQUIRE (VIA ZOOM)
            MITZI DEASE PAIGE, ESQUIRE
 6          U.S. ATTORNEY'S OFFICE
            501 EAST COURT STREET, STE. 4.430
 7          JACKSON, MISSISSIPPI 39201

 8          ANGELA MO, ESQUIRE (VIA ZOOM)
            U.S. DEPARTMENT OF JUSTICE, ENRD
 9          150 M STREET, N.E., ROOM 2.900
            WASHINGTON, DC 20002
10
     FOR THE PLAINTIFF, STATE OF MISSISSIPPI:
11
            ROY FURRH, ESQUIRE
12          DONNA J. HODGES, ESQUIRE
            MS DEPARTMENT OF ENVIRONMENTAL QUALITY
13          515 EAST AMITE STREET
            JACKSON, MISSISSIPPI 39201
14
     FOR THE DEFENDANT, CITY OF JACKSON:
15
            TERRELL S. WILLIAMSON, ESQUIRE
16          DREW MARTIN, ESQUIRE
            KEYONA HENRY, ESQUIRE
17          OFFICE OF THE CITY ATTORNEY
            455 EAST CAPITOL STREET
18          JACKSON, MISSISSIPPI 39201

19   FOR THE DEFENDANT, JXN WATER:

20          CHARLES MITCHELL MCGUFFEY, ESQUIRE
            MALISSA WILSON, ESQUIRE
21          FORMAN, WATKINS & KRUTZ, LLP
            POST OFFICE BOX 22608
22          JACKSON, MISSISSIPPI 39225-2608

23          FRANK PAUL CALAMITA, ESQUIRE (VIA ZOOM)
            AQUALAW, PLC
24          6 S.5TH STREET
            RICHMOND, VIRGINIA 23219
25
```

```
 1   FOR THE INTERVENOR PLAINTIFF:

 2           EMILY C.R. EARLY, ESQUIRE (VIA ZOOM)
             MIKAILA HERNANDEZ, ESQUIRE (VIA ZOOM)
 3           JOSHUA TOM, ESQUIRE
             THE CENTER FOR CONSTITUTIONAL RIGHTS
 4           666 BROADWAY AVENUE, FLOOR 7
             NEW YORK, NEW YORK 10012

 5

 6   ALSO PRESENT:

 7   TED HENIFIN, THIRD-PARTY MANAGER
     SUSAN RICHARDSON (VIA ZOOM)
 8   SUZANNE ARMOR (VIA ZOOM)
     JIM VINCH (VIA ZOOM)
 9   SUZANNE RUBINI (VIA ZOOM)
     GERALD KUCIA, ESQUIRE (VIA ZOOM)
10   JONATHAN M. BARNES, ESQUIRE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    **IN OPEN COURT, MARCH 18, 2024**

2

3          THE COURT:  Terri, call the case, please.

4          THE COURTROOM DEPUTY:  Your Honor, this is United

5    States of America versus City of Jackson, Civil Action

6    Number 3:12-cv-790-HTW-LGI, as well as related case

7    3:22-cv-686-HTW-LGI.  We are here this morning for a status

8    conference, and at this time, I'm going to ask the parties

9    to state their names for the record, starting with the

10   plaintiff.

11         THE COURT:  All right.  Please do so.

12         MR. FINGERHOOD:  Good morning, Your Honor.  Karl

13   Fingerhood, U.S. Department of Justice, Environmental

14   Enforcement Section.

15         THE COURT:  All right.  Good morning.

16         MS. PAIGE:  Good morning, Your Honor.  Mitzi Dease

17   Paige, U.S. Attorney's Office here in Jackson, Civil Division.

18         THE COURT:  Okay.  Good morning to you.

19         MS. PAIGE:  Good morning.

20         MR. FURRH:  Good morning, Your Honor.  Roy Furrh with

21   the Mississippi Department of Environmental Quality.

22         THE COURT:  All right.

23         MS. HODGES:  Good morning, Your Honor.  Donna Hodges

24   with the Mississippi Department of Environmental Quality.

25         THE COURT:  All right.

```
 1          MR. MARTIN:  Drew Martin with the City of Jackson.
 2          THE COURT:  Okay.
 3          MR. WILLIAMSON:  Terry Williamson, City of Jackson.
 4          THE COURT:  All right.
 5          MR. HENIFIN:  Ted Hinifin, interim third-party manager.
 6          THE COURT:  All right.
 7          MS. WILSON:  Malissa Wilson, counsel for the interim
 8   third-party manager, Ted Hinifin.
 9          THE COURT:  All right.
10          MR. MCGUFFEY:  Mitch McGuffey, also counsel for the
11   interim third-party manager.
12          THE COURT:  Okay.
13          MR. TOM:  Good afternoon, Your Honor.  My name is
14   Joshua Tom.  I'm here for --
15               (Courtroom deputy interruption.)
16          Good afternoon, Your Honor.  My name is Joshua Tom.
17   I'm here on behalf of the proposed intervenors, Mississippi
18   Poor People's Campaign, and the People's Advocacy Institute.
19          THE COURT:  All right.  Thank you so much.
20          MR. BARNES:  Good morning, Your Honor.  This is
21   Jonathan Barnes for Lakeland Seniors.  We are not a party,
22   but we are interested -- interested party to the action.
23          THE COURT:  All right.  Good morning.
24          MR. CALAMITA:  Your Honor, Paul Calamita, also for the
25   interim third-party manager.
```

```
 1          THE COURT:  All right.  Thank you.  Good morning.
 2          MR. VINCH:  This is Jim Vinch, an attorney with the
 3    United States Environmental Protection Agency in Washington,
 4    D.C.
 5          THE COURT:  Okay.  Good morning.
 6          MR. KUCIA:  Gerald Kucia on behalf of the Mississippi
 7    Department of Health.
 8          THE COURT:  All right.  Good morning.
 9          MS. WILLIAMS:  Angela Givens Williams, Your Honor, on
10    behalf of the United States.
11          THE COURT:  Okay.  Next?
12          MS. MO:  And Angela Mo with the U.S. Department of
13    Justice Environmental Enforcement Section on behalf of the
14    United States.
15          THE COURT:  All right.  Next?
16          MS. ARMOR:  Good morning, Your Honor.  Suzanne Armor,
17    United States Environmental Protection Agency.
18          THE COURT:  All right.  Next?
19          MS. RICHARDSON:  Good morning, Your Honor.  Susan
20    Richardson for Patrick Townsend on behalf of the City of
21    Jackson.
22          THE COURT:  All right.  Good morning.
23          MS. RICHARDSON:  Good morning.
24          MS. RUBINI:  Good morning, Your Honor.  Suzanne Rubini
25    U.S. EPA Region 4.
```

```
 1          THE COURT:  Okay.  Thank you.
 2      Next?  Did I miss anyone?
 3      Okay.  Did I miss -- go ahead.
 4      MS. EARLY:  Hi.  Emily Early on behalf of the proposed
 5  plaintiff intervenors, Mississippi Poor People's Campaign,
 6  and the People's Advocacy Institute.
 7          THE COURT:  All right.  Good morning to you.
 8      MS. EARLY:  Good morning.
 9          THE COURT:  Now, did I miss anyone?
10      MS. HERNANDEZ:  Yes, Your Honor.  Just Mikaila
11  Hernandez for the proposed intervenor plaintiff, People's
12  Advocacy Institute, and Mississippi Poor People's Campaign.
13          THE COURT:  Okay.  Thank you.  Good morning to you.
14      Now, again, did I miss anyone?
15      All right.  Does not appear that I have missed anyone.
16          There are a number of matters I want to address.  First
17  of all, I want to address a pressing concern of Mr. Henifin
18  relative to the moneys that need to be provided for the
19  vendors who have been given contracts and are awaiting
20  payments for same.
21          So then I'll start with Mr. Henifin.  Mr. Henifin,
22  would you go to microphone, make sure that it's on, and give
23  us a comprehensive overview of what's happening here.
24      MR. HENIFIN:  Yes, Your Honor.  Thank you.
25          So we were in this courtroom on the 27th of February,
```

1    and I left under the impression that we were going to return

2    to the status quo of grant funding appearing in the account,

3    in the ASAP account, for me to draw down and pay vendors as

4    I needed it.

5        The grant was approved at 115 million.  Initial

6    allocation was 44 million based on the first year budget.

7    We've received another 15 in December, and then the day

8    after our status conference, I received 10 million to pay

9    the outstanding invoices I was holding at that time.  EPA

10   had been talking about a reimbursement model, but we had not

11   seen anything in writing at that point.

12       So when we left the courtroom, I was under the

13   impression that they would provide any proposed changes to

14   the Court before they instituted those.  So then I received

15   the first writing from EPA on this subject on March 8th,

16   Friday afternoon, where they provided the report of their

17   compliance assistance visit, spent the weekend responding to

18   those findings, and sent my response on Wednesday, March

19   13th.

20       On -- surprised on March 15th to get a notice of

21   special conditions from EPA that didn't take into account

22   any of the information we provided as a result of the

23   response to their -- to their report from the compliance

24   assistance visit.  So from that, I take it that they just

25   unilaterally put these forward.  I received it from the

1    Office of Grants and Debarment about 16 minutes before you

2    received it in the court, and so, again, I didn't see where

3    the process that we had laid out in this courtroom on the

4    27th played out the way I thought it was going to play out,

5    where they would provide that in writing to you, you could

6    consider it, we could ask questions, we could have some

7    discussion before it went into effect.

8        But the letter that I received on the 15th, just last

9    Friday, said it was effective immediately, that we would be

10   in a reimbursement mode.  So I have been sending invoices,

11   because when I received the $10 million on February 28th, at

12   the time when I was in the courtroom, I said we had about 7

13   million outstanding invoices at that point in time.  Paid

14   those invoices on the 28th after receiving the $10 million,

15   and then in the subsequent days, ran the rest of the money

16   down with other eligible invoices that needed to be paid, so

17   effectively was out of money again in the first week of

18   March.

19       Been notifying EPA's Office of Water Grants folks about

20   that and sending them invoices as they've come in, and now

21   we are over $10 million in outstanding invoices that are now

22   in the possession of EPA's Office of Water, and they are

23   asking questions about those invoices.  Again, raising the

24   issue, if they decide to dispute an invoice or not pay an

25   invoice, I've got no reserves to pay that.  I have put

1    contractors out in the field, told them they were authorized

2    to do the work.  I've got nothing to pay them if I don't

3    have these grant funds in the bank or at least available at

4    that point in time.

5        So this is putting us in a very tough position, and if

6    this continues, I'm going to be forced to the tell the

7    contractors they're operating at their own risk.

8        THE COURT:  So now, at present, you have some

9    outstanding invoices, which total to approximately 10

10    million?

11        MR. HENIFIN:  Yes, Your Honor.

12        THE COURT:  The last time we were here, you mentioned

13    the problem you were having on acquiring moneys to pay the

14    vendors, and at that time, there was an agreement, I

15    thought, that had been reached that you were going to be

16    given enough moneys to pay those vendors.

17        Was that your understanding?

18        MR. HENIFIN:  Yes, Your Honor.

19        THE COURT:  So instead of getting that money, you are

20    saying that, instead you have now been told that EPA will

21    only pay on a reimbursement system.  Is that correct?

22        MR. HENIFIN:  Yes, Your Honor.

23        THE COURT:  Now, a reimbursement system means that if

24    you award projects to various contractors, that they would

25    be performing those contracts at their own peril.  Is that

1    so.

2         MR. HENIFIN:  That's how I understand it, yes, Your

3    Honor.

4         THE COURT:  Because then if they are awarded the

5    contracts and if then during the award period they perform,

6    they still have to have trust that EPA is going to release

7    the funds to you to release to them?

8         MR. HENIFIN:  Yes, Your Honor.

9         THE COURT:  And if EPA does not release the funds, then

10   what happens?

11        MR. HENIFIN:  I have got no money to pay them, so they

12   would have to sue me, I guess.  I'm not really sure.

13        THE COURT:  And at present, there are about $10 million

14   outstanding?

15        MR. HENIFIN:  That's correct, Your Honor.

16        THE COURT:  And tell us how long that sum of money has

17   been outstanding for these vouchers.

18        MR. HENIFIN:  These are only about a week old at this

19   point, Your Honor, since the 8th of March.

20        THE COURT:  And I would imagine, Mr. Henifin, that the

21   trust and the confidence of the contractors is vital to this

22   procedure, because you have to pick the appropriate vendor

23   whom you think to be the best and ablest to perform the

24   work.  But if they are not certain or confident that they'll

25   be paid, then we will be in danger of some of these best and

```
 1    ablest not accepting the work.
 2        MR. HENIFIN:  That's a potential, Your Honor, yes.  I
 3    actually have one of those invoices is older than March 8th,
 4    because I overlooked payment on an invoice to one of our
 5    consultants that's now -- was originally submitted on
 6    January 25th, so we're waiting on that payment as well.
 7        THE COURT:  So this concern that I just announced, has
 8    that been a concern enumerated by any of the vendors or
 9    potential vendors?
10        MR. HENIFIN:  I have gotten questions lately about,
11    asking if they've done something wrong, because their
12    payments aren't coming the way they used to come.  I've been
13    explaining to them that the payment method or the -- or the
14    way the money flows from EPA has changed, they are not doing
15    anything wrong, I'll get them paid as soon as I get the
16    money from EPA.
17        THE COURT:  You said they have asked whether they've
18    done something wrong?
19        MR. HENIFIN:  They were concerned that I was
20    withholding payment for some other reason.
21        THE COURT:  And in the past before EPA took this
22    position, what was the timeframe that they were being paid,
23    the interval?
24        MR. HENIFIN:  We would typically pay within a week of
25    receiving an invoice, often within days.
```

```
1         THE COURT:  Okay.  And we are beyond that now?
2         MR. HENIFIN:  Yes, Your Honor.
3         THE COURT:  Well, have you gotten any letters of
4    complaints by any vendors at this point?
5         MR. HENIFIN:  No letters, Your Honor.  Just a couple of
6    phone calls.
7         THE COURT:  And did you explain to them why the
8    payments on these invoices, these payments have not been
9    made?
10        MR. HENIFIN:  Yes.  I told them that the EPA process
11   had changed, and I was waiting on getting additional funds.
12        THE COURT:  And did any of these vendors issue any
13   threats of discontinuation?
14        MR. HENIFIN:  No, they did not.
15        THE COURT:  And where are these vendors with regard to
16   their completion of their particular projects?
17        MR. HENIFIN:  On the case of one of the biggest ones,
18   Jacobs, there's isn't a -- has a completion date.  They are
19   running the plants, so we depend on them totally to provide
20   the safe-treated drinking water that goes into the system.
21   So the longer we delay payment on them, the more they may be
22   scratching their head about entering a long-term contract.
23        Our current method at the current time, we are in a
24   reimbursable contract with them, hoping to enter a 10-year
25   contract with them when we resolve a few issues we've got
```

1    outstanding on some liability language.  But once that's

2    done, we would like to enter a 10-year deal with them.

3    Obviously, this might put some shade on that.

4        THE COURT:  When did you find out that EPA was not on

5    the same thought processes that you were on with regard to

6    the timely payment of those vouchers?

7        MR. HENIFIN:  Really it just -- it started after

8    Christmas.  The first of the year, they started saying that

9    because of the compliance assistance visit and their

10    findings, that they weren't going to fund the grant the way

11    they had in the past.  So they didn't provide anything in

12    writing, but what they didn't do is provide any money in the

13    account.  So it's, essentially, we have been waiting on the

14    official letter or report from EPA since the beginning of

15    the year when they stopped putting money into the grant

16    account.

17        THE COURT:  Did they tell you why they found it

18    necessary to change the procedure?

19        MR. HENIFIN:  They had a few issues in that they had

20    expressed in -- verbally to me, and then in writing when we

21    did get the report this past Friday, or the 8th, rather, two

22    weeks ago, a week ago Friday, that we couldn't reconcile

23    specific drawdowns with specific invoices.  That was because

24    at the time, we didn't realize that was needed.  We can

25    reconcile every dollar we've spent to eligible grants

1    expenses, but they were under the impression that I needed

2    to be able to prove every time I drew money down and say

3    exactly what that was -- what invoice that went to pay for,

4    which we didn't understand that as a requirement of the

5    grant when we took the money.

6        Once they pointed that out in November, we changed our

7    process to do that.  So now every time we drawn money down,

8    we get a receipt, PDF file from the system that the EPA

9    uses.  We annotate that with the specific invoices that that

10   drawdown went for, and the money moves almost immediately

11   from EPA to our bank account to our vendors, in very short

12   order.

13       THE COURT:  Apparently you didn't recognize that EPA

14   was reserving, to itself, the right to refuse to pay?

15       MR. HENIFIN:  Correct.

16       THE COURT:  And that's EPA is now saying.  Is that

17   correct?

18       MR. HENIFIN:  Essentially.

19       THE COURT:  And did the EPA give you a reason why they

20   wanted to change the -- the protocol for payment?

21       MR. HENIFIN:  Again, it's because they said I wasn't

22   following their normal grant procedures, they couldn't -- I

23   couldn't, at the time, tie specific invoices to specific

24   draws.

25       So after receiving the written report on Friday the

1    8th, I spent the next five days going back and doing the

2    forensic accounting to tie those back together and provided

3    that information to them on the 13th.  So we have now gone

4    back and tied every draw to eligible grant expenses and

5    provided all of that data to EPA.

6        THE COURT:  So where is EPA now after you have done

7    that?

8        MR. HENIFIN:  They didn't respond to that, instead they

9    sent their letters putting the special conditions on us for

10   not doing that.

11       THE COURT:  Okay.  With whom have you been dealing?

12       MR. HENIFIN:  So largely, I deal with the Office of

13   Water.  I think part of the challenge here is the Office of

14   Water is who -- from EPA, is who negotiated this stipulated

15   order, who has been at the table the whole time and been a

16   good partner.  And they are -- also have a grant management

17   group in the Office of Water, and I have been dealing with

18   them directly.

19       On top of that, now, you have got the Office of Grants

20   and Debarment, and that group seems to operate totally

21   independent of the Office of Water, and there is no

22   connection.  We're not sure where they come together, if

23   they ever come together.  So they seem to be operating very

24   independently from the Office of Water, under the umbrella

25   of EPA.

1        THE COURT:  And who is present here today?

2        MR. HENIFIN:  From either of those?

3        THE COURT:  That's right.

4        MR. HENIFIN:  I don't believe we have -- we've got some

5    lawyers online, I think, from the Office of Water that are

6    in -- on the Zoom call, nobody from the Office of Grants and

7    Debarment that I recognize.

8        THE COURT:  Have you ever talked to somebody directly

9    from that office?

10        MR. HENIFIN:  I have met with them when they came to

11    town doing their compliance assistance visit in November,

12    and I have had a -- at least one virtual meeting with some

13    of their folks, and I have had a couple of phone calls.

14        THE COURT:  So then who makes the decision, the final

15    decisions, on these matters?

16        MR. HENIFIN:  I would assume the matter that we have in

17    front of us is the Office of Grants and Debarment, would

18    make the final decision.

19        THE COURT:  Not Water?

20        MR. HENIFIN:  Not the Office of Water, I don't believe,

21    but I'm not privy, really, to the inner workings of EPA.

22        THE COURT:  But water is the one who comes here?

23        MR. HENIFIN:  Yes, Your Honor.

24        THE COURT:  To talk about what the decisions are on

25    these matters?

1          MR. HENIFIN:  Yes, Your Honor.

2          THE COURT:  And from whom do you get your

3   correspondence in writing?

4          MR. HENIFIN:  Most of the time, it has been Office of

5   Water until this past -- you know, a week ago Friday was the

6   first time I have gotten correspondence directly from the

7   Office of Grants and Debarment, for the exception of when

8   they set up the compliance assistance visit, I got some

9   correspondence from them back in November.

10         THE COURT:  What was your understanding -- when we

11   started this process and you were dealing with EPA, what was

12   your understanding as to which branch you were going to be

13   dealing with?

14         MR. HENIFIN:  I don't really think in terms of

15   branches.  I think in terms of United States Environmental

16   Protection Agency, how those people have introduced

17   themselves on these calls.  And I would think that, at some

18   point, whoever dealt with the -- the negotiation of this

19   order -- these orders, actually, two of them, that that

20   would be the people we would be dealing with, and they would

21   work their inner EPA issues out amongst themselves.

22         THE COURT:  From the way you are describing this, is

23   that there are two wings of EPA, at least, and from the way

24   you describe it, I'm not sure they talk to each other.

25         MR. HENIFIN:  It doesn't appear to.  Thankfully, we are

```
1    not dealing with soil or trash or air.  We would have a
2    whole bunch of different wings of EPA floating around.
3         THE COURT:  But these two wings that we are talking
4    about now, do you have any confidence that they talk to each
5    other?
6         MR. HENIFIN:  I think there's some communication, but I
7    don't know, you know, at what level and it's, you know,
8    whose got the controlling decision-making power.
9         THE COURT:  Do you know whether they have the same
10   lawyers, or they have different attorneys?
11        MR. HENIFIN:  They are all represented by the
12   Department of Justice, Your Honor.
13        THE COURT:  Well, but the ones that are coming here to
14   report?
15        MR. HENIFIN:  I have not seen anyone from the Office of
16   Grants and Debarment.
17        THE COURT:  So you don't know whether the ones who are
18   here represents the other wing?
19        MR. HENIFIN:  I know they operate with the Office of
20   Water.  I have no idea if they operate -- or if they
21   represent the Office of Grants and Debarments.
22        THE COURT:  Let's talk about the problem that you're
23   having now on this different approach that is supposed to be
24   followed now, this approval process after the vendors have
25   been let, and after they may have even done the work.
```

1          Have you talked to EPA here about your situation?

2          MR. HENIFIN:  I have talked to the Office of Water

3     about this many times, their grant folks.  Again, they have

4     been cooperative and seem to want to help, but I don't know

5     they have got any control over what the Office of Grants and

6     Debarment is doing.

7          THE COURT:  In other words, you don't know whether they

8     have the power?

9          MR. HENIFIN:  Correct.

10         THE COURT:  Did you ask them did they have the power?

11         MR. HENIFIN:  We asked for a decision-maker at one

12    point, said who -- where does this come together, and who

13    makes the decisions?  But we have never received a single

14    point of contact that can combine those two.

15         THE COURT:  I seem to recall that this question on the

16    decision-making -- maker was proposed to EPA some time ago?

17         MR. HENIFIN:  Yes, Your Honor.

18         THE COURT:  In fact, seems like that was as far back as

19    maybe during the Christmas?

20         MR. HENIFIN:  Probably right after the holidays, yes,

21    Your Honor.

22         THE COURT:  When -- because I remember I asked that

23    question, and so you are saying you did not get an answer

24    since that time as to who makes the decision?

25         MR. HENIFIN:  No, Your Honor.

1      THE COURT:  I guess that also means that you didn't get

2  an answer as to who has the power to deny the request?

3      MR. HENIFIN:  Correct.

4      THE COURT:  Let's talk about the appeal process.

5  There's an appeal process for their latest decision.  Is

6  that correct?

7      MR. HENIFIN:  Yes, there is.  So we followed that and

8  filed that appeal this morning.  But there doesn't seem to

9  be a timeframe at which they have to make a decision on the

10  appeal.  There's a clear timeframe for us to appeal within

11  30 days, but there is no timeframe on the response to the

12  appeal.

13      THE COURT:  Well, if there is no timeframe for EPA to

14  resolve the matter, does that mean that the vendors would be

15  sitting without money for quite a while?

16      MR. HENIFIN:  Potentially, yes, Your Honor.

17      THE COURT:  Tell me about the appeal process.

18      MR. HENIFIN:  It seemed fairly straightforward.  They

19  required that I had to submit the basis of the appeal by

20  email to a Mr. Hughes, and I did that this morning with the

21  basis of appeal.  I had really listed five points, that they

22  failed to consider our response to the technical assistance

23  review, which, again, I submitted on the 13th, and they sent

24  this letter on the 15th.

25      I've submitted a corrective action plan, which solves

1    most of the issues.  Unsupported -- which I submitted the

2    corrective action plan with this appeal.  Unsupported

3    drawdowns, again, that was covered by the March 13th

4    response.

5        I talked about the grants are supporting the emergency

6    restoration of water and sewer, and that the -- you know,

7    JXN Water is a new entity that was formed for this purpose

8    by the stipulated order and has no financial reserves, can't

9    pay invoices prior to drawing them down, as would typically

10   happen in a reimbursement model.  You know, we are not

11   dealing with a city with any kind of reserves.  We are

12   dealing with a private entity that has no reserves.

13       I asked for specific relief, which was the other piece

14   of a appeal that was supposed to be in there.  It's very

15   simple.  Immediate review and approval of the corrective

16   action plan, immediate withdrawal of the special conditions

17   upon approval without waiting for the corrective action plan

18   to be fully implemented, and that the balance of the 115

19   million approved grant be made available in the ASAP System

20   by 22 March with the approval --

21       THE COURT:  Could you slow down some?

22       MR. HENIFIN:  I'm sorry.

23       THE COURT:  Okay.

24       MR. HENIFIN:  Got rolling.

25       So the last one would be that the balance of

1    $115 million approved grant be made available in the ASAP

2    System by March 22nd, and the approval of the $30 million

3    amendment that has been pending be approved by April 1st.

4        So those were the relief sought and the basis of

5    appeal, and that was submitted this morning.

6        THE COURT:  And you have no idea how long EPA might

7    take on resolving that matter?

8        MR. HENIFIN:  No, Your Honor.

9        MS. WILSON:  The Court's indulgence, Your Honor?

10        MR. HENIFIN:  My lawyer is telling me they have

11    180 days to respond, Your Honor.

12        THE COURT:  Who has 180 days?

13        MR. HENIFIN:  EPA, to respond to the appeal.

14        THE COURT:  So they have six months to respond?

15        MR. HENIFIN:  Yes, Your Honor.

16        THE COURT:  If they have that length of time to

17    respond, six months, what -- what adversities might we

18    suffer during that time period?

19        MR. HENIFIN:  I think we could have some stopped work

20    if this is continued to languish.  We could continue

21    local-funded work, and we might have to stop the

22    grant-funded work until we can get this resolved, which,

23    essentially, is all the Drinking Water work, and I'm not

24    really sure how we deal with Jacobs who is under contract to

25    operate the plants.

```
 1          THE COURT:  So that 180 days begins to run when?

 2          MR. HENIFIN:  When I submit the appeal, which was

 3     today, this morning.

 4          THE COURT:  Okay.

 5          MR. HENIFIN:  I'm appealing their decision they gave us

 6     Friday.  I took three days to -- over the weekend, to submit

 7     my appeal.  They are going to take 180 days to decide

 8     whether or not to grant that.  This is not Atypical of EPA,

 9     Your Honor.

10          THE COURT:  What do you mean by that?

11          MR. HENIFIN:  They typically put very short time frames

12     on folks.  Like, I had a 30-day window to make this appeal,

13     and if I didn't appeal it in 30 days, it was a final

14     decision.  That's normal EPA language, but yet, there is no

15     clock ticking on them, or it's a very slow clock or a

16     calendar ticking to get to their decision point.

17          THE COURT:  And if they take six months to make a

18     decision, that would be most adverse to the progress that

19     we've been making?

20          MR. HENIFIN:  This is such an unusual situation, Your

21     Honor.  We are in an emergency trying to -- the funds we're

22     talking about, are under a special section of the Safe

23     Drinking Water Act for emergency measures.  We are trying to

24     spend these down quickly to solve the problems here in

25     Jackson.  We have made incredible progress on the water
```

1    system.  Largely, because we have had this money available,

2    and we've been able to hire contractors and move quickly to

3    make that happen.

4        As that arose, I guess they forgot that this was an

5    emergency less than a year ago -- or a little over a year

6    ago, and we were desperate for solving this problem.  But

7    now that we've got it going, well, business is usual, I

8    guess.  We'll revert back to slow federal government motion.

9        That is not what we are here for.  That's not what that

10   1442(B) Section of the Safe Drinking Water Act was all

11   about.  It's about emergency measures.  We need to be

12   moving.  We can't wait six months for decisions.  We can

13   barely wait six days for decisions.

14       THE COURT:  You said something at one point that if we

15   couldn't get that money timely, you might have to shut down

16   all efforts that are now being waged?

17       MR. HENIFIN:  On the -- with the -- that are being paid

18   for with federal funding, yes, Your Honor.

19       THE COURT:  That are federal-funded projects.  And

20   might have to resort to moneys that we could get out of the

21   local rendition of moneys.

22       MR. HENIFIN:  Which aren't adequate.

23       THE COURT:  That's what I was about to ask.  Because

24   that's what my understanding is, it's not adequate.

25       MR. HENIFIN:  Correct.  You know, we are under a lot of

1    pressure to bring in more local revenue, which we are

2    working very hard on the billing system, disconnects, trying

3    to get people to paying their bills.  We were up to, last

4    month, 65 percent of those billed pay their bills.

5        We started the severance process, meaning we have

6    started automatically cutting letters out of our billing

7    system, to tell people they are going to be shut off if they

8    don't pay within 21 days.

9        So all of that is moving forward to try to increase

10   folks payment.  We have worked hard at getting meters in the

11   ground, making a lot of progress.  But we knew we would

12   never get to the 80 to 90 percent collection rate within the

13   first few months.  Our target this year is to try to get to

14   80 percent from our current 65, but that's for the year.

15   That's going to be a challenge.  We are already three months

16   into the year, and we're not getting to that point, but we

17   are going to continue to do our best to do that.

18       That increases the amount of local revenue, but we are

19   paying $1.6 million a year on private debt -- I mean,

20   $1.6 million a month, which is really hurting us on the cash

21   flow perspective.  There is potential that we can retire

22   some of that debt using the other federal funding we have

23   got, which is the state revolving loan fund.

24       But we are challenged to make that work due to some

25   statutory restrictions on the money, can only be used for

 1    Drinking Water projects, and, unfortunately, we haven't been

 2    able to tease out of the 160 million in private debt that is

 3    outstanding, how much was used for Drinking Water projects

 4    and how much was used for sewer projects, and EPA wants

 5    invoices and proof of payment before they would let us

 6    retire any of that debt using the state revolving loan fund

 7    money.

 8        That's a pretty convoluted conversation I just had, and

 9    I'm sorry.  I live in this world right now, and it's a bit

10    confusing.  But, essentially, we are going broke with $450

11    million in the bank that could solve some of the problem,

12    but we can't get everybody to play along with trying to

13    figure out how to actually get the debt retired, or at least

14    a portion of it that's eligible to be retired with the

15    $450 million that Congress provided us through the state

16    revolving loan fund.

17        Different issue all together than the grants.  Grants

18    is 150 million, 450 is a state resolving loan fund for

19    infrastructure projects or debt retirement or both, and

20    that's a different issue than the one we were talking about

21    earlier.  But it is every bit as troublesome, because our

22    local cash flow is stretched to the extreme, due to the debt

23    we are carrying on this system.

24        THE COURT:  Identify the EPA people with whom you've

25    had this conversation.

```
1          MR. HENIFIN:  As far as the local revenue issues, or
2     the grant issues?
3          THE COURT:  The grant issue.
4          MR. HENIFIN:  The grant issues have been with Deborah
5     and Treita (phonetically) from the Office of Water and
6     Grants.  And I'm sorry I don't have their last names in
7     front of me.  It's somewhere here.
8          And then I have gone on the record in both the --
9     copied the whole water distribution -- there is a whole list
10    of lawyers, many of them are on the call, in the Office of
11    Grants and Debarment that received all of this information
12    as we have been sending out the emails.
13         THE COURT:  And your attorneys?
14         MR. HENIFIN:  And my attorneys, of course.
15         THE COURT:  Have they been in contact with some of the
16    attorneys from EPA?
17         MR. HENIFIN:  Yes.  And from Department of Justice.
18         THE COURT:  And have they discussed these issues that
19    now we're discussing?
20         MR. HENIFIN:  Looking at Mr. Calamita to see him nod
21    his head yes or no, or --
22         MR. CALAMITA:  Your Honor, if I may, we have had some
23    conversation, but I got no advanced notice of the EPA
24    decision to put Mr. Henifin on a reimbursement basis.  First
25    I learned of it was Friday, at the same time Mr. Henifin was
```

1   notified.

2       THE COURT:  You did not know about it beforehand?

3       MR. CALAMITA:  I did not, Your Honor.  And I -- when we

4   left the status conference on February 27th, I thought the

5   understanding was that we would have conversation with --

6   with the agencies about that decision before they made that

7   decision, and those conversations did not occur.

8       THE COURT:  All right, Mr. Calamita.  Thank you.

9       Is there anything else I need to go over right now?

10      MR. HENIFIN:  I don't think so, Your Honor.

11      THE COURT:  Okay.  Thank you, Mr. Henifin.

12      Well, then, I should turn to EPA now.  Who is going to

13  speak for EPA?  But before you start speaking, good morning

14  to you, again.

15      Now, but before you start, could you educate me on your

16  hierarchy at EPA as it addresses or concerns the crisis we

17  have here in Jackson?  Who the decision-makers are, and what

18  process you go through, and what authority, if any, you have

19  to bind EPA when you are here?

20      MR. FINGERHOOD:  Well, I'll address the -- that last

21  question first, Your Honor.

22      THE COURT:  Okay.

23      MR. FINGERHOOD:  Good morning, Karl Fingerhood.

24      THE COURT:  Yes.

25      MR. FINGERHOOD:  I represent the Department of Justice

1    in the enforcement action that was brought with respect to

2    the Safe Drinking Water Act and the Clean Water Act.  I do

3    not represent EPA with respect to the grants issue.  That is

4    an administrative process.  That process has begun, and as

5    the ITPM stated, he has begun the process to appeal that.

6    That is not before this Court and will not be ripe until

7    there is a final agency decision once those appeal rights

8    have been exhausted.

9        Just quick side note, I think the 180-day is an outside

10   time limit.  I do understand and, again, I'm not an expert

11   in the grant area of law, but I have been advised that once

12   the appeal has been issued, there's a 15-day period where

13   the decision officer is supposed to acknowledge receipt and

14   then advise if there is additional information, et cetera,

15   that will be necessary for the administrative process.

16       So I do not represent the Office of Grants and

17   Debarment.  As you know, there was hundreds of millions of

18   dollars that was appropriated for Jackson.  Those are

19   federal taxpayer funds and are subject to the laws that --

20   and regulations that apply to federal grants.

21       The Office of -- EPA's Office of Grants and Debarment

22   is the office that's in charge of ensuring that those

23   regulations are complied with.  They have reviewed this, and

24   we did share the correspondence with Your Honor, and there

25   has been -- as the ITPM indicated, he did respond, and there

1      is -- the administrative process is beginning now.

2          There is a law as part of that grant process that when

3      someone is placed on a reimbursement basis, the -- the

4      invoices, the properly submitted invoices, are to be paid

5      within 30 days, which, I believe, is consistent with the

6      contracts the ITPM indicated he has with his vendors.  I

7      believe that in the instances where concern payments have

8      been processed on, kind of, a reimbursement basis, it is

9      usually taken place around a two week timeframe, which while

10     not as fast as the ITPM was previously playing the vendors,

11     it's within the timeframe that is in the contracts with the

12     vendors and within the 30-day reimbursement timeframe.

13         So there is a process as part of the EPA decision where

14     Mr. Henifin -- I'm sorry, the ITPM in JXN Water, can take

15     certain steps to have the advance payment model reinstated,

16     and he has raised those in his appeal that was filed this

17     morning.  And, again, I can't speak for the administrator

18     process, but I would assume that since they are now being

19     submitted, they will be reviewed and decided, and there will

20     be some follow-up conversations.

21         I can say this, that the Office of Grants and Debarment

22     has received the communications regarding the grants issues,

23     both the 3/13 one and this morning, and have advised the

24     appropriate staff in that office that they are reviewing it

25     expeditiously, the Office of Grants and Debarment will be in

1    touch with the ITPM and JXN Water in short order regarding

2    the administrative action.

3        One other point I want to address quickly is, I think

4    there were assertions that somehow under reimbursement

5    model, the entire invoices may not be paid, I don't believe

6    and, again, I'm speaking outside of my area of expertise,

7    but I don't believe that to be the case.  I think if there

8    were specific items and invoice that were -- there may need

9    additional support or something, that would be pointed out,

10   and perhaps, that might be the type of thing.  But I don't

11   think they would just not be paid, and as I said, the stat-

12   -- the regulations itself provide that reimbursement

13   invoices, when appropriately submitted, are to be paid

14   within 30 days.

15       THE COURT:  You've been here since I have been involved

16   in seeking solutions to this emergency matter.

17       What is your prediction as to how a six-month delay on

18   the reimbursement system would impact on the efforts that

19   this Court and Mr. Henifin have been trying to accomplish?

20       MR. FINGERHOOD:  Well, first, Your Honor, I don't think

21   it would be -- at most, it would be a six-month delay.  That

22   also doesn't consider the indication from the Office of

23   Grants and Debarment that there are certain -- and it is in,

24   I think, Section 3 of the notification that they sent out

25   this past Friday there are steps that JXN Water and the ITPM

1   can take to get the advanced payment model reinstated.  One

2   of those was to get a grants manager or someone to assist

3   Mr. Henifin to kind of do the -- make these procedural

4   changes, et cetera, that the Office of Grants and Debarment

5   have been requesting.

6        And also, you know, the third-party manager has a lot

7   of on his plate in addition to all of the engineering, et

8   cetera.  It would be, I think, helpful in my own personal

9   opinion and apparently in the opinion of the Office of

10   Grants and Debarment, helpful to have somebody that they can

11   contact with any type of accounting questions and things

12   like that, for example -- for dealing with processing of the

13   grant funding.

14        THE COURT:  So who do you recommend?

15        MR. FINGERHOOD:  Who would I recommend?

16        THE COURT:  Yes.  Give me a name.

17        MR. FINGERHOOD:  Oh, well, the third-party manager

18   indicated that he plans on retaining someone from HORNE

19   accounting, which is a regional.  I think they are a Top 25

20   nationwide accounting company, and I think they have several

21   offices in Mississippi, including one in the Jackson area.

22   I don't know, specifically, who the third-party manager has

23   identified at that office, but, you know, I think they have

24   been working on things related to Jackson and the water

25   issues for some time.  Is that correct?  Yes.

 1          THE COURT:  So then who would you recommend?  You got a

 2     person's name?

 3          MR. FINGERHOOD:  Oh, I have had -- I personally have

 4     had no dealing with HORNE, but it is my understanding they

 5     are a well-represented accounting firm, and would have, you

 6     know, CPAs and people of those types of qualifications that

 7     would be available to work.  I don't know who the

 8     third-party manager at JXN Water has been working with at

 9     that office.  I don't know if it's a person they're

10     currently working with, or if they have someone else in that

11     office in mind, but...

12          THE COURT:  And who -- and have you ever worked with

13     this company you're now possibly suggesting?

14          MR. FINGERHOOD:  Oh, well, first --

15          THE COURT:  Or even the procedure?

16          MR. FINGERHOOD:  First let me qualify that I -- this

17     was from Mr. Henifin -- or, I'm sorry, the third-party

18     manager's communication to EPA.  He recommended this company

19     that he was going to find someone there.  So I have no

20     involvement in this recommendation.  I just do know of the

21     company, because I think they are somewhat well-known

22     locally, and may have also been involved in some other

23     earlier matters involving either the sewer or water system.

24          THE COURT:  Have you ever seen this procedure applied?

25          MR. FINGERHOOD:  Actually, I do think it's fairly

1    common.  Again, this is not my area of expertise, but I do

2    think that when you have a large federal grant, that the

3    grantee does frequently retain someone.

4        And there are -- just from a Google search, there are a

5    number of entities that specialize in grants management, and

6    so there is -- you know, I think the practice is somewhat

7    established that there is an industry of people who are

8    experienced in, you know, the requirements of federal grants

9    and what is needed, and, you know, the procedural

10   requirements, the best practices, et cetera, to be

11   implemented, and so there is -- there are a number of

12   entities and individuals that provide those services

13   nationwide.

14       THE COURT:  Is EPA taking this case seriously?

15       MR. FINGERHOOD:  Yes.

16       THE COURT:  Well, let me tell you why I ask that

17   question:  You filed this -- this matter in a certain year.

18   Do you recall what year you all filed this case?

19       MR. FINGERHOOD:  We filed the Drinking Water Case in

20   November of 2022.

21       THE COURT:  And you also filed the sewage case,

22   correct?  When did you file it?

23       MR. FINGERHOOD:  That was originally filed in 2013, and

24   then, as the Court's aware, we negotiated an interim order

25   on that part of the case.  I think that was entered

```
 1    September 30th of 2023, right before the new fiscal year, I
 2    believe.
 3         THE COURT:  But then 13 years went by, and EPA did
 4    nothing.  Is that so?
 5         MR. FINGERHOOD:  Well, I wouldn't characterize it as
 6    that.  We were in constant dialogue with the city about
 7    issues that had not been addressed under the consent decree.
 8    I think there -- also MDEQ is involved in those discussions.
 9    There were administrative orders issued, and --
10         THE COURT:  It's not on a docket sheet.
11         MR. FINGERHOOD:  No.  These were -- these were done,
12    again, administratively, so they wouldn't be on the docket
13    sheet, but there was communication.  The city, again, had
14    indicated that their precarious financial condition
15    prevented them from being able to afford some of the things
16    that EPA had requested.  So there was an ongoing dialogue
17    during that time period.
18         THE COURT:  Well, then, who dropped the ball during
19    those 13 years?
20         MR. FINGERHOOD:  I guess --
21         THE COURT:  I'm just -- I'm just responding based on
22    what the docket sheet shows.  The docket sheet is silent.
23    So it doesn't show that anything.  All it shows is that the
24    case was filed, and then later on, it shows that I took over
25    after I went and requested the case, because I saw that
```

1  nothing had been done.  But in the interim, there was

2  nothing.

3       So did somebody drop the ball during that time period?

4       MR. FINGERHOOD:  Well, as I said, there were ongoing

5  discussions.  You know, I think part of those discussions

6  were if the United States and MDEQ were to bring a renewed

7  enforcement action with spending additional limited city

8  funding on litigation and related expenses be in the best

9  interest of the United States and the citizens of Jackson,

10  or would it be better to continue it -- dialogue about

11  trying to get the work done.

12       Unfortunately, you know, those discussions were not as

13  fruitful as were hoped, and I think -- you know, I don't

14  know if I could blame -- lay the blame at one person's feet.

15  I mean, I certainly was part of that, and I was involved in

16  it.

17       THE COURT:  Well, I was moved to ask the question,

18  because when I picked up the file and saw that nothing had

19  been done in 13 years, and then when I recognize that the

20  water case and the sewage case had some relationship to each

21  other, and I asked if I could be assigned the sewage case

22  along with the water case, because I already had the water

23  case.  And then after I managed to get the sewage case

24  assigned to me too, because of the interaction between the

25  two, and I thought that that would move these whole matters

1    more rapidly.

2        Then I remember some difficulty we had with trying to

3    merge the consent orders, and even when we were trying to

4    merge the consent orders, I remember the difficulty that

5    surfaced, was EPA had some objections that, at first, I

6    didn't quite understand.  And EPA then submitted its

7    objections to the merger of the two, and after a process, we

8    finally worked out all of that to get it merged, and then

9    the next time, there was a problem from EPA on how the

10   moneys were going to be paid.

11       So we did this hearing not that long ago, and frankly,

12   I'm on the side of Mr. Henifin who says that he left here

13   with a certain understanding.  I -- I guess I made the same

14   mistake, because I left here with the same mistake, too.  I

15   thought that we had agreed that some moneys were going to be

16   provided that he could pull down and get the vendors paid,

17   because we were afraid that if the vendors were not timely

18   paid, that they might withdraw their interest in working on

19   these various projects.  And so I thought that was a matter

20   that was already discussed and decided, and so then I now

21   find out that EPA has endorsed another approach.

22       And, Counsel, do you recall any discussion that before

23   you adopted another approach that you would inform the Court

24   of the possibility of another approach?  Because I don't

25   recall any notification on your conversion from one system

1    to another.

2        So do you agree with that, or is it something that I

3    missed and Mr. Henifin missed and his lawyers missed?  Is

4    there something there that we just were confused about?

5        MR. FINGERHOOD:  Well, Your Honor, we did provide the

6    -- the March 8th report to the Court, to chambers, which

7    provided -- that was the initial basis of the notice letter.

8    That was issued on the 15th.  We provided that to the Court,

9    and then when the notice letter was issued on the 15th, we

10   provided that to the Court as well.

11       THE COURT:  That you were going to a reimbursement

12   procedure?

13       MR. FINGERHOOD:  Right.

14       THE COURT:  So is that where you are now, that you have

15   now decided -- and I'm saying "you," that's EPA.  So now EPA

16   now is on a reimbursement system now?

17       MR. FINGERHOOD:  That EPA Office of Grants and

18   Development has made that decision.  I don't represent them.

19   That's an administrative decision that's been issued.  I

20   have no authority to tell them what to do or not to do.

21   That was an administrative decision, and that's not before

22   the Court either at this time.

23       THE COURT:  Well, can you tell me the hierarchy -- the

24   hierarchy at EPA relative to decision-making on these

25   matters that concern JXN Water?

1          Can you tell me then the hierarchy, so we know who is

2     making the decisions about moneys and the other matters that

3     are so vital to the continuation of our efforts to solve our

4     problems down here without some third person making the

5     decision, whom we haven't even seen?

6          So can you tell me then, the hierarchy, place.

7          MR. FINGERHOOD:  Yes, Your Honor.  It's my

8     understanding that, for example, on the Clean Water Act side

9     and Safe Drinking Water Act side, it's EPA's Region 4 in

10    conjunction with EPA headquarter's Office of Water.

11         With respect to --

12         THE COURT:  Okay.  Now, let me get these down, so I

13    know who I'm talking about.

14         Okay.  So you are saying that it's Region 4?

15         MR. FINGERHOOD:  EPA Region 4.

16         THE COURT:  Now, who is that?

17         MR. FINGERHOOD:  That would be some of the folks on the

18    call, Suzanne Rubini and Suzanne Armor and Michael Creswell.

19    And they also have a team of engineers they work with.  Jim

20    Vinch is the headquarters attorney with the Office of Water,

21    and, again, those are the individuals with the Safe Drinking

22    Water Act and the Clean Water Act issues.  There is also

23    Michelle Wetherington who have -- on the Clean Water Act

24    side of things --

25                    (Court reporter interruption.)

1           I'm sorry.  Michelle Wetherington is also involved in

2    the Clean Water Act.  She is an attorney at EPA Region 4.

3           Now, with respect to the grant funding, there is a part

4    of the Office of Water that I think the third-party manager

5    referred to, and they deal with the initial phase of, you

6    know, invoices and working the system, but ultimately, it's

7    my understanding that EPA's Office of Grants and Debarment

8    has final say over that process, along with EPA's Office of

9    General Counsel.  And those -- both of those offices are

10   located, I believe, at EPA headquarters in D.C.

11          THE COURT:  How many people are we talking about?

12          MR. FINGERHOOD:  Well, with respect to -- I would say

13   there is probably at least a half dozen people I have seen

14   on emails.  But as far as, you know, the specific issues and

15   the appeals, there were people named in the correspondence

16   between the Office of Grants and Debarment and the

17   third-party manager.

18          And so those -- I think those -- at least those two

19   people, one was the officer who will be I think -- I forget

20   what the formal title is, but I think he is the final

21   decision-maker of the office of dispute.  His name is

22   escaping me.

23          And then also there's -- I believe there was Keva

24   Lloyd, who is someone who was offered as a person that JXN

25   Water could contact with questions about, you know, the

1     process, and how it -- it would work.

2          THE COURT:  This change that was made in the protocol

3     on paying the vendors, was that a committee decision, or a

4     one-person decision?

5          MR. FINGERHOOD:  I think it was made by the Office of

6     Grants and Debarment by several people.

7          THE COURT:  It sounds like a committee.  So then is

8     that a committee decision, basically -- well, because here

9     is why I'm asking the question on this:  And I don't think I

10    got an answer to the question I asked a few moments ago.  I

11    asked whether we were misinformed or misheard last time we

12    were together, that EPA was going to follow the same

13    reimbursement system.

14         Now, did we just make that up or get confused?

15         MR. FINGERHOOD:  Well, there was the 10 million

16    reimbursement that was processed.  I think, perhaps, while

17    we were in court last time, or shortly after that.  It's my

18    understanding that after that was issued, the Office of

19    Grants and Debarment, along with the EPA's Office of General

20    Counsel, made the decision reflected in both -- the

21    decisions reflected in both the March 8th report and the

22    March 15th notice.

23         THE COURT:  So how much time went by from the time you

24    were in court last time, and we talked about these matters,

25    and some of us here apparently got the wrong impression of

1    what you actually said, how much time went by before you

2    sought to clarify and it say, no, we are going to employ

3    another system?

4        MR. FINGERHOOD:  I think it was approximately two

5    weeks.

6        THE COURT:  Two weeks?  And during that two-week

7    period, were you submitted or did you have any additional

8    documents before you to change your mind?

9        MR. FINGERHOOD:  It was not up to me.  And, as I

10   indicated at the last status conference, you know, I think

11   Your Honor referred to my vast pool of knowledge on this

12   issue --

13       THE COURT:  I did.

14       MR. FINGERHOOD:  -- and I think I referred back

15   somewhat jokingly, but also somewhat seriously, that I was

16   more like a kiddy pool of knowledge.  So I do think part of

17   it was misunderstanding on my part, as far as this being an

18   entirely administrative process for which is totally

19   separate and apart from the Department of Justice, and even

20   EPA Region 4 and headquarters who have been working on the

21   Safe Drinking Water Act and Clean Water Act side.

22       THE COURT:  Okay.  So then just to complete that line

23   of thought, when we had that conversation about leaving

24   things in place, what you are telling me is that you didn't

25   know that your superiors were going to change it?

1          MR. FINGERHOOD:  Well, as I said, they're not my

2     superiors.  It's a totally different part.

3          THE COURT:  Well, you didn't know that there was going

4     to be an alteration by a group of folk who had primary

5     authority?

6          MR. FINGERHOOD:  Right.  I was -- I was not fully aware

7     of the separateness of the process, and I understand the

8     meaning for -- or the -- I guess the appropriateness of it,

9     being a separate process.  But, yeah, I was not fully aware

10    of the separateness of the process.  And I knew -- I think I

11    referred -- when I was here before that, I knew there was an

12    administrative process involved, but I did not understand

13    how it was totally separate from any process that I had been

14    involved in and that EPA Region 4 had been involved in on

15    the Clean Water Act and Safe Drinking Water Act side.

16         THE COURT:  Are you also saying that that puts you in

17    an awkward position?  And let me say something else on that.

18         What I mean by that is this:  After we had that

19    conversation here last time, you were aware that Mr. Henifin

20    was going to go forward on hiring contractors, and that if

21    it took two weeks to tell him that the procedure is

22    different, then he would know that when he engaged them.

23         And, further, some of them had already been engaged on

24    other projects.  Therefore, they were rightfully under the

25    assumption that they would be paid timely.  And so then when

1    he was told that that is not necessarily the case, then do

2    you appreciate the difficulty you placed him in?  Or are you

3    saying that he had no difficulty?

4        MR. FINGERHOOD:  No.  As I understand, as he has

5    expressed, that, you know, he likes to pay the contractors

6    on a much quicker timeframe.  I think -- and I think I

7    stated even at the last status conference that, you know --

8    and that's before I knew there was actually a regulation

9    that requires a grantee on a reimbursement basis to, you

10    know, receive the funds within a 30-day period.  Although it

11    would perhaps be longer than what had Mr. -- the third-party

12    manager had been doing in practice, it was still consistent

13    with the terms of the contract.  In that, again, this is

14    federal money, not city funds, and so the federal

15    government, you know, pays its bills on time, and there's

16    still full faith and credit in the federal government

17    funding.

18        THE COURT:  So then you would understand and not

19    quibble with the Court's choice, should I decide to resort

20    to this approach I'm now considering, to write a short

21    opinion or notice to the public, especially to the vendors,

22    that this inability to pay within the timeframe we had been

23    paying is because EPA chose to change its system without

24    notice to us within a two-week period.

25        Would you understand if I did that how that would be a

1    salvation issue for Mr. Henifin's integrity and confidence

2    that he didn't do anything wrong here, but EPA simply

3    changed its mind?

4         MR. FINGERHOOD:  Well, I don't know if that -- like I

5    said before, Your Honor, this is meant to be a temporary

6    change, and there is a process for him to be reinstated to

7    the advance payment model.  So there is that option, which

8    he has already availed himself of.

9         I also think that, at some point, there was frustration

10    on a point of the third-party manager about this dialogue

11    with the Office of Grants and Debarment.  So there was an

12    indication that they wanted some sort of final decision that

13    they could take before Your Honor.  This is not that

14    decision.  This is an administrative action.  There is no

15    proceeding before this Court, and it would not be ripe until

16    the administrative appeals process had been exhausted.

17         THE COURT:  And you had said there's an expedited

18    approach that Mr. Henifin can take?

19         MR. FINGERHOOD:  Right.

20         THE COURT:  What is that expedited process?

21         MR. FINGERHOOD:  Well, I said that -- I had read that

22    quote from the Office of Grants and Debarment that

23    indicated, and this is just the latter part, they've advised

24    the appropriate staff of both the March 13th communication

25    and the appeal notification that was filed this morning.

1    They are reviewing it expeditiously and will be in touch

2    with the third-party manager in short order regarding the

3    administrative action.

4        THE COURT:  Okay.  That's as close as you can get to

5    naming how long it would take, correct?

6        MR. FINGERHOOD:  At this time, yes.  And, again,

7    because these are not -- I don't represent this part of EPA.

8        THE COURT:  I know you've said that, and I understand

9    that.

10       MR. FINGERHOOD:  Okay.

11       THE COURT:  Right?  So there's another part of EPA,

12   just like that 13-year wait when this lawsuit was filed on

13   the sewage side, and nothing was done by EPA.

14       MR. FINGERHOOD:  Well, actually, that I -- that was not

15   another part of EPA.  That was -- I was part of the initial

16   group that negotiated the consent decree.  So, I mean, I do

17   take some responsibility for that, although -- although

18   nothing appeared on the docket, there were ongoing

19   discussions about how to proceed and how to get the city

20   back into compliance.  Those aren't reflected in the docket,

21   but I was a part of those, and so I do take some of the

22   blame for that.

23       THE COURT:  Well, if there were some things that were

24   done and some documents that were generated, then I would

25   like to see those documents, because I have looked at the

1    docket sheet and there is nothing there for 13 years.  But

2    if there was something that was done, then I would like to

3    see it to give you adequate credit for what was done during

4    that 13 years, because right now, it looks to me like

5    nothing done.  There's --

6         I mean, the docket sheet was just amazing.  I mean, I

7    just see where the case was filed.  Then I see where a

8    consent order was put in, and then 13 years went by, and

9    meanwhile the citizens of Jackson suffered that here it is

10   you have a lawsuit filed by EPA, and EPA could say that,

11   look, we have filed a lawsuit, so we're trying to move this

12   thing along, but the citizens of Jackson were suffering

13   during those 13 years.

14        And in addition, the citizens of Jackson didn't know to

15   go and look at a docket sheet and see that there was

16   absolutely nothing done.  I mean, that's -- it's just a

17   matter showing that there was a filing, and then after that,

18   a consent order, and after that, nothing, and -- just

19   nothing.  And I was amazed over that, and because I was so

20   amazed over that, and working so hard at that time on the

21   water matter and recognizing that the water case and the

22   sewage case had some family relationship between the two,

23   then I went and asked for the sewage case.

24        It was not assigned to me.  I went and asked for it,

25   because I felt like the two need to be worked together.  And

1    the consent decree needed to be worked together.  And so

2    then we all tried to marry these consent decrees and finally

3    got those together, and that took a while.  And then after

4    that, this matter of money, you know, surfaced, trying to

5    get that decided, but the people of the City of Jackson have

6    just suffered this entire time.

7        And that's why I started off with the question on

8    whether EPA was really serious about this lawsuit, you know,

9    because it just seems to be some interruptions here and

10   there, and -- but, you know, but I can't say that the

11   interruptions are not fitting and appropriate from your

12   standpoint and from the regulations that you are calling,

13   but I would appreciate knowing all the regulations that you

14   say that you have to operate under and the ways that we can

15   move this matter quickly ahead so that I can give you credit

16   for what you're doing, because I would hate to determine

17   that you all are not serious about this matter, because this

18   is a grave matter for 160,000 folk, at a minimum, and there

19   they are out there just suffering, you know, on all of this

20   stuff here.  And -- and not to mention that some of us have

21   had to learn a whole lot more than we ever cared to learn

22   about water and sewage, you know.

23       So -- you know, so I have spent weekends trying to read

24   up on these things and trying to be sure that we can push

25   this as fast as possible.  So then I would like to be

1    informed about what was done during this 13 years.  If there

2    is something in there that says that EPA during those

3    13 years was actually moving towards a resolution.  But I

4    certainly didn't see it, and once I picked this case up, it

5    certainly was not apparent that anything has been done, like

6    I said before.

7        So if there are some regulations that haunt us at

8    present, and I need to know about these regulations, then I

9    would like very much that you submit them to me, you know,

10   because it seems like we came into this case about the same

11   time.  That's what I was thinking.  But apparently, that's

12   not correct, because you actually came to the case when you

13   filed it.

14       MR. FINGERHOOD:  Yes, sir.

15       THE COURT:  But that's right.  But then when you filed

16   it, when you filed this lawsuit, that is the sewage lawsuit,

17   were you -- well, I guess I don't need to ask that question.

18   I was going to ask you whether you looked down here in

19   Jackson and say I need to file that lawsuit, so I'm going to

20   go down there and file it.  But actually you probably were

21   assigned it, you know, but I don't know.

22       But, nevertheless, you seem to have been working

23   diligently on this matter, and so then I would not like to

24   draw a negative conclusion about this matter without knowing

25   all the players and all of the pieces of litigation.

```
 1        So then if you would be so kind to tell me what
 2   administrative orders were put in during that 13-year
 3   period, because I don't have any of that on my desk.  You're
 4   saying there were some.
 5        MR. FINGERHOOD:  Actually, Your Honor, I do remember
 6   now with some prompting from one of my colleagues.  As I
 7   mentioned, we were considering how to --
 8        THE COURT:  You were considering?
 9        MR. FINGERHOOD:  I thought I heard someone.
10        THE COURT:  You did.  But go ahead.
11        MR. FINGERHOOD:  We were --
12        THE COURT:  They're not ghosts.  You did hear
13   something.
14        Terri, what's the story?
15        THE COURTROOM DEPUTY:  Someone on Zoom is not muted.
16        THE COURT:  Oh, okay.  Somebody on Zoom was not muted.
17   And can everybody mute on Zoom?
18        Okay.  Go ahead.
19        MR. FINGERHOOD:  So we were considering how to best
20   move the case forward.  So we did a few years, I think,
21   before the --
22        THE COURT:  I'm sorry.  Say what now?
23        THE COURTROOM DEPUTY:  It's Ms. Rubini.  Suzanne Rubini
24   needs to mute.
25        THE COURT:  Okay.  Tell her.
```

```
 1            THE COURTROOM DEPUTY:  Ms. Rubini, we need you to mute

 2       your microphone, please.  Thank you.

 3            THE COURT:  Okay.  Now, go ahead.

 4            MR. FINGERHOOD:  So I think a few years before the

 5       drinking water system issue arose, or the emergency arose,

 6       the water issues had also been, you know, under the watch of

 7       EPA and MSDH.  We started filing joint status reports in the

 8       Clean Water Act case.  We were trying to get the -- a

 9       consent decree.  We were discussing a modification of the

10       consent decree, and so we did file reports on a regular

11       basis with the Court about those and providing some

12       background as far as what was going on.

13            In the interim, you know, the first one obviously had

14       some -- a lot more detail, but then in the subsequent

15       reports, we were updating the Court.  And, again, this was

16       not before Your Honor, but a different judge, on what had

17       occurred since the time of the last status report.  So there

18       is -- some of that should be in the docket.

19            THE COURT:  Okay.  It's not on the docket.  But I can

20       look through the files and see if I could find that, and if

21       I can't, I will notify you.  But I would like to be up to

22       snuff on everything that happened during that time period.

23       It would probably be very informative for me, so then I'll

24       have an idea what was happening.

25            So let's now address the present.  On the crisis that
```

1    we are having right now on this money, do you get involved

2    in this process at this point at all?

3        MR. FINGERHOOD:  The grants process and also the

4    disbursing of the funds pursuant to the grant, no, I have no

5    involvement.  I think, as I indicated, there are a couple of

6    people at the Office of Water who I think will still be

7    involved in this on a reimbursement basis, but the

8    administrative appeal and issues related to the

9    correspondence on March 8th and March 15 are all within the

10   Office of Grants and Debarment and EPA Office of General

11   Counsel.

12       THE COURT:  Oh, okay.  A few moments ago I said that to

13   be sure that the vendors out here don't look with

14   displeasure upon Mr. Henifin because he was acting on what

15   he thought to be the situation of hiring contractors and

16   allow them to go to work and recognizing that they would

17   expect to be paid within a week, and he thought he had the

18   capability of doing that because the money is there, so then

19   should I write a short note as just an explanation?  Would

20   that be something that would trouble EPA?

21       MR. FINGERHOOD:  Well, I think there may be information

22   in the March 15th letter that describes the process for JXN

23   Water being placed back on the -- the advanced payment

24   model.  I think, you know, that's in that letter already,

25   and also there's the provision that indicates that vendors

1    are to be paid within 30 days when a grantee is on the

2    reimbursement model.

3        THE COURT:  Well, should I decide to do that, this

4    notice will be neutral and benign, just to say here are the

5    facts, and contractors and the public should understand that

6    Mr. Henifin is working diligently in the manner in which he

7    said he would, hiring contractors in the manner in which he

8    said he would, expecting them to perform their projects with

9    a high degree of competence, as he said he would, and we ran

10   into a situation here where EPA has changed its mode of

11   reimbursement and may have to -- and Mr. Henifin may have to

12   go through an appellate process, which might take some time,

13   but which was not expected because of the conversation that

14   was had earlier, and without casting any other aspersions,

15   let it go with that, just so the public understands where we

16   are.

17       You know, I have, what, two, three?  I think I've done

18   about three clarification letters.  I just did one last week

19   on this new act that the Mississippi Legislature is

20   contemplating, and I'm going to make sure that the public

21   understood the parameters of that and understood that one

22   could read it as thinking that something else had gone into

23   effect when actually it has not, and so then I just did a

24   short note to the public to let them know that.  So I might

25   do the same thing here just to make sure that we are all on

1    the same page.

2         Now, is there anything else you want to tell me about

3    this?  Because you've been gracious enough to answer my

4    questions here.  You want to talk to your brain trust over

5    there?

6         MR. FINGERHOOD:  Yeah, I do want to mention one thing

7    first.  With all due respect, I would be a little hesitant

8    about the approach Your Honor is suggesting to the extent it

9    could be construed as some kind of court order, because, as

10   I said, this is -- and then this matter is not before the

11   Court, and so I do have that concern.

12        You know, Mr. Henifin -- I'm sorry, the third-party

13   manager, and JXN Water, they could issue a press release

14   that they're entitled to do that.  And, you know, if EPA

15   feels it's necessary to issue their own press release, they

16   could do that.  But I would be concerned with something

17   coming from the Court to the extent it could be construed as

18   some sort of court order or finding of something that we

19   contend is not before the Court.

20        THE COURT:  Well, to one extent it is.  I mean, because

21   Mr. Henifin said at one point that if he can't pay his

22   contractors, that he might suspend operations.  Now, as the

23   third-party manager, that would be his call on that.  He

24   will have to report to me about that, but, nevertheless, if

25   he can't pay his vendors, then I certainly understand that.

1          And I also understand, at this juncture, that he might

2     not be able to pay them, not for any defect or default on

3     his part, but because of the unfortunate change by EPA on

4     this matter, which happened when he was in the process of

5     hiring contractors.  And they had a right to rely upon past

6     conduct, and so they did, I'm sure.

7          So I'm not so sure you're right on that, that that's

8     not a fight that, you know, I'm not in at this point,

9     because I want this thing to be done as fast as possible, as

10    competently as possible, by the contractors who are deemed

11    to be the best that we can get without creating any ire

12    amongst them where they aren't interested in further

13    contracts with the JXN Water, and that was certainly --

14    that's a certain possibility if these people go out and they

15    spend time with their workers and then find out they can't

16    be paid.  That was one of the big complaints that when I

17    came in on the water case, contractors said they had against

18    the city, and that was one of the -- one of the notions or

19    factors that I wanted to be sure that was not present at the

20    present time, whether the city was guilty or not.

21         I'm not saying that the city was guilty.  I'm just

22    saying that that's something that the contractors said, and

23    they said that in open court here, that they couldn't get

24    paid.  Now, I told them -- I believe I said at the time that

25    I'm not getting into that.  We're going forward so that we

1   are going forward.  But if this matter here surfaces and

2   these people can't be paid, then I can't say that's not a

3   matter that doesn't concern the Court and the Court's order,

4   because the overall scheme that concerns this Court is to

5   try and get these things done, is to try and get the water

6   repaired, sewage repaired, and try to get these things done.

7       And here it is all this effort that has gone into

8   identifying the various defects, the various problems that

9   need to be addressed, the -- the eruptions on the water

10  side, the eruptions on the sewage side, the standing of raw

11  sewage all over the city, the fissures in various pipes and

12  the loss of water that has already -- had already been

13  processed, those are things that are right on my plate.

14      And so if I can't get those things repaired, then it

15  does concern me.  And if I can't find appropriate

16  contractors out here because they said they don't want to

17  work on these things anymore because they can't get paid,

18  well, that certainly concerns us.

19      But I'll see what position I take on this.  But,

20  nevertheless, I know what my end game is, and I'm trying to

21  make sure we get there as fast as possible.

22      Now, is there anything else you want to say to me?  If

23  so, I'll hear it.  I'd ask you if you've consulted with

24  Ms. Brain Trust over there.

25      MS. PAIGE:  Thank you, Your Honor.

1         THE COURT:  Okay.  You like that name?

2         MS. PAIGE:  I'll take it.

3         MR. FINGERHOOD:  So I have a few points I would like to

4    clarify.

5         THE COURT:  Okay.  Go right ahead.

6         MR. FINGERHOOD:  First of all, you know, the

7    reimbursement process has been in place since Friday.  I

8    think it's somewhat speculative to suggest that people are

9    not going to get paid.  As I said, the statute requires

10   payment within 30 days.

11        None of the changes that have been proposed, and, as I

12   noted, these are intended to be temporary, prevent JXN Water

13   or the third-party manager from using the funds for eligible

14   expenses related to the drinking water system.  EPA is

15   committed to the success of the system and stands ready to

16   provide grant funding on receipt of the approval invoices

17   and is committed to working with JXN Water and the ITPM to

18   provide technical assistance and improve JXN Water grant

19   management capabilities.

20        On the Drinking Water side, I believe there were a

21   couple of administrative orders issued by EPA and MSDH

22   before the -- both the freeze issues that happened the year

23   before and then the collapse in August of 2020 -- I'm sorry,

24   2022 -- actually, one was in 2020, and then in 2021, to try

25   and get the city into compliance with the Safe Drinking

1    Water Act.

2        On the -- on the Clean Water Act, as I noted before, we

3    were in discussions and did file status reports, and we

4    worked with the city, their outside attorneys, their outside

5    consultants, EPA engineers, and had meetings in person,

6    virtual meetings, we had monthly calls trying to figure out

7    what we could do to get the consent decree back on track.

8        We started discussing modification to the consent

9    decree, and unfortunately, when things kind of erupted on

10   the Drinking Water Act side, you know, the primary attention

11   was focused on that.  But there were discussions that were

12   going on between all of the parties involved trying to get

13   the city back into compliance.

14       The fact that, you know, there was some time gap, I

15   think we -- you know, we -- we would say that that is

16   unfortunate, but there were -- even during those time

17   periods, there was communication between the city and the

18   EPA on a technical level between the engineers indicating

19   what was going on and what could be done to fix it.  And in

20   the interim, the city did bring in an outside contractor to

21   start operating the sewage treatment plants, and that was a

22   step in the right direction.  They were making some progress

23   on some of the projects under the consent decree, but they

24   were falling behind the timetable that was established under

25   the consent decree.

1          THE COURT:  All right.  Thank you very much.

2          MR. HENIFIN:  Your Honor?

3          THE COURT:  Yes, Mr. Henifin, go right ahead.

4          MR. HENIFIN:  So, you know, we're all here today.

5     We're here in Jackson because four parties came together and

6     negotiated an interim stipulated order, started with the

7     Drinking Water.  In paragraph -- subparagraph 6-T of that

8     agreement the U.S. EPA signed onto, it said,

9     "Notwithstanding subparagraph 6-M, comply with the terms,

10    conditions, and assurances of any current --

11         THE COURT:  Not too fast.  Go ahead.  Notwithstanding?

12         MR. HENIFIN:  "Notwithstanding subparagraph 6-M, comply

13    with the terms, conditions, and assurances of any current or

14    future grant or loan that funds the system, or, if

15    compliance is not practicable, comply to the extent

16    practicable."

17         So I would argue that they agreed to that, the four

18    corners of this document, and this grant, we're complying to

19    the extent practicable, and they're changing the rules on us

20    as we move along.  I also point out that Mr. Fingerhood

21    mentioned the March 8th letter as having noticed that the

22    reimbursement process was going to start.  It did not.  It

23    just purely provided the report of the findings from the

24    compliance assistance visit.  We knew nothing about the

25    reimbursement process until the 15th, when the letter showed

1    up in my mailbox, e-mail box, and yours as well that day.

2        And finally, and this is a challenging project overall,

3    and this just adds extra burden.  And, sure, we're going to

4    hire another grant assistance person through HORNE and waste

5    some more federal dollars, because we've yet to misspend,

6    misappropriate, or been pointed to for misusing any federal

7    dollars.  We haven't.  We can prove every dollar we've used.

8        The system was working fine.  We're not meeting the

9    exact letter of the grant law potentially, but, again, I

10    think that the deal we negotiated -- and we didn't, I'm not

11    party; they named me a third-party manager at that point.

12    They're just piling on additional burdens.

13        So this may not sound like much, but now I'm reviewing

14    an invoice, I forward it to EPA, EPA asks additional

15    questions, I research that, get that back to them, and then

16    I have to pester them week after week asking:  When am I

17    going to see money to pay my contractors?  That's all in the

18    normal course of business that we're -- you know, our hair

19    is on fire.  We are working very, very hard, and it doesn't

20    seem like the four parties, especially the EPA part of this

21    party, is helping.

22        But that's where I am at the moment, Your Honor.

23        THE COURT:  All right.  Thank you very much.

24        MR. FINGERHOOD:  Can I just state something?  As I

25    noted in the outset, and it might have gotten lost, you

1      know, the --

2           THE COURT:  Speak up.  Thank you.

3           MR. FINGERHOOD:  There's a lot of federal money

4      involved here.  There's a lot of people paying attention to

5      how it's being used, a lot of good is being done with that

6      money.  And so that's why, you know, the -- I think, you

7      know, as the third-party manager might view this as kind of

8      a paperwork headache, but I also think it's important for

9      the public to have transparency and know that the funds are

10     being spent appropriately.  And there are kind of processes

11     to ensure that, you know, that is the case, and that's why I

12     believe the Office of Grants and Debarment got involved.

13          One quick thing.  I think what I said is that the March

14     8th technical assistance report served as the basis for the

15     notice letter, not that it was mentioned in there, but I

16     think that was the -- at least my understanding of reading

17     those documents, is that's what they based the change on.

18          Again, it's meant to be temporary change, but, again,

19     because of the amount of federal funds involved, that is why

20     I understand they believe this is necessary.  And, you know,

21     as Mr. Henifin just indicated, this is -- that's why you

22     need to have a grants manager or someone of that type to

23     help assist, because he has a lot of other stuff going on

24     and it would be, we think, helpful to have someone assist

25     and work with the grants people to ensure that things move

1  smoothly on a going-forward basis.

2      THE COURT:  One second.  I really don't understand

3  those comments, because things were going along quite

4  smoothly before.  And then we apparently had some

5  bureaucrats in D.C. who decided to do something else without

6  any real explanation of why they were doing it.

7      So I really don't understand those comments.  We have

8  made a lot of progress here.  We're just trying to keep the

9  progress going, and we can't keep it going if we can't pay

10  the vendors.  It would seem to me that EPA in D.C. would

11  have known this and wouldn't have waited two weeks to tell

12  Mr. Henifin that the rules of the game had changed, and so I

13  don't see where hiring some other person to assist on this

14  matter is something that he needed.

15      The process was going along fine.  The people were

16  being paid.  We were moving and getting things done.  The

17  wrinkle in this whole matter came when EPA changed the

18  rules.  So I don't quite understand why he needs to hire

19  somebody else.  He was doing fine before that.  The process

20  was not complicated.  He was searching out people of

21  competence, checking out their credentials, their past

22  history, working with the city and other people and other

23  entities, hiring them and getting the job done.

24      We have made so much progress under that system, and

25  then the way I look at it, EPA then decided that it wanted

1    to change the rules without any real explanation.  That's

2    why I asked the question earlier whether EPA took this as a

3    serious matter, because one could look at the history of

4    this thing and say EPA has not done that and that it has

5    been obstructionist.  And so I hate to say that.  And so I'm

6    going to be looking to see what needs to be done here and

7    whether the Court needs to shore up its efforts by any other

8    written opinions on this matter.

9        But I just don't understand that comment.  I really

10   don't, so I don't need to say anything else about it.  But

11   this system on advanced payments was working quite fine, and

12   there has been, the way I see it, no complaints that any

13   moneys were spent on contractors who didn't do their job or

14   didn't do it well.

15       I've tried to keep up as much as possible with the

16   amounts being spent on contractors, the payment dates for

17   those contractors, the projects that they have been doing,

18   and I think that the projects have gone quite well.  So I

19   was taken aback sometime ago when EPA stopped the money, and

20   we had to have a powwow on it.  And I thought everybody had

21   worked towards a common goal when they said, okay, here's

22   what we'll do; we will maintain the protocol we've utilized

23   so far.  And then to find out that that's been changed.

24       So I don't quite understand the thrust of the words,

25   and let's just see if we can go ahead and work towards a

1  resolution on this matter.  You know, because I would like

2  to think that all of us have the same goals of trying to

3  satisfy the water needs of a city and to reach a conclusion

4  that would allow the citizenry to enjoy their constitutional

5  right to clean water and to move forward like every other

6  city that's well run.  So we'll see.

7       All right.  Thank you so much.

8       MR. FINGERHOOD:  One last thing, Your Honor.

9       THE COURT:  Go ahead.  Did your brain trust signal you

10  for something else?

11      MR. FINGERHOOD:  There are terms and conditions that

12  come with a grant.  The -- as I have noted many times, this

13  matter is not before the Court, but we did provide the

14  correspondence to the Court, which indicates the rationale

15  that the Office of Grants and Debarment had with respect to

16  the issues that led to the March 15th decision.

17      They said there is a road map to put the third-party

18  manager back on an advanced payment model, and that's

19  spelled out.  Also as an appendix, there is kind of a

20  history of the back and forth between the third-party

21  manager and the grants people about these issues.  So there

22  has been a dialogue that's been going on.

23      THE COURT:  I'm going to pull everything out, and,

24  again, go back over it one more time.  But I just want to

25  work out how best we get back to the advanced payment

1    schedule, because it's just too hard to expect or too dismal

2    to expect that folk want to be on a system where they can't

3    be guaranteed to get paid after they have already expended

4    their efforts.

5        So we'll all get back together on this.  And we're

6    going to see what we can get done and what kind of timeframe

7    we're looking at, because we have to try and move forward

8    fast on this.  And so I will look at all the regs again, and

9    see if there's anything in there that I have questions

10   about.  And if so, then without requiring you to leap onto a

11   plane and come down here, we can do it by telephone and see

12   what we can get done on that.  Okay?

13       MR. FINGERHOOD:  Thank you, Your Honor.

14       THE COURT:  Okay.  Thank you very much.

15       Now, I assume that Ms. Brain Trust has communicated all

16   she needs to communicate.  Is that so, Ms. Paige?

17       MS. PAIGE:  For the most part, yes, Your Honor.  If I

18   could just say one thing?  And that is the report that

19   Mr. Fingerhood referred to earlier does lay out substantial

20   issues that JXN Water has and has not complied with.  And so

21   as a result of the noncompliance, that is why the action was

22   taken by the Office of Grants and Debarment.  And so we

23   would ask Your Honor to look back very carefully at those

24   things and that sequence of events that have led to this.

25       And the only other thing I'd say, Your Honor, is that

1    there's been no proven impact.  He has not shown that none

2    of his vendors will not be paid.  He hasn't given it a

3    chance.  He said in the last hearing that there would be two

4    weeks, but the two weeks was the outset for the amount of

5    time that he's had.  So he hasn't proven any impact.  It's a

6    change in the process, and it's because of things that JXN

7    Water has not implemented.  And we're giving him the road

8    map to try to do that.  It's not pointing the finger at him.

9    It's just making sure that the taxpayer dollars are spent in

10   the way that they're supposed to be.  He signed the -- an

11   agreement that said that he would operate within those

12   confines, and we're just asking him to do that.

13       THE COURT:  Well, now, you heard him read off a

14   paragraph from the consent order.  Did you hear that?

15       MS. PAIGE:  I did.

16       THE COURT:  Okay.  And it also said that, if practical,

17   unless it was not practical, that EPA would agree to that.

18   So are you saying that it's not practical?

19       MR. FINGERHOOD:  Your Honor, if I may, I don't believe

20   in tag team attorneys here.  But there also were terms and

21   conditions in the actual grant itself, but "practicable"

22   means -- I think you know it's something that can be done,

23   and I think what the Office of Grants and Debarment have

24   laid out in their letter are things that can be done.  If

25   it's impracticable, that would mean something that he could

1    not do.  But I think that the belief is that these are

2    things and procedures that he can do, and so that's -- that

3    language is --

4        THE COURT:  You know what I thought?  What I thought in

5    the spirit in which you were addressing me before that these

6    are things that he's working towards and make sure he gets

7    them.  Once he's notified of all these regulations and

8    stuff -- and there are quite a few regulations -- that he's

9    doing that.  And just like he's been working hard to try and

10   satisfy all the regulations that come with this grant of

11   money, which is a large sum of money, which also has some

12   impact on the Court, because I have to review it.  I have to

13   review the expenditures on these matters, so he is not the

14   only one who is looking at that.

15       And so just as he has his duties to perform to make

16   sure he is trying to do things as expeditiously as possible,

17   so do the other parties to this litigation, which is what I

18   spoke about earlier.  And, of course, I don't know how long

19   all counsel at your table have been involved for 13 years,

20   you know, on the -- on this matter, at least on the sewage

21   matter.  But then there are a whole lot of questions about

22   that, but as I said before, we need not get into all those

23   matters, because what we're trying to do is go forward.  And

24   so we're not trying to put logs on the fire.

25       What we're trying to do is just make sure we go

1    forward, because, if so, there's a whole lot that could be

2    said and a whole lot of -- of irritation that could be

3    mentioned on this matter.  So let's not do that.  So thank

4    you so much.

5        MR. FINGERHOOD:  Thank you.

6        THE COURT:  There is a motion for leave to file suit by

7    the Lakeland Seniors.  Are these parties here?  These are

8    lawyers?

9        MR. MARTIN:  Judge, if I could, Drew Martin, for the

10   city.  I don't think University Medical Center would have

11   gotten notice that the Court was going to hear that today,

12   and they are one of the parties to that litigation.

13       THE COURT:  You say you don't think they got notice?

14       MR. MARTIN:  I assume they didn't.  I don't think

15   anybody's here for UMC.  Is that correct?  The Court -- I

16   think the Court -- well, the email I saw was Friday

17   afternoon, and the city is prepared to move forward with

18   that motion if the Court wants to hear it.  I just wanted to

19   advise the Court that UMMC probably doesn't have anyone

20   here.

21       THE COURT:  Okay.

22       MR. MARTIN:  In fact, does not have anyone here.

23       THE COURT:  Do I have everybody else here?

24       MR. MARTIN:  I believe so.  And, Judge, the reason they

25   wouldn't have gotten the notice is because they're not a

1    party to this litigation; that is, the consent decree

2    stipulated order litigation.  They would have only seen it

3    on the docket that is the underlying litigation with

4    Lakeland Seniors and the city and UMMC.

5        THE COURT:  Okay.  Now, who is the respondent in that

6    motion?

7        MR. MARTIN:  Well, I think JXN Water is.  The city

8    filed a response as well, but certainly JXN Water is

9    probably the primary respondent, I would think.

10       THE COURT:  Okay.  Let's do this, unless it interferes

11   with your schedules too much.  It is now 11:58, and so we

12   can take a lunch break, and take a lunch break until 1:30.

13   Let me see -- 12:00 to 1:30.  In the meantime, you can call

14   up the missing party and see if that attorney would be

15   available later at 1:30, both in body and mind, to go

16   forward on the motion.  If not, then I'll just simply set it

17   for another day.

18       MR. MCGUFFEY:  We can do that, Your Honor.

19       MR. MARTIN:  Yes, sir, we can do that.

20       THE COURT:  Okay.  So then I'll see you all back here

21   at 1:30 then.  Okay?

22       MR. MARTIN:  Thank you, Judge.

23       THE COURT:  All right.  That's for everybody else.  See

24   you at 1:30.

25       MR. CALAMITA:  Your Honor?

1          THE COURT:  Yes?

2          MR. CALAMITA:  Your Honor, before we close, there's

3     just one thing I have to correct.  The last representative

4     from the Department of Justice suggested that Mr. Henifin

5     was in noncompliance with this grant.  Your Honor, that is

6     not correct.

7          They raised four issues.  The first is that he was not

8     tying his drawdowns to specific invoices.  That has not been

9     the case since November.  As soon as he was notified, he

10    changed that practice.  He's in full compliance.

11         The second issue was that he was holding on, he drew

12    down extra money, which is contrary to the regulations, but,

13    again, that is not a current practice.  That practice has

14    stopped.  He only draws down against a specific invoice.

15         The third was that he's paying excess payroll, Your

16    Honor.  And what that is is supplemental pay that he's

17    paying to some of the key JXN Water people.

18         Your Honor considered specifically and at length, that

19    supplemental pay last July in your status conference, and in

20    your order on that status conference, you approved that

21    supplemental pay, Your Honor.  EPA, last Friday in their

22    letter, or two weeks ago, disapproved what Your Honor had

23    proved and said that the grant money can't cover that

24    supplemental pay.  Mr. Henifin disagrees vehemently, but he

25    has acquiesced so that that supplemental pay will come from

1    other funds.

2         And the last allegation of noncompliance is that he

3    doesn't have adequate institutional controls over the

4    grants, which we think is absolutely incorrect, Your Honor.

5    We had told the Department of Justice that Mr. Henifin, last

6    year, put a bid out, a six-figure position, Your Honor, in

7    Jackson, Mississippi for somebody to manage these grants and

8    did not get any acceptable people, and the conversation I

9    had with DOJ, Your Honor, was that he would redo that job

10    posting on Indeed to see if he could get somebody.

11         Instead, he's going to use HORNE.  But that's the last

12    thing they say that he's in noncompliance for, he didn't

13    have institutional controls.  That institutional control

14    requirement is a vague one.  It's a narrative requirement.

15    It doesn't say he has to have an outside person.

16         My view was he was doing it perfectly fine.  But,

17    again, we have yielded to them, so as we sit here today, I

18    don't think there's a single allegation of noncompliance,

19    and if we had had the opportunity to talk to them, as the

20    Court contemplated in the last status conference, I don't

21    think we would be going down this path.

22         And the last thing I'll say is the harm here, which is

23    today's harm, for Your Honor and Mr. Henifin, is that every

24    contract he signs, he really doesn't know if he can pay it,

25    Your Honor, because some independent party who, by the way,

1    in the same letter disapproved the supplemental pay for the

2    city employees.  So it's not like the grants people aren't

3    willing to, you know, put their views on these contracts on

4    things that are most critical to us, like, how we pay our

5    people.

6         When Mr. Henifin signs a contract for somebody to make

7    a repair, he doesn't know that he's going to have money to

8    do that.  And none of my other clients are in that position,

9    and, quite frankly, nobody on this -- in the status

10   conference today signs contracts they don't know whether or

11   not they can pay.

12        So I'll would stop there, but I would ask the Court I

13   think this should be expeditiously resolved, because

14   Mr. Henifin, the couple of outstanding allegations are no

15   longer accurate, and the one or two that they raised,

16   Mr. Henifin has conceded on, so I would hope it's not

17   six months.  I would hope it's two weeks, and we get back to

18   the proper approach where Mr. Henifin knows he can pay a

19   contract when he signs it.

20        Thank you, Your Honor.

21        THE COURT:  Okay.  All right then.  Now, for the people

22   who are going to be here -- counsel, you want to add

23   something?

24        MR. FINGERHOOD:  Just quickly, Your Honor.

25        THE COURT:  Okay.

1        MR. FINGERHOOD:  All those matters can be raised

2   administratively.  And, in fact, I believe Mr. Henifin has

3   already raised those in -- at least many of those in the

4   papers he's already submitted to the EPA Office of Grants

5   and Debarment.

6        THE COURT:  Well, that's my understanding, that those

7   things have already been raised.  I read all those, and --

8   but like I said before, that I would hate to see the parties

9   devolve into challenges to each other on matters that's

10  supposed to be handled administratively, because if that's

11  the case, then the Court has enough matters that he could

12  bring up concerning EPA.  And so -- but that's not why we're

13  here.  We're here to try and see if we can reach a

14  resolution on it.  Thank you.

15       Yes?

16       MR. TOM:  Good afternoon, Your Honor.  Joshua Tom, on

17  behalf of the proposed intervenor plaintiff.  I just wanted

18  to raise whether Your Honor expected to hear that motion

19  today?  We'd be happy to talk about that today or at another

20  time of the Court's choosing.

21       THE COURT:  Who are your opposite numbers?  Are they

22  here today?

23       MR. TOM:  Yes.  Everybody's here -- all of the people

24  that should be here are here today.

25       THE COURT:  Are you prepared to go forward on that?

```
 1          MR. TOM:  If we could do that, yes, sir.

 2          THE COURT:  I had put it down --

 3          MR. TOM:  Okay.

 4          THE COURT:  -- to go forward on it, because then I was

 5     going to hear this first one, I told everybody 1:30, now

 6     it's going to be 1:45, because we're going to be at 1:45

 7     pretty soon.  But I had put it down to hear it, so I would

 8     like to hear it.

 9          MR. TOM:  That's great.  Thank you, Your Honor.

10          THE COURT:  So unless -- unless it's causing some

11     serious problems on schedule-wise for some of the other

12     persons involved with that motion, I'd like to go forward on

13     it.

14          MR. TOM:  That's great.

15          THE COURT:  Okay.

16          MR. TOM:  All right.

17          THE COURT:  We'll see what we have.  1:45 then on the

18     first one.

19               (A recess was taken at 12:08 p.m.)

20          THE COURT:  All right.  I'm ready.

21          MR. BARNES:  Good afternoon, Your Honor.  Jonathan

22     Barnes for Lakeland Seniors.

23          THE COURT:  All right now.

24          MR. BARNES:  Good afternoon, Your Honor.  Jonathan

25     Barnes for Lakeland Seniors.
```

1          THE COURT:  Okay.  Go ahead.

2          MR. BARNES:  Your Honor, Lakeland Seniors has filed a

3     motion for leave to sue JXN Water, and that's why I'm here

4     today.  What is the lawsuit going to be about?  The

5     lawsuit --

6          THE COURT:  Is your mic on?

7          MR. BARNES:  I believe so.

8          THE COURT:  Is the green light on?

9          MR. BARNES:  The green light is on, Your Honor.

10         THE COURT:  Okay.  Talk directly into that mic then.

11         MR. BARNES:  Yes, Your Honor.

12         So, Your Honor, I'm here today on behalf of Lakeland

13    Seniors regarding its motion for leave to sue JXN Water.

14    And so what is that lawsuit going to be about, Your Honor?

15    It's about an ongoing problem.

16         There is leaking water and sewage infrastructure near

17    Lakeland Seniors' property that is causing subsurface

18    flooding and significant damages to Lakeland Seniors'

19    property.

20         First, I'll give just a brief overview of the leaking

21    issues, and then I'll address why we are seeking leave to

22    sue JXN Water.

23         So, first, the issue.  Lakeland Seniors owns an

24    apartment complex on Lakeland Drive.  This is on the west

25    side of the interstate near Fondren.  It sits adjacent to

1    some of UMMC's medical offices, and the apartment complex is

2    for senior citizens in particular, Your Honor.

3         A few years ago, Lakeland Seniors initiated work to do

4    some redevelopment to improve its parking lots, and some

5    time during that work, Lakeland Seniors discovered that

6    there was subsurface water and sewage that was migrating

7    from UMMC's property across the property line on to Lakeland

8    Seniors' property, and those leaks are ongoing, and they

9    have caused substantial damage.

10        Lakeland Seniors has hired outside vendors to do

11   testing and analytics and has also performed visual

12   inspections, and it appears that there is a sewer line, a

13   fire hydrant, and a water meter that are contributing to the

14   leaks that are causing these issues.

15        So that's the issue, and now the question is why are we

16   suing JXN Water?  Why are we seeking leave to do so?  We

17   believe JXN Water is responsible for one or more of those

18   leaks.  It is JXN Water's ordinary business to maintain and

19   to operate the water and sewer system.  That includes fixing

20   leaking pipes, that includes fixing leaking meters, and that

21   includes fixing leaking fire hydrants.

22        My firm was hired in July of 2023 to represent Lakeland

23   Seniors' interest.  The following month, we served on JXN

24   Water a notice under the Mississippi Torts Claim Act.  That

25   was in August of 2023.  We also sent JXN Water's counsel the

1    results from the testing that we had done.  We sent them

2    photographs of the issues and a spreadsheet of the itemized

3    damages.  However, to date, the leaks have not been

4    resolved, Your Honor.  So that is why Lakeland Seniors has

5    filed leave to sue JXN Water.

6    THE COURT:  Do you have any pictures?

7    MR. BARNES:  Your Honor, they are submitted into the

8    record.  They are attached to the reply brief of our motion.

9    THE COURT:  Okay.  I'll get them then.

10    MR. BARNES:  Yes, Your Honor.

11    THE COURT:  I'll look at them.  Go ahead.

12    MR. BARNES:  Okay.  And with those pictures is also a

13    declaration from a representative of Lakeland Seniors.

14    So in addition to JXN Water, Your Honor, we also

15    believe that UMMC and the City of Jackson may also be

16    liable.  So the -- as you're aware, the MTCA has a one-year

17    statute of limitations, and once you serve the notice, it

18    toils the statute for 90 days.  So when those 90 days were

19    set to expire, we went ahead and filed a lawsuit in Hinds

20    County Circuit Court.  That was to preserve our right to be

21    able to have the lawsuit, Your Honor.

22    We have served UMMC and the City of Jackson, but we

23    have intentionally held off on serving JXN Water while this

24    motion has been pending, so they have not officially been

25    made a party to that lawsuit.

1          So I believe that's all the pertinent background for

2     the moment leading up to the motion for leave.  Now I'll

3     address the legal arguments and why we believe we're

4     entitled to file the lawsuit, Your Honor.

5          So I think there is three independent reasons why

6     Lakeland Seniors is entitled to file a lawsuit against JXN

7     Water.  The first two reasons is we believe that leave is

8     not even required to file a lawsuit against JXN Water.  And

9     that's true under both the stipulated order, and it's true

10    under 28 USC, Section 959(a).

11         But even if leave were required, Your Honor, there's a

12    third reason, and leave should be granted because there is a

13    foundation for Lakeland Seniors' claims; that is, the low

14    hurdle that Lakeland Seniors would have to meet if leave is

15    required.

16         So I'll address each independent reason in turn:

17         First, the Court's stipulated interim order does not

18    require leave to sue JXN Water.  The interim stipulated

19    order provides limited immunity to the ITPM and his agents.

20    JXN Water itself is neither the ITPM or one of his agents.

21         Instead, Mr. Henifin is the agent of JXN Water.

22    Mr. Henifin filed the articles of incorporation for JXN

23    Water.  He is director and the registered agent of JXN

24    Water.  And under Mississippi corporate law, JXN Water has

25    its own individual existence and it can only act and operate

1     through its director or its representatives.  Accordingly,

2     we don't believe that the limited immunity set forth in the

3     stipulated order would apply to JXN Water.

4          Second, Your Honor, even if JXN Water has limited

5     immunity under the stipulated order, we believe that the

6     exception that is found in 28 USC, Section 959(a) applies

7     and so we still don't need leave, and that's because JXN

8     Water can be sued for any claims related to it carrying on

9     its business, and that's what the statute -- the statutory

10    exception provides.  And, Your Honor, the interim stipulated

11    order recognizes the statutory exception, and that's set

12    forth in paragraph 9(b) of the order.

13         So JXN Water's corporate purpose is the operation and

14    maintenance of the water and sewer system that includes

15    fixing pipes, fixing meters, and fixing hydrants.  That's

16    its ordinary business.  So Lakeland Seniors' lawsuit will be

17    about the water and sewer system's operational failure and

18    JXN Water acts or omissions related to those systems.  This

19    is not a lawsuit about the receivership itself or

20    misspending of money or improper contracts; this is about a

21    property injury that is personal to Lakeland Seniors, Your

22    Honor.

23         And third, even if leave is required from this Court,

24    the Court should grant leave because Lakeland Seniors has

25    met the very low burden that it needs to meet.  And, Your

1    Honor, the Fifth Circuit has said that leave should be

2    granted unless it is clear that a claim is without

3    foundation, and the Fifth Circuit has explained that leave

4    to sue is practically never refused.

5         So the question before this Court is whether there is

6    any foundation at all for Lakeland Seniors' claim, and the

7    answer is clearly yes, there is a foundation for our claim

8    because there is leaking water and leaking sewage that is

9    affecting and damaging our property.  And it is JXN Water

10   who operates and maintain those water and sewer systems.

11        In conclusion, Your Honor, the Court should find that

12   leave is not necessary because JXN Water is -- is not the

13   agent of the ITPM or because the statutory exception

14   applies, but if leave is required, it should be granted

15   because Lakeland Seniors' claim is not without foundation.

16        Your Honor, that's all I have unless you have any

17   questions at this time.

18        THE COURT:  Okay.  I'll come back to you after I hear

19   the other side.  Okay.

20        MR. MCGUFFEY:  Good afternoon, Your Honor.

21        THE COURT:  Good afternoon.

22        MR. MCGUFFEY:  Mitch McGuffey on behalf of the ITPM.

23        So I'm going to address the sort of background -- the

24   background Mr. Barnes provided as I go through the legal

25   arguments, as opposed to separately.

1        So starting with the first issue that he identified,

2   this question of whether or not leave of the Court is even

3   required and in particular whether or not leave is required

4   under the stipulated order.  Our biggest issue is maybe with

5   this argument, and it's because the issue -- potentially the

6   broadest impact on the actual operations of the receivership

7   or the ITPM.  In fact, for the Court -- just so the Court

8   knows and I'm sure is already aware, this issue has already

9   come up again in another motion for leave that has been

10  filed, in which JXN Water's response is due on Friday.

11       So we are going to be talking about this again until

12  it's sort of resolved.  Counsel pointed to the provisions of

13  the stipulated order, so I'll start with that.

14       Paragraph 9(b) of the interim stipulated order in the

15  water case -- and I'll note that the same language is echoed

16  in the sewer order that was entered about 10 or 11 months

17  afterwards -- says:  No suit shall be filed against the ITPM

18  or ITPM agents without leave of court.  That order was later

19  amended, and the amendment says in paragraph 4 -- amends

20  paragraph 4 of the stipulated order to state:  For purposes

21  of implementing this stipulated order, the ITPM may operate

22  through JXN Water, Inc.

23       It is a fairly difficult thing to find if you search

24  through case law to find any court going -- bothering to

25  state that a principal acts through its agent because it's

1    sort of black letter law that everybody understands.

2        The ITPM operates through JXN Water, Inc., and that is

3    always the way it was intended.  In fact, I would point the

4    Court back to the joint motion to amend the stipulated order

5    in which the parties that are all sort of sitting behind me,

6    so I'll -- they are the ones that made the motion, Your

7    Honor, not the ITPM.

8        But all of the parties agreed and in the motion stated

9    JXN Water is the entity created by the ITPM solely to

10   implement the ITPM's obligations under the ISO.  They went

11   on to say:  For legal, financial, and practical reasons,

12   Mr. Henifin performs many ITPM obligations through JXN

13   Water, the whole point of the amendment was to facilitate

14   the ITPM's ability to fulfill his obligations and to work

15   through JXN Water to do so.

16       All of that language was not casual; it was

17   intentional.  That is exactly what the parties intended.

18   Practically, I want to address this issue sort of

19   separately.

20       I think the language of the stipulated order sort of

21   speaks for itself.  I think it is very clear and unambiguous

22   what the Court intended and what the parties intended, but

23   practically, we want to raise this concern.  JXN Water is

24   the contract party for almost all vendors -- I would say all

25   vendors.  Mr. Henifin could check me on that, but they are

1    the contract party for all vendors.  They are the ones that

2    retain vendors for water and sewer projects.  They're the

3    ones that -- that's the entity that holds the bank account

4    that was required under the stipulated order.

5        Under Lakeland Seniors' interpretation, that means that

6    the Court's protection for ITPM agents does not extend to

7    any of those parties because they are working for JXN Water,

8    and so if JXN Water isn't covered by the stip order, neither

9    are their contract parties.

10        We talked earlier today, this morning, about keeping

11    good contractors, and the protection that is provided by the

12    stipulated order for immunities and other protections

13    guaranteed to those contract parties, that is vital to the

14    ITPM's effort to actually get contractors to take our work.

15        So we would absolutely welcome the Court's

16    interpretation on that initial question of whether or not

17    JXN Water, Inc., is covered by the protections and therefore

18    its contract parties are covered by the protections of the

19    stipulated order.

20        Moving forward, the second sort of -- that's a first

21    cut.  There is a second cut on whether or not leave is

22    necessary, and counsel pointed to the second half of

23    paragraph 9(b) in which the Court stated that the immunity

24    protections or the leave -- the protection seeking leave was

25    qualified by 28 USC, Section 959(a).  I'm going to call it

1    "959(a)" for short if that's all right with the Court.  If I

2    say it again, I'll just say that.

3         We think it's pretty obvious that the claims in this

4    case actually have everything to do with the receivership

5    going on.  The question of whether of not these claims have

6    to do with the ongoing operation of JXN Water itself or

7    whether they have to do with just suing because they now own

8    the infrastructure, they now have charge of the

9    infrastructure.

10         Counsel said -- and I wrote it down so that I would get

11    it right.  Counsel said this is not about the receivership

12    itself.  We would say that the timing of this entire -- of

13    everything that we have done bears out that it is in fact

14    about the receivership itself.

15         For one, the claims in this case are about leaks that

16    started on June of 2020 that have caused harm to Lakeland

17    Seniors.  That obviously has nothing to do with JXN Water

18    because the ITP wasn't even appointed until November 29th,

19    2022, about 18 months, if I'm doing the math right, later.

20         On top of that, there was no communication from

21    Lakeland Seniors to JXN Water or to the ITPM or anybody that

22    works for JXN Water for months after his appointment.  The

23    communication was to the City of Jackson and to UMMC only.

24    That started in -- that started -- I'm actually not even

25    sure when it started because we just weren't involved.  We

1    know that they have represented that they had communications

2    with both of those entities in November of 2022, prior to

3    the ITPM being named, and JXN Water wasn't actually

4    incorporated until later in December.

5         So didn't talk to anybody then; didn't talk to anybody

6    on our side until really August of 2023.  But the case was

7    filed in June of 2023, and we became aware of it when it was

8    first filed not by Mr. Barnes' firm but by prior counsel for

9    Lakeland Seniors.

10        The fact that they never provided notice is a little

11   tricky when you're making negligence claims because the only

12   other way that you could get here is if they contend that

13   JXN Water knew or should have known about subsurface leaks

14   that are not apparent from actually walking by the property.

15   I don't think they have ever actually contended that, but to

16   the extent that they have, that is really a strict liability

17   standard that they're trying to apply, and there is no basis

18   for a claim on strict liability here.

19        So I don't think there is any real question that JXN

20   Water is being named here not because of any act that it

21   took -- and we'll get to the question of whether it's

22   actually had omissions, but not because of any act that it

23   has taken.  It is being named because it was named receiver

24   for the actual water infrastructure.

25        And so there is a case that I would refer the Court to

1    that is in our briefs, but just for the record, it's *OHM*

2    *Systems, Inc. v. Park Place Corporation*, 2020 Westlaw

3    2572203, that kind of sums up, in our view, what exactly is

4    happening here.

5        The quote from that case -- and it's lengthy, and I

6    apologize, but it's good enough for me to read, so I'll do

7    it.  It says, "Plaintiff's allegations leave no doubt that

8    it is suing the Receiver only because he is in possession

9    of" -- and I'll editorialize this -- "the City of Jackson's

10   assets and has control over those assets under the authority

11   of this Court's order appointing him as the Receiver for

12   Jackson's water and sewer system.  Plaintiff seeks to

13   recover assets that are under the Receiver's control,"

14   namely money, "as a result of damages caused by the City of

15   Jackson's alleged negligence.  Plaintiff does not seek to

16   recover damages from the Receiver for alleged acts or

17   omissions of the Receiver himself."

18       There is another quote in here that is pertinent that a

19   number of circuit courts have come to the same conclusion,

20   that merely holding assets does not constitute carrying on

21   business, and that's really what we have here.  He is

22   holding the infrastructure -- he has control over the

23   infrastructure under this Court's order and therefore he has

24   been named in the suit.

25       So to the extent the claims are limited to claims for

1    omissions after notice, there's a lot of record evidence

2    that demonstrates the opposite, and so I would point the

3    Court to Mr. Henifin's declaration, which an exhibit to our

4    surreply that is Docket Number 75-2, happy to have him talk

5    about anything he has done, but I'll walk through it.

6         There was an allegation that there was a leak ongoing

7    in 2022.  The meter was changed in June of 2023,

8    coincidentally, days after we learned about this lawsuit.

9    That actually wasn't planned; it just happened that way

10   because they are in the constant process of updating all of

11   the meters.

12        Meters changed in June of '23.  At some point, another

13   entity, which we believe to be UMMC, repaved the adjacent

14   lot that stands between Lakeland Seniors' property and the

15   meter itself.  There is no evidence that there is a leak

16   pushing through that repaved lot.  There was a visible

17   inspection October 6th of 2023 with no visible leaks.  There

18   was another visible inspection on October 30th of 2023 when

19   some of the surface water, they went back to check to see

20   whether the surface water had dried up and it had.  And then

21   in January of '24, JXN Water sent contractors to scope the

22   sewer line.

23        Now, it's important to note that we are talking about

24   the public sewer line that runs along Lakeland; that line is

25   flowing.  So there is a question about what more JXN Water

 1    needs to do there, but setting that aside, Mr. Barnes made a

 2    point of saying that there was a foundation for the claims,

 3    that it's a very low burden, it's practically never refused.

 4    I think the case law is pretty clear that the word

 5    "foundation" in this context doesn't mean the same thing

 6    that it does when we're looking at plausibility under *Iqbal*

 7    and *Twombly* and things like that.

 8        There is a requirement that's applied across this

 9    country in receivership cases that has to do with, what does

10    a prima facie case look like in this circumstance?  And you

11    have to actually put on evidence of the harm and actually

12    put on evidence of the claim, not just to say, "We have made

13    allegations so they know what the claim's about."  That is

14    what we would do if it was a regular complaint.

15        Here you have to actually look at the merits.  The

16    merits inquiry's appropriate.  The courts have plainly said

17    that this Court is permitted to balance the interests of all

18    parties.  It is permitted to consider the impact on the

19    receivership, and that has been done even in the Fifth

20    Circuit.

21        So, again, just for the record, this is in our

22    briefing, but *In re Highland Capital Management*, that's 2023

23    Westlaw 5523949, it's a Northern District of Texas case that

24    applies the same prima facie showing standard that would

25    apply here under *Barton* and under 959(a).

1          We don't really know whether Lakeland Seniors' factual

2     allegations have merit, but the claims against JXN Water

3     don't.  They have made three separate claims, that's

4     trespass, private nuisance, and negligence.  There is no

5     alleged act, so a trespass is going to be difficult to show,

6     since it's an intentional act claim.

7          Private nuisance can either turn on an intentional act,

8     which, again, there is no act actually alleged, so really

9     that claim turns on negligence; we're back to just a

10    negligence claim.  Again, we will reiterate:  There is no

11    notice here.

12         And I would point to -- Mr. Barnes noted the

13    declaration.  I believe the man's name is Mr. -- well, I

14    won't venture.  The person who had put in in their own

15    declaration, he noted damp -- damp mud, and he also noted

16    that there was bacteria in some of the tests that they ran.

17    What he didn't say is there is evidence -- there is treated

18    water flooding that.

19         So if this was coming from actual treated waterlines,

20    that would have been evidenced by the test that they ran,

21    and it's not.  The bacteria that he noted, there is nothing

22    that says where it's coming from, and that is part of our

23    issue, is that he's not saying that it's flowing from

24    Lakeland.  He's saying it's flowing from somewhere else --

25    Lakeland, the street.  He's saying it's flowing from

 1    somewhere else, and that's not public infrastructure.

 2         The last point I'll make, Your Honor, is that there is

 3    another piece to paragraph 9(b) under the stipulated order,

 4    which also provides for derivative immunity.  Whether or not

 5    Lakeland Seniors has cleared the hurdle of putting on a

 6    foundational case, they have to also clear the hurdle in the

 7    initial instance of proving that derivative immunity would

 8    not apply.  And that has to be answered separate from the

 9    question of whether or not they have made a proper prima

10    facie showing.

11         There is no allegation of willful misconduct or gross

12    negligence.  No meaningful allegation of gross negligence in

13    this case.  The -- I guess I would just point the Court to

14    page 12 of our response or page 14 of our surreply.  I'm not

15    going to beat a dead horse.  They just haven't really made

16    any allegation that would rise to the level of willful

17    misconduct or gross negligence, which is what's necessary to

18    prevail over the derivative immunity that applies to an ITPM

19    agent.

20         The last thing I would say is that if the Court is so

21    inclined to permit the claim to move forward, we would

22    appreciate an instruction that the damages that can be

23    recovered, the only thing that can be asked for would be

24    what was -- what would be -- what accrued after notice was

25    provided.  Because, again, they have made claims that date

1    back to 2020, and then they have tried to say that from the

2    date the ITPM took over, that's when this triggers his

3    responsibility because this is ongoing operations of JXN

4    Water.  That's just not true.

5        And so we're looking at, you know, August of 2023 for a

6    water claim, October of 2023 for a sewer claim because

7    that's actually when the sewer order was entered.  So making

8    any claim against the ITPM or against JXN Water for a sewer

9    leak prior to October 2023 doesn't make any sense.  They

10   didn't have any control over the infrastructure.

11       I think I'll leave it at that.  Our argument in sum --

12   and I do just want to reiterate this -- the stipulated order

13   is clear that Mr. Henifin operates through JXN Water.  That,

14   by necessity, makes JXN Water an ITPM agent, however you

15   want to define that.

16       Under 959(a), the claims can only be made for carrying

17   on business.  There is no real allegation that there's been

18   an act taken by JXN Water that caused this harm.  The best

19   they have done is to say that there was some omission,

20   although I'm not sure what those omissions are supposed to

21   have been since October of 2023 for the sewer system or

22   August of 2023 for the water system, which is the first date

23   of notice.

24       And we would argue that their interpretation of the

25   case law on what sort of prima facie case or foundation is

1    just -- it just doesn't reflect what the case law actually

2    says.  And if we dig into that, what you find is they can't

3    actually make trespass claims.  They can't actually make

4    private nuisance claims, and they are left with a negligence

5    claim that, at best, survives since last fall.

6        Any questions, Your Honor?

7        THE COURT:  Not right now.

8        MR. MCGUFFEY:  Brilliant.

9        THE COURT:  Rebuttal?

10        MR. BARNES:  Your Honor, Jonathan Barnes, again, for

11    Lakeland Seniors.  I'll just go through the points in the

12    same order.

13        JXN Water is not an ITPM agent.  I do understand that

14    there was an amendment to the interim stipulated order, and

15    it says:  Whereas solely to implement the obligations under

16    the ISO, Mr. Henifin incorporated JXN Water, Inc. on

17    December 7, 2022, whereas JXN Water, Inc., is a corporation

18    organized under the laws of the State of Mississippi.  And

19    then it goes on to say that the parties have agreed to

20    modify the ISO to clarify that the ITPM may act through JXN

21    Water, Inc.

22        Your Honor, what the amendment does is it gives the

23    ITPM, Mr. Henifin, it gives him further protection.  It

24    gives him clarity to know that, yes, you can go out and you

25    can form JXN Water, and you can act through JXN Water.  But

1    you still have limited immunity even if you are acting

2    through JXN Water.

3         The order -- the amendment to the order says nothing at

4    all either implicitly or explicitly about giving that

5    limited immunity also to JXN Water.  Could the amendment

6    have done so, maybe so, but it didn't, Your Honor.

7         Your Honor, I don't think that that interpretation puts

8    any of the other vendors or contractors that the ITPM is

9    working with in danger of somehow losing their limited

10   immunity.  The ITPM, under the order, is required to be the

11   one that signs off on all of these contracts with all of the

12   contractors and vendors.  That doesn't put them at danger

13   whatsoever.  What we're here talking about and the only

14   thing that I believe it would affect is just JXN Water

15   itself.

16        Your Honor, I'd like to correct one misstatement I

17   believe that JXN Water has said.  They said that the -- the

18   leak started in June of 2020.  Your Honor, that's not in any

19   of the allegations, not in the notice letter, and it's not

20   in any of the briefing.  Jackson -- Lakeland Seniors did not

21   become aware of any of the leaking until late in 2022.

22        As far as past communications or failures in past

23   communications before that time, Your Honor, my firm was not

24   representing Lakeland Seniors at that time.  We began

25   representing Lakeland Seniors in July of 2023.  The next

1    month, we provided notice of these issues, nothing was done

2    to resolve them, and so that's when we -- we filed this

3    motion for leave.

4        And, Your Honor, this is -- this is not simply about

5    past harm or injuries; this is about an ongoing issue.

6    There is currently leaking water and sewage coming on to our

7    property.  So the whole distinction about what timeframe JXN

8    Water may be responsible for and what timeframe they may not

9    be responsible for, that doesn't matter for today's purpose.

10   What matters for today is that there is an ongoing injury

11   and tort that JXN Water has notice of.  They have notice of

12   these issues, and they have done nothing.

13        So the timeframe for what they're responsible for

14   doesn't matter; that is for a separate court to address.

15   What matters is, is the sewer system and the water system in

16   their ordinary business and if -- and whether our claim has

17   foundation, and we believe that it does, Your Honor.

18        I'd also like to address the *OHM* case that JXN Water

19   cited to that's in their brief.  We distinguished it in our

20   surreply.  That case was about a contract that had been

21   breached before the receivership was put into place, and the

22   remedies that the plaintiff was seeking -- was seeking I

23   believe it was the return of software that they believed

24   that they were entitled to, and at that time, the software

25   was in the hands of the receivership.

1          Your Honor, that's completely not the facts of this

2     case.  In fact, the *OHM* case was in state court.  The

3     receivership was put in place by a state court, Your Honor.

4     So the exception to whether leave is required, that's a

5     federal statute, and the Court found that it didn't apply

6     because the receivership was put in place by a state court.

7          That was the holding in that case.  Here, we are in

8     federal court, and the receivership was put in by a federal

9     court, so the federal statute does apply.  So *OHM* has no

10    bearing on this case whatsoever, Your Honor.

11         Your Honor, he also mentioned the -- the declaration

12    from Mr. Henifin.  Well, we have a fact dispute.  You have

13    dueling declarations.  You have a declaration from one of

14    our representatives, and you have a declaration from one of

15    their representatives.  That's a fact issue that deserves to

16    be presented to a jury.  And there are lots of technical

17    issues with how many leaks are out there.  There may be

18    more, Your Honor.  We don't know.  Whose responsibility is

19    it for these leaks?  Those are questions that remain to be

20    answered, Your Honor.

21         Some of these questions may take technical analysis.

22    So the question is, if leave is required, have we made a

23    prima facie case?  And JXN Water is taking issue with the

24    "without foundation" standard.  Well, the Fifth Circuit said

25    that the prima facie case -- in explaining what that

1    standard was, says that it is -- the question is whether the

2    claim is without foundation.  So they're one and the same.

3        And, Your Honor, we believe that our claims do have

4    foundation.  There is ongoing leaks of water and sewer.  JXN

5    Water is operating and maintaining those systems, Your

6    Honor.  We believe we're entitled to name them in a lawsuit

7    and to conduct discovery.

8        THE COURT:  Are you suing just the water side of this

9    case, or the water and the sewage?

10       MR. BARNES:  Your Honor, I believe it would be both.

11   There is subsurface flooding of both water and sewage, so I

12   think both of those components are wrapped up in the same.

13       THE COURT:  You are saying you are suffering damages

14   from both?

15       MR. BARNES:  Yes, Your Honor.

16       THE COURT:  Tell me about your damages that you have

17   pleaded concerning the water matter.

18       MR. BARNES:  Yes, Your Honor.  So it's about $3 million

19   worth of damages.  When we began repaving our parking lot,

20   the amount of water and sewage that was leaking onto our

21   property caused significant delays in that construction.  I

22   believe we had to repair our foundation because of this

23   water damage and various other aspects of our physical

24   property.

25       I'm not sure that I can distinguish the physical

1      damages between just the migration of water or just the

2      migration of sewage.  Your Honor, they are both migrating at

3      the same time from multiple sources, and so I don't think we

4      are going to be able to get a test that says this is the

5      treated water that is migrated from that location versus

6      this is the sewage that's migrated from that location.

7          Your Honor, it's all moving subsurface underground and

8      probably mixing together.  The answers to those questions, I

9      think, cannot be answered today.  But it's a complex issue.

10         THE COURT:  So then what are you asserting your

11     complaint?

12         MR. BARNES:  That's what we asserted, Your Honor.

13         THE COURT:  I mean, but what kinds of injuries did you

14     assert in your complaint?

15         MR. BARNES:  We asserted the cost of repairing or

16     repaving the lot.  We asserted the cost of the delays in the

17     initial construction, the commercial loss of time.  We have

18     also sought injunctive relief, Your Honor.  So there are

19     various damages that we have asserted.

20         THE COURT:  In your complaint, though, tell me how you

21     describe your injury.

22         MR. BARNES:  Your Honor, the complaint is 13 pages

23     long.  It has close to 80 factual allegations.  I'm happy to

24     submit a copy of the complaint to the Court.

25         THE COURT:  Let me have it.

1          MR. BARNES:  Your Honor?

2          THE COURT:  Let me have it then.

3          MR. BARNES:  Sure.

4          THE COURT:  Counsel, you can have a seat while I read

5     through this.  Okay?

6                         (A recess was taken.)

7          THE COURT:  All right.  Go ahead with your argument.

8          MR. BARNES:  Your Honor, that's all I have unless you

9     have any questions.

10          THE COURT:  Oh, I don't have any questions then.

11     Thank you.  Anything else over here?

12          MR. MCGUFFEY:  Your Honor, just two exceedingly quick

13     points.  The first one is I had to go back and make sure I

14     wasn't crazy by mentioning June 2020.  That actually shows

15     up in their August 2023 notice letter.  That's in the

16     record.  It's Document 50-1.  The exact statement is:

17     Beginning in June 2020, Lakeland entered into a contract for

18     the performance of work.

19          The next sentence is:  Throughout work on the project,

20     excess and unexpected water and other aqueous substances

21     were encountered.

22          I guess I do have to plead ignorance about exactly when

23     they started that work.  I assumed that date was included

24     for a reason.  But I think it would be well before the entry

25     of the stipulated order in November 29th of 2022.

1          The last point I wanted to make was one about the

2     dates, and just to illustrate the point further, the motion

3     for leave was filed in September 11th of 2023.  The ITPM

4     wasn't named as a receiver or as a third-party manager over

5     the sewer system for about a month after that.

6          There is no question that the claims made against JXN

7     Water are made because JXN Water now possesses those assets,

8     not because of any act or omission that it took, because the

9     claims were actually made before it even had full

10    possession.

11         That's it.  That's all there is from me.

12         THE COURT:  Okay.  One second.  Don't move.

13         Counsel, when you file for removal, on what basis did

14    you remove --

15         MR. MARTIN:  Your Honor, we removed on federal question

16    jurisdiction based on the authority of the ITPM and this

17    Court's orders.

18         THE COURT:  And what co-provisions did you cite?

19         MR. MARTIN:  Your Honor, to be honest, I don't have the

20    notice with me.  We cited to -- we did cite to a specific

21    statute, Your Honor, and I don't recall the statute as I sit

22    here.  We didn't bring that with us.  We can probably find

23    it while we are sitting here, if you would like.  I can look

24    it up.

25         THE COURT:  You have your removal papers?

1    MR. MARTIN:  I don't have the papers, but I think I can

2    get to them or have them sent to me.

3    THE COURT:  Oh, well, I'm just asking you what is the

4    federal question?

5    MR. MARTIN:  So there's a statute -- I think it was a

6    receivership statute, as -- if I recall correctly, that

7    said -- or that we argued at least that said that when the

8    subject of the lawsuit encompasses a property that's in

9    receivership, the federal court where that receivership is

10    can maintain jurisdiction over the case.

11    I'm playing a little bit loose with my language there,

12    Judge, because it's a statute that I hadn't -- I don't have

13    a lot back familiarity with prior to this filing, and I even

14    internally, I acknowledge it's sort of a novel concept.

15    But the idea behind it I can tell you is simply this:

16    Similar to Mr. McGuffey's arguments on behalf of JXN Water,

17    the city believes that JXN Water is either the agent of the

18    ITPM or stands in the shoes of the ITPM for all purposes in

19    terms of executing and administering the water and sewer

20    stipulated orders.

21    And so the city believes that all protections that are

22    specifically granted in those stipulated orders to the ITPM

23    and any agent thereof, necessarily applied to JXN Water.

24    We also believe that JXN Water -- the city also

25    believes that JXN Water would have been named defendant and

1    served in this but for this Court's orders and those

2    stipulated orders and that this Court, meaning in particular

3    you, Judge Wingate, were the right court to evaluate any of

4    those claims if they touch on the receivership in any way.

5    Judge Johnson, by the way, did not agree and has remanded

6    the case to state court.

7        THE COURT:  That's why I was asking, you know, about

8    this particular matter.  I don't know what Judge Johnson

9    did.

10       MR. MARTIN:  And her order is just in the last week or

11   two, Judge.  And, in fact, she even has a short statement in

12   the order that looked like maybe there was -- that we were

13   close to invoking federal jurisdiction properly if I read it

14   correctly at least.

15       But I didn't come prepared to argue any of those

16   removal issues today.  I did come for the parts of this

17   hearing this morning and also to add what I just added in

18   terms of this hearing.

19       I mean, Judge, as a practical matter, the city is put

20   in kind of a different sort of situation here on these

21   lawsuits now, and that will change again as time passes.

22   But, for example, let's say -- regardless of what the Court

23   does with JXN Water here today, whether the Court grants

24   leave for the plaintiffs including JXN Water as a defendant

25   or does not, the city will still be defending this lawsuit

1    now in state court, and among other things, other provisions

2    of the stipulated orders will call into question how the

3    city is going to properly defend itself.

4        We can't compel deposition testimony.  It is not even

5    clear that we can compel discovery-type responses from JXN

6    Water.  I'm sure they'll cooperate, of course, but as a

7    practical matter, Mr. Henifin is trying to run the water

8    system and sewer system, and this Court has already

9    acknowledged in the stipulated orders that we don't want any

10   more interference with that than is necessary.

11       Be that as it may, JXN Water is now in possession,

12   custody, and control of most of the city's information, for

13   example, this lawsuit.  We'll need to get that information

14   from JXN Water.  Potentially depositions might be required

15   either by the plaintiff or by the city as to JXN Water.  Of

16   course, we will come back to you to ask about that when the

17   time comes.  But we are hoping to get a little guidance on

18   that today.

19       THE COURT:  This complaint does not contain, on its

20   face, any federal removal statutes.  Do you agree with that?

21       MR. MARTIN:  Your Honor, what we cited -- I still don't

22   have the statute, I apologize.  But it gets referred to a

23   lot -- it comes out of the lawsuit *Grable & Sons Metal*

24   *Products*, and the idea was that with the stipulated orders

25   being specifically pursuant to the Safe Drinking Water Act

1    and the Clean Water Act and the federal court -- we are

2    calling it a receivership, even though I don't think that

3    phrase is specific as to the stipulated orders -- but as a

4    practical matter, receivership.  That those things combined

5    create what is essentially a federal question.

6         Again, Judge Johnson disagreed, but that was the -- big

7    picture; that was our argument.

8         THE COURT:  But then on the other hand, there's a

9    provision here which is -- let me see -- well, I don't think

10   it's cited here in the complaint.  But on the other hand,

11   there is a provision in the stipulated order that says that

12   this Court is to give permission; is that correct?

13        MR. MARTIN:  Yes, sir.  At least for leave as to naming

14   and serving and filing suit against JXN Water, yes, sir.

15        THE COURT:  Okay.

16        MR. MARTIN:  And any agent thereof, I suppose.

17        THE COURT:  And Lakeland Seniors, Inc., is proposing to

18   sue JXN Water among other defendants.

19        MR. MARTIN:  Yes, sir.

20        THE COURT:  And based on that, then, that's -- now I

21   didn't see that ground specifically raised in here, though.

22   Was it specifically raised in here?

23        MR. MARTIN:  In the motion to remand?

24        THE COURT:  Not motion to remand, in the motion to

25   remove.

1      MR. MARTIN:  I'm sorry, in the notice of removal.  I

2   hope we had something in there about it, Judge, but as I

3   stand here right now, I can't say one way or the other with

4   certainty whether the city referred to that provision or

5   not.  I know we cited to some of the provisions of the

6   stipulated orders, but I don't recall which ones.

7      I would have wanted to say, Judge, and I should have if

8   I didn't, that the Court having to give leave to file the

9   suit should apply to the suit as a whole.

10      THE COURT:  Well --

11      MR. MARTIN:  JXN Water had not yet been served, so my

12   hands were tied a little bit on that as well.  We were

13   moving with just the city and UMC as served defendants at

14   the time.

15      THE COURT:  Let's look at page 2 of the complaint.

16      MR. MARTIN:  Of the complaint?

17      THE COURT:  Yes.  It says:  The Court has subject

18   matter jurisdiction over this proceeding pursuant to Section

19   9-7-81 of Mississippi Code.

20      MR. MARTIN:  Yes, sir.

21      THE COURT:  Was that the code section you are looking

22   for?

23      MR. MARTIN:  Not for the state code, Your Honor, no,

24   sir.  We haven't filed an answer yet in the case.  Well,

25   actually, I think we just filed an answer.  We just filed an

1    answer, but at the time of our removal, we had not -- the

2    city had not answered, but the city would not have been

3    citing to the Mississippi subject matter jurisdiction

4    statute in the notice of removal, we would have been arguing

5    under a well-pleaded complaint federal questions were

6    implicated here that were sufficient to justify and invoke

7    federal jurisdiction.

8        THE COURT:  Okay.  Then on page 3 you start off with

9    the factual background that says:  Statement of relevant

10   facts.

11       Page 6 -- I mean 4, there's a continuation on the

12   relevant facts as well as on page 5, and then at the second

13   half of page 5, it actually goes into the basis of the

14   claim.

15       MR. MARTIN:  Yes, sir.  It's all in the complaint.

16                     (Crosstalk)

17       THE COURT:  -- limine and control, et cetera, and you

18   should have known -- and defendants' water and sewage and

19   other waste continues to migrate into the subsurface

20   environment.

21       32 and 33 on migration, that they present -- that that

22   circumstance presents an imminent and substantial threat.

23   And page 34:  Upon information of a leave, defendants

24   regularly permitted the release and migration of water and

25   of sewage and other waste from defendants' facility and

1     systems to surround neighboring properties.

2          And then there's some counts.  Count 1 is on trespass.

3     Page 8 is talking about migration again.

4          Page 8 second half is private nuisance.  Page 9,

5     defendants have failed to take reasonable steps and timely

6     measures to abate the migration.  Public 9 (sic) is on

7     public nuisance.

8          Top of page 10 is continuing negligence and then down

9     on the same page, paragraph 63 through 67, alleges

10    negligence as a duty of reasonable care.  Defendant has

11    further failed to evaluate the information available to them

12    to apprise themselves of the faulty systems.

13         67, defendants are suffering -- I mean, plaintiffs are

14    suffering and will continue to suffer unless there is some

15    change.  An element of damages is that Lakeland Seniors also

16    suffer damages including, but not limited, to increased

17    construction costs, cost of significant delays, and expense

18    when Lakeland Seniors had to postpone construction of the

19    project and incur additional expenses and attempt to migrate

20    the damages caused by the defendants.

21         Gross negligence is -- is mentioned in paragraph 61

22    through 81.  And in the prayer for relief, I see request for

23    preliminary and permanent injunction directing defendants to

24    respond, to remove and remedy the contamination.

25         Paragraph -- then in paragraph 78(e), we are back to

1    damages.  And punitive damages, attorneys fees,

2    prejudgment/postjudgment interest.  Any other relief that

3    the law requires.

4        Now, did I just go over too fast or I read past where

5    there was any assertion for jurisdiction based upon my

6    order?

7        MR. MARTIN:  In the complaint, there is no such

8    allegation, Your Honor.  In our notice of removal, which I

9    do have on my colleague's phone right now actually, not on

10   my phone, what the city said was, the city acknowledged that

11   the complaint asserted only state law causes of action.

12   What we said was that federal question jurisdiction would

13   still lie over those state law claims because of the

14   significant federal issues which are implicated and we cited

15   to the *Grable* doctrine in that, which has not been applied

16   very many times, but has been applied in a receivership

17   setting.

18       And so the idea here is that, sure, the factual basis

19   underneath all of this is the idea that somehow water was

20   migrating to -- from UMC's property to Lakeland Seniors, but

21   that everything about this implicates JXN Water -- well, not

22   the facts, and I don't mean that in a conclusory fashion.

23   But in terms of the way the complaint has been laid out, it

24   speaks to specifically JXN Water's role, that Jackson and/or

25   JXN Water own and are responsible for the maintenance and

1    repair of these meters and hydrants as well as sewer lines.

2    All of the allegations of fault in the complaint are

3    intertwined into this sort of defendants did this,

4    defendants did that.  So it's very difficult, if not

5    impossible, to tease out what the plaintiffs claim the city

6    actually did or, for that matter, what JXN Water did.

7         And here is where it specifically said:  Although no

8    allegation of the complaint expressly invokes federal

9    jurisdiction, the allegations directly implicate federal

10   jurisdiction pursuant to the stipulated orders entered in

11   this Court and at least two cases.  And we cited to the

12   Clean Water Act case and the we cited to the Safe Drinking

13   Water Act case and also did cite, Your Honor --

14        THE COURT:  What page is that?

15        MR. MARTIN:  In the notice of removal, it's on page 4.

16        THE COURT:  Oh, it's on the notice of removal.  I don't

17   have that up here.

18        MR. MARTIN:  Yes, sir.  Yes, sir.  I'm sorry.  It's on

19   page 3 and 4 in the notice of removal.

20        THE COURT:  Okay.

21        MR. MARTIN:  And we cited that the *Grable* case goes

22   into a little more detail when a federal court sitting in a

23   receivership situation might take a federal question --

24   might take federal question jurisdiction as having been

25   invoked even though the actual torts that are alleged are

1    all state law torts.  So this has happened.  It hasn't

2    happened very often.  But based on, as Your Honor noted

3    earlier, this Court requiring leave of court to be granted

4    before a suit could be filed against JXN Water, given that

5    the suit had already been filed naming JXN Water and serving

6    the city and UMC, and given the number of federal

7    questions -- and I put that in lower case now -- but we're

8    going to be coming back to this Court repeatedly if this

9    litigation moves forward in state court.

10         We will have to come back over -- I can't imagine how

11    many discovery questions we're going to have to come back to

12    the Court and say, well, Judge, the plaintiffs have asked

13    for this, JXN Water has that information, we can't force JXN

14    Water to turn that over.  And, in fact, the orders say that

15    JXN Water doesn't have to participate in a variety of ways.

16         So we will have no choice but to come to this Court for

17    answers to those questions as we go along.  And, frankly,

18    Judge, in terms of the city's position, we are going to face

19    this on numerous cases, and they are only going to grow --

20    hopefully they'll be less in terms of the number of

21    customers who claim there's been a problem, but there will

22    be more in the sense that as we get to the date that the

23    stipulated order is appointed the third-party administrator,

24    these claims will be slightly different because now they are

25    going to name JXN Water and now there is going to be

1    identification issues from the city on that as well.  So we

2    are hoping to get to some clarification on all the issues

3    that are related to this as we go along.

4        But the specific question the Court asked was:  What

5    was the basis of our removal?  It was the stipulated orders,

6    it was Clean Water Drinking Act, Safe Water Drinking Act,

7    and specifically the provisions in this Court's orders with

8    immunity leave -- leave to file suit and so forth.  It will

9    have to be resolved by this Court if litigation goes

10   forward.

11       THE COURT:  All right.  Thank you very much.

12       MR. MARTIN:  Yes, sir.

13       THE COURT:  Thank you very much.  Do you have something

14   you want to add to that?

15       MR. MCGUFFEY:  No, Your Honor.

16       MR. MARTIN:  Can I add one more thing, I'm sorry.  This

17   was much simpler.

18       Mr. McGuffey pointed this out earlier with the notice

19   of claim, but since Your Honor just read the whole

20   complaint, the original complaint says the exact same thing

21   in it.  Paragraph 13 of the complaint says, beginning in

22   June of 2020, Lakeland Seniors entered into contracts for

23   the performance of work to improve its property.  And the

24   next paragraph says:  Throughout the work on the project,

25   excess and unexpected water, blah, blah, blah.

1        So I think they artfully omitted saying some of the

2   dates that probably exist, but they did say in the complaint

3   that these issues -- that the contracts and the work started

4   in June of 2020 and that the problems they experienced --

5        THE COURT:  Slow down some.

6        MR. MARTIN:  I'm sorry.

7        And that the problems they experienced occurred

8   throughout the life of those projects, which, again, began

9   in June of 2020.  That's paragraphs 13 and 14 on page 3 of

10  the Document 2 of the complaint.

11       That was all, Your Honor.  I wanted to mention that

12  while it's still out there.

13       THE COURT:  Okay.

14       MR. MARTIN:  Thank you, Judge.

15       THE COURT:  Something you want to add?

16       MR. MCGUFFEY:  Nothing to add, Your Honor.  If you have

17  any questions for me, I'm happy to take them; otherwise,

18  I'll take a seat.

19       THE COURT:  All right.  Thank you.  Let's go back to

20  plaintiff.

21       Now, it's not in your complaint, but in their removal

22  papers, they just read some materials to me that refers to

23  this court's -- what this court said supposedly about the

24  removals papers.  I haven't gotten a chance to see the

25  removal papers.

1        But do you recall the court's -- any statements by the

2    court that -- that had to be permission from this Court for

3    there to be a lawsuit against JXN Water?

4        MR. BARNES:  Your Honor, I don't believe that Judge

5    Johnson addressed that specific issue or took a position on

6    that specific issue in her remand order.  The notice of

7    removal, the basis for removal was federal question

8    jurisdiction under the Supreme Court case of *Grable*.  *Grable*

9    just says that even if a complaint only lists the names

10    state court claims or state claims, that there might be

11    federal question jurisdiction if those claims raise a

12    significant federal issue that is significant to the federal

13    system as a whole.

14        So as I recall it, Judge Johnson's order I believe said

15    that whatever issue this was, wasn't a federal issue on the

16    face of the complaint, and that even if it was an issue, it

17    was not significant to the federal system as a whole.  It's

18    narrow and tailored to this local issue of the City of

19    Jackson and the water system and sewer system here.

20        That's my understanding.  I do believe that Judge

21    Johnson was aware of the consent orders.  They may have been

22    attached to some of the notice of removal or some of the

23    pleadings.  I do believe that Lakeland Seniors' motion for

24    leave in the briefing that has been submitted before this

25    Court, I believe that was attached to Judge Johnson's docket

1    as well.  So I think she had full access and -- to

2    everything that we have been talking about here today.  I do

3    not think she took a specific position on whether we must

4    seek leave or not.

5         THE COURT:  Okay.  Thank you.

6         MR. BARNES:  And the last thing I'll mention, Your

7    Honor, there has been a little bit of back and forth about

8    the dates.  I have with me the notice letter that was sent

9    out to JXN Water.  In the fourth body paragraph, I believe

10   JXN Water read this into the record, it says:  Beginning in

11   June of 2020, Lakeland entered into contracts for

12   performance of work to improve its property, including a

13   contract for foundational work (the project).  It goes on to

14   say that throughout the work of the project, we experienced

15   the migration of the water.

16        So there's no date on when that specific work began in

17   relation to all of the different contracts and works that

18   were being done over a period of time, Your Honor.  And if

19   you'll -- on the last page of the letter, which is in the

20   record, Your Honor, at Docket 50-1, the very last paragraph

21   says:  On or about November 2022, Lakeland discovered that

22   water and other aqueous substances was migrating from UMC's

23   property.

24        So that is the date of when we discovered the

25   subsurface flooding.  There is no other date, and the

1    June 2020 date refers only to when we started entering into

2    various contracts.

3         That's all, Your Honor.

4         THE COURT:  Okay.  Thank you very much.

5         I'm going to write a very short opinion on this, so it

6    will probably be some time next week before I finish it up,

7    though.  It will be a short opinion.

8         All right.  Thank you all very much.

9         The next matter, I have one more argument this

10   afternoon.

11        MR. MARTIN:  Judge, if I can mention real quick.  I

12   have to leave at about 3:45, and I'm not needed for this

13   next part.  So I didn't want think I was being rude if I

14   sneak out in a few minutes, if we are not done.

15        THE COURT:  Oh, it's okay with me.  But these parties

16   might be upset you're not interested in hearing them make

17   their argument.

18        MR. MARTIN:  I'm very interested.  And that's why I

19   have capable co-counsel right here to listen and report.

20        THE COURT:  All right.  Thank you.  You can be excused

21   if you want to.

22        Okay.  Now, then, your motion.

23        MR. TOM:  Yes, good afternoon, Your Honor.

24        THE COURT:  Good afternoon.

25        MR. TOM:  One of my colleagues who is actually on the

1    screen is going to argue this motion.  It's Mikaila

2    Hernandez.

3          THE COURT:  Okay.  Who is going to argue the motion?

4          MR. TOM:  Mikaila Hernandez.  She's top left.

5          THE COURT:  Okay.  Top -- there she is.  All right.

6          MS. HERNANDEZ:  Hi, Your Honor.

7          THE COURT:  Ms. Hernandez, are you ready?

8          MS. HERNANDEZ:  Yes, sir.

9          THE COURT:  Okay.  Then hang on just one second.  Okay.

10   Just one second.

11         Ms. Hernandez, I'm ready.

12         MS. HERNANDEZ:  Thank you, Your Honor.

13         I represent the proposed intervenor plaintiff, the

14   People Advocacy Institute, and Mississippi Poor People's

15   Campaign, along with co-counsel Emily Early, Jess Vosburgh,

16   and Joshua Tom, who is there in your chambers today.

17         I do want to start with a couple of brief intro.

18   Really, we want to ask the Court to rule on our motion for

19   leave to intervene in this case given how long it has been

20   pending, which is about six months now.  The motion is not

21   opposed, and we are given the unconditional right to

22   intervene under Rule 24(a)(1) and under certain provisions

23   of the Safe Drinking Water Act.

24         I do want to note that this conference wasn't noticed

25   as a hearing on the motion, but we do want to brief the

1        Court on four preliminary points, if that's okay.

2            THE COURT:  You say your motion is not opposed?

3            MS. HERNANDEZ:  Correct.

4            THE COURT:  Let me turn to the other side.

5            Is this motion opposed?

6            MR. MCGUFFEY:  No, Your Honor.

7            THE COURT:  So now it's not opposed by anyone.

8            MR. MCGUFFEY:  Your Honor, I can't speak for the other

9        parties, but not from the ITPM's perspective.

10           MR. FINGERHOOD:  Good afternoon, Your Honor.

11           THE COURT:  Good afternoon.

12           MR. FINGERHOOD:  Karl Fingerhood, U.S. Department of

13       Justice, Environmental Enforcement section.

14           That is correct.  The intervenors seek to intervene on

15       three claims.  One is related to turbidity limits -- three

16       claims in the Safe Drinking Water Act action.  The second is

17       related to corrosion control, and the third is related to

18       filter rehabilitation at J.H. Fewell.

19           We do consent to intervention to those three claims

20       against the city; however, we do not consent to intervention

21       as to any other claims or allegations set forth in the

22       moving papers.

23           Finally, as the Court is aware, the case has been

24       stayed and we are seeking a further stay, so if the

25       relief --

1          THE COURT:  Now, I have signed the proposed order

2     seeking a stay from henceforth out, or at least one year or

3     so ago.  But whatever the paper set out, I signed it this

4     morning or last night.  I think I signed it this morning.

5          MR. FINGERHOOD:  Well, as the case is stayed, we would

6     then also ask that to the extent intervention is allowed on

7     those three claims, that there not be any discovery or other

8     type of action be taken on the intervenors they have related

9     to those three claims.

10          And, finally, the proposed intervenors have been

11     included in the ongoing status conferences, and that's fine,

12     but we also want to note that the United States retains

13     ultimate discretion to negotiate its claims against the city

14     as they see fit.  And, of course, ultimately those will have

15     to be approved by Your Honor, but we want to make -- just

16     make clear that we still retain that discretion, that given

17     -- should intervention be allowed on those three claims.

18          THE COURT:  Okay.  So to go back over your statements,

19     there are six claims; is that correct?

20          MR. FINGERHOOD:  In the complaint, I think --

21          THE COURT:  I think you said --

22          MR. FINGERHOOD:  Since I looked at it.  But they only

23     seek to intervene as to three claims, and we do not oppose

24     them intervening as to those three claims.  But their

25     intervention papers raise a lot of issues that are, we

1    believe, not related to those three claims, and so to the

2    extent they seek to litigate those or take discovery as to

3    those other matters against the city or against the state or

4    any other parties, the United States, we would oppose going

5    beyond --

6         THE COURT:  Those three claims?

7         MR. FINGERHOOD:  Right.

8         THE COURT:  Okay.  What says the city?

9         MR. WILLIAMSON:  Your Honor, the city does not oppose

10   the --

11        THE COURT:  Pardon me?

12        MR. WILLIAMSON:  I said -- Your Honor, this is Terry

13   Williamson for the City of Jackson.  The city does not

14   oppose the motion to intervene.

15        THE COURT:  Okay.  Then is there anybody here who

16   opposes?

17        I see no hands.  Going, going.  Okay.  Nobody opposes.

18        Well, let me ask then:  You said that you do not oppose

19   the first three claims, but you would oppose if there is any

20   effort to go beyond those three claims; is that correct?

21        MR. FINGERHOOD:  That's correct, Your Honor.

22        THE COURT:  Okay.  Well, let me ask the opposed

23   intervenor:  Is there any intent to go beyond those three?

24        MS. HERNANDEZ:  I think at this point that's a bit

25   speculative, Your Honor, but at this point, we are only

1        wanting to intervene on those three claims.

2            THE COURT:  That's all you want to intervene on?

3            MS. HERNANDEZ:  In our proposed complaint, yes, sir, at

4        this time.

5            THE COURT:  Okay.  Well, doesn't seem like anybody is

6        disagreeing with you, so I'm going to allow you to intervene

7        then on those three claims.  But now, you can't go beyond

8        those three.

9            Is that your understanding, Ms. Hernandez?

10           MS. HERNANDEZ:  My understanding is that if we are

11       provided party status and we would reserve the right to

12       amend a complaint in the future if we see fit, but at this

13       point, we do only want to intervene on those three claims.

14           THE COURT:  Then at this point, I'll allow you to

15       intervene on those three claims, and if there is some intent

16       to seek to expand that intervention, then I will have to

17       take that up.

18           Do you understand that?

19           MS. HERNANDEZ:  I understand, Your Honor.  Thank you.

20           THE COURT:  Okay.  Well, that didn't take long.

21           Anybody else have something else that's short?  We can

22       work.

23           All right.  Well, Nav, look at the list.

24           Okay then.  Well, that takes care all of the businesses

25       that I put down to take care of today.

1        Now, is there anyone who disagrees and there is

2   something else that needs to be taken up?  Anybody?

3        Mr. Henifin, at some point you mentioned that you had

4   made a request for some documents from the city.

5        MR. HENIFIN:  Yes, sir.

6        THE COURT:  And that request now has some whiskers on

7   it and that you made that request some time ago.

8        MR. HENIFIN:  Yes, Your Honor.

9        THE COURT:  Have you received those documents yet?

10       MR. HENIFIN:  Not yet, Your Honor.

11       THE COURT:  What are those documents?

12       MR. HENIFIN:  We need proof of payment invoices and

13   payment for grant -- I mean, for bond-funded projects.

14       THE COURT:  That's right.

15       MR. HENIFIN:  In particular, we're looking at the

16   Siemen's metering contract.  If we can show EPA that's --

17   what is specifically a drinking water eligible project, we

18   can use some of the state resolving loan fund dollars to pay

19   down that debt.

20       Currently, that debt is crushing us from a local cash

21   flow perspective at 1.6 million a month.  If we can get the

22   Siemen's information that EPA is seeking to show that that

23   was a water-related project and we didn't do any sewer

24   projects with that, we should be able to reduce that monthly

25   cost by about $800,000.

1          THE COURT:  Let me turn to the city.

2          Are you aware of any such request?

3          MR. WILLIAMSON:  Yes, Your Honor.  It was our

4     understanding that Mr. Henifin was seeking a text amendment

5     to the authorization for those SRF funds.  And that would

6     have allowed him to, you know, use those SRF funds for water

7     and sewer debt.

8          And so we were hopeful that he would be able to obtain

9     that text amendment so that he could, you know, retire all

10    of the city's water and sewer debt.  We have recently

11    learned from Mr. Henifin that that seemed to probably be

12    unlikely or he was -- it was going to take longer than he

13    had anticipated.

14         And so we are trying to locate those documents if --

15    Your Honor, those documents are from, you know, at this

16    point, eight or nine years ago.  But our finance department

17    is looking through those documents, you know, looking

18    through documents to see if they can locate them.  If they

19    are unable to locate them, we are also -- you know, we had

20    outside counsel involved in the lawsuit against Siemen to

21    recover the city's money that was paid under that contract.

22         I would hope that they would still have copies of those

23    documents if the city does not.  But I'm -- it's just taking

24    awhile, Your Honor, because in the middle -- well, after all

25    of this, the city has converted to a different financial

1   management system so it's very cumbersome to go back and

2   look at things that were done under the old system, but we

3   are working to do that.

4       THE COURT:  How long will it take you to verify whether

5   you can obtain those documents?

6       MR. WILLIAMSON:  I would have to check again with the

7   finance department to get a specific date for that.  I don't

8   know right now.  That's not something that I'm capable of,

9   you know, doing myself.  That's something I'm depending upon

10  our finance department to do.

11      THE COURT:  Would a week be reasonable for me to expect

12  some sort of response?

13      MR. WILLIAMSON:  Yes.  We could provide a response to

14  whether we have located documents or, you know, what

15  additional time might be required to locate documents.  So

16  we can do that in a week, yes, Your Honor.

17      THE COURT:  Okay then.  Report back to me by next --

18  oh, let's see -- I guess next Tuesday by 5:00.  Is that all

19  right?

20      MR. WILLIAMSON:  Yes, Your Honor.

21      THE COURT:  Okay then.  I'll expect your report by

22  then.

23      Mr. Henifin, we'll see what we have, all right?

24      MR. HENIFIN:  Thank you, Your Honor.

25      THE COURT:  All right.  Thank you so much.

 1          Is there anything else from anyone?

 2          MS. HERNANDEZ:  Your Honor, I do have a question.

 3          THE COURT:  Yes?

 4          MS. HERNANDEZ:  Will you be issuing a written order

 5     granting intervention?

 6          THE COURT:  Pardon me?

 7          MR. HENIFIN:  Will you be issuing a written order

 8     granting the intervention, the motion to intervene?

 9          THE COURT:  You want to send me a proposed order?

10          MS. HERNANDEZ:  Yes.  I believe we did, but we can

11     resend.

12          THE COURT:  Okay then.  Then just send me a proposed

13     order.  How long would it take you to get it, to prepare it?

14          MS. HERNANDEZ:  Today.

15          THE COURT:  Pardon?

16          MS. HERNANDEZ:  Today.

17          THE COURT:  Okay.  Let's make it tomorrow by noon,

18     okay?

19          MS. HERNANDEZ:  Yes, sir.

20          THE COURT:  Because it's already 3:42.

21          You have another question?

22          MS. HERNANDEZ:  No, that's all.  Thank you, Your Honor.

23          THE COURT:  Okay.

24          Yes?

25          MR. FINGERHOOD:  Your Honor, one brief clarification.

1    I think Mr. Henifin said that it was EPA that would make the

2    determination.  I'm not sure that's necessarily the case.  I

3    think it may be the state that would make the call about the

4    SRF, you know, what would be eligible.

5        But, anyway, I think we are all working (crosstalk) --

6    right.  We are all doing it cooperatively.  There is a

7    dialogue ongoing between the state EPA and Mr. Henifin and

8    the city has been looking for those documents.

9        THE COURT:  Okay.  With that correction, we are

10   still -- okay.  Anybody else on anything?

11       All right.  Thank you all very much.  I'm closing out.

12   Have a good day.

13              (Court adjourned at 3:44 p.m.)

14   **************************************************************

1             **COURT REPORTER'S CERTIFICATE**

2

3        I, Caroline Morgan, Official Court Reporter for the

4  United States District Court for the Southern District of

5  Mississippi, do hereby certify that the above and foregoing

6  pages contain a full, true, and correct transcript of the

7  proceedings had in the forenamed case at the time and place

8  indicated, which proceedings were stenographically reported by

9  me to the best of my skill and ability.

10        I further certify that the transcript fees and format

11  comply with those prescribed by the Court and Judicial

12  Conference of the United States.

13        THIS, the 18th day of July, 2024.

14

15                /s/ Caroline Morgan, CCR

16                Caroline Morgan CCR #1957
                        Official Court Reporter

17                United States District Court
                        Caroline_Morgan@mssd.uscourts.gov

18

19

20

21

22

23

24

25