```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                       NORTHERN DIVISION

 3

 4   UNITED STATES OF AMERICA, ET AL.              PLAINTIFFS

 5   VERSUS                    CIVIL ACTION NO. 3:12-CV-790-HTW-LGI

 6   THE CITY OF JACKSON, MISSISSIPPI, ET AL.       DEFENDANTS

 7

 8
                         STATUS CONFERENCE
 9            BEFORE THE HONORABLE HENRY T. WINGATE,
              UNITED STATES DISTRICT COURT JUDGE,
10                     OCTOBER 10, 2024
                     JACKSON, MISSISSIPPI
11

12

13

14
                    (APPEARANCES NOTED HEREIN.)
15

16

17

18

19

20

21
     REPORTED BY:
22
         CAROLINE MORGAN, CCR #1957
23       OFFICIAL COURT REPORTER
         501 E. Court Street, Suite 2.500
24       Jackson, Mississippi  39201
         Telephone:  (601)608-4188
25       E-mail:  Caroline_Morgan@mssd.uscourts.gov
```

```
1   FOR THE PLAINTIFF, UNITED STATES OF AMERICA:

2           KARL J. FINGERHOOD, ESQUIRE
            U.S. DEPARTMENT OF JUSTICE
3           ENVIRONMENTAL ENFORCEMENT SECTION
            POST OFFICE BOX 7611
4           WASHINGTON, DC 20044

5           ANGELA GIVENS WILLIAMS, ESQUIRE
            MITZI DEASE PAIGE, ESQUIRE
6           U.S. ATTORNEY'S OFFICE
            501 EAST COURT STREET, STE. 4.430
7           JACKSON, MISSISSIPPI 39201

8   FOR THE PLAINTIFF, STATE OF MISSISSIPPI:

9           ROY FURRH, ESQUIRE
            DAVID L. CAMPBELL, ESQUIRE
10          MS DEPARTMENT OF ENVIRONMENTAL QUALITY
            515 EAST AMITE STREET
11          JACKSON, MISSISSIPPI 39201

12
    FOR THE DEFENDANT, CITY OF JACKSON:
13
            TERRELL S. WILLIAMSON, ESQUIRE
14          DREW MARTIN, ESQUIRE
            SHERIDAN CARR, ESQUIRE
15          OFFICE OF THE CITY ATTORNEY
            455 EAST CAPITOL STREET
16          JACKSON, MISSISSIPPI 39201

17  FOR THE DEFENDANT, JXN WATER:

18          CHARLES MITCHELL MCGUFFEY, ESQUIRE
            MALISSA WILSON, ESQUIRE
19          FORMAN, WATKINS & KRUTZ, LLP
            POST OFFICE BOX 22608
20          JACKSON, MISSISSIPPI 39225-2608

21          FRANK PAUL CALAMITA, ESQUIRE
            AQUALAW, PLC
22          6 S.5TH STREET
            RICHMOND, VIRGINIA 23219
23

24

25
```

```
 1   FOR THE INTERVENOR PLAINTIFF:

 2           MIKAILA HERNANDEZ, ESQUIRE
             THE CENTER FOR CONSTITUTIONAL RIGHTS
 3           666 BROADWAY AVENUE, FLOOR 7
             NEW YORK, NEW YORK 10012
 4
             AYANNA DENISE HILL, ESQUIRE
 5           ACLU OF MISSISSIPPI - JACKSON
             P.O. BOX 2242
 6           JACKSON, MS 39225

 7           LORI SHERMAN, ESQUIRE
             FORWARD JUSTICE
 8           ONE COPLEY PARKWAY, SUITE 302
             MORRISVILLE, NC 27560
 9

10   ALSO PRESENT:

11   TED HENIFIN, THIRD-PARTY MANAGER
     A.J. JOHNSON, ESQUIRE (VIA ZOOM)
12   SUSAN RICHARDSON, ESQUIRE (VIA ZOOM)
     SUZANNE ARMOR, ESQUIRE (VIA ZOOM)
13   JIM VINCH, ESQUIRE(VIA ZOOM)
     SUZANNE RUBINI, ESQUIRE (VIA ZOOM)
14   MICHELLE WETHERINGTON, ESQUIRE (VIA ZOOM)
     MICHAEL CRESWELL, ESQUIRE (VIA ZOOM)
15   GABE ALLEN, ESQUIRE (VIA ZOOM)
     EMILY C.R. EARLY, ESQUIRE (VIA ZOOM)
16

17

18

19

20

21

22

23

24

25
```

1              **IN OPEN COURT, OCTOBER 10, 2024**

2

3          THE COURT:  Terri, call the case, please.

4          THE COURTROOM DEPUTY:  Your Honor, this is United

5     States of America versus the City of Jackson, Civil Action

6     Number 3:12-cv-790-HTW-LGI, as well as related case, Civil

7     Action Number 3:22-cv-686-HTW-LGI.  We are here this

8     afternoon for a status conference.

9          And at this time I'm going to ask the parties to state

10    their names for the record starting with the plaintiff.

11         MR. FINGERHOOD:  Good afternoon, Your Honor.

12         THE COURT:  Good afternoon.

13         MR. FINGERHOOD:  Good afternoon, Your Honor.  Karl

14    Fingerhood, U.S. Department of Justice.

15         THE COURT:  All right.  Good to see you again.

16         MR. FINGERHOOD:  Good to see you, Your Honor.

17         MS. WILLIAMS:  Good afternoon, Your Honor.  Angela

18    Williams for the United States.

19         THE COURT:  All right.

20         MS. PAIGE:  Good afternoon, Your Honor.  Mitzi Dease

21    Paige, also for the United States.

22         THE COURT:  Okay, then.

23         MR. FURRH:  Good afternoon, Your Honor.  Roy Furrh with

24    the Mississippi Department of Environmental Quality.

25         THE COURT:  All right.

```
 1          MR. CAMPBELL:  David Campbell with the Mississippi

 2   Department of Environmental Quality.

 3          THE COURT:  Thank you.

 4          All right.  Let's go to the defense first, and then I

 5   come back to the intervenors.  Okay?

 6          MR. MARTIN:  Judge, Drew Martin, city attorney for

 7   Jackson.

 8          THE COURT:  All right.  Good.

 9          MS. CARR:  Sheridan Carr, special assistant to the city

10   attorney, City of Jackson.

11          THE COURT:  Okay.

12          MR. WILLIAMSON:  Terrell Williamson, City of Jackson.

13          THE COURT:  Good.  Glad to see you again.  Thank you.

14          Next.  Good afternoon.

15          MS. SHERMAN:  My name is Lori Sherman with Forward

16   Justice, and I'm here on behalf of the plaintiff

17   intervenors, and I have two of my colleagues with me.

18          THE COURT:  Okay.  Can you just state their names?

19          MS. HILL:  Good afternoon, Your Honor.  Ayanna Hill

20   with the ACLU representing the intervenor plaintiffs.

21          THE COURT:  Thank you.

22          MS. HERNANDEZ:  Good afternoon, Your Honor.  Mikaila

23   Hernandez with the Center for Constitutional Rights for

24   plaintiff intervenors.

25          THE COURT:  You want to spell your name?
```

```
 1          MS. HERNANDEZ:  Mikaila, M-I-K-A-I-L-A, Hernandez,

 2     H-E-R-N-A-N-D-E-Z.

 3          THE COURT:  All right.  Thank you.

 4          MS. HERNANDEZ:  And we also have someone online as

 5     well.

 6          THE COURT:  All right.  Thank you so much.

 7          And would the person online who corresponds with her,

 8     would that person identify that person?

 9          MS. EARLY:  Yes.  Good morning, Your Honor.  Yes.

10     Uh-oh.  I froze.  I'm sorry.  My name is Emily Early with

11     the --

12          THE COURT:  All right, Ms. Early.  Go ahead.

13          MS. EARLY:  -- Center for Constitutional Rights and

14     also plaintiffs intervenors.

15          THE COURT:  Okay.  Thank you.

16          Now let's go to defense over here, and then I'll come

17     back to the remaining parties.

18          MR. HENIFIN:  Ted Henifin, interim third-party manager.

19          THE COURT:  All right.  Thank you.

20          MS. WILSON:  Good afternoon, Your Honor.  Malissa

21     Wilson, counsel for the interim third-party mgr, here with

22     counsel Paul Calamita and Mitch McGuffey.

23          THE COURT:  All right.  Gentlemen, good afternoon.

24     Thank you.  All right.

25          Now, do I have anybody else?  Okay.  So have all the
```

 1    introductions been completed?  Apparently so.

 2        MR. ALLEN:  Your Honor, there are some folks online.

 3    Would you like to identify ourselves?

 4        THE COURT:  Well, why don't you.

 5        MR. ALLEN:  Good afternoon, Your Honor.  My name is

 6    Gabe Allen from the U.S. Department of Justice for the

 7    United States.

 8        THE COURT:  Okay.  Next?

 9        MR. JOHNSON:  Good afternoon, Your Honor.  My name is

10    A.J. Johnson.  I'm here for the interim third-party manager.

11        THE COURT:  Okay.  Thank you, Mr. Johnson.

12        Next?

13        MS. RICHARDSON:  Susan Richardson for Patrick Townsend.

14    I'm here for the City of Jackson.

15        THE COURT:  Okay.  Ms. Richardson.

16        Next?

17        MS. ARMOR:  Good afternoon, Your Honor.  Suzanne Armor

18    with the United States Environmental Protection Agency.

19        THE COURT:  Okay.  Good afternoon.

20        Next?

21        MR. VINCH:  Good afternoon.  I'm Jim Vinch.  I'm an

22    attorney with the USEPA in Washington, DC.

23        THE COURT:  Okay.  Thank you so much.

24        Next?

25        MS. RUBINI:  Good afternoon.  My name is Suzanne

```
 1    Rubini.  I'm with the USEPA Region 4.
 2         THE COURT:  Say that again now?
 3         MS. RUBINI:  Suzanne Rubini with USEPA Region 4.
 4         THE COURT:  All right.  Thank you so much.
 5    Next?
 6         MS. WETHERINGTON:  Good afternoon.  Michelle
 7    Wetherington, USEPA Region 4.
 8         THE COURT:  Thank you.
 9    Next?
10         MR. CRESWELL:  Good afternoon, Your Honor.  I'm Michael
11    Creswell, USEPA Region 4.
12         THE COURT:  All right.  Thank you.
13         Anybody else?
14         All right.  Apparently not.  All right.  So, then, we
15    are prepared to begin this status conference, and the intent
16    of these proceedings is just what I stated.  It's a status
17    conference.  And so this status conference will allow
18    Mr. Henifin to give us an update, and then I would like to
19    converse with some of my governmental people over here to my
20    right to see what they are up to and what they have to say
21    about this status conference, as well as what they have been
22    doing.
23         So, Mr. Henifin, are you ready to proceed?
24         MR. HENIFIN:  I am, Your Honor.
25         THE COURT:  And, Mr. Henifin, I would like for you to
```

1    provide as much detail as you wish on these various matters

2    that you will be apprising us on.  So take your time.

3         MR. HENIFIN:  Thank you, Your Honor.

4         THE COURT:  I might have some questions during your

5    presentation to sharpen some of the edges, because I might

6    want to bring out some other points, but in the meantime,

7    take as much time as you want.  And if you would, when you

8    switch categories, could you tell us the headings for those

9    various categories?

10        MR. HENIFIN:  Yes, Your Honor.

11        THE COURT:  All right.  Now go ahead.

12        MR. HENIFIN:  Certainly.  And so I'll start with a

13   general category.  A year ago, just about exactly a year

14   ago, you signed the order for the sewer system, and we are

15   celebrating that one-year anniversary, so we will talk a

16   little about that.  But I think in general, we are really

17   doing well in many areas, and I'll start with sewer.  And I

18   appreciate the opportunity to update folks.

19        We also just ended a quarter, and we are preparing our

20   quarterly update, which will be due at the end of this

21   month, so I don't have all of that information in front of

22   me, so this status conference is kind of interim highlights

23   of what will be in the quarterly report that will be due at

24   the end of the month, and you can look forward to seeing

25   that sometime around Halloween.  I don't think it will be a

1    trick; should be a treat.

2         With that, we will continue sewer issues.  The order

3    contained a number of priority projects, and I would say the

4    critical one were the 215 emergency sewer failures that were

5    listed by address in the order.  I stood before you a year

6    ago and estimated as you tried to pin me down on how long it

7    would take to get those done at two to three years.  I'm

8    happy to report to the Court today that all of those have

9    been resolved one year after the order was signed.  So those

10   were -- if you recall, that was raw sewage that was coming

11   out on the streets and private property and public property

12   throughout the city, something that just isn't normal in any

13   U.S. city.  You know, you might have a few of those going on

14   at any given time and awaiting repair, but the fact that we

15   had 215 listed in the order and there were actually others

16   we found along the way that were putting sewage in the

17   streets of Jackson on a daily basis and had been doing so

18   for years was just unheard of.

19        So we have taken the opportunity to go out and

20   repair -- most of those required repairing pipes underground

21   that had collapsed.  We did all of this without the benefit

22   of any federal resources.  You recall that all of the money

23   that has come to Jackson has been for the drinking water

24   system.  We used local dollars to fund the work that was

25   required, and largely it was individual repairs at each of

1    those 215 locations that made that happen.

2        THE COURT:  Now, Mr. Henifin, I want you to emphasize

3    two points.  One is the raw sewage that was spewing from the

4    ground.  Would you describe that?

5        MR. HENIFIN:  So that is exactly what it is.  It is

6    untreated sewage.  It is nasty and smelly and shouldn't

7    be -- it is a public health hazard.  The City was required

8    to put signs up next to these locations as part of their

9    consent decree obligations, but they continued to flow for

10    months and months and years and years.  There were many, one

11    of which you witnessed during our tour, but there were

12    several in neighborhoods where it just -- and it was across

13    the city.  It wasn't isolated to any particular

14    socioeconomic neighborhood.  There were nice neighborhoods,

15    they were challenged neighborhoods, and everyone was sharing

16    equally in this really public health hazard and just quality

17    of life.  Just it made your neighborhood a much worse to be

18    with sewage flowing.

19        THE COURT:  Well, just to put more illustration on your

20    comments, I will add how horrific those incidents were to

21    have raw sewage that normally would be flushed down a toilet

22    popping out of the ground in locations all over the city,

23    attended with their horrible odors and with the public

24    feeling helpless about the matter.  So these sewage

25    eruptions were occurring all over the city, and there were

1    multiple.

2        How many would you say there were again?

3        MR. HENIFIN:  There were 215 listed in the order.  We

4    think the total that we repaired was closer to 300.

5        THE COURT:  300 eruptions.  You know, the one that I

6    visited at first was out on Northside Drive, and it was less

7    than 50 yards, would you say, or 25 yards from the nursing

8    home?

9        MR. HENIFIN:  Yes, Your Honor.

10       THE COURT:  And the sewage was coming directly out of

11    the ground, just spewing, just like a little geyser coming

12    out of the ground, raw sewage, fit only for a commode.  But

13    it was coming out of the ground.  It had been there.  There

14    were no warning signs around it.  There was no indication to

15    the public it was there other than the horrible smell that

16    was being generated.  But there were no signs up warning the

17    public or advising the public of what was happening out

18    there.  Nor were there any signs that a sign had ever been

19    up.

20       In fact, that situation had been recurrent and had

21    lasted for quite a while until I took over the sewage

22    matter, and then we started designating the areas in

23    priority which had to be dealt with.

24       Now, Mr. Henifin, I don't want to get ahead of your

25    presentation, but when you started working on the sewage

1    project, you didn't address immediately -- all of these

2    outdoor eruptions immediately because you first had to deal

3    with the sewage eruptions inside the homes.

4        MR. HENIFIN:  They were kind of related, Your Honor.

5    Those only typically happen during rainy weather, but we

6    have been addressing those at the same time.

7        THE COURT:  But when you first started, you had to deal

8    with the sewage eruptions inside the various homes, and

9    at -- and when those occurred, when the raw sewage invaded

10   the homes around Jackson, how would you describe those as to

11   how thick the sewage was or how prevalent it was?

12       MR. HENIFIN:  It wasn't -- it is not terribly prevalent

13   in homes, but when it happens in someone's home, obviously

14   it's a huge disruption and expensive cleanup.  And it will

15   continue to happen during rainy weather even with our

16   operation of the sewer until we can find all the sources of

17   rainwater that get into the system, but we have minimized

18   that in many cases and continue to try to focus on

19   preventing it.

20       THE COURT:  So then when you undertook this project of

21   adding this sewage to the water matter, then you had to

22   address this sewage matter immediately because it was a

23   health hazard.

24       MR. HENIFIN:  Yes, Your Honor.

25       THE COURT:  Now, so then as you had a few moments ago,

1    you had hundreds of such incidents around the city of

2    Jackson.

3         You mentioned something about signs to warn.  I never

4    saw any signs.

5         MR. HENIFIN:  There actually were a number that were in

6    place.

7         THE COURT:  Where were they?

8         MR. HENIFIN:  There were signs basically warning the

9    public that raw sewage was a health hazard, to avoid it,

10   that there was going to be work to fix it at some point.

11   And going back to the one that you saw originally, we did

12   find the sign later on a barricade overtop of a storm hold

13   because they were concerned someone might fall into the

14   storm -- manhole, and so they moved the sign barricade over

15   to that even though it was originally intended to be on the

16   sewer.  So in defense, the system -- they were trying to put

17   signs up where they could, and I think in many cases the

18   signs were there.

19        THE COURT:  I didn't see them.

20        MR. HENIFIN:  Yes, Your Honor.

21        THE COURT:  Okay.  Now, continue on.

22        MR. HENIFIN:  The other large item in the order as a

23   priority project was to address the 2200 unaddressed service

24   requests.  These are things people had called the City to

25   have -- report a sewer issue, and no one had actually gone

1    out and looked at any of those 2200 different locations.  So

2    when the order was signed and we took responsibility for the

3    sewer system, we started investigating those 2200, meaning

4    we had to go to them, figure out what the issue was, is it

5    active, is it still a problem?

6        I'm happy to report that we are down to under 200 of

7    those left after one year.  So in one year, we have done

8    over 2,000 of those unaddressed service requests.  So we

9    should have the rest of them finished by the end of November

10   barring any other changes that we have going along.  So

11   definitely by the end of year.  Our goal is to have them

12   done by the end of November.  And that -- in many cases,

13   there was nothing left to do.  In other cases, there was a

14   repair needed to be made.  But of the 2200 that were

15   reported, again, we have seen and visited over 2,000 of

16   those in this first year.

17       Treatment plant compliance has significantly improved.

18   So our treatment plants, we have got three, and one in

19   particular is the large one that handles most of the

20   wastewater treatment in Jackson, which is the Savanna Street

21   plant on the Pearl River.  That has had traditional problems

22   with bypasses, prohibited bypasses, and permit exceedances,

23   and we have eliminated those sig- -- or reduced those

24   significantly and over the last several months haven't had

25   any prohibited bypasses or permit exceedances.  A lot of

1    that is due to the contract operator and maybe the way they

2    were operating the plant.  We have been helping them

3    understand the better ways to operate the plant and how to

4    get more capacity through the plant, and that is proving to

5    be very significant improvements.  We still have a lot of

6    investment that needs to be made at the Savanna Street

7    plant, capital investment.  We have identified about 36

8    million in what I call critical needs.  We haven't

9    identified a funding source yet.  And by the end of the

10   year, we owe that plan to the plaintiffs, and we will have

11   that submitted to the parties by the end of December, a

12   detailed plan of how we will accomplish those.

13       THE COURT:  Let me say just something else --

14       MR. HENIFIN:  Sure.

15       THE COURT:  -- I just thought about.  On this matter of

16   signs, I wasn't talking about JXN Water or sewage company

17   that you are now directing not putting the signs up.  I know

18   you're supposed to put some up now, but before that, it was

19   the City's responsibility to put the sign up, wasn't it?

20       MR. HENIFIN:  Yeah.  And they were -- the City had put

21   many of those up.  That's what I -- not that I like to

22   defend the City for a lot of things, but they were getting

23   the signs up on these overflows.

24       THE COURT:  But as I said before, I didn't see them.

25       MR. HENIFIN:  Yeah.  The one that we visited, you

1    definitely didn't see.  And there were overflows that the

2    signs might have been knocked over.  They had been up for a

3    long time.  But there were many signs in the system.

4        THE COURT:  Well, but going back to this -- this

5    situation, was there work being done by the City on those

6    matters?

7        MR. HENIFIN:  No.  Most of those just signs were put

8    up.  So the difference is we don't have to put signs up now

9    because we don't have dry weather chronic overflows.

10       THE COURT:  Well I ask that because I took it upon

11   myself just to ride around Jackson because I have to come to

12   work.

13       MR. HENIFIN:  There were little yard signs.  You might

14   have missed it, potentially.  I'm not doubting that you

15   didn't see them, Your Honor.  There were 215 locations.  I

16   didn't visit them all, and I know there weren't signs at

17   every one I visited, but what I'm saying is there were a

18   number of places that I did see signs that were posted.

19   They look like the little real estate signs, you know, about

20   this big.

21       THE COURT:  You also might remember that from time to

22   time I called to tell you when homeowners were complaining

23   that nothing had been done on their property, either in

24   their yards or in their homes, but that was on the City's

25   watch.

1          MR. HENIFIN:  Yes, Your Honor.

2          THE COURT:  That is before I took over this matter

3     concerning the sewage.

4          MR. HENIFIN:  Yes, Your Honor.

5          THE COURT:  And I'd call and I would tell you how

6     people were calling disturbed, that people who said they had

7     to move out of their houses because of the stench and

8     because of the raw sewage there on their floors and how they

9     had to vacate their houses and all, and also their

10    complaints that they were calling the City's alleged hotline

11    but couldn't get anybody.  That was a prevalent complaint

12    that they were calling and couldn't get anybody, which is

13    what led JXN Water to put up -- or to -- to establish its

14    own telephone hotline on these matters.

15         MR. HENIFIN:  Yes, Your Honor.

16         THE COURT:  Because so many citizens were calling and

17    could not get anybody on the telephone.  Well, I just want

18    to make sure that I cleared for any listener my comments,

19    because the comments I made about the signs were not

20    directed at a criticism of you and your crew.  This is

21    something that was supposed to have been done by the City,

22    which had not been done, as far as I can see.

23         MR. HENIFIN:  Yes, Your Honor.

24         THE COURT:  So, now, go ahead and finish your report.

25         MR. HENIFIN:  Sure.  And when you signed the order on

1    sewer about a year ago, if you recall, there was a 30-day

2    public comment period prior to that with about -- over 95

3    percent of the public comments supporting this move to move

4    sewer under the control of the interim third-party manager,

5    so, again, a lot of public support for making this happen.

6    I believe we have delivered by eliminating these chronic

7    sewer problems where the sewer was flowing in the streets.

8        We are responsive.  Not -- you know, we still hear some

9    challenges getting through to our call center, and we've

10   tried to investigate all those and figure out what's going

11   on, but for the most part, we have been very responsive,

12   hearing a lot of positive comments continue from citizenry

13   on what we have accomplished to date in the sewer system,

14   and, again, we are looking forward to even bigger and better

15   things over the next year.

16       I'm going to move now to drinking water, Your Honor.

17   So as of February, and I think I reported this in the last

18   status conference, the system is really operating as

19   designed, meaning we can operate at a little bit lower

20   pressure coming out of the plant.  At night, when folks

21   aren't using water, the elevated storage tanks fill, and

22   during the day when people are, that water is put back into

23   the system and helps keep the pressure equal through the

24   system without having to crank up pumps at the plant on an

25   off-and-on basis.

```
 1              Prior to this, prior to the JXN Water work and even
 2      early in our work, the only place you could measure pressure
 3      in the system was at the actual treatment plants as we
 4      pushed water out, and the only feedback we got was the
 5      elevation in the tanks, and it all didn't make a lot of
 6      sense most of the time.  So we were constantly turning pumps
 7      on and off, which we were contributing to our own problem of
 8      breaking lines.  As you turn a large pump on and turn a
 9      small pump off, there is hammer or pressure that goes
10      through the system and actually stresses the pipes at a
11      higher pressure than they would normally see, and the more
12      frequently you do that, the more you loosen up joints.  You
13      cause weak spots in pipes to break, so we were kind of
14      causing our own problem on a lot of the pipe breaks we were
15      dealing with, and the system had been doing that for years.
16              You can imagine you are running a -- and these are big
17      pumps.  We are talking a pump that moves 8 million gallons
18      of water a day and you switch to a pump that moves
19      32 million gallons a day, you can imagine the pressure and
20      the volume changes pretty instantaneously when you do that.
21      There is not a soft start, which you have in modern
22      treatment plants, no variable frequency starts, so these
23      were instantaneous, just go from one smaller pump to a giant
24      pump to get the pressure back up and get the volume you need
25      in the system as we were losing so much water.
```

1          Again, since February or so, we have seen the system

2     respond much more so like it was designed to operate, and we

3     can attribute almost all of that to opening valves.  We have

4     found hundreds of valves in the closed position, many of

5     them in big transmission mains.  We also found several in

6     the open position that needed to be closed where they were

7     isolating the system from -- we have got a groundwater

8     system and a surface water system, and those weren't

9     isolated.  So as we have made those changes, got the system

10    valved correctly --

11          THE COURT REPORTER:  Slow down, please.

12          MR. HENIFIN:  Sorry.  I'm getting excited.  I'm talking

13    about technical valves and water.

14          So as we were able to isolate the system, get the

15    valves open in the correct positions throughout the system.

16    It now can move water the way it was designed to, and that

17    has been wonderful for the water system, made our jobs

18    easier now as we have moved forward.  We are not seeing

19    anywhere the number of breaks that we had to repair to start

20    with, and we have backed down on the number of crews that

21    have to be out on a daily basis, and we are starting to get

22    into a rhythm, a maintenance rhythm, along the distribution

23    system.

24          That has also resulted in a significant decrease in the

25    amount of water lost.  So as we started this, water loss had

1    been estimated at various numbers, and in real numbers, or

2    as close as we can estimate, we were putting out about 50 to

3    55 million gallons of water a day, meaning what we measured

4    that went out of the two treatment plants combined was

5    somewhere in that 50 to 55 million gallons a day range.

6         What our consumers need, what our customers need, is

7    about 18 million gallons a day.  And we now have accurate

8    enough meters on enough meters in the ground to verify that.

9    I had estimated it early on as 15 million gallons.  The

10   meter information we have now says we need about 18 million

11   gallons a day to serve our customers.  We are putting 55

12   into the system.  We need 18 -- say round to 20, because my

13   math is easier if we do it that way.  We are losing about

14   35 million gallons a day when we started.  That is a

15   significant amount of water loss when you only need 18 to

16   meet the demand.

17        So we have been looking for big leaks and small leaks

18   and leaks everywhere in the system, and as of August, the

19   amount of water we had to put in the system was 25 percent

20   less than it was a year ago in August.  So we only have to

21   put in 40 million gallons a day today as opposed to

22   55 million gallons a day.  Still, significantly more than

23   the 18 we need to serve our customers.

24        We are still on the hunt for water leaks.  We think

25   most of these now are leaks subsurface, so it's water that

```
 1    is not reaching the surface; it is moving from a broken
 2    waterline underground to an opening in a storm drain or a
 3    sewer line underground, never making it to the surface.
 4    Much harder to detect.  And we are deploying new
 5    technologies to try to figure out where those might be to
 6    dig up and look.  In fact, we have got four different
 7    contractors that say their technology can do that for us.
 8    We have put them, at different times, in the same locations
 9    to give us the pinpoint location where they say we need to
10    dig down to find the leak.  We haven't finished this yet, so
11    we don't know who the winner is, because they won't be there
12    when we start digging, and we will dig down in the locations
13    that each of these four technology companies claim to be
14    able to locate leaks and see who is actually accurate.
15    Assuming one or two of them are, we will continue to use
16    them over the next year to try to find more of these
17    subsurface leaks throughout the system.
18         Unfortunately, if none of them are accurate, we are
19    back to square zero in trying to find a technology to help
20    us find these unknown leaks.  But our goal is to continue to
21    look for these large leaks, small leaks, whatever is
22    contributing to this lost water that now is somewhere in the
23    18 to 20 million gallons a day range and bring that --
24    continue to bring that down over the next several years,
25    ideally to the point where we only need somewhere around
```

1    30 million gallons a day.  Still significantly more than our

2    customers use.  We get to that point, we can supply all of

3    the City's water demands from just the O.B. Curtis plant and

4    we will be able to close the J.H. Fuel plant, which will

5    save millions of dollars in annual operating costs, which

6    would be great for us going forward to reinvest in the

7    system as opposed to having to operate a second plant just

8    to put the water out into the community that doesn't get to

9    anybody.

10        So, again, goal is all water production happens at the

11   O.B. Curtis plant, ideally within the next few years, but we

12   have to get the water demand, get rid of the losses down

13   below 30 million gallons a day to be able to comfortably do

14   that.

15        The capacity of O.B. Curtis is 50 million gallons a

16   day.  It will peak up at times, so we need to make sure we

17   have enough reserve capacity, and that is why we wouldn't

18   start making that decision to close the J.H. Fuel plant

19   until we get to the 30 million gallon-a-day range.  When we

20   start getting below that, we will still have plenty of

21   capacity to produce all the water we need at the O.B. Curtis

22   plant.

23        So that is our future.  We are working hard to get

24   there, but a lot of water to still find to make that happen.

25        THE COURT:  Now, I have raised this question before,

1    and you diligently have been seeking an answer to this

2    question, so you know what question it is.

3        MR. HENIFIN:  I think so.

4        THE COURT:  Because I asked this question the first

5    time I became acquainted with the system and recognized this

6    water loss, and I wanted to have a quantification in terms

7    of dollars, how much does that mean in dollar loss to us, to

8    the citizenry, how much money is going into the ground or

9    wherever that water loss is taking us, and that's a

10   complicated question, I understand; is that correct?

11       MR. HENIFIN:  I keep telling you that because I haven't

12   been able to produce you an answer yet.  Yes, Your Honor.

13       THE COURT:  I know it.  And you said that.  And I asked

14   the question because I was trying to get a report that would

15   mean even more to the citizenry to know in terms of dollars

16   -- how much in terms of dollars does this water loss cost

17   when it is not making it to the homes after it has been

18   processed.  Now, we are talking about processed water,

19   aren't we?

20       MR. HENIFIN:  Yes, Your Honor.  Fully treated drinking

21   water.

22       THE COURT:  So we are talking about water that has been

23   drawn into the plant to be processed with various chemicals

24   with the human labor and also with the chemical labor to

25   change that water from non-drinkable water, nonconsumable

1    water, to consumable water to go to the households.  And if

2    we put this on a basis of 100 percent of what is being drawn

3    from these sources to be tempered and cleansed so that it is

4    fit for human consumption and also fit for human use, such

5    as bathing, dishwashings, *et cetera*, but to go to domestic

6    households, and we are losing such a huge amount of that

7    hundred percent that comes out that never makes it there, it

8    is waylaid somewhere in between the plant and to the homes,

9    and, again, tell the audience and anyone who reads the

10   record how much of that 100 percent does not make it.

11        MR. HENIFIN:  Currently about 50 percent of that

12   100 percent doesn't make it.

13        THE COURT:  50 percent of that purified water does not

14   make it to the households.  Instead, it's lost in transit.

15   Now, when we went out to look at Atkins Boulevard, I think

16   it was -- is that the name of the street?

17        MR. HENIFIN:  Yeah.  Colonial -- where the Colonial

18   Golf Course was, in that area.

19        THE COURT:  Right.  Now, out there when we first looked

20   at it, remember there was something like 5 million gallons

21   of water that was being lost every day just in that one

22   location.  And now we are talking about more than one

23   location, but 5 million gallons were being lost.  And

24   remember the disturbance was -- was manifest when one asked

25   how long that had been going on.  We had different estimates

1    as to how long that particular incident had been occurring,

2    5 million gallons of processed water being lost every day of

3    the week.  And we had different estimates on how long it had

4    been occurring; is that correct?

5        MR. HENIFIN:  Yes, Your Honor.

6        THE COURT:  So did we ever nail down how long that had

7    been?  Because, remember, at one time we were told it had

8    been going on not for a week or a month but had been going

9    on for seven years.

10       MR. HENIFIN:  We don't have an exact date.  We were

11   never able to nail that down, but from all anecdotal

12   evidence, it was several years at least.

13       THE COURT:  Several years.  And I remember when I went

14   out there, the fear was that it had been going on for seven

15   years.  Now, that is some huge mathematics involved.  That

16   is 365 days times seven, and then multiply that 5 million

17   gallons of lost processed water per day and what that comes

18   to, and then as a result of that, I first asked my questions

19   in terms of dollars:  What does that mean for all of that

20   processing and all of that loss of 5 million gallons?  And

21   that was just in one spot at the time.

22       MR. HENIFIN:  We have probably found two more that size

23   and repaired them since then.  But --

24       THE COURT:  But I don't know if the public recognizes

25   that after you were shown all that, you and your crew

1    repaired all that in what kind of time frame?

2         MR. HENIFIN:  The water leaks have been repaired over

3    the period of a little -- about 22 months.

4         THE COURT:  And so that has been repaired.

5         MR. HENIFIN:  That one was repaired within months after

6    we found it.

7         THE COURT:  Okay.  So that was repaired in 22 months.

8         MR. HENIFIN:  That particular leak was repaired within

9    three months of us finding it.

10        THE COURT:  Within three months, but yet we were told

11   that this leak had been ongoing for years.  And so you and

12   your crew got out there and dug the necessary entrenchments,

13   located the pipe.  How big was that pipe?  36?  What was it?

14        MR. HENIFIN:  42-inch.

15        THE COURT:  42.  And located the pipe that was ruptured

16   that was causing this huge, huge leak, and it produced a

17   lake, did it not?

18        MR. HENIFIN:  Small lake and a big waterfall.

19        THE COURT:  The waterfall was pretty, though, wasn't

20   it?

21        MR. HENIFIN:  It was down to the creek.  It came up in

22   the little lake and then rolled over the side and went down

23   into Purple Creek.

24        THE COURT:  And it was a lake, wasn't it?

25        MR. HENIFIN:  Yes, Your Honor.

1    THE COURT:  In fact, you all rode out there one time,

2  at least your crew did, because you wanted to know how deep

3  the lake was.  Remember that?

4    MR. HENIFIN:  Couldn't reach the bottom of it.

5    THE COURT:  Yeah.  At first, you couldn't.  But you

6  finally recognized how deep the lake was that was purely a

7  manmade lake from this water loss, and you took out there

8  with you on the boat, what, something that was about -- the

9  pole was 36 inches, I think -- I mean 36 --

10    MR. HENIFIN:  35 feet long.

11    THE COURT:  35 feet long.  And that first one -- that

12  first foray didn't reach the bottom.  And so then you had to

13  take another pole out there to see how deep that lake was.

14  And so how long was that particular pole?

15    MR. HENIFIN:  Well, the first one was probably, like,

16  20 feet, but it was right at 35 feet to get to the bottom.

17    THE COURT:  So you got to the bottom.  And how deep was

18  that lake?

19    MR. HENIFIN:  35, 36 feet.

20    THE COURT:  35 feet.  Okay.  And that wasn't the only

21  one.

22    MR. HENIFIN:  We haven't found any quite like -- that

23  deep, but we found plenty that were leaking lots of water,

24  so about the same volume, just creating really pretty

25  wetlands in various parts of the city.

1    THE COURT:  So now with that as a backdrop, that

2    particular -- that particular place with its peculiar

3    problem -- I would like to say peculiar, but there were some

4    -- some that was close to it, but that particular situation

5    was evident to the naked eye.  If anyone had walked over

6    there, then the person would have seen that lake and also

7    would have seen that waterfall.  And, by the way, how tall

8    would you say that waterfall was?

9        MR. HENIFIN:  About -- like, the bank of the creek

10   right there, maybe 10, 12 feet, so it was just running down

11   the rocks there along the bank of the creek.

12       THE COURT:  So this water was flowing down 10 or

13   12 feet of rock and then headed on to this lake that was

14   later created.

15       Now, what I was saying is this, is that to the naked

16   eye, one could have walked over there and seen all of this

17   and then, if the person had any real interest in it, would

18   investigate it and recognize that all of this came from a

19   ruptured -- ruptured pipe.  But a lot of these other leaks

20   around the city where you are losing water which amounts to

21   this 50 percent loss is not evident by a lake or waterfall;

22   is that correct?

23       MR. HENIFIN:  That is correct, Your Honor.

24       THE COURT:  And so that water loss is simply being lost

25   out of ruptured pipes, and these pipes are underground.

```
 1          MR. HENIFIN:  We believe so, yes, Your Honor.

 2          THE COURT:  And so then the naked eye can't detect that

 3     on topsoil.  They have to get beneath the surface in order

 4     to encounter this leak and understand how really dreadful it

 5     is.  Am I correct?

 6          MR. HENIFIN:  We are using -- the technologies that are

 7     being deployed are typically acoustic of some sort to

 8     listen -- to listen to pipes, put devices on hydrants,

 9     valves.  Our meters themselves all have listening

10     capabilities.  Trying to -- you try to get through that

11     noise and you actually use some artificial intelligence to

12     look at a big data set with a lot of noise in it to try to

13     pinpoint where an actual leak might be happening, and it is

14     pretty new technology and not overly proven is why we are

15     trying.  We really have this almost contest among four

16     different technologists to prove out their -- their

17     equipment to see if it would work here in Jackson on our

18     condition and actually find some of those leaks, because you

19     can't go around digging up every street looking for them.

20     So you've got to listen and hope you can come up with

21     technology that can find it.

22          THE COURT:  Well, I used the example I just did about

23     the waterfall and the lake because someone familiar with

24     that would think that all you had to do was go around town

25     and look for another lake or look for another waterfall when
```

1    they wouldn't recognize that these waters have not surfaced,

2    that they are subsurface, and where they go after that is

3    only explained by into the ground.  And so you got to go

4    down under the surface in order to find all these other

5    leaks.  They all are not as apparent as the one I said,

6    although the one I said was sitting there for a terribly

7    long time and nothing was done about it.

8         MR. HENIFIN:  Well, in defense, Your Honor, you know,

9    you see water coming out of the ground and a waterfall, you

10   might think it's an underground spring.  You might there was

11   some other source.  I don't know that anyone would

12   immediately jump to the thought that all of that water was

13   coming from a drinking waterline, but --

14        THE COURT:  Let's go back to that lake.

15        MR. HENIFIN:  Yes, sir.  I won't try to defend it any

16   longer.

17        THE COURT:  No.  That just won't get it, you know,

18   because anybody who had walked out there, they might see

19   what they thought to be a scenic waterfall, but when they

20   took another step about 10 yards back and they see this hole

21   in the ground that is a now lake, they recognize that was

22   not a lake, and they would recognize that that is something

23   called a huge leak, and it is just sitting right there.  And

24   then after you all pumped out some of the water and one

25   could actually for a while there see part of the pipe, then

1    one knew that this was all emanating from a broken pipe.

2    And if any city workers had gone out there, they certainly

3    would have seen this and not been confused about a waterfall

4    or confused about the lake.  They would have known this is

5    something called a horrendous leak.  And on top of that, the

6    City did have apparatus to indicate how much water was being

7    lost and not getting to the homes, did it not?

8        MR. HENIFIN:  Yes, Your Honor.  That was a fairly

9    straightforward math problem.

10       THE COURT:  And that same -- that same inquiry that was

11   not that difficult to determine would have shown that a

12   hundred percent of the water being manufactured at the water

13   plant was not getting to the homes and, instead, less than

14   50 percent -- because now that is down to 50 percent, that

15   is an improvement, isn't it?

16       MR. HENIFIN:  It's sad, but, yes, it is an improvement.

17       THE COURT:  And so it was even less than 50 percent of

18   the manufactured 100 percent of the water coming from the

19   plants not getting to the homes in Jackson.

20       MR. HENIFIN:  In rough numbers, probably 33 percent was

21   getting to them.

22       THE COURT:  33 percent.  So you are talking about just

23   a little over one-third of water that was being produced,

24   processed by human endeavor, by the addition of chemicals

25   that cost, by the public expecting to receive the water that

1    was processed for public use, only a little bit over

2    one-third was actually making it to the homes, and since

3    these leaks were ongoing and deep and prevalent and

4    consequential, that had a whole lot to do with the Jackson

5    water woes during that time period, but yet that just went

6    unattended.

7        So then, as I just stated, when we went out there and

8    looked at this particular problem, we saw that this water

9    was not making it there because all of that water that was

10   in the lake and all of that water that was in the waterfall

11   was processed.  It was drinkable.  It was showerable.  All

12   of that water.  Go out there and wash your dishes out there,

13   because all of that water was processed, and yet we were

14   told that this condition had lasted for years.  So then you

15   knew exactly where I was coming from when I asked what was

16   the cost.

17       MR. HENIFIN:  And I commit to you that we will have a

18   cost for you in this quarterly report.

19       THE COURT:  That is what I want.

20       MR. HENIFIN:  Yes, sir.

21       THE COURT:  I want to see, and I know the citizenry

22   want to see, just how much money the water company before

23   you came was losing on these leaks and how much of the

24   citizenry was hurt not only in the loss of this treated

25   water but also out of dollar bills out of their pockets,

1    because the City was not collecting all of the bills that

2    were out there.  A lot of folk had been excused from paying.

3    The City was not collecting various moneys that was due the

4    City because people were not paying their water bills.  And

5    I don't know if that is in your report either about the

6    increase in the number of people or percentage of people who

7    are now paying their bills.  Did you intend to mention that?

8         MR. HENIFIN:  Yeah, I have got that, Your Honor.

9         THE COURT:  Okay.  Well, then I'm going to stop here

10   and let you get back to your report.

11        MR. HENIFIN:  Well, I'm not going to let you leave this

12   leak issue alone quite yet, because we will get you a cost,

13   but I would like to also put on the record it contributed to

14   the pressure problems we were having, because you are losing

15   water, you can't keep pressure up throughout the system, and

16   it is also a reason we have to keep the fuel plant open, so

17   it's not just the cost of producing the water but the whole

18   fact that we have to run a second plant and that we had

19   pressure problems throughout the system were all aggravated

20   by this water loss.

21        And good systems don't exceed 10 percent water loss.

22   In fact, that is kind of the borderline EPA thinks is

23   acceptable, and they still want you working on water loss if

24   it was at 10 percent, and, again, we are at 50 percent and

25   trying to get our -- work our way down to 10 would be the

1    goal ultimately.

2         That is enough on water loss.

3         THE COURT:  Well, I have told you this in our various

4    discussions.  When I have reviewed everything that is going

5    on, because that is my job, I'm impressed at the efforts

6    that you have made, you and your crew, and they have done a

7    wonderful job in trying to address these issues, but I still

8    do not think that the public thoroughly understood the

9    humongous problems that faced the water company when you

10   came.  I don't think they understood that.

11        MR. HENIFIN:  I think people just --

12        THE COURT:  I don't think they still understand it,

13   but --

14        MR. HENIFIN:  People just want clean, safe drinking

15   water at the tap every day, so they don't really care about

16   all the other problems.  They just want it there.

17        THE COURT:  Well, but it was overwhelming almost.  I

18   say almost because you have now been taming it.  So it was

19   not overwhelming.  You have now underwhelmed it, and so I

20   appreciate you, and I'm sure the citizens of Jackson share

21   my comments about this, because there have been so many

22   great changes in this matter, and if we were going to go and

23   address it in its minutia, we would talk about all of the

24   different areas that had to be put together.

25        MR. HENIFIN:  Thank you, Your Honor.

 1          THE COURT:  And there was this tremendous amount of

 2     effort that had to go into this, not only in getting people

 3     to pay but also in changing the call center; making sure the

 4     call times were appropriate; making sure the costs, whatever

 5     they had been in toto, are decreasing and how much chemicals

 6     had to be put in this water.  And, I mean, it's on and on

 7     and on.  Every aspect of this system had to be tweaked.  So

 8     that is what I'm saying.

 9          MR. HENIFIN:  Yes, Your Honor.  Appreciate that.

10          THE COURT:  All right.  Go on back.

11          MR. HENIFIN:  I've got a great team.

12          I'll pick it up here at water quality since we are

13     talking about that.  We're -- the lead and copper were water

14     quality parameters we have to meet right now because we

15     don't have the enhanced corrosion control fully in place.

16     It, again, was an obligation.  The City undertook that

17     obligation back in 2016 as a result of some failed lead

18     sampling.  That work is finished at Fuel and under way at

19     Curtis.  We will have it done sometime next year at Curtis

20     plant.

21          In the meantime, there's four water quality parameters

22     we have to measure multiple times each month.  And so you

23     see those results, you can see we are making those -- we are

24     actually meeting those parameters more and more of the time.

25     So it's really a big improvement in the consistency of the

water.  Those four parameters are pH, hardness, alkalinity,
and dissolved inorganic carbon, and those have a good
relationship to the corrosiveness of your water, which,
again, could lead to leaching lead out of largely your home
plumbing, but we have been able to get those -- through the
work of Jacobs, who is operating our plants, and work we are
doing on the distribution system, we have been able to get
much more consistent in those four parameters month to
month.  That has been a great success story as well.  So
water quality is meeting the MCLs, the maximum contaminant
levels, set by the Safe Drinking Water Act, so the water
quality has been great.

We report that all the time, but it has been wonderful
to see an independent study that we had nothing to do with
come to Jackson and validate exactly what we have been
saying.  So a Yale University study has been conducted by
Ambria McDonald, a Ph.D. candidate at Yale.  She leads the
water sustainability group for the 3M Corporation.  She's
pursuing her Ph.D.  She is a Jackson native.  She saw the
Jackson water crisis, heard a lot about what was going on in
Jackson, decided that her Ph.D. would be around the Jackson
water system and the water quality.

She came down and randomly selected and got volunteers
at 26 homes and four businesses to allow them to do
extensive testing of the water at their taps and found that

1    every time our water met every maximum contaminant level,

2    met the Safe Drinking Water Act.  So it has been great to

3    see that independent, because I'm always leery of people

4    doing their own testing of our water without our knowledge,

5    but this one -- she's got this short summary of her study

6    that shows that our water is safe.  We had nothing to do

7    with that, so it is great to get a little validation from an

8    outside source.  Even if it is at Yale University, we still

9    think they are pretty good.

10         There has been very few lead service lines --

11         THE COURT:  You know I can't let that go.

12         MR. HENIFIN:  There have been very few lead --

13         THE COURT:  First of all --

14         MR. HENIFIN:  I'm not going to get past that, am I?

15         THE COURT:  You tried to slide that in, huh?

16         MR. HENIFIN:  I did.

17         THE COURT:  Well, first of all, I do not know the lady.

18    I have never met her.  And in fact, I just know that she --

19    based on what I read, that she is from Jackson.  I don't

20    even know her race.  What is her race?

21         MR. HENIFIN:  She is a Black woman, Your Honor.

22         THE COURT:  Okay.  And so I just saw in that little

23    blurb --

24         MR. HENIFIN:  I thought you knew all the families in

25    Jackson.  Everybody that gets up here, you seem to know

1    where they went to high school.  I thought for sure you knew

2    the McDonald family.

3        THE COURT:  No, I don't know her, and I don't know the

4    family either, to my knowledge.  But she came down

5    unsolicited; is that correct?

6        MR. HENIFIN:  Right.  This was her decision to pursue

7    her Ph.D., and this was her -- her thesis is around water

8    quality and issues with water -- trusting water in the

9    Jackson water system.  So she got an advisor.  Her advisor

10   is actually from Vanderbilt, I believe, on this, or

11   collaborator.  And she has been down here doing this work on

12   her Ph.D. thesis.

13       THE COURT:  I've never met her.  Have you ever met her?

14       MR. HENIFIN:  Only online, Your Honor.

15       THE COURT:  Only online.  Okay.  Is her study over?

16       MR. HENIFIN:  No.  She is still working on, I guess,

17   writing her dissertation.  I'm not sure what -- what the

18   next steps are.  I never got beyond a bachelor's degree, so

19   I'm not really sure how you get to that Ph.D. piece.

20       THE COURT:  So that is what she is working on?  So she

21   is supposed to submit this to her Ph.D. panel for her

22   dissertation; is that it?

23       MR. HENIFIN:  Yes, Your Honor.

24       THE COURT:  Oh, I see.  Okay.  Did she give an ending

25   date on there?

1           MR. HENIFIN:  She is working full-time, and people I

2     know that have pursued a Ph.D. while they're working

3     full-time, that ending date slides, typically, a little bit,

4     but I didn't ask her, but I will try to find out, Your

5     Honor.

6           THE COURT:  I'm curious as to when she will be finished

7     her study.

8           MR. HENIFIN:  I'll find out.

9           THE COURT:  Okay.  But, again, state her conclusion so

10    far.  Again, state her conclusion.

11          MR. HENIFIN:  Her conclusion is that the water matches

12    what we are reporting as far as water quality meeting all of

13    the Safe Drinking Water Act maximum contaminant levels.  So

14    safe drinking water is what we're providing.  She confirmed

15    that at the 30 locations she did the in-depth analysis,

16    they're receiving the same water we say we are providing

17    everybody.

18          THE COURT:  Okay.  Thank you.  Continue.

19          MR. HENIFIN:  So lead service lines is a big topic

20    because there's a lot of work going on across the nation on

21    replacement of lead service lines.  A new rule was just

22    promulgated this week from EPA for a revision, I guess Lead

23    and Copper -- LCR.  Lead Copper Rule I, which is

24    Improvement.  Thank you.  It's got a lot of initials, and it

25    has changed a lot.

1          But essentially there is a lot more work to do on the

2     part of a utility, water utility, related to lead service

3     lines and lead in the water.  As part of that, we are doing

4     an inventory of all of our service lines across the city.

5     Part of our inventory work is also with a predictive model,

6     because you can imagine we couldn't go out and dig up 60,000

7     service lines across the city reasonably.  We have done

8     hundreds because the predictive model requires validation

9     and calibration, meaning they predict where they think lead

10    service lines might exist based on age of housing and other

11    history pieces, and then they ask us to go out and dig up

12    the line to see what it is actually made of, and they put

13    that into the model, and we have done that now at over 500

14    locations.

15         And you can't just do it in one spot.  You have to do

16    it on the privately owned piece of line, the waterline that

17    runs between the water meter and your house.  That is your

18    line.  But we have to expose that and understand what that

19    is made of.  And then we have to do it on the city side

20    somewhere between the water main and where it goes to the

21    water meter.  And typically we have to do a third one right

22    on top of where it's connected to the water main, because

23    there's what's called a gooseneck.  It's a flexible part

24    that ties into the valve that is actually connected to the

25    water main, and many of those in many communities were made

1     of lead because they have to be bent in an interesting shape

2     to allow the line basically to move a little bit as the

3     ground moves around without pulling out of the main.

4          So we have to really do three, and we call them

5     potholes.  We use hydroexcavation, essentially a vacuum that

6     sucks out the dirt so you don't make a lot of disturbance

7     and you don't damage the pipe, and then you can see exactly

8     what the pipe is made of.  You record that, put it into your

9     inventory, give it back to your model folks, they put all

10    that data into the model, they run it again and say, okay,

11    now you've got to go over to this location and we need these

12    particular locations exposed and know what the material is.

13         The model will have about a 95 percent confidence level

14    that they can predict where lead lines might be in the

15    system.  The good news in Jackson is we have less than ten

16    identified.  We have actually replaced the ones we have put

17    our hands on, and every other one was on an abandoned

18    service line of some sort from years ago.  So just not very

19    much lead in the Jackson system.  So there is a positive

20    about Jackson water system.  We don't get a lot of those.

21    Very little lead as far as the pipes go.

22         The other thing that was great to measure is the

23    forever chemicals that a lot people are hearing in the news.

24    PFAS and PFOA.  They're polyfluorinated something.  I'm sure

25    someone here could tell me what they are.  But they are used

1    in so many products.  They are ubiquitous in our water

2    systems across the country.  They're used in Teflon.

3    They're used in Scotchgard, any kind of fire-retardant

4    clothing, flooring manufacturers, carpet.  It is everywhere.

5    We all have PFAS now already in our bodies because we have

6    been exposed to it.

7         It is in most drinking water systems; it's in most

8    wastewater systems.  EPA, while they haven't promulgated a

9    rule on a level, on a contaminant level, they have proposed

10   some fairly low numbers that most people are worried to

11   make.  Here in Jackson, we have tested our water and our

12   wastewater, and good news again:  No PFAS, measurable PFAS,

13   that we have to worry about.  Not even close to these

14   proposed levels.  So Jackson doesn't have many lead lines,

15   very few, almost none, and no PFAS.  So we are ahead of the

16   game in two areas that most people are struggling with

17   across the country.  So I like to hit the positives on our

18   drinking water system.  Not ahead of the game on the leakage

19   yet, but we'll get there.  I think that is all we have on

20   the drinking water, if that's -- any other questions?  Good.

21        THE COURT:  Move to the next category.

22        MR. HENIFIN:  Yes, sir.  We will go to a financial.  A

23   few things there.  We just completed our 2023 audit.  It had

24   an unmodified opinion.  For those who aren't familiar with

25   audits, auditors really don't like to say anything, but the

1    best you can do is an unmodified opinion.  We got that for

2    our 2023 calendar year audit, and we will have that

3    submitted to the parties with the quarterly report.  But

4    that was good news to get that done.

5        And then the biggest news for us financially is the

6    Mississippi Local Governments and Rural Water Systems

7    Improvement Board, and that's the board created by the

8    Mississippi Legislature to administer the drinking water

9    state revolving loan fund money, has worked closely with us

10   and they've approved an amended -- what's called an intended

11   use plan, which lists out the projects that were going to

12   use some of that state revolving loan fund money.  That was

13   $450 million appropriated by Congress in 2023 -- end of --

14   end of 2022 calendar or fiscal year '23.  That 450 million

15   has to be used in accordance with the rules of that SRF

16   program.

17       I am working with the State and the Health Department

18   and this board.  They have really leaned in to find ways to

19   make those dollars available to us.  That IUP, that intended

20   use plan that has now been approved by the board on the 20th

21   of September, once finalized will obligate nearly 360

22   million of the 450 million Congress appropriated for us.

23   Great projects listed in there.  Really going to be making

24   some significant effort.

25       The first ones have been waiting for this approval on

1    the intended use plan.  We have got design complete on the

2    chemical feed building.  And all the chemical feeds at the

3    O.B. Curtis plant will be replaced from where they start to

4    where they go into the system.  That is a significant

5    investment.

6        We will be changing the chlorine.  I think I've

7    mentioned before in this court that it is gaseous chlorine

8    color that is used now, giant cylinders of gaseous chlorine.

9    Very dangerous but widely used across the country for many

10   years for water and wastewater chlorination.  Been phased

11   out in many places, especially where your plant is near a

12   population, which in our case both of our plants are, and

13   we'll be going to on-site chlorine generation, which is done

14   with salt, so there's no hazardous chemical involved that

15   needs to be stored in large quantities at the plant as there

16   is today with the gaseous chlorine.  And that is all in one

17   package, one design.  Design is complete, and we are working

18   on getting that one under construction within the next few

19   weeks, as soon as we get the final signatures on the loan

20   agreement with the State.

21       I used loan agreement, and everyone turns their heads

22   because the state revolving loan found is a loan fund.

23   Congress appropriated $450 million to the state revolving

24   loan fund for Jackson's drinking water system, but it is a

25   zero-interest loan, principal forgiveness.  This is all EPA

1    talk for grant, but they can't say grant.  So there's no --

2    we don't pay any of this back, but I talk in terms of it

3    being a loan because it is following the exact same process.

4    So there is a loan agreement for a zero-interest loan with

5    principal forgiveness.  We would all like to have one of

6    those.  We are very fortunate that Congress has provided

7    that for us.

8         The other pile of money they gave us was --

9         THE COURT:  One second.

10        MR. HENIFIN:  Yes, sir.

11        THE COURT:  As far as that amount of money you just

12   mentioned, that money has been dedicated, has it not?

13        MR. HENIFIN:  Yes.  It was -- it was specifically

14   required to be used for the drinking water system in Jackson

15   under the requirements of the state revolving loan fund,

16   which are pretty stringent requirements about developing

17   bidding packages, how you -- Davis-Bacon wages.  There is a

18   variety of requirements in there that make those pretty

19   challenging to do anything except infrastructure projects

20   with it, and that's exactly what we will be doing with it.

21   And then of that 450, this intended use plan obligates about

22   360 million of it, and we will be providing updates to that

23   over the next couple years to add more projects as we

24   identify them that will use the balance of that 450 million.

25        THE COURT:  But of that 450, 360 has been committed --

1    have been committed already?

2          MR. HENIFIN:  Under this intended use plan, yes, sir.

3          THE COURT:  And so that money is already earmarked for

4    various projects?

5          MR. HENIFIN:  Correct, Your Honor.

6          THE COURT:  And, of course, those projects are projects

7    that meet the specifications of the regulations --

8          MR. HENIFIN:  Yes, Your Honor.

9          THE COURT:  -- on -- for the expenditures of those

10   moneys?

11         MR. HENIFIN:  Correct.

12         THE COURT:  Okay.  Go to the next matter.

13         MR. HENIFIN:  The balance of the money appropriated by

14   Congress was 150 million through an emergency appropriation

15   section of the Safe Drinking Water Act referred to as

16   1442(b).  That is the section of the Safe Drinking Water

17   Act.  We've spent over a hundred million of that to date.

18         So going back to our leak fixing, our valve changing,

19   our valve repairs, our finding the valves, repairing the

20   drinking water plants, operating the drinking water plants,

21   that is where that money has been spent.  So we have had an

22   advantage over the City in getting leaks fixed and water

23   losses.  We have had this resource, this 1442(b) dollars,

24   and we have gone through over a hundred million of it.

25         We will have spent the 150 probably within the next --

1    by the next -- say sometime next spring, we will have the

2    balance of that obligated.  So that has been a real shot in

3    the arm for the water system to have that money available.

4    It was a great thing that Congress did, and the fact that

5    the EPA found this -- this section of the 14- -- or Section

6    1442(b) of the Safe Drinking Water Act to let us use this

7    water in a -- or money in a much more flexible way than the

8    state revolving loan fund meaning we can pay for operating

9    and maintenance work that you can't do under the SRF.  So

10   this 150 million has been critical for these early successes

11   that we have done, so we are very pleased to have that and

12   appreciate EPA making that happen.

13        THE COURT:  And were any of the personnel involved in

14   that negotiations and decision-making a part of the

15   courthouse crowd here?

16        MR. HENIFIN:  Your Honor, I think there may be a couple

17   online.  I'm not sure who was actually -- helped get that

18   money and figure out what -- the 600 million is a large

19   mystery.  Where the number came from and how the

20   appropriation, I think this all was behind closed doors with

21   EPA and Congress, but I wasn't in any of those rooms, so I

22   don't really know, Your Honor.

23        THE COURT:  We were the beneficiary, in other words.

24        MR. HENIFIN:  We were the beneficiary, yes, Your Honor.

25        THE COURT:  Okay.  And as great beneficiaries, we know

1    how to spend it appropriately.

2        MR. HENIFIN:  We spend it appropriately and we are

3    thankful we have it, yes, sir.

4        THE COURT:  All right.  Go to your next matter.

5        MR. HENIFIN:  You asked about local revenues and growth

6    and collection, and there is a lot of discussion about

7    collection rate, and collection rate is a -- while a

8    seemingly clear metric, it is really not in this case

9    because it is related to how much you actually bill, and if

10   you are billing a lot more than you used and even collecting

11   more, your collection rate might not reflect what it used to

12   look like.

13       So, for example, say we were billing in stats, real

14   numbers, so in December of 2022, when you signed the order,

15   we billed $4.9 million to our customers for water, and we

16   collected 4.4.  That was a 90 percent collection rate.

17   Sounds great.  But the billing of 4.9 is about half of what

18   we should have been billing.

19       So today, last month, August, we billed 9.8 million,

20   and we've collected 5.8 million of that 9.8.  That is only a

21   collection rate of 60 percent, but it was over 1.4 million

22   more than the month reported when we started at 90 percent

23   collection rate.  So there are some people that like to talk

24   a lot about this collection rate number, but it is not

25   really the real number.  The real number is how much money

1    do -- how much are you billing and how much are you

2    collecting and if they change in time, which they have

3    because we are billing a lot more people for water than were

4    billed in the past.

5        The other thing that gets pointed out is, well, it's

6    all because we increased the rates, and we did increase the

7    rates in January of this year by about 15 percent.  So when

8    you really look -- if we were billing 5 million in December

9    of '22, if you only added 15 percent to that, that would be

10   somewhere in the 5.8 million, and yet we are billing

11   9.8 million.  So it is not due to rate increase.  It is due

12   to we are working hard at getting people to pay their bills.

13   And we've still got a long way to go.

14       So over the last several months, the average has

15   been -- so in the first six months of this -- from October,

16   when JXN Water was given the responsibility for all the

17   revenue, as you recall with the sewer order, we assumed all

18   the responsibility for debt and revenue related to water and

19   the sewer.  And in October, our net water revenue was

20   4.6 million.  Last October when you signed the order.

21       It is averaging now, over the last six months, 6.1.

22   So, again, $1.5 million per month increase in that short

23   period of time.  And that is only because we are busy making

24   sure people get accurate bills and that they pay their

25   bills.  We have not even started shutting off single family

1    yet.  That is within weeks.

2         The problem is we have got 11,000 customers that are

3    more than 60 days in arrears, single-family residential

4    customers.  We don't have the capacity to turn them all off

5    at once and then get them all restored fast enough, so we

6    need to modify our billing system, which is designed to

7    automate this process, that if anyone is delayed and doesn't

8    pay, it automatically kicks out a letter, tells them they

9    are behind, and then if they don't pay, it automatically

10   kicks out a work order to go turn them off.  And you can

11   imagine if we flipped that switch right now and created

12   11,000 work orders, we would go under.

13        So we need to modify our own system to meter it out in

14   pieces that we can actually manage.  Because if you cut

15   someone off and they pay their bill, they expect you to turn

16   them back on.  We can't do that at 11,000 properties in a

17   short period of time.  So we are going to be starting in

18   small groups, but sometime in the next few weeks, we will be

19   ready to pull the trigger on the definition of who gets the

20   first turnoffs, and it is going to be probably the larger

21   balances or the oldest will be going first.  And we will be

22   out there shutting people off, and they'll have to pay their

23   bill to get their water turned back on, and we want to make

24   sure that we can restore it rather quickly after they pay

25   their bill, but it might take a day or two.

1          And so the moral of the story here is if you're behind,

2    start paying your bill.  You can go online.  You can create

3    a payment plan.  There is no reason that folks at this point

4    shouldn't be paying their bills.  But we will be helping --

5    we'll incentive them a little bit by turning off their water

6    if they don't pay.

7          THE COURT:  Now, I want the public to be sure to

8    understand that what you are providing here is an estimate

9    on how long it would take to restore.

10         MR. HENIFIN:  Yes, Your Honor.

11         THE COURT:  Because I don't want them to think that

12    they are behind now and then their water gets shut off and

13    it is going to be cut back on two days after you pay,

14    because you have, as you just stated, 11,000 folk who you

15    have to address.  And it takes time to replug these folk up.

16         So then if someone's water is shut off today and they

17    come in and pay the bill tomorrow doesn't mean that by the

18    next day or the next day the water is going to be cut back

19    on.

20         MR. HENIFIN:  We do have goals to try to get them on.

21         THE COURT:  Oh, that's what I'm telling you.

22         MR. HENIFIN:  But as you're clearly explaining, volume,

23    number of people, all those are going to play into that, and

24    we will get it turned on quickly.

25         THE COURT:  As fast as you can.

1              MR. HENIFIN:  Yes, Your Honor.

2              THE COURT:  But you can't give them a time period of a

3      day or two because you don't know what the work order is

4      going to be.

5              MR. HENIFIN:  You're right, Your Honor.

6              THE COURT:  And so -- and you don't know how many

7      people will be shut off even though you are going to take

8      them in classes or take them in groups.

9              MR. HENIFIN:  Yes, Your Honor.

10             THE COURT:  But you don't know how many people at any

11     given time will be shut off at the same time for which you

12     will have to go and reconnect them.

13             MR. HENIFIN:  Correct.

14             THE COURT:  And that is going to take time.

15             MR. HENIFIN:  And they all get a warning letter.

16             THE COURT:  And so it is not going to be a simple

17     matter of pushing a button --

18             MR. HENIFIN:  Right.

19             THE COURT:  -- and starting it back up.  It has to

20     be -- it is more involved than that.  And so they just have

21     to understand that if they don't want to go through this

22     process of waiting to see how long it is going to take to be

23     reactivated, they better go ahead and pay now.

24             MR. HENIFIN:  That is right, Your Honor.

25             THE COURT:  And not get shut off, because there is no

1    telling if they get shut off how long it is going to be.

2    Not to mention that if in the interim we have some other

3    problems that come up that challenge the water company, you

4    know, and so they just better go ahead and pay now.

5        MR. HENIFIN:  Absolutely.  If you want to avoid that

6    situation, pay your bill, start paying it, reach out to us

7    and start paying.

8        THE COURT:  Well, there are some people who have been

9    calling around inquiring about that, and unfortunately,

10    there are some people who are ready to call the water

11    company's bluff on that matter, and since it hasn't occurred

12    in the past, they are thinking, well, they still have time,

13    and even if it is shut off, they'll get it cut back on in a

14    day or two, so they just go ahead and take the risk.  But

15    this is going to be a much greater risk than they think.

16        MR. HENIFIN:  Yes, Your Honor.

17        THE COURT:  Because it might be some time before that

18    water is cut back on, and they should be advised not to be

19    calling you and asking for expedited treatment, because you

20    can't you give them expedited service.  You are going to

21    have so many people to deal with.

22        MR. HENIFIN:  They'll be calling you, Your Honor.

23        THE COURT:  Well, that is also why I am saying this,

24    because I like to keep my telephone calls down, you know.

25    So just because they went to high school with me is not

1    going to mean anything.

2        MR. HENIFIN:  That's not going to get them water turned

3    on right away, is it?

4        THE COURT:  It is not going to -- that is not going to

5    cut it back on.  So no.  So they have to understand they

6    simply have to get their place in line, and it will be cut

7    back on when their turn comes up.  And in the meantime, they

8    won't be washing many dishes or they wont be utilizing any

9    water services around their house, won't be taking showers

10   there at their house, but they just have to understand that

11   this is something they brought on themselves with adequate

12   warnings because you even had a flier, I think, at one time

13   that told people that the efforts to cut off water was about

14   to start.  Well, it didn't start right then because of these

15   other technical problems.  But now --

16       MR. HENIFIN:  We have cut off all of the people --

17   well, close to all of them that didn't have accounts with

18   us.  So we found -- we identified those roughly 2,000

19   properties that were using water but weren't even in our

20   system.

21       THE COURT:  That's right.

22       MR. HENIFIN:  You know, you ordered the -- Entergy to

23   turn over their customer information to us.  We matched that

24   up with our information and found a number, almost 2,000

25   properties, that were using electricity but didn't have an

1    account with the water department.

2        THE COURT:  That's right.  That was the way -- that was

3    the way we got the names.

4        MR. HENIFIN:  That was perfect.  And then those

5    folks -- we have cut them off, and they had to go establish

6    service to get their water restored.  In most cases, they

7    did exactly that and we didn't hear much from them.  There

8    were a few that got a little loud and made the news, maybe,

9    but we then find people have established their accounts.

10   That is why we can bill 9.8 million in a given month now,

11   because we have got accurate meter reads, we know who has

12   got accounts, and we need to collect that 9.8 million.

13   Everyone needs to pay their fair share because we need that

14   money to operate the system the way it needs to operate.

15   This isn't just so we can build a big war chest.  This is to

16   just get day-to-day operations going and start reinvesting

17   in the system.  So it is critical that we get to the point

18   where when we send people a bill, everybody's paying their

19   bill, and we will work our way to get to that point.  Most

20   water utilities in the U.S. collect in excess of 99 percent

21   of what they bill, so we've got a long way to go.

22       THE COURT:  Long way.

23       MR. HENIFIN:  But shutting off the water is the big key

24   to making that happen.

25       THE COURT:  For those who missed the connection, when,

1    Mr. Henifin, you said that -- that the electric company was

2    directed to give us their accounts, that -- the theory was

3    that if a house is receiving electricity, it is habitable

4    and therefore it should be a house that would expect to have

5    water.  And then when the accounts didn't match, when there

6    is an electrical account but there is no water account, then

7    we recognize those people were not in the system.  And so

8    that was made possible from getting those records from the

9    electric company.

10    MR. HENIFIN:  Yes, it was, Your Honor.  I appreciate

11    that.

12    THE COURT:  And so, you see, this is how the

13    determination was made that you came up with this specific

14    avenue to get that information, because I know some people

15    might be wondering how did you know who was not getting

16    water, and they might think there's some great big

17    chartboard down to the water company that you can look up

18    every address and just simply see who was not getting water

19    or who is getting water.

20    But the simplest way is to determine if that house is

21    habitable.  If it is getting electricity or if it is getting

22    any other utility service but not getting water service,

23    then it does not take rocket science to recognize that they

24    are not living there without water, so therefore they are

25    simply not paying for it.  And that is how those people were

1      identified.

2          Well, those were the major violators who weren't even

3      in the system that had been getting water for a long period

4      of time.  We were talking not that long ago about some of

5      these people who owe back bills of, what, hundreds of

6      thousands of dollars?

7          MR. HENIFIN:  Those aren't single family.

8          THE COURT:  I know.  Not single families, though.  No.

9      We had a different conversation on them.

10         MR. HENIFIN:  Yes, sir.

11         THE COURT:  And we are trying to work with some things

12     on that.  But, nevertheless, we are talking about some

13     accounts that had hundreds of thousands of dollars in

14     arrears because they essentially had never paid any bills,

15     never paid water bills, basically, and nevertheless had been

16     using volumes and volumes of water through their various

17     endeavors but had not paid any water bills, and now they

18     have been outed, and now they are going be held to task for

19     that.  And so that is where we are on that.

20         MR. HENIFIN:  And our billing staff and -- you know,

21     they make those tough calls and negotiate and prod and push

22     to keep us from having to turn people off, but it's -- it's

23     a tough job to be collector, basically, for the water

24     department.

25         THE COURT:  Well, you know my position on that, and I

1    have talked to you at length about this.  My position on

2    this is those serious violators knew they were violating.

3    They knew that they owed the company, they owed the

4    citizenry.  They knew that.  And so I don't see why they

5    should be afforded much mercy, because they have allowed the

6    rest of the people to support the system that they were

7    bilking the entire time, and they knew they were not paying

8    their fair share or any share, not paying anything at all.

9         MR. HENIFIN:  Correct.

10         THE COURT:  And yet they were consuming far in excess

11    of what the others were utilizing, because a lot of these

12    were companies, *et cetera*, and so if these folk were out

13    there utilizing the system as they were and taking advantage

14    of the rest of the citizenry, then they ought to be brought

15    to task.  So we'll get back to that later, because there

16    might be some other measures that might be in store for

17    people like that.

18         MR. HENIFIN:  Yes, Your Honor.

19         THE COURT:  It just should not be something we just

20    simply wink and say pay a few dollars here and there and

21    seeing no more.

22         MR. HENIFIN:  Correct.

23         THE COURT:  I mean, they have caused us some serious,

24    serious financial problems, because this system has held on

25    by a thread at times when it didn't have revenues to support

1    it, and the public didn't even appreciate that, that people

2    not paying the bills, the water company can't run its plant.

3    It needs to pay its people.  It needs to buy chemicals.  It

4    needs to make repairs.  It has all kinds of costs, and these

5    folk who are not paying anything but enjoying what other

6    folk are making possible, there should be something special

7    for them, and so that might come up later on.

8        MR. HENIFIN:  Well, fair warning, you are probably

9    going to see some of those folk try to come in front of you

10    to keep us from collecting.  You are going to get your fair

11    share of this whole effort to collect.  It's on its way.

12        THE COURT:  Well, I'm looking forward to seeing those

13    folk.

14        MR. HENIFIN:  You'll get to participate actively, I

15    think, in some of those.

16        THE COURT:  Well, I'm looking forward to seeing these

17    folk who want to come in front of this Court saying that

18    they had the wherewithal to pay, chose not to pay, and don't

19    think they had to pay.  I have heard all kinds of excuses

20    why people didn't pay.  I have heard that various people in

21    high places had low ideas and decided that they just weren't

22    going to pay because they didn't have to.  Even some folk

23    who were elected, that they didn't have to, they didn't have

24    to pay.  But we'll see.

25        MR. HENIFIN:  Yes, Your Honor.

1          THE COURT:  That is something that is on the horizon,

2     and then we will see what the people say later on.  But I

3     can say right now I don't have very much mercy for those

4     kinds of people.  But go ahead on.  Talk to us again.

5          MR. HENIFIN:  I think that's all I've got, Your Honor.

6     It has been plain.  So just --

7          THE COURT:  Well, let's see now.  I don't think I had

8     anything else.  Let me think just for a moment.  So let's

9     take a recess.  All right?

10         MR. HENIFIN:  Yes, Your Honor.

11         THE COURT:  Recess for 15 minutes.

12                        (A recess was taken.)

13         THE COURT:  I don't have any more questions, but I

14    might have some after I hear from some other people.

15         And I'll start with the EPA.  Hold it.  Let me see.  We

16    have somebody with their hand up.

17         MS. HILL:  Yes, Your Honor.  Ayanna Hill, ACLU of

18    Mississippi, representing the intervenor plaintiffs.

19         Your Honor, I just wanted to make it known that the

20    intervenor plaintiffs would like to speak on the record

21    today as well.

22         THE COURT:  Speak about what?

23         MS. HILL:  We would like to raise a couple issues.  One

24    of them would be a motion to modify the ISO, amongst other

25    things.

```
1         THE COURT:  Well, that motion -- I didn't think I had
2    it down for today.
3         Did I, Terri?
4         MS. HILL:  We have not filed one, Your Honor.
5         THE COURT:  You need to file it.  So you have another
6    motion that you have filed?
7         MS. HILL:  We have not.  We wanted to orally make the
8    motion, if you would --
9         THE COURT:  Oh, no, I'm not going to take it orally,
10   because the parties need an opportunity to respond to it.
11   So then if you have some motions, then go right ahead and
12   file them, okay?  And then after you file them, call the
13   office and get a time to argue your motions.  That is going
14   to be after everybody has had a chance to respond to it.
15        So do you have any other motions that have been filed?
16        MS. HILL:  No, Your Honor.  We would just like to raise
17   other concerns that we have.
18        THE COURT:  Well, this is a status conference as to
19   where we are.  And I'm going to have a time period for
20   concerns, but right now this is a status conference to
21   determine where we are and what's going on.
22        MS. HILL:  I understand, Your Honor.
23        THE COURT:  Now, let me ask this question:  What is
24   your name?
25        MS. HILL:  Ayanna Hill.
```

1          THE COURT:  A-Y-A --

2          MR. HILL:  A-N-N-A.

3          THE COURT:  -- N-N-A?  Two Ns or one N?

4          MS. HILL:  Two Ns, Your Honor.

5          THE COURT:  I was right on top of it, wasn't I?

6          MS. HILL:  You were.  You were.  You got it right.

7     Right on the money.

8          THE COURT:  Okay.  You are with who now?

9          MS. HILL:  The ACLU of Mississippi.

10         THE COURT:  And what is your background in this water

11    controversy?

12         MS. HILL:  Yes, Your Honor.  So as representatives of

13    the intervenor plaintiffs, I represent local counsel, and so

14    I, along with my cocounsel --

15         THE COURT:  You say you represent who?

16         MS. HILL:  I represent the intervenor plaintiffs as

17    local counsel.

18         THE COURT:  Okay.  As local counsel.

19         MS. HILL:  Yes, Your Honor.  I misspoke.

20         THE COURT:  And your intervenor plaintiffs, did they

21    have any background in water matters, or are they just

22    concerned citizens who --

23         MS. HILL:  Concerned citizens.

24         THE COURT.  -- who feel affected by it all.

25         MS. HILL:  Yes, Your Honor.

1    THE COURT:  Okay.  And you yourself, have you followed

2    this litigation?

3    MS. HILL:  Yes.

4    THE COURT:  So have you read the various orders?

5    MS. HILL:  Yes.

6    THE COURT:  What about the consent order?  Let's start

7    you off at the basic, the one that set up this consortium of

8    people here.  Have you read that?

9    MS. HILL:  Yes.

10    THE COURT:  So do you understand the powers that these

11    various people have here and what powers emanate from that

12    document?

13    MS. HILL:  Yes, sir.  I have reviewed the interim

14    stipulated order as well.

15    THE COURT:  Okay.  So did you review the other orders

16    that came out of this court not that long ago, especially

17    the one where I gave the public an opportunity to appear

18    before this Court?

19    MS. HILL:  Yes, Your Honor.

20    THE COURT:  Do you know anything about that?

21    The green light.  Press.  You got it now?

22    MS. HILL:  I just pressed it on.

23    THE COURT:  Okay then.

24    MS. HILL:  Can you hear me loud and clear now?

25    THE COURT:  You are here.  Now, have you gotten a

1    chance to read that?  For instance, that might be

2    informative to -- you can talk to the court reporters and

3    order a transcript, because it was transcribed, and you

4    might want to get up to snuff on that, also to see what they

5    said.

6        Following that proceeding, I wrote some opinions that

7    addressed the concerns of the people who had come here to

8    raise those concerns, and so I wrote an opinion.  You would

9    want to read that so that you don't trade over or cover or

10   track over covered ground already, because I responded to

11   some of the folk who came here to offer their comments,

12   criticisms, *et cetera*, or platitudes, but I went over those

13   matters in that opinion, so you might want to read that too

14   so that you know the kinds of issues that have been covered

15   already and so that when you file your motion and then

16   register your concerns, that you don't find yourself

17   registering concerns which have already been thoroughly

18   covered.  But other than that, feel free to file.  Okay?

19       MS. HILL:  Yes, Your Honor.

20       THE COURT:  Okay, then.  Thank you.

21       MS. HILL:  Thank you.

22       THE COURT:  Okay, then.  Thank you so much.

23       I saw another hand go up.  Did I?

24       MS. HERNANDEZ:  Yes, Your Honor.

25       THE COURT:  Would you come forward?

1          And then we will get to the EPA.  So just hold your

2     comments.

3          MS. HERNANDEZ:  Your Honor, it's Mikaila Hernandez.  We

4     are for the plaintiff intervenors.

5          We are parties to this case, and we would like to give

6     a status update from our parties' side as well.  And we were

7     there at the last conference when you had the public

8     commentary as well.

9          THE COURT:  Okay.  You have a status of what?

10         MS. HERNANDEZ:  A status of the community concerns,

11     because we are parties to this case.

12         THE COURT:  Let me -- hold it.  You have a status on

13     the community concerns?

14         MS. HERNANDEZ:  Uh-huh.  Status update based on the

15     work that the IPTM has done, that the EPA has done, the DOJ

16     has done.  So --

17         THE COURT:  And so this status, is that a report?

18         MS. HERNANDEZ:  There is not a report, but this is a

19     status conference.

20         THE COURT:  Yes, it is.  But do you have a report?

21         MS. HERNANDEZ:  Is a report required for a status

22     conference to participate?

23         THE COURT:  So I take that your answer is no, you don't

24     have a report.

25         MS. HERNANDEZ:  Does every -- does the EPA have a

```
1     report?  Does the City have a report?

2          THE COURT:  But I'm asking you do you have one?

3          MS. HERNANDEZ:  We do have a report back, yes.

4          THE COURT:  And who did your report.

5          MS. HERNANDEZ:  We did.  The community did.

6          THE COURT:  Who is "we"?

7          MS. HERNANDEZ:  The community.  Plaintiff intervenors.

8          THE COURT:  The community couldn't have written a

9     report together, so who did the report?

10         MS. HERNANDEZ:  What do you mean, "who did the report"?

11         THE COURT:  Is one written?

12         MS. HERNANDEZ:  We have a status update as parties.

13         THE COURT:  I asked you a question.  Is it written?

14         MS. HERNANDEZ:  We don't have a written report.

15         THE COURT:  So then the report that you would purport

16    to give is something that you are giving.

17         MS. HERNANDEZ:  It's something that we are giving

18    orally, yes.

19         THE COURT:  Okay, then.

20         MS. HERNANDEZ:  At this status conference, yes.

21         THE COURT:  Okay.  Thank you.  I want you to give your

22    report in writing, and so that when I have my next status

23    conference, I would have had a chance to study it and so

24    would they, so they'll know then what you're about to say.

25         MS. HERNANDEZ:  Okay.  Well, we did inform the Court
```

1    that we would be attending this status conference and

2    requested a time to speak.

3            THE COURT:  Oh, no problem.

4            MS. HERNANDEZ:  I thought all the parties were giving

5    an update on the status.

6            THE COURT:  But they are in a different situation than

7    you're in.

8            MS. HERNANDEZ:  But we are parties to the case.

9            THE COURT:  You are arguing with me?

10           MS. HERNANDEZ:  I'm just saying, Your Honor, that we

11   are --

12           THE COURT:  I said are you arguing with me?

13           MS. HERNANDEZ:  I'm just pushing back on the

14   assertion that we don't have a right --

15           THE COURT:  Then you are arguing with me, then, aren't

16   you?  Won't you sit down.

17           MS. HERNANDEZ:  Thank you, Your Honor.

18           THE COURT:  Is there anybody else over there who has

19   court manners who would like to address the Court?

20           MS. SHERMAN:  As the plaintiff intervenors?

21           THE COURT:  No.  I have heard enough from there.  If

22   you have a report, put it in writing.

23           Now then, EPA.  My question to you -- first of all, how

24   are you doing this afternoon?

25           MR. FINGERHOOD:  I'm doing well right now.  Thank you,

1    Your Honor.

2        THE COURT:  You are good.  You have been here many

3    times.  And you do understand protocol, you know.

4        Now, my question to you, though, is, from what

5    Mr. Henifin has provided -- and you have been with us the

6    entire time since day one, and so you have heard me go over

7    various aspects of this particular matter -- do you have any

8    update on what he said?

9        MR. FINGERHOOD:  No, Your Honor.  For purposes of the

10   status report, we agree that there has been some great

11   progress made.  The third-party manager meets regularly with

12   both the EPA and state technical people to discuss the work

13   that he is proposing, the work that he has done, and so I

14   have nothing to report on that.  I think they have been

15   working well.

16       And on the financial side of things too, I know perhaps

17   in the past there have been some conflicts there, but I

18   think even recently those discussions have been going

19   smoothly as well.

20       THE COURT:  There's a second matter.  Besides just

21   asking how you are reacting to Mr. Henifin because you have

22   been here with us the entire time and you know what steps we

23   have endured to get to where we are at the present time, but

24   I understand that your agency is holding a conference

25   tonight for community input; is that correct?

1          MR. FINGERHOOD:  Yes.  It's a public comment.

2          THE COURT:  Now, I know that there was a provision for

3     public comment, and we had dealt with that at some time

4     before when you talked about the public comment period

5     before, so we had gone through all of that, and -- and I did

6     have that period for public comment where -- I think I did

7     maybe two of them where we allowed people to come in to make

8     their public comments, and so we did that.  We set that

9     aside for them to do.  But there's one tonight I was a bit

10    surprised at.  This doesn't seem to be a part of the regular

11    protocol for public comment, or am I missing something on

12    that?

13         MR. FINGERHOOD:  No, you're correct, Your Honor.  This

14    isn't a formal public comment meeting.  I guess maybe an

15    outreach meeting would be a more appropriate title.  It's to

16    hear from the community about the progress that has been

17    made to date and any concerns they may have and what they

18    would like to see in the future.  It's not a formal

19    proceeding.  There won't be any response to comments

20    prepared.

21         And it is something that we have done in the past too.

22    I think shortly after the original interim stipulated order,

23    there was a similar, you know, public outreach session held

24    in January of that year.  I think the actual -- the Deputy

25    Assistant Attorney General was there, the U.S. Attorney at

1    the time was there.

2        And then we also had, I think in March that year, some

3    meetings with smaller groups, business owners, school

4    officials, public health officials, to get some input at

5    that point too.  So it has been kind of a process that we

6    have been doing really from shortly after the interim order

7    was entered.

8        THE COURT:  Now, I understood why you wanted the public

9    comment section or experience after this Court first entered

10   this fray and went about issuing some orders on some

11   matters, especially when there was a combination on the

12   water plant along with the sewage and all of that, but under

13   what grant are you marching for this particular public

14   comment?  What does it emanate from?  What document?  What

15   statutory enabling matter, or is this just something that

16   EPA thought would be a good thing to do?

17       MR. FINGERHOOD:  Right.  I think there is no legal

18   requirement or regulatory requirement.  I think it had been

19   some time since the last kind of outreach meeting had been

20   held, and so it was, you know, thought that it would be a --

21   it was overdue to kind of hear from the community.

22       THE COURT:  Well, then, I'm further mystified that if

23   you just simply wanted an outreach to determine the status

24   of things, why didn't you ask the Court for a status

25   meeting?

1          MR. FINGERHOOD:  Well, it wasn't -- I mean, we have

2     the -- we wanted to get, I guess, the public's thoughts as

3     far as what they have -- the improvements they have seen, if

4     they have been having any, you know, issues with, you know,

5     not getting notified of -- you know, if there is a

6     boil-water notice associated with some construction work,

7     things like that.  Just wanted to hear from the community.

8     This is just feedback that EPA is going to use to -- for its

9     own purposes.  And to the extent there are concerns related

10    to either state or the third-party manager, we'll share

11    those with them as we have done in the past.

12         THE COURT:  Well, but as you have done in the past, you

13    had notified the Court that you would like to do that, and I

14    held it here in the courtroom and invited all who were

15    interested to come.  So why is this procedure different?

16         MR. FINGERHOOD:  Right.  Well, this isn't a formal

17    procedure.  It's just an outreach meeting.  In the past, for

18    example, when we had the -- the public comment, those were

19    more formal procedures.  People mentioned, for example, they

20    had a sewer backup at their home or an overflow, and so we

21    relayed those concerns to the third-party manager and he

22    followed up with those people, and so to the extent we get

23    those types of comments, we will pass them on.

24         THE COURT:  Will you have a stenographer there at this

25    particular session?

1    MR. FINGERHOOD:  No.  There is no court reporter or

2    anything like that.

3        THE COURT:  Will you make a written report on it?

4        MR. FINGERHOOD:  We -- this is, like I said, for, you

5    know, EPA's internal purposes.  We don't plan on issuing any

6    report or anything like that.

7        THE COURT:  So there will not be a public assessment of

8    the meeting?

9        MR. FINGERHOOD:  Right.  I mean, it is open to the

10   public.

11       THE COURT:  I understand open to the public, but as far

12   as drawing any conclusions from what is stated during the

13   course of those proceedings, will there be a record of that?

14       MR. FINGERHOOD:  No, no official record.

15       THE COURT:  Will there be any potential adverse

16   consequences flowing from that?

17       MR. FINGERHOOD:  I'm not sure what you're referring to.

18       THE COURT:  Well, EPA is going to conduct this, and I

19   would imagine that EPA is going to either take notes or

20   record.  So are you going to do either one of those?

21       MR. FINGERHOOD:  I'm sure people may take notes, but

22   there is no official note-taker, no recording that is going

23   to be prepared.  If somebody has a concern, you know, that

24   we think maybe the State might know the answer to or it is

25   something that the third-party manager could address, then,

1    you know, we'll pass that on to them as we have done in the

2    past.

3         THE COURT:  So there will be an open microphone there?

4         MR. FINGERHOOD:  Correct.

5         THE COURT:  So then will you be taking the names of

6    people who approach the microphone?

7         MR. FINGERHOOD:  Yeah, not specifically.  If they want

8    to give their names.  I mean, especially if they want some

9    sort of follow-up if they have a specific issue.

10        THE COURT:  Now, I don't understand that answer.  So

11   you are saying that people can approach the microphone and

12   potentially complain but are not required to give their

13   names or addresses?

14        MR. FINGERHOOD:  I think that's -- that's the case, but

15   if they would want someone to try and follow up on that,

16   then I think someone would ask, you know, can we get your

17   name and contact information?

18        THE COURT:  Well, how would you expect such a program

19   to be valuable when you can't determine the veracity of the

20   persons who are appearing before you?  If you don't even

21   know their names or addresses, how can you determine that

22   they are really being truthful with what they are saying or

23   they're having the experience they say they are saying --

24   they are experiencing?

25        MR. FINGERHOOD:  Well, I mean, it's not an evidentiary

1    proceeding.  It is just an opportunity for people to say

2    things, and if people want to say things that -- you know,

3    what's on their minds, you know, it's not an evidentiary

4    hearing.

5         THE COURT:  So you are not going to even verify whether

6    these persons own a piece of property or are renting in

7    Jackson?

8         MR. FINGERHOOD:  It is open to the public, so --

9         THE COURT:  Anybody who wants to get up and just say

10   something?

11        MR. FINGERHOOD:  Right.

12        THE COURT:  No matter whether that person is a citizen

13   of Jackson, a homeowner in Jackson, a renter in Jackson, or

14   just a trucker going through Jackson, you are just saying

15   that it doesn't matter?

16        MR. FINGERHOOD:  Right.  They can come in and voice

17   their opinion.  And obviously if they have a specific

18   concern or they make some sort of claim that they want to be

19   followed up on, then we would, you know, ask if they want to

20   give their name and number and whatever contact information.

21   If they don't, then, you know --

22        THE COURT:  And who will be the moderator?

23        MR. FINGERHOOD:  It will be Assistant U.S. Attorney

24   Mitzi Paige.

25        THE COURT:  And so she will be moderating this

1    discussion.

2        MR. FINGERHOOD:  Yes, sir.

3        THE COURT:  And I suppose as moderator she will have

4    some powers of moderation, like finding out who is talking?

5        MR. FINGERHOOD:  I don't think that would be an opening

6    question.  I think -- as Your Honor said, I think it is

7    going to be an open mic type of situation.  Someone will

8    raise their hand and, you know, someone will bring a

9    microphone to them.

10       THE COURT:  I never heard of a proceeding like that.

11   Is this an official proceeding?

12       MR. FINGERHOOD:  No, it is not an official --

13       THE COURT:  So this is -- this is nonofficial.

14       MR. FINGERHOOD:  Right.  It is for EPA's own and DOJ's

15   own purposes just to hear from the community.  There is no

16   recording.  In our past meetings, we have -- we have really

17   only had concerned people from Jackson show up.  We haven't

18   had by-passers come in.  And for the public comment period,

19   it was a more formalized process where we did have a court

20   reporter and we did prepare a transcript and did have people

21   give their, you know, names and contact information, but

22   this is not that type of process.  It is supposed to be

23   informal, and it is an opportunity to hear from the

24   community.

25       THE COURT:  What code section authorizes this?  I have

1   never heard of this before in this informal context with

2   these loose procedural indicators of anybody who can get up

3   and say anything without any aspect of being tied to what

4   they were saying or involved in what they were saying, and I

5   have just never heard of a setting like this.  So what is

6   the regulatory pronouncement for this?

7          MR. FINGERHOOD:  I don't believe there is a regulation

8   that establishes this.  It's just, you know, as the

9   regulatory agency, EPA wants to hear from the public, and if

10  there are, like I said, specific concerns or claims that are

11  made, then, you know, we can ask for people to provide their

12  information, but they -- we're not requiring it and we're

13  not, you know, having people verify their address when they

14  come in.  It is just an open listening session.

15         THE COURT:  Do you expect the press to be there?

16         MR. FINGERHOOD:  I do think that there will likely be

17  some press that show up.

18         THE COURT:  Did you invite the press?  Not you

19  personally but your agency, your agents, did you invite the

20  press?

21         MR. FINGERHOOD:  I don't think they were specifically

22  invited, but I think we did reach out to them to publicize.

23         THE COURT:  So you notified them?

24         MR. FINGERHOOD:  Yeah, we did notify them.

25         THE COURT:  And what did you notify them of?

1      MR. FINGERHOOD:  That, you know, we were having these

2   outreach meetings, the date, the location, the times.

3      THE COURT:  And this notification gave all the

4   appearance of an official proceeding?

5      MR. FINGERHOOD:  No.

6      THE COURT:  Your notification didn't say that this is

7   thoroughly unofficial?

8      MR. FINGERHOOD:  No.  It said it's just a public

9   outreach.

10      THE COURT:  Put on by the EPA.

11      MR. FINGERHOOD:  EPA and DOJ.

12      THE COURT:  So it gives people the impression that it

13   is a formalized proceeding.

14      MR. FINGERHOOD:  Well, no, not a -- it is us wanting to

15   hear from the community.  It's not a --

16      THE COURT:  But you don't know if you're hearing from

17   the community.  You said you don't know where these people

18   will be coming from.

19      MR. FINGERHOOD:  Right.

20      THE COURT:  So how do you know you are hearing from the

21   community?

22      MR. FINGERHOOD:  Well, we are hearing from people who

23   want to come up to the microphone.  We will have sign-in

24   sheets, so if people do want to sign in, they can.

25      THE COURT:  But if they don't want to sign in, they

1    don't have to.

2        MR. FINGERHOOD:  Right.

3        THE COURT:  And so, then, how do you know, then, that

4    the majority of your attendees won't be just political

5    hacks?  How do you know that?  You can't know that, can you?

6        MR. FINGERHOOD:  No, I don't know that.

7        THE COURT:  So, then, you don't know what motive these

8    people might have or, for that matter, as I said before,

9    whether they have a water issue at all.

10        MR. FINGERHOOD:  That's correct.

11        THE COURT:  I just never heard of that.

12        MR. FINGERHOOD:  I think it is actually somewhat,

13    common, Your Honor, not just for EPA but across the

14    government, especially, you know, more recently that the

15    regulators want to hear from the communities that they are

16    working with.  So it's not a formal process and there is no

17    kind of regulatory basis for it, and there is no, I guess,

18    required outcome either.  We -- we would like to hear from

19    them and, you know, they may have specific concerns; they

20    may have general concerns; they may have praise.  And so

21    we're -- we just want to hear whatever they have to say.

22        THE COURT:  So how much publicity did you submit on

23    this matter?  I didn't hear about it until the other day.

24    So how long has your publicity machinery been operating?

25        MR. FINGERHOOD:  Well, I don't know if we have a

1    publicity machinery, but there are some, you know, public

2    affairs people at EPA, and I think they sent out emails to

3    people who had attended past meetings.  Also, you know, the

4    local TV networks, radio stations, you know, they got a, you

5    know, notification and request to, you know, let the public

6    know.

7        THE COURT:  When is the last time you had such a

8    meeting anywhere in the country?

9        MR. FINGERHOOD:  Well, I know specifically in Jackson,

10    we had one in March, I guess following the --

11        THE COURT:  Well, you know, I know about the ones that

12    were held in three different venues here.

13        MR. FINGERHOOD:  Right.

14        THE COURT:  But that had a different procedural

15    background.  And not only had a different procedural

16    background, but the Court was notified on all three of

17    those.

18        MR. FINGERHOOD:  Right.

19        THE COURT:  Unlike this one.  The Court was not

20    notified formally, was it?

21        MR. FINGERHOOD:  Right.  Well, we did provide a letter

22    to the Court in advance.

23        THE COURT:  After you had -- not in advance.  You mean

24    after you had planned it.

25        MR. FINGERHOOD:  Yeah.  But before it was publicized.

1    But the -- you know, it is not that unheard of.  In fact,

2    you know, the third-party manager has quarterly, you know,

3    meetings where the public can come in.  He also has -- I

4    mean, I think this is something that is done, you know, in

5    all different situations, especially more recently where,

6    you know, the regulator would like to hear from the

7    community.

8         THE COURT:  What about Mr. Henifin?  Was he informed?

9         MR. FINGERHOOD:  Yes, he was informed.  As was the City

10   and the State and the intervenors.  So we did let them know.

11        THE COURT:  Do you have your public announcement?  Do

12   you have that with you?

13        MR. FINGERHOOD:  We have -- yeah, we have a -- is that

14   the press release?

15        THE COURT:  Yes, press release will do.  Could you read

16   it into the record?

17        MR. FINGERHOOD:  It is -- I can also submit a copy, but

18   I'm also happy to read it into the record.

19        THE COURT:  Okay.  I'll take the hard copy for the

20   record, but could you go ahead and read that into the

21   record?

22        MR. FINGERHOOD:  Sure.  "Community input needed for

23   City of Jackson drinking water system.

24        "September 26, 2024.

25        "Contact Information EPA Region 4 Press Office.

1          "404-562-8400.

2          "Jackson, Mississippi.  (September 26, 2024) - the U.S.

3    Environmental Protection Agency (EPA) and U.S. Department of

4    Justice will hold public meetings to get community input on

5    mid- and long-term solutions to improve Jackson's drinking

6    water system.  This feedback will assist the agency's

7    oversight of the drinking water system.  The meetings will

8    be held at the Mississippi e-Center at Jackson State

9    University located at 1230 Raymond Road.  The meetings will

10   be held on Thursday, October 10th at 6 p.m. Central Standard

11   Time in the e-Logistics Room and Friday, October 11th at 10

12   a.m. Central Standard Time in the California Room.

13        "The EPA and DOJ have heard from the public in previous

14   meetings, letters, emails, and phone calls concerning the

15   future of the drinking water system.  In the upcoming

16   meetings, the EPA and DOJ are seeking additional community

17   input on the future of the system.

18        "Background.

19        "On November 29, 2022, the United States District Court

20   for the Southern District of Mississippi" -- that would be

21   Your Honor -- "entered an Interim Stipulated Order (ISO),

22   agreed to by the EPA, the Department of Justice, the

23   Mississippi State Department of Health, and the City of

24   Jackson to:  (1) create a Priority Projects List with steps

25   needed to stabilize the City's drinking water system, remedy

1  problems that contributed to the water crisis, and establish

2  sustainable practices; (2) appoint Edward 'Ted' Henifin as

3  the Interim Third-Party Manager (ITPM) to manage the City's

4  drinking water system and implement the Prior Projects List;

5  and (3) delay further litigation while the Parties (EPA,

6  MSDH, DOJ, and the City) worked on a longer-term solution.

7       "In addition to hearing from the community at the

8  meetings, we have created an email box to gather your input.

9  Comments can also be sent to JacksonMSWater@epa.gov until

10  Friday October 31, 2024.

11      "The EPA and DOJ cannot discuss details of negotiations

12  with the City or MSDH about this civil enforcement action.

13      "For more information, please visit

14  www.epa.gov/ms/jackson-ms-drinking-water."

15      And that's it.  It has some language if you need

16  assistance for different languages.

17      THE COURT:  All right.  Thank you.  If you would make

18  that copy available to my courtroom department here, I would

19  appreciate it.  Do you want to take that note up from your

20  brain trust first?

21      MR. FINGERHOOD:  I will when I return.

22      THE COURT:  Thank you.  Now -- let me see it.  Who came

23  up with the catchy title, "Community input needed for City

24  of Jackson drinking water system"?

25      MR. FINGERHOOD:  Someone in the EPA public affairs

1    office.

2        THE COURT:  Okay.  And then whose idea was this -- this

3    whole matter right here and decision not to go through the

4    Court, for instance?  Whose decision was that?

5        MR. FINGERHOOD:  Well, I think it's something, as I

6    said, that has been done in other cases and not just -- you

7    know, not just cases but other issues where the regulator

8    wants to hear from the community.  I think it's kind of a,

9    you know, principle of good government that you want to hear

10   from the constituents.  I think, like I said, it is not

11   going to be transcribed, and perhaps that's a setting that

12   might make people feel more comfortable to say what they

13   have to say.  And as Your Honor says maybe, you know, we --

14   it is not going be verified.  They are not under oath.  And

15   it's just to hear from the community, and it's, you know,

16   something that I think is being done more and more when the

17   government is involved in, you know, taking certain

18   regulatory actions.

19       THE COURT:  So then it says here on the background that

20   this stipulated order was entered, "agreed to by the EPA,

21   the Department of Justice, the Mississippi State Department

22   of Health, and the City of Jackson (1) to create a Priority

23   Projects List with steps needed to stabilize the City's

24   drinking water system, remedy problem that contributed to

25   the water crisis, and establish sustainable practices."

1      That was part of the stipulated order, correct.

2      MR. FINGERHOOD:  Correct.

3      THE COURT:  Do you think that in large part this has

4  been done?

5      MR. FINGERHOOD:  Yes.  In fact, we just heard a status

6  report as far as the progress that has been made, and, you

7  know, there are still things that need to be done, and those

8  are, you know, being done, and there has been consultation

9  between, you know, the third-party manager and the State and

10  EPA on -- on all those technical issues, and that's why I

11  said at the beginning of our remarks I didn't have anything

12  to add to the third-party manager's update.

13      THE COURT:  Okay.  And then number two:  "appoint

14  Edward 'Ted' Henifin as the Interim Third-Party Manager to

15  manage the City's drinking water system and implement the

16  Priority Protects List."

17      Are you of the opinion that he has done a good job in

18  doing these things?

19      MR. FINGERHOOD:  Yes.  I think I said that earlier,

20  that he has been giving the status reports and he has been

21  coordinating with both the State and EPA on, you know, what

22  he has been doing, what he is planning on doing, and I have

23  heard no concerns from my client on -- as far as the work

24  that is being done on the priority projects list and the

25  updates he has been giving to the Court and the regulators.

1      THE COURT:  This Court has been tasked with

2  oversighting these matters.  Are there some matters that the

3  EPA feels that the Court could be stronger in providing its

4  oversight in as opposed to what it has done thus far?

5      MR. FINGERHOOD:  No, Your Honor.  And if we did feel

6  that way, we would bring an appropriate pleading and ask

7  Your Honor to do that, but, you know, we haven't filed any

8  such pleading.

9      THE COURT:  And then the last one on here:  "delay

10  further litigation while the parties (EPA, MSDH, DOJ, and

11  the City) work on a long-term solution."

12      Now, isn't that what is being done now under Henifin,

13  trying to determine a long-term solution?  But before we get

14  to a long-term solution, we have to address the short-term

15  problems to put ourselves on an even keel to even think

16  about the long term.  And do you agree with that since there

17  are some issues that still need to be resolved?

18      MR. FINGERHOOD:  Yes, sir.  There is still work to be

19  done even on the priority project list.

20      THE COURT:  We still can't get to the financial

21  stability that we need to be at because people are not

22  paying their bills and are not even on the rolls.  So we

23  still have all those things to consider and to address.  And

24  then, of course, this matter of a long-term solution.  Do

25  you have one in mind that -- that is precious to you?

1          MR. FINGERHOOD:  No, I don't, Your Honor.  I do want

2     to, I guess, maybe take a step back.  You know, when we

3     first negotiated the interim stipulated order, we didn't

4     know about any of this money that was going to come from

5     Congress.  We were trying to figure out what we could do

6     with the money that the City had and the revenue it was

7     bringing in at the time, and Mr. Henifin agreed to kind of

8     take the position under those circumstances.

9          You know, it was fortunate that Congress saw fit to

10    provide that money.  I think everybody would say -- I don't

11    think it is controversial -- that that money, even though it

12    is a terrific amount and has helped make tremendous

13    progress, it is not enough to address all of the concerns

14    that need to be met, especially when you factor in the sewer

15    system, because none of that money can be used towards the

16    sewer.  All of the money from Congress primarily -- well,

17    has to go either to capital improvement projects or the

18    small portion that can be used for O and M.

19          THE COURT:  I think I asked this question before on one

20    of our previous occasions, but I'll ask it again:  Have you

21    ever taken a tour of Jackson to see firsthand its particular

22    water problems and sewage problems?

23          MR. FINGERHOOD:  I was on a small tour with Your Honor

24    and --

25          THE COURT:  That's the first time.  And that was way

```
 1    some time ago.  But since then, have you taken one?
 2        MR. FINGERHOOD:  I have been in Jackson many times, and
 3    I have seen a lot of the infrastructure problems, the sewer
 4    overflows, and, you know, I'm also aware of them through,
 5    you know, our engineers, who meet frequently with the City
 6    and the State and Mr. Henifin, and they are all also aware
 7    of the progress that has been made since the interim order
 8    has been --
 9        THE COURT:  Was there ever a time you didn't trust
10    drinking Jackson's water?
11        MR. FINGERHOOD:  I always drank the water and --
12        THE COURT:  Did you always trust it?
13        MR. FINGERHOOD:  Yeah.  I'm not a bottled water person
14    personally, and, you know, there are certain other issues
15    with, you know, bottles and all of that other stuff too, so
16    I have always -- I use tap water.
17        THE COURT:  So then --
18        MR. FINGERHOOD:  But I don't live in Jackson and I
19    haven't experienced the issues that the people who live here
20    do.  That is one of the reasons that we like to hear from
21    the community.  I know Your Honor has personally experienced
22    many of these things.  Some of the people I work with --
23    AUSA Paige has experienced a number of these issues as well
24    as some of the, you know, state and -- engineers who, you
25    know, have been working on this case.  So, you know, I know
```

1    this has been a long-running problem.

2        THE COURT:  But you have seen the reports that say that

3    the water here is safe.

4        MR. FINGERHOOD:  I haven't seen the Yale report, but I

5    have seen --

6        THE COURT:  Well, that just happened.

7        MR. FINGERHOOD:  Right.  I have seen the EPA and the

8    state reports about the -- you know, the water quality and

9    also the recent PFA testing, which I think that rule

10   actually has been finalized now, so there is an official

11   limit on what can be in the water.  And as Mr. Henifin

12   accurately reported, Jackson's levels are way below that

13   threshold.

14       THE COURT:  Yeah.  So far, these reports have been

15   quite -- quite glowing towards Jackson.  They show what

16   Jackson has become as opposed to where it was.  Of course,

17   you know all that, though, because weren't you with Jackson

18   and this crisis years and years and years ago?

19       MR. FINGERHOOD:  Yes, Your Honor.  I was one of the

20   original people who worked on the sewer consent decree.

21       THE COURT:  That's right.  And that was a long time

22   ago.  And so, then, you then have firsthand knowledge; that

23   is, from your filings and from your monitoring of Jackson's

24   drinking and sewage problems for many years.

25       Would you say -- and if it puts you on the -- you know,

1    on the hook, just let me know, but would you say that

2    Jackson has improved drastically in the last couple of years

3    or so?

4        MR. FINGERHOOD:  Yeah.  I mean, I -- I don't think, you

5    know, you need to take my word for it, but, you know, the

6    reports are filed with the Court that show that, you know,

7    there has been progress made, there has been water testing

8    on the sewer side, there have been reports filed with MDEQ,

9    so I think people can look and see that information is out

10   there.

11       THE COURT:  Well, I ask these questions because I would

12   hate for the public to get the impression from this flier

13   that you all suspect that Jackson is not doing well, but

14   that is not what this flier is about, though, is it?

15       MR. FINGERHOOD:  It's just to hear from the public both

16   positive and negative.  And as the third-party manager

17   reported, when we did have the public comment period, the

18   official public comment period, on the sewer stipulated

19   order, the feedback was overwhelmingly positive.

20       THE COURT:  Exactly.  So I just wanted to be clear that

21   this public service announcement is not the result of some

22   criticism of Mr. Henifin's work at this point?

23       MR. FINGERHOOD:  Correct.  It's an opportunity to hear

24   from the public.

25       THE COURT:  It is just an opportunity for the public,

1    whoever they might be, to weigh in on what they think about

2    the matter.  But, of course, we recognize that much of the

3    public does not really understand all of the issues that are

4    here involved, only a portion; that is, what affects them

5    directly, as to whether their house is flooded or whether

6    their house does not have any water.

7        But, of course, Mr. Henifin and his crew are open to

8    those telephone calls to come in to tell them that so that

9    it can get started immediately what they have been doing,

10   but that this flier and that this meeting, they are not the

11   product of some criticism from EPA or from the Justice

12   Department where they are -- where you all are investigating

13   the City and its problems as though it needs more than a

14   Band-Aid.

15       MR. FINGERHOOD:  No, that's -- that's -- you have said

16   it correctly.  There is no investigation.  We just want to

17   hear from the public positive, negative.  Just want to hear

18   what they have to say, you know, get their thoughts.

19       THE COURT:  Okay.  But I still repeat that I'm

20   surprised that the EPA would be anchoring a proceeding which

21   is guaranteed to, from what I have heard so far, present

22   people of unidentified identities, unidentified names,

23   addresses, and legitimacy as to what they are talking about.

24   These folk just simply might be folk who, for some reason,

25   don't like the consent decree or might be some people who

1   just don't like the Court's involvement vis the involvement

2   and the control of the City or might be some people who just

3   don't like our third-party interim manager.  And I can't for

4   the life of me under this procedure that you are proposing,

5   see how that's supposed to be helpful when you will not know

6   the integrity, will not know the legitimacy of the comments.

7   I don't quite understand that.

8        Everybody who appeared before me at my last status

9   conference I allowed to come to the microphone, state

10  his/her name, address, connection so that anyone who wanted

11  to know if they had a legitimate gripe could investigate

12  what they said and understand from whence they are coming.

13  But under the procedure you just explained, anybody could

14  show up.  Like I said, it could be a passing truck driver

15  who drives interstate, just stopped at the meeting because

16  it looked interesting and come in and start making

17  complaints about water which might actually emanate from his

18  hometown in Flint, Michigan.

19       So we have no idea where these people might be coming

20  from and what they might be saying, and yet two reputable

21  agencies are inviting them to come out to allegedly provide

22  input that's supposed to be helpful.  I don't understand how

23  you can even say that's helpful.  But nevertheless, that is

24  what you have chosen to do, and so I'll go with that.

25       So let me see what I have here.  Hold on just for a

1    second.

2        Oh, yeah.  There was one other matter.  This -- let's

3    see.  There was a note.  It's not on this document.  It's on

4    another one.  I'm asking about a letter from the mayor's

5    office that went to the EPA administration that I have a

6    copy of here.  This letter is dated March 27, 2024.  And in

7    this letter were some criticisms of the third-party manager,

8    Mr. Henifin.  Are you familiar with that letter?

9        MR. FINGERHOOD:  I believe I have seen a copy of it.

10        THE COURT:  Well, I ask because this letter has a

11    number of items in it that this Court took up at its last

12    status conference, and you were at that last status

13    conference where I expressed my displeasure to some of the

14    people who appeared at the podium there to make their

15    complaints about what had been ongoing.  Some of those

16    complaints were ridiculous, but nevertheless, I wrote an

17    opinion, a response, later as to those.  In fact, I pointed

18    out how a number of persons simply had some misinformed

19    ideas and even some racist ideas, and so I pointed all of

20    that out in my public response to those people who had

21    chosen to address the City on their comments which were not

22    informed.

23        But my question is:  Since this letter is dated back in

24    March 27, '24, do you know whether your agency was anywise

25    motivated to have these conferences that we are now talking

1    about by that last status conference and some of those

2    comments that were made there and by this office -- in this

3    letter from the mayor's office?

4        MR. FINGERHOOD:  No, I'm not sure if the letter was

5    actually filed with the Court.  I do recall seeing that,

6    but, no --

7        THE COURT:  But you did read the letter?

8        MR. FINGERHOOD:  -- I have no knowledge of that.

9        THE COURT:  But you did read the letter?

10       MR. FINGERHOOD:  Oh, yeah.  I think EPA may have

11   responded to it.

12       THE COURT:  Yeah.  You saw my response.

13       MR. FINGERHOOD:  I think EPA issued a --

14       THE COURT:  Huh?

15       MR. FINGERHOOD:  I think EPA responded as well.

16       THE COURT:  And what did you think about my response

17   when I criticized some of those persons who had appeared

18   before this Court for their racist comments where they said

19   that their problem with Mr. Henifin was that he was white

20   and that he was also from out of state?  What did you think

21   about that?

22       MR. FINGERHOOD:  I have no position on that, Your

23   Honor.

24       THE COURT:  You think it might be right?

25       MR. FINGERHOOD:  I have no position on that.

1       THE COURT:  Well, do you agree with it?  Do you think

2  that is a valid criticism?  I'm putting you on the line

3  here.  You represent EPA here, and I'd like to know what

4  EPA's position is here.

5       MR. FINGERHOOD:  I don't think EPA has any official

6  position on that.

7       THE COURT:  Do you think EPA is racist?

8       MR. FINGERHOOD:  I -- I have not seen that in my

9  experience.

10       THE COURT:  So, then, EPA would be against any racist

11  comments, then, wouldn't they?

12       MR. FINGERHOOD:  Yes, I think --

13       THE COURT:  Or do you think that EPA harbors some race

14  against Jacksonians?

15       MR. FINGERHOOD:  No, I don't think that.

16       THE COURT:  So, then, you would agree with me, then

17  that if those comments that I emphasize and isolated were

18  racist, then you would agree that EPA would be against those

19  comments, wouldn't you?

20       MR. FINGERHOOD:  (Inaudible).

21       THE COURT REPORTER:  Can you repeat that?

22       THE COURT:  He said EPA does not take any position on

23  that.

24       Is that correct?

25       MR. FINGERHOOD:  I think there was a transcript, and

1    people can look at the transcript and read Your Honor's

2    opinion and --

3        THE COURT:  But you can read it too, though, can't you?

4        MR. FINGERHOOD:  I can, but my --

5        THE COURT:  And you then have a -- you then have a

6    notion of what racism is, don't you?

7        MR. FINGERHOOD:  My own personal opinions are not

8    before this Court.

9        THE COURT:  Okay.  So EPA -- but you speak --

10        MR. FINGERHOOD:  EPA and DOJ have not taken any --

11        THE COURT:  But you speak for them right now, though,

12    don't you?

13        MR. FINGERHOOD:  On -- on the matters that are, you

14    know, being litigated before the Court.

15        THE COURT:  Well, I mean, you don't think that matter

16    was being litigated here in court about criticisms against

17    what was taken place?  You don't think that is official?

18        MR. FINGERHOOD:  There has been criticism.  There has

19    been praise.  There have been both.  And I'm here to follow

20    the law and argue on behalf of the United States and EPA.

21        THE COURT:  Well, I'm just trying to determine why did

22    you come to hold what is, in my estimation, an unusual

23    session after you have received a letter from the mayor.

24        MR. FINGERHOOD:  Yeah.  This public meeting is not

25    motivated in any fashion by the mayor's letter.  We are just

1    trying to hear from the public.  If it would be helpful, I

2    could provide this Court with a list of EPA outreach

3    meetings that they have held on various matters, you know,

4    in the past year and you can see that it's widespread not

5    just through EPA but throughout other federal agencies as

6    well.

7        THE COURT:  Was this letter taken into account at all

8    in your decision to hold these ad hoc meetings?

9        MR. FINGERHOOD:  To my knowledge, no.

10       THE COURT:  Let me ask you more directly.  Is this

11   letter from the mayor some sort of foundation for the EPA

12   and Justice Department taking a contrary view of the

13   progress that is being made in Jackson under Ted Henifin?

14       MR. FINGERHOOD:  No.  I mean, I think we have been

15   clear on the record today at the status report that we were

16   pleased with the progress that has been made.

17       THE COURT:  Well, I just wanted to know whether there

18   is some effort to try and undermine that progress, because

19   for years, you know, we had no progress.  In fact, we had

20   nothing.  And so I was making sure that this letter here was

21   not some foundation for you all coming in here to advise the

22   public that, quote, "Community input needed for City of

23   Jackson drinking water system," because that is the heading

24   on this matter.  It could give a different impression to

25   someone that the EPA, the powerful Environmental Protection

```
 1      Agency, and the Justice Department are coming here to

 2      investigate what has been going on down here.  But you

 3      didn't come for that, though, did you?

 4          MR. FINGERHOOD:  No.  We just came to hear from the

 5      public.

 6          THE COURT:  So there is no investigatory effort expect

 7      to be expended on this matter, is it?

 8          MR. FINGERHOOD:  Not that I'm aware of.  This is to --

 9      a public meeting for people to, you know, hear from the

10      public.  You know, they may have good things to say; they

11      may have complaints.  And maybe to the extent, like I said

12      before, you know, people had a backup in their home, so we

13      let the third-party manager know about that, and I think he

14      responded to those fairly quickly.  So they may hear some of

15      that tonight too.  And we will, of course, again, pass those

16      on to his --

17          THE COURT:  Your brain trust has another note for you.

18          MR. FINGERHOOD:  Also, when we had the prior meetings

19      too, we promised the community that, you know, we wouldn't

20      just kind of come in once, hear from them, and never hear

21      from them again.  So we also did say, you know, we will be

22      back to hear from you at some point in the future.  So this

23      is some point in the future.

24          There may be, even further down the line, additional

25      outreach meetings.  We will make sure we give the Court
```

1    advance notice of any such future ones.  But it's a process

2    that EPA and other agencies have been doing more so recently

3    in the last few years.

4        THE COURT:  Okay.  Well, you have something you want to

5    add?  I have asked you a lot of questions, and I don't to

6    shortchange your responses.  So if you have something you

7    want to say, you can talk to your brain trust over there for

8    a moment and see if there is something that you should close

9    out with.  Okay?  So go right ahead.

10        MR. FINGERHOOD:  Okay.  Thank you, Your Honor.

11        THE COURT:  Okay.

12        MR. FINGERHOOD:  The brain trust has nothing further,

13    Your Honor.

14        THE COURT:  Are you all sure?

15        Ms. Williams, are you all sure that you don't have

16    anything?

17        MS. WILLIAMS:  Yes, Your Honor, we are.

18        THE COURT:  If you all have another note for him, go

19    ahead and give it to him now.

20        MS. WILLIAMS:  We would if we did, Your Honor, but we

21    don't.  We appreciate your graciousness, though.

22        THE COURT:  Okay.  Thank you.

23        And, Ms. Paige, I assume that both of you all were

24    acting together?

25        MS. PAIGE:  Yes, Your Honor.  She speaks for me as

```
 1    well.

 2         THE COURT:  Okay, then.  Thank you very much.  You got

 3    two able people sitting next to you.

 4         MR. FINGERHOOD:  Very fortunate.

 5         THE COURT:  All right, then.  Now, of my original

 6    plaintiffs and defendants, I want to hear from you on the

 7    status.

 8         And so now, Mr. Henifin, is there something else you

 9    want to add?

10         MR. HENIFIN:  There is.  I hate to go there.

11         THE COURT:  Go ahead.

12         MR. HENIFIN:  I think this horse has been beaten, but

13    I'll continue to whip it.

14         So on this meeting tonight, the flier that was sent

15    that was delivered to me, had a link at the bottom:  "For

16    more information."  When you clink on that link, it takes

17    you to the EPA website.  Last paragraph of the EPA website

18    says, "The EPA and DOJ have heard from the public in

19    previous meeting, letters, emails, and phone calls about

20    what matters to you concerning the future of the drinking

21    water system.  This has included a desire to hire from

22    within the community and use local contractors, requests for

23    increased transparency and information, the importance of

24    ensuring accountability and equity, and the importance of

25    having a voice about the future of the system.  Through
```

1    these meetings, the EPA and DOJ are hoping to receive input

2    on several different items where your voice could have an

3    impact."

4        Take you back to the letter from May 27th (sic) you

5    were referring to.  Mayor highlights five issues.  Four of

6    those issues are listed in that same area:  the use of local

7    contractors and hiring from within is the "Lack of

8    Competitive Procurement," number 1 in the mayor's letter.

9        "Insufficient Communication and Coordination" would

10   line right up with "transparency and information."

11       "Uncertainty in Financial Planning" is the

12   "accountability and equity."

13       And finally, the improper support of the legislation

14   that was proposed was the voice in the future of the system.

15       So I would believe that somehow this letter is linked

16   to this meeting.

17       THE COURT:  Well, let's go back to the EPA.  You all

18   just happened to utilize the same four out of five factors

19   that the mayor's letter included?

20       MR. FINGERHOOD:  Those are concerns that were raised by

21   the public, and I think the third-party manager has been --

22   has made efforts to accommodate those.  For example, when we

23   did negotiate the stipulated order, he now has quarterly

24   public meetings.  He also started the JXN Water Academy,

25   which allows people to learn about the drinking water

 1   system.

 2       So we have, you know, spoken with him about these

 3   concerns, and he has taken steps to incorporate those.  He

 4   has on his website, you know, list transparency about, you

 5   know, the local contractors he has used and the minority

 6   business enterprises that he has been contracting with.

 7       Now, as he explains, and this is a valid point, you

 8   know, Jacobs Engineering that runs the plant is a large

 9   national, maybe international, firm, and so they hire people

10   from all over, and, you know, financially that's where most

11   of the money goes.  There's a national shortage of qualified

12   water engineers.  That is one of the reasons, you know, the

13   system got to be where it was.  And so -- but it's all

14   been -- there is transparency now.  He has been posting this

15   information.

16       There are -- people commented about, well, where is the

17   money going?  He has a tracker on his website that you can

18   go and see, you know, where the money -- and it has pie

19   charts and things.

20       So there are things that were raised, and we mentioned

21   them to him, and he has taken steps to -- to try and

22   incorporate those into both his website and, you know,

23   notices.  And, you know, he now has, you know, public

24   relations or public affairs people who help also kind of

25   reach out and kind of let the public know what is being

1    done.

2         So that's all I have to say.

3         THE COURT:  So you are telling me that the mayor's

4    letter which mentioned these in particular and these same

5    factors ended up being in your notice are just a

6    coincidence?

7         MR. FINGERHOOD:  It is the same issues that have been

8    raised.

9         THE COURT:  You are saying it is a coincidence and that

10   you were not influenced by the mayor's letter?

11        MR. FINGERHOOD:  No, I don't believe that to be the

12   case.

13        THE COURT:  Well, then who wrote that flier?

14        MR. FINGERHOOD:  Huh?

15        THE COURT:  Who wrote the flier?

16        MR. FINGERHOOD:  Someone at the EPA public relations.

17        THE COURT:  And it just happened to identify the same

18   four out of five factors that the mayor said in almost the

19   same language?

20        MR. FINGERHOOD:  I don't know.  I can't speak to what

21   the mayor wrote or where he got those factors.

22        THE COURT:  Well, you have the mayor's letter, don't

23   you?  And you had a flier.

24        MR. FINGERHOOD:  I have seen it, yeah.

25        THE COURT:  Well, can you just compare those just for a

1    second and tell me if that was just a coincidence?

2        MR. FINGERHOOD:  To my knowledge, I think those are the

3    things that have been raised in the public, both before the

4    letter -- I don't think those are things that, you know --

5    wasn't any specific thing.  I think, you know, we have

6    probably mentioned those to the third-party manager in the

7    past, and that, I think, is why he, you know, has made some

8    of the things -- you know, I don't where the mayor --

9        THE COURT:  You know, that transparency matter was

10    something that the group that came in front of me last time

11    constantly talked about, but yet when I asked them what they

12    meant by "transparency," apparently they didn't have a

13    dictionary to look that word up, because they didn't know.

14    And so I had asked them what was not transparent.

15        Just a few moments ago, you gave all the -- not all,

16    but you gave various matters where our third-party manager

17    has endeavored to be just that:  transparent.  So, then, why

18    is that one of the matters you want to investigate when you

19    just said that there has been so much progress in that area?

20        MR. FINGERHOOD:  I didn't say, Your Honor -- with all

21    due respect, I don't think we said we are investigating

22    anything.

23        THE COURT:  Well, it is --

24        MR. FINGERHOOD:  We want to hear from the public.

25        THE COURT:  It says "Community input needed," and then

1     Mr. Henifin read that footnote.  So did you not read the

2     footnote in your own flier?

3          Mr. Henifin, was that a footnote in that flier?

4          MR. HENIFIN:  Yes, Your Honor.  It was -- the flier

5     that they prepared had a "For more information," go to this

6     link, and that is where I went to and found the information

7     I just relayed.

8          THE COURT:  I see.

9          MR. FINGERHOOD:  I mean, I -- those are concerns we

10    have heard for, you know, some time, and, as I said, we have

11    relayed those to Mr. Henifin, and he has made efforts to

12    address those.  We have heard that, you know, beginning back

13    in -- I think it was March of 2023, when we had meetings

14    with some of the smaller groups, the schools, the hospitals,

15    the business leaders, so I don't think it was something new.

16    I don't think it was related to the letter from the mayor.

17         THE COURT:  Sounds rather suspicious, doesn't it?

18         MR. FINGERHOOD:  I -- I mean, I think these have been,

19    you know, out there in the press and people have been saying

20    these things, and, you know, there have been -- we have

21    relayed them.  And, you know, you mentioned the -- the

22    hearing.  I think that may have preceded some of these

23    changes that were made to the sewer stipulated order and

24    also some of the additions to the website that, you know,

25    Mr. Henifin and JXN Water have made to include a lot more

1    information.  And, you know, there is -- you know, he has

2    the 24-hour hotline too.  I think a lot of efforts have been

3    made to address the concerns.

4        Now, I'm sure people still may have some concerns, and

5    we'll hear what they are and we'll -- to the extent they

6    relate to, you know, what EPA is doing, what the State is

7    doing, what the third-party manager is doing, we'll pass

8    those along as well.

9        THE COURT:  I want to be sure about this last point,

10   and then we'll finish.  You are speaking on behalf of EPA,

11   aren't you?

12       MR. FINGERHOOD:  Yes.  EPA is my client.

13       THE COURT:  And so you are speaking on EPA's behalf.

14       MR. FINGERHOOD:  Correct.

15       THE COURT:  So the answers you have provided here are

16   answers that are binding EPA as to what EPA's mission is

17   here and EPA's recognition of what has been accomplished

18   here?

19       MR. FINGERHOOD:  Correct.  We have -- I have stated

20   EPA's position on the status report, and the public outreach

21   meetings are merely just to hear from the public.

22       THE COURT:  And EPA is committed to assisting this

23   project, to assisting this Court, to assisting Mr. Henifin,

24   to assisting the water industry, and to assisting the

25   sewage, you know, efforts to ensure that the citizenry of

1    Jackson are getting what they should get as citizens of this

2    city, and so EPA is not interested in working against those

3    interests, is it?

4        MR. FINGERHOOD:  No, Your Honor.  Our interest is

5    ensuring that the laws with respect to safe drinking water

6    and the laws related to clean water are complied with both

7    here in Jackson as they are everywhere else in the United

8    States.

9        THE COURT:  So EPA and Justice are committed to

10    handling this matter in a justiciable manner to be fair to

11    the citizens of Jackson and not to, for instance, the

12    mayor's administration?

13        MR. FINGERHOOD:  No.  Our obligation is to the citizens

14    of the United States and the people of Jackson.

15        THE COURT:  Citizens of Jackson.  I also threw in the

16    "citizens of Jackson."

17        MR. FINGERHOOD:  And the citizens of Jackson to ensure

18    that the laws applying to safe drinking water and clean

19    water are applied to them just as they are everywhere else

20    in the country.

21        THE COURT:  So you do not see your agency as being a

22    tool of city government here?

23        MR. FINGERHOOD:  No.  We are here to work with the --

24    to enforce the federal laws.

25        THE COURT:  No matter where they fall?  No matter --

1       MR. FINGERHOOD:  Right.  Right.

2       THE COURT:  Whether they fall --

3       MR. FINGERHOOD:  I guess Your Honor knows we had a

4 disagreement over what the law provided with respect to SNAP

5 recipients' information.

6       THE COURT:  That's right.

7       MR. FINGERHOOD:  And I know you didn't like my position

8 there, but I felt that that was the position of -- that was

9 provided for in the statute, and you disagreed with me and

10 issued an order.

11       THE COURT:  Well, I understand --

12       MR. FINGERHOOD:  So that happens, but that's my -- my

13 obligation is to --

14       THE COURT:  And I want you to continue to support your

15 obligation.  I understand why you took that position.  At

16 least I could understand it, because there was some

17 language, and I understand that if you follow that language,

18 then you come out with your interpretation.  And so,

19 therefore, there was another interpretation that I would

20 have preferred, but nevertheless, I understand that

21 reasonable minds can differ, and therefore, I agree with you

22 on taking your stance, because I anticipated what you would

23 say.  I didn't like what it was because I was hoping for a

24 different outcome, but it didn't happen.  But nevertheless,

25 this Court took no umbrage at what you said, and the Court

 1  thoroughly respected you in your legal opinion, and you had

 2  a certain requirement to follow the law as you read it, your

 3  agency read it, and I understood what they did, and it is

 4  actually a reasonable interpretation.

 5      It is up to another court to make a determination as to

 6  whether there can be a quote/unquote exception or whether

 7  there can be a broadening of the category as I had hoped

 8  that we could have.  But if the court -- but if they decide

 9  they don't want to broaden that category to include this

10  matter, that's certainly within the court's prerogative, but

11  it still is a reasonable matter.

12      But there are some things that just aren't reasonable,

13  and some of those people who appeared in front of me before

14  who were talking about what their criticisms were, that was

15  not reasonable.  It is not reasonable to say that they are

16  opposed to Mr. Henifin because he is white.  That is not

17  reasonable.  That is racist.  It is not reasonable for them

18  to say that they were opposed to him because he hailed from

19  Virginia.

20      That is not reasonable.  We are looking for a qualified

21  person to take over the system, and he has shown many times

22  over that he is fully capable of doing exactly that, and we

23  had nobody on the scene who could have done what he is

24  doing.  We didn't have anybody who could have stepped in his

25  shoes and performed as he's performing, because these folk

1    don't understand anything about water.  They don't

2    understand the diseases.  They don't understand how the

3    plants work.  But yet they have an opinion, which I would

4    hope before they get up and tell me what their criticisms

5    are, they at least understand what the real problems are.

6    And the ones who appeared in front of me last time certainly

7    didn't, and that was evident from the questions I asked them

8    and the nonsensical answers that most of them gave.

9        So I'm not upset about that, so make sure you

10   understand that.  And as long as you practice in my court,

11   then what I want from you is your honest opinion if I ask

12   for it on what the law is and what the facts are, and you

13   give me that and you and I are in good shape.  And so I have

14   no problem with that, that matter you mentioned.

15       But I do have a question about this mayor's letter and

16   how it includes some criticisms that found its way into this

17   particular notice to the public.  I do have that.  The

18   mayor, it seems to me, is not a friend of this endeavor to

19   straighten out this mess, so I hope that's wrong, and I hope

20   that if he has been antagonistic before, I hope he

21   recognizes that we all need to work together for the

22   betterment of the citizenry of Jackson.  And that is why you

23   are down here, correct?

24       MR. FINGERHOOD:  Yes, Your Honor.

25       THE COURT:  Okay, then.  Thank you so much, because

1    that's what I think Mr. Henifin has been doing all along.

2         Now, then, good folk, thank you all very much, and

3    there's a transcript of this matter.  If any of you want to

4    get a transcript, there's my court reporter there, and she

5    will glady give you a copy of this transcript at a small

6    cost to you.  But she will have it prepared for you in great

7    order.

8         Now, then, thank you all very much.  I'm adjourned.

9              (Court adjourned at 4:58 p.m.)

10   *****************************************************************

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **COURT REPORTER'S CERTIFICATE**

2

3        I, Caroline Morgan, Official Court Reporter for the

4 United States District Court for the Southern District of

5 Mississippi, do hereby certify that the above and foregoing

6 pages contain a full, true, and correct transcript of the

7 proceedings had in the forenamed case at the time and place

8 indicated, which proceedings were stenographically reported by

9 me to the best of my skill and ability.

10        I further certify that the transcript fees and format

11 comply with those prescribed by the Court and Judicial

12 Conference of the United States.

13        THIS, the 18th day of October, 2024.

14

15                          /s/ Caroline Morgan, CCR

16                          Caroline Morgan CCR #1957
                            Official Court Reporter

17                          United States District Court
                            Caroline_Morgan@mssd.uscourts.gov

18

19

20

21

22

23

24

25