IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

UNITED STATES OF AMERICA,                          PLAINTIFF
STATE OF MISSISSIPPI

VS.                         CIVIL ACTION NO. 3:12CV790-HTW-LGI

THE CITY OF JACKSON, MISSISSIPPI,                  DEFENDANTS
JXN WATER

**TRANSCRIPT OF STATUS CONFERENCE**

BEFORE THE HONORABLE HENRY T. WINGATE
UNITED STATES DISTRICT JUDGE

MARCH 14, 2025
JACKSON, MISSISSIPPI

(APPEARANCES NOTED HEREIN.)

REPORTED BY:  TERI B. NORTON, RMR, FCRR, RDR
              Mississippi CSR #1906
_____

501 EAST COURT STREET, SUITE 2.500
JACKSON, MISSISSIPPI  39201
TERI_NORTON@MSSD.USCOURTS.GOV
(601)608-4186

FOR THE PLAINTIFF, UNITED STATES OF AMERICA:

    ANGELA GIVENS WILLIAMS, ESQUIRE
U.S. ATTORNEY'S OFFICE
501 EAST COURT STREET, STE. 4.430
JACKSON, MISSISSIPPI  39201

    KARL J. FINGERHOOD, ESQUIRE
U.S. DEPARTMENT OF JUSTICE
ENVIRONMENTAL ENFORCEMENT SECTION
POST OFFICE BOX 7611
WASHINGTON, DC  20044

FOR THE PLAINTIFF, STATE OF MISSISSIPPI:
    ROY FURRH, ESQUIRE
MS DEPARTMENT OF ENVIRONMENTAL QUALITY
515 EAST AMITE STREET
JACKSON, MISSISSIPPI  39201

FOR THE DEFENDANT, CITY OF JACKSON:
    TERRELL S. WILLIAMSON, ESQUIRE
DREW MARTIN, ESQUIRE
SHERIDAN CARR, ESQUIRE
SUSAN RICHARDSON, ESQUIRE  (VIA ZOOM)
OFFICE OF THE CITY ATTORNEY
455 EAST CAPITOL STREET
JACKSON, MISSISSIPPI  39201

FOR THE DEFENDANT, JXN WATER:

    CHARLES MITCHELL MCGUFFEY, ESQUIRE
FORMAN, WATKINS & KRUTZ, LLP
POST OFFICE BOX 22608
JACKSON, MISSISSIPPI  39225-2608

FOR THE INTERVENOR PLAINTIFFS:

    EMILY C.R. EARLY, ESQUIRE  (VIA ZOOM)
THE CENTER FOR CONSTITUTIONAL RIGHTS
666 BROADWAY AVENUE, FLOOR 7
NEW YORK, NEW YORK  10012

    D. KORBIN FELDER, ESQUIRE
CENTER FOR CONSTITUTIONAL RIGHTS
1570 FONTAINE DRIVE
JACKSON, MISSISSIPPI  39211

AYANNA DENISE HILL, ESQUIRE
ACLU OF MISSISSIPPI
P.O. BOX 2242
JACKSON, MISSISSIPPI  39225

LORI LASHA SHERMAN, ESQUIRE   (VIA ZOOM)
FORWARD JUSTICE
ONE COPLEY PARKWAY, SUITE 302
MORRISVILLE, NORTH CAROLINA  27560


ALSO PRESENT:

TED HENIFIN, THIRD-PARTY MANAGER

DANE WILSON, EPA (VIA ZOOM)

MICHELLE WETHERINGTON, EPA (VIA ZOOM)

DANYELLE HOLMES, PLAINTIFF INTERVENOR, MISSISSIPPI POOR PEOPLE'S CAMPAIGN  (VIA ZOOM)

MAKANI THEMBA, PLAINTIFF INTERVENOR, PEOPLE'S ADVOCACY INSTITUTE (VIA ZOOM)

NICOLE LITTLE, PARALEGAL, FORWARD JUSTICE (VIA ZOOM)

**\*\*\* IN OPEN COURT, 9:40 A.M. \*\*\***

**THE COURT:**  Rita, please call the case, first of all.

**DEPUTY CLERK:**  We are here on the United States of America versus the City of Jackson, Case Number 3:12cv790, in a related case, United States versus City of Jackson, Civil Action Number 3:22cv686.  We are here for a status conference. We will ask the parties to introduce themselves, beginning with the parties in the room, with the plaintiffs' attorneys beginning.

**THE COURT:**  Plaintiff counsel, please stand and identify yourselves one by one.

**MS. WILLIAMS:**  Good morning, Your Honor.  Angela Givens Williams for the United States.

**THE COURT:**  All right.  Good morning to you.  Next?

**MR. FURRH:**  Good morning, Your Honor.  Roy Furrh, attorney for the Mississippi Department of Environmental Quality.

**THE COURT:**  How do you spell your last name?

**MR. FURRH:**  F-U-R-R-H.

**THE COURT:**  Thank you.  Next?

**MR. MARTIN:**  Drew Martin for the City of Jackson.

**THE COURT:**  Spell your last name.

**MR. MARTIN:**  M-A-R-T-I-N.

**THE COURT:**  And City of Jackson?

**MR. MARTIN:**  Yes, sir.

THE COURT:  All right.  Next?

MS. CARR:  Sheridan Carr, City of Jackson.

THE COURT:  And spell your last name, please.

MS. CARR:  C-A-R-R.

THE COURT:  All right.  Next?

MR. WILLIAMSON:  Terrell Williamson for the City of Jackson.

THE COURT:  And the City of Jackson, Williamson. City of Jackson.  Thank you so much.  Next?

MR. HENIFIN:  Ted Henifin, interim third-party manager.

MR. MCGUFFEY:  Mitch McGuffey on behalf of the third-party manager.

THE COURT:  Spell your last name, please.

MR. MCGUFFEY:  M-C-G-U-F-F-E-Y.

THE COURT:  M-C-G-U-F-F-E-Y, and counsel.  Next?

MS. HILL:  Good morning, Your Honor.  Ayanna Hill, attorney for the plaintiff intervenors.

THE COURT:  All right.  Now, spell your first name.

MS. HILL:  Yes, sir.  A-Y-A-N-N-A.

THE COURT:  Ayanna Hill?

MS. HILL:  Yes, sir.

THE COURT:  That's for the intervenors.

MS. HILL:  Yes, sir.

THE COURT:  Good morning to you.

**MS. HILL:**  Good morning.

**THE COURT:**  Next?

**MR. FELDER:**  Good morning, Your Honor.  Korbin Felder.

**THE COURT:**  Felder?

**MR. FELDER:**  Yes, sir.  Last name is F-E-L-D-E-R, for intervenor plaintiffs as well.

**THE COURT:**  Good morning to you too.

**MR. FELDER:**  Good morning.

**THE COURT:**  Anybody else here in the courtroom who is a party?

Okay.  Now I go to the video.  And let's have them introduce themselves.  Let's start.  I guess I'll have to start it off, then.  Mr. Fingerhood, would you start it off, then, for me, please.

**MR. FINGERHOOD:**  I will, Your Honor.  Good morning, Your Honor.  Karl Fingerhood, U.S. Department of Justice, Environmental Enforcement Section.

**THE COURT:**  Yes.  Good morning to you.  Next?

**MR. WILSON:**  Dane Wilson, I'm an attorney for the Environmental Protection Agency, the Water Enforcement Division.

**THE COURT:**  All right.  Next?

**MS. WETHERINGTON:**  Michelle Wetherington, EPA Region 4, attorney in the Water Law Office.

**THE COURT:** Spell your last name, please.

**MS. WETHERINGTON:** W-E-T-H-E-R-I-N-G-T-O-N.

**THE COURT:** Thank you so much.  Next?

**MS. RICHARDSON:** Susan Richardson, Kilpatrick Townsend, attorney for the City of Jackson.

**THE COURT:** All right.  Ms. Richardson.  And you are representing whom?

**MS. RICHARDSON:** City of Jackson.

**THE COURT:** City of Jackson.  All right.  Next?

**MS. EARLY:** Good morning, Your Honor.  Emily Early on behalf of the plaintiff intervenors.

**THE COURT:** On the intervenors.  And spell your last name.

**MS. EARLY:** Early, like early in the morning, E-A-R-L-Y.

**THE COURT:** Okay.  Thank you so much.  Next?

**MS. SHERMAN:** Good morning, Your Honor.  Lori Sherman on behalf of the plaintiff intervenors.

**THE COURT:** Ms. Sherman.  All right.  Again, with the intervenors.  Next?

**MS. THEMBA:** Makani Themba, plaintiff intervenor.

**THE COURT:** All right.  And you pronounce it Themba; is that correct?

**MS. THEMBA:** That is correct, Your Honor.

**THE COURT:** Intervenors.  Thank you so much.  Next?

**MS. HOLMES:**  Danyelle Holmes, plaintiff intervenor.

**THE COURT:**  All right.  Is that Home or Holmes?

**MS. HOLMES:**  Holmes, H-O-L-M-E-S.

**THE COURT:**  For intervenors.  Thank you so much. Next?

**MS. LITTLE:**  Good morning, Your Honor.  This is Nicole Little on behalf of the plaintiff intervenors.

**THE COURT:**  All right.  Ms. Little also on behalf of the intervenors.

**MS. LITTLE:**  Yes, sir.

**THE COURT:**  Next?  Is there anyone else on the broadcast?  Anybody else?  1, 2, 3, 4, 5, 6, 7.  I see 7 pictures of individuals, 1, 2, 3, 4, 5, 6, 7, 8.  Okay.  So I believe I have everybody.  Or did I miss anybody at all, either here present in the courtroom or on the broadcast?  Anybody? All right.  I see no additional hands.

Now, then, the purpose of this status conference called by the Court is to accomplish two broad tasks:  One, to give a quick update as to where we are, where we hope to go; and, secondly, with regard to that intent to go further, we want to tell you what we have encountered as a potential concern and get your input so that we are all still traveling in the same direction.

This short announcement by me because Mr. Henifin is here, and he is going to flesh out this skeleton on these various

matters, but there are four major categories that will be covered to some extent during this status conference.  They are as follows:  Matters concerning water, the problems; secondly, the sewage matters concerning the problems, and what we have done on the water and sewage; three, billing capability and the problems we had when we undertook this operation and where we are; and finally, we have some comments on the system integrity at present and our goal of self-sufficiency with regard to the fiscal accountability of the system as a whole.

This latter point is what caused us to determine that perhaps we needed to address this matter to all of you to get some input to see where we hope to go and need to go.  But as far as the other three, that will address what we have accomplished so far to bring us to this point because we think we have been quite successful so far as to how we have handled these matters.  I imagine that when it comes to the water problem that existed at the time that the Court and Mr. Henifin took over the operations involve the numerous issues concerning inadequate pressure of the water system, contamination in the water system, availability of the water in the water system, and it's delivery to the households in a timely fashion, and also, and probably most importantly, the numerous leaks that were apparent with regard to the water system.

When I first encountered all of these matters, Mr. Henifin was so kind as to carry me out to one of the major leak sites

in crises where we were losing five million gallons of treated water per day, and I said treated water per day, and that this circumstance had been occurring for quite some time, over a few years.

The second matter that we will touch on is the sewage problem.  And, of course, you might remember and the public certainly remembers the numerous geyser-like eruptions of raw sewage which permeated the groundwork in the city of Jackson. We had so many sewage eruptions where sewage was coming out of the ground, festering in a cesspool, concomitant with its odors and possible infestations, and we had so many of those particular matters.  And then we had to address the matters where sewage was overflowing in the houses, where people had to move out of their houses until those houses could be decontaminated, and where businesses so disturbed at the city of Jackson's water and sewage problems, that businesses gave up and decided that perhaps they needed to move elsewhere.  So we had all those problems that confronted us when we began this operation.

I was fortunate that amongst those who had applied for managerial responsibility in these areas was Mr. Henifin, who, with his vast experience, was agreed to by the parties, we hired him, and he has made the difference.  And so now we do not have boil water alerts like we did when we began, we don't have sewage eruptions around the city as we had before, and so

we have made tremendous strides on those particular matters in particular areas.

And then on the billing matters, one of the major problems we had was that people weren't paying their water bills.  They weren't paying their water bills because the system that was to identify these customers who weren't paying was in such bad repair or incapability.  So we had a woeful inadequacy percentagewise of people who were actually paying their water bills.

At one time I mentioned the E-code where people who were placed on an E-code at some point did not have to pay their water bills either because of political or inaccurate billing or because of other reasons, but nevertheless, there were a number of people who did not pay any water bills for a lengthy amount of time.

And so then the billing crew was refurbished, redone, moved outside of Jackson because we needed a certain central post for billing and for complaints that would come into the system.  We made tremendous strides in that direction because when we took over these matters, persons were held on hold for inordinate amounts of time.  Some just gave up and decided that they couldn't get any response from the City, or when they got a response from the City, that that response was totally inaccurate, unresponsive, and inadequate with regard to the problems that were being reported if they eventually got

through to the City.

The response time was horrendous, and we have reduced that response time tremendously. So now people have confidence that if they call, they will get a live person on the line and someone with whom they can communicate their problems.

We still are working on those matters because when you have over 160,000 customers, we are bound to have a few glitches here and there, but we are working to address all of that.

The last area, number four, is the system integrity and what we aim to do as fiscal self-sufficiency. Mr. Henifin is going to speak to all four of these but especially as to this last one because on this whole matter of fiscal integrity and sustainability, it's vital to, as are the others, to how we measure our accomplishments here in this area because the aim was to devise a system based on the revenue, based on the grants that we had available to us, and based on our reduction of costs and our reductions of inefficiencies, to have a system that could sustain itself, that could replenish its facilities, its equipment over time, to hire competent people who would understand what it means to address these water problems and sewage problems and other such problems over time so that our system then would be a different system than what has been in the past, and that this system would function as it is hopefully intended to do but fiscally as we need it to do.

Now, that will be the last discussion, but nevertheless, it is at the top of our list because we have been looking at this particular matter, doing the numbers, seeing where we are, trying to project what the system can expect if we have 80 percent of collectability of bills, 90 percent, what happens if our grants run out, where are we on that matter and whether that will call for some other approach that has not been done but nevertheless might have to be done in order for us to have what we need to have as a self-sustaining system overall.

Now, then, these are my introductory remarks, and I thank you all for answering in a short amount of time my call that we have this status conference.  I wanted to have this status conference as soon as possible so that we will hear from you on the self-sustainability matter, so we will know from you what your thoughts are on that matter because we have some grants that might expire in the very near future.  And every day is a precious day in the life of self-sustainability.

So we need to have this dialogue as fast as possible so that we can make some decisions about what we need to do and to prop up the system even more than it has been supported in the past and to reach the goal of fiscal self-sufficiency.

So I want to thank all of you for having come here on this short notice because you have been involved in this matter for a lengthy time period, and before major decisions are made that might be a right turn or a left turn from where we were before,

then we need to make sure that you understand what is happening.

Certainly I want to reach out to Mr. Henifin here, who has been our drum major on these matters of change and responsibility and reaction to all of these matters, his crew that he has assembled who are on 24/7 alerts, so they are out in the fields at night, during the daylight hours 24/7, seeking to address these particular matters and brainstorming with Mr. Henifin as to where we are and where we need to go.

I also want to reach out, as I said before, to all of you. And as far as my staff, I have Navketan -- yeah, she's here -- who is seated over there, my law clerk who has had to educate herself as to these water issues, sewage issues, billing issues, fiscal integrity issues and be my sounding board so I had someone who is versed, researched enough so that we could have these dialogues.

Of course, let me say something else about my very able corps of law clerks I've had over the years.  They all understood the tasks that from time to time this Court has had, and when I get a chance, I always like to say something about these folk who spent their extra precious time beyond the call of duty doing the same things that Navketan does right now.  I have one of those persons here in the courtroom who worked with me on redistricting.  We had to redistrict the state of Mississippi.  Yes, Ms. Williams, I'm talking about you.  We had

to restrict the state of Mississippi, and we had all the hardware, software testimony in court that required us, especially you, to spend these countless hours and countless nights trying to get it right.  And sometimes these matters are thankless because people knew that we had at that time the redistricting matter on our plate, but they didn't know how much time we had to spend on looking at every voter and seeing where they lived and what district they need to be placed in, how the districts need to be separated, and the tasks that required us to try and have each district pretty much the same topography, geography as the others, including colleges, universities, including businesses, et cetera, et cetera.  And then most folks only recognized when we finished what it meant. Again, Ms. Williams, thank you for that effort.

We put out that map, and the map lasted until the next census, because every ten years Mississippi goes through a census, and every ten years one has to look back at the configuration and see where it is.  I have been on more of those particular three-judge courts than I think anybody.

So when I've had people in the past who were assigned to these very difficult time-consuming matters, then they have behaved, responded in a most dramatic and professional way.

And so it is the same way now.  So Navketan over here has had to spend many hours after the regular working hours for us to go through all of these matters and then to look at the

ground swell of problems that beset us, to look at the sewage problems that we took on, the water problems, the billing problems, and now we are talking about the fiscal integrity concerns.

So I throw some -- I throw some kudos to Nav, who is probably tired of my late night calls, especially this last week where we have had to talk, talk, talk about these matters, along with Mr. Henifin, on these issues. And I hope at some point the public appreciates the sacrifices these folks make in their personal lives and professional lives in order to address these very, very real concerns that plague us. But nevertheless, that's our responsibility, that's our professional responsibility, and that is our pleasure to render a service.

Now, having said all of that -- and by the way, Patrick is sitting over here to my right, and you might have seen him from time to time. I know other people have. He's my computer guy. And so then he sets up all of this computer stuff from time to time. The system is not as predictable and reliable as he is, which is why it is great to have a human that we can work with, but our system from time to time has been quite ornery, but nevertheless, Patrick has come up. He has brought a wrench with him so that he can make whatever changes need to be made and from time to time some wires that he has plugged up. And, of course, I look on as though I know what's going on, and so I

stare intently, because that's my function, to look like I know what I'm doing, even though I have no idea of what's going on. I just know whether the switch works when I hit on, and does it go off when I hit off. So that's what I know. Thank you, Patrick.

Now, I have a substitute courtroom deputy here. This is Rita. And she works for one of the other judges in the court, and so my courtroom deputy is out today on an emergency. So, on last night, Rita was contacted -- I think it was just last night, but being such a professional, then it didn't take her long to get up to speed and know what she was supposed to do. So Rita, thank you so much.

My court reporter over here is another Teri. And my regular courtroom deputy is named Terri, so when I talk to them, I speak to Teri, court reporter, or Terri, courtroom deputy. Sometimes I get the names different because they are both Terri. But anyway, she is the court reporter. I remind you that since she is the court reporter, then I need anyone who speaks to do so distinctly and loudly because she has an obligation to make a verbatim record, and she has this obligation foisted upon her by oath. So when she finishes her transcript, she has to swear to the accuracy of that transcript.

Of course, she is highly trained. In fact, she was with me when I tried my last lengthy case when I was down on the

coast of Mississippi, about two years now, and I tried a case that lasted for a short ten weeks, and so I was down there handling this matter, and Teri was with me down there because ordinarily she is assigned to the coast. You know, we have four courthouses, one in Jackson, one in Natchez, one in Hattiesburg, and one in Gulfport. And so she is assigned down to the Gulfport area, but when we need her, she is right here. So now she is back here, and I'm glad to see her because during that ten-week period that I spent down in Gulfport trying a lengthy case, she was with me and such great company because she has such a great personality. So, Teri, again, I thank you, as I always do, for being here with us. When we have to have a pitch person to come in, you are here. She is such a professional.

And that ten-week trial was ten weeks because we did not finish at 5:00. We went late on many nights. And we saw a whole lot of adventures while we were there, not to mention the one where I got sick. And it was reported down there in the paper, and the way they wrote it up, I was on my death bed. And then the Jackson news media picked it up. And when my sister called me, she wanted to know what arrangements she needed to make because it seemed like I was on my last leg. The truth of the matter is, I was not. I was simply dehydrated because I decided that I needed to go out and walk. And I went out and walked, and I walked, and I walked.

I had called a recess for the lawyers to finish up a little project, so I walked from 12:00 noon until 6:00 that afternoon, and the stubbornness in the back of my head said I did not need any water, and so I walked and I walked. And at 6:00, when I finally finished my continuous 6-hour walk, my body said, "It's my turn now. You forced me to do this walk. Now I have a plan for you, Junior."

And so I experienced severe dehydration, and that was the problem. It was minor, although I had to be treated by my staff, and I resisted EMTs or any other medical treatment because I just felt the good ole H2O would revive me in a period of time. It did, but it took a day and a half.

So that's where I was when Teri, down here, was worried about me. So then she came into chambers and wanted to know should she call some medical providers. And, of course, she was helping drag water there.

So, then, that brings us to the subject, water. So let's go back to where we were. So now we are here to talk about water, and fortunately, there was no sewage involved down there, but we did have water.

So, now, with regard to the water matters, Mr. Henifin -- Mr. Henifin, we've had conference after conference on these matters. And Mr. Henifin, what I want you to do is speak to the good folk out here and to start off with the water discussion, where we are, the problems we faced, and what your

overall insight and oversight is concerning that.

I expect that in the next two weeks, the Court will publish some overview of these matters for public consumption, if they wish to read it, but that they can have an up-to-date. Now, I can do that either as a court order, which is what I expected to do, or, Mr. Henifin, you have a wonderful magazine that you have utilized for the public, or we can put it there, but we will talk about it.  Okay?

**MR. HENIFIN:**  Yes, Your Honor.

**THE COURT:**  So, then, Mr. Henifin, since you are talking to me and to them, would it be better if you move to the other side of the podium, or are you more comfortable where you are?

**MR. HENIFIN:**  I thought for this portion, for the water and sewer and a little bit of the billing update, that I could do it here from the podium, if that's all right with you, Your Honor.

**THE COURT:**  That's fine.

**MR. HENIFIN:**  And then I will move over and run the PowerPoint for the last item, which is the fiscal self-sustainability.

**THE COURT:**  All right.  Mr. Henifin, you have the floor.

**MR. HENIFIN:**  Thank you, Your Honor.

So, water, a great lead-in with your dehydration story.

It's obviously very, very important to life.  And the first statement I would like to make is there's a lot of confusion about water quality.  In fact, I was in Costco yesterday, and it seemed like everybody had giant carts full of water, bottled water.  And I just wanted to go up to them and say, "You live in Jackson?  You can drink the water."

Our water is very high quality water, perfectly meets standards, no reason for anyone to be drinking bottled water, but we continue to fight that battle.  And I just wanted to put that on the record to start with.  And we will get back to some of the cost implications of that, but the first step is, we've made great progress on water quality.  The water quality is consistent, it meets all standards, very safe to drink.  People should be taking advantage of the fact that we have got a great water system providing great water to the taps.

So, delivery, the big topic was pressure and availability of water on a regular basis.  We've made incredible strides there.  As you are well aware, Your Honor, we've worked on leak detection and correction, we have opened valves, we have gotten the system really to operate the way it needs to operate on a daily basis 24/7.  And the first big proof of that was this past winter.  January, we had a deep freeze.  It's the first deep freeze we've been through in many, many years that did not impact the water system.  Everyone had water the entire time.  So it wasn't easy to get there, and it will get easier as we

continue to make investments in the system, but we made it through a deep freeze and put that -- maybe that scare behind us for the near term and hopefully forever.

On the leak side, when we started, as you referenced, a significant amount of leakage, still a significant amount, but we've gone from losing 40 million gallons a day to 20 million gallons a day.  And we are still on the job looking for that final 20 million gallons, and we will be continuing to do that for many months ahead.

Investments in the system, we are taking the federal dollars we've gotten, some local revenues, making a lot of investments in the system.  A lot of those are focused right now in the drinking water plant, at the O.B. Curtis plant.  We have a new chemical feed system being constructed now, we have other process improvements going, we are fixing filters, and we just finished installing two new membrane cassettes, which essentially restored membrane integrity for all six of the current membrane trains.  You know, at Curtis we have got a membrane plant and a conventional plant.  The membrane plant now has had four of the six membrane trains replaced.  The other two are on order to be delivered and installed at the end of the year, which will provide us a good 5 to 10 years of very reliable membrane capacities.  All six of those trains will have been renewed with brand new cassettes.

On the conventional side, we have had one filter.  There

are six filters there.  One has been down for many, many years. We have got a contractor working to fix that filter.  They are getting close to being finished, and then they will go through the other five filters and get them all up to speed by the end of the year.  So we'll have full filter capacity on the conventional side, full membrane capacity, still making some improvements on sedimentation basins, but the amount of effort and energy going on there is impressive.  And when we are finished, the Curtis plant will have many, many years of reliable service in front of it.

We are evaluating on the water side a master plan to determine the fate of the J.H. Fewell plant, the one there off of 55 at Waterworks Curve, trying to determine when it can be closed.  When we have enough capacity at Curtis, reliable capacity and we have reduced the leaks enough, we will be able to take that plant offline.  Its future as to whether it is a pump station, a storage facility or nothing at all is still what is being analyzed through modeling.

Again, it is a complex work to make that figure -- to figure all of those out, and we are doing that largely with a grant from MEMA to pay for that work to look at a master plan for the overall water system.

Then, finally, we have been looking at how we can take the water system from where it is.  We have developed a -- well, it's sort of a product of our own success.  By reducing the

leaks and getting the system to operate the way it needs to, we are seeing the water age a little bit in the system.  Prior to this, we had so many leaks, and the system wasn't working well.  Water was going through the system very quickly.

When water ages in the system, you get some production of disinfection byproducts, so we are working hard to figure out how to manage that a little better.  But we have seen some elevated disinfection byproducts, not to create any health hazard, and it is a complicated regulation on how it is measured over a period of time.  It is a quarterly average, rolling one year, four quarters.  So we are working hard at finding ways to manage those disinfection byproducts.

That is really something unusual here because the water never aged in the system.  We couldn't keep water in tanks, we couldn't keep water in the system, and now we do.  This is sort of a new challenge for us, and we are working on that right now.

So from the water side, again, the big message is, the water is safe, we are providing the pressure for everyone in the system, and it's available all the time.  And we certainly encourage people to take advantage of the high quality drinking water that is coming from their taps.

**THE COURT:**  Mr. Henifin, when we first addressed our energies to this matter, there were constant boil water alerts.  We have not had those, have we?

**MR. HENIFIN:** We haven't had a citywide one since sometime last year, when there was a false positive on a regular system test. We haven't had any in the last many months. I think the last one was about a year ago with that false positive test.

Since then, we have a lot of small boil water notices. Again, we are doing a lot of pipe repairs out in the field, and when you disrupt the system and have a pipe repair and you lose some pressure, you issue a boil water notice to just the small number of folks impacted and hopefully for a short period of time. And that continues on a regular basis.

So people see a lot of boil water notices if you are looking at the total, but if you carefully look at how many residents are affected by those and how many days of impacts, it's very, very small numbers. But no, no more citywide boil water notices, and hopefully that's a thing of the past.

**THE COURT:** So we don't have citywide boil water notices now?

**MR. HENIFIN:** Correct.

**THE COURT:** And when we began our adventure here, those were coming in regularly.

**MR. HENIFIN:** Well, the summer of '22, I believe the citywide boil water notice was in effect for about 60 days.

**THE COURT:** Okay. And as soon as we -- well, as soon as that 60 days expired, then seemingly there was another boil

water alert.

**MR. HENIFIN:** Under our watch, during the first two winters we had citywide boil water notices, but we have been able to narrow those down quickly to zip code boil water notices when we had the big freezes, and now, again, we have largely put those behind us, we believe. We're keeping our fingers crossed.

**THE COURT:** The public has not been reluctant to send letters to me when they found out my involvement here to express their concern with the boil water matters, and I have gotten so many letters that now speak to their happiness at not having received notices in a lengthy amount of time that's citywide. So we have been quite successful in that area, wouldn't you say?

**MR. HENIFIN:** Yes. By that measure, absolutely, Your Honor.

**THE COURT:** Now, then, you are about to move over to the sewage?

**MR. HENIFIN:** Yes, sir. So, on the sewer, as you are well aware, when the order was entered there were 215 individual locations included in the order where, as you have pointed out, sewage was rising up and coming out onto the streets and in yards and all over the city. We have addressed all of those 215. They have all been corrected. We continue to find collapsed pipes and respond and address those very

quickly.

The number of what we call dry weather overflows, overflows that happened on a clear day when rainwater is not getting in the system has dropped to really just once a week and clear on the same day.  So you still have overflows in the system.  A line might get blocked by grease or might have a pipe collapse.  We might get the call through our call center, which you referred to.  We will respond within hours.  We have got construction crews that are lined up to make those repairs.  And we are really having great success in keeping the sewage running during dry weather without having real problems.

We had a contract for Closed Circuit TV inspection and cleaning, and they do miles and miles and miles of that daily, and we are being able to see problems and fix and address those before they actually become a problem because the TV inspection allows you to see defects, and then we can figure out if we need to dig down and repair the pipe or if we can line it.  We have lots of tools in our hands to make all of those things happen.

**THE COURT:**  Now, tell them something about that TV capability.

**MR. HENIFIN:**  Yes, sir.  So it's pretty common in the wastewater industry any longer that you have TV inspection capabilities where you put a camera down into a manhole and then you launch it through the pipe.  It is taking video of the

condition of the pipe all the way along, between manhole to manhole. That is then analyzed for defects that can be seen. Largely anymore, that is being done using AI. You used to have to have someone sit and watch the videos and note exactly what they saw. Now artificial intelligence can review that same film, look for the defects and point out exactly where they are. It is measured by the foot as it goes into the pipe. So you know if you need to dig down, you know where to dig. And then you clean it, you TV inspect it, and then you make your decision on what the next course of action, if any, is needed.

We are finding some interesting things in Jackson where we will TV inspect a line and the pipe is not there. It is just essentially an opening in the clay where the pipe has just gone away, sewage is still flowing, but there's no pipe around it. So the solution there often is just pulling a liner through, so we are actually lining an opening in the clay to create a pipe again in the ground without having to replace anything.

So it is a little unusual to find that there is no pipe there and it is still essentially clay acting as a pipe, so it's a bit different from my perspective, but it's not that unusual, I guess, around here.

THE COURT: Now, but for this TV capability, you would not have discovered that?

MR. HENIFIN: Correct. And the City did TVing before. Many communities do a lot of TV inspection, but the

big difference is they don't either have the resources or expertise to immediately go make the repairs that need to be made as opposed to just inspecting, documenting, then putting a big contract together years later when there may be a lot of different defects by that point.  So if you are not contemporary with your inspection, it's much more challenging to go back and make those repairs.  So we try to stay right on it, within weeks after a TV inspection has identified something, sometimes within days, and we are out there making those repairs.

**THE COURT:**  Okay.

**MR. HENIFIN:**  On the sewer system, you mentioned backups into homes.  That still happens some during rain events.  We try to be quick there to respond.  Some of that is on the citizen's own lateral, the piece that connects their house to our sewer main.  And that's been an issue here in Jackson because the citizens own -- the property owner owns that lateral all the way to the sewer main.  So the sewer mains typically run down the middle of the street, sometimes off to one side or the other.  So you can imagine if it is a big street and your house is on a four-lane street and the sewer line is in the middle.  You are responsible for the pipe all the way to the middle of the street, meaning you have to dig down to the street and make the repairs.

A lot of our problems are in the privately owned portions

of these lines from the house to the sewer main.  And we will use that same TV technology so we can launch the camera from the main up into the line that goes to serve the house, and we can tell folks where the blockage is on their line.  But they still need to get a plumber out and dig down and make the repair.

So that is causing -- a lot of our sewer issues are in that section, and we are working hard with our residents to help them figure out how to get that resolved.

**THE COURT:**  We talked about that many times, about, first of all, educating the public about this relationship between the private aspects and the public.

**MR. HENIFIN:**  Yes, sir.

**THE COURT:**  Because when we began these operations and spoke to many people, we discovered, at least I did, that most of our citizenry didn't understand that difference.  And, therefore, they thought that when they had problems, they were all attributable to the public tools, and they didn't recognize that there were some private responsibilities there that had already been written into the system long ago.

**MR. HENIFIN:**  Yes, Your Honor.

**THE COURT:**  In fact, there's never been a time when the system went directly to the house, has it, and had responsibility?

**MR. HENIFIN:**  Correct, Your Honor.  When the sewer

ordinance was originally passed here in Jackson, it put the requirement on the property owner to connect all the way to the main.

**THE COURT:** And that is an agreement or at least an edict of some duration.  That goes all the way back -- well --

**MR. HENIFIN:** I think the sewer ordinance might be the '72 time frame.  I don't know off the top of my head, but it is pretty dated, yes, Your Honor.

**THE COURT:** So it had gone back to, like you just said, 1972, possibly.  So that is a long time period.  But when this edict was put into effect, it put the responsibility on the homeowner to make corrections with the piping and the delivery of water/sewage on the homeowner to the middle of the street where the public responsibility would start.

**MR. HENIFIN:** That's only on the sewer, Your Honor. The water, your responsibility starts at your water meter, on the outside water meter.

**THE COURT:** Right.  But the people didn't quite understand that.  That was one task we had when we came in, to try to tell them that.

Now, at some point, I wondered if in the future we might be able to make some adjustments to that, that is, to take the public responsibility all the way to the house.  And then I had asked did we have the grant money to do that.  We don't yet.

**MR. HENIFIN:** Correct, Your Honor.

**THE COURT:**  In fact, we have some other problems with grants.

**MR. HENIFIN:**  A lot of them.

**THE COURT:**  So here it is, I'm talking about extending a grant or pioneering a new grant to see, then, if there is a possibility that we could run the City's responsibility all the way to the house.

**MR. HENIFIN:**  Most likely, Your Honor, many communities run it to the property line as opposed to all the way to the house.  But we would be evaluating both of those.  But you are absolutely right, we don't have the resources at this point in time identified to do that.  So currently it remains the property owner's responsibility to the main, but we do offer for the -- essentially they can purchase a new tap, and we will replace their tap back to wherever they have good pipe on the private property.

So we are trying to work with folks.  That is a $3,500 expense for them, which not everyone has $3,500 to work on it.

The other education piece, Your Honor, is around our local plumbers, and we continue to reach out to them.  They are part of the -- they didn't really realize that it was the property owner's responsibility all the way to the main, so often they will come in and use their equipment to push out the blockage close to the house and push it out into the street and then tell the property owner, oh, it is the City's problem.  Well,

it's not the City's problem until we get it all the way to the main.  So we are working with our local plumbers to try to clarify that as well.

**THE COURT:**  Yes, and later on, we hope to have some directions to them in writing that could be circulated so that the plumbers then can't rely upon ignorance on this matter, and they will understand that as well as the homeowner.  But I go back to what my concern was, and my hope was that we could find a way later on to finance it so that it won't be the homeowner's responsibility, but it will be the City's responsibility, based upon what I thought we might one day be able to accomplish on some fiscal capability so that we can afford that or get it through some grants.  Now, we have not given up on that.

**MR. HENIFIN:**  No, we have not, Your Honor.

**THE COURT:**  So we are still hoping that we can put through something on that, but I just want to emphasize that this problem here dates back well before JXN Water came on the scene.  And as you said, somewhere around 1972 is when this whole scheme was put into operation, so that it won't be overnight for us to try to put in a different approach and overrule a 1972 approach and go forward for the betterment of the homeowners, but we still have to cross some Ts, dot some Is, find some money and all kinds of things.  But we have roughly, what, 160,000 folk in the system, right?

**MR. HENIFIN:**  There are only about 60,000 actual taps.

**THE COURT:**  Actual taps.

**MR. HENIFIN:**  Right.

**THE COURT:**  So then we have to actually address these 60,000 folk and might have to -- oh, that would require some digging, some architectural work and some other things if we can find the moneys to do it.

**MR. HENIFIN:**  And we are working on that, Your Honor.

**THE COURT:**  And, yes, we are trying to work at it. This is something, by the way, the public has not placed on our shoulders to do because they didn't understand this.  So we are educating them as to a problem, but it is a problem that we have discovered and a problem that we hope to find a solution to for the betterment of our citizenry if we can find the money.

**MR. HENIFIN:**  Yes, sir.

**THE COURT:**  In the meantime, we are trying to take steps that would help in that direction, like you just stated, educating plumbers and homeowners.

And on that matter, let me bring up another topic.  When I was looking through one of the last consolidated reports and looking through how many sewage lines have been clogged and the reasons, therefore, because your very comprehensive report also gave reasons why so many sewage lines -- that is, not so many.

I don't want to state it as though there are hundreds of sewage lines or anything.  But on the report, I looked through to determine what were some of the main problems that resulted in clogged sewage lines, and I saw grease clogging by homeowners.

And then I asked the next question.  How much on average did it take us to expend towards repairing those matters?  Because someone has to go out and snake the lines.  I remember when I first started looking at line snaking, and I was disturbed when you gave me some unfortunate news.  I thought we would just simply send a few trucks out and have them snake the lines, that is, take coils, wires, feed them into the system, turn around, motorized, and sort of carve out the sewage obstruction and push it either towards the city side or be able to raise it on the homeowner's side, but nevertheless, just clear the lines.

So I asked you how many snake trucks did the City of Jackson have so they could send these out and get these things accomplished.  Your answer was three.  I was quite disturbed about that because I know of other jurisdictions that have way more than that, but Jackson only had three.  And at the time that you informed me of these three trucks, they were all in the shop.  Is that so?

**MR. HENIFIN:**  Yes, Your Honor.

**THE COURT:**  They were all in a shop to be repaired.  So Jackson had zero while these three trucks were in the shop.

And then I wanted to know how long had they been in the shop.  I didn't like that answer either because they had been there quite a while.  And then I asked you to contact the shops to see how long they had been there, why they were there, when they were expected to be released, and I didn't like the answer because their answer was that the City had not paid its bills.  Is that it?

**MR. HENIFIN:**  I believe that is correct, Your Honor.

**THE COURT:**  So they were not releasing -- the shops were not releasing these trucks that we needed because the answer provided by the shops was that the City of Jackson had not paid its bill on the repair.  So they were not releasing those matters, those trucks.  And then, to move on, the City ordered a new truck, right?

**MR. HENIFIN:**  I believe they bought a used one.  Yes, Your Honor.

**THE COURT:**  Pardon?

**MR. HENIFIN:**  I believe they bought a used one.

**THE COURT:**  The City bought a used truck.  And then, when I inquired as to the productivity and efficiency of that truck, the same ole song, I didn't like the news because that used truck very soon broke down.  Is that right?

**MR. HENIFIN:**  I don't recall, Your Honor, on that.

**THE COURT:**  Okay.  Well, we didn't have it.  The answer was maybe I make the call.  But nevertheless, it was

supposedly broken down.  So, then, we were right back at no snake trucks.  Well, where are we now on the snake trucks?

MR. HENIFIN:  We contract that operation, Your Honor. And right now they are running four crews 24/7.  Basically, at night we don't get very many calls, so they weren't running much after 10 at night, but those four crews are available to do that.  Really, it is four trucks, and when you keep up with it, it's not -- we had five.  We released one crew to try and reduce costs, and we were able to keep up with the workload. So we have four contracted crews running throughout the city.

THE COURT:  So now we have improved in that department, too.

MR. HENIFIN:  Yes, sir.

THE COURT:  Now we have some snake operations going on, finally.  So, then, now that people are calling saying that their lines are clogged, we can send somebody out?

MR. HENIFIN:  Yes, Your Honor.

And then the next step, as we talk about looking forward, is trying to keep the grease out of the lines.  So we will have a whole campaign around folks not pouring grease down the drain.  And in addition, all of our food service establishments are required to have grease interceptor devices, and we are going to work on a better method of getting those cleaned on a regular basis so that that grease doesn't move into the system.

So we've got a number of things coming over the next

several months on what we call fats, oil, and grease, or FOG. It is a lovely topic.  It's lovely to be dealing with FOG on a regular basis.  But the contract we are looking at putting in place actually will haul it to a new facility being built in Canton where they distill it and create bio-fuel and then dispose of what they can.  So it becomes a beneficial reuse of some of that material as we move forward.

**THE COURT:**  Now, I asked you about a potential approach.  We have not reached a consensus on this approach yet, or might not, but what I had asked, if in the future we might ascertain who the culprits are who are dumping grease and other obstructions into the lines that require us to make these repairs and whether we could make an assessment of the frequency of the individual violators.  And if we find that we have frequent violators who have not heeded our instructions to cease obstructing the lines in this fashion, whether we ought to fine them or charge them for our labor in coming out to constantly rectify a problem that they have created, which apparently, at some point, has to be deemed willfully since they have not made any changes in their operation and in their habits in their households and still are dumping obstructions that cause us some difficulty.

Now, I brought that matter up, and you are thinking about it, I think, as to your approach and how it could make it work. I am thinking about a notice to educate the public on the

matter and also a notice to state how many violations would result in a fine or in some pay that the offender has to make. We can talk about that later.

**MR. HENIFIN:**  And we will, I am sure.

**THE COURT:**  That's right.

Now, then, one other matter on water before we go back to sewage, since you haven't concluded your remarks on sewage.  I have just thought about it.  When a fire occurred in Jackson and a house burned down, there were those who wondered why the house burned down and the fire company didn't put the fire out. And the answer was that the water hydrant that should have been accessed by the fire department did not have water.  Do you recall that?

**MR. HENIFIN:**  Yes, Your Honor.

**THE COURT:**  Talk to us about that.

**MR. HENIFIN:**  So we are going through the whole system and finding all the hydrants, testing them and working on them as we can through the system.  There are about -- I think we have identified 8,000-plus hydrants throughout the system.

**THE COURT:**  Mr. Henifin, I want you to put an asterisk there just for a moment because one of the first tasks you had when we started addressing the water hydrants was for your crew to determine how many fire hydrants did Jackson have. Correct?

**MR. HENIFIN:**  Yes, Your Honor.

**THE COURT:**  And so then you did the normally expected thing of contacting the fire department and asking them how many hydrants did the city of Jackson have.  Do you recall that number that they gave us at first?

**MR. HENIFIN:**  I want to say it was, like, 1500 or something, 2000 maybe.

**THE COURT:**  Did I hear you say 1500?

**MR. HENIFIN:**  I think that's what they said.

**THE COURT:**  They gave us -- well, I was just being facetious.  I know the number.  So they gave us a woefully low number, didn't they?

**MR. HENIFIN:**  Yes, Your Honor.

**THE COURT:**  So then when you sent your people around to ascertain how many fire hydrants we had, how many did you come up with?

**MR. HENIFIN:**  It was over 8,000, and we did that from mapping and plans, and as we were physically going to each of those hydrants, some of them that were in the plans aren't there, and some that weren't on the plans are.  So the number is constantly in flux as we work our way through the system. It's going to take us to the end of '27 to touch every fire hydrant in the system.  We have done about 1600, I think, to date where they have been flow tested.  We are going back and painting them.

And those of you who have been observant around town may notice that the tops, the caps, are now different colors, depending on how much pressure and flow is available at that particular hydrant.

THE COURT: Now, whose idea was that to paint the fire hydrants?

MR. HENIFIN: That was ours.

THE COURT: That's JXN Water?

MR. HENIFIN: JXN Water. And it's an American Waterworks Association standard color coding that, theoretically, if cities do this across the country, firefighters would know when they pulled up how much water they could expect at a particular fire hydrant.

THE COURT: And the trucks are expected to carry so much water?

MR. HENIFIN: Yes, sir. As we understood from the testimony or conversation you had here in this court in July of '23, I believe Jackson Fire Department said they typically begin fighting a fire with the water on the truck and then source other water through hydrant to backfill that truck as they are fighting the fire. So that was how they explained their standard procedures.

THE COURT: But, of course, if the hydrant has no water, then houses burn down.

MR. HENIFIN: Well, the Jackson Fire Department said

they can shuttle water to the truck.  The truck shows up with water on it, and then if there's no hydrant available with water nearby, they shuttle water to that.  So I don't believe there's been a lot of danger from dry hydrants in the city, which when you consider the extent of the water pressure problems and lack of water over long periods of time in the city, I was always surprised that we didn't have a bigger fire problem in Jackson.  The fire department really figured out how to deal with the unknown availability of water by responding first with water on a truck and then sourcing water from other places to continue to refill and continue to fight the fire. So I think Jackson Fire Department has great procedures to avoid lack of water from causing a massive or a loss of property that way.

**THE COURT:**  Well, that's wonderful that you want to be a little politic on your answer.  I looked over there at Nav, and we recognized that that was a great, like I said, politic answer.  But the fire department wasn't as nice to you when that house burned down, though, were they?  They blamed JXN Water for not having water in the fire hydrant when it was all the fault of the City of Jackson Fire Department.  Do you recall that?

**MR. HENIFIN:**  Yes, Your Honor.

**THE COURT:**  Okay.  And they weren't as nice to you in their comments because they then said that the house burned

down because there was no water in the fire hydrant, and that was due to JXN Water not having water in the fire hydrant, when they had not identified these fire hydrants as having no water. And, in fact, this low number of fire hydrants, which is not even, what, one-fifth of what Jackson has as fire hydrants around the city, and so they didn't even know it when they sat over here and testified. Because, remember, what I constantly heard from the fire officials was that they needed to go back to their office to find the books to find out how many they had. And even when I gave them an opportunity to do that, I never got the figure that we determined of fire hydrants in the city. We never got that figure. Now, you said in your opening remarks that there were 8,000. We never got close to 8,000, did we?

**MR. HENIFIN:** Yes, Your Honor.

**THE COURT:** As I said, you have been politicking your response about what they have done. In fact, you told me in our conferences that you were surprised that Jackson had not had more catastrophes. And you said they must have done something right somewhere at some time, and so we gave them appropriate kudos for not experiencing many destructive fires in the city of Jackson. But nevertheless, I responded that that was simply a catastrophe waiting to happen when the fire department didn't even know how many fire hydrants they had in the city, correct?

**MR. HENIFIN:** Yes, Your Honor.  We are working very closely with them now to keep them up to speed on where we are on fire hydrants.

**THE COURT:** Well, I want you to work closely with them, and I want you to keep making your politic statements and try to work closely with them.  But I don't have to worry about that right now.

**MR. HENIFIN:** Yes, Your Honor.

**THE COURT:** So I just know what the facts are, and the facts are not complimentary because anytime you have a fire department which is so woefully underestimating how many fire hydrants they have, they were not color-coded, many of them were dry, and they, then, didn't even know, as I just stated, how many hydrants they actually had.  And then when that fire erupted that consumed that particular household, the fire department said that the reason there was no water in the fire hydrant was because of JXN Water.

Now, I don't have to be politicking.  So that's what transpired.  But I didn't come really to discuss that.  You made some comments about some capabilities, and so where they are willing to work with us, we are willing to work with them because we are all supposed to be working for the betterment of the citizenry of Jackson, Mississippi.  So we have to get a lot of people on board and in the correct philosophy to get to where we need to go.

**MR. HENIFIN:** Yes, Your Honor.

**THE COURT:** So I was quite disturbed when I read how the Jackson Fire Department made some statement about what JXN Water didn't do with regard to the fire hydrants, when they full well knew what they hadn't done, and I would imagine that over in the fire department now they are shocked to find that we have located roughly 8,000 fire hydrants in the city that they initially reported a fraction of. They didn't even know where the fire hydrants were and certainly didn't know whether they had water in them.

Now, as I said before, we need them to work with us, and we hope that they do. But go on to your next topic.

**MR. HENIFIN:** Let me just wrap up sewer. The last thing that we are working that's a big issue for us, for the entire system, is the West Bank Interceptor. It's the large diameter pipe that runs along the west bank of the Pearl River from the very northern tip of the city down to the Savanna Street Wastewater Treatment Plant. It's got a number of issues. We are working on getting it surveyed, clean. There are some sags in it that we are going to work with the Corps of Engineers to try to get a project to help get that leveled up. But during big rains, that is still where we are having the majority of our overflows. The system can't process the water that -- the rainwater gets into the sewer system, not supposed to but it does. We are looking for where that happens and

working hard on the West Bank Interceptor.

So things in the future that we really need to be focused on is improvements on that part of the system to handle rainwater better, and we are working on that.

**THE COURT:** Okay. Next topic.

**MR. HENIFIN:** Next topic, I'm going to introduce the billing piece, and then I would like to move over to the PowerPoint presentation which has some more of the collections information actually in graphs and slides. But I will start a little bit about in general on the billing.

When we took over, you know, the City had a history of challenged billing that dates back to the failed Siemens contract in the 2013-14 time frame, and it's been hard to recover from that. The data was not real clean.

You had successfully ordered Entergy to turn over their customer data. We were able to use some of that to help clean up data. We have retained Horne to help get addresses straight. So we've spent a lot of time trying to get the data in the billing system straightened out.

You mentioned folks that are using water without accounts. We still have a real problem with folks that are using water. Often they will move into a house, the water is still active in the previous owner's names, and this may have been years ago, and they never bothered to establish their own account. And the previous owner not making payments, the account sort of

folded and closed on its own.  So they continued to receive water, never get a bill, and then when we finally find them and shut them off, they become quite surprised, and it takes us a little bit of time to, one, get their account set up, get them back working, and then get the water turned back on.

So the message to the public from our discussion today, Your Honor, would be if you are receiving water and you are not receiving a bill, you need to reach out to JXN Water to make sure the account is current in your name and that you do get a bill because you are subject to be shut off without further notice, and it can take up to 7 days for us to get you back on once you've opened an account.  That has been an issue that continues to surface throughout the system.

But we are making progress on collections, and we are making progress on the billing.  And the meters, about 98 percent of the new meters are in, and they are very accurate.  They are ultrasonic, they've got no moving parts, and they broadcast a signal to our collectors, which ultimately get back to our billing system on an hourly basis.  So we can actually see the hourly reads, and we can tell people when they are having a leak.  We can see that.

At some point in the future, and we are talking sort of where we are and where we are going, we will have that data available for consumers to see on their digital self-service sites or on their phones.  We are still probably a year or two

away from that, but we are getting closer. But when they call our call center, 601-500-5200, they can actually have the person on the other end tell them, look at their billing, see if they have a leak. Many people don't believe us, but if there is water flowing through your meter 24/7, you have got a leak. You just haven't found it. And we have been very successful helping people get to that point and understanding where their leaks are.

You know, we had to develop a work order system, not just for billing, but we had to start with a work order system to make the water repairs. The priorities we put together were we need to repair the infrastructure and get water delivered regularly. That was job one. Job two was to get the sewer out of the street. And then job three has been let's get everyone paying their bills. I would love to say that could have all happened concurrently, but we really didn't have the capacity to do that.

We had to start first with mapping. We didn't have accurate maps, so we built our own geographic information system, which is the foundation for our work order system. Everything ties back to the geographic location of where we are working. Then we built the work order system to deal with fixing the water system. So when someone called in with a problem on the water system, we could put it into the work order system, and a crew would show up in the field with that

information, be able to take care of the problem and then report back that it was done.

We did the same thing on the sewer system, and we've just, in the last several months, been working on the billing system. And why it's important in the billing system is that the billing system is set up that every time a payment is ready to go out, it looks at the account and says, is there a past-due amount. If there is a past-due amount, then it sends a notice with the bill saying, you have ten days to pay your past-due amount or you are subject to shut off. Ten days go past, the billing system is still looking, getting ready to see if there's been a payment made. If the payment hasn't been made, the billing system generates a work order through the work order system which would go to the truck with a person in it to go out and turn the water off for nonpayment. As soon as a customer makes a payment, the billing system sees the payment, generates a work order to a person in a truck to go out and turn the water back on. And that's all very automated when it is working well.

So you can imagine we have got, again, 60,000 accounts, and about 15,000 of those in arrears. We can't manage that manually without that work order -- automatic work order system fully functional. We finally got it designed because it had to be built to tie to the billing system, and the work order system had to be made to talk to each other. Great IT work. I

know you know a lot about it. Just like me, you flip the switch and it's on or off. But we need people like Patrick to build those connections between those two systems.

That's now in user acceptance testing, meaning they have got it where they think it's working. We have actually got it to our people in the field and to our people in the office to test different scenarios and see if it all works.

So far this week it has been great. We have one more week of user acceptance testing. If all goes well -- and there's always a few tweaks to the software at that point in time. If all goes well, we go live with that on the 24th of this month, which means we will be able to do much more severance, shut-offs for nonpayment, starting March 24th, which should see an increase in the amount of people paying regularly to their bills.

And I'm going to get to the PowerPoint, and you will see some charts towards the end of the PowerPoint about those rates, but the message here is that we will have the tools to do much more serious efforts towards severance to get everyone to pay their bills very soon.

**THE COURT:** Now, before we get to your PowerPoint, are you tired?

**MR. HENIFIN:** No, sir.

**THE COURT:** What about you down here?

(Off the record.)

**THE COURT:** Okay.  Then I'm going to ask one last question, and then we are going to take about a 15-minute break.

**MR. HENIFIN:** Yes, sir.

**THE COURT:** Because I've got to rest those precious fingers of my court reporter here.  But before we take a break, not too long ago I heard what can only be construed as a criticism of the billing system where somebody made a public statement that the billing system now might be in worse shape than it was before.  Do you recall someone making a statement like that?

**MR. HENIFIN:** Yes, Your Honor.

**THE COURT:** And that person made the statement, but, of course, that person has made some other statements that were inaccurate too.  In fact, that person even tried to sell water filters to the citizenry while we were telling the citizenry that the water was safe.  So that person has not exactly been on board with us.

I don't need to name the person, but I just want you to comment on the billing system and where we are with it and where we were when we started and where we intend to go on the billing system.  Then we will take the break, and then you can come back and do the PowerPoint.

**MR. HENIFIN:** Yes, Your Honor.

**THE COURT:** Go ahead.

**MR. HENIFIN:** So the comment claimed that there are more inaccuracies in the billing system today than when we started, or before we even started. That's blatantly false.

**THE COURT:** Say that again. How false is it?

**MR. HENIFIN:** Blatantly. Patently. What other word do we need? Patently? Is that a better word?

**THE COURT:** Enormously, unmistakably.

**MR. HENIFIN:** We have not found inaccuracies in the billing.

**THE COURT:** Okay. Go ahead.

**MR. HENIFIN:** And so we continue -- we put a lot of bills out, and a lot of people get a high bill and they will immediately question the accuracy. And it turns out with the research that it is typically a leak in the system, or they got their new meter, because the old meters were all estimated the last several years, and the new meters are registering real usage, and they questioned that at first, so a lot of hand holding to folks when they have a problem, a perceived inaccuracy on their bill.

But if there have been inaccuracies, it has been an incredibly small number, if any. The system calculates your bill very accurately. The meter read gets to it. The meter, again, no moving parts. It sends a signal every hour, goes into the billing system. From time to time we will have an address issue. We've got a lot of postal issues, bills not

getting to folks, but the bill itself has been highly accurate, and they were not so when we started. We would have a lot of bills stuck in the system.

The system still provided an accurate bill, but we weren't getting meter reads. We were using estimates, bad choices on how we were getting numbers into the system. But, again, we are finding the system to be incredibly accurate. I don't know what the basis of that comment was. We really have not seen inaccuracies to any degree at all through the billing system.

**THE COURT:** Now, then, we are going to take that 15-minute recess. We are in recess for 15 minutes.

**(RECESS TAKEN AT 11:07 A.M. UNTIL 11:36 A.M.)**

**THE COURT:** All right. We are ready to begin again. And we are still on the record. Mr. Henifin, you have a PowerPoint presentation you want to make on this last issue?

**MR. HENIFIN:** Yes, Your Honor.

**THE COURT:** All right. Then you have the podium.

**MR. HENIFIN:** Thank you.

So the proposed rate increase starts with really a financial management plan update. That was updated and released on February 28th of this year, and that plan modeled a rate increase and recommended implementation, with that taking effect in the spring of 2025.

With that rate increase, we still don't need our positive cash flow until 2029. And the required debt service coverage

ratio, which has been a measure of our requirement under the bonds, we would finally reach that in 2026.  So this doesn't solve all the problems immediately, but it does have -- it's modeled as a long-term solution for JXN Water's finances.

These are the recommendations in it.  Again, spring 2025, increase the volumetric rate, which is the proposal on the table.  We will get into details on that.  They talk about, again, the collection efforts, which we have discussed earlier. If and when feasible, paying off some of the existing debt.  We ran into a challenge trying to use some of the EPA or federal government provided dollars to do that.  We haven't come up with a great solution there.

We have worked with Mississippi Department of Health and retired the water debt, which was about $18 million.  And we are working with the Mississippi Department of Environmental Quality to change the terms of that debt to make it a little better for our cash flow, but we haven't been able to find other ways to pay off some of the debt, but that is a long-term desire.

The rate-setting process, you really start with a detailed budget.  It's not some arbitrary number.  We work on really developing a detailed budget.  We didn't really have any data to base that on starting out.  And we took the entire system in October of 2023, which gave us 15 months about -- by the end of 2024, which really started to shape what we thought the real

budget, ongoing operational budget would be. We really tried to set that budget at a steady state because we were really focused on getting the system working, and we were plowing a lot of energy, federal dollars, a lot of things were going into place to get us where we are today.

The flexible funding that came from Congress under the Safe Drinking Water Act, Section 1442(b), was down to 15 million left in the balance. That was reported in the quarterly report. That chart, the project expenditure tracker, shows where that was, and that was in the quarterly report, and there was roughly 15 million left. We have gone through 8.7 of that. As of today, we have got another 3 million reimbursement in process and expect to have that full grant exhausted by the end of April of this year.

So our total spend, if you go back to January -- actually, it is January '23 through February of '25, operating has been 188 million. Total capital is 153 million. If you look at the operating, it's been 11 million a month over that period of time, and that's just a number to think about. All the capital money has come from various sources, including local revenues, but it's been great to have that.

The 2025 operating budget, as we've pared things down, we are not in that emergency mode, it really works out to about 9.6 million a month, and it shows the major sources or major places we are spending money. The big one is on the drinking

water side.  The two large contracts really make up the most of that.  That is the Jacobs operating contract for the plants, and then we have a contract with Wicker Construction to take care of maintenance of the actual -- maintenance and repairs of the actual water distribution system.  So the majority of that is those two contracts.

Over on the other side, on the sewer side, about $34 million designated for sewer operations.  The big part of that is the plant contract, $18 million a year to Veolia that runs the sewer plants and pump stations, and the balance of that is on repairs that are being made to the system, and then the TV inspection that I talked about, that contract.  Up here in the corner, we have another almost 14.3 million for customer service, which really is the call center.  It's the billing system maintenance.  It's the -- the meters themselves have a monthly cost.  Those contracts end up -- and then the meter maintenance work that we do turning people on and off, so that is 14.3.

The two smaller pie sections, the bottom one down here, the 3.9 is payroll for the JXN Water staff, and the 6.1 is the operations of JXN Water.  So a small piece of it is our people and operating.  A big part of it is in getting the work down out in the field.

The budget requirements go beyond just that operating number.  The operating, based on that budget, is 115 million a

year.  We also have debt service to pay.  Currently that's about 20 million a year for the private debt that the City had taken out years ago.  Debt service coverage requirement or ratio is 4 million.  So on top of just having enough money to pay the debt service, we need to have extra money at the end of the year to show that we have got some capacity if we needed it.  And that requirement is 1.2 times the debt, which is where the 4 million comes in.

And then capital reinvestment and reserves of 9 million gets us to the 148 that we potentially need in 2025.  The capital reinvestment and reserves is really ARPA match, money we anticipate needing as we do the ARPA projects, and some Corps of Engineers match money to get leverage to get to the Corps of Engineers Section 219.  It's part of the Water Resource Development Act fund.

So the bottom line is, we need to operate -- operations and debt service, all in, right around 148 million is needed to sustain JXN Water.  Comparable utilities of our size typically have closer to a 200-million-dollar budget, and we may find that we are going to have to grow ours again in the future, but I think the 148 number is a good number to target for the moment.

The existing rates -- this is the question we always get.  It's like if everyone was paying their bill -- because we've talked about the fact we are somewhere around 70 percent of

people paying their bills -- the existing rates, if everyone was paying, can only generate about 115 million.  So, again, we need 115 just for the operating, that's great, but we don't have any money to pay debt service or any of these other things.  So we need to get to 148, and the existing rates just won't get us there.  That's really the story.

The proposed rates, we had those modeled as well, and those can generate 148.65, if 100 percent of the people were paying, which ties that 148 million need that we had on the earlier slide.

So that's how we get to what's needed on the rate side.  We match it up with what's needed on the cost side.  And it's all about full cost recovery.  If we are going to be sustainable going forward, we need to generate enough local revenue to pay all of our bills.

THE COURT:  You mentioned 100 percent.  How practical or realistic is it that we would get to 100 percent --

MR. HENIFIN:  It's not very --

THE COURT:  -- of the users paying that kind of money?

MR. HENIFIN:  Most utilities in the United States are close to 99 percent.  Our model, we didn't take it above 90 percent.  We showed 70 percent this year conservatively, 80 percent the following year, and 90 percent by year 3.  And ideally we will continue to inch up from that point forward,

but it would be incrementally and slow because this community has just been so challenged with lack of meters, lack of information, and it's going to take a while to get there.  But most -- again, most utilities, water utilities in the United States, find they can ultimately get about 99 percent of their revenue recovered.  It might not be realized in the year it is billed, but they continue to go back and get people to pay up from previous years.  And so when you look at it over a couple of years, most of them are in that 99 percent range.

THE COURT:  So we are not there.

MR. HENIFIN:  We are not there.  We are targeting 90 percent in 3 years.

THE COURT:  But at present, we are not even close to the 90 percent?

MR. HENIFIN:  No, we are just hovering right at 70, 68 to 70.  So the model, as we ran it, we just put a solid 70 percent in, very conservative, as if we weren't going to move forward, but I have a chart here showing the trajectory we are on to try and increase that.

THE COURT:  Before we go to that chart, back when the public was first notified that their water might be cut off if they failed to pay their bill, some people questioned why that was necessary to make such a threat and even to carry out that threat because some people had the mistaken impression that a city this size would have excess revenues to take care of any

debits that were needed or expenses that were needed to be paid because of the size.

It sort of reminds me of when I ran into a person one time running for public office, and this individual had promised everything for the public, to do this, to do that, to increase police, to fix potholes, to reduce crime.  And I asked her, Where is the money coming for all of that?  And she had this response of, Well, you know, the size of the city tells us that when people are paying their property tax and when they are paying their other obligations, a city this size, we have plenty of money.  And the politicians who are in office or were in office back at that time just have not utilized the money properly.

So I asked her, Have you ever seen a budget for the city, or do you understand the difference between revenue and expenses?  What do you have on that?  Well, she was running for office, and, in fact, running for the board of supervisors, I believe, but had never seen any of those things nor taken any time to look at any of that.  Therefore, she just had an assumption that the city could afford all of these bills and all of these projects because this is a city, and it has thousands of people in this city, and, therefore, we have the money.  In fact, her last statement to me was an emphatic, "We have the money."  And I said, But you haven't even researched any of this.

Well, that brings us to what we are talking about here now, that people who are not aware of these particulars about which you speak, about what has to be paid, for instance, something like debt service, most folk have no idea what debt service is.  They don't know what the definition of debt service is.  So then when you put down debt service being a certain amount, they don't know what that is because most folks don't have debts where they have to pay interest on the debts, and they have a time period to pay their interest on the debt, and they call it debt service.  So they don't even know what debt service is.

And then there are some other matters here that they don't understand.  And, then, in order to produce clean water, there's a cost.  You have to order the chemicals.  You have to pay the people who are doing the work themselves.  You have to have a facility.  You have to have machinery that gets old, and you have to replace that machinery.  You have all kinds of expenses that have to be subtracted.  Well, this is what we are talking about here.

So, then, you are saying that even if we had 100 percent of the water users pay their bills, and not to mention those who might be allowed to pay at a lesser rate, because we have a matter right now that's still in court where we have proposed to try and help out some of our less fortunate citizens to be able to pay a lesser rate because they might be what would be

called ordinarily the poverty level, although we prefer not to use terms like that but, nevertheless, those people who are already utilizing transfer payments, government subsidies and payments and are already challenged financially.  Then we don't want to deny them water, and, therefore, we have proposed a system by which they can be furnished water at a lesser rate contingent upon their ability to pay.  And we have that in court right now, correct?

MR. HENIFIN:  Yes, Your Honor.

THE COURT:  And we have, then, made our determination on that, and we are dealing with another arm of the federal government on this particular point because that arm says that, well, there's a prohibition in the statute, the governing statute, which would prevent what we want to do to help the citizenry in that regard.  But we have allowed the courts to tell us on the interpretation of the relevant statute whether we can do it or not do it.

So what we have tried to do is have a different rate structure for those who are seriously financially troubled and challenged so that they can enjoy water without going bankrupt in one essence.  So that's in court right now, correct?

MR. HENIFIN:  Yes, Your Honor.  We expect, I think in 30 days or so, maybe for a decision from the appeals court, somewhere in about a month.

THE COURT:  So we have that already, and we have

mounted a response to the alleged statute that governs that. And we have said that we think there could be an exception. And we are asking the Court to confirm that we have identified an exception that would allow our impoverished citizenry to take advantage of that so then they can have the benefit, as I said, of a reduced payment plan for their water.

So back to this matter of everybody paying 100 percent, that would not be necessarily 100 percent of what the billing might be if we are successful. Do you agree?

**MR. HENIFIN:** They would receive that bill. So we have built that into all of these models as if that is already in place. That's accounted for here, that we would be successful in court, would be able to put that program in place, and that the estimated number of users that would apply to has already been built into these numbers.

**THE COURT:** So then if we had 100 percent of this model to pay, what, then, would you see as the revenue that's generated?

**MR. HENIFIN:** That's the 148 million and change.

**THE COURT:** And how much do we need?

**MR. HENIFIN:** 148 million.

**THE COURT:** But that's at 100 percent?

**MR. HENIFIN:** Correct.

**THE COURT:** So what is the likelihood of our receiving 100 percent?

**MR. HENIFIN:** We won't do that in the next few years. So we have to find ways to reduce costs or bridge the gap with loans. And up to this point, we have bridged that difference with the federal funding, flexible federal funding.

So we are approaching it from many different angles, but bridging that gap really doesn't impact the rate increase because this is built on what our budget requirements are. Here is what the rate required to generate that money is.

We are dealing with a decline or a valley in our current cash flow because the federal funding is running out, so we are exploring many ways to fill that, but the rate increase isn't the solution. It is finding other ways to fill that gap until we get closer to 100 percent of the folks paying.

**THE COURT:** But am I jumping you ahead of your presentation?

**MR. HENIFIN:** You might be.

**THE COURT:** Then go ahead, then, because you need to talk about the grants and what happens there too. So go ahead so you can get to the bottom line of the options that we would have in front of us. Go ahead.

**MR. HENIFIN:** So, again, this proposed rate would generate 148 million and change. We are only proposing to change the volumetric rate. So our rate is built in two pieces. One is an availability charge based on meter size, and the other is the amount you are charged for the water that

actually flows through the meter.  And we are changing that starting at the bottom tier, which most residential customers are at that bottom tier, less than 30 hundred cubic feet a month, which is a lot of water.  The change goes from $6.00 per hundred cubic feet to $7.48, which is one penny per gallon. Right now we are at .8 cents per gallon.  We are going to go to one cent per gallon, a pretty normal average across the country, and that is water and sewage services.  So we are not only delivering the water to your house at tap at a penny a gallon, we are taking it away, included in that penny, and treating it and releasing it to the environment.

The availability charges or the fixed part of our fees are not changing.  They generate -- let me go back to this -- the availability charge generates about 33 million of the 148, and the balance comes from the water consumption that folks use.

So that's the rate proposal is the one cent per gallon at the bottom, and the other tiers are proportionally increased to meet the same numbers.  So the typical bill would go from $76 a month -- that's for someone who uses 600 cubic feet per month -- it would go from $76 a month to 84, which represents about a $9.00-a-day increase, $8.88, if you want to be exact, and that's a 30-cents-per-day increase in the residential bill for a typical residential user.  If you use more water, your bill is going to be higher; if you use less water, you're bill will be lower.

Here are some ideas of what else costs per gallon, other things we drink. On the far side -- these are all from Walmart.com last week, so these are pretty relevant prices. You have got a gallon of bottled water, Crystal Springs there on the one side, at $1.48, $1.46 -- $1.43. So you could buy a gallon of tap water and have it delivered to your house and treated and disposed of for a penny per gallon through the tap, or you can go to Walmart and buy that same gallon for 143 times higher, at $1.43 cents.

Orange juice, I haven't bought a big thing of orange juice lately, it is over $10.00 a gallon. We have milk over $4.00 a gallon. Coca-Cola is at $5.00 a gallon. Apple juice, $5.00 a gallon. We are selling treated, wonderful water at your tap, don't have to go to the store and carry it home, a penny a gallon, and we will take it away used and clean it back up. So the value here is amazing when you think of what we are paying for other items. So the penny per gallon seems to make a lot of sense.

Affordability, you addressed this a little bit a moment ago, Your Honor, but we look at it as a couple of different metrics. One is as a percentage of median household income, and that's the top line. At 2.4 percent, that is water and sewer. That's part of your median household income. EPA sets 4.5 percent as fiscally stressed, if it exceeded 4.5 percent, so we are well under that standard.

Another place you might compare it to is the lower quintile income, so the bottom 20 percent of our earners in our community, a pretty small income at 17, just under $18,000 a year.  They would be paying a significant amount.  5.7 percent of their income would go to this water bill.  But as you've referenced also, the SNAP concept, which is our assistance program or the reduced rate for the SNAP-qualified customers, they would be at 3.7 percent, again, well below the 4.5 percent that EPA has set as fiscally stressed.

So from those measures, the rate is affordable.  We think at a penny per gallon, it is a great deal compared to other things people are purchasing and drinking.

And then, finally, how does that look across other utilities?  And I don't believe in benchmarking other utilities to set the rate makes much sense.  It's nice to see where it lands, but we need to set our rates to recover our costs, and those are going to be different in different communities.  But we did ask the consultant to look across a number of communities to see where we landed.  Kind of midpoint, you can see Birmingham, which had a tremendous sewer problem in Jefferson County, Alabama, back 10 or 15 years ago.  They are still paying for that.  Atlanta has got a huge sewer issue.  Charleston has a big issue, New Orleans.  All of these communities have had to make major investments in their system, and their rates are significantly higher than what we have

proposed across the southern U.S.

There are still communities that are much lower. I don't get into their books and understand how they are doing it. My guess is they are supplementing it with general fund or they're not doing what they need to be doing.

And finally you get into the collections, which I said we had some slides on. This is where we have been working hard to try to increase the amount of money coming in. Over the last 12 months, we have brought in 68 million from water and sewer revenue alone. While that is well short of the 115 we may need, it's -- it represents significantly more than the City was bringing in. I think the last consolidated annual financial report from the City that has been posted was 2022, for that fiscal year, and they were less than 30 million in revenues for the water system at that point in time. So we've done a good job of getting more people to pay, getting more money into the bank.

When you look at calendar year '25 over '24, each month, in the first two months, we have been significantly higher than we were a year ago. We are averaging about 1.5 million more a month this year than we did the last. If you just take that estimate of 1.5 million more each month, we would end up generating about or receiving about $86 million this year, which is getting us on our way towards our full 148 million that we are ultimately going to need. Obviously, we can't make

all of our payments at that without some help, either loan or grants or other sources of funding.

Finally, here's the trends we are on.  A monthly budget that we had had set in place was about 9-and-a-half million a month, which is what we were trying to get to this year and where we need to be on the operations side going forward.  You can see the green bars represent what we actually received each of the months.  And the dark line is a trend line that shows we are definitely headed in the right direction but probably at too low of a slope.  We really need to pick that up.  And we expect again, as we turn on the severance system, as I explained with the work order system that goes live at the end of the month, we should see that slope of that line increase and start seeing more revenue close to what our monthly budget is.

And if you look at the collection rate as a percentage, it goes up and down month to month because it is all on timing of when revenue is received and when bills go out.  So it doesn't look real consistent.  To the naked eye, you can't maybe tell it is going up, but the trend line from the actual information in the data shows we are on an increase.  We have gone from below 65 percent to above just about 68, almost 70 percent.  Again, without the ability to turn water off en masse, that hasn't moved quickly, but we expect to see that move much better as we go forward.

I think that's all I had.  I can't remember where we left off on any other conclusions.  The conclusion really is we need this rate increase to support the full operations going forward.  We have a near term cash flow that we are going to need to borrow money for or get additional grant money, and we are working a number of different options to figure that out.  And in the near term, we are going to struggle to pay some of our bills while we are trying to make all of that happen.  But the rate increase itself is needed to support the full budget.  It's supported by the financial management plan update.  It makes sense in terms of affordability.  It makes sense as far as other communities in the South, what they are charging for water and sewer, and I think it's right in line with where we need to be.  The earlier we can put that in place, the faster we will see some of that revenue helping us out in this near term problem.  But we are looking to try to implement this as quickly as possible.

**THE COURT:**  An important point that we need to stress is this, is that we were provided certain moneys that we could utilize, but the purposes for which we could use that money was not universal.  We could only use certain of those dollars based on certain, certain projects, certain aims and objectives.

**MR. HENIFIN:**  Yes, Your Honor.

**THE COURT:**  So while we were given facially some

moneys that would have spoken to this and still might, we might not be able to use all of that money for what we want to use it for to sustain the system in the manner in which we want to sustain it, correct?

**MR. HENIFIN:**  That is correct.  The biggest challenge is almost all the federal dollars are not available for operation and maintenance.  They are all for infrastructure projects.  So the number that gets thrown around a lot is 800 million, but the actual appropriation from Congress at the end of 2022 was $600 million.  150 of it was a fairly flexible technical assistance fund that we have relied on to get the system up and running, to pay operation and maintenance costs, very, very flexible in what we could apply that to.

The lion's share of the money, $450 million, came through a program known as the state revolving loan fund which has serious restrictions about what you can use.  It has to be used for infrastructure projects, pipes, pumps, improvements to the plants.  It has to be used in accordance with their rules and regulations, and not a big problem but slow-moving big construction projects, essentially, and that's that 450 million.

So the 150 did a great job to get us two years down the road, but we are out of that.  And unfortunately, no one really knew what was needed in the end of 2022, when Congress made this appropriation.  Perhaps they could have done it

differently if they had known more about what the system was going to look like, but this was done in response to the emergency, the disaster. A lot of people were trying to figure -- make the best shots they could of how that money needed to be broken up. And this is what we got, 150 million flexible money that could be used in operation and maintenance, 450 that has to be used only for infrastructure, and all of it only on the drinking water side. And as you are well aware, we have spent significant resources on the sewer side consuming a lot of the local revenue that could be used on the sewer.

So we've got these competing needs. The money comes from different places. The number that gets thrown around in the public a lot is 800 million, which includes a lot of Corps of Engineers money, which can only be used for Corps of Engineers infrastructure projects. Again, it can't help us through the operation and maintenance.

And their process, while it sounds like they've got the money, they have got authority for that money, authorization, but they don't have an appropriation. They get the appropriation on an annual basis. And so of the Corps of Engineer money, we have had $30 million appropriated and programmed and going to work for Jackson very slowly, but it is moving, and we are working with the Corps to start the next appropriation to get another 30 million of the 139 that's been authorized by Congress through the Water Resource Development

Act.  So that is slow moving.

And then the balance of the 800 million is really the federal share of the ARPA money, which, again, we are working closely with the department of the -- the Mississippi Department of Environmental Quality that administers that program.  We do have four ARPA projects in process where we will receive -- ideally we would get our full match, if we execute it correctly, by the end of '26.

So all of these different funds, as you pointed out, have restrictions and specific uses, and the biggest challenge is on the operation and maintenance where there is no federal money short of this one 150-million-dollar grant we got from Congress.  We are looking at how we can reallocate those between the two, working with Congress to try to make that happen.  That is one option.  Again, looking at borrowing money is another option.  So we are exploring everything we can to keep ourselves fiscally sound through this challenged time while we continue to increase local revenues.

THE COURT:  That $150 million is going to run out pretty soon?

MR. HENIFIN:  April of this year.

THE COURT:  Exactly.  And that was what brings us to this concern, immediate concern where we are, because while we are trying to explore other avenues of moneys, this grant money that came from the government that has this restrictive price

tag on it is going to expire pretty soon, and we still can't tap into this 400-plus million unless we get some additional authorization to do so.

In the meantime, we don't have 100 percent of the people paying their bills, so we, then, are possibly headed towards some bind that would require us to increase the rate structure. If we don't get a grant, if we don't get permission to use some moneys that right now they are saying is just for infrastructure and we can't use it for operation and maintenance, if we don't get any new grants, if we don't have the public to radically increase their payments, which right now we are still a long way from what we need, then we might only have as a solution an increase in the rate structure. And then once we have looked at the increase in the rate structure, then we have looked at the minimum amount of increase that could solve our situation for the foreseeable future, and that's back to what you were talking about as a penny a gallon.

**MR. HENIFIN:** Right. But that -- slight correction, Your Honor, is that even with grant, loan, whatever we need to get through our current challenge, cash flow challenge, we need the rate increase to support us long term because that 148 million meets all of our needs on an annual basis.

**THE COURT:** Right. And it would come up on an annual basis, as you were just saying. So unless we got some great big grant that authorized us yearly to pay our expenses over

and beyond what the taxpayers are not paying because they are not paying their 100 percent of the bill, then we will have to have some scheme in place, some plan in place that's going to provide us the necessary funds to run the system based on the payments from the citizenry.

**MR. HENIFIN:** Correct.

**THE COURT:** And that's where that penny a gallon comes in at the present.

**MR. HENIFIN:** Yes, Your Honor.

**THE COURT:** Because it still doesn't take into account if we later have to change facilities, improve the equipment. And by the way, on that particular matter, you know, when we had that huge storm that so concerned us that kept you up at night, kept me up too, but, you know, I'm just talking about you right now, and it kept you up at night, when we had that huge storm, and we were wondering whether it was going to take out the system, because that storm was so huge, and the damage that could be done to the system was so great, that if we had just a bit more water poured into the system, then -- and if it had wiped out the entire system, what kind of bill were we talking about?

**MR. HENIFIN:** I don't even know. I could give you an estimate, Your Honor.

**THE COURT:** Was it in the billions?

**MR. HENIFIN:** It probably wouldn't be in the

billions, but it would be in the hundreds of millions.

THE COURT:  Hundreds of millions?

MR. HENIFIN:  Yes, sir.

THE COURT:  I heard a figure one time that it was going to be at least two billion if they took out the entire system.  Now, is that close enough or just hundreds of millions?

MR. HENIFIN:  I don't think we would ever have to replace the entire -- a lot of the infrastructure in the ground has a lot of life, so I don't know that we would ever have to spend billions of dollars on it.  Everything above the ground potentially -- if we lose a water treatment plant entirely and have to rebuild it, that is in the hundreds of millions.

THE COURT:  Well, I guess that's why I stayed up more nights than you did then because I was told at one time that it might be, if the whole system got wiped out, that it might be somewhere closer to two billion.  And I never got a chance to verify that.  I'm just saying what they said.

MR. HENIFIN:  Maybe if you had to start from scratch, probably, but we have got a lot of good pipe in the ground still.

THE COURT:  Well, that's what I'm saying, you know.  And then later, when I found that out, I felt better, not a whole lot but I did feel a little better, because then I thought, well, we don't have to worry about the whole system

being taken out.  But it did come close to having some severe damage to the system when that huge storm came, but fortunately we were able to survive that.

So based on what we now have and where we are now, we still, according to your calculations, need a rate increase. Is that correct?

**MR. HENIFIN:**  Yes, Your Honor.

**THE COURT:**  And this rate increase appears to be modest, right?

**MR. HENIFIN:**  Yes, Your Honor.

**THE COURT:**  So, then, say it again what this rate increase that you propose would be.  Say it again because I want to make sure that everybody here understands it because I want their comments later, not today, but later, after they've had a chance to think about it and review the documents that you have there.  So go ahead and tell us.  What, again, are we talking about as a potential rate increase?

**MR. HENIFIN:**  So the rate increase changes the consumptive charge, doesn't change the availability charge, just the consumptive charge, and raises -- for the average residential customer, it goes from $6.00 per hundred cubic feet to $7.48 per hundred cubic feet, raises the monthly bill by $8.88 or 30 cents a day.  So that is the change in the rate for our average residential customer.  Ends up being a penny a gallon for water that is both delivered to your tap with

pressure and clean and prepared to drink and takes it away from the house in the form of your sewer and gets treated and released to the environment so it causes no damage.  So one penny does all of that for every gallon of water.  It seems like a pretty good deal.

**THE COURT:**  Now, let's talk about the procedure to reach this result.  In the papers to which everyone here is a signatory from the agency, there is an allowance for this; is that correct?

**MR. HENIFIN:**  Yes, Your Honor.  I'm supposed to present this to the mayor and his staff, and then once we have had that meeting, he is supposed to put it on the next regular counsel agenda.  So I have sent the proposal.  We have not scheduled the meeting yet.

**THE COURT:**  So this is in the papers, the agreement that we had before, which says that if we come to this place, we then need to have approval by the city council, and the city council would have it on their agenda by the actions of the mayor, who has to ask them can he -- can they put this on the calendar.  They, then, at that point, can vote on it, up or down, or abstain.  Now, they have in the past abstained, on an occasion abstained, haven't they?

**MR. HENIFIN:**  Yes, Your Honor.  On the one other rate increase we did, they abstained.

**THE COURT:**  So then when an earlier rate increase was

proposed, they abstained.  In other words, they chose not to vote on it.  They chose not to reject it nor accept it.  Correct?

**MR. HENIFIN:**  Yes, Your Honor.

**THE COURT:**  So, in the instance now, if the mayor then succeeds in putting it on the calendar, then they can do the same thing.  They can abstain or vote up or down.

**MR. HENIFIN:**  Yes, Your Honor.

**THE COURT:**  Now, after they have voted or not voted, that doesn't leave us in a quandary, does it?

**MR. HENIFIN:**  No, Your Honor.  The order also says if they don't pass it, either they vote it down or they abstain or it doesn't pass, then the order allows the interim third-party manager to implement the rate increase with the appropriate notice, which is 30 days public notice, and then we can implement.

**THE COURT:**  And who would give you that authority to do that?

**MR. HENIFIN:**  You would, Your Honor.

**THE COURT:**  So, then, whether the city council approved or disapproved or chose the route of abstaining, it would still be in my territory to determine whether that rate increase was necessary?

**MR. HENIFIN:**  Yes, Your Honor.

**THE COURT:**  So that's where we are at the present

time, correct?

MR. HENIFIN: Yes, Your Honor.

THE COURT: So, then, what I'm saying to the assembly here is that I would like to have your comments on the matter. Now, because, you see, we will ask that the matter be placed on the agenda for the city council, and we will see, then, what the city council does.

Now, if the city council passes the measure, then that would satisfy the city council's responsibility in the area. But if they chose to not pass it or if they chose to abstain and not vote, then it comes on my calendar as to whether I think it still should go into effect, notwithstanding the actions of the counsel. Correct?

MR. HENIFIN: Yes, Your Honor.

THE COURT: So, then, that's where you come in, that is, you and your various agencies. I'd like to have your input just so I can see what you think about the matter. I will make the final determination, if that's necessary. And I can either, in that instance, follow your recommendations, not follow your recommendations, whatever. But it will still be my discretionary call, and I will make it. And so -- but I would like to hear whether you see the necessity for such a rate increase, the necessity for the increase which is proposed, or some other increase, or no increase, but I'd like to hear what you all have to say on it because I will consider your

comments.

Now, Mr. Henifin, we talked about the imminence of all of this and how it needs to be addressed quickly. So, then, I would like to give 10 days to all of you here to study this matter and then to respond to my question on this matter as to whether it ought to be submitted as presently discussed and whether we then should ask the mayor to seek to put this on the city council's calendar and then hopefully get it on the calendar where the city council can make a determination one way or another on this matter, and so I would know thereafter whether I need to take any action that is allowed to me on my own.

Now, Mr. Henifin, what about that?

**MR. HENIFIN:** It works for me, Your Honor.

**THE COURT:** Okay. Is there anybody here who thinks you will need more than ten days? Okay. I see no hands.

So, then, I want you to submit to me, and I will share it with Mr. Henifin, your responses, and then I will study the matter and wait on the city council, because during this interval, Mr. Henifin, I believe you have already contacted the mayor at one point and said this might be a possibility. Did you do that yet?

**MR. HENIFIN:** Yes, and we are waiting to schedule a meeting so we can complete that part of the stipulated requirements.

**THE COURT:**  Okay.  So then he will submit the matter, asking the mayor if he would put it on the council's agenda, and then we will hear, hopefully, in a rapid succession the council's response, and then thereafter I would know how I should approach this whole matter.

Now, any question about this procedure?  Over here to my right?  Over here to my left?

**MS. WILLIAMS:**  No, Your Honor.

**MR. MARTIN:**  Judge, Drew Martin for the City.  I just wanted to say this if I could.  It's not really a question for clarity, and I will absolutely abide by the Court's order that we respond within 10 days, but I think I can give you the City's response right now, which is the stipulated order is clear.  I, as the city attorney, don't have an opinion as to whether Mr. Henifin's suggested rate changes are good, bad or indifferent.  I understand what he has presented here, and it makes sense to me.

What I would suggest, though, is that the governing authorities for the city have to make that decision, and all I will be able to say is, please request the meeting, and I will be glad to pass that along as well myself to the governing authorities.

**MR. HENIFIN:**  It was requested on Tuesday.

**MR. MARTIN:**  Okay.  And this presentation that has been here today, this presentation made to the mayor and to the

city council would go a long way to getting it passed.  I think that the city governing authorities need to hear this.  They need to have the opportunity to ask whatever questions they deem appropriate on behalf of the people that elected them. And I don't know what those questions would be.  From a legal perspective, I understand what we are doing here, but from a governing perspective, I think that the city governing authorities need to hear this, need to have the opportunity to ask questions, and need the opportunity to get whatever answers there are so they can properly present it.  And I have no doubt that it will be put on a city council agenda regardless, but I just think that will all help in terms of actually getting this moved forward.

**THE COURT:**  Thank you so much.

**MR. MARTIN:**  Yes, sir.

**MR. MCGUFFEY:**  Your Honor, just a point of order, I guess.  We would like to have this presentation included with any transcript or any posting for an order for this hearing so that it can be made public.  I don't know how you want me to do that.  I can literally make a motion to include it on the minutes entry or -- I know it has been provided to chambers already.

**THE COURT:**  So then you want the transcript provided?

**MR. MCGUFFEY:**  Well, I don't know if we are going to order the transcript.  We have done it in the past.  But the

more important thing, I think if there is a minutes entry, then it can be attached as an exhibit even to that.

**THE COURT:** Okay. Well, Teri, how long would it take you to prepare a finished transcript of this?

**COURT REPORTER:** Three days.

**THE COURT:** We can make it happen. I think it's a good idea. And so Teri says that she could have it in three days, which means she can have it in three days unless --

**MR. MCGUFFEY:** I believe her.

**THE COURT:** -- unless she is in some other court matter that I need earlier, but I don't think I will. We will make sure we get it.

**MR. MCGUFFEY:** If Judge McNeel detains her, we will forgive her for that as well.

**THE COURT:** All right. Thank you. Anything else? Anybody else? I thought I saw you stand up.

**MS. WILLIAMS:** I was just simply responding to the Court that we had no misunderstandings about the Court's instructions.

**THE COURT:** All right. Thank you so much. Anybody else? Again, I thank you all for coming over. Let me go over to my monitor here. Any questions?

**MS. SHERMAN:** Just one, Your Honor.

**THE COURT:** That is Ms. Lori Sherman. Go ahead. What is your question? Ms. Sherman, what are your questions?

**MS. SHERMAN:** I apologize. Just one thing.

Earlier Mr. Henifin indicated that the water in Jackson was meeting all standards. However, the statement seems -- the statement made on the record seems to contradict the fact that JXN Water just sent out a notice of noncompliance last week. So I just wanted to raise that and put that on the record. And it is my understanding that these notices explained that the water system is actually not meeting all of the federal water quality standards. I just would ask that the Court take notice of these violations that went out to the public.

**THE COURT:** Okay. Mr. Henifin, your response?

**MR. HENIFIN:** I mentioned that in my comments. It's the disinfection byproduct issue we are having. And, again, it's over -- there are quarterly readings, but your actual maximum contaminant level violation is over multiple quarters in a rolling one-year average. So, yes, we had a quarterly violation that we did notice recently.

**THE COURT:** Okay. Did you hear that?

**MS. SHERMAN:** I did hear that, but I -- yes, Your Honor, I did hear that, but I thought there was more than one violation, but I could be wrong about that.

**THE COURT:** Okay. Well, check your facts and get back to us. Hello? Ms. Sherman?

**MS. SHERMAN:** Yes, Your Honor.

**THE COURT:** You said you thought. So what I'm

saying --

**MS. SHERMAN:**  I did check --

**THE COURT:**  Hold it, Ms. Sherman.  Just check whatever facts you need to check so you can speak with authority from your facts.  You said you "thought," so that tells me you are not sure.

**MS. SHERMAN:**  Actually, I said "thought" to be kind, but I'm pretty sure --

**THE COURT:**  Well, be unkind then and tell me your --

**MS. SHERMAN:**  -- there were multiple violations that were sent out.  So I wanted to just be -- I wanted to make sure the record reflects --

**THE COURT:**  Ms. Sherman, be unkind then and tell me what your source is.

**MS. SHERMAN:**  Well, it's my understanding it's the -- I mean, this is a public record --

**THE COURT:**  Your understanding.  So what's your source, Ms. Sherman?

**MS. SHERMAN:**  It's the Mississippi Department of Health, and I actually have reached out to folks at JXN Water.  So it's my understanding that the folks at JXN Water have reached out to Jacobs.  So, that's my --

**THE COURT:**  Now -- okay.  Look, if you have some facts you want to submit, just submit them.  I don't mind that.

**MR. FELDER:**  Your Honor, I'm co-counsel with

Ms. Sherman.

**THE COURT:**  Okay.  Could you come forward then so we can understand you then?  Do you have facts?

**MR. FELDER:**  I'm a JXN Water customer.  I have the two notices.  One was sent out in December.

**THE COURT:**  Okay.  Go ahead and state --

**MR. FELDER:**  Can we submit these on the record as exhibits?

**THE COURT:**  As soon as you tell me what it is.

**MR. FELDER:**  Oh, yes.  This is the total Trihalomethanes, TTHM --

**THE COURT:**  I didn't understand what you said.

**MR. FELDER:**  How do you pronounce these?

**MR. HENIFIN:**  This is the disinfection byproduct.  It's total Trihalomethanes.

**MR. FELDER:**  And one was sent on December 2024, and the other was sent on March 3rd of 2025.

**MR. HENIFIN:**  We had two quarters where we exceeded the quarterly limit.  But again, the maximum contaminant limit is set on a rolling four-quarter average.  So we haven't exceeded that yet.  We are working to solve this problem.

**THE COURT:**  So, then, do you understand that, what he just said?

**MR. FELDER:**  Yes, I understand that.

**THE COURT:**  Go ahead, then.  What is your complaint?

**MR. FELDER:** I'm just supplementing what my colleague was adding, that --

**THE COURT:** But tell me what that is. That's what I asked for a few moments ago. I said tell me what it is that you want to supplement.

**MR. FELDER:** Oh, the notices that were sent out that indicate that these violations occurred.

**THE COURT:** Okay. What does the notice say?

**MR. FELDER:** Do you want me to read the whole thing?

**THE COURT:** Just give it to me then.

**MR. FELDER:** Yes, sir. So I can submit them?

**THE COURT:** Go ahead. Give it to her. Hold it. Don't move.

Now, this says, "Important information about your drinking water." And then there's two pages. Actually, it is four because it is front and back.

**MR. FELDER:** They are two separate ones. They were sent out on two different occasions.

**THE COURT:** What point on here are you specifically noticing?

**MS. SHERMAN:** Your Honor, I assume that that is directed to me?

**THE COURT:** No, it is directed to him.

**MS. SHERMAN:** Okay.

**THE COURT:** But I will let you supplement if you

wish.  Let me just go with him first because he gave me these two sheets, and I'm asking him what on these two sheets is he emphasizing.

**MR. FELDER:**  The sheet is a notice of, as Mr. Henifin has explained, they are a notice that these chemical byproducts have been in the water.  And as he explained earlier, and what counsel for Mr. Henifin has explained to my colleague, is it has come from the water sitting for a prolonged period of time.

What Ms. Sherman was explaining earlier was, and I have these two copies just for the point that it was more than one time it occurred, that to the citizens of Jackson, to the JXN Water customers, like myself, we received more than one violation.  That's all -- I happened to have them readily on my person today, so I just wanted to share that, that there were multiple times these were sent out.

**THE COURT:**  Would you come back up here, please. What I want you to do is circle what you want me to look at specifically on those two sheets.  Give him a pen.  Could you do that?

**MR. FELDER:**  Yes, sir.

**THE COURT:**  Now, take that over to Mr. Henifin, these two sheets.  Take them to him.  Now, Mr. Henifin, look at what he circled.

**MR. HENIFIN:**  These were produced by us.

**THE COURT:**  I know.  This is your product.  I know

it.

**MR. HENIFIN:** This is language we are required to submit. Again, that's what he circled, but at the end of the day, we did go over the quarterly average for the first quarter, and we went on for the fourth quarter of last year. And so, what does it mean? On the backside, it talks about how it doesn't have a real health impact at these very low levels, but if you continue to have TTHMs and HAA5s, which, again, are these disinfectant byproducts, that if you drink that in excess over the MCL over many years, you can develop a health issue.

That's why this quarterly, rolling four-quarter average is how the standard was set, but every time we exceed the standard in one quarter, we still have to let everyone know that has happened. So if we had four of these in a row, we would be exceeding the maximum contaminant level in the Safe Drinking Water Act. The individual occurrence does not require really anything else other than we are taking action to minimize the presence of these through flushing and changing the levels at which the tanks are held.

Again, these are new issues because Jackson never was able to keep water in the system, and we are figuring how the system works and reacts. So we are making progress on this, and we anticipate that we will get the next quarters under, and we will be able to not have to deal with this issue going forward.

**THE COURT:** This was the point you were making in

your presentation --

**MR. HENIFIN:**  Yes, Your Honor.

**THE COURT:**  -- when you said that this is a new situation because previously Jackson couldn't keep water in the system.

**MR. HENIFIN:**  Yes, Your Honor.

**THE COURT:**  So this situation would not have developed at that time.  But now we have gotten to the point where we can keep water in the system, and, therefore, we have a new issue that we have not had before because Jackson could not keep water in the system.

To the counsel, do you have any information to say any of this is wrong?

**MR. FELDER:**  No, Your Honor.

**THE COURT:**  Okay.  Well, thank you for commenting on that, but he mentioned this in his presentation.  Maybe you didn't understand when he mentioned it that this is what he was talking about.  So if you have any other issues you want to bring up in front of us, feel free to do so.  Okay?

**MR. FELDER:**  Yes, Your Honor.

**MS. SHERMAN:**  Your Honor, I did understand -- I apologize.  This is Lori Sherman.  I did understand what he said earlier.  I did understand that.  I also heard him say that this is a complicated issue.

I also want to point out the fact that one of these -- the

HH -- I'm sorry, HHAA (sic), which is the haloacetic acid, and I might be pronouncing that incorrectly, was something that was covered in the original complaint.  It is my understanding that the THMS (sic) is something that is new and outside of the complaint.  So I just want to make that clear.  And then, also, that Mr. Henifin said that this is a complicated issue, and it's my understanding that this might not even be fixed until September.  This was information that I was able to get from attorneys at JXN Water.  So I just want to make sure that that is also on the record, Your Honor.  Thank you.

**THE COURT:**  Now, did you speak to the attorney for JXN Water?

**MS. SHERMAN:**  I have communicated with them via e-mail.

**THE COURT:**  I said did you speak to them?

**MS. SHERMAN:**  In person?

**THE COURT:**  Yes.

**MS. SHERMAN:**  Not over the phone and not in person.  This was all written.

**THE COURT:**  And so, did you have e-mail contact with them?

**MS. SHERMAN:**  I did, Your Honor.

**THE COURT:**  And did you get a response?

**MS. SHERMAN:**  I got a response.

**THE COURT:**  And what was the response?

**MS. SHERMAN:** Well, initially when I raised this to JXN Water, I was told that there weren't any violations, and that JXN Water was extremely busy, and that they were doing what they could. And then I followed up for clarification. And at that time, I was also told that it was their understanding that there weren't any violations. But they had also added the State of Mississippi to it, and I was told that folks at Jackson would get with Jacobs, who was running the water, and get back with me.

And then after that communication, I was told that there were, in fact, violations for the quarter, but the numbers were looking good and that they were working on this issue. I was told that the BP -- I'm sorry, I might get the acronyms wrong -- but the byproducts was something that was new that arose from the system having water in the tanks and that the raw water contained carbon. So when you have carbon that mixes with chlorine, sometimes that can produce a byproduct, but they were working on it, and that it was complicated, and that the expectation is that they will hope to get it fixed in September, which based on my reading of the violations, that would kind of put us at a year mark, which is concerning because these particular byproducts are not something you can boil out. It's a chemical. So, with that being said, like Mr. Henifin said, the maximum amount of time, if we get to that year mark, is where we see, based on research --

**THE COURT:** Slow down just a little bit. We are trying to take down what you said. So, then, go ahead.

**MS. SHERMAN:** Based on some of the literature that I've read from EPA and some other entities, that that year mark is significant because that's where you start to see things like bladder cancer and things like that when these chemicals aren't being addressed. That's what I know, and I just wanted to make the Court aware of that.

**THE COURT:** Okay. Well, I'm aware of that. In fact, I'm aware of what Mr. Henifin stated as to the cause of some of these matters. And so are you satisfied that now you understand the potential causes of these matters? Are you satisfied or not satisfied? Because if you are not satisfied, then we will try to make sure you are satisfied, as well as making sure that I'm satisfied.

And so, then, as I look through literature, then I can advise Mr. Henifin to send you some of these things. So, then, are you satisfied with what you have received thus far, or do you need to receive something else?

**MS. SHERMAN:** Well, I don't want to use the word "satisfaction." I would appreciate if there was an opportunity to meet with some of the folks at Jacobs to talk about some of these issues. But I do appreciate an opportunity to bring this before the Court, but I would -- I can't say that I'm satisfied, because as I communicate with the folks at Jackson,

I have ongoing questions, and I asked to meet with Jacobs several times and asked to have a sit-down with the folks at Jackson.  But at this particular point, I was told that they were pretty busy and they didn't have time.  So I can't say I'm satisfied, Your Honor.

**THE COURT:**  All right.  Well, you are not satisfied.  We will try to make sure you are satisfied and send you some information.  How is that?

**MS. SHERMAN:**  I appreciate that.  Thank you so much, Your Honor.

**THE COURT:**  Okay.  Now, anybody else?

**MR. FELDER:**  May I take a seat, Your Honor?

**THE COURT:**  Oh, yes.  I'm sorry.  I forgot about you over there.  You became a part of the fixture.  I forgot about you.  I apologize.  But I was looking this direction over here.

All right.  Now, then, I have made my comments.  We are going to try to make sure everybody stays up to snuff on what's going on to understand this whole situation here with a degree of transparency that would delight everybody at least as to what is going on and what the options are, you know.

So I'd like to hear from you, and so then I will wait for my 10-day period, and then we will move from there.

All right.  Thank you all so much.  You have been very gracious, very kind.  Ms. Sherman, thank you so much.

**MS. SHERMAN:**  Thank you.

**THE COURT:**  All right.  We are out.  Thank you much.

(HEARING CONCLUDED)

CERTIFICATE OF COURT REPORTER

I, Teri B. Norton, RMR, FCRR, RDR, Official Court Reporter for the United States District Court for the Southern District of Mississippi, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a correct transcript of the proceedings reported by me using the stenotype reporting method in conjunction with computer-aided transcription, and that same is a true and correct transcript to the best of my ability and understanding.

I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.


S/ *Teri B. Norton*
TERI B. NORTON, RMR, FCRR, RDR
OFFICIAL COURT REPORTER