**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, and the STATE OF MISSISSIPPI, | ) ) ) | |
| Plaintiffs, | ) ) ) ) | Case No. 3:12-cv-790-HTW-LGI (Clean Water Act Case) |
| v. | ) ) ) | |
| THE CITY OF JACKSON, MISSISSIPPI, | ) ) | |
| Defendant. | ) ) | |
| UNITED STATES OF AMERICA, | ) ) | |
| Plaintiff, | ) ) ) | Case No. 3:22-cv-00686-HTW-LGI (Safe Drinking Water Act Case) |
| v. | ) ) ) | **ORDER** |
| | ) ) | |
| THE CITY OF JACKSON, MISSISSIPPI, | ) ) | |
| Defendant. | ) ) | |

This Court, at present, sits at a crossroads where judicial oversight must meet the stark, unyielding math of municipal survival. For years, the citizens of Jackson, Mississippi, have endured a water system that, by all accounts, was a ghost of a functional utility, a crumbling network of age-challenged pipes and veteran treatment plants held together by emergency declarations and the intermittent grace of federal intervention. Decades of systemic neglect had reduced the City's water and sewer infrastructure to a point of near-total collapse, inviting an eventual, dreaded, but predictable, lawsuit filed by the federal government against the City under

the Safe Drinking Water Act and the Clean Drinking Water Act[1]. That lawsuit on its face sought straightforward relief for the City: a competent water collection system; purification and delivery of residential and commercial useful water uncontaminated by dangers capable of robbing the good health of its citizenry and sending those citizens to the waiting commercial arms of clean water vendors.

Reacting to this salvation lawsuit, this Court and the lawsuit's parties[2] drew up an unprecedented approach whereby this Court , in a CEO[3] capacity, would appoint and oversee an Interim Third-Party Manager ("ITPM"). For several years, a temporary shield of approximately $150 million in federal operating subsidies allowed the water system under the Court's guidance and day-to-day nursing of the ITPM to survive, but all the while struggling to move the system to self-sufficiency.

---

[1] The legal struggle over the City of  Jackson's water infrastructure is a consolidation of two major federal actions stemming from decades of systemic decay and environmental non-compliance. The litigation began in 2012 when the United States and the State of Mississippi sued the City under the Clean Water Act for discharging raw sewage into local waterways, leading to a consent decree that the City struggled to fulfill (See Civil Case No. 3:12-cv-790-HTW-LGI). The crisis reached a breaking point in late 2022 following the near-total failure of the O.B. Curtis Water Treatment Plant, which left over 150,000 residents without safe drinking water for weeks and prompted a second federal lawsuit under the Safe Drinking Water Act (See Civil Case No. 3:22-cv-686-HTW-LGI, later consolidated with the earlier Clean Water Act matter).

[2] Plaintiffs herein are The United States of America and the State of Mississippi. Defendant is the City of Jackson, Mississippi. The Intervenor-Plaintiffs are The Mississippi Poor People's Campaign and the People's Advocacy Institute. The Intervenor-Plaintiffs were not signatories to the original or Amended Interim Stipulated Order in this matter.

[3] By operating in a "CEO capacity," the Court has taken on:

- Direct Management Oversight: Rather than simply ruling on law, the Court is supervising the day-to-day survival and financial stability of the utility through the ITPM (Ted Henifin).
- Fiscal Responsibility: The Court is making executive-level decision, such as this rate increase, to ensure the business (the water utility) stays solvent and does not default on its debts.
- Accountability: A CEO is responsible to a company's shareholders; similarly, the Court is holding the ITPM and JXN Water accountable to the "shareholders" (the citizens of Jackson) through forensic audits and performance mandates.

Today, that shield has vanished. The federal operating subsidies are exhausted. The ITPM, JXN Water, now stands on the precipice of a "fiscal cliff," facing a monthly deficit of $1.2 million. JXN Water's "chicken little" pronouncements warn the public that without an immediate infusion of capital, dire consequences will befall the City: JXN Water will default on the City's debt service obligations[4]; key equipment may succumb to the weather elements and the ravages of impatient time again permitting raw sewage to flow into the streets and streams of this community; equipment failure could also see health-debilitating rogue germs gaining access again to a system still weakened by battles barely won; and certainly, the citizenry's lost confidence, which has spirited the enthusiasm for many to join the relocation parade out of Jackson for clean-water accommodative venues

Having reviewed the extensive record and the competing proposals of the parties, this Court finds it must **GRANT** JXN Water's request for a 12% rate increase, effective immediately.

## I.    THE NECESSITY OF THE RATE INCREASE

The determination of a 12% increase,  equivalent to an additional $20.4 million in annual revenue, is not an arbitrary figure snatched out of the clouds. Nor was it an easy decision, in spite of the present necessity for this move. This decision was the result of rigorous financial modeling, based on the 2025 Bond Feasibility Study (attached hereto as "Exhibit A")[5], which serves as the "test year" for the utility's requirements.

---

[4] Following the issuance of the Water & Sewer Revenue Refunding Bonds, Series 1993-A and pursuant to the General Bond Resolution adopted March 11, 1993 (the "General Bond Resolution"), and as amended, Jackson's Water System and the Jackson Sewage Disposal System, along with the Water Fund and the Sewer Fund, were combined.  As such, holders of bonds issued under the General Bond Resolution are legally entitled to the net revenues of the combined System for payment of their bonds.  Currently, $159 million of bonds are outstanding under the General Bond Resolution through December 2040.

[5] The Study proposes a  rate increase of 24.7% ; however, this percentage reflects just the volumetric portion of the two-part rate (availability fee and volumetric fee).  The availability fee does not change under the new rate structure;

Under the existing rate structure, the system generates approximately $120.5 million annually. To cover essential operating expenses, chemical costs, emergency repairs and, critically, the City's mandatory debt service obligations, JXN Water requires $40.9 million per year.

This clearly creates a $20.4 million shortfall. JXN Water has painted a vivid, troubling scenario of the tumultuous results of systematic failure which bite at the heels of Jackson. No party has argued convincingly that JXN Water's montage is manufactured, hyperbolic, or simply inaccurate. The shortfall described by JXN Water unmistakably is a "sword of Damocles" hovering menacingly over a city badly in need of money. JXN Water reached the specific 12% figure by applying across-the-board volumetric increases to its current billing determinants to bridge this exact gap.

## II.    THE EQUITY OF THE BURDEN

This Court is deeply troubled by the argument that faithful, bill-paying residents are being "punished", while thousands of others remain unpaying and, even unbilled. Consider these disturbing numerical observations: the number of citizens not paying; the number of citizens with

---

thus, the net increase to the typical customer's overall bill (availability and volumetric) is approximately 11.7%, rounded up for discussion to "12%".

Current Rate:
$40 availability
6 CCF usage x $6 = $36 usage
Total current bill= $76 ($40 availability + $36 usage).

New rates:
$40 availability
6 CCF X $7.48 = $44.88 usage
Total proposed bill= $84.88.

The additional $8.88 is an 11.7% overall increase for a 6 CCF user.  ($8.88\$76 = 11.7%).

no accounts; the "E-Code" fiasco[6]; and the huge unpaid water bills of various large apartment complexes[7], owned by out-of-state corporations and individuals. Jackson's "water mess" is a profound inequity born of the City's decades of seemingly deliberate disregard of water shortages, intermittent pressurization, and funding emergencies passed from one administration to the next; a failure to maintain an accurate billing registry; and even a horrendous shockingly-bad Siemens[8] investment, which saw the City hand out what could only be described as "Christmas money".

We, the Court and the citizenry of Jackson,  nonetheless, are in a tragic Catch-22: without the revenue from paying customers today, JXN Water cannot obtain the resources to fix the billing system and identify the "free riders" tomorrow.

## III.   THE CITY

In an effort to ensure that every possible alternative was exhausted before placing a further burden on the citizens of Jackson, this Court allowed the City a significant indulgence: the

---

[6] The "e-code" (where "E" stood for "Emergency") was a specific designation in the City's billing system intended for critical institutions like hospitals or residents with severe medical needs. Accounts with this code were protected from water shut-offs regardless of whether they paid their bills. The "fiasco" arose because there was virtually no control or approval process for those who received an e-code; any billing clerk could apply the code to any account without supervision. This practice allowed these "free riders" to receive water services for years without paying, resulting in millions of dollars in uncollected fees, when, reportedly, many of these e-coders never had a true "emergency", but supposedly were awarded e-code status because of "political favors".

[7] JXN Water has identified in the City at least 15 apartment complexes, each owing more than $100,000 in past-due amounts. Prominent names in litigation and public disputes include, *inter alia*: Blossom Apartments; Chapel Ridge Apartments; Gardenside Apartments; and Tracewood Apartments.

[8] The 2013 Siemens Industry, Inc. contract, was a $90.6 million capital investment that resulted in a debilitating failure of the City's billing and revenue collection systems. Originally pitched as a self-funding "Performance Contract" guaranteed to generate $120 million in savings, the project instead triggered a decade-long financial "death spiral" characterized by an estimated $450 million in lost revenue and unbilled services. While the City successfully recovered an $89.8 million settlement in 2020, the net proceeds of approximately $59.8 million (after $30 million in legal fees) were primarily diverted to stabilize general fund deficits and service existing bond debt rather than performing critical physical repairs to the O.B. Curtis and J.H. Fewell treatment plants. Consequently, the utility remains burdened by the original debt incurred for the failed Siemens system while lacking the capital reserves necessary for modern operations, leaving a structural deficit that necessitates the proposed rate adjustment to ensure the continued delivery of safe drinking water. This Court, though, continues to hunt for millions in unaccounted-for settlement funds not explained by the above alleged allocations by the City.

opportunity to conduct an independent financial review. The resulting hearing, however, was a study in administrative irrelevance; rather than addressing the "Sword of Damocles" hanging over the water system's solvency, the City's financial expert, Michael Thomas, presented an analysis that was fundamentally untethered from the crisis at hand.

Remarkably, the record suggests the City did not even direct its own expert to perform the specific, rigorous analysis of water revenue requirements that this Court requested. Mr. Thomas, instead, expended the vast majority of his review time to sanitation fees, an issue this Court had explicitly and repeatedly announced was immaterial to the immediate necessity of a water rate increase.

Instead of a collaborative effort to solve a municipal emergency, the City's presentation focused only on unrelated accounting discrepancies, rather than addressing the reality of the $1.2 million monthly deficit. The City, then, failed to offer a single viable, immediate alternative to bridge the $20.4 million shortfall. Accordingly, to this Court, the City's objections stand as a hollow protest against the very math that past City administrations orchestrated through years of mismanagement. The City, thus, continues to urge this Court to defer approval of the rate increase pending completion of an additional affordability study.

The Court expressly rejects that request. Neither federal law, state law, nor the Court's prior Orders condition lawful operation of a public utility on the completion of further study once the evidentiary record establishes that existing rates are inadequate. The Court will not sanction continued noncompliance, service degradation, or financial insolvency in the name of additional analysis. Where a system is operating in violation of federal mandates, the remedy is compliance, not delay. *See Ruiz v. Estelle*, 679 F.2d 1115, 1145 (5th Cir. 1982).

The record here already contains multiple affordability and rate analyses, including studies relied upon by the City and JXN Water. The City's expert himself confirmed that JXN Water's financial condition supports a rate increase and testified that maintaining the current rates, which are insufficient to cover operating costs and debt service, would reflect unsound professional judgment. See Dkt. 257.  No additional study proposed by the City would generate the revenue necessary to satisfy present operational, compliance, and debt-service obligations **at this time**. This Court, hence, declines to postpone legally required action on that basis.

## IV.    INTERVENOR-PLAINTIFFS' ALTERNATIVES

It its continuing pursuit of a resolution that balances fiscal reality with public equity, this Court has been exceedingly deliberate, intent on ensuring that no stone was left unturned before imposing an additional financial burden on the citizens of Jackson. To that end, this Court granted the Intervenor-Plaintiffs- the Mississippi Poor People's Campaign and the People's Advocacy Institute- ample time and latitude to conduct their own exhaustive independent financial analysis. The Court provided these parties with broad access to JXN Water's financial data and delayed final judgment specifically to allow their consultant, Mr. Larkin-Connolly, the opportunity to formulate and submit alternative revenue models.

After carefully reviewing these submissions, this Court finds that while the Intervenors utilized this time to produce academic "silver bullets," they ultimately failed to present a viable plan that provides the immediate, liquid capital necessary to stop the $1.2 million monthly hemorrhaging.

The Intervenor-Plaintiffs propose that JXN Water could avoid this increase by aggressively billing 4,000 "unmetered" properties and tripling rates for customers outside city limits. Billing these 4,000 unmetered properties, say the Intervenor-Plaintiffs, could generate $5 million

immediately. The evidence, however,  shows that many of these properties are vacant, abandoned, or require physical meter installations that cannot be performed without the very capital this rate increase would provide. JXN Water's projections indicate that revenue from these accounts will not be fully realized until 2029. To treat it as "cash on hand" today is a fiscal fantasy. No party has refuted this assertion.

The Intervenor-Plaintiffs propose to triple revenue from outside-city customers. This path, however, ignores the legal and administrative reality that implementing such changes typically requires 12 to 18 months of regulatory proceedings. JXN Water's system, at present, does not have 18 months; it needs financial help today.

Next, the Intervenors propose lowering Tier 1 thresholds (from 50 CCF to 10 or 30 CCF) to shift costs to higher-volume users. This Court finds that such a radical redesign of the billing system at a moment of extreme instability would be fiscally irresponsible. The utility requires a predictable revenue stream, not an experimental rate design based on "apples-to-oranges" comparisons [9].

## V.    DIRECTIVES FOR FUTURE MITIGATION AND BILLING REFORM

While the Court grants this 12% increase as a survival measure, it does so with the strict expectation that JXN Water must aggressively pursue needed structural reforms to prevent further financial strain on the rate-paying public.

---

[9] This Court has analyzed the Intervenor-Plaintiffs' most recent "amended" filings [Docs. 272-1, 272-2, and 272-3], submitted on February 11, 2026. The Intervenors argue that a "radical redesign" of the billing tiers (shifting from a 50 CCF threshold to 30 CCF) could generate similar revenue while shielding the smallest users. While the Intervenors characterize their data as more "credible," they fail to account for the implementation lag and the volatility that such a sudden shift in rate design would introduce to an already unstable utility.

While JXN Water maintains that the current "financial crisis" is largely an inheritance of the City's past mismanagement, JXN Water acknowledges that its transition to a self-sustaining utility could have been executed with greater foresight. JXN Water, for example, admits its inability timely to identify and bill thousands of water users who have historically avoided establishing accounts- a process JXN Water concedes is still its infancy.  JXN Water further acknowledges that its previous revenue projections were overly optimistic and failed fully to account for the "death spiral" of a shrinking ratepayer base and high delinquency rates. The ITPM also has admitted that the utility relied too heavily on the continuation of federal subsidies rather than aggressively implementing the structural billing reforms and "normalization" of accounts required to make the system stand on its own two feet before the federal lifeline was severed.

To that end, JXN Water is hereby **DIRECTED** to implement the following strategies to bolster long-term revenue and alleviate the need for future increases:

1. **Mandatory Account Normalization:** JXN Water shall expedite the identification and billing of the currently unmetered or unbilled properties. The Court requires a quarterly progress report detailing the number of new accounts added and the specific revenue impact of these additions.

2. **Establishment of an In-Person Service Site:** JXN Water is **ORDERED** to establish and maintain a physical, in-person site within the City of Jackson where residents can set up accounts, lodge formal complaints, and bring forth billing discrepancies for immediate review. Transparency and accessibility are non-negotiable mandates of this Court.

3. **Sample Bill for Public Education:** JXN Water is **DIRECTED** to create and make publicly available a "sample bill." This document must, line by line, detail the specifics of

9

the base rate, the volumetric charge, and the new 12% increase in plain language, ensuring a lay person can understand exactly what he or she is being charged for and why.

4. **Efficiency Audit of Tiered Billing:** JXN Water shall study the feasibility of the Intervenors' proposed tier threshold adjustments (shifting from 50 CCF to 30 CCF for the first tier) to be implemented once the system achieves initial solvency. The goal is to ascertain whether it is financially feasible and practical to move toward a more equitable consumption-based model that protects the most vulnerable, low-volume users.

5. **Enhanced Debt Collection:** JXN Water must continue to develop and refine a vigorous, fair collections strategy for the estimated $74 million in outstanding arrears, prioritizing large commercial delinquencies to recover lost capital. This Court requires JXN Water, in its Quarterly Reports, to provide a detailed accounting of recovery efforts specifically targeting commercial accounts, including the number of commercial shut-offs performed and the total dollar amount recovered from these high-volume users.

6. **Priority Project Adherence:** In executing these financial maneuvers, JXN Water must not lose sight of its priority projects as outlined by the United States Government and this Court. Financial solvency must be coupled with continuing the actual, physical repair and modernization of the infrastructure as mandated by the existing Consent Decrees.

## VI.    MANDATORY ACCOUNTABILITY AND FORENSIC REVIEW

Finally, this Court grants this increase out of operational necessity; it does not do so blindly. This Court has not yet reached a determination that JXN Water utilized the previous $150 million in federal subsidies with maximum efficiency or propriety. The City's concerns regarding "free spending" under the ITPM's tenure are noted,  land tabled for later inquiry.

Therefore, let this Order serve as notice: this Court will initiate its own independent, forensic analysis of JXN Water's historical expenditures. While the City of Jackson must keep the water flowing today, the public is entitled to a full accounting of how every dollar, federal and local, has been spent. Accountability is not being waived; it is being deferred only long enough to ensure the system does not collapse under the weight of its own debt.

**SO ORDERED this the 23rd day of February, 2026.**

**/s/HENRY T. WINGATE**
**UNITED STATES DISTRICT COURT JUDGE**