**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| and the STATE OF MISSISSIPPI, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 3:12-cv-790-HTW-LGI |
| | ) | (Clean Water Act Case) |
| v. | ) | |
| | ) | |
| | ) | |
| THE CITY OF JACKSON, MISSISSIPPI, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 3:22-cv-00686-HTW-LGI |
| | ) | (Safe Drinking Water Act Case) |
| v. | ) | |
| | ) | |
| | ) | |
| | ) | |
| THE CITY OF JACKSON, MISSISSIPPI, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**JXN WATER, INC.'S SUPPLEMENTAL BRIEF REGARDING**
**THE METRO JACKSON WATER AUTHORITY ACT (HB 1677)**

On April 30, 2026, this Court asked all interested parties to address whether HB 1677, the Metro Jackson Water Authority Act, encroaches upon (1) this Court's subject-matter jurisdiction; (2) the requirements of the existing Stipulated Orders; or (3) this Court's oversight and management of the City of Jackson's water and sewer systems. *See* Case No. 12-CV-790, Minute Entry for 4/30/2026 Status Conference. Additionally, this Court asked the parties to discuss whether the All Writs Act provides this Court with authority to enjoin collateral State legislation.

A review of the legislative intent, specific provisions of the Metro Jackson Water Authority Act, and the specific transition requirements included the Sewer Stipulated Order clarifies that the Authority created by the HB 1677 does not limit this Court's jurisdiction, oversight, or authority over Jackson's water and sewer systems. Significantly, the Authority Act specifies that the Metro Jackson Water Authority does not assume control over the systems until termination of the *managership*. That termination is not effective until this Court approves the Transition Plan. In other words, this Court's approval of the Transition Plan is a condition precedent to shifting control to the Authority. The Authority will obtain control over the systems only if this Court agrees to that arrangement in the Transition Plan.

Likewise, under the Authority Act, the newly-formed Authority does not assume control over the systems unless and until it has a lease arrangement with the City of Jackson. The Act requires only that the City and the Authority enter into negotiations for the lease, and if this Court is concerned with the terms of that arrangement, it could require the City and the Authority to report on those lease negotiations and potential terms. The Authority Act itself does not require the City to lease its assets on any particular terms.

Moreover, the Authority Act does not foreclose or affect this Court's current oversight or limit this Court's options for the transition away from the federal receivership. Instead, the Authority Act creates a non-mandatory option for such transition and specifically places its president under this Court's authority, as a deputy to this Court's Interim Third-Party Manager, until such time as the Authority assumes management and control over the systems. Accordingly, this Court need not enjoin HB 1677, the Authority, or the Board created by the Act.

To be sure, if this Court reaches the opposite conclusion, this Court likely possesses the power, under the All Writs Act, to issue a limited order restricting the Authority or particular

2

provisions of the Authority Act in order to protect this Court's jurisdiction or prevent frustration of the Stipulated Orders. However, this Court should not exercise that power here. The Authority Act does not conflict with this Court's jurisdiction, and any potential conflict is speculative. Because any such collateral attack or frustration of the Stipulated Orders depends on events that may never materialize, this Court should avoid issuing any injunction at this time, secure in the knowledge that it may do so later if the appropriate circumstances arise. Additionally, this Court benefits because, at such later date, the scop of any such injunction or order will be more targeted and on a firmer legal foundation.

**I.    Key provisions of H.B. 1677 (Metro Jackson Water Authority Act)**

The analysis must begin with the text of the Metro Jackson Water Authority Act (the "Authority Act"). The context for the Authority Act and the Legislature's intent in passing the Authority Act are provided by Section 2, the Legislature found:

(f) The November 29, 2022, order appointing the interim third-party manager for the public drinking water system does not have a termination date and ends only *when final judgment is entered by the court*;

(g) The September 30, 2023, order appointing the interim third-party manager for the sewer and wastewater system terminates on September 30, 2027, unless such order is earlier terminated or extended by the court;

(h) Before the termination of the orders by the court, the system must be stable, the financial plan sustainable, and *the transition plan approved* to transition the system to post-interim third-party managership operations;

(i) The creation and organization of a structure for future governance requires legislation for it to continue in perpetuity beyond the eventual end of the interim third-party manager's work and related federal court orders; and

(j) The creation and organization of a structure for future governance prior to the date of the conclusion of the interim third-party manager's work

3

> will allow for an orderly transition to ensure minimal disruption in water and wastewater services.

Miss. Code § ---, Laws 2026, H.B. No. 1677, §§ 2(1)(f) – (j) (emphasis added). These Legislative findings make plain that the Legislature understood that the Stipulated Orders can only be terminated by the Court, that such termination required Court approval of the transition plan, and that creation of a State-authorized governance structure would be one future option, structured to allow an orderly transition from the Interim Third-Party Manager.

Next, the Authority Act provides the Legislative intent. In creating the Metro Jackson Water Authority, the Legislature expressly intended to permit the Authority and the City to enter into a lease for system assets. Further, "upon lease of such assets *and termination of the interim third-party managership by the court*, or an earlier date as ordered by the court," the Authority would take management and control of those assets. *Id.*, § 2(2)(a) (emphasis added). The Authority Act also authorizes the Authority to issue bonds to refinance the systems' debts. *See id.*, § 2(2)(d).

> In creating the Metro Jackson Water Authority, the Authority Act states,
>
> (4) The authority shall assume management and control over the water and wastewater systems *on the date of termination of the interim third-party managership by the court*, or with respect to any specific functions on an earlier date *as ordered by the court*. If the termination date is not the same for all systems or functions, the authority shall assume management and control over the system or functions for which the interim third-party managership is terminated on the termination date for that system or function.

*Id.*, § 4(4) (emphasis added). The second part of this section appears to recognize that the Sewer Stipulated Order provides a date certain for termination, September 30, 2027, unless extended by motion of the United States approved by this Court. *See* Case No. 12-CV-790, Dkt. 72, at 38–39, § VIII Termination, ¶ 28(d). The Authority Act directs that all federal or other funds provided in connection with these cases and overseen by the Court "shall be spent according to the direction

4

of the ITPM until the authority assumes management and control of the water and wastewater systems." Laws 2026, H.B. No. 1677, § 4(6). In other words, the Authority has no power of management or control of the Systems nor any right to direct federal or State funds overseen by this Court and the ITPM.

The Authority Act then outlines how the Board will operate. The Authority Act explicitly provides for public accountability for the Board by subjecting it to the Open Meetings Act and the Mississippi Public Records Act. *See id.*, §§ 5(5) – (6). Prior to assuming management and control of the systems, the Authority Act requires the Board to "coordinate with the ITPM in order to provide the best opportunity for minimal disruptions in service and maximum ease of transition after the ITPM has concluded his work in overseeing and operating the water system." *Id.*, § 5(9).

Following appointment of a majority of the Board, the Authority is required to "commence negotiations with the [City of Jackson] to enter into an agreement . . . for the transfer by lease to the Authority . . . the water system or wastewater system, or both." *Id.*, § 6(1). However, the Authority Act does not *require* the City or the Authority to enter a lease. Any lease between the two will be "for such term and upon such conditions as may be deemed desirable." *Id.* Further, the Legislature explicitly intended that lease as a precondition for the Authority assuming any management or control of the Water or Sewer System. *See id.*, § 2(2)(a).

The Authority Act requires the Authority, through the Board, to "consult with the court to appoint a president within thirty (30) days following the appointment of a majority of its board." *Id.*, § 7(1). The Authority Act explains, "The president shall serve as deputy to the ITPM *until the court enters final judgment*, at which time the president shall manage the daily affairs of the authority." *Id.* (emphasis added). Prior to the Authority assuming management and control of the

5

systems, like the Board itself, the president selected by the Board in consultation with this Court must "coordinate with the ITPM in order to provide the best opportunity for minimal disruption in service and maximum ease of transition after the ITPM has concluded its work in overseeing and operating the water system and wastewater system." *Id.*, § 7(2).

Lastly, the Authority Act provides certain significant benefits that can be provided *only* by State legislation. Those benefits include: (1) authorizing the Mississippi Department of Environmental Quality and/or the Local Governments and Rural Water Systems Improvement Board to lend to the Metro Water Authority [*id.*, § 2(2) (b) – (c)]; and (2) authorizing the Authority to write off uncollectible revenues bill prior to November 29, 2022 or other revenues deemed uncollectible after three years of collection efforts [*id.*, § 8(1)(dd)]. The latter provision also provides a financial benefit to many of Jackson's poorest residents.

## II.    Key provisions of the Stipulated Orders

In addition to the text of the statute, the precise requirements of the Stipulated Orders, as amended, must be considered. As the City correctly noted, the Interim Stipulated Order for the Water System ("Water SO", included with the City's Motion as Exhibit 1) does not include detailed provisions for the system's transition. Those are found only in the Stipulated Order for the Sewer System ("Sewer SO", included with the City's Motion as Exhibit 2). However, for purposes of this briefing, JXN Water assumes the transition provisions of the Sewer SO will apply to both Systems.

Under the Sewer SO, the ITPM is required to "develop and submit to the Parties an ITPM Transition Plan" that provides for steps to "transition operation, maintenance, management, and control" of the Systems, including transition of the ITPM's processes, procedures, contracts, staff, and accounts. *See* City Exhibit 2, at ¶ 5(z). The Parties are identified as the City, MDEQ (and MSDH under the Water SO), and the United States. *See id.*, at ¶ 2; City Exhibit 1, Dkt. 6, at

6

¶ 3. The ITPM is required to submit the Transition Plan no later than October 5, 2026. *See* City Exhibit 2, at ¶ 5(z)(ii). From submission, the Parties have 30 days to review and comment, and the ITPM must submit the Transition Plan for Court approval 15 days after receiving comments from all Parties. *Id.* Any Party may submit objections to the Transition Plan within 30 days of the ITPM's submission to the Court. *Id.*

Both Stipulated Orders explicitly name Edward "Ted" Henifin as the ITPM. *See* City Exhibit 1, at ¶ 4, as amended by Case No. 22-CV-686, Dkt. 23; City Exhibit 2, at ¶ 3. Both Stipulated Orders include similar provisions for removal or replacement of the ITPM, *i.e.*, Ted Henifin. Such removal or replacement requires a motion by a Party demonstrating good cause or a notice of withdrawal by Mr. Henifin. *See, e.g.*, City Exhibit 1, at ¶ 10(a) – (b). In such case, the Parties must propose at least one ITPM replacement candidate, and "[t]he Court shall select and appoint the replacement ITPM from the candidates provided by the Parties." *Id.*, at ¶ 10(c); *see also* City Exhibit 2, at ¶ 9(d). In other words, the Court makes the selection of the replacement ITPM, but the Court is limited to the Parties' proposed candidates.

This removal or replacement process is distinct from termination of the interim third-party *managership* as a whole. The Sewer SO explains that any Party may move to terminate the entire managership, which would result in the City resuming operation and control of the Sewer System. *See* City Exhibit 2, at ¶ 10(a). That termination motion may be granted only on a showing that (1) the ITPM has substantially complied with the Stipulated Order *and* (2) the City is capable of operating and controlling the System and capable of completing the priority projects on the set timeline. *Id.* Even then, the termination of the managership is not effective until the Court approves that Transition Plan, as discussed above. *Id.*, at ¶ 10(b). In other words, approval of the Transition Plan is a condition precedent to terminating the managership.

Finally, each Stipulated Order provides separate provisions for termination of the Stipulated Order itself. Under the Water SO, the Order terminates "when a final judgment is entered by the Court." City Exhibit 1, at ¶ 24. Under the Sewer SO, the Order terminates on October 5, 2027, unless extended by the Court, upon entry of a new Consent Decree, by motion of a Party after the ITPM substantially completes the priority projects, or by motion of the United States. *See* City Exhibit 2, at ¶ 28. For any of the latter three options, the termination of the Stipulated Order is only effective after the Court has approved the Transition Plan. *See id.*, at ¶ 33. Pursuant to the language of both Stipulated Orders, termination of the managership or termination of the Order itself requires either Court approval of the Transition Plan, entry of final judgment, or entry of a new Consent Decree.

**III.    The Metro Jackson Water Authority Act does not conflict with this Court's jurisdiction or the provisions of the Stipulated Orders.**

The text of the Authority Act makes clear that the Legislature was aware that termination of the Stipulated Orders required, *inter alia*, Court approval of a Transition Plan. *See* Laws 2026, H.B. No. 1677, § 2(1)(h) ("Before the termination of the orders by the court, . . . the transition plan [must be] approved"). This Legislative finding conforms to the Stipulated Orders, which require either final judgment or approval of the Transition Plan before any termination is effective. *See* City Exhibit 1, at ¶ 24; City Exhibit 2, at ¶ 33 ("termination of this Stipulated Order shall not be effective until . . . the Court has approved the ITPM Transition Plan"). This section sets the baseline expectation of the Authority Act: this Court will approve the Transition Plan before the Orders are terminated and the Authority takes management and control. The Authority Act does not impair the Transition Plan process; instead, it provides one option for future management and control of the System.

Other provisions, which outline when the Authority would assume management and control, operate under the same assumption that the Court will have approved a Transition Plan. Section 4 of the Authority Act states that the Authority will assume management and control "on the date of termination of the interim third-party *managership*." Laws 2026, H.B. No. 1677, § 4(4) (emphasis added). As noted above, termination of the managership is not the same as removal of the ITPM; moreover, to become effective, termination of the managership requires this Court's approval of the Transition Plan. *See* City Exhibit 2, at ¶ 10(b).

Based on the incorporation of this Court's approval of the Transition Plan prior to the Authority assuming management and control of the System, there is no need for this Court to enjoin the Authority Act. It stands to reason that the Authority cannot assume future governance of the System unless it is approved by this Court in the Transition Plan or until after this Court has entered final judgment. The Authority does not interfere with this Court's oversight of the System or the Stipulated Orders.

Later, the Authority Act specifies that the Authority's president will be selected in consultation between the Board and the Court. *See* Laws 2026, H.B. No. 1677, § 7(1). That section also makes clear that the president will serve as "deputy to the ITPM until the court enters final judgment." *Id.* That provision serves three purposes. First, it ensures this Court has a role in selecting the Authority's president, in the event the Authority later assumes control of the System. Second, it places the selected president under the ITPM, which likely makes the president an ITPM Agent and, therefore, subject to the oversight and control of this Court for as long as the managership continues. Third, the provision ties the "deputy to the ITPM" role to termination of the Water SO, which occurs on entry of final judgment. Presumably, the president also could begin managing the affairs of the Authority by order of this Court, if the Authority has

9

assumed management and control of the Systems. As discussed above, that does not happen until "termination of the interim third-party *managership*," which does not take effect until this Court has approved the Transition Plan. Although the City takes issue with appointment of a "deputy to the ITPM," [*see* Dkt. 285, at 7, ¶ 16], the Court presently does not oversee or micromanage the ITPM's hiring. The ITPM will work with any president selected by the Board and the Court, and that individual is subject to the same Court oversight as other ITPM Agents.

None of these provisions conflict with this Court's jurisdiction, its power and authority to oversee the Systems, or the terms of the Stipulated Order.

**IV.    The Metro Jackson Water Authority Act is not mandatory on the City or the Court.**

The City claims, "The new State law requires the City to 'transfer by lease' the water system to the new State-created authority." Dkt. 285, at 8, ¶ 21. However, the Authority Act contains no such requirement. It requires the City and the Authority to "*commence negotiations*" to lease the Systems on terms and conditions "as may be deemed desirable by the city and the authority." Laws 2026, H.B. No. 1677, § 6(1). Contrary to the City's claim, the City is not required to enter a lease. It is required to negotiate with the Authority.

Further, the Authority Act requires both (1) a lease between the City and Authority and (2) "termination of the interim third-party managership" before the Authority will assume management and control of the Systems. *Id.*, § 2(2)(a). As discussed repeatedly above, the termination of the managership is only effective *after* this Court has approved the Transition Plan. For the Authority to assume management and control, it first needs to reach a lease agreement with the City; then, the Court must approve a Transition Plan and end the interim third-party managership.

In addition, this Court has the power to require the City to provide updates to the Court regarding lease negotiations or even to require Court approval of any terms prior to entering a

lease arrangement. Such a targeted order would clarify that both the City and the Authority must have Court approval before the lease becomes effective, which provides a second layer of Court involvement before the Authority can assume management or control. Additionally, this type of narrow order shows deference to the State Legislature's preferences and powers while eliminating any risk of interference with or avoidance of this Court's oversight.

**V.    Without a current conflict with this Court's jurisdiction or an irreparable harm to the City, this Court should not issue injunctive relief.**

The City has asked this Court to enjoin implementation of the Authority Act, but it has not met its burden on all elements necessary for injunctive relief. As this Court is aware, "a preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion." *AbbVie, Inc. v. Fitch*, 152 F.4th 635, 642 (5th Cir. 2025). The movant must clearly establish:

> (1) substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Id.* "The third and fourth factors 'merge when the government is a party.'" *Id.* (citing *Mock v. Garland*, 75 F.4th 563, 577 (5th Cir. 2023)). However, the City has failed to establish clearly that the Authority Act conflicts with this Court's jurisdiction, the provisions of the Stipulated Orders, or this Court's authority and management over the Systems. Because the Authority Act is contingent on the City entering a non-mandatory lease agreement, any claim of harm by the City is pure speculation. For irreparable harm, however, "speculative injury is not sufficient." *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 585 (5th Cir. 2013). Here, the City has failed both the first and second prong. This Court should deny the City's Motion. At

11

most, this Court should limit any relief to a targeted order, such as a requirement of Court approval of lease terms between the City and the Authority.

## VI. The Metro Jackson Water Authority Act provides benefits that cannot be provided by the City or an authority created by ordinance.

Instead of conflicting with this Court's jurisdiction and oversight, the Authority Act provides this Court and the ITPM with an option for transition. Moreover, the Legislature provided certain benefits that the State alone can offer. For example, the State authorized both the Water Systems Improvement Board and MDEQ to loan funds required in connection with the Authority's acquisition of the leasehold in the Water and Sewer Systems, respectively. *See* Laws 2026, H.B. No. 1677, § 2(2)(b) – (c). That is a benefit the City cannot convey.

Additionally, the Authority Act permits the Authority to write off uncollectible revenue billed prior to November 29, 2022 and allows future write offs for bills deemed uncollectible after three years of collection efforts. *See id.*, § 8(1)(dd). That write off provision would provide a substantial benefit to the utility by cleaning up the books, but it may also provide a benefit to poorer residents with long-term debt that they cannot afford. Again, that is a benefit the City cannot provide.

The State Legislature has made clear its preference for transition of the Systems, and it has provided an Authority with powers that the City cannot convey. The Authority is a good transition option for this Court's and the ITPM's consideration.

## VII. Any conflict between the Authority Act and this Court's jurisdiction or the Stipulated Orders is speculative and should be addressed when it arises.

If this Court determines that some portion of the Authority Act conflicts with the Court's jurisdiction or frustrates the purposes of the Stipulated Orders, the Court almost certainly has the power and authority to issue any order, including an injunction, to safeguard its jurisdiction and

prevent frustration of its orders. Even then, the Court should not issue the requested injunction today because any potential conflict is speculative and can be addressed if it occurs in the future.

This Court asked the Parties to address its power under the All Writs Act. Under that Act, "all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of the law." 28 U.S.C. § 1651. The Supreme Court "has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *United States v. New York Tel. Co.*, 434 U.S. 159, 172 (1977). Further, under the All Writs Act, the Court is not limited to injunctions against the Parties. "The power conferred by the Act extends . . . to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate implementation of a court order . . . and encompasses even those who have not taken any affirmative action to hinder justice." *Id.* at 174.

Where, as here, the court has proper jurisdiction over the case, it also has "subject matter jurisdiction to issue an injunction to preserve and protect its jurisdiction." *Newby v. Enron Corp.*, 302 F.3d 295, 300–01 (5th Cir. 2002). However, "[c]ourts have read this language [of the All Writs Act] narrowly, finding a threat to the court's jurisdiction only where a state proceeding threatened to dispose of property that formed the basis for federal in rem jurisdiction or where the state proceeding threatened the continuing superintendence by a federal court." *Id.*; *see also Singh v. Duane Morris, LLP*, 538 F.3d 334, 341 (5th Cir. 2008) ("We construe the [All Writs Act] narrowly and apply it only under 'such extraordinary circumstances . . . that indisputably *demand* such a course of action as absolutely necessary to vouchsafe the central integrity of the federal court judgment.'") (quoting *Texas v. Real Parties in Interest*, 259 F.3d 387, 395 (5th Cir. 2001)).

Similarly, courts in this district have explained "that the All Writs Act may be utilized to enjoin state court proceedings when those actions threaten to disrupt earlier orders of the Court." *Caldwell v. Am. Home Prods. Corp.*, 210 F. Supp. 2d 809, 811–12 (S.D. Miss. 2002). Beyond threatening to disrupt earlier orders, "federal injunctive relief may be necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case." *Zacarias v. Stanford Int'l Bank, Ltd.*, 945 F.3d 883, 902.

Based on this statute and the case law, the Court certainly has the power to enjoin any state-court proceeding affecting its jurisdiction or oversight. Even reading the language of the All Writs Act narrowly, a threat to federal court jurisdiction seemingly could come from State *legislative action* that threatened continuing receivership oversight by the federal court or threatened to disrupt earlier orders by the receivership court. In that case, the Court could issue an injunction to preserve the Court's jurisdiction. Any such injunction, however, should be a "narrowly tailored order." *Newby*, 302 F.3d at 301; *see also United States v. Mississippi*, 82 F.4th 387, 398–99 (5th Cir. 2023) ("Injunctions must be narrowly tailored . . . to address the specific relief sought.").

Just because the Court has the power to issue such an order does not mean that it should do so. This perceived dispute between the Authority Act and this Court's jurisdiction, or its prior Stipulated Orders, is purely speculative. In fact, any alleged conflict is a mere possibility that may arise at some point in the future. As discussed above, the Authority Act does not purport to transfer management and control of the Systems until this Court terminates the managership or enters final judgment, which is a termination of the Stipulated Orders. These actions *require* the Court's approval of a Transition Plan prior to taking effect. Indeed, in its legislative findings, the

14

Legislature assumed that the Court *would* approve a Transition Plan. With that understanding, the purpose of the Authority Act is not to foreclose that Court action but to provide a State-endorsed option for transition. Further, nothing in the Authority Act impairs JXN Water's ongoing work. The Authority could operate in parallel until such time that it, with Court approval, assumes management and control of the Systems.

If, in the future, the Court approved a different governmental structure to take management and control of the Systems, the Authority Act may come into conflict with that plan for transition of the Systems, and this Court could take action at that time. This is the same scenario presented in *Texas v. Real Parties in Interest*. There, a state court investigative proceeding created potential for conflict with federal court oversight over the tobacco settlement agreement. *See* 259 F.3d 387 (5th Cir. 2001). In discussing the federal court's authority under the All Writs Act, the appellate court explained:

> This pending state court [investigatory] action . . . ultimately may or may not pose an actual threat to the federal tobacco settlement. The investigation could lead to no further action, or it could result in a cause of action not contemplated or covered by the settlement agreement; or, indeed, it may lead to the institution of a cause of action for which the invocation of, at least, the injunctive powers of the All Writs Act would be timely and appropriate. . . . Private Counsel's claim that such a threat exists is premature. We recognize that if, at some point in the future, the State attempts explicitly to upset provisions of the settlement agreement in state court, circumstances may well dictate that the proceeding be enjoined.

*Texas*, 259 F.3d at 394–95. The same is true here.

At this time, the City's claim of a conflict is premature, "abstract[, and] hypothetical." *Lower Colo. River Auth. v. Papalote Creek II, LLC*, 858 F.3d 916, 924 (5th Cir. 2017); *see also Shields v. Norton*, 289 F.3d 832, 835 (5th Cir. 2002) ("We look to the practical likelihood that a controversy will become real."); *Orix Credit All., Inc. v. Wolfe*, 212 F.3d 891, 897 (5th Cir. 2000) ("focusing on whether an injury that has not yet occurred is sufficiently likely to happen to

justify judicial intervention").[1]Here, there is no risk of harm to the City through engaging in negotiations. Moreover, nothing in the Authority Act affects the ITPM's responsibility or authority to submit a Transition Plan to the Parties and the Court as contemplated in Paragraph 5(z) of the Sewer SO, and under that same Order, the Court cannot terminate the managership or the Order itself until the Court ahs approved the Transition Plan.

At this time, none of the claimed injuries or alleged conflicts are real or concrete.  This Court should not act under the narrowly-read All Writs Act to broadly enjoin implementation of the Metro Jackson Water Authority Act under these circumstances. JXN Water respectfully asks the Court to let this play out. Let the Board convene. Let the Authority engage the City in lease negotiations, and consult with the Board and the ITPM on a president. Those steps will provide greater insight for the ITPM to craft a Transition Plan for this Court's approval. "[I]f, at some point in the future, the [Authority] attempts explicitly to upset provisions of the [Stipulated Order or this Court's oversight], circumstances may well dictate that the [Authority] be enjoined." *Texas*, 259 F.3d at 395. For now, this Court should deny the City's Motion.

## VIII.   Conclusion

For all the reasons discussed above, the Metro Jackson Water Authority Act does not impair this Court's jurisdiction or its continued oversight and management of the Water and Sewer Systems. Likewise, the Authority Act does not conflict with this Court's prior orders. Even if the Court finds some potential conflict between the Authority Act and the Transition Plan process established in the Sewer SO, this Court should withhold issuing any injunction until that remote conflict materializes. Accordingly, the City's Motion should be denied.

---

[1] Although these cases deal with the ripeness doctrine, this inquiry and analysis crystalizes the problem with issuing an injunction to prevent potential conflict and shows how courts deal with this problem in another context.

DATE: May 11, 2026

Respectfully submitted,


/s/ *Mitch McGuffey*
Charles Mitchell McGuffey (MSB #104986)
Malissa Wilson (MSB # 100751)
FORMAN WATKINS & KRUTZ LLP
210 East Capitol Street, Suite 2200
Jackson, MS 39201
Telephone: (601) 690-8600
mitch.mcguffey@formanwatkins.com
malissa.wilson@formanwatkins.com

F. Paul Calamita (admitted *pro hac vice*)
AQUALAW, PLC
6 South 5th Street
Richmond, VA 23219
Telephone: (804) 716-9021
paul@aqualaw.com

*Counsel for the ITPM & JXN Water, Inc.*

17